## U.S. COURT OF APPEALS FOR THE D.C. CIRCUIT

—————————————————————x
SPIRIT AIRLINES, INC, Petitioner,       :
v.                                      :
U.S. DEPARTMENT OF TRANSPORTATION       :
       Respondent.                        :
—————————————————————x
ALLEGIANT AIR, LLC, Petitioner,         :
v.                                      :
U.S. DEPARTMENT OF TRANSPORTATION       :
       Respondent.                        :
—————————————————————x

Consolidated Docket Nos.
11-1219 & 11-1222

**MOTION FOR STAY**

In 1978, Congress enacted the Airline Deregulation Act,[1] which eliminated government authority to dictate airline routes, prices and services. Congress directed the Secretary of Transportation ("DOT") to instead place maximum reliance on market forces and competition to drive efficiency, innovation and low prices. Pursuant to Federal Rules of Appellate Procedure 18 and 27 and the corresponding D.C. Circuit Rules, Petitioners Spirit Airlines, Inc. ("Spirit") and Allegiant Air, LLC ("Allegiant") hereby move for an immediate stay pending judicial review of four rules (the "Rules") in *Enhancing Airline Passenger Protections*, 76 Fed. Reg. 23,110 (Apr. 25, 2011) (Ex. 9) (the "Final Rule").[2]

A stay is urgently needed to prevent substantial business harm and uncertainty associated with efforts to comply with the Rules. Real and perceived

---

[1] Pub. L. No. 95-504, 92 Stat. 1705 (1978) (codified at 49 U.S.C. § 40101 *et. seq.*).

[2] On July 6, Petitioners asked DOT for a stay pending judicial review (Exhibit 1). On July 20, DOT extended the effective date of the Final Rule until January 24, 2012, but denied Petitioners' request (Ex. 2). The short extension issued by DOT does not obviate Petitioners' need for a judicial stay.

fare increases caused by the Rules will undermine Petitioners' longstanding marketing programs and immediately harm their primary competitive advantage—low fares. Higher fares will reduce demand, forcing service cuts in marginal markets (typically, smaller communities) and delaying expansion. For Spirit, this could also mean aircraft delivery delays/cancellations and job cuts. Higher fares and less service will cause irreparable harm to Petitioners' customer relationships and hurt the public who will lose low-fare options in a challenging economy.

Petitioners are likely to succeed on the merits because the Rules clearly violate the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551-559, 701-706 (2006). The Rules interfere with airline pricing and services and re-regulate airline business practices in ways that diminish competition, weaken smaller carriers, stifle innovation and harm service to small communities, thus violating the Deregulation Act's clear public interest mandates. In addition, one Rule violates the First Amendment, and all the Rules are arbitrary and capricious because they are unsupported by the record and prohibit longstanding, DOT-approved practices that are not unfair or deceptive.

## **FACTS**

Petitioners are low-cost carriers whose business models reflect the variety and innovation Congress wanted to achieve with the Deregulation Act. Both carriers have relied on longstanding DOT policies in structuring their businesses,

2

generating strong customer good will and brand loyalty.

**Spirit Airlines** A core feature of Spirit's innovative ultra-low cost carrier business model is the ability to advertise base fares and separately list government taxes in a fully transparent way, consistent with DOT policy dating back more than 25 years. Baldanza Decl. ¶ 10 (Ex. 3). Spirit focuses on price-sensitive consumers, many of whom cannot travel but for very low fares. *Id.* ¶ 6. As with virtually all other commerce, including hotels and cellular phones, customers understand that government taxes are added to the advertised fare. Spirit has among the lowest operating costs in the industry, which enables it to offer what are generally the lowest fares in the markets it serves. *Id.* ¶ 5. When Spirit enters a market, prices drop and demand rises significantly. *Id.* Advertising base fares, selling nonrefundable tickets and being able to adjust prices for ancillary services **before** they are purchased are critical to Spirit's business. *See id.* ¶¶ 10, 17-19.

**Allegiant Air** Allegiant is a full-service travel company whose unique business model makes it possible for travelers from small communities throughout the United States to reach major destinations easily, at low cost. Gallagher Decl. ¶ 2 (Ex. 4). Allegiant now serves 63 small communities. *Id.* ¶ 3. On all routes, Allegiant offers low-cost, nonstop, large-jet aircraft service, which can be purchased on a stand-alone basis or bundled with hotel accommodations and other travel-related services. *Id.* ¶ 4. Base fare advertising has been key to Allegiant's

3

marketing since it commenced scheduled service in 2000. *Id.* ¶ 6.

**The Rules** (1) New 14 C.F.R. § 399.84 (the "Fare Advertising Rule") reverses DOT's decades-old enforcement policy permitting carriers to advertise a fare that includes federal excise tax (the "base fare") but **separately list** other government taxes. Under the *status quo*, airlines always display the total price before consumers make their purchases. The Fare Advertising Rule requires carriers to include and essentially bury all government taxes in the advertised price. It self-servingly imposes unconstitutional restrictions on how taxes may be disclosed. (2) New 14 C.F.R. § 259.5(b)(4) (the "Refund Rule") prohibits carriers from selling nonrefundable tickets and requires carriers to hold reservations at a quoted fare for 24 hours, or to provide a refund without penalty if the purchase is cancelled within 24 hours. (This requirement applies to tickets purchased seven days or more before a flight.) The Refund Rule regulates airline prices, harms low-fare carriers (which sell 90% of tickets more than seven days before a flight) and harms consumers by increasing ticket prices. Jenkins Decl. ¶ 21 (Ex. 5). (3) New 14 C.F.R. § 399.88(a) (the "Price Change Rule") prohibits carriers from adjusting prices for ancillary services when they are purchased after passengers buy their tickets, and from offering consumers the option to purchase a discounted flexible fare ticket, the price of which could increase or decrease in the future consistent with the price of fuel. *See* Gallagher Decl. ¶¶ 21, 22. (4) New 14 C.F.R. § 259.8

4

(the "Flight Status Notification Rule") requires carriers to give passengers notice, within 30 minutes, of a flight delay, cancellation or diversion even when premature notice might cause the flight to be further delayed or cancelled unnecessarily. *See* Jenkins Decl. ¶ 2(e).

**The Deregulation Act**: The Deregulation Act was intended to remove government's heavy hand from the air transportation market. Senator Edward M. Kennedy, a cosponsor of the legislation, said:

> [T]oday we shall have the opportunity to vote on legislation which will change the entire face of the domestic aviation regulatory process. We will have the chance to tell the American Public that we believe competition to be better than regulation, that business men and women can make better decisions about the conduct of their businesses than bureaucrats.[3]

Congress found it in the public interest to "place maximum reliance on competitive market forces," and to encourage

> an air transportation system relying on…competition – (A) to provide efficiency, innovation, and low prices; and (B) to decide on the variety and quality of, and determine prices for, air transportation services,

while "ensuring" that small communities "have access to affordable, regularly scheduled air service." 49 U.S.C. § 40101(a)(6), (12), (16). As noted in *Morales v. TWA*, 504 U.S. 374, 378 (1992):

---

[3] 124 Cong. Rec. S5860 (daily ed. Apr. 19, 1978).

In 1978, [ ] Congress, determining that "maximum reliance on competitive market forces" would best further "efficiency, innovation, and low prices" as well as "variety [and] quality . . . of air transportation services," enacted the Airline Deregulation Act.

DOT must consider and abide by these public interest mandates when issuing rules. It cannot simply proclaim that practices—which have been perfectly acceptable for decades and on which Petitioners, the industry and the public have relied extensively—are suddenly unfair or deceptive. New sections 259.5(b)(4) and 399.88(a) violate the Deregulation Act by directly affecting the prices and services offered by Petitioners and other airlines and should not be countenanced by this Court.

## ARGUMENT

The Court may issue a stay to prevent irreparable injury. 5 U.S.C. § 705. Relief is granted where (1) the moving party is likely to prevail on the merits; (2) the moving party will suffer irreparable injury if relief is withheld; (3) no substantial harm will come to other parties if relief is granted; and (4) a stay serves the public interest.[4]

## I.     PETITIONERS ARE LIKELY TO PREVAIL BECAUSE DOT VIOLATED THE ADMINISTRATIVE PROCEDURE ACT

Under the APA, the Court shall hold unlawful and set aside agency action that is contrary to constitutional right, in excess of statutory authority or

---

[4] *See CSX Transp., Inc. v. Williams*, 406 F.3d 667, 670 (D.C. Cir. 2005).

limitations, or without observance of procedure required by law. 5 U.S.C. § 706(2)(B)-(D). In addition, agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law is unlawful. 5 U.S.C. § 706(2)(A). For agency action to survive review, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"[5] DOT fact-finding must be supported by substantial evidence. 49 U.S.C. § 46110.

## A. Prohibitions on Base Fare Advertising Violate the First Amendment

Advertising base fares enables airlines to clearly show customers how much of the total price consists of government taxes. DOT Order 88-8-2 (Aug. 2, 1988) at 3 ("Not only is separate listing of [taxes] not deceptive but…passengers benefit from knowing how much they are paying government entities apart from the fares they pay the carriers."). This truthful, non-misleading commercial speech is protected by the First Amendment.[6] The Fare Advertising Rule restricts constitutionally protected speech by prohibiting base fare advertising repeatedly approved by DOT for more than 25 years.[7] Less than five years ago, DOT found

---

[5] *Motor Vehicle Mfr. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted).

[6] *Virginia State Pharmacy Bd. v. Virginia Citizens Consumer Council*, 425 U.S. 748, 772 (1976).

[7] *See* DOT Order 85-12-68 (Dec. 24, 1985); DOT Order 88-3-25 (Mar. 10, 1988);

that base fare advertising **"protects consumers, facilitates price comparison, fosters fare competition, and affords sellers an appropriate degree of freedom to innovate."**[8]

Because DOT will be unable ultimately to prove its new restriction on speech is constitutional, Petitioners' First Amendment claim is likely to succeed.[9] The restriction (1) does not directly advance a substantial government interest, and (2) is not narrowly tailored to serve that interest.[10] DOT's interpretation of its authority to regulate unfair and deceptive practices is not entitled to *Chevron* deference because the rule raises a serious constitutional question.[11]

DOT failed to establish that "the harms it recites are real and that its restriction will in fact alleviate them to a material degree."[12] As evidence that base fare advertising, which is fully consistent with standard practice in all U.S. commerce, allegedly harms consumers, DOT made only vague references to

---

DOT Order 88-8-2.

[8] *Price Advertising*, 71 Fed. Reg. 55,401 (Sept. 22, 2006) (withdrawing Notice of Proposed Rulemaking) (Ex. 8).

[9] *Edenfield v. Fane*, 507 U.S. 761, 770 (1993); *Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009).

[10] *Central Hudson Gas & Elec. Co. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980).

[11] *See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988).

[12] *Ibanez v. Fla. Dep't of Bus. & Prof'l Regulation*, 512 U.S. 136, 146 (1994) (citation omitted).

consumers feeling deceived without connecting the claims of confusion with the exclusion of government taxes from advertised fares. *See* 76 Fed. Reg. at 23,142-43. This "rote invocation of the words 'potentially misleading'" cannot be allowed to replace DOT's burden to show true harm.[13]

These claims do not prove any real harm to consumers. Comments made in the experimental online Regulation Room[14] responded to a factually inaccurate and misleading prompt, which solicited feedback on DOT consideration of "stricter advertising requirements to make sure that ticket buyers aren't fooled by…charges hidden in the fine print."[15] The prompt failed to explain that, for over 25 years, airlines have been required to clearly disclose government charges. It also failed to distinguish between mandatory charges **imposed by government** and other charges for ancillary services. Responses to this provocative, leading inquiry have no probative value.[16] Additionally, of the over 2,000 public comments filed in the

---

[13] *Id.* at 146 (citation omitted); *see also Pearson v. Shalala*, 164 F.3d 650, 656-57 (D.C. Cir. 1999) (conclusory assertions failed to justify restriction on speech).

[14] The Regulation Room is a **non-transparent extra-record attempt** by DOT to claim broad consumer support for the new rules. However, the Regulation Room "is not an official DOT Web site, and so participating in discussion on that site is not the same as commenting in the rulemaking docket." *Enhancing Airline Passenger Protections*, 75 Fed. Reg. 32,318, 32,319 (June 8, 2010) (Ex.10).

[15] Regulation Room, Airline Passenger Rights "Pricing & Advertising," http://regulationroom.org/airline-passenger-rights/fare-advertising-and-practices/#1 (last visited July 22, 2011).

[16] *Cf. Byrum*, 566 F.3d at 447 (rejecting proffered evidence of deception where

docket, approximately 1,400 comments concerned peanut allergies, showing a lack of consumer interest in the Rules. Six individual comments suggested that existing airline price displays are confusing or misleading, but only two specifically pointed to the exclusion of taxes as the source of their frustration. No comments discussed actual episodes of being deceived. Given that almost 800 million passengers fly annually in the United States,[17] these meager numbers fall short of substantial evidence of consumer harm.

Furthermore, the new policy is not narrowly tailored. "Narrow tailoring means the government's [ ] restriction must signify a careful calculation of the costs and benefits associated with the burden on speech."[18] The record contains no indication DOT conducted any calculation.[19] Significantly, where **disclosure** can achieve the government's goals, it is constitutionally preferable to suppressing speech.[20] The prior enforcement policy is preferable because, through the clear disclosure of government taxes, it protected consumers from potential confusion

---

survey consisted of irrelevant questions and failed to include relevant information that would have produced responses with probative value).

[17] Final Regulatory Analysis, DOT-OST-2010-0140, 15 (Apr. 8, 2011) (Ex. 11).

[18] *U.S. West v. FCC*, 182 F.3d 1224, 1238 (10th Cir. 1999).

[19] Indeed, the Final Regulatory Analysis is fatally flawed both because no alternatives—including the *status quo*—were considered, and the cost-benefit analysis was based on unscientific and erroneous cost estimates. Jenkins Decl. at ¶¶ 6, 7-11.

[20] *Pearson*, 164 F.3d at 657 (citing *Bates v. State Bar of Arizona*, 433 U.S. 350, 376 (1977)).

while allowing airlines to advertise base fares.

### B. **In Violation of the Deregulation Act, Sections 259.5(b)(4) and 399.88(a) Directly Affect What Passengers Pay for Air Transportation**

The Deregulation Act explicitly eliminated government regulation of airline pricing and service.[21] Nonetheless, new § 259.5(b)(4) (requiring that tickets be refundable) and new § 399.88 (prohibiting airlines from raising prices for an ancillary services **before** it is purchased) directly affect airline prices and services and therefore violate the Deregulation Act. Because DOT lacks statutory authority to regulate airline pricing, these provisions also violate the APA.

### C. **Congress Authorized DOT to Prohibit Only Practices that are Unfair or Deceptive; The Final Rule Far Exceeds that Statutory Limitation**

DOT has authority to investigate and prevent "unfair or deceptive practice or an unfair method of competition in air transportation or the sale of air transportation." 49 U.S.C. § 41712. DOT, however, does not have *carte blanche* to regulate any and every facet of a carrier's interaction with its customers. For a practice to be deceptive, it must be a material representation, omission or practice that is likely to mislead consumers acting reasonably under the circumstances.[22]

---

[21] § 40(a), 92 Stat. at 1744-45 (setting forth the Deregulation Act's "sunset provisions," which terminated government authority over airline pricing).

[22] *Cliffdale Assoc., Inc.*, 103 F.T.C. 110 (1984), 1984 FTC LEXIS 71 at *104 (interpreting § 5 of the Federal Trade Commission Act, the model for § 41712).

DOT's limitless and unlawful interpretation of its authority under 49 U.S.C. § 41712 is not entitled to deference under *Chevron*.[23]

DOT failed to establish unfairness or deception necessitating the Rules. Accordingly, it cannot use § 41712 to undermine the Deregulation Act's broad public interest mandate to encourage, develop and maintain "an air transportation system **relying on actual and potential competition** to provide efficiency, innovation, and low prices, and to decide on the variety and quality of, and determine prices for, air transportation services." 49 U.S.C.§ 40101(a)(12) (emphasis added).

### D. The Rules are Arbitrary and Capricious Because DOT Failed to Provide an Adequate Basis and Explanation for its Choices

#### 1. DOT Failed to Justify Its Departure from Its Longstanding Fare Advertising Policy

Petitioners and the public have relied for more than 25 years on the current policy permitting airlines to display base fares and simultaneously make clear disclosure of additional government taxes a passenger must pay. This policy was established in 1985 (DOT Order 85-12-68 (Ex. 6)) and reaffirmed in 1988 (DOT Orders 88-3-25 (Ex. 7) and 88-8-2 (Ex. 7), specifically to prevent confusion (over the level of taxes) caused by requiring carriers to display a single price. As recently

---

[23] *Chevron v. Natural Res. Def. Council*, 467 U.S. 837, 842-843 (1984).

as 2006, as discussed *supra* at p. 7, DOT again forcefully reaffirmed the current policy and explicitly found the reasons for maintaining its longstanding practice "most compelling." 71 Fed. Reg. at 55,401.

Now, as discussed *supra* at pp. 8-10, DOT has proclaimed base fare advertising to be an unfair and deceptive practice, and has done so without sufficient evidence of consumer confusion. DOT's decision cannot survive the "arbitrary and capricious" test.

DOT has failed to provide the required reasoned explanation for departing from its longstanding interpretation that base fare advertising is not unfair or deceptive where the industry has relied substantially on this policy.[24] As emphasized above, Petitioners' current business models are premised and built on DOT's prior interpretation. Baldanza Decl. ¶ 10; Gallagher Decl. ¶ 6.

### 2. <u>DOT's Purported Findings of Unfair and Deceptive Practices Are Not Supported By Substantial Evidence</u>

The remaining Rules violate the APA because DOT's explanations for them are counter to the evidence before it.[25]

**<u>Refund Rule</u>** Selling nonrefundable tickets enables Petitioners to offer rock-

---

[24] *See FCC v. Fox Television Stations, Inc.*, 129 S. Ct. 1800, 1811 (2009) (explaining that a more detailed explanation is necessary when an agency's prior policy has engendered serious reliance interests and that ignoring the existence of reliance interests would be arbitrary or capricious) (citation omitted).

[25] *See State Farm*, 463 U.S. at 43.

bottom prices. Baldanza Decl. ¶ 17; Gallagher Decl. ¶ 18. It is key to their business models. Other carriers may hold reservations or give refunds. Petitioners, however, will need to raise fares by more than $3.00 a ticket, Jenkins Decl. ¶ 21, Baldanza Decl. ¶ 17, to cover real transactional costs imposed by new § 259.5(b)(4). This requirement raises fares, reduces competition and harms consumers. DOT's sole justification for this new price regulation is that it will be more convenient for passengers to shop for a fare. 76 Fed. Reg. at 23,129. Inconvenience, however, is not unfair or deceptive, and it does not amount to consumer confusion. DOT has failed to consider the impact the Refund Rule will have on fares of low-cost carriers like Spirit and Allegiant. Indeed, the record is devoid of any cost-benefit analysis on this point.

**Price Change Rule** Currently, carriers may adjust prices after a purchase if proper advance notice is provided. *See Notice of Terms of Contract of Carriage*, 47 Fed. Reg. 52,128 (Nov. 19, 1982) (codified at 14 C.F.R. § 253.7). DOT never explains why this longstanding 1982 rule is suddenly an unfair and deceptive practice that must be radically altered and restricted. DOT recognizes that in practice, airlines (such as Petitioners) have not raised ticket prices after purchase. 75 Fed. Reg. at 32,330. However, the Price Change Rule arbitrarily prevents adjustments for **subsequently purchased ancillary services** and stifles innovations such as Allegiant's potential flex-fare concept discussed *supra* at p. 4.

14

**Flight Status Rule** In the NPRM, DOT proposed to apply the Flight Status Notice Rule (§ 259.8) to larger carriers only. DOT said it "tentatively believes that the cost of requiring smaller carriers [such as Petitioners] to provide [flight status notifications] outweighs the benefits to consumers in light of the fact that the operations of the [larger] carriers account for nearly 90% of all domestic passenger enplanements." 75 Fed. Reg. at 32,331. DOT abruptly reversed its tentative position, but provided no cost-benefit analysis to support the change.

## II.    PETITIONERS WILL SUFFER IRREPARABLE HARM

Irreparable harm exists where there is a clear and present need to prevent the harm,[26] and the harm is beyond remediation.[27] The stay is necessary to prevent immediate irreparable harm to Petitioner's business models, relationships with their customers and ability to grow and provide service to small communities. Irreparable harm is created by: infringement of First Amendment rights; interference with critical business decisions affecting pricing, service and competition; and unrecoverable direct compliance and opportunity costs that must be incurred in the near future to meet the new January 2012 compliance deadline. Delaying the effective date of the Rules does not mitigate the harm they will cause.

---

[26] *Wisconsin Gas Co. v. FERC,* 758 F.2d 669, 674 (D.C. Cir. 1985) (citation omitted).
[27] *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

## A. Denial of First Amendment Rights is Irreparable Harm

Petitioners rely on being able to effectively communicate their low base fares to attract price-conscious customers and increase demand in the markets they serve. Baldanza Decl. ¶¶ 7, 10; Gallagher Decl. ¶ 6. The Fare Advertising Rule prevents Petitioners from effectively advertising their fares and engaging in other protected commercial speech. Loss of First Amendment rights, for even minimal periods, constitutes irreparable injury.[28]

The Fare Advertising Rule artificially inflates Petitioners' low fares by forcing them to include all taxes in fare advertising. For a nonstop roundtrip ticket, taxes could easily exceed the base fare, sometimes by an amount that is a multiple of the ultra-low base fares offered to Spirit's $9 Fare Club members.[29] Baldanza Decl. ¶ 16. **No customer will look at the tax and fee explanation, now required *by DOT* to be obscured in small print away from the displayed "full fare."** 76 Fed. Reg. at 23,143. The value of lost sales and damage to brand loyalty this will

---

[28] *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Cmty. Commc'n, Inc. v. City of Boulder*, 660 F.2d 1370, 1376 (10th Cir. 1981) ("[t]o the extent that First Amendment rights are infringed, irreparable injury is presumed") (citation omitted).

[29] Relying on longstanding DOT policy, Spirit has invested heavily in this program, which provides members with access to unadvertised fares of $9 or less. Membership costs $59.95 annually, and this revenue helps to reduce base fares. Baldanza Decl. ¶ 9.

cause is incalculable and thus irreparable.[30] Given Petitioners' low fares, forcing them to include taxes in advertised prices will lead consumers to believe that fares on low-fare airlines have increased by a greater percentage than on higher fare airlines. The Fare Advertising Rule will suppress consumer understanding of government charges and constitutes a serious First Amendment violation.

### B. Creation of Business Uncertainty Causes Irreparable Harm

Compliance with the Rules will directly cause perceived and actual fare increases, which will force Petitioners to make immediate business decisions that will reduce service and harm their competitive position. Petitioners will need to set in motion now cutbacks in service and growth that will not take effect until the Rules become effective. Fleet utilization decisions and employment decisions must be made now, months or even years in advance. Future aircraft deliveries may be postponed or cancelled. Baldanza Decl. ¶ 12. Petitioners will be harmed by lost business and loss of customer good will, and the public (particularly customers in smaller markets and lower income customers who cannot travel but for low fares) will be harmed by lost service and higher fares. Baldanza Decl. ¶¶ 13-14; Gallagher Decl. ¶¶ 11-13, 15.

Unless the Rules are stayed, the harm to Petitioners' business models and

---

[30] *See CSX Transp. Co.*, 406 F.3d at 673 (finding irreparable harm where damages would be difficult to ascertain).

17

brand reputations will be impossible to undo. Low fares require cutting costs wherever possible. *See* Baldanza Decl. ¶ 5; *see also* Jenkins Decl. ¶ 13. Interfering with the *status quo* will result in higher fares and diminish Petitioners' primary competitive advantage—their price differential versus legacy air carriers. Baldanza Decl. ¶ 14-16; *see* Jenkins Decl. at ¶¶ 13, 21. Thus, they will not be able to compete as effectively, resulting in substantial revenue loss and reductions or outright cancellation of service to small communities.[31] Jenkins Decl. ¶ 17-18.

### C. Petitioners Will Suffer Imminent, Substantial and Unrecoverable Economic Loss In Unnecessary Compliance Expenditures

Serious, unrecoverable economic loss amounts to irreparable harm.[32] DOT relied on regulatory analyses that underestimated industry compliance costs for the Fare Advertising Rule alone by at least $150 million. Jenkins Decl. at 6 tbl.1. Petitioners estimate their combined compliance costs for this Rule alone will account for almost 39% of DOT's compliance estimate for the entire airline industry. Baldanza Decl. ¶ 24; Gallagher Decl. ¶ 16. Total direct compliance costs for Petitioners will exceed $7 million. Baldanza Decl. ¶ 24; Gallagher Decl.

---

[31] Since deregulation, there have been at least 129 airline startups and—as of 2003— 95 had gone out of business. William A. Jordan, Airline Entry Following U.S. Deregulation: The Definitive List of Startup Passenger Airlines, 1979-2003, Transportation Research Forum, 9-12 app. B (Mar. 2005), http://www.trforum.org /forum/downloads/2005_Deregulation_paper.pdf (Ex. 12).

[32] *Sterling Commercial Credit–Michigan LLC v. Phoenix Industries*, 2011 U.S. Dist. LEXIS 8334, *17-18 (D.D.C. 2011).

¶¶ 16, 19-20. Losses caused by delaying revenue generating information technology enhancements in order to comply with the new Rules, as well as long-term economic losses, are incalculable. Baldanza Decl. ¶¶ 24, 26-27; Gallagher Decl. ¶¶ 11, 15. There is no mechanism for Petitioners to recoup any of these costs if the Rules are ultimately vacated.[33]

## III.  DOT WILL NOT BE HARMED WHILE THE INDUSTRY AND THE PUBLIC WILL SUFFER IF THE STAY IS NOT GRANTED

A stay will not harm DOT. It merely preserves the decades-old *status quo*. Not staying the Rules, however, imposes excessive costs, which DOT did not consider or properly evaluate. The Fare Advertising Rule alone will cost the industry over $150 million, and total industry compliance costs for all of the rules under review will be $273.5 million. Jenkins Decl. at 6 tbl.1. A stay will ensure that innovation and low fares made possible by deregulation are not cut short prematurely by ill-considered and unsupported new rules. If no stay is granted, Petitioners will be forced to raise fares, which will harm the most price-sensitive travelers.

---

[33] *See Smoking Everywhere, Inc. v. FDA*, 680 F. Supp. 2d 62, 77 n.19 (D.D.C. 2010) (because party cannot recover damages from FDA, the economic injury it suffers is irreparable *per se*); *Nalco Co. v. EPA*, No. 11-760, 2011 WL 1882397, at *10 (D.D.C. May 18, 2011).

## IV.    **THE PUBLIC INTEREST STRONGLY FAVORS A STAY**

Compliance with the Deregulation Act's mandates and the First Amendment is strongly in the public interest, as is preventing government regulation of airline prices and ensuring that DOT rules are based on sufficient evidence and a realistic cost-benefit analysis. Failure to grant a stay will harm Petitioners, other airlines and the traveling public. If the Rules are ultimately set aside, the public will be confused by a sudden transformation in how fares have been marketed for more than 25 years as well as changes in other practices required by the Rules. Further confusion will result if airlines are able to revert to their time-honored prior practices. Avoiding consumer confusion and deception concerning government taxes will best serve the public interest. Given Petitioners' substantial likelihood of success, a stay will ensure these public interests are protected while judicial review proceeds. On balance, the public interest strongly favors granting a stay.

### **CONCLUSION**

The Rules should be stayed while this Court considers the Petitions for Review filed by Petitioners and (prospective Intervenor) Southwest/AirTran Airways. Neither DOT nor the public interest would be harmed if the Rules are stayed.

RESPECTFULLY SUBMITTED,

_____

Joanne W. Young
David M. Kirstein
KIRSTEIN & YOUNG, PLLC
1750 K Street, NW
Suite 200
Washington, D.C. 20006

*Counsel for Petitioners Spirit Airlines, Inc.*
*and Allegiant Air, LLC*

July 22, 2011

## CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2011, using the Appellate CM/ECF system, I electronically caused to be filed with the Clerk of the Court for the U.S. Court of Appeals for the District or Columbia Circuit the foregoing Motion for Stay on behalf of Petitioners Spirit Airlines and Allegiant Air.  Participants in the case are registered CM/ECF users and service will be accomplished by the Appellate CM/ECF system.

_____
David M. Kirstein

Exhibit 1



July 6, 2011

*By FedEx and Electronic Mail*

The Honorable Ray LaHood
Secretary of Transportation
U.S. Department of Transportation
1200 New Jersey Avenue SE
Washington, DC 20590

Re:     Request to Postpone, or Stay, the Effective Date of Certain Provisions of
        the Enhancing Airline Passenger Protections Final Rule,
        76 Fed. Reg. 23,110 (Apr. 25, 2011)

Dear Secretary LaHood:

## INTRODUCTION AND REQUEST FOR RELIEF

Allegiant Air, LLC ("Allegiant") and Spirit Airlines, Inc. ("Spirit") (jointly, the "Petitioners") have sought review of various amendments to 14 C.F.R. Parts 259 and 399 in the United States Court of Appeals for the District of Columbia Circuit. *Spirit Airlines, Inc. v. DOT*, No. 11-1219, D.C. Cir. (filed June 15, 2011), consolidated with *Allegiant Air, LLC v. DOT*, No. 11-1222, D.C. Cir. (filed June 16, 2011). These amendments were enacted in Enhancing Airline Passenger Protections, 76 Fed. Reg. 23,110 (Apr. 25, 2011) (the "Final Rule"). Pursuant to 5 U.S.C § 705 and Fed. R. App. P. 18, Petitioners respectfully request that the Department postpone, or stay, the effective date of the amendments pending judicial review. We ask that you respond by 5:00 p.m. on July 14, 2011. We will construe the absence of a response as a denial of this request and will proceed to seek a stay from the Court.

In the Final Rule, the Department (1) reverses an almost-25 year policy permitting government taxes and fees to be stated separately from the base fare in airline advertising (§ 399.84(a)); (2) prohibits the sale of nonrefundable tickets purchased seven days or more before departure (§ 259.5(b)(4)); (3) prohibits post-purchase price increases, including increases to the price of ancillary services and products, made after the purchase of underlying air transportation (§ 399.88(a)); (4) dictates the manner in which baggage fees must be disclosed on e-ticket (electronic) confirmations (§ 399.85(c)); and (5) mandates when a carrier must

The Honorable Ray LaHood
Request for Postponement or Stay
July 6, 2011

communicate notices regarding flight changes, delays or cancellations to its customers (§ 259.8).[1]

These rules fall short of the procedural and substantive standards set forth in the Administrative Procedure Act (the "APA"), 5 U.S.C. §§ 551-559, 701-706.  As explained in detail, they are arbitrary and capricious, not in compliance with procedures required by law, contrary to the governing statute—the Airline Deregulation Act of 1978 (the "Deregulation Act")—and, most problematically, contrary to air carrier commercial free speech rights as protected by the First Amendment.  In addition to imposing unreasonable implementation costs at a time of escalating fuel prices, these amendments threaten to seriously harm Petitioners' business models, which are based on the existing rules, as well as harm the millions of passengers who travel on these carriers.  For these reasons, justice requires that relief be granted.  Petitioners request that the Department stay the effective date of the amendments until the judicial review proceedings are concluded in the Court of Appeals.

## BACKGROUND

Allegiant and Spirit are post-deregulation, low-cost carriers that cater to price-conscious and underserved consumers.  These carriers contribute significantly to the Deregulation Act's goal of an air transportation system relying on actual and potential competition to provide efficiency, innovation, and low prices.[2]

Allegiant is a Las Vegas-based, full-service travel company, whose unique business model makes it possible for travelers from small communities throughout the United States to reach major destinations like Las Vegas, Phoenix, Los Angeles, Orlando, Tampa/St. Petersburg and Ft. Lauderdale easily and affordably.  Allegiant now serves 63 small communities and 11 other destinations using its fleet of full-sized (not regional) jet aircraft.  On all routes, Allegiant offers low-fare nonstop service that can be bundled with hotel accommodations and other travel-related services.  Allegiant's average base fare in 2010 was approximately $76 and, in the first quarter of 2011, this figure was $89.  In 2010, Allegiant ranked number one for low-cost carriers in *Aviation Week's* Top Performing Airlines study and ranked 25th on *Fortune* magazine's Fastest-Growing Companies list.

Spirit is an ultra low-cost, low-fare carrier based in Ft. Lauderdale that provides affordable travel options in the United States and between the United States and cities in Central and South America and the Caribbean.  Its ultra-low cost carrier (ULCC) business model, instituted in 2007, allows it to offer the lowest possible fares combined with a range of optional services for additional fees, which provides price-sensitive travelers valuable flexibility in selecting the combination of services that best suits their needs.  Spirit's average passenger ticket revenue per segment in 2010 was approximately $77 and, in the first quarter of 2011, this figure

---

[1] Allegiant did not include a challenge to § 259.8 in its petition for review.  However, Allegiant did challenge the sufficiency and validity of the cost-benefit regulatory evaluation analysis of the Final Rule undertaken by the Department pursuant to applicable requirements.
[2] 49 U.S.C. § 40101(a)(12).

The Honorable Ray LaHood
Request for Postponement or Stay
July 6, 2011

was only $82.  On a regular basis, Spirit offers promotional base fares as low as $9 (plus applicable taxes and fees).

Allegiant and Spirit have been successful principally due to their ability to innovate and market affordable base fares to very price-sensitive travelers.  Offering affordable base fares with unbundled ancillary services allows Petitioners to stimulate demand in the markets they serve.  This business model has enabled Allegiant to provide valuable service primarily to travelers from small communities who otherwise would be without nonstop air service and have only limited ability to connect through larger cities, at markedly more expensive fares.

In order to compete with the legacy airlines, these low-cost carriers have relied on the Department's prior policies regarding price advertising, refundability of tickets, and post-purchase price changes.  Their rapid growth in recent years has been due largely to their ability to differentiate themselves from legacy carriers and to target markets that are underserved or feature largely high-fare service, generating new traffic that in many instances would not otherwise have traveled by air, if at all.  The Final Rule threatens the carriers' very way of doing business and ultimately will harm the public and the communities they serve.

## LEGAL ARGUMENT

Pursuant to APA, the Department may postpone the effective date of the rules "when the agency finds that justice so requires."  5 U.S.C. § 705.  In accordance with D.C. Cir. R. 18, such relief pending review is appropriate where (1) the moving party is likely to prevail on the merits; (2) the moving party will suffer irreparable injury if relief is withheld; (3) no substantial harm will come to other parties if relief is granted; and (4) a stay serves the public interest.  *See CSX Transp., Inc. v. Williams*, 406 F.3d 667, 670 (D.C. Cir. 2005).  DOT has applied this four-part test to prior requests to postpone the effective dates of final rules, *e.g.*, Letter from Jim L. Swart, Director, Office of Drug and Alcohol Policy and Compliance, to William F. Sheehan, Counsel for BNSF Railway Company, Docket DOT-OST-2003-15245 (Oct. 30, 2008).

**I.      Petitioners Are Likely To Succeed on the Merits.**

A reviewing court shall hold unlawful and set aside agency actions, findings and conclusions when they are (a) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; (b) contrary to law or the Constitution; or (c) without observance of procedures required by law.  5 U.S.C. § 706(2)(A)-(D).  The challenged rules fail one or more of these tests and, as a result, are likely to be set aside by the D.C Circuit.  Because Petitioners are likely to prevail on the merits, and the carriers will be irreparably harmed if forced to comply, justice demands that the agency postpone the effective date of the rules pending judicial review.

Spirit and Allegiant made clear in their comments in the underlying rulemaking that certain of the proposed rules were contrary to the purpose and spirit of the Deregulation Act, now codified at 49 U.S.C. § 40101.  The Deregulation Act eliminated government control over carrier routes, pricing and services and promoted, to the maximum extent possible, competitive forces that would result in, among other things, entry by new carriers and innovation.  *Id.*

The Honorable Ray LaHood
Request for Postponement or Stay
July 6, 2011

Importantly, Congress specifically directed the Department, in carrying out the agency's regulatory functions, to foster the continued strengthening of small air carriers like Allegiant and Spirit. *Id.* In large part, the Deregulation Act has achieved those goals and spawned the birth and growth of carriers like Allegiant and Spirit, which have been market innovators and have made it possible for millions of passengers to enjoy low-fare travel. The rules impose requirements that directly affect the price of air travel and the services that carriers can offer. Since the Department has stifled innovation and competition without making any credible finding that the prohibited practices are unfair or deceptive, it has overstepped its statutory authority.

In addition, the rules are arbitrary and capricious or are not in compliance with procedures required by law. The Department has not examined the relevant data, has relied heavily on a few anecdotal and unsubstantiated public comments and a highly flawed regulatory analysis,[3] and has failed to articulate a satisfactory explanation for its action (*i.e.*, a rational connection between the facts found and the choice made). *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Also, the Department violated the APA's notice-and-comment requirements, 5 U.S.C. § 553, by failing to provide prior notice of its evidence purporting to establish the existence of consumer confusion, thus depriving Petitioners and other carriers of the meaningful opportunity to comment on the alleged evidence, including the final Regulatory Analysis, before the deadline for submitting comments on the Notice of Proposed Rulemaking.[4] The APA requires an agency to make available to the public the data and information on which it relies in its rulemaking. *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 236 (D.C. Cir. 2008) ("Under APA notice and comment requirements, among the information that must be revealed for public evaluation are the…data upon which the agency relies in its rulemaking." Also, "[c]onstruing section 553 of the APA, the court explained long ago that in order to allow for useful criticism, it is especially important for the agency to identify and make available…data that it has employed in reaching the decisions to propose particular rules.") (internal citations omitted); *see also Am. Iron & Steel Inst. v. OSHA*, 939 F.2d 975-1009-10 (D.C. Cir. 1991) ("OSHA's reliance on the 1987 Dun & Bradstreet data without providing an opportunity for comment was improper.").

Because the Department purports to have based the Final Rule on evidence of consumer confusion, and minimal cost to the industry, the Department had an obligation under the APA to provide the evidence in the rulemaking record and to give interested parties a sufficient opportunity to examine and comment on it. For this additional reason, the Final Rule is deficient under the APA, and Petitioners are likely to prevail on the merits.

---

[3] Among other deficiencies, the Department's regulatory analysis failed to evaluate alternatives or no-regulation scenarios, as required by Executive Order 12,866, 58 Fed. Reg. 51,735 (Oct. 4, 1993). The Econometrica, Inc. Final Regulatory Analysis was placed in the record only <u>six</u> working days before the Final Rule was issued which did not allow sufficient time for parties to review or comment on this document
[4] *Enhancing Airline Passenger Protections*, 75 Fed. Reg. 32,318 (June 8, 2010) ("NPRM").

The Honorable Ray LaHood
Request for Postponement or Stay
July 6, 2011

A.    **The Department's Reversal of Its Enforcement Policy Regarding the Full-Fare Rule (§ 399.84) Violates Petitioners' First Amendment Rights and is Arbitrary and Capricious.**

1.    **The Department Prohibition Against Truthful, Non-Deceptive Base Fare Advertising Violates Petitioners' Commercial Free Speech Rights Protected By the First Amendment.**

Truthful, non-misleading advertising is protected commercial speech under the First Amendment. *Virginia State Pharmacy Bd. v. Virginia Citizens Consumer Council*, 425 U.S. 748, 765 (1976). The DOT may not regulate this speech unless it can show that (1) it has a substantial interest in restricting the speech, (2) the regulation in question directly advances the government interest, and (3) the regulation is narrowly tailored to serve that interest. *See Central Hudson Gas & Elec. Co. v.* Public *Service Comm'n of N.Y.*, 447 U.S. 557, 566 (1980); Board of Trustees of the State University of New York v. Fox, 492 U.S. 469, 480 (1989) (discussing Central Hudson, 447 U.S. at 564-66). The Department has failed to meet this burden with respect to base fare advertising.

The Department has not established a substantial interest in prohibiting base fare advertising. The Department has not established through evidence in the record that base fare advertising is misleading. Indeed the current enforcement policy enables the airlines to fully and fairly communicate important information to consumers about governmental charges affecting air travel. The Department itself has recognized, "passengers benefit from knowing how much they are paying to government entities apart from the fares they pay the carriers." Order 88-8-2, 3 (Aug. 2, 1988). The Department reiterated this conclusion in 2006. 71 Fed. Reg. 55,398 (2006).

The regulation does not advance DOT's interest in preventing unfair or deceptive practices in a "direct and material" way. *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487 (1994). The prohibition against base fare advertising *creates* consumer confusion rather than relieves it. Consumers are accustomed to seeing the actual price of a product or service displayed separately from government-imposed fees, as this has been the practice in the airline industry for nearly 25 years and is the norm in virtually every other industry.

Most importantly, the prohibition on base fare advertising does not represent a "reasonable fit" between the Department's limited responsibility under the Deregulation Act of preventing unfair and deceptive practices and the means chosen to advance that responsibility. *Fox*, 492 U.S. at 480. Where disclosure can effectively achieve the government's goal it is constitutionally preferable to prohibition. *Pearson v. Shalala*, 164 F.3d 650, 657 (1998). Clearly the Department's goal of providing consumers with the total price of a ticket at the first point of contact is achieved through the current rule by requiring base fare ads to list government-imposed taxes and fees separately and in a manner that is "clear and the total amount to be paid by the customer can be easily calculated," 54 Fed. Reg. at 31,052, without suppressing truthful information about the base fare of an airline ticket.

5

The Honorable Ray LaHood
Request for Postponement or Stay
July 6, 2011

**2. The Department Reversal of Its Longstanding Airline Price Advertising Policy, on Which Petitioners Based Their Innovative, Consumer-Friendly Low-Cost Business Models, is Arbitrary and Capricious**

For almost 25 years, the Department has permitted carriers to quote advertised base fares separately from non-*ad valorem* government-imposed taxes and fees collected on a per-passenger basis, provided the existence and amount of such taxes and fees is disclosed in accordance with Department requirements.  Among other advantages, this policy enabled customers to more readily see what they were paying the airline and what was paid to the government.  Allegiant and Spirit developed their business models around the marketing of the base price charged by the carrier.  Nearly all other air carriers—including Southwest Airlines, the largest domestic airline—advertise their products this way.  Significantly, virtually all other retail and service industries also advertise prices without applicable government taxes and fees.  Consumers readily understand such taxes and fees are charged separately from the price of virtually all goods and services they buy.  For nearly the last 25 years, literally billions of passengers have seen these ads, purchased tickets and traveled—apparently without being confused about their airfares.  Indeed, the original exception was created to prevent confusion.  *See* Order 88-3-25 (March 10, 1988).

Importantly, less than five years ago, the Department found the reasons for maintaining this policy "most compelling." Price Advertising, 71 Fed. Reg. 55,398, 55,401 (Sept. 22, 2006).  In deciding to withdraw a Notice of Proposed Rulemaking in which the Department considered eliminating the taxes and fees exception, the Department stated, "*As enforced, § 399.84 protects consumers, facilitates price comparison, fosters fare competition, and affords sellers an appropriate degree of freedom to innovate.*"  *Id.*  Nothing in the instant rulemaking record supports this abrupt reversal of longstanding policy heavily relied on by the entire airline industry.  Given industry reliance—especially by low-fare carriers like Allegiant and Spirit—on the prior enforcement policy regarding taxes and fees, which the Department reaffirmed as recently as 2006, this was arbitrary and capricious.

The Department has asserted in the Final Rule that the landscape relating to airfare advertising has changed since 2006, and has identified three recent innovations: (1) advertising via social media outlets such as Facebook and Twitter, (2) unbundling in connection with fees for ancillary services, and (3) offering routings with multiple connections that may increase the amount of taxes and fees a traveler has to pay.  76 Fed. Reg. at 23,143.

Missing from the rulemaking record, however, is any explanation of how the advent of these innovations now renders a practice endorsed for more than two decades suddenly unfair or deceptive.  By requiring carriers to bundle payments going to the government with the price going to the carrier, the rule makes it more difficult to compare the base price charged by carriers  Speculative analysis in the Final Regulatory Analysis that changing this rule will save three minutes in search time for 0.74 percent of the passengers who traveled in 2010 hardly supports a finding of an unfair or deceptive practice.[5]  Because the Department failed to establish that its prior policy regarding the full-fare rule results in unfair or deceptive advertising, the decision to

---

[5] *See* Final Regulatory Analysis, Docket OST-2010-0140, 58 (Apr. 8, 2011).

The Honorable Ray LaHood
Request for Postponement or Stay
July 6, 2011

eliminate its longstanding policy is arbitrary and capricious, and Petitioners are likely to succeed on the merits of this claim.

      **B.**      **The Department's Decision to Require Carriers to Permit Consumers to Hold Fares Without Purchase or to Receive Cash Refunds Within 24 Hours of Reservation (§ 259.5)—a Form of Fare Regulation Eliminated by the Airline Deregulation Act—Exceeds the Department's Authority and is Arbitrary and Capricious.**

With respect to § 259.5(b)(4), which requires carriers to permit consumers to hold an airfare without payment for 24 hours, or to receive a refund without penalty after purchase if requested within 24 hours, the Department has exceeded its statutory authority. As a direct result of this requirement, airfares will rise. Because this requirement is effectively a prohibited rules tariff and will directly affect the price of tickets, this requirement is a form of regulation that Congress eliminated in the Airline Deregulation Act.

In addition, DOT has failed again to provide any explanation of how a carrier that offers a nonrefundable ticket (after having made clear to the consumer the ticket's nonrefundable nature) has engaged in an unfair or deceptive practice. In the Final Rule, the Department recounts in some detail the objections raised by various carriers with respect to this requirement, 76 Fed. Reg. at 23,125-26, but provides no substantive response to these objections. Indeed, the Department's Final Regulatory Analysis baldly attempts to justify the new mandate for <u>every</u> carrier by simply asserting that "most reporting U.S. carriers currently allow travelers either to hold a reservation for 24 hours without payment or to cancel ticket purchases within 24 hours without penalty."[6]

Moreover, the Department provides no rational explanation for why the sale of nonrefundable tickets is *per se* unfair or deceptive. There is zero evidence in the record that passengers cannot shop for the fare that best suits their needs before making a final purchase. If the ability to obtain a refund is important, customers can purchase their tickets from a carrier that voluntarily offers a refund. This is how the competitive marketplace required by the Airline Deregulation Act is intended to function—customers exercise their choices from a range of options offered by different airlines.

The Final Rule fails to address the substantial objections that Spirit and other carriers raised in the rulemaking docket concerning the impact this provision will have on the price of tickets and airline reservation systems, and thus fails to save the Department's decision on this matter from being arbitrary and capricious. Petitioners, therefore, are likely to succeed on the merits of this claim.

---

[6] Final Regulatory Analysis at 5.

The Honorable Ray LaHood
Request for Postponement or Stay
July 6, 2011

C.    **The Department's Decision to Prohibit Post-Purchase Price Increases for Services not Purchased with the Ticket (§ 399.88) is Arbitrary and Capricious and Oversteps Its Statutory Authority.**

Before the Final Rule, carriers were permitted to adjust a passenger's air transportation costs after ticket purchase, so long as this was made clear in the contract of carriage and so long as the passenger received direct notice. The new rule prevents carriers from collecting increased charges for separate, ancillary services (*e.g.*, baggage, advance seat selection, flight insurance, *etc*.) selected and paid for under the passenger purchased his ticket. 14 C.F.R. § 399.88(a). The effect of this rule is to require carriers to make these ancillary services available at the charge in place at the time the passenger pays for his ticket, rather than the charge in place at the time—which could be weeks or even months later—when the passenger looks to select and pay for the ancillary service. Indeed, keeping track of when a passenger purchased a ticket and determining the cost of the ancillary service at that point in time will involve substantial programming costs on Spirit and other carriers that sell other services after the time the ticket is purchased. The rule also prevents Allegiant from offering an innovative, pro-consumer "flex-fare" that could go up or down based on the price of jet fuel and which consumers could choose as an alternative to a higher, locked-in fare.[7]

This rule is arbitrary and capricious. The Department has failed to articulate a rational basis for deeming post-ticket purchase price increases by carriers relating to charges for separate, ancillary services unfair or deceptive, or why offering customers properly explained flex-fares would be unfair or deceptive. In addition, the final regulatory analysis altogether fails to address this rule in the context of transactions involving only carriers rather than air tour operators. The cost-benefit studies examine this issue only with respect to package tours, where air travel is but one component of the purchase. (This would appear to be a direct result of the Department's determination, as noted in the NPRM, that it had not observed carriers making post-purchase price increases. *See* 75 Fed. Reg. at 32,330.

Because the Department has not found that carriers have engaged in unfair or deceptive practices with respect to post-purchase price increases, the Department has not established a rational basis for adopting an across-the-board prohibition on post-purchase price increases (except for government-imposed charges). The agency has overstepped its statutory authority and acted arbitrarily and capriciously. Petitioners, therefore, are likely to succeed on the merits of this claim.

D.    **The Department's Decision to Require Carriers to Provide Individualized Baggage Charge Information on E-Ticket and Other Electronic Confirmations Oversteps Its Statutory Authority and Is Arbitrary and Capricious.**

Section 399.85(c) requires carriers to include information in "text form" about the specific baggage allowances and baggage fees that apply to the individual passenger on all

---

[7] This concept was discussed in greater depth in Allegiant's supplementary comments filed February 16, 2011, Docket DOT-OST-2010-0140.

The Honorable Ray LaHood
Request for Postponement or Stay
July 6, 2011

e-ticket confirmations (including confirmations provided at the end of an online purchase transaction and sent to the consumer by e-mail after purchase), taking into account factors that affect the particular charges that apply to the passenger (*e.g.*, military, frequent flyer status, early purchase, *etc.*).  In the Final Rule, the Department confirms that it has "determined that there is value in providing [this information]," 76 Fed. Reg. at 23,147, and concludes that the Final Rule will include this requirement.  However—as before—the Department fails to explain how current practices regarding the disclosure of baggage allowances and baggage charges are unfair or deceptive and fails to articulate the basis for regulating in this area.  Importantly, the Final Rule permits "agents," but not airlines, to provide this information via a link to the baggage fee page of a carrier website.[8]  If a link is good enough for an "agent" to use in interfacing with the public, why is a link not good enough for the airlines?

In the preamble, the Department identified two purported benefits associated with this provision—(1) reduced consumer confusion over baggage charges and (2) time savings for both consumers and airlines (*id.*).  Econometrica's regulatory analysis identifies "improved customer good will toward carriers" also as a benefit flowing from this requirement.  Final Regulatory Analysis at 63.  But nowhere in the record has the Department quantified these alleged benefits.  On the other hand, the Department has estimated that this requirement will involve implementation and compliance costs of nearly $8 million (discounted cost, 2012-2021).  *Id.* at 65.  Section 399.85(c), therefore, oversteps the Department's statutory authority to prevent only practices that are unfair and deceptive, and is arbitrary and capricious.  Petitioners, therefore, are likely to succeed on the merits of this claim.

E.      **The Department's Decision to Require Flight Status Notifications (§ 259.8) is Arbitrary and Capricious.**

Section 259.8 requires all U.S. and foreign carriers (such as Allegiant and Spirit) that operate at least one aircraft with 30 or more seats to notify passengers within 30 minutes when a flight is cancelled, diverted or delayed by 30 minutes or more.  Notification must be made in the boarding gate area, on the carrier's website, via the carrier's telephone reservation line and on airport display boards.  In the NPRM, DOT proposed to apply this requirement only to those larger carriers required to report their operating statistics, explaining that "[t]he Department tentatively believes that the cost of requiring smaller carriers to provide this information outweighs the benefits to consumers in general in light of the fact that the operations of the reporting carriers account for nearly 90 percent of all domestic passenger enplanements." 75 Fed. Reg. at 32,331.

Because the Department gave smaller carriers reason to believe the requirement would not apply to them, DOT received no information that would disturb its tentative conclusion or support the version of the requirement included in the Final Rule.  Moreover, the Department's regulatory analysis fails to address the cost impacts associated with this requirement.  Both flight

---

[8] If the Department agrees to permit carriers to comply with § 399.85(c) by providing the required notice of applicable baggage charges via a link to a page or pop-up on the carrier's website, which supplies a detailed explanation of the carrier's baggage charges and the factors that affect them, Petitioners will exclude their objection to this provision of the Final Rule from their litigation.

The Honorable Ray LaHood
Request for Postponement or Stay
July 6, 2011

cancellations and delays will increase under the rule. This outcome will result because airlines routinely post *tentative* cancellation and delay information in anticipation of bad weather but do not make final decisions about whether to operate a flight until closer to departure. If bad weather does not materialize, the flights return to their original schedules. But—under the new rule, which requires notification of potential flight irregularities within 30 minutes of "knowledge of a delay"—airlines may be forced to cancel or delay flights even if the weather improves, because—upon learning that a flight *might be* cancelled or delayed—some passengers will immediately make alternative travel arrangements or decide not to travel, or arrive at the departing airport very close to actual boarding time.

DOT's decision to adopt this requirement and to apply it to smaller carriers was arbitrary and capricious because it is unsupported by any weighing of the relative costs and benefits and therefore does not reflect a reasoned judgment. Petitioners, therefore, are likely to succeed on the merits of this claim.

## II.    Petitioners Will Suffer Irreparable Harm Unless the Department Stays the Effective Date of the Rules

As explained in section I.A. above, the new full-fare advertising rule violates Petitioners' commercial free speech rights protected under the First Amendment. This constitutional violation involves a special type of irreparable harm. The Supreme Court has stated that the "free flow of commercial information is indispensable." *Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 765 (1976). Suppression or "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (U.S. 1976); *see Community Communications, Inc. v. City of Boulder*, 660 F.2d 1370 (10th Cir. 1981). For example, the new rule will undermine Spirit's $9 Fare Club, a popular program for its customers. The appeal of the program is the availability of base fares as low, or lower than $9. Members are well aware that these fares do not include government taxes and fees and, if purchased on the Internet, a convenience fee. The fare advertising rule will hide what Spirit is charging and wrap it in various governmental taxes and fees that have absolutely nothing to do with what Spirit is actually charging for its service. No customer will look at the tax and fee explanation, which the Department will now require to be hidden in small print away from the displayed "full fare." The potential loss of this program will directly reduce Spirit's subscription revenues and force ticket prices to rise.

Allegiant and Spirit will suffer irreparable harm in the form of compliance costs and economic losses unless the Department stays the effective date of the rules pending judicial review. In addition to the Fare Club, Spirit and Allegiant will be forced to dramatically change or abandon the marketing, distribution, and pricing models that allowed them to keep ticket prices low and to compete effectively with legacy carriers as well as with non-aviation alternatives. If the rule is ultimately set aside, these compliance expenditures will have been unnecessary and will be unrecoverable, either through litigation or market participation. The harm done to Petitioners' business models and customer goodwill would be impossible to undo.

The rules impose disproportionate compliance costs on low fare carriers, like Allegiant and Spirit, which the Department did not consider. The initial compliance costs will be

The Honorable Ray LaHood
Request for Postponement or Stay
July 6, 2011

substantial, imminent, and unrecoverable.  Petitioners will need to make significant changes to their websites and the way they communicate with their customers.  These changes will not be simple and will require substantial information technology (IT) investments.  Allegiant and Spirit estimate their combined compliance costs for the amended full-fare rule alone will amount to more than $2.6 million.   Spirit estimates its total implementation costs at over $5 million.  Allegiant and Spirit are both rapidly growing carriers, and these compliance expenditures will detract significantly from their ability to invest in additional routes and services.   These additional opportunity costs are unquantifiable and unrecoverable.

Additional marketing expenditures will have to be made to educate consumers regarding the change in the full-fare advertising rule to prevent the misconception consumers will have that air travel prices have increased.  It bears emphasis that for low cost carriers, the apparent percentage increases will be much larger than for the higher fare, legacy carriers.  Despite these efforts, consumers will likely be confused.  If the rule is ultimately set aside, more money will have to be spent on transitioning back to Petitioners' preferred, time-tested method of advertising, resulting in further consumer confusion and potential loss of customers.   The damage done to the business models Petitioners have developed in reliance on the Department's prior rules will be substantial and irreparable.

The carriers will suffer irreparable harm in the form of unrecoverable compliance expenditures, lost opportunity costs, and damage to their corporate systems and identities.  Petitioners would not be able to recoup these costs through subsequent litigation, as the Department is protected by sovereign immunity and, even if they could, the damages would be impossible to quantify.  This unrecoverable harm to Petitioners' business qualifies as irreparable harm.   *See Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1986) ("The threat of unrecoverable economic loss…qualif[ies] as irreparable harm."); Feinerman v. Bernardi, 558 F. Supp. 2d 36, 51 (D.D.C. 2008); *Nat'l Mining Ass'n v. Jackson*, No. 10-cv-1220, 2011 U.S. Dist. LEXIS 3710, *46 (D.D.C. Jan. 14, 2011).  Furthermore, unquantifiable damages, such as the harm that will be caused to Petitioners' corporate identities and lost opportunity costs, constitute irreparable harm.  *See CSX Transp. Co. v. Williams*, 406 F.3d 667, 673 (D.C. Cir 2005).

Implementation of this rule will threaten Petitioners' viability.  Allegiant and Spirit are products of a deregulated airline industry.  They are small and have relatively little market power compared to most of their competitors.  Their viability in the airline industry depends on their ability to innovate new products, services, and means of distribution in order to compete aggressively with the much larger legacy carriers, not to mention competing against non-aviation alternatives.  Advertising low base fares is essential for attracting customers and increasing demand in the markets served.  Non-refundable tickets, flexibility in ancillary fees and services, and efficiency in relaying information to customers are all essential to keeping Petitioners' ticket prices low and differentiating themselves from their larger competition.   The Final Rule essentially seeks to apply inflexible uniform standards to all air carriers and results in a forced commoditization of services, leaving little distinction between the low fare carriers and legacy carriers.  Ultimately, this will hinder the ability of low-cost carriers to survive in the market and will frustrate the objectives of the Deregulation Act, to the public's detriment.

The Honorable Ray LaHood
Request for Postponement or Stay
July 6, 2011

**III.    Because No Other Parties Will Be Harmed, the Balance of Equities Favors Postponing the Effective Date of the Rules**

Granting relief pending judicial review will not harm other parties.  The Department has made no showing that that the challenged rules address substantial consumer harm in need of immediate redress.  The rulemaking process itself took more than ten months, excluding the time to develop the NPRM.

While the Department has an interest in preventing unfair and deceptive practices, its role is not to regulate every practice that a small number of passengers finds inconvenient. Importantly, in light of the fact that the Department has not explained how any of the challenged provisions addresses an unfair or deceptive practice, maintaining the *status quo* will not harm the public interest.  Given the significant harm to Petitioners, and the airline industry in general, that will result from not postponing the rules, the balance of equities strongly tilts in favor of granting relief.

Not postponing the effectiveness of the rules will harm Petitioners, other carriers, and ultimately consumers.  Air carriers have already started to invest substantial amounts of time and money in developing means of complying with the Final Rule.  Given the substantial likelihood the rules will be set aside, preventing the industry from incurring these unnecessary costs and ultimately having to pass them on to consumers in the form of higher ticket prices benefits both the industry and the public.

**IV.    The Public Interest**

The public interest is best served by maintaining the existing rules and practices while the court determines if the challenged rules are contrary to the policy mandates and legal requirements of the Airline Deregulation Act, violate the constitution or are arbitrary and capricious.

If the rules are ultimately set aside, the public will be confused if carriers change their price advertising and other practices to comply with the rules only to later revert to time-honored practices.  For nearly 25 years, airline consumers have come to understand that airfare advertisements display the base fare without government taxes and fees.  Pursuant to DOT's established enforcement policy, the nature and amount of taxes and fees were prominently and proximately disclosed, and consumers were informed of the total price before purchase.  This has been the practice in the airline industry dating back at least as long ago as 1988, and it continues to be the widespread practice in other industries.  Maintaining the *status quo* while review is pending will avoid the substantial likelihood that the public will be confused if the rules are overturned (or changed) as a result of Petitioners' challenge. Avoiding consumer confusion will best serve the public interest.

In addition, the public has a vital interest in having as much access as possible to truthful, nondeceptive information about prices for air transportation, an interest that a stay will protect. Given the difficulty airlines will have with complying with the new fare advertising requirements (because of the difficulty of determining a final ticket price before an individual customer selects

The Honorable Ray LaHood
Request for Postponement or Stay
July 6, 2011

a specific itinerary), and the risk of costly penalties for violations, airlines are likely to significantly scale back the price information they make available to the public. A stay would preserve the free circulation of (truthful, nondeceptive) information in the public domain, an important public interest protected by the First Amendment.

The public has a strong interest in "good government," which—in the context of this case—means that an agency acts within its statutory authority and makes decisions that are supported by the record and not arbitrary and capricious. For the reasons explained above, the Department has fallen short of these requirements, and relief will help to ensure that these public interests are preserved while judicial review proceeds. Importantly, relief will help ensure that confusion and inconvenience of the traveling public is avoided.

## <u>CONCLUSION</u>

Because Petitioners meet the applicable standards for a judicial stay in the D.C. Circuit, the Department has ample reason to find that justice requires relief pending judicial review. In particular, Petitioners are likely to succeed on the merits of their challenge, the harm visited upon them in the absence of relief will be immediate and irreparable, no other parties will be harmed by the relief, and relief will serve important public interests. For these reasons, Petitioners request that, pursuant to APA § 705, the Department stay the effective date of the rules, as described herein.

Sincerely,

Joanne W. Young
David M. Kirstein
*Counsel for Petitioners*

Aaron A. Goerlich
Garofalo Goerlich Hainbach PC
1200 New Hampshire Avenue NW
Washington, DC 20036-6802
Tel (202) 776-3970
agoerlich@ggh-airlaw.com
*Of Counsel for Allegiant Air, LLC*

cc:    Robert Rivkin, Esq.
       Samuel Podberesky, Esq.
       Docket DOT-OST-2010-0140

Exhibit 2



**U.S. Department of Transportation**

Office of the Secretary
of Transportation

Assistant Secretary

1200 New Jersey Ave., S.E.
Washington, DC 20590

July 20, 2011

Joanne W. Young
David M. Kirstein
Counsel for Petitioners
Kirstein and Young
1750 K Street, N.W., Suite 200
Washington D.C. 20006

Dear Ms. Young and Mr. Kirstein:

This is in response to your letter dated July 6, 2011 on behalf of Spirit Airlines, Inc. ("Spirit") and Allegiant Air LLC ("Allegiant") (collectively "Petitioners") requesting that the U.S. Department of Transportation (the "Department" or "DOT") postpone or stay the effective date of its final rule enhancing airline passenger protections, *Enhancing Airline Passenger Protections*, 76 Fed. Reg. 23,110 (Apr. 25, 2011), pending judicial review of various provisions in this regulation by the United States Court of Appeals for the District of Columbia Circuit. On June 15 and 16, 2011, respectively, Allegiant and Spirit sought judicial review of this rule.

As an initial matter, the Department notes that other interested parties, who have not filed petitions for review, have requested that the Department extend the effective date of the final rule, or certain provisions of the final rule. Upon review of those requests, the Department has decided to extend the effective date of certain provisions of the final rule, including the five provisions Petitioners challenge here, to January 24, 2012. The Department's decision to extend the effective date of those provisions will appear shortly in the rulemaking docket, DOT's website, and will be subsequently published in the Federal Register. Because the Department is extending the effective date of the provisions Petitioners challenge in this matter, a stay is not warranted under applicable law. Nonetheless, the Department has given careful consideration to your request, but has concluded that there is no basis for granting a stay.

The Department's final rule on enhancing airline passenger protections contains many new requirements to improve the air travel environment for consumers, expanding upon the passenger rights included in its first consumer rulemaking. The rule (1) increases the number of carriers that are required to adopt tarmac delay contingency plans and the airports at which they must adhere to the plan's terms; (2) increases the number of carriers that are required to report tarmac delay information to the Department; (3) expands the group of carriers that are required to adopt, follow, and audit customer service plans and establishes minimum standards for the subjects all carriers must cover in such plans; (4) adds carriers to those required to include their contingency plans and customer service plans on their websites;  (5) increases the number of carriers that

must respond to consumer complaints; (6) enhances protections afforded passengers in oversales situations, including increasing the maximum denied boarding compensation airlines must pay to passengers bumped from flights; (7) strengthens, clarifies and codifies the Department's enforcement policies concerning air transportation price advertising practices; (8) requires carriers to notify consumers of optional fees related to air transportation and of increases in baggage fees; (9) prohibits post-purchase price increases; (10) requires carriers to provide passengers timely notice of flight status changes such as delays and cancellations; and (11) prohibits carriers from imposing unfair contract of carriage choice-of-forum provisions. Only this Department can adopt consumer-protection regulations to protect airline passengers as states are preempted from regulating in this area[1] and the Federal Trade Commission (FTC) Act by its own terms cannot be enforced against U.S. and foreign air carriers. Further, no private right of action exists for airline consumers to enforce the pertinent provisions of Title 49 in the courts.

The Petitioners assert that the rule unlawfully: (1) ends the practice of permitting sellers of air transportation to exclude government taxes and fees from the advertised price; (2) prohibits the sale of nonrefundable tickets by requiring airlines to hold reservations at the quoted fare without payment or cancel without penalty for at least twenty-four hours after the reservation is made if the reservation is made one week or more prior to a flight's departure; (3) prohibits post purchase price increases, including increases in the price of ancillary products and services, after the initial ticket sale; (4) requires baggage fees be disclosed on e-ticket confirmations; and (5) mandates notification of flight schedule changes. The entire rule is scheduled to take effect on August 23, 2011, except for the provisions related to full fare advertising which were to become effective on October 24, 2011. However, as noted above, the Department has decided to extend the effective date of the full fare advertising provisions, as well as the other provisions Petitioners challenge along with certain other provisions, to January 24, 2012.

The Department has the authority to postpone the effective date of rules when it "finds justice so requires." 5 U.S.C. § 705. The factors to be considered in determining whether a postponement or stay is warranted are: (1) the likelihood that the party seeking the stay will prevail on the merits; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if a stay is granted; and (4) the public interest in granting the stay. *See, e.g., CSX Transp., Inc v. Williams*, 406 F.3d 667, 670 (D.C. 2005); *Washington Metro. Area Transit Commission v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977). A stay is considered "an extraordinary remedy that should be granted only when the party seeking relief, by a clear showing, carries the burden of persuasion." *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004). We apply these four criteria in evaluating a request to DOT for a stay of a DOT final action pending judicial review. We have considered the arguments made in your stay request and concluded that you have not demonstrated that a stay is warranted in this instance.

I. **Petitioners Are Not Likely To Succeed On The Merits.**

Petitioners contend that a reviewing court is likely to set aside various provisions of the Department's final rule on enhancing airline passenger protections because they are (1) contrary

---

[1]     49 U.S.C. 41713 ("..States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier..."), see *Morales v. Trans World Airline*, 504 U.S. 374, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992).

3

to the purpose and spirit of the Airline Deregulation Act; (2) arbitrary and capricious or not in compliance with procedures required by law as the Department failed to make a rational connection between the facts found and the choice made; (3) in violation of the Administrative Procedure Act's notice and comment requirements; and (4) contrary to air carrier commercial free speech rights as protected by the First Amendment.    However, the carriers provide no real evidence to support their claims.

<u>Full-Fare Advertising Rule</u>

Petitioners contend that the full-fare advertising rule is defective because it violates the Petitioners' commercial free speech rights protected by the First Amendment.  The Petitioners also challenge as arbitrary and capricious the Department's change in its enforcement policy regarding price advertising, which previously permitted carriers to quote advertised base fares separately from non-ad valorem government imposed taxes and fees collected on a per passenger basis.  DOT disagrees with Petitioners' allegations.

The First Amendment does not extend to commercial speech that does not "accurately inform the public about lawful activity" or is "more likely to deceive the public than to inform it."  *Central Hudson Gas & Elec. Co. v. Public Service Comm'n of N.Y.*, 447 U.S. 557, 566 (1980).  When commercial speech concerns a lawful activity and is not misleading, the Department may impose restrictions on it only when its interest in regulating speech is substantial, the regulation directly advances the governmental interest asserted, and the regulation is not more extensive than is necessary to serve that interest.  *Id.*

Spirit's and Allegiant's contention that its First Amendment rights are violated appears to be based on its mistaken belief that the Department has not established through evidence in the record that fare advertising that excludes government taxes and fees is misleading.  This is not the case.  As we explained in responding to comments in the final rule, we have received complaints from consumers regarding fare advertising "some of which specifically mention feeling deceived when they are not quoted the full price to be paid after an initial inquiry."  76 Fed. Reg. 23110, 23143 (Apr.25, 2011).  We also noted that "comments from individual commenters and persons participating in Regulation Room show consumers feel deceived when the total price, including taxes and fees, is not quoted to them after an initial fare inquiry."  *Id.*  In addition, we explained that consumers need a full picture of the total price to be paid in order to compare fares and routings as "carriers and online travel agencies have started to offer more complicated routings with multiple connections in order to provide the 'lowest' airfare to consumers" and that "with these changes in routings, taxes and fees can increase and become a significant portion of the price to be paid by consumers."  *Id.*  Further, the rulemaking record makes it clear that "in recent years, carriers are increasingly unbundling the cost of air travel, which further obscures the total fare to be paid by the consumer."  *Id.* The Department believes that not requiring that the advertised price include all mandatory fees including government taxes and fees[2] when combined with the increasingly common practice of unbundling the cost of air

---

[2]      Nothing in the current regulation prohibits carriers from informing the public of the taxes and fees the government imposes on air travel.  These taxes and fees, which have proliferated in number and increased in amount assessed over the years, may be stated separately or through links or "pop-ups" on websites that display the total price.

travel makes it difficult if not impossible for an ordinary person viewing an advertisement to determine the total amount to be paid for the transportation.

We also dispute the claim by the Petitioners that the prohibition on the practice of excluding government taxes and fees is arbitrary and capricious because, according to these carriers, nothing in the rulemaking record supports a reversal of policy relied on by the airline industry which the Department reaffirmed in 2006. Petitioners' contentions are not accurate. The Department proposed to end the practice of permitting sellers to exclude government taxes and fees from the advertised price because of concern that "in many cases consumers are not easily able to determine the total cost of air transportation services or are deceived regarding the true price." 75 Fed. Reg. 32318, 32327 (June 8, 2010). The Department was also concerned that "[g]iven technological innovations and new methods of communication, carriers and ticket agents are finding new and creative ways to advertise airfares, some of which circumvent the spirit if not the letter of the full-price advertising rule and Department enforcement policy." Id.

A review of the enforcement orders issued by the Department demonstrates this point, that is, that the landscape relating to airfare advertising has changed since 2006 when the Department withdrew a notice of proposed rulemaking ("NPRM") in which it considered eliminating the taxes and fees exception. From 2001 to 2006, the Department issued 56 enforcement orders relating to advertising, with assessed penalties of $1,877,000. This is contrasted with the past three and a half years (2007 through July 11, 2011), during which the Department has issued 52 advertising orders with assessed penalties totaling $2,656,000. The increase in enforcement orders concerning advertising is related to the technological innovations mentioned in the NPRM, including the increased use of the Internet and other means used for searching for airfares.[3] In 2006, two of the advertising orders issued by the Enforcement Office dealt with Internet advertising. That number has steadily increased over the last three years: in 2007, four orders dealt with internet advertising; in 2008, ten orders; in 2009, eight orders; in 2010, sixteen orders; and, so far in 2011, twelve orders. With the advent of mobile technology, Twitter, Facebook, and other methods to advertise fares, there is an even greater likelihood that carriers and ticket agents will find new and creative, and in some cases deceptive, ways to advertise airfares further circumventing the Department's enforcement policy.

In addition to the reasons mentioned above for changing the Department's price advertising policy, the Department's regulatory evaluation explains that consumers are likely to benefit in several ways from a requirement that the price advertised include government taxes and fees. "The first benefit is the time saved for those consumers beginning a ticket purchase that is later abandoned once the full fare is known. These beneficiaries see a fare advertised (in print, on television, etc.) that does not include all taxes and fees and decide to make the effort to purchase

---

[3]    For example, in 2008, the Department issued an order assessing a compromise civil penalty of $50,000 against Allegiant for not including convenience fees in initial base fares displayed in website advertisements despite such convenience fees being mandatory for on-line bookings. Similarly, in 2009, the Department issued an order assessing a compromise civil penalty of $375,000 against Spirit for a number of violations of our consumer protection regulations, including its display of fares on its website that did not include certain carrier-imposed fees in the advertised "base fare." Both carriers were directed to cease and desist from future similar violations. See Allegiant Airlines (Order 2008-9-18, September 15, 2008) and Spirit Airlines (Order 2009-9-8, September 17, 2009).

a ticket based on the advertised price, only to find that the full-fare price is 'too high' and no longer worth purchasing." Final Regulatory Analysis, Consumer Rulemaking: Enhancing Airline Passenger Protections II, p. 56. The regulatory evaluation also notes that "passengers who purchase tickets from websites that did not previously present full fares up front will benefit by (1) saving time that would previously have been spent searching for the full fare on single or multiple websites to be able to compare full-fare prices or (2) avoiding being attracted by lower, incomplete fares and then not fully taking into account the full fare when it is subsequently revealed, which in turn may lead to less than optimal purchasing decisions." *Id.*

Although Petitioners assert that the agency had an insufficient basis for concluding that the new policy would reduce customer search times, they failed to provide comments on the preliminary regulatory analysis that dealt with this issue, which was posted in the rulemaking docket on June 2, 2010. In the preliminary regulatory analysis, we stated that we are expressly soliciting comments on the estimated benefits for this provision "including the average search time saved for passengers who already search for full fare information; the percentage of passengers who spend time searching websites to find full fare ticket information; the percentage of online ticket purchasers who purchase only from websites that provide full-fare pricing up-front; the percentage of passengers who are fully aware of added fees and taxes when purchasing tickets from travel sites that do not automatically display that data up front...." Preliminary Regulatory Analysis, Consumer Rulemaking: Enhancing Airline Passenger Protections II, pp. 42-43. The Petitioners declined to take advantage of this opportunity and yet would now deny this protection to all consumers on the basis that it would allegedly harm these two carriers' commercial opportunities.

In sum, the requirement that the price advertised include all mandatory fees including government taxes and fees does not violate the First Amendment and is not arbitrary and capricious, but a measured response to the need to prevent misleading and deceptive advertisements. Thus, the Department concludes that Petitioners have not demonstrated a likelihood of success on the merits with respect to this provision of the final rule.

Allowing Reservations to Be Held at the Quoted Fare

Petitioners also assert that the Department exceeded its statutory authority when it required carriers to permit consumers to hold fares without payment or cancel without penalty for at least twenty-four hours after the reservation is made if the reservation is made one week or more prior to a flight's departure. The carriers argue that this requirement is a form of fare regulation eliminated by the Airline Deregulation Act. The carriers also contend that the decision to impose such a requirement is arbitrary and capricious as the Department failed to provide an explanation for why the practice of not offering such reservations is per se unfair or deceptive.

Although the Airline Deregulation Act phased out regulation of domestic airline rates and routes, Congress did not discontinue the government's role and authority to protect consumers from unfair or deceptive practices. Indeed, the House Report accompanying the Civil Aeronautics Board ("CAB") Sunset Act, which transferred the responsibility for protecting consumers from the CAB to DOT, stated that a continuing government role to protect airline consumers was necessary because "[t]hese problems involve important issues of health, passenger comfort, and

social policy, and in these limited areas the solutions reached by the marketplace are not always acceptable." GAO Report, Airline Competition: DOT's Implementation of Airline Regulatory Authority (June 1989), p. 39.

The customer service standards in the final rule, including the requirement for airlines to allow passengers to hold a reservation without payment or cancel without payment for twenty-four hours if the reservation is made one week before travel, were put in place by the Department because it found that the solution reached by the marketplace in this area was unfair or deceptive. In 2009, the Department issued a final rule which required, among other things, that U.S. carriers adopt customer service plans that address "allowing reservations to be held or cancelled without penalty for a defined amount of time." 74 Fed. Reg. 68983 (Dec. 30, 2009). This rule became effective on April 29, 2010. However, after reviewing carriers' customer service plans, we concluded that the protections afforded consumers in that final rule were not sufficient. In particular, Spirit and Allegiant and a few others did not adopt plan provisions to effectuate the intent of the rule.

We found that some carrier plans, though arguably in compliance with the original rule, were unfair in that they did not provide adequate protection to consumers or were deceptive in that they were vaguely written, making it difficult for a consumer to know exactly what a carrier was committing to do. For example, Allegiant states in its customer service plan that it does not allow reservations to be held without full payment being made at time of booking. In the same plan, Allegiant states that customers can cancel their reservations up to 24 hours before the scheduled time of departure, but fails to mention that there are significant fees associated with cancellation or that the remaining funds are returned only as a credit voucher for future travel on Allegiant to take place no later than one year from the date the original itinerary was booked. A customer needs to review various sections of Allegiant's terms and conditions of travel to ascertain the fees that will be deducted from the amount of the credit voucher: a cancellation fee of $50 per segment, per person, a convenience fee of $16.99 per traveling passenger for purchases that are not made at any of Allegiant's ticket offices, and an additional $14.99 per segment, per passenger for purchases made through an Allegiant Air Call Center. For example, if a family of four had a round-trip ticket consisting of two nonstop Allegiant flights that they purchased online, the cost of cancellation for them would be $467.96. If the same family of four had purchased the ticket through the call center, the cost of cancellation would increase to $587.88. This significant cancellation fee cannot be gleaned from a review of Allegiant's customer service plan.

Moreover, we view it as an unfair and deceptive practice not to provide a "cooling off period" for the purchase of airline tickets. As we noted in the NPRM, Congress modeled the Department's statutory authority under 49 U.S.C. § 41712 to prohibit unfair and deceptive practices on section 5 of the Federal Trade Commission (FTC) Act, 15 U.S.C. § 45. *See* 75 Fed. Reg. 32318, 32328 (June 8, 2010). The FTC has a three day cooling off rule for sales made at a location that is not the seller's permanent place of business.[4] In addition, some states have

---

[4]    Since 1972, the FTC has had a requirement for a three day cooling-off period for sales of $25 or more made at a location that is not the seller's permanent place of business (*e.g.*, sales at the buyer's residence or at facilities rented on a temporary or short term basis, such as hotel or motel rooms, convention centers, fairgrounds and restaurants, or sales at the buyer's workplace or in dormitory lounges). 16 C.F.R. § 429.0(a).

7

instituted cooling off periods for a variety of other purchases.[5]  The FTC promulgated its cooling off rule to prevent customers from being pressured into making unwanted purchases.  *See* 37 Fed. Reg. 22937-40 (Oct. 26, 1972).   Similarly, we are requiring a cooling off period for airline ticket purchases to prevent consumers from being rushed/pressured into making unwanted purchases.   A cooling off period allows consumers to check for lower fares and gives them time to coordinate their other travel arrangements without losing a quoted fare.   It is also worth noting that the carriers and not the passenger determine the methodology that will be used to hold an airfare reservation: the reservation is held without payment or the reservation is held with payment which the carrier must refund without penalty if requested within 24 hours.

As for the argument that the requirement for airlines to allow reservations to be held at the quoted fare is arbitrary and capricious, we note that we explained our reasoning for this requirement in the notice of proposed rulemaking.  We stated that "many carriers' customer service plans are not specific enough for a consumer to have realistic expectations of the types of services a carrier will provide under its plan, or that some carriers may not be living up to their customer service commitments." 75 Fed. Reg. 32318, 32323 (June 8, 2010).  We elaborated further that "when determining what minimum standards to apply to these plans, the Department reviewed customer service plans as currently implemented by a number of carriers, and chose the services already provided by some carriers that appear to be 'best practices.' " *Id*.

Also, despite arguments to the contrary by Petitioners, the final rule addresses the substantial objections and concerns raised in the rulemaking docket regarding the impact of this provision. In fact, we agreed with the comments of the carriers who suggested that, should we adopt this provision, we should establish a point in time after which carriers are no longer required to follow the "twenty-four hour" rule as it "could result in loss of sales and revenue by carriers and prevent other passengers from purchasing the seat if the seat is not released in a timely manner prior to the flight." 76 Fed. Reg. 23110, 23129 (Apr.25, 2011).   As such, we modified the provision so that the requirement to hold the reservation for twenty-four hours does not apply during the last seven days before a flight.  This modification strikes a balance between consumers' needs to make travel plans and shop for a fare, and the carrier's need for adequate time to sell seats.

In sum, the requirement to hold an airfare without payment for 24 hours if a consumer makes the reservation one week or more prior to a flight's scheduled departure is not a form of fare regulation eliminated by the Airline Deregulation Act and is not arbitrary and capricious, but rather a measured response to prevent an unfair and deceptive practice.  As a result, the Department concludes that the Petitioners have not demonstrated a likelihood of success on the merits on this issue.

---

[5] For example, the State of Washington has several buyer's remorse laws that protect customers.  You can cancel health club memberships within three days of signing up in Washington. The State of Tennessee is another example of a state with multiple buyer's remorse laws: Tennessee provides consumers with 15 full business days to cancel camping club or vacation club contracts.

## Post Purchase Price Increases

Petitioners maintain that the Department's decision to prohibit post-purchase price increases for services and products not purchased with the ticket is arbitrary and capricious. This includes, but is not limited to, fees for checked baggage, carry-on baggage, meals, advance or upgraded seating assignments, canceling or changing reservations, and pet transportation. As support, the carriers claim that the Department has not found that carriers have engaged in such practices, has not articulated a rational basis for deeming such charges to be unfair or deceptive and has not explained the reasons that flex-fares would be unfair or deceptive.

However, the carriers provide little evidence to support their claims. The fact that the Department has not found that carriers are currently engaging in post-purchase price increases does not mean that carriers will not do so in the future. Indeed, it appears that based on Spirit's and Allegiant's lawsuit challenging this provision that the carriers would like to engage in such a practice by increasing the price of ancillary services and products not purchased with the ticket. Further, the Department articulated a rational basis for deeming such charges to be unfair or deceptive in the NPRM. The Department explained that "[c]onsumers are not made aware of the potential for a price increase at the time of purchase, and therefore are deceived when the increase is imposed and the seller uses the terms of the contract of carriage to justify an additional collection." 75 Fed. Reg. 32318, 32330 (June 8, 2010). When purchasing tickets, passengers are interested in not only the price of the fare but also the price for ancillary services and products.[6]

The presence or absence of a fee for a certain service or product, along with the amount of such fee, influences a customer's purchasing decision. For example, consider a consumer who purchases non-refundable tickets for a family of four, based on the carrier's representation at the time that baggage is free, and the carrier subsequently changes its policy and introduces a bag fee. That family could suddenly be paying hundreds of dollars more than they anticipated. Consider also this same consumer having purchased four tickets but deciding not to pay a first checked bag fee of $25 at the time of purchase because the first checked bag fee at that time is $35 if purchased at the airport. The carrier subsequently changes its first checked bag fee policy so that it is $100 if purchased at the airport. This consumer may have made the decision to fly with a different carrier or pay the bag fee at the time of ticket purchase had he or she known of the actual baggage fees that would have applied. Imposition of post-purchase fees and fee increases makes it difficult if not impossible for consumers to make decisions rationally as they lack adequate information to do so.

We also want to point out that the prohibition on the imposition of post-purchase fees and fee increases for ancillary services codifies the existing enforcement policy that carriers and agents cannot increase the price of baggage after the purchase of the underlying air transportation and

---

[6]     According to a survey of 1,396 air travelers conducted by the Consumer Travel Alliance from August 20-31, 2010, two out of every three air travelers say they have been surprised at the airport by unexpected fees for things such as checked bags, requesting a seat assignment, getting extra legroom, or flying standby. Nearly two out of three (65%) also stated that such fees placed some or a great deal of unexpected financial strain on their budget for the trip. See *Things that Annoy Travelers Most: Consumer Reports Survey Results,* Consumer Travel Alliance Comment on Rulemaking, DOT-OST-2010-0140-1710.

expands this protection to other types of ancillary services and products.  In 2008, the Department's Aviation Enforcement Office issued guidance concerning the disclosure of baggage fees to the public.  In that notice, the office stated that "[i]n no case should more restrictive baggage policies or additional charges be applied retroactively to a consumer who purchased his or her ticket at a time when the charges did not apply, or when a lower charge applied."  Notice of the Assistant General Counsel for Aviation Enforcement and Proceedings, Guidance on Disclosure of Policies and Charges Associated with Checked Baggage, May 13, 2008, available at http://airconsumer.dot.gov/rules.guidance.htm .  Even before the recently issued final rule, a carrier had the obligation under the enforcement policy not to change the baggage fees between the date of purchase and day of flight.  Carriers, including Petitioners, have been complying with this requirement and continue to do so.

The final rule also does not impose any new obligation on carriers with respect to flex-fare tickets although the Petitioners appear to believe it does.  As we understand it, flex-fare tickets would allow consumers to choose between a traditional "locked in" fare that would not fluctuate, and a lower fare that could change before the date of travel.  In Allegiant's comments, submitted to the rulemaking docket well after the date by which such comments were due, it mentions that it is considering this new pricing option for its website and urges the Department to allow carriers to implement such a pricing structure.  Because Allegiant filed its comments many months after the close of the comment period, the Department was unable to fully consider its suggestion.  As such, the Department's rule banning post-purchase price increases does not address this issue at all  -- it does not explicitly allow or prohibit this type of practice.  It appears that the practice as described in Allegiant's comment would be an unfair and deceptive practice in violation of 49 U.S.C. § 41712 as it does not appear that there is a mechanism available for the consumer to know when the price will increase. Shortly after Allegiant's comment, a consumer advocacy group also submitted comments to the rulemaking docket.  AirlinePassengers.org expressed its view that Allegiant's proposal is "[a]nother step backward from true transparency for consumers."  This organization noted its deep concern about the "impossible-to-determine total cost because Allegiant would determine that total cost on its own"  and described Allegiant's new pricing option as "an effort to have DOT approve shifting normal airline business risk onto the consumer" *See* AirlinePassenger.org letter to DOT dated February 28, 2011, DOT-OST-2010-0140-2041.  In any event, because the flex-fare pricing structure is not addressed in the rule, a stay in the rule would have no impact on this matter.

For the reasons described above, the Department's decision to prohibit post-purchase fees and fee increases for services not purchased with the ticket is not arbitrary and capricious, and the Department has acted well within its statutory authority in imposing this prohibition.  Nothing in the final rule tells carriers what they can charge for, or how much they can charge for it.  The final rule simply requires that carriers notify consumers of existing charges at time of purchase and honor those commitments.  The final rule also doesn't address the flex fare pricing structure as Petitioners contend.  Thus, the Department finds that Petitioners have failed to demonstrate a likelihood of success on the merits on this issue.

## Baggage Fee Information on E-Tickets and Other Electronic Confirmations

Petitioners argue that the Department acted arbitrarily and capriciously by requiring carriers to provide individualized baggage charge information on e-ticket and other electronic confirmations. As support for this argument, the carriers claim that the Department failed to explain how current practices regarding the disclosure of baggage allowances and baggage charges are unfair or deceptive. In addition, the carriers question the legality of permitting agents but not airlines to provide this information via a link to the baggage fee page of a carrier website. Also, presumably as further support for its contention that the Department overstepped its statutory authority and acted arbitrarily and capriciously, while acknowledging that the rule provides information about the benefits associated with this provision the carriers note that these benefits are not quantified.

First, the Petitioners are mistaken in their belief that the rule requires individualized baggage charge information on e-ticket and other electronic confirmations. The rule states that, on all e-ticket confirmations, including the summary page at the completion of an online purchase, carriers must provide information regarding the free baggage allowance and fee for a carry-on bag and the first and second checked bag "as specific charges taking into account any factors (e.g., frequent flyer status, early purchase, and so forth) that affect those charges." 76 Fed. Reg. 23110, 23166-67 (Apr.25, 2011). We used the term "specific charges" to ensure that the regulated entities understood that a range of fees would not be acceptable under the rule. In other words, carriers must provide specific information to consumers about all the factors that cause the fee for a carry-on bag or the first and second checked bag to vary so passengers can determine for themselves the fees that would apply to them. For example, it would not be sufficient for a carrier to state that the fee for the first checked bag ranges from $0 to $50. However, it would acceptable if the carrier states that the fee for the first checked bag would be $0 for its elite frequent flyer passengers or those with a specified credit card, $25 for passengers who purchase it online, and $50 for those passengers who pay at the airport. Of course, carriers are free to provide individualized baggage charge information to passengers but this is not required by the rule.

Despite assertions to the contrary from the Petitioners, the Department has provided an explanation regarding how the current practice regarding the disclosure of baggage allowances and baggage charges are unfair and deceptive. Presently, carriers do not provide consumers with information regarding their free baggage allowance or fees for checked and carry-on baggage on e-ticket confirmations. The Department has stated on more than one occasion that it views checked or carry-on baggage as being "fundamental to air travel." 76 Fed. Reg. 23110, 23148 (Apr.25, 2011). Individual commenters on the proposed rule noted being "surprised by additional baggage fees when they check-in at the airport." *Id.* The Consumer Travel Alliance also submitted comments stating that it "found that 66 percent of passengers were surprised by airline fees at the airport and 65 percent said these fees caused unexpected financial strain." *See* Consumer Travel Alliance letter to DOT dated September 20, 2010, p. 11, DOT-OST-2010-0140-1507. We view the lack of disclosure to consumers about carry-on baggage and first and second checked bag fees in text form in the e-ticket confirmation in advance of check-in to be an unfair and deceptive practice. We do permit ticket agents, unlike carriers, to provide the required notice of applicable baggage charges through a hyperlink "to the locations on the airline websites

where specific information may be obtained since the airlines often update and change fees." *Id* at 23147.

As for the cost-benefit analysis for this provision, the Petitioners appear to argue that the Department exceeded its statutory authority because the Department estimated compliance costs of $8 million but did not quantify the benefits. The Petitioners acknowledge that the Department has described qualitative benefits for this provision in the rule and the Final Regulatory Analysis accompanying it. Executive Order 12866 does not mandate that an agency rely only on benefits or costs that it can quantify. It is perfectly reasonable and acceptable for an agency to also address and consider costs and benefits that cannot be monetized.[7] See OMB Circular A-4.

For the reasons described above, the Petitioners fail to demonstrate that the Department's decision to require carriers to provide specific baggage fee information on e-tickets and other electronic confirmations oversteps its statutory authority and is arbitrary and capricious. Therefore, the Department concludes that the Petitioners have not demonstrated a likelihood of success on the merits with respect to this provision of the final rule.

Flight Status Notifications

Petitioners are claiming that the Department's decision to require flight status notifications is arbitrary and capricious because the Department gave smaller carriers reason to believe the requirement would not apply to them and because the Department's regulatory analysis fails to address the cost impacts associated with this requirement. The carriers also assert that flight cancellations and delays will increase under the rule, as they appear to believe the rule requires notification about tentative cancellations and delays.

We reject the assertion that the Department gave smaller carriers reason to believe a requirement to provide information about flight status changes to passengers and members of the general public would not apply to them. Although the Department stated that it was "tentatively" of the opinion that the costs of this provision for smaller carriers outweighed the benefits to consumers, it invited comments on whether this requirement should be applied to smaller U.S. carriers and foreign carriers and asked for information on the cost and benefit of expanding coverage to these carriers. See 75 Fed. Reg. 32318, 32331 (June 8, 2010). Indeed, the Department received comments from various organizations and individuals on this point. The New York State Consumer Protection Board, Association of Airline Passenger Rights, Flyersrights.org, Consumers Union, various commenters on RegulationRoom.org, and Airports Council International-North America (ACI-NA) all submitted comments supporting expanding the proposed coverage of this rule to smaller U.S. carriers and foreign carriers. ACI-NA specifically points out that delays and cancellations by smaller carriers who mainly serve small and non-hub airports can have severe adverse effects on connection hubs. The Department sees no reason for smaller carriers to conclude that the Department had ruled out applying this provision to them.

---

[7]     OMB Circular A-4 states that "You should monetize quantitative estimates whenever possible. Use sound and defensible values or procedures to monetize benefits and costs, and ensure that key analytical assumptions are defensible. If monetization is impossible, explain why and present all available quantitative information." (p. 19).

We also reject the argument that the Department did not weigh the relative costs and benefits of requiring flight status notifications of smaller carriers. We note that both Petitioners failed to comment on the flight status notification provision in the NPRM despite the Department specifically soliciting comment on "whether the regulation should cover a greater number of carriers and operations, including operations of smaller U.S. carriers and/or international operations of U.S. and foreign carriers" and "[w]hat would be the cost or benefit of expanding coverage to those additional carriers?" 75 Fed. Reg. 32318, 32331 (June 8, 2010). The Department made a determination to apply the flight status notification requirement to smaller U.S. carriers and foreign air carriers because it concluded that the unquantifiable benefits outweighed the unquantifiable costs based on all the information available to it. 76 Fed. Reg. 23110, 23158 (Apr. 25, 2011). More specifically, the Department explained that "monetized estimates could not be developed from the information available on the record" for the requirement to provide prompt passenger notification of flight status changes. *Id.* However, it added that there are "[a]dditional unquantifiable benefits that are directly or indirectly related to this rulemaking, which result in benefits that the Department has determined justify the costs." It identified this unquantifiable benefit as the benefit to consumer from "[g]reater comfort and certainty from knowing that information will be available in a timely manner." *Id.* Put another way, consumers should not be left with critical schedule information related to their trip that the carrier knows is false.

The Department further explained the qualitative benefit of the rule by stating that "[t]he need for, and importance of timely notification regarding flight delays, diversions or cancellations exists whether it is a U.S. or foreign carrier operating the flight and whether it is a non-reporting or reporting carrier operating the flight." *Id* at 23154. As for the cost, the Department states that it expects that "foreign carriers and non-reporting U.S. carriers will work with their code-share reporting-carrier partners, most of which have the necessary systems in place, to comply with the notification requirements contained in this final rule." *Id.* While we recognize that Petitioners do not code-share with the reporting carriers, we do not expect these carriers or other small carriers to be starting from scratch to comply with this requirement as they already address notifying consumers of known delays, cancellations, and diversions in their customer service plans as required by the prior consumer rule.

Petitioners also seem to misunderstand the flight status notification requirements, which may be the reason they believe the cost impact is much larger than it actually is. The carriers mistakenly believe the final rule requires carriers to notify passengers and the public of "tentative delays or cancellations." In the NPRM, we proposed to require carriers to provide notifications in situations where the carrier becomes aware or should have become aware of a flight status change. Many carriers challenged the "should have known" standard, arguing that it is difficult to comply with this standard. The Department agreed with commenters that this proposed standard would have created uncertainties and did not include it in the final rule. Under the final rule, carriers are only required to notify passengers and others of any "known" delay, diversion, and cancellation. We do not consider a carrier to be aware of a delay or cancellation when the carrier is still in the process of determining whether such a change may occur. Carriers are also free under the rule to notify passengers that a delay or cancellation may have to occur, if the final decision has not as yet been made.

In sum, the Department's decision to require smaller carriers to provide information about flight status changes is not arbitrary and capricious, as the Department solicited comments on whether this requirement should be applied to smaller U.S. carriers and considered the cost impacts to them. Thus, the Department concludes that Petitioners have failed to demonstrate a likelihood of success on the merits on this issue.

## II.     <u>Petitioners Have Not Demonstrated That They Would Suffer Irreparable Harm in the Absence of a Stay</u>

In order to obtain a stay, Petitioners must also demonstrate that they will suffer irreparable harm absent a stay of the effective date of the amendments pending judicial review. Irreparable injury is the essential predicate for a request for a stay of agency action pending review. 5 U.S.C. § 705. Indeed, "[t]he basis for injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Sampson v. Murray*, 415 U.S. 61, 88 (1974), quoted in *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

Petitioners' contentions of irreparable harm rest in part on their claim that a violation of the First Amendment automatically results in irreparable harm. However, when the irreparable harm alleged "is inseparably linked" to a claim of a First Amendment violation, the irreparable harm determination first requires an analysis of Petitioners' likelihood of success on the merits. *See, e.g., Newsome v. Albemarle County School Board*, 354 F.3d 249, 254-55 (4th Cir. 2003); *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 511 (4th Cir. 2002). Here, Petitioners cannot simply assert a "per se" finding of irreparable harm because, as set forth above, they have failed to establish a likelihood of success on the merits of their First Amendment claim under *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980) and its progeny.

Petitioners also allege they will suffer irreparable economic injury in the form of compliance costs, lost opportunity costs, and damage to their corporate system/identities unless there is a stay of the effective date pending judicial review. The D.C. Circuit imposes "a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). "[T]he injury 'must be both certain and great; it must be actual and not theoretical." *Id.* (quoting *Wisc. Gas Co.*, 758 F.2d at 674). Also, "[t]he moving party must show '[t]he injury complained of is of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm.'" *Id.* (citations, brackets, and internal quotation marks omitted).

Under this standard, Petitioners have failed to meet their burden. Without providing supporting evidence, Petitioners contend that they will suffer irreparable harm because they "will be forced to dramatically change or abandon the marketing, distribution and pricing models that allowed them to keep ticket prices low." They assert that non-refundable tickets and flexibility in ancillary fees and services are essential to keeping Petitioner's ticket prices low and differentiate them from other carriers. They also mention Spirit's $9 Fare Club program and state that the fare advertising rule would have significant negative impact on this program as it would require the carrier to include government taxes and fees and if purchased on the internet a convenience fee which would "reduce Spirit's subscription revenues and force ticket prices to rise." Petitioners add that "[a]dvertising low base fares is essential for attracting customers and increasing demand

in the market served." They argue that the rule leaves "little distinction between the low fare carriers and legacy carriers."

We find the Petitioners arguments to be seriously flawed and reject their claim that they will suffer irreparable economic harm for various reasons. The fare advertising rule doesn't cause ticket prices to rise – the passenger would have had to pay for the government taxes and fees and if purchased on the internet a convenience fee (in Spirit's case) whether or not the full fare advertising rule existed. The full fare requirement simply ensures the passenger is aware of the total ticket price earlier. As for the argument that displaying the full fare could reduce Spirit's subscription revenues, we agree that it is possible that a passenger may not be as interested in the $9 Fare Club program when they realize that the actual cost of travel is more than $9. However, the impact of the full fare advertising rule on Spirit for its $9 Fare Club program is no different than the impact on other carriers, including legacy carriers, who would also be required to display all the mandatory fees associated with air travel in the ticket price. This was fully considered in the Department's regulatory evaluation. Indeed, we noted that one of the benefits of the full fare advertising rule is "the time saved for those consumers beginning a ticket purchase that is later abandoned once the full fare is known." We explain that these individuals "see a fare advertised (in print, on television, etc.) that does not include all taxes and fees and decide to make the effort to purchase a ticket based on the advertised price, only to find that the full-fare price is 'too high' and no longer worth purchasing." Final Regulatory Analysis, Consumer Rulemaking: Enhancing Airline Passenger Protections II, p. 56.

Petitioners also assert that the new rules will require them to make unspecified "significant changes to their websites and the way they communicate with their customers." Absent any explanation or evidence of the nature of the required changes, Petitioners' assertions are entitled to little weight. While we acknowledge that the rule requires some changes to advertising practices, it is far from self-evident that there would be a dramatic cost associated with altering web sites to alert customers earlier in the purchase process of taxes and fees that already must be calculated, disclosed, and collected at the time of purchase. We noted in the preamble to the April 25, 2011 rule that "sellers of air transportation are constantly updating their fare matrices and the methods by which they display fares." *See* 76 Fed. Reg. 23143 (Apr. 25, 2011). In addition, we are now giving carriers until January 24, 2012 (9 months from the date the final rule was issued) to comply with the full-fare advertising provisions, allowing them to use their business judgment to determine the most cost-effective time and manner to make any necessary adjustments.

We also find unpersuasive the assertion that the final rule will necessitate a change in the marketing, distribution and pricing models that allowed Petitioners to keep ticket prices low. Again, the Department's full fare advertising rule does not increase ticket prices but requires disclosure of the actual ticket prices. With respect to ancillary services and fees, nothing in the rule tells a carrier what kind of ancillary service or product they can have or how much they can charge for it. The rule simply requires that carriers notify consumers of existing charges at time of purchase and honor those commitments. Also, Petitioners did not provide any evidence that they will suffer irreparable harm related to holding a reservation for twenty-four hours without payment or refunding a payment upon request within 24 hours of the sale. The Department already addressed the cost concerns regarding this provision by establishing a point in time after

which carriers are no longer required to follow the "twenty-four hour" rule as it "could result in loss of sales and revenue by carriers and prevent other passengers from purchasing the seat if the seat is not released in a timely manner prior to the flight." 76 Fed. Reg. 23110, 23129 (Apr.25, 2011).

Petitioners' allegations do not establish irreparable harm under the high standards required by applicable law. Accordingly, the Department finds that Petitioners will not suffer irreparable harm in the absence of a stay pending judicial review.

## III.     Substantial Harm to Other Parties Would Occur If a Stay Is Granted, and Issuance of a Stay Would Harm the Public Interest

Petitioners must further demonstrate that no other parties will be harmed if a stay is granted, and that a stay would serve the public interest. Petitioners argue that a stay would not impose any substantial harm on any other person and that a stay would serve the public interest by maintaining existing consumer protection rules and practices in place pending judicial review.

These factors tip decisively in favor of denying a stay. Beyond the interests of Allegiant Air and Spirit Airlines, who disagree with the rule amendments, Petitioners fail to demonstrate how a stay would not harm other parties and serve the public interest. Here, the government shares with the public a strong interest in timely implementation and enforcement of air passenger consumer protection regulations. The Department is not persuaded, as Petitioners contend, that the public will be confused if the amendments change as a result of judicial review, or that the public will benefit by air carriers' continued deceptive practices. To the contrary, the interests of other parties and the public are best served by enhancing protections for airlines passengers as set forth in the final rule. Airlines and sales agents currently have widely varying practices regarding which taxes and fees are included in quoted prices, and Petitioners fail to explain how obtaining consistency would confuse, rather than aid, consumers.

Moreover, if the Department were to issue a stay that would delay implementation of the amendments beyond the new effective dates, airline passengers will suffer injury by the practices that the amendments seek to eliminate in the air travel environment. *See, e.g., Serono Laboratories, Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998) (irreparable harm to plaintiff arising from challenged regulation, balanced against similar harm to a third party if the stay is granted, resulted in a "wash" on the factor of irreparable harm). Accordingly, the Department rejects the contention that the issuance of a stay in this matter would not harm other parties and serve the public interest.

**IV.**     <u>**Conclusion**</u>

The Department has reviewed Petitioners' request for a stay of the effective date of the amendments, and finds that Petitioners have failed to satisfy any of the four criteria required for an agency to grant a stay pending judicial review.  Accordingly, the Department finds that justice does not require a stay in this matter.

Sincerely yours,

Susan Kurland
Assistant Secretary for
Aviation and International Affairs

Exhibit 3

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————————x
:
SPIRIT AIRLINES, INC. :
:
          Petitioner, :
:
v. :
:
U.S. DEPARTMENT OF :
TRANSPORTATION :
:   Consolidated Docket
         Respondent. :   Nos.
———————————————————x   11-1219 & 11-1222
:
ALLEGIANT AIR, LLC :
:
          Petitioner, :
:
v. :
:
U.S. DEPARTMENT OF :
TRANSPORTATION :
:
         Respondent. :
———————————————————x

## DECLARATION OF B. BEN BALDANZA

    1.    My name is B. Ben Baldanza. I am the President and Chief Executive Officer, and also a member of the Board of Directors, of Spirit Airlines, Inc. ("Spirit"). I have held these positions since 2006. I first joined Spirit in 2005 as its Chief Operating Officer.

2.     Spirit was founded originally in 1964 as Clippert Trucking Company. Beginning in 1983, we started doing business as a Detroit-based charter tour operator, known as Charter One. In 1990, we received our air carrier certificate and began directly operating charter flights. In 1992, we renamed ourselves Spirit Airlines and began to operate scheduled flights using jet aircraft, and in 1999 we moved our headquarters office to its present location in Miramar (Fort Lauderdale), Florida. Beginning in 2005, we began acquiring an entirely new aircraft fleet. Since 2007, we have been the largest operator of both domestic and international flights at Ft. Lauderdale-Hollywood International Airport, currently accounting for approximately 20% of that airport's total passenger traffic. At this time, Spirit employs almost 2,500 people, about 12% more than this time last year according to a recent Department of Transportation ("DOT") report.

3.     As of July 2011, Spirit operates more than 150 daily flights to 49 destinations throughout the United States, the Caribbean and Latin America. We operate an all-Airbus fleet of 35 aircraft and have contracted delivery orders for additional aircraft that will bring the fleet to 68 aircraft by the end of 2015.

4.     On June 1, 2011, Spirit closed its initial public offering and our stock now trades under the ticker symbol "**SAVE**" on the NASDAQ Stock Market.

5.     Spirit is the first so-called "ultra low-cost" carrier in the United States. We have one of the lowest unit operating costs in the industry. Our business model is focused relentlessly on maintaining the lowest costs possible and transferring those savings to consumers by offering what are generally the lowest fares in the markets we serve. Experience reflects that when Spirit enters a market, prices drop and demand rises—both significantly.

6.     Spirit focuses on price-sensitive travelers, many of whom would not be able to travel by air at all but for the availability of very low fares. During the five years ending in December 2010, Spirit's average price per one-way flight segment fell from $104 to $77. In the first quarter of 2011, it has risen slightly to $82, which is remarkable given the dramatic increase in the cost of fuel which rose almost 29% from the first quarter of 2010 and an 11% increase in pilot labor rates compared to 2010 (due to a new collective bargaining agreement signed in June of 2010).

7.     A core feature of Spirit's ultra low cost model is to stimulate passenger traffic by saving customers money in two ways: first, by passing

3

on our low costs in the form of lower fares; second, by empowering customers to pay only for those options they need or value. We make available a variety of optional ancillary products and services for a fee. Ancillary products and services include carriage of checked and large carry-on baggage, the ability to select specific seats in advance and upgrades to premium seating. Airlines that do not separately charge for baggage are including their cost to carry bags in the base fare such that all passengers effectively pay for checking a bag even if they do not use that service. In contrast, our business model caters to extremely price-sensitive and lower-income passengers for whom the ability **not** to pay for an unneeded service is a crucial means to save money on travel, without which such passengers might not be able to travel at all. For example, Spirit's entry into new international markets has resulted in an average 25% drop in airfares for that market and a related increase of 43% in passenger traffic. Often this stimulated demand comes from resident ethnic communities in the U.S. who had very limited ability to travel to their home countries before Spirit provided a low-cost travel option to these markets.

8.    The fees for ancillary services are explained clearly on Spirit's website so a customer can easily determine in advance what the total cost will be for the fare and additional services the customer wants before

4

making a purchase. In 2009, Spirit pioneered a "shopping cart" customer interface on our website, similar to the approach used by online retailers such as Amazon.com, allowing customers to review and adjust their selections of ancillary services and products before agreeing to a final purchase. This consumer friendly approach enables a passenger on Spirit to pay only for what he wants. Typically, even when a customer chooses to add ancillary services, he will pay a lower total price to fly on Spirit than on a traditional legacy airline or even other low cost carriers.

9.    Another feature of Spirit's ultra low cost model is to develop and grow other non-ticket revenue, which may be only indirectly related to a particular trip and which allows us to drive fares even lower. A good example of this is Spirit's unique $9 Fare Club, a subscription service that offers Club members exclusive access to our very lowest fares, which can run as low as, and sometimes lower than, $9. By joining the Club for an annual $59.95 fee, members obtain both discounted fares and discounts on various ancillary services such as for checked bags. The Club has proven highly popular with our customers who are traveling in a family group, or who expect to fly more than two or three times per year but are not highly sensitive to a particular schedule. Indeed, the cost of Club membership is often recouped in a single flight.

5

10.     Critical to Spirit's ultra low cost model is the ability to advertise base fares (which already include 7.5% federal excise tax, per IRS regulations) and separately list other non-*ad valorem* government taxes in a fully transparent way. This practice—which is consistent with DOT enforcement policy dating back more than 25 years—is fundamental to Spirit's business. Spirit has relied extensively on DOT's longstanding policy—which DOT reaffirmed as recently as 2006 as in the public interest—in developing its reputation for offering very low fares and will suffer significant and irreparable harm if it is required to comply with the new rule.

11.     Our customers understand that government taxes are added to the price shown in advertisements. Airlines have advertised their services in this fashion for many years, due to the longstanding DOT policy, and consumers are conditioned to this practice. Listing government taxes and fees separately is consistent with general commercial practice for virtually all goods and services a consumer buys. Moreover, Spirit clearly discloses the amount and breakdown of government taxes and fees on its website, which information is readily viewable by a prospective customer before making a decision to book a trip.

12.    The *Enhancing Airline Passenger Protections* rule issued on April 18, 2011 (the "Final Rule") seriously interferes with Spirit's business model. As discussed below, Spirit believes it will not have the necessary Information Technology ("IT") infrastructure and functionality to fully comply with this rule for more than a year. We anticipate the cost of compliance will significantly increase airfares resulting in fewer customers and dramatically increased uncertainty in operating its business and planning for future growth. Airlines require very significant commitments of capital to operate and grow. The selection and acquisition of new aircraft, which may cost from approximately $35 million to almost $100 million apiece depending on the model, and the configuration and implementation of reliable, high-volume IT infrastructure, are examples of decisions that have very long term consequences and which are implemented over several years. Airlines work on these very long timelines to design their business models, define their travel product to consumers (including pricing policies, the terms and availability of ancillary products and services and overall brand and reputation features that establish a desired relationship with customers) and plan future growth. At the same time, as is well known, the industry has been characterized through most of its history by thin and volatile profit margins and—since deregulation of the industry—a high level of

7

competition. These realities raise the stakes in long term planning decisions, as even small errors or deviations from projections can be extremely costly, perhaps fatal to an airline business. As a result, the introduction of new and significant uncertainty arising from the major changes provided in the Final Rule will require Spirit, and other airlines, to reconsider or delay new service, cut back existing service in marginal markets and well could necessitate delaying or cancelling earlier scheduled aircraft deliveries. This will directly harm the traveling public and also result in reduced hiring and job cuts, at a time when the difficult economy makes many consumers dependant on low airfares to travel. Specific issues with the rules are as follows.

13.    The reversal of DOT's longstanding fare advertising policy will eliminate base fare advertising. As described above, base fare advertising is essential to Spirit's marketing of very low fares to price-conscious travelers and to its brand reputation as the price leader in the markets we serve. It is also a fundamental basis behind Spirit's reservations system, which today lacks the functionality to quote prices in the manner required under the Final Rule. Even disregarding the significant and irreparable damage to Spirit arising from the inevitable change in consumer behavior from higher actual and perceived prices, implementing the changes required to Spirit's IT

8

systems will be impossible in the time provided by DOT, including the newly extended January 2012 implementation deadline.

14.    Elimination of base fare advertising (*i.e.*, requiring Spirit to incorporate government taxes and fees in its pricing) will artificially inflate the price of tickets, doing great harm to Spirit's primary competitive pricing advantage. Because Spirit's average fares are generally lower than its competitors, requiring Spirit to advertise the fare with hidden government taxes and fees will make it appear that, on a percentage basis, Spirit's fares have increased more than those of its higher priced competitors. The typical consumer, accustomed to many years of seeing base fare prices advertised, will simply not be able to sort out the difference.

15.    Since government taxes are imposed on a per flight segment basis, the new rule requiring these taxes to be incorporated in the base fare causes an especially acute problem for Spirit. This is because the total cost of government taxes and fees will change with the routing of the flight. For example a one-stop flight will have higher taxes and fees than a non-stop. Spirit's current reservation system enables passengers to select from a range of departure times and routings, which benefit the traveler. The new rule will either force Spirit to reduce customer ability to select routings or require Spirit to charge the same price regardless of the routing which will

9

ultimately force base fares to go up. Already, I hear regularly from Spirit customers who accuse us of "making up for low fares" with taxes. Eliminating the transparency provided by the DOT's longstanding base fare policy and by our separate disclosure of government taxes and fees will cause customers to think, understandably, that such taxes and fees are part of Spirit's revenue. If the Final Rule is allowed to stand, based on past practice, customers will naturally think that additional taxes and fees will be assessed on top of the already composite price.

16.     Given the significant cost of government taxes and fees when measured against Spirit's low fares (government taxes and fees are generally $21.40 for a non-stop domestic roundtrip, $42.80 for a one-stop domestic round trip and between $57 and $152 for a non-stop international round trip), the price increase perceived by customers will appear substantially greater for Spirit than for its higher fare legacy competitors even though the base fare actually received by Spirit remains unchanged. The new rule will thus mislead consumers as to the true cost of the airline service versus the amount of money going to governments, and fatally interfere with the perceived benefits of the $9 Fare Club. Loss of Club members will directly reduce Spirit's subscription revenues, force general passenger fares to rise

and damage the customer loyalty Spirit has worked hard for several years to develop.

17.    The prohibition in the Final Rule against nonrefundable ticket sales made seven or more days before departure also will drive fares up. More than 90% of Spirit tickets are sold seven or more days before travel. Selling only nonrefundable tickets enables Spirit to offer rock-bottom prices. It is an essential part of Spirit's ultra low cost model. While legacy airlines targeting business customers make refundable tickets available, Spirit made a very deliberate decision to keep fares as low as possible by adopting a no-refunds policy. Spirit's reservation system is not designed to enable reservations to be held without payment or to process refunds electronically. Spirit's simple approach to ticketing, well understood by its customers, is an essential aspect of its ability to deliver low fares. Spirit estimates conservatively that its prices would rise between $3 and $4 per ticket if the Court were to permit DOT to impose this pricing restriction (even with the carve-out for tickets sold less than one week before travel). It should be noted that Spirit does provide an optional travel insurance product, for a modest fee, that allows customers to protect their investment by obtaining refunds for many unforeseen eventualities that may prevent them from taking their trip. Spirit also is certainly not opposed to the idea of an airline

offering a "hold" feature for customers. In fact, Spirit is currently developing just such a feature, as an ancillary product, that will give a customer the option to pay an additional amount for the right to keep a reservation in place for a limited period prior to final purchase. Such an approach will allow the great majority of our customers who do not mind a non-refundable ticket to receive the very lowest price available, while offering those who do need greater flexibility the option to pay a bit more for the ability to hold a reservation or receive a refund. In contrast, DOT's required 24-hour hold or refund period unfairly stifles new and innovative approaches, like Spirit's, that carriers may design to accommodate their target customers.

18.    The prohibition against charging the current price when a customer purchases an ancillary service after the time of ticketing would have a significant revenue impact on Spirit. Due to the volatility of costs (especially our largest cost, fuel) and passenger demand in our industry, pricing of ancillary products must be allowed to fluctuate until they are actually purchased.

19.    To be clear, Spirit does not raise the price of a ticket or ancillary service once it has been purchased. However, the price of a yet-unpurchased ancillary service may change after the time a customer purchases his ticket, because passengers often wait to purchase ancillary

12

services until long after they make their initial ticket purchase. The Final Rule prevents Spirit from charging the customer the price in place at the time he purchases the ancillary service, and requires Spirit, at great expense, to keep track of what the price was when each individual purchased his ticket (which could be weeks or even months earlier), and "lock" ancillary pricing for ticketed passengers until the flight is flown in order to make the service available at the old price. Meanwhile, implicitly, DOT would allow ancillary prices to change for prospective customers who have not yet bought their ticket. This system is obviously immensely complex to implement, and Spirit does not now have the IT functionality to do so; nor does the technology and software even exist today in Spirit's platform, requiring us to essentially write entirely new code and engage in lengthy testing – a process that will take far longer than the time allowed by DOT. Due to the broad array of ancillary products and services, the large number of promotional and other influences on pricing, our revised system would have to be able to process literally millions of potential combinations. It also needs to be able to deliver that functionality directly to customers on our own website, as well as working correctly on the completely different systems used by third-party distribution channels. The technology does not exist today and may take several years to develop. From an economic point

of view, this aspect of the Final Rule effectively forces Spirit's prices for ancillary services to lag behind its costs, which is anathema to a low-margin business in which reservations are often booked many months before flight date. Over time, we and other airlines who offer optional ancillary products and services for a separate charge from the ticket will be forced to systematically "overprice" such ancillary products and services, in order to properly bear the risk of cost increases. The net effect will be higher prices for the consumer and lower demand and revenues for the airline industry— with all the secondary adverse effects on the general economy that those outcomes imply.

20.    The provisions in the Final Rule regarding notification of individualized baggage charges on electronic ticket confirmations and flight status notifications present operational challenges and accompanying compliance costs that DOT did not consider.

21.    Spirit's policies regarding baggage charges are posted on our website and kept current on a dedicated page, which customers can consult at any time through a link to the page. The information is also available by phone. Since the charges are spelled out clearly, we believe requiring Spirit to express charges "taking into account any factors (*e.g.*, frequent flyer status, early purchase, and so forth) that affect those charges" (§ 399.85(c))

in text form on each individual passenger's electronic ticket confirmation is an unnecessary burden.

22.    Spirit is already subject to a requirement regarding flight status notifications, which DOT imposed in its December 2009 rule on tarmac delays. As a result, Spirit's Customer Plan (which is incorporated into our contract of carriage) states:

> We will give our Customers, whether at the airport, onboard an aircraft, or elsewhere with computer or telephone access, the best available information regarding delays and cancellations in a timely manner. Because we know that timely and accurate communication regarding travel interruptions is important, we make every reasonable effort to provide Customers and employees with the most accurate, up-to-date flight information as quickly and frequently as possible.

The Final Rule imposes a new, strict 30-minute deadline for notifying passengers about cancellations, delays expected to last longer than 30 minutes and diversions.

23.    DOT noted in its proposed rule that because nearly 90% of domestic air travelers fly on the largest U.S. airlines, smaller airlines (like Spirit) should not be subject to the new flight status requirement. We agree but note that the DOT's own finding did not keep it from imposing this mandatory notification rule. In practice, the hard 30-minute notification

deadline will have the perverse effect of causing, rather than preventing operational problems. This is because premature notice to passengers about flight cancellations or delays could cause them to arrive at the departing airport later or make alternate travel plans even though the flight ultimately could have departed on schedule.

24. In addition to inserting tremendous uncertainty into Spirit's route and service planning and implementation, the challenged rules impose substantial compliance and lost opportunity costs by diverting employee time away from other IT programs, which Spirit would not be able to recover if, ultimately, the Court sets the rules aside. Spirit estimates that compliance costs (associated especially with extensive back-end and front-end changes to our information technology systems) for the fare advertising rule alone will exceed $2.1 million. This is almost 30 percent of the total cost to implement the rule that DOT's Regulatory Analysis estimated for the entire airline industry. Spirit's total compliance costs for all five of the provisions challenged will easily exceed $5 million. (As context, for the three months ended March 31, 2011, Spirit's total net income was $7.9 million.) Information Technology time spent on implementing these rules will delay other technology changes that will improve our customer interface

16

and delay IT improvements that would likely generate approximately $53.5 million in additional revenue or cost savings.

25.    Importantly, the traveling public will be directly harmed if Spirit is required to come into compliance with the new requirements before judicial review is complete. For example, as noted earlier, our customers know and understand base fare advertising (*i.e.*, that the fares Spirit and other airlines advertise do not include government taxes and fees). If, because of the Final Rule, we are forced to abandon base fare advertising and must begin to include government taxes in the fares we advertise, consumers will be confused if ultimately our challenge to the Final Rule is successful and, like every other industry, we are able to return to the status quo base fare advertising. This kind of flip-flop would immeasurably erode customer trust and loyalty.

26.    Most important, Spirit will not be able to make critical business decisions until we know the outcome of our challenge to the Final Rule. Typically, network planning (where we will fly and how we will use our existing aircraft and the new aircraft we have scheduled for delivery) and marketing decisions (where we will advertise and what we will say to consumers) are made many months, sometimes years, in advance of the time they are implemented. Our route planning and marketing decisions for this

17

Fall/Winter season were made long before the rule was issued. If the challenged rules take effect as scheduled or are even extended for several months, it is likely that perceived and real increases in fares caused by the rule will result in fewer than anticipated passengers, leading to reduced revenues and the need to reduce service and employment. While we cannot be certain how to move forward until judicial review is complete, we must proceed now to plan for the Spring 2012 season and make as well as implement decisions as if compliance with the rule will be necessary for the Spring season.

27.    For example, we will need to evaluate now whether the flight schedule we have planned for Spring 2012 will be sustainable given the negative demand elasticity resulting from fare increases caused by these rules. Because the challenged rules will cause fares to rise (and thus demand to fall), we anticipate it will not make economic sense to fly some of the routes planned to smaller or more marginally profitable cities, necessitating service reductions in some of these markets. This may require the delay or cancellation of new aircraft deliveries and subject Spirit to substantial penalties.  If we are unable to operate a planned route, our decision will have a two-fold adverse impact on affected communities. First, without Spirit flying in a given market, tickets will be more expensive, making some

18

consumers unable to travel and, second, higher fares mean less market stimulus and fewer jobs in local economies. For example, in our home region of South Florida, a tourism-centric region, approximately every 90 incremental visitors support a local full-time job.

28.     Similarly, if there is a risk that Spirit will have to comply with the Final Rule before judicial review is complete, we will have to scale back our growth plans, which means fewer jobs at a time when unemployment continues to be a drag on economic recovery.

29.     Spirit will be irreparably harmed if the challenged rules are permitted to become effective before judicial review is complete. Maintaining the *status quo* will serve the public interest by avoiding consumer confusion, keeping fares low and preventing unnecessary economic harm to small communities and to those employed in the aviation sector.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Miramar, Florida
July 22, 2011

By:

Name:  B. Ben Baldanza
President and CEO
Spirit Airlines, Inc.

Exhibit 4

# DECLARATION OF MAURICE J. GALLAGHER, JR.

I, Maurice J. Gallagher, Jr., state as follows:

1.     I am Chief Executive Officer of Allegiant Air, LLC ("Allegiant").  I have been actively involved in the management of Allegiant for over ten years and have served as CEO since 2003.   I am responsible for overall supervision and management of Allegiant, including the company's sales and marketing activities, website, customer relationships, and regulatory compliance.  These responsibilities are carried out in close coordination with Allegiant's other senior officials including its President, Andrew C. Levy, and Chief Financial Officer, Scott Sheldon.   I also serve as Chairman of Allegiant's parent, Allegiant Travel Company, and in that capacity I am actively involved with our Board of Directors in Allegiant's strategic planning and decision-making.

## *Allegiant's Business Model*

2.     Allegiant, based in Las Vegas, Nevada, is more than an airline.  It is a full-service travel company whose innovative and unique business model makes it possible for travelers from small communities throughout the United States to reach major destinations like Las Vegas, Phoenix, Los Angeles, Orlando, Tampa/St. Petersburg and Fort Lauderdale easily and economically.  Allegiant's

business model has been very successful in stimulating passenger traffic over these routes – almost all of which are served only by connecting (change-of-plane) service apart from Allegiant's nonstop flights – primarily on the basis of our low fares. In the absence of our service and economical fares, many of our passengers would not travel by air, if at all.

3.    Allegiant began linking numerous smaller communities with major destinations some nine years ago and has grown rapidly and consistently until very recently, earning a profit each year since 2003. In late 2006, Allegiant Travel Company (of which Allegiant Air is a wholly-owned subsidiary) successfully completed an initial public offering of stock. The company continued to prosper and grow, overcoming industry challenges such as high fuel costs and national economic instability. Allegiant now employs some 1,700 people and serves 63 small communities and nine larger destinations using a fleet of over 50 jet aircraft seating on average 150 or more passengers. In 2010, Allegiant ranked number one for low-cost carriers in Aviation Week's Top Performing Airlines study, and ranked 25th on Fortune magazine's Fastest-Growing Companies list.

4.    On all routes, Allegiant offers low-cost nonstop service that can be purchased on a stand-alone basis or bundled with hotel accommodations and other travel-related services. Allegiant's average base fare (i.e., our advertised fare

which excludes taxes and fees) was approximately $76 in 2010 and approximately $89 in the first quarter of 2011. We keep prices low commensurate with a goal of filling 90% of our seats on average. Revenue from the sale of ancillary goods and services is a significant part of the Allegiant business model, and products available to passengers for optional purchase include advance seat assignments, priority boarding, beverages, snacks, and checked baggage service.

5.    Allegiant's innovative business model, and therefore Allegiant itself, is a product of the Airline Deregulation Act of 1978. Allegiant contributes significantly to the Deregulation Act's goal of a national air transportation system relying on actual and potential competition to provide efficiency, innovation, and low prices.[1]

### *Effect of New Full-Fare Advertising Rule*

6.    Allegiant will be harmed significantly and irreparably if forced to comply with the new "full-fare advertising rule" imposed by the U.S. Department of Transportation ("Department" or "DOT"). Simply put, the foundation of Allegiant's pricing model is the ability to advertise base fares in a manner consistent with DOT regulations and policies that have been in effect for over 25 years. For Allegiant, the fact that it was on the right path in developing and

---

[1]    49 U.S.C. § 40101(a)(12).

implementing its pricing model was affirmed by DOT in 2006, when the Department completed a comprehensive rulemaking review focused exclusively on airline pricing practices and concluded that the status quo should be maintained.[2] Our approach to price advertising was reaffirmed in 2008 when the DOT enforcement office asserted that a convenience fee Allegiant charges customers who choose to purchase travel via our website, rather than in-person at our ticket counters, should not be separated from our base fares. After lengthy negotiations with DOT, we and the Department arrived at a resolution whereby our base fares continued to exclude government taxes and fees (and the convenience fee) on initial presentation to consumers using our website,[3] subject to our making disclosures consistent with the long-standing DOT requirements. In short, Allegiant has relied on over two decades of consistent DOT rules and policy in building a business model and pricing structure that stimulates passenger traffic and enables Allegiant to cater to price-sensitive travelers from smaller, underserved communities across the country.

---

[2]    *Price Advertising*, 71 Fed. Reg. 55398 (Sept. 22, 2006).

[3]    The sole exception is the 7.5% federal excise tax on domestic air transportation, which is required by § 7275 of the Internal Revenue Code to be combined into the base fare.

Our current route map is shown below.



7.     To illustrate the effect of the new rule, a one-way fare Allegiant currently advertises at $69 would increase, perceptively, by 15% to become a $79 or $80 advertised fare.  The inevitable (albeit inaccurate) consumer *perception* of a higher fare would have a dampening effect on sales, as consumers would not understand that air transportation is now being advertised on a different basis than (a) has been the case for nearly a quarter century, and (b) remains the case for essentially all other goods and services.

8.     We know from years of experience that consumers understand base fares do not include certain additional charges.  Allegiant receives very few consumer complaints about price advertising, indicating the public is fully accustomed to the

manner in which Allegiant and other sellers of air transportation price and advertise their products.  We know as well that consumer perception is key in terms of generating interest, thereby stimulating traffic, and thereby enabling Allegiant to provide and expand the unique and valuable service it offers the public.  Stronger and stronger consumer resistance is encountered as perceived prices become higher.

9.     We also know from years of experience that Allegiant's prospective passengers are highly price-sensitive – they are ordinary consumers paying the cost of travel out of their own pockets.  Even a small increase in the perceived fare would cause a portion of them simply to lose interest in what Allegiant has to offer.  This is absolutely critical in an industry where the difference between profit and loss reduces itself to a few passengers per flight.

10.     DOT's new price-advertising rule, if upheld, would harm not only Allegiant and other low-fare carriers, but would do a disservice to the public interest.  It would do so by fostering confusion among members of the traveling public who, by virtue of DOT's consistent advertising rules and policies, have been conditioned since the 1980s to understand that the basis upon which air transportation is advertised and sold is fundamentally the same as other consumer goods and services.  That is, while DOT requires sellers of air transportation to disclose the

amount of taxes and fees by website hyperlink or on the same page as the base price, advertised base prices for air transportation do not include at least $10.70 each way (with very few exceptions) in taxes and government fees. In other words, prices for air transportation are advertised on a tax-excluded basis, just like virtually all other goods and services offered to consumers. As noted, the public has been conditioned for over 25 years to understand that an advertised airfare does not include all taxes and fees. The new rule would alter that foundation and generate confusion. A byproduct would be weakened demand for air transportation, harming Allegiant and other carriers directly, and disserving the public interest indirectly by causing fares to rise and/or service to be curtailed to compensate for the weakened demand. The resulting contraction in air service – not just Allegiant's but all carriers' – would generate a downstream adverse effect on the national economy.

11. Another serious problem created by the price-advertising rule is that the uncertain situation stemming from the new rule's pendency makes it impossible for Allegiant to engage in business planning on other than a very short-term basis. DOT's recent decision to postpone the effective date of the rule to January 24, 2012, does not cure this problem. For example, Allegiant currently has four aircraft in storage that it can return to airline operation in a 120 to 180 day time frame. In the absence of the new advertising rule, there is a strong probability

Allegiant would return some or all of these aircraft to service within that time frame, providing nonstop, low-fare service between smaller U.S. cities Allegiant does not presently serve and our major destinations.  Under current circumstances, however – that is, under circumstances where the entirety of our existing business is imperiled by ill-conceived government action – we cannot make plans to expand service.  Indeed we have curtailed growth in the wake of DOT's issuance of the new rule in April 2011:  Based on our historical growth rate, we should carry some 6.9 million passengers in 2011, but will carry only approximately 5.75 million; we should serve 79 cities by year end, but we expect to serve considerably fewer; and we should employ some 1,950 workers by year end, but will likely employ only about 1,700.  This unfortunately denies certain smaller communities and major destinations the benefits of our service that would otherwise be available, including stimulation of travel, low fares, and convenient nonstop flights.  Further, to the extent the new price-advertising rule ultimately takes effect, Allegiant would very likely be forced to withdraw from markets and/or reduce capacity to compensate for weakened demand resulting from the rule. As noted previously, Allegiant's pricing model is founded upon the ability to advertise base fares in a manner consistent with the DOT regulations and policies that have been in effect for over 25 years.

12.    If a stay is issued by the court, control over both the ultimate fate and the implementation of the new price-advertising rule would be removed from DOT's hands.  That would make an enormous difference in Allegiant's ability to operate and plan its business, as the uncertain situation described above – i.e., What will DOT require and when?  Will there be an extension of the January 2012 deadline if necessary? – will cease.  The agency's decision to delay implementation of its arbitrary rules does not cure the arbitrariness, it simply postpones it.  A stay of the rules would eliminate the possibility of Allegiant (and the rest of the airline industry) having to come temporarily into compliance with rules the court could, and in our view will, overturn.  Under a stay there would be sufficient certitude that we could manage and plan our business on a reasonable basis pending the court's final decision.  That would allow us, in turn, to avoid reductions in service and even expand into new markets that appear most promising, benefitting the public in the manner described above.

13.    It is a basic and well-known rule of economics that demand for a product moves inversely to its price.  For Allegiant and other low-fare carriers, the impact of having to incorporate $10.70 each way in taxes and government fees (the usual amount per domestic flight segment) into base fares would be very substantial in its own right, as well as disproportionately negative versus most of the airline industry.  We have calculated that the rule would represent, for Allegiant, an

average 12% increase in our fares as perceived by consumers, when there is no change in the actual amount we would collect. From all appearances, DOT has ignored this impact on carriers' revenues as well as the downstream revenue loss for the destinations they serve, which would be visited by fewer travelers as a result of the depressed demand stemming from what would appear to consumers to be higher fares.

14.    It bears mention as well that the situation would not improve over time. The rule change would result in a permanent price-comparison handicap for air travel-based vacation and leisure offerings versus products and services such as cruises, all-inclusive resorts within driving distance, and others that compete with air travel for discretionary spending – and for which there is no prospect that tax-included advertising will be required.

15.    Allegiant's average one-way fare to and from Las Vegas during 2009 was $80, while the equivalent industry-wide average fare for Las Vegas was $128. Using these figures, the impact of incorporating $10.70 taxes and fees into the advertised base price would be a perceived fare increase of 13.3% for Allegiant and 8.4% for Las Vegas fares generally. Using a conservative elasticity assumption of 50% (i.e., passenger traffic would decline by a percentage only half that of the fare increase), the financial impact vis-à-vis Las Vegas air transportation

would be very substantial.  More specifically, applying these percentages to 2009 passenger arrival and departure activity at Las Vegas, and extrapolating to the 2012-2021 period used by DOT in its regulatory analysis (discounted at 7% to present value as done by DOT), the impact would be $74 million in present day dollars for Allegiant alone, and $1.6 billion for the Las Vegas market as a whole. Again, these figures concern Las Vegas alone – on a national scale, the results of the new price advertising rule would be many times more calamitous.

16.    Apart from the effects described above, the new price advertising rule would necessitate wholesale changes to Allegiant's website and, indeed, to the pricing and advertising models Allegiant has developed over nearly a decade.  These changes would require an extraordinary allocation of manpower and would necessarily include, among other things, a full review of the required changes to our suite of information technology systems including pricing, inventory management, booking/reservations, packaging, financial accounting and customer-facing websites.  Changes must be documented, designed, coded, tested, deployed and maintained.  To handle the increased volume of database queries that would result from displaying all prices inclusive of taxes, we would likely have to implement new database systems that must be specified, purchased, deployed and maintained.  We estimate the total cost of compliance with the full-fare advertising

rule to be more than $300,000 in labor alone, plus required purchase of third-party software and external labor.

### *Effect of New Requirement to Issue Refundable Tickets*

17.    Apart from forcing a reinvention of price advertising as discussed above, DOT's new rules would require another major change: the only tickets Allegiant could sell on a nonrefundable basis would be those purchased less than one week (168 hours) before the scheduled time of departure.  On average, Allegiant sells only 9% of its tickets within that time frame, meaning that 91% of Allegiant's tickets – all of which are presently sold on a nonrefundable basis – would have to be fully refundable during the first 24 hours after purchase.

18.    Fundamentally, we do not understand how it can be considered unfair or deceptive to sell a nonrefundable ticket when the non-refundability is clearly disclosed prior to purchase, as is the case for Allegiant.  We do not perceive any reasonable basis for DOT to dictate contract terms that would drive up our costs of doing business and drive up ticket prices, particularly when the government's authority to regulate domestic air transportation pricing was terminated by Congress over 30 years ago.  If a customer wishes to purchase a refundable ticket, the customer is free to do so from one of the various carriers who offer that option, including those voluntarily offering a 24-hour reservation "hold" on otherwise

nonrefundable tickets. Allegiant has chosen not to offer that option, as is our right in an ostensibly deregulated industry.

19.    We have developed an estimate of the cost to Allegiant should this new requirement take effect. Comprehensive changes to our information technology, customer service, and financial systems will be required. We estimate that direct development, call center and other compliance costs would total $1.2 million, driven primarily by regulatory compliance and technology costs related to the full-fare advertising and 24-hour refund rules. In particular, we estimate that documentation, coding and testing of required IT changes will require more than 2,000 man-hours. These estimates do not include (a) the purchase of new database systems to deal with additional queries during passenger bookings, or (b) overhead, burden and opportunity costs related to our IT team.

20.    Much worse than the above, however, would be the continuing effect on our costs and sales. Inevitably, some of our customers would change their minds (for whatever reason) during the 24 hours after purchase, creating a continuous "forward float" of seats in 24-hour limbo that have been ticketed but will be refunded. If just 3% of our customers exercise this option to cancel, we estimate the direct cost of additional credit card transaction fees from this booking-cancellation churn at $1.3 million annually or $9.1 million over the next 10 years

(reduced to present value), not including the underlying loss of revenue from cancelled seats that are not resold. Allegiant knows of no reason customers cannot shop for air travel bargains (or whatever travel option they find most suitable) and make a final decision before purchase, as is the case for essentially all other consumer goods and services. Nor has DOT cited a reason consumers of air transportation cannot do that – indeed, they are the same consumers who regularly purchase a wide variety of other goods and services not regulated by the Department. We are unaware of any compelling reason to shift the costs of travelers' indecisiveness or post-purchase second thoughts onto air carriers.

### *Effect of New Prohibition of Post-Purchase Price Increases*

21.    Whereas current DOT rules allow air carriers to impose post-purchase price increases provided the passenger has received conspicuous written notice of that condition, the new rule would prohibit it. Allegiant has never utilized its right to impose a post-purchase price increase, and DOT cites no instance in which an airline (as opposed to a tour operator) has done so. Nevertheless, the existing rule supplies the flexibility needed for a pricing program Allegiant has under consideration and has described publicly as a possibility. Under this approach, when making a purchase, consumers would be able to choose between a traditional locked-in fare that would not fluctuate, and a lower fare that could change before

the date of travel. The lower fare could be reduced further or could increase (up to a set maximum that would be clearly disclosed) depending on changes in fuel price between the booking and travel dates. This would be a non-compulsory alternative for consumers; it would provide them another option for potential savings on their trip costs and would be clearly disclosed and explained prior to any purchase. It is not unlike the choice many utility companies now offer consumers: pay for electricity or natural gas based upon your consumption at market rates that vary, or lock in a constant monthly bill under a one- or two-year contract.

22.    The potential to offer this alternative is especially important for Allegiant. First, even a slight change in fuel cost has a major financial impact on Allegiant, as it does on other air carriers. Second, Allegiant carries numerous vacation travelers – meaning, among other things, that a relatively high proportion of Allegiant customers purchase their travel significantly in advance of their travel dates, in many cases months in advance – making it especially difficult for Allegiant to predict what the fuel price might be at the time of travel. Preservation of the ability for Allegiant to offer and customers to choose between a locked-in price and a price that may change, within limits, based on the price of fuel strikes an appropriate balance between the interests of consumers and the interests of carriers. There is no reason consumers should be denied the choice of receiving additional savings in the event of a decline in fuel price, as would be the case for

passengers purchasing when fuel prices are high but traveling when they are low. Nor is there reason carriers should be denied some measure of protection against unpredictable increases as long as appropriate disclosure and customer agreement have occurred. Consumers would understand this concept easily, just as they understand changes in the price of gasoline at the pump.

23. In Allegiant's view, fundamental fairness dictates that both parties to a travel transaction have available a measure of protection. Notably, DOT regulations applicable to the many tour operators who charter aircraft and resell the seats (with or without a ground package) continue to allow such operators to impose mandatory post-purchase price increases of up to 10%; see 14 C.F.R. §§ 380.32 and 380.33. Thus, the new rule not only denies airlines the flexibility they may need, but puts them in a position of having to compete with other air service providers not subject to the same restriction. This skewed competition would be particularly injurious to Allegiant, which operates principally to and from major vacation destinations where charter tour operators are most active.

24. The factors discussed above underscore the necessity for a stay. Current DOT rules afford Allegiant the flexibility to deal with fuel-cost volatility to at least some degree, and place Allegiant on equal footing with actual and potential competitors. Fuel is by far the most volatile and unpredictable expense for airlines

with the cost often varying widely from one week to the next, yet fuel represents a major portion of carriers' operating costs – in Allegiant's case, 37.9% to 51.2% during the 2008-2010 time frame, and 48.0% for the first six months of 2011. In the event of another crisis in the Middle East or other factor causing a significant run-up in fuel prices, Allegiant may need to implement the flexible-fare concept described above or take other action that the new prohibition on post-purchase price increases would foreclose. The new rule is an arbitrary measure that should be stayed to prevent potentially severe repercussions for Allegiant and other carriers while judicial review proceeds.

### *Conclusion*

25.    Allegiant, other carriers, and consumers would be harmed substantially and irreparably by the new rules. The rules would create the perception of a price increase when in fact there is none, cause air travel to appear less competitive with other products and services, reduce airlines' passenger traffic and the concomitant economic activity across the United States, and have an adverse effect on carriers' bottom lines – particularly those of low-fare carriers such as Allegiant. This would necessarily result in higher fares, reductions in service, and foregone opportunities to serve new markets. Allegiant and others would suffer additionally by having to allocate human and financial resources to website redesign and other IT functions

when those resources would otherwise be used for beneficial, revenue-producing activities.   It is not an overstatement to say the existence of various carriers, Allegiant among them, could be threatened.

26.    In light of all of the above, Allegiant believes the new rule should be stayed until such time as it can be determined with finality whether DOT met applicable legal requirements in adopting the rule.   A stay is additionally necessary to enable Allegiant to manage and plan its business in a commercially reasonable manner while judicial review is accomplished.

I declare under penalty of perjury that the foregoing declaration is true and correct. Executed on the 22nd day of July, 2011.

Maurice J. Gallagher, Jr.

Exhibit 5

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

————————————————————x
:
SPIRIT AIRLINES, INC.
:
          Petitioner,
:
:
v.
:
:
U.S. DEPARTMENT OF TRANSPORTATION
:
          Respondent.
:     Consolidated Docket Nos.
————————————————————x     11-1219 & 11-1222
:
ALLEGIANT AIR, LLC
:
          Petitioner,
:
:
v.
:
:
U.S. DEPARTMENT OF TRANSPORTATION
:
          Respondent.
:
————————————————————x

## DECLARATION OF DARRYL JENKINS, CHAIRMAN, AMERICAN AVIATION INSTITUTE

I, Darryl Jenkins, declare as follows:

    I make this declaration in support of the Motion of Spirit Airlines, Inc. and Allegiant Air, LLC for a stay pending judicial review of certain provisions of the Department of Transportation (DOT) Enhancing Airline Passenger Protections Final Rule, 76 Fed. Reg. 23,110 (EAPP-2).

## I. Qualifications and Background

    I am the Chairman of the American Aviation Institute (AAI), an aviation economic and policy organization based in Bethesda, MD, which specializes in data driven analysis of airline policy and regulatory issues.  I am a co-founder of the George Washington University (GWU) Aviation Institute, a past professor at

both GWU and Embry-Riddle Aeronautical University, an adviser and consultant to airlines and aviation companies for two decades, and an author of more than 10 books on travel and aviation, including The Handbook of Airline Economics. A copy of my Resume is attached as Appendix A.

AAI has been asked by the attorneys for Spirit and Allegiant to conduct, under my direction, an economic analysis of certain provisions of EAPP-2. The full AAI report titled *Negative Consumer & Economic Impact of EAPP-2 DOT Consumer Regulations* ("AAI Rep.") prepared under my supervision is attached as Appendix B and incorporated as part of this Declaration.

AAI's analysis of EAPP-2 shows that the new rules are costly to implement, have negative customer benefits, and irreparably destroy fundamental aspects of airline price competition and product innovation established in the United States over more than two decades.

## II. The Challenged Regulations

1.      On April 18, 2011, DOT issued EAPP-2, published in 76 Fed. Reg. 23110 (April 25, 2011) which extends previous consumer regulations (from EAPP-1) to foreign carriers and introduces new restrictions on airline pricing, advertising, websites, ticketing and distribution. Airlines must comply with most of the EAPP-2 rules by August 23, 2011 and with the fare advertising rule by October 24, 2011.

2.      AAI's analysis focuses on the cost benefit analysis contained in the Final Regulatory Impact Analysis ("RIA") prepared by Econometrica, Inc. which was filed in Docket on April 8, 2011, with respect to five new rules imposed by

2

EAPP-2 that disproportionately impact low-fare airlines and are likely to reduce price competition:

a.     Fare Advertising Rule (399.84):   Under prior enforcement policy followed since 1988, DOT allowed air carriers to separate airline taxes and fees from advertised fares, as long as such fees were fully disclosed to customers prior to the final purchase.  EAPP-2 now requires that fares be displayed including all government taxes and fees. This rule undermines the marketing and sales programs created and developed by Allegiant and Spirit since the companies were established, where base-fare advertising is a fundamental and integral part of their business model and commercial viability.  In addition Spirit and Allegiant as well as virtually all other airlines will face significant compliance costs in restructuring print, broadcast and online fare displays to comply with the new rule. AAI Rep. at 12-22.

b.     The 24-hour Ticket Hold and Refund Rule (259.5(b)(4)): The new rule requires that new reservations should "be held at the quoted fare without payment, or cancelled without penalty, for at least twenty-four hours after the reservation is made if the reservation is made one week or more prior to a flight's departure."  Allegiant, Spirit and other low-fare airlines sell non-refundable tickets to help maintain the lowest possible transaction costs.  The new rule will raise direct costs.  Allegiant and Spirit do not have reservation and financial processing systems compatible with this rule and will have to make significant changes to these systems, leading to increased costs that will put upward pressure on ticket prices.  AAI Rep. at 23-26.

c.      Prohibition on Post-Purchase Price Increases (399.88):  EAPP-2 now prohibits all post-ticket-purchase price increases.  The rule is vague, but if DOT's intent was to restrict charges for later purchased services to the price on the date of the original ticket sale, implementation will be extremely costly.   Compliance  with  the  rule  will  require  substantial  information technology investments by airlines because it will be necessary to track the ancillary fees offered to each customer on the date of ticket purchase. This rule will make the unbundling of fares less economical for carriers, resulting in  higher  ticket  prices  and  less  consumer  choice.   Additionally,  it  will discourage airlines from offering convenient third-party ancillary services, such as hotels, car rentals, and travel insurance, where the airline does not have  control  over  price  increases.    The  rule  will  also  stifle  new  and innovative methods for pricing tickets that would benefit consumers.  AAI Rep at 27-29.

d.      Disclosure  of  Baggage  Fees  on  E-Ticket  Confirmations (399.85(c)):  EAPP-2 requires that airlines list in "text form" on "all e-ticket confirmations…  information  regarding  the  passenger's  free  baggage allowance and/or the applicable fee for a carry-on bag and the first and second checked bag."   Implementation of this rule will require significant investment  in  information  technology  to  connect  website  baggage information with outbound email systems.  AAI Rep. at 30.

e.      30-Minute  Time  Limit  on  Notifying  Passengers  of  Delays (259.8):  EAPP-2 requires airlines to "promptly provide to passengers who are ticketed or [who] hold reservations, and to the public, information about a change in the status of a flight within 30 minutes after the carrier becomes aware of such a change in the status of a flight.  A change in the status of a

4

flight means, at a minimum, cancellation of a flight, a delay of 30 minutes or more in the planned operation a flight, or a diversion. The flight status information must be provided in the boarding gate area at a U.S. airport, on the carrier's website, and via the carrier's telephone reservation system upon inquiry by any person."   As written, this rule has the unfortunate consequence of actually causing more delays and cancellations. Many airlines tentatively schedule delays or cancellations in anticipation of predicted weather and operational disruptions. If airlines are forced to notify passengers of these delays within 30 minutes of a tentative decision to cancel or delay a flight, and the predicted disruption does not materialize, carriers may not be able to operate the flight on its original schedule, because passengers may have already left the departure gate area or changed their travel plans in anticipation of the cancellation/delay. AAI Rep. at 30-31.

3.     For the five rules of EAPP-2 analyzed, AAI estimates that the best-case impact to public welfare is negative $273 million, substantially based on one-time compliance costs that were either excluded from, or grossly underestimated in, the RIA.  When long-term impact on airfares and cancellations is included, the worst-case impact to public welfare is negative $3.78 billion over 10 years. AAI Rep., Ex. A.

5

**Table 1: EAPP-2 Revised Public "Benefits" based on AAI Analysis**

| Harm estimate by The RIA & AAI (in USD millions, 10 year PV @ 7%) | The RIA RIA Estimate | AAI Best Case | AAI Worst Case |
|---|---|---|---|
| Full-fare advertising rules | 22.2 | (153.2) | (1,239) |
| e-Ticket baggage fee disclosure | (7.9) | (32.3) | (32) |
| Limit on post purchase price increases | 6.1 | (35.8) | (36) |
| 30-minute status notification | | | (2,102) |
| Mandatory hold/refund 24 hours | | (45.1) | (368) |
| EAPP-2 components not reviewed by AAI | (6.2) | | |
| **Cost/Benefit*** | **14.2** | **(273.5)** | **(3,777)** |

* DOT RIA Estimate includes rounding error

## III. The Final Regulatory Impact Analysis

4.      The RIA states that the overall economic welfare from the rule is $14 million *in total* over the period from 2012-2021.[1] However, this conclusion is primarily based on a gross underestimate of compliance costs and an unsupported $29 million in benefits from the full-fare advertising rule, the only significant source of quantifiable economic benefits in the rulemaking.  AAI Rep. at 17.  The RIA itself recognizes the criticality of these assumptions to validating EAPP-2.[2] We identify erroneous assumptions and omissions in the analysis, and show that it was based on misunderstandings of federal taxes, airline operations and airline distribution.  *E.g.* AAI Rep. at 20.

---

[1] EAPP-2 RIA, Table 40 (pp74-75)

[2] EAPP-2 RIA p2.  "Substantial portions of the estimated benefits, costs, and net benefits from the Rule are attributable to the full-fare advertising provisions of Requirement Area 7. The estimated benefits for these requirements total $29.0 million over the 10-year period from 2012 through 2021 using a discount rate of 7 percent. Benefits estimated for the full-fare advertising provisions represent 64 percent of the total benefits estimated for all 11 sets of new requirements during the period from 2012 through 2021."

5.    DOT acted unreasonably in accepting the cost-benefit analysis contained in the RIA. DOT's economic consultants list no previous airline publications material to the analysis performed prior to the EAPP-1 and EAPP-2 RIAs.[3]  We cannot find any public disclosure of previous airline customer service, distribution systems, airline IT, or safety compliance reports by the firms.  After the preliminary regulatory analysis was published, trade associations identified material misstatements and invalid assumptions. The RIA either ignored these comments or included minimal changes that did not address the issues raised.

6.    AAI has found the RIA defective.  It failed to evaluate alternatives or no-regulation scenarios as required by Executive Order 12866, or to ensure that it used the best available information and techniques to achieve an accurate cost benefit analysis as required by Executive Order 13563.  It draws conclusions from trivial and unsupported assumptions of airline costs and consumer behavior. It does not reference academic literature, industry reports or rigorous consumer surveys to validate critical assumptions. For several areas, the Final Rule does not attempt to quantify *any* material benefits from the rules introduced. As a consequence, the Final Rule will have negative consequences far in excess of the estimated benefits.

---

[3] See http://www.econometricainc.com/publications.html for Econometrica and see http://www.hdrinc.com/portfolio?region=All&market=17&keywords= for HDR Decision Economics.  HDR projects listed include Lexington, KY Blue Grass Airport runway construction, Boise Airport customs facility, Denver International Airport parking expansion, Fort Lauderdale airport infrastructure improvement, Beale AFB hangar expansion, master planning for Alaska airports, Newark Liberty runway reconstruction, and Phoenix Sky Harbor Airport taxiway construction.

## A.  The RIA Overstates Benefits and/or Fails to Offer Support for its Estimates

7.     All net benefits related to the *entire package* of EAPP-2 rules can be traced to <u>a single assumption:  that 2% of passengers buying tickets online, which corresponds with just 0.74% of all domestic passengers, will save 3 minutes apiece by having full-fare pricing information at each stage of the booking process.</u>  The RIA claims this unproven assumption generates $29 million in present-value benefits.[4]

8.     Yet this core assumption is <u>unsupported and therefore unreliable</u>. Assumptions are based on internal "user time trials."  No analytical support is provided because "[i]ndependent data on the potential search time saved was not located."[5]  The RIA lacks confidence in its method's reliability, stating "this value could not be estimated for a representative sample of all online ticket purchasers."[6]  It does not prove that its 2% and 3 minute assumptions are relevant or material, yet these assumptions provide the majority of public benefits for the rule.

9.     Furthermore, the RIA's basic assumption behind this calculation is that passengers will receive accurate and final tax information during each step of the sales process, so that passengers would not "be required to complete the entire

---

[4] EAPP-2 RIA Table 30 (p58)

[5] EAPP-2 RIA p57 footnote 49.  "Independent data on the potential search time saved were not located.  We have therefore re-estimated the amount of time saved to 3 minutes based on a series of user time trials.

[6] EAPP-2 RIA p57 footnote 49 Cont.  "The revised estimate measures only the portion of time spent searching on additional websites to find full-fare prices as opposed to the time that would be required to complete the entire purchasing process (entering names, credit cards, seat preferences, etc.) on more than one site.  **However, it should be noted that this value could not be estimated for a representative sample of all online ticket purchasers**."

purchasing process" before learning of the final fare.[7]   However, as discussed in the full report, under EAPP-2 passengers will not always receive accurate tax information until the entire purchasing process is complete.   AAI Rep at 16-17. The benefit is based on a false assumption that airlines can accurately display fares inclusive of taxes and fees at each step of the booking process.   Importantly, many airlines, and in particular low-fare airlines, including Allegiant and Spirit, enable passengers to choose each leg of a round-trip ticket separately. Because government taxes and fees are contingent on (1) the number of stops in an itinerary, (2) the airports used, and (2) the number of connecting flight segments, the total taxes and fees cannot be calculated accurately until the entire itinerary is purchased.   This is but one example of problems that permeate the RIA.

### B.  Underestimated Costs

10.    The RIA grossly underestimates the compliance costs of the rule changes. For example, the RIA estimates it will take only 20 hours for small carriers to reconfigure online booking systems to comply with the fare advertising rule.[8]  However, Spirit has calculated that it will cost $2,150,000 alone for IT costs required to implement the new airline fare advertising rule on its systems.   This gross under-estimate reflects the RIA's complete misunderstanding of the complexity and connectivity of the carriers' websites, reservations systems, accounting systems, and other key components of online distribution.   AAI Rep at 17-18.  It also contradicts cost estimates that were used for a similar but much less

---

[7] EAPP-2 RIA, p57, Footnote 49
[8] EAPP-2 RIA, Table 31 (p60)

complicated task required by EAPP-1, which estimated that the cost of supplying flight delay data on a carrier's booking pages was $400,000 per airline.[9]

11.     As noted, for small, low-fare carriers like Spirit and Allegiant, the fare advertising rule will require them to substantially overhaul their online fare display systems.  Their systems were built ground-up for tax-exclusive pricing.  Others, such as Delta, which already estimate taxes and fees in the booking process, will have lower expenditures. However, we estimate that even carriers like Delta will have compliance expenditures of up to $300,000 related to full-fare advertising, which is significantly higher than the RIA estimate of just $8,240 for large carriers. AAI Rep at 19-20.  Spirit estimates it total IT cost to implement the five rules considered in the AAI report to be $5,485,000.  Technical compliance costs alone will cost the industry up to $273 million, dwarfing the RIA's estimate of $16 million.  These costs are substantial in an industry where the total operating profit margin has been just 3.1% for the period from 2006 through 2010.

## IV.  Harm From EAPP-2 That Was Not Considered in the Rulemaking

12.     In addition to overestimating benefits and underestimating the direct compliance costs, the RIA failed to recognize or address many side effects to the rule changes that will significantly harm the airline industry and consumers.

### A. Disproportionate Impact on Low-Fare Carriers

13.     Many of the challenged provisions prohibit or significantly undermine cost-saving practices utilized by low-fare carriers to keep base fares low and stimulate price competition.  In the past, DOT has recognized the substantial benefits low-fare carriers bring through new routes and price competition.  Now,

---

[9] EAPP-1 RIA, Appendix A.  Emphasis added.

the challenged regulations force low-fare carriers to give up key aspects of their business models, reducing innovation and increasing fares. Radical shifts in regulatory policy related to 24-hour refunds, fare advertising, and price changes for ancillary purchases fundamentally and permanently change business practices for these carriers. These changes will harm competition by forcing standardization, blocking innovation and reducing consumer choice.

14.    For example, low-fare carriers generally have integrated reservations systems that incorporate many functions that are traditionally separated at legacy airlines.  By providing a single platform for call center bookings, Internet sales, revenue accounting, pricing and airport operations, these platforms reduce cost and improve flexibility at low-fare airlines.  They are not set up for the 24-hour refunds and reservation holds.

15.    Allowing customers to open a new reservation without making a payment may be straightforward for legacy airlines where reservations and financial transactions are separated, but they are fundamentally difficult for airlines that use integrated systems. We estimate that changing IT systems to permit refunds will require between 500 and 1,000 hours of IT resources, including the need to create a new database to track refunds and charge-backs.

16.    The full report also shows that the fare advertising rule, post-purchase price increase restrictions, and 30-minute passenger notification rule will disproportionately affect low-fare carriers.

### B.  Small Communities

17.    Harming low-fare airlines such as Southwest, AirTran, Allegiant and Spirit has the additional effect of reducing the viability of low-fare service to

11

smaller communities. AAI Rep. at 21-22. Low-fare airlines are key to sustaining jet service at small communities nationwide. Major legacy carriers cannot profitably sustain nonstop service from many of these communities with "mainline" aircraft – instead, they operate with small regional jets. Less capacity on regional jets means less inventory for fare sales, so small communities face the unpleasant combination of poor connecting service and high fares to key destinations.

18.    Low-fare airlines capitalize on this market opportunity by bringing access and affordability to small communities. For example, Allegiant operate nonstop service between 63 small communities and major destinations nationwide. These services are viable because of low operating costs, including the carrier's direct customer sales practice via telephone and Internet. The new rules by forcing substantial changes in the advertising and booking process will hurt service to these communities.

19.    Consider Allegiant's entry into secondary markets such as Billings, Cedar Rapids, Des Moines, Springfield, Grand Junction and Fargo. These markets were historically underserved. Allegiant entered each market with nonstop service to Las Vegas, a key market, bringing significantly lower fares (from 11% to 61% less than incumbents), and passenger demand has thrived (increasing between 68% to 300%). Similarly Spirit benefits extremely price-sensitive travelers and drives substantial local and international business/trade activity (within the U.S. as well as between U.S. and, e.g., Latin America). With its Caribbean/Latin network, Spirit benefits US-resident ethnic communities and increases investment, trade and tourism flows between the U.S. and the Latin/Caribbean region. Like Allegiant, Spirit lowers fares and stimulates traffic: in international markets entered by Spirit,

the first year shows an average 25% decline in fares and 42% increase in passengers.

20.    By forcing carriers such as Allegiant to raise prices, both to comply with regulations and cover compliance costs, the Final Rule will suppress demand from these underserved markets.  Small airports that are marginally viable for Spirit, Allegiant and other low-fare carriers risk losing service altogether.

### C.  Air Fare Increases

21.    The large compliance expenditures required for this rule will result in fare increases across the industry.  For the 24-hour hold/refund rule alone we estimate that Spirit and Allegiant will need to recoup $3.26 per passenger to cover the compliance costs.  For Spirit, this represents 1.4% of the average ticketing transaction. Additionally, AAI analysis shows that these new regulations will lower travel demand by 1.5% and decrease revenue by $1.1 billion. . AAI Rep., Ex. E.  The Final Rule imperils an industry that has adapted to volatile oil prices, and has a total industry operating profit margin of just 3.1%, by unbundling air travel, reducing base fares, stimulating demand and maximizing consumer choice.[10]  There are significantly secondary impacts of fare increases, as fewer price-sensitive travelers will be staying in hotels or using car-rentals, or other services that benefit directly from more passengers in the air transportation system. These related travel industries are key employers in Florida, Nevada and other core markets served by Spirit and Allegiant.

---

[10] From http://www.transtats.bts.gov/.  From 2006 through 2010, total revenue $855.86 billion, total operating profit $26.45 billion.  Ratio of operating profit to revenue 3.09%.

## V. Conclusion

22.    In conclusion, it is apparent that the economic analysis of EAPP-2 was based on unsupported, untested, and unreasonable assumptions that produced a severely flawed cost-benefit analysis.  Therefore, DOT's reliance on the analysis was not reasonable and should not have formed the basis for the Final Rule. Use of the public benefits found in the RIA as justification for the new regulations is unreasonable.  Contrary to the findings of the RIA, these regulations will have a significant negative impact on consumers and the airline industry as a whole, and will disproportionately harm low-fare carriers.

I, Darryl Jenkins, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this eighth day of July, 2011.

Darryl Jenkins, AAI Chairman

# APPENDIX A

## RESUME

Darryl Jenkins
American Aviation Institute
4833 Rugby Avenue, Suite 301
Bethesda, MD 20814

**Background**:

Born in Michigan, and educated in Utah and Arizona, he has been interested in aviation since he was nine years old.  His first experiences in aviation were as a travel agent.

His aviation experience covers over thirty years.  Recent work includes extensive merger and acquisition experience at United Airlines and Delta Air Lines. Previously, he was at GWU for fifteen years and served as director of the Aviation Institute and was the Director of the Graduate Certificate Program in Aviation Management from 2001 to 2003. He was visiting faculty at Embry Riddle Aeronautical University in 2004. As a consultant he has worked for the majority of the world's top fifty airlines.

He is a regular commentator for the major media (ABC, NBC, CBS, Fox, CNN, MSNBC, and CNBC) on aviation issues and is regularly quoted in the print media as well.  A recent Lexus nexus search showed over 1,000 citations in the last four years. He is a regular speaker at trade and other conferences and is the author of several books.

Education:  BA 1973 Brigham Young University,

1974 to 1975 The American Graduate School of International management, Glendale, Arizona: Certificate of Advanced Study.

1980 to 1984 Ph.D. program in Mineral Economics, The University of Arizona, Tucson, Arizona.


1989 to 2003:  Department of Travel and Tourism GWU

1991:  Failed Partnership:  Why Airlines Fail, GWU Monogram

1993:  Managing Business Travel and Savvy Business Travel: Irwin Publishing

1

1994:  The Bankruptcy Virus in the Airline Industry, GWU Monogram

1995 The Handbook of Airline Economics; McGraw Hill Publishing and the second edition (2001).

1996: Chaired the White House Conference on Aviation Safety and Security in the 21st century sponsored by Vice President Gore.

1997: Founded the GWU Aviation Institute
Chaired three conferences held and sponsored by GWU on airline competition, air traffic management, and predation in the airline industry, Wrote three monograms on airline competition, one monogram on travel agency economics, and one on predation.

1998:  An Examination of Why Airlines Fail; GWU Publishing
1998:  An Examination of FAA Cultural Problems, George Mason University with Roger Stough.

1998:  Chaired The GWU World Summit on Aviation Infrastructure, Three monograms on aviation infrastructure:  Economics of infrastructure, The Economics of air traffic control, and The Opportunity Cost of an Outdated Air traffic Control System

1999:   Began work on the NTSB Training Academy at GWU
      Began work on bringing the IASA program to GWU

2000: Congress appropriates money for the IASA program at GWU

2001: Congress appropriates money for the NTSB Training Academy at GWU

2004:  Visiting Professor at Embry Riddle Aeronautical University, Daytona Beach Florida

2004 to 2008 began and promoted www.theairlinezone.com

2008 to Present:  Chairman of the American Aviation Institute

Senior Editor of the Handbook of Airline Economics: Forthcoming fall 2011

Editor and Publisher of the Forthcoming Journal of Air Transport Operations

2

Expert Witness: The Bankruptcy litigation regarding the Chapter 11 filing of Great Plains Airlines.  Did not go to trial.

Expert Witness:  Bankruptcy litigation regarding the Chapter 11 filing of Northwest Airlines.  Did not go to trial.

A partial list of private consulting work:

British Airways,
American Airlines,
Delta Air Lines,
Continental Airlines,
Northwest Airlines,
JetBlue,
Eastern Airlines,
US Airways,
United

Airport related Work:

The City of Richmond,
The City of Fort Smith Arkansas,
The City of Lansing Michigan,
Panama City Airport Florida,
Daytona Beach, Florida Airport

**APPENDIX B**

# NEGATIVE CONSUMER & ECONOMIC IMPACT OF EAPP-2 DOT CONSUMER REGULATIONS

**July 8, 2011**



AMERICAN AVIATION INSTITUTE
4833 Rugby Avenue, Suite 301
Bethesda, Maryland 20814

# Summary

This analysis by The American Aviation Institute ("AAI") shows that the Department of Transportation's broad new rules standardizing airline advertising and components of customer service are costly to implement, have negative customer benefits, and destroy fundamental aspects of airline price competition and product innovation.

As recently as 2006, the Department of Transportation (DOT) validated the importance of base fare advertising that it found encouraged competition, innovation and consumer choice. This longstanding policy led to new low-fare airline business models and massive investments in technology and distribution infrastructure. DOT's new regulations reverse existing policies or impose new regulations with no real evidence of any existing harm to the public. DOT fails to recognize factors related to compliance cost, loss of competition, and irreparable harm to the industry and public. In several cases, DOT does not (and apparently cannot) articulate offsetting consumer benefits from rule changes. In others, DOT relies on incorrect or arbitrary assumptions about consumer preferences. DOT's economic consultants provide no reasonableness test or outside validation for key assumptions, even after airlines and trade associations noted obvious defects. Finally, DOT explanations to support these rules rely on immaterial, distorted or incorrect claims about airline competition.

As published, the DOT rules particularly harm low-fare airlines. In the past, DOT has noted the substantial benefits low-fare carriers bring through new routes and price competition. The new regulations force low-fare carriers to give up key elements of their business models, reducing innovation and increasing fares. The regulations also force low-fare carriers to make multi-million dollar investments in technology and distribution systems. Implementation of several of these rules will cause serious harm to the highly competitive airline industry by reducing pricing transparency and raising industry costs that will directly harm consumer welfare.

We validate that Spirit Airlines, Allegiant Air, Southwest Airlines, AirTran Airways and other low-fare carriers are disproportionately impacted by DOT's rules. Shifts in regulatory policy related to 24-hour refunds, full-fare advertising, and restrictions on pricing practices fundamentally and permanently change business practices for these carriers. These changes will harm competition by forcing standardization, blocking innovation and reducing consumer choice.

In this report, we show that:

- DOT fails to cite, validate and/or test its key economic assumptions;

- DOT rules are detrimental to innovation and growth business models, as well as price-sensitive small communities served by growth carriers;

- DOT relies on incorrect and unsupported compliance cost estimates ($16 million) which we show are understated by an order of magnitude (estimated $274 million);

- DOT's new regulations will lower travel demand by 1.5% and decrease industry revenue by $1.1 billion; and

- DOT's rules imperil an industry that has adapted to volatile oil prices by unbundling air travel, reducing base fares, stimulating demand and maximizing consumer choice.

# Core Findings

On April 25, 2011, DOT issued EAPP-2 to set new controls and limits on airline-passenger communication.[1]  EAPP-2 extends previous consumer regulations (from EAPP-1) to foreign carriers and introduces new restrictions on airline pricing, advertising, websites, ticketing and distribution.  Airlines must comply with EAPP-2 rules by August 2011, except for full-fare advertising rules that take effect in October 2011.

We focus on five aspects of EAPP-2 that disproportionately impact low-fare airlines and **are likely to reduce price competition**.  We identify **false assumptions and omissions by DOT** in its economic analysis, and show DOT's economic consultants either **misunderstood or ignored key aspects** of federal taxes, airline operations and airline distribution.[2]

These omissions undermine the economic foundation for these rules.  We show that DOT's approach causes actual and current harm to Spirit, Allegiant and other airlines. **Technical compliance costs alone will cost the industry up to $273 million dwarfing DOT's estimate of $16 million**.  Total compliance costs for individual low-fare carriers such as Spirit are very likely to reach $5 million or greater.

We demonstrate myriad reasons why the Regulatory Impact Analysis ("RIA") commissioned by DOT and presented for EAPP-2 was defective.  The RIA does not evaluate alternatives or no-regulation scenarios as required by Executive Order 12866 and violates President Obama's Executive Order 13563 which requires agencies to "use the best available techniques to quantify anticipated present and future benefits and costs as accurately as possible."[3] It draws its conclusions from trivial and unsupported assumptions of airline costs and consumer behavior.  It does not reference academic literature, industry reports or rigorous consumer surveys to validate critical assumptions.  While the RIA claims to "present the economic rationale for adopting additional requirements" by specifying "the nature of benefits and costs associated with" EAPP-2 rules, it openly states the necessity "to make many estimates and assumptions in cases where specific data were not available or to make the estimation exercise manageable."[4]

For several EAPP-2 components, DOT cannot estimate *any* material benefits from the rules introduced.[5]  The RIA justifies such action because "estimated costs to carriers of complying with these requirements are projected to be extremely small in relation to carrier revenues from passenger service".  However, airlines are inherently low-margin businesses.  Costs that are "extremely small" in relation to "carrier revenues" can still have a fundamental impact on survival and market viability.  The total industry *operating profit margin* has been just 3.1% for the period from 2006 through 2010.[6]

We illustrate core defects in the RIA's basic welfare assumptions.  Virtually all <u>net</u> benefits related to the *entire package* of EAPP-2 rules can be traced to <u>a single assumption:  that 2% of passengers buying tickets online will save 3 minutes apiece by having full-fare pricing</u>

---

[1] Enhancing Airline Passenger Protections, 2nd Round ("EAPP-2").  76 FR 23110.  Docket DOT-OST-2010-0140.
[2] EAPP-2 Regulatory Impact Analysis ("RIA") conducted by Econometrica and subcontractor HDR Decision Economics. 1029-000/DTOS59-09-F-10089, April 8, 2011.  See DOT-OST-2010-0140.
[3] 76 FR 3821, January 18, 2011.
[4] RIA p4
[5] RIA p4 ("we were not able to make quantitative estimates of the benefits for certain Rule provisions").
[6] From http://www.transtats.bts.gov/.  From 2006 through 2010, total revenue $855.86 billion, total operating profit $26.45 billion. Operating profit represented 3.09% of total industry revenue during this period.

information as a unitary figure at each stage of the booking process. The RIA claims this unproven assumption generates $29 million in present-value benefits. Even Econometrica recognizes the criticality of these assumptions to validating EAPP-2.[7]

Yet this core assumption is without support and unreliable. Assumptions are based on internal Econometrica "user time trials." No analytical support is provided because "[i]ndependent data on the potential search time saved were not located."[8] Econometrica lacks confidence in its method's reliability, stating "this value could not be estimated for a representative sample of all online ticket purchasers."[9] Econometrica does not prove that its 2% and 3 minute assumptions are relevant or material, yet these assumptions are used to justify the majority of public benefits for the price-advertising rule. This is but one of many unsupported assumptions and disclaimers that permeate the RIA.

The rule seems to standardize airline competition based on outdated airline traits: bundled product and travel agency distribution.[10] DOT does not account for market changes created by Southwest, AirTran, Spirit and Allegiant. These carriers, among others, have brought consumer choice through unbundling and direct distribution.[11] They brought new competition and access to small communities, reduced fares, and stimulated demand for air travel.[12] EAPP-2 threatens the business models that made these airlines successful and enabled them to bring the benefits of increased competition to the airline industry.

In this report, we focus on five key EAPP-2 components: the requirement for full-fare advertising; the mandate for 24-hour ticket holds and/or refunds; a prohibition on post-purchase price increases; e-ticket baggage fee disclosures; and a 30-minute requirement for customer notification of flight status changes. Our analysis does not seek to quantify secondary effects of the suppression in air travel demand brought about by cost and fare increases, both real and perceived to the customer. There are meaningful secondary impacts of lower traffic volumes on tourism-related industries including hotels and car rental agencies. We focus on the direct short- and long-term cost impact of the new regulations for both airlines and consumers.

DOT relied on incorrect information in its RIA, and the economic cost to airlines *and* consumers is far higher than the Department estimated.

---

[7] RIA p2. "Substantial portions of the estimated benefits, costs, and net benefits from the Rule are attributable to the full-fare advertising provisions of Requirement Area 7. The estimated benefits for these requirements total $29.0 million over the 10-year period from 2012 through 2021 using a discount rate of 7 percent. Benefits estimated for the full-fare advertising provisions represent 64 percent of the total benefits estimated for all 11 sets of new requirements during the period from 2012 through 2021."

[8] RIA p57 footnote 49. "Independent data on the potential search time saved were not located. We have therefore re-estimated the amount of time saved to 3 minutes based on a series of user time trials."

[9] RIA p57 footnote 49. The full statement by Econometrica reads: "The revised estimate measures only the portion of time spent searching on additional websites to find full-fare prices as opposed to the time that would be required to complete the entire purchasing process (entering names, credit cards, seat preferences, etc.) on more than one site. **However, it should be noted that this value could not be estimated for a representative sample of all online ticket purchasers**."

[10] On-time performance for low-cost carriers averaged 80.5% during September 2010 versus 83.1% for regional (Express) airlines and 84.4% for major airlines. Flight cancellations averaged 0.5% of total scheduled for LCCs versus 1.4% for regional carriers and 0.7% for major airlines. Source: FlightStats monthly report. Low-cost carriers include AirTran, Frontier, Spirit, JetBlue, Southwest, Allegiant. Regionals include GoJet, Mesa, PSA, Horizon, ExpressJet, Mesaba, Republic, Shuttle America, SkyWest, Compass, Pinnacle, Chautauqua, ASA, American Eagle, Trans States, Comair, Piedmont, Air Wisconsin, Colgan and Cape Air. Major airlines include Alaska, United, US Airways, Continental, Midwest, American, Delta, and Hawaiian.

[11] See http://www.spirit.com/AboutUs.aspx

[12] For more detail, see Exhibits L and M for price elasticity and market change data.

**WEAKNESSES IN DOT'S REGULATORY IMPACT ANALYSIS**

DOT's economic consultants list no previous airline publications prior to the EAPP-1 and EAPP-2 RIAs.[13]  We cannot find any public disclosure of previous airline customer service, distribution systems, airline IT, or safety compliance analysis by the firms.  After the preliminary RIA was published, trade associations filed comments in the Docket (DOT-OST-2010-0140) that identified material misstatements and invalid assumptions. In the final RIA, these were either ignored or led only to marginal change, resulting in a defective final product.

Econometrica states that the overall economic welfare from the rule is $14 million *in total* over the period from 2012-2021.  For the five aspects of EAPP-2 analyzed by AAI, we estimate that the best-case impact to public welfare is negative $273 million, substantially based on one-time compliance costs that were either excluded or grossly underestimated in the RIA. When long-term impact on airfares and cancellations is included, the worst-case impact to public welfare is negative $3.78 billion over 10 years.

**Table 1: EAPP-2 Revised Public "Benefits" based on AAI Analysis**

| Harm estimate by Econometrica & AAI (in USD millions, 10 year PV @ 7%) | Econometrica RIA Estimate | AAI Best Case | AAI Worst Case |
|---|---|---|---|
| Full-fare advertising rules | 22.2 | (153.2) | (1,239) |
| e-Ticket baggage fee disclosure | (7.9) | (32.3) | (32) |
| Limit on post purchase price increases | 6.1 | (35.8) | (36) |
| 30-minute status notification | | | (2,102) |
| Mandatory hold/refund 24 hours | | (45.1) | (368) |
| EAPP-2 components not reviewed by AAI | (6.2) | | |
| **Cost/Benefit*** | **14.2** | **(273.5)** | **(3,777)** |

* DOT/Econometrica Estimate includes rounding error

**SUMMARY OF REVIEWED COMPONENTS**

**1.      Full-Fare Advertising**

EAPP-2's fare advertising policy change mandates that carriers display *all* fares *inclusive* of taxes and fees at *all* times, including during the booking process and in advertisements.  This policy represents a return to the policy in 14 CFR 399.84 as originally written in 1984, which requires the inclusion of all taxes and fees in the advertised fare.  However, due to the proliferation of government taxes and fees after that date, in 1988 DOT issued an order permitting carriers to separate out government taxes and fees (other than excise tax calculated from the base fare paid) so that passengers could identify what portion was paid to the government and avoid confusion.[14] For reasons we illustrate below, it has been in airlines', consumers' and DOT's interests to deviate from the regulation and separate fees and taxes for the past two decades.  It remains so today.

---

[13] See http://www.econometricainc.com/publications.html for Econometrica and see http://www.hdrinc.com/portfolio?region=All&market=17&keywords= for HDR Decision Economics.  HDR projects listed include Lexington, KY Blue Grass Airport runway construction, Boise Airport customs facility, Denver International Airport parking expansion, Fort Lauderdale airport infrastructure improvement, Beale AFB hangar expansion, master planning for Alaska airports, Newark Liberty runway reconstruction, and Phoenix Sky Harbor Airport taxiway construction.

[14] See Orders 88-3-25 (March 10, 1988) and 88-8-2 (August 2, 1988).

For over two decades DOT has permitted airlines to advertise and sell their products like other consumer products, separating taxes and fees from base prices. DOT recently affirmed its separation policy, stating in 2006 that "the public interest will be best served by maintaining the status quo" of separating taxes and base fares.[15]  DOT stated that:

-   Government-imposed taxes and fees collected on a per-passenger basis may be excluded from the advertised fare;

-   If multiple destinations are advertised in print or media, and not all destinations entail the same government-imposed charges, the airline may state a maximum fee or range of fees;

-   Fares that are higher when purchased by telephone versus the Internet must disclose the price differential and notify customers where they lowest fare can be purchased;

-   Per-person government fees may be listed separately via hyperlink in online and email advertisements by airlines.

DOT said separation "protects consumers, facilitates price comparison, fosters fare competition, and affords sellers an appropriate degree of freedom to innovate."  It stated separation "has worked well for over 20 years" and that strict enforcement of the statute (to display only fares inclusive of taxes) would "create marketing difficulties for sellers without necessarily making prices more transparent to consumers."[16]

Carriers have relied on this position. Spirit and Allegiant built business models on advertising low base fares.  They brought stable, long-term competition to a consolidated industry and stimulated demand, entering new markets and driving down fares.[17]  In response to the effectiveness of Spirit, Allegiant, and various other low-fare carriers, all U.S. carriers have adapted strategies, pricing and distribution that rely on DOT's 2006 policy statement and its pre-existing policy allowing base fare advertising.

It is critical to recognize the value of tax-exclusive prices when passengers are selecting itineraries.  Separating taxes and fees, and allowing passengers to pick among outbound and return flights with different fares, maximizes consumer choice.  *Transparency in base fares is masked by tax and fee calculations.*  Moreover, as we discuss in this report, forcing airlines to present outbound and return flight segment prices inclusive of taxes can result in presenting consumers with inaccurate tax information.

**DOT now takes the very positions that in 2006 it clearly stated harm consumers, dampen price comparison, hinder fare competition and stifle innovation.** DOT provides no material explanation why a reversal in policy is required.  It alludes to the impact of social media, yet does not explain why consumers in these channels are not protected by existing policy.  It does not measure or address whether total fares are somehow unfair today versus 2006, nor does it cite any broad-based consumer outcry for such drastic changes.

Since DOT's last policy affirmation in 2006, inflation-adjusted average airfares dropped 18% and all-in passenger fares (including ancillary fees and other revenue sources) dropped 5%. In the same period, oil prices (in 2006 dollars per barrel) increased 57%.[18]  Separation of base fares from taxes and other services, inextricably tied to and reliant upon DOT's advertising

---

[15] OST-2005-23194 Price Advertising, 71 FR 55398
[16] 71 FR 55402 Col. 1.
[17] See Exhibits L and M for price stimulation examples by route.
[18] For more detail, see Exhibit K.

policies, has fostered immense consumer benefits and industry stability. Both Allegiant and Spirit have built advertising and distribution models that present a tax-exclusive base fare to passengers, with taxes listed separately and clearly along with the airline's ancillary products. Customers can choose among routings and ancillary products to customize a total product according to their preferences. Customer choice is critical. Mandating all-inclusive advertising restricts carriers' ability to advertise the lowest fares, and to show what portion of a given fare is paid to the government and to airports.

DOT's shift in policy significantly affects U.S. carriers, and threatens the viability of low-fare airline models. DOT does not consider the possibility or difficulty of complying with the rules as stated. By requiring the display of fares including taxes at all times during itinerary selection, DOT policy conflicts with the very structure of federal and airport taxes. Taxes for a round-trip journey can only be definitively calculated once the *full itinerary* has been selected.[19] Forcing full-fare displays will generate consumer confusion by causing inaccurate price displays and inhibiting price advertisements.

Compliance costs outweigh customer benefits. We show that the RIA grossly underestimates the complexity and cost of compliance with full-fare advertising. The RIA estimates 80 hours of labor ($8,240) per large airline to overhaul dozens of complex application and web pages, and an improbably low 20 hours ($2,060) for small airlines.[20] This totals just $6.8 million for more than 2,600 individual entities in the aviation industry. No basis is established for this eighty-hour assumption. In fact, this metric directly contradicts estimates for less complicated website compliance used during the EAPP-1 RIA, by the *same subcontractor*, that specified a $400,000 cost per airline (without distinction between large or small carriers).[21] Airline and trade association filings identified this error during the EAPP-2 rulemaking process, but no material correction was made.

We show that throughout the RIA compliance costs are understated.[22] For carriers operating ticketless reservations systems (including Spirit) compliance costs for the full-fare advertising rule alone will likely exceed $750,000 in direct labor and infrastructure expenditures and $1.8 million or more in new external systems required for compliance, reaching $2.6 million per carrier. Similar costs would apply to other low-fare airlines. **AAI estimates full-fare advertising compliance cost at $153.2 million for the airline industry**. We also demonstrate that ongoing compliance with full-fare advertising rules will encourage fare increases that may drive over $1.1 billion in annual decline in revenue for the industry. **Importantly, the new rule will mask** <u>any new taxes</u> imposed on passengers, airlines and communities and consumers will naturally assume that the <u>airlines</u> are raising prices.

---

[19] On airline sites today, customers can view base fares for both outbound and return flight options. Key to the time savings proposed by Econometrica is that all airlines must show outbound flights with fares inclusive of taxes, even for fares that require a round-trip purchase. 100% accuracy in this calculation is not possible.
[20] RIA Table 31, p60. $8,240 is based on 80 direct labor hours at $103.00 full cost per hour.
[21] RIA for EAPP-1 (Enhancing Airline Passenger Protections), HDR Decision Economics, p58 third paragraph and Appendix A, Data Sources. "The cost to carriers to provide delay data on their websites is estimated at $400,000. Assuming information is fed into the electronic infrastructure free of charge, there would only be the fixed cost to set up the website and infrastructure to receive delay data."
[22] RIA p4

**Table 2a: Full-Fare Advertising Requirements**
**Public Benefits including Compliance Costs (Millions)**



| 10-Year Cost (millions) | Benefits | Compliance Cost | Net Benefit (10yr) |
|---|---|---|---|
| Econometrica/DOT | $29.1 | ($6.75) | $22.32 |
| AAI Revised (a) | $0 | ($153.2) | ($153.2) |

(a)   Does not include potential revenue loss of **$1.1 billion annually** from fare rule compliance

## 2.    24-Hour Ticket Holds & Refunds

There are two different ticketing models today: airlines whose computer systems reserve inventory and permit future payment, and airlines whose systems require an immediate purchase and are not built for refunds.  Airlines that allow reservations without purchase are generally geared towards travel agencies.  Airlines that require payment are geared towards direct distribution to consumers.  Legacy carriers fit the former model, while price-competitive low-fare airlines fit the latter.  Under EAPP-1, airlines clearly disclose policies to customers about ticket holds, refunds or travel credits after booking.[23]  Two-thirds of U.S. carriers (including legacy carriers United and Delta) offer 24-hour refunds or holds to purchasers, but a third of domestic carriers (primarily low-fare carriers such as Spirit, JetBlue and Allegiant) either offer vouchers or offer no refunds to passengers after booking a non-refundable fare.

Under EAPP-2, (1) all carriers must offer refunds or holds, as vouchers are no longer permitted; (2) all carriers must use a 24-hour standard; and (3) all carriers must comply, including foreign airlines.  We demonstrate that DOT and its economic consultants *ignore* this significant policy shift in the RIA, *omit* compliance costs, and *scrupulously avoid any discussion* of consequential economic impact. DOT's rule penalizes low-fare carriers disproportionately to legacy airlines.  By forcing business model changes at low-fare carriers, EAPP-2 will raise fares. No corresponding analysis is made in the RIA. For low-fare carriers, creating a new structure for refunds will require multi-million dollar industry investment in IT and force irrevocable changes to their business models.  We estimate non-compliant carriers will require new systems to process refunds at an average cost of $750,000 per airline.  Costs will permanently be increased. Flexibility and innovation will decrease. Low-fare carriers will be forced to forego current business models and act like legacy airlines.

Because the rule will make cancellation options clearer and more available to passengers, it is likely to increase frivolous and uncommitted reservations. While EAPP-2 carves out bookings within 7 days of departure, this is little solace to low fare airlines such as Allegiant and

---

[23] 74 FR 69003 (14 CFR 259.5(b)(4))

Spirit, where more than 90% of passengers have already booked their tickets by this window. Credit card companies and reservations platforms are winners from this refund churn because they collect fees on both ticket purchases and cancellations. AAI estimates that the direct cost of compliance to airlines affected will be $45.1 million. **We estimate that low-fare carriers will be forced to raise fares by $3.12 per ticket to recover refund transaction costs.** If a 24-hour holds causes a 5% increase in booking churn, **the incremental industry cost exceeds $323 million over 10 years.**

**Table 2b: 24-Hour Refunds and Holds (Direct Costs Only)**
**Public Benefits including Compliance Costs (Millions)**



| (USD Millions) | Benefits | Compliance Cost | 10 Year Benefit |
|---|---|---|---|
| Econometrica/DOT | $0.0 | $0.0 | $0.0 |
| **AAI Revised (a)** | **$0.0** | **($45.1)** | **($45.1)** |

(a) Does not include -$323 million of worst-case long-term impact

### 3. Post-Ticketing Ancillary Price Increases

DOT's new rule prohibiting post purchase price increases clearly prohibits increases in the price of the air ticket. Virtually all airlines today (pursuant to exiting guidance documents from DOT) do not raise ticket prices after purchase. However the new rule creates confusion by not stating clearly whether price increases are prohibited (1) for *any* ancillary product offered to the consumer at the time of sale; (2) for ancillary products that are specifically referenced in the airline's contract of carriage; or (3) only for ancillary products actually purchased (and fully paid) at the time of ticketing.

If DOT intends to block increases in ancillary services offered to, but not purchased by, consumers at the time of ticketing, *this provision has substantial and profound implications for both low-cost and legacy airlines.* Airlines will lose flexibility regarding fuel prices. Airlines will likely reduce third-party ancillary services such as hotels, car rentals and travel insurance offered to consumers. The provision will prevent the carriers from charging more for the payment of a baggage fee at the airport at check-in, even though it is more costly to the airline to process the purchase at that point. Consequently, it will decrease airline ancillary revenues and force carriers to recoup that revenue through higher base fares. This result will be particularly evident for low-fare carriers like Spirit and Allegiant that offer an "unbundled" travel product and depend on ancillary sales.

For example, assume an airline offers passengers ancillary products such as rental car, hotel packages or travel insurance as part of their ticket purchases, and but passengers choose not to purchase those services at first booking. Before departure, the airline's ancillary suppliers increase prices or introduce new fees. Is the airline bound to the price offered during ticketing?

Are non-airline ancillary services even covered by the rule? Or does the rule apply only to airline services such as baggage fees? For Allegiant, where 79% of passengers buy ancillary products, this is a question critical to its core business model.[24]

There are profound industry implications if DOT intends to ban any price change for travel products offered to the consumer but not purchased at the time of first booking. Many unbundled and ancillary products (hotels, car rentals, travel insurance, etc.) are outside an airline's pricing control. Such a policy would profoundly impact airlines and online travel sites by limiting access to these products or requiring airlines to absorb these increased costs.

Compliance will entail tracking ancillary products offered to passengers and the prices in effect at the time of booking, both for the airline and for its partners (including code-share partners, hotels, insurance providers and other ancillary product vendors). We estimate the cost of building database systems to house ancillary fee information, connecting that database to front-end web sites and re-training customer-facing personnel will exceed $2 million per carrier, or $43 million in total compliance cost over the next 10 years.

**Table 2c: Prohibition on Post-Purchase Price Increases
Compliance Cost and Public Benefits**



| (USD Millions) | Benefits | Compliance Cost | 10 Year Benefit |
|---|---|---|---|
| Econometrica/DOT | $7.2 | ($1.1) | $6.1 |
| AAI Revised | $7.2 | ($43.0) | ($35.8) |

4. **Listing Baggage Fees on e-Ticket Confirmation**

EAPP-2 mandates that airlines list baggage fees, specific to the purchaser, on any printed e-ticket confirmation.[25] The RIA understates IT compliance costs. We estimate total compliance costs at $32.3 million, not counting opportunity cost of lost marketing revenue from displacing advertisements on email confirmations. In addition, we believe this rule will create confusion since some travelers are exempt from baggage fees due to elite status or by credit card membership. The airline might not be able to recognize their status (if, for example, the ticket was booked via an agency) and might incorrectly advise the passenger of their baggage cost.

---

[24] Ashok Shah, VP Revenue Management, Allegiant Travel Company, July 1, 2011.
[25] We interpret DOT's language to mean that this applies to e-mailed confirmations, and not e-tickets in the definitional sense, since many carriers operate ticketless distribution systems.

DOT does not estimate benefits from this rule. As the RIA states, "insufficient data were found to adequately estimate the benefits".[26] In lieu of concrete analysis, the RIA lists qualitative factors such as "decrease in check-in time" and "improved customer good will" yet makes no effort to quantify or estimate these benefits for airlines or consumers.[27] These loose statements do not counterbalance the millions of dollars in compliance cost required, nor do they incorporate other material costs such as lost advertising revenue displaced by text notification.

### Table 2d: Listing E-Ticket Baggage Fees
### Compliance Cost and Public Benefits



| (USD Millions) | Benefits | Compliance Cost | 10 Year Benefit |
|---|---|---|---|
| Econometrica/DOT | $0 | ($7.9) | ($7.9) |
| AAI Revised | $0 | ($32.3) | ($32.3) |

## 5.    30-minute Notification to Customers of Flight Status Changes

Requiring airlines to notify customers of any change in flight status (delay, cancellation or diversion) within 30 minutes of the known change may appear beneficial to customers, but with operational realities, this rule has the potential to cause severe disruptions. This is because airlines routinely post advance delays and cancellations for expected weather events as part of contingency and recovery plans. If bad weather does not materialize, the flights return to their original schedule.

In these cases, airlines notify customers of advance delays when the final decision for a flight is made, usually well before departure time. Under EAPP-2, customers would be notified immediately when the *first* change is made, resulting in higher passenger and flight cancellations. Once a long delay or cancellation is published long in advance of departure, it is difficult to return that flight to schedule as customers have already secured alternative transportation. A robust cost/benefit analysis is required, yet DOT glosses over the topic. The cost of compliance for low-fare airlines such as Spirit and Allegiant is $120,000 or more.

### Table 2e: Thirty Minute Flight Status Notification
### Compliance Cost and Public Benefits

| (USD Millions) | Benefits | Compliance Cost | 10 Year Benefit |
|---|---|---|---|
| Econometrica/DOT | $0 | $0 | $0 |
| AAI Revised* | | ($2,102) | ($2,102) |

\* Potential increase in cancellations due to loss of delay/cancel flexibility

---

[26] RIA p63
[27] RIA p63

**REGULATORY IMPACT ANALYSIS STANDARDS**

Effective in 1993, departments are required to present RIAs to justify regulations that are "made necessary by compelling public need, such as material failures of private markets to protect or improve the health and safety of the public."[28]  By Executive Order, Departments must:

-   In completing analysis "assess all costs and benefits of available regulatory alternatives, including the alternative of not regulating."  In EAPP-1, HDR Decision Economics evaluated *five* different alternatives to regulation in addition to the final rules proposed. HDR assessed different regulatory standards. In EAPP-2, **no alternative is evaluated**. Econometrica and HDR only present the costs and benefits related to specific proposals by DOT.[29]  In the preliminary analysis, Econometrica listed two alternative scenarios for full-fare advertising (applying the rule to websites only, and making the effective date within 30 days of the final rule).  Econometrica deletes any material alternatives from its final analysis, stating that "net benefits would be lower under [these alternatives] than under the base case analyzed" without further justification, quantitative analysis or updated figures.  **The RIA that DOT presented does not meet the federal standard to (1) evaluate alternatives and (2) consider the welfare impact from not regulating.**

-   Establish both definitive and subjective standards by including "both quantifiable measures (to the fullest extent that these can be usefully estimated) and qualitative measures of costs and benefits that are difficult to quantify, but nevertheless essential to consider." Agencies are instructed to base research and decisions on "the best reasonably obtainable scientific, technical, economic, and other information concerning the need for, and consequences of, the intended regulation." Material omissions, inconsistencies and errors distort Econometrica's final analysis.  Econometrica excuses missing impact estimates because DOT lacks information or measurement systems. Econometrica ignores a fundamental change in policy, altogether disregarding 24-hour holds and refunds.   Instead of citing outside academic or consumer research to support key assumptions, Econometrica relies on "subject matter experts" at HDR, its subcontractor. This makes inconsistencies between the EAPP-1 and EAPP-2 RIAs all the more curious. This approach clearly is contrary to Executive Order 13563, which mandates using the best available techniques and data to create an accurate cost benefit analysis.

-   Choose approaches and alternatives that "maximize net benefits… unless a statute requires another regulatory approach."  The final rules should be written "with the goal of minimizing the potential for uncertainty and litigation arising from such uncertainty."  As shown in Exhibit A, of the regulatory packages evaluated by Econometrica, no positive change in public welfare was found for 8 of 11 rules.   No alternatives at all were presented for any of the 11 packages considered.

-   **Neither DOT nor Econometrica have presented analysis consistent with maximizing public welfare.**

---

[28] Executive Order EO 12866 October 4, 1993.  58 FR 51735.

[29] As stated by Econometrica in the RIA Executive Summary:  "In this analysis, we discuss and, where possible, provide estimates of the benefits and costs for specific regulatory requirements in 11 areas, including extension of the EAPP1 requirements for tarmac contingency plans, customer services plans, and customer complaint responses to cover foreign carriers; expanded reporting of tarmac delays; changes in denied boarding compensation (DBC) requirements; elimination of the break-out of government taxes and fees from advertised fares for air transportation; and disclosure of baggage and other optional fees."

# Section One:  Full-Fare Advertising Rule

Price advertising is governed by 14 CFR 399.84, which states that any advertised price for air transportation, an air tour or an air tour component must be the entire price to be paid by the customer for that transportation, tour or tour component.  For two decades, DOT and the Aviation Enforcement Office have interpreted this section to allow carriers to separate airline taxes and fees from advertised fares, as long as such fees are fully disclosed to customers prior to the final purchase.

DOT has stated carriers may "state separately from the advertised price government-imposed taxes and fees, provided they are not ad valorem in nature, are collected by the seller on a per-passenger basis, and their existence and amount are clearly indicated in the advertisement so the customer can determine the full price to be paid."[30]

## 2006:  DOT VALIDATES SEPARATION OF FARES AND TAXES

In 2006, DOT issued a Notice of Proposed Rulemaking to re-assess its long-standing policy regarding separation of base fares, taxes and fees.  After an extensive comment period, DOT withdrew its NPRM and maintained its policy of separation.[31] In support of its decision to maintain the status quo, DOT stated that:

1.  The public interest would be best served by maintaining its existing enforcement policy, which allows airlines to separate taxes and passenger-specific fees from base fares;

2.  That the Enforcement Office should be permitted to exercise its prosecutorial discretion to permit exceptions as warranted;

3.  That the regulation, as enforced (separating taxes and fees), "protects consumers, facilitates price comparison, fosters fare competition, and affords sellers an appropriate degree of freedom to innovate."

4.  That consumer advocates and other commentators "fail to establish a rationale for undoing over 20 years of permitting exceptions to the rule's strict terms as a matter of enforcement policy."

5.  That strict enforcement of §399.84 would "create marketing difficulties for sellers without necessarily making prices more transparent to consumers."

6.  That the policy allowing separation of taxes and fees is transparent and understood by "sellers and lawyers practicing in the industry" and adequately disclosed to consumers and newcomers to the industry.

In 2006 DOT remained strongly in favor of separating taxes and fees when advertising or selling airfares to the public. It believed flexible enforcement of §399.84 provided necessary flexibility to sellers, strict compliance would be expensive and difficult, and consumers were adequately protected.  The implications of this decision were significant.

---

[30] 76 FR 23142.  Col. 1.
[31] 71 FR 55402, Cols. 1-2.

1. Low-fare airlines responded by using very low advertised base fares (exclusive of taxes and ancillary services) to stimulate traffic in price-sensitive markets. Both low-fare carriers and their legacy airline competitors introduced new ticket unbundling and ancillary options (separated from the base fare).[32] Tax-exclusive fares stimulate traffic, but they also unmask differences in airline fares for different routings between origin and destination. This gives customers more transparency in choosing combinations of travel time and fares that best fit their preferences. The acceleration of tax-exclusive advertising post 2006 has accompanied an overall drop in average ticket prices as measured by DOT's Bureau of Transportation Statistics and shown in Exhibit J. Even with ancillary fees included, total airfares paid by consumers have dropped.

2. Distribution and ticketing technology enhancements were built on this policy.

3. The Enforcement Office has investigated and fined airlines in rare cases where they were non-compliant, indicating the current enforcement policy is effective.

## 2011: DOT PROHIBITS BASE FARE ADVERTISING

EAPP-2 now changes interpretation of §399.84 by saying that any display of a fare must *include* all taxes and fees. This must occur even when fares are displayed for partial itineraries, where a round-trip ticket is required. In addition, DOT now states that it is "unfair and deceptive" to impose convenience fees on sales through certain distribution channels, a significant shift from current policy that permits convenience fees to encourage bookings through lower-cost channels.

DOT provides no material justification for its reversal in policy.

1. DOT claims that sellers are "marketing air transportation through a variety of methods that they were not using" in 2006. DOT names Facebook and Twitter feeds. This is insignificant. Ads through any online channel (whether web banner, short text message or Facebook page) are bound by existing policy. As of June 2011, Delta is the only carrier to sell tickets through Facebook. Twitter is not a transactional platform. Industry use of Twitter and Facebook remains trivial compared to established channels online and through travel agencies.

2. DOT claims that airlines "offer more complicated routings with multiple connections in order to provide the "lowest" airfare to consumers" and that customers "need a full picture of the price to be paid in order to compare fares and routings." This opinion is not based on fact. In both Q2 2006 and Q2 2010, the average number of flight segments

---

[32]See Spirit Airlines S-1 Filing, Overview. "We have reduced our unit operating costs significantly since redefining Spirit as a ULCC in 2006... Our ULCC business model allows us to compete principally through offering low base fares. For 2009 and the six months ended June 30, 2010, our average base fare was approximately $85 and $83, respectively, and we regularly offer promotional base fares of $9 or less. Since 2007, we have unbundled components of our air travel service that have traditionally been included in base fares, such as baggage and advance seat selection, and offer them as optional, ancillary services for additional fees (which we record in our financial statements as non-ticket revenue) as part of a strategy to enable our passengers to identify, select and pay for the services they want to use. We have lowered our base fares by up to 40% since initiating our unbundling strategy, with the goal of stimulating additional passenger demand in the markets we serve. We plan to continue to use low fares to stimulate demand, a strategy that generates additional non-ticket revenue opportunities and, in turn, allows us to further lower base fares and stimulate demand even further."

per round trip ticket was 2.7 segments.[33]  While DOT may have heard anecdotal evidence that airlines advertise "more complicated routings" now versus 2006, this is not supported by DOT's data.  There has been no significant increase in "complicating routings" or "multiple connections" on which to base a policy change.

3. DOT claims that airline tickets are "different from products in other industries for a variety of reasons, including the multitude of methods of advertising that sellers of air transportation employ and the various taxes and government fees that apply."  Airlines advertise in the same channels and methods as travel industry peers (hotels, car rentals, cruise providers and other providers), including television, print, online and outdoor channels.  There is no functional difference.  DOT is correct, however, that airlines face a heavy tax burden compared to other industries.  Burying these taxes and fees may be in DOT's interest as it seeks new funding sources for FAA infrastructure and other projects, but that is not sufficient justification for this policy change.

The economic foundation for action is weak, and DOT explained why in 2006.  At a time when large "legacy" airlines are legally challenging alleged anti-trust behavior by distribution providers in order to unbundle and customize product for consumers, and to match price-competitive new entrants like Spirit and Allegiant, it is ironic that DOT has chosen to threaten the model of low-fare, unbundled service that benefitted consumers since 2006.

## PROBLEMS WITH ESTIMATING TAXES & FEES

Federal taxes on airline passengers are composed of the following components.[34]

a. **Excise tax (ad valorem).**  7.5% of the amount paid for base transportation.  (Sec 4261)

b. **Excise tax (per segment).**  $3.70 per segment flown by passengers, defined as a single takeoff & landing. Flights with a stop but no change of plane are treated as multiple segments. (Sec 4261)

c. **TSA September 11 Security Fee.**  A security services fee of $2.50 per enplanement, with a limit of two enplanements ($5.00) per one-way trip or four enplanements ($10.00) for round-trip itineraries.  See 49 CFR 1510.5(a).

d. **Airport Passenger Facility Charges ("PFCs").**  Airport-imposed fees for passengers enplaning at that airport, varying from $1 to $4.50 per passenger, with a limit of $9.00 for one-way trips and $18.00 for round-trip itineraries.[35]  Many large airports charge the maximum $4.50 fee, while other are approved to charge $3.00 per passenger.

Most airlines operate broad flight networks with multiple nonstop and connecting itineraries.  Because customers may choose nonstop or connecting itineraries – which could have different tax and airport fee structures – the final composition of taxes is not known until the final itinerary is selected.  Exhibit M illustrates differences in taxes and fees by routing.

---

[33] Based on DOT Data Bank 1B ticket survey for Q2 2006 and Q2 2010, including only round-trip domestic itineraries with credible dollar indicators and excluding bulk fares.
[34] See Committee Report 49 of 50, House Report 112-044, Part 1.  In addition, airlines must pay federal tax of $0.043 per gallon of fuel consumed in scheduled and charter operations.  (Sec 4081)
[35] See http://www.faa.gov/airports/resources/publications/regulations/media/pfc_14cfr158_062207.pdf and http://www.arccorp.com/forms/pp/iah/current/iah7_8.pdf

For example, a passenger shopping for a round-trip between Los Angeles and Washington Dulles will be presented with two options: **nonstop**, and **connecting** with one or more intermediate points. The passenger is offered a choice of flights for the outbound flight segment, usually followed by returning flight options on a subsequent web page. An airline or ticketing system cannot **always** display an **exact** all-in fare for the outbound flight without knowing if the passenger wants a nonstop, one-stop or multi-stop itinerary for the return.

To demonstrate, we priced itineraries between Los Angeles and Miami for a round-trip in July 2011 on Travelocity, a dominant online travel agent (OTA). When selecting the outbound flight segment, Travelocity quotes taxes and fees of $21. However, when the return flight is selected, taxes and fees increase to $32. The base fare does not change. The taxes do. Tax information presented at early stages of the booking process can be incorrect. Today's tax structure and distribution technologies are incompatible with DOT's expectations for perfect all-in pricing.

### Table 3:  Tax Variance between Outbound & Final Fare Selection
### Travelocity, LAX-MIA-LAX 7/20-7/22/11, Snapshot June 26, 2011

## Outbound Flight Selection:  Fare $369 + <u>$21 Taxes</u>



## Completed Flight Selection:  Fare $369 + <u>$32 Taxes</u>



To resolve this uncertainty about taxes and fees, airlines take a different approach. They present component fares on a pre-tax basis (but including the 7.5% ad valorem tax as required by DOT policy). Consumers are also presented with an *estimated* tax, usually in the form of a range of total fares. When the consumer finalizes his itinerary choice, a final exact tax structure is presented. At no time during this process is incorrect information presented to the customer. This is further illustrated in Exhibit B, which demonstrates that tax-inclusive approaches utilized by OTAs can display inaccurate taxes, while separated tax and fee displays by airlines only present definitive taxes once the full itinerary is known.

Why is DOT reversing policy? DOT states that carriers have "started to offer more complicated routings with multiple connections in order to provide the 'lowest' airfare to

consumers, a statement unsupported by DOT's own ticket data.[36]  However, with these changes in routings, taxes and fees can increase and become a significant portion of the price to be paid by consumers."  DOT then states "consumers need to be able to see the entire price they need to pay to get to their destination the first time the airfare is presented to them."[37]  This is a clear conflict in objectives.  DOT wants airlines to display airfares including taxes from point to point during itinerary selection, yet they recognize the variability of taxes and fees based on the final itinerary selected.  The new rule will cause airlines to adopt displays that can present inaccurate information for the consumer.

**The benefits of the full fare rule are based on the mistaken assumption that tax-inclusive fares can be accurately displayed at each step of the booking process.**

DOT bases its action on benefits calculated in the RIA.  Econometrica's analysis for the full-fare advertising rule is based on a brief review of airlines and OTAs.  Econometrica states that in their review, "full-fare prices were displayed for each available option at the flight selection stage on all four OTA [on-line travel agency] sites, along with prices that did not include the additional taxes and fees."[38]  To compare, Econometrica viewed airline websites where they note "prices that do not include the full amount of the fare being charged, including all mandatory fees and taxes, complicate consumer comparison of alternative travel itineraries to reach the same destination, which may involve different amounts of these mandatory fees and taxes."

To provide the foundation of their economic analysis, they claim this difference is material for consumers: "experienced travelers will incur longer search times to confirm they have found the lowest or most appropriate fare" if full fares are not presented; similarly, they state "inexperienced travelers may find themselves purchasing tickets at prices that are higher than those for other alternatives they reviewed once the charges for all mandatory fees and taxes are included."[39]

But Econometrica makes a **fundamental error** that full-fare prices displayed at each step of the flight selection page **will be accurate**.  As shown above, **they will not**.  But to create quantitative metrics, Econometrica calculates time saved by ticket purchasers from full-fare prices displayed **at each stage of flight selection**.  They state, "passengers who purchase tickets from websites that did not previously present full fares ***up front*** will benefit by (1) saving time that would previously have been spent searching for the full fare on single or multiple websites to be able to compare full-fare prices or (2) avoid being attracted by lower, incomplete fares and then not fully taking into account the full fare when it is subsequently revealed."[40]

Their economic value from estimated tax information is based on the following methodology, and presented in Exhibit C:

- Calculation of the total number of tickets purchased on websites (127 million/year)

- Estimation of passengers who cross-shop multiple websites (2.5 million/year)

---

[36] As previously discussed, average segments per domestic round-trip remained largely unchanged between Q2 2006 and Q2 2010 at 2.7 flight segments per round-trip ticket, based on DOT Data Bank 1B ticket data.
[37] 76 FR 23143 at Col. 1
[38] RIA, p54
[39] RIA, p55
[40] RIA, p56

- An estimated time savings (3 minutes) per ticketing transaction, valued at $24.15 per hour using standard government value-of-time metrics.

Econometrica **cites no independent data to validate their assumptions regarding the number of passengers purchasing tickets by cross-shopping multiple websites, or the time savings from viewing full fares.** The entire customer benefits from full-fare advertising (and therefore for EAPP-2 in its entirety) are based on 2% of all online purchasers saving exactly three minutes apiece.

Yet **Econometrica's basic assumption behind this calculations is that passengers will receive accurate and final tax information during each step of the sales process**, so that passengers would not "be required to complete the entire purchasing process" before learning of the final fare.[41] As we have shown, under EAPP-2 passengers will not always receive accurate tax information until the entire purchasing process is complete.

Econometrica fails to demonstrate that its in-house estimates are non-trivial. They cite no external validation or reasonableness test. Other factors including network speed impact the time estimate. No user surveys or robust sampling methods are used. By estimating trivial savings per ticket – and then multiplying that trivial value across hundreds of millions of transactions – Econometrica creates a big number to justify EAPP-2. **But a million trivial calculations are inherently trivial as a whole.**

Econometrica also discusses "customer good will" generated from premature estimates, stating customers may "perceive the carriers as treating them more 'honestly.'" We are puzzled how consumers will perceive premature tax estimates that are sometimes wrong and misleading as more "honest". Yet Econometrica estimates $3 million per year in time value benefits, or $29 million over 10 years.

We strongly disagree. There will be no time savings and no "good will" savings. Even raising these points in defense of sub-standard analysis shows that Econometrica and DOT were aware of deficiencies in their core methodology.[42]

## ECONOMETRICA UNDERESTIMATES COMPLIANCE COSTS AND FAILS TO SUPPORT THOSE ESTIMATES

Airlines will now be saddled with comprehensive compliance costs as websites are rebuilt to show estimated taxes at each stage of the booking process. DOT/Econometrica estimates compliance costs as follows:

- 80 direct labor hours for large carriers to reconfigure entire websites, at $103 per hour in fully burdened labor cost;

- 20 and 10 hours for small carriers and agencies respectively, also at $103 per hour, to reconfigure online booking systems;

---

[41] RIA, p57, Footnote 49

[42] Econometrica fully recognizes the criticality of the full-fare benefits estimate to their overall case in favor of EAPP-2. They state that"[s]ubstantial portions of the estimated benefits, costs, and net benefits from the Rule are attributable to the full-fare advertising provisions of Requirement Area 7. The estimated benefits for these requirements total $29.0 million over the 10-year period from 2012 through 2021 using a discount rate of 7 percent. Benefits estimated for the full-fare advertising provisions represent 64 percent of the total benefits estimated for all 11 sets of new requirements during the period from 2012through 2021." (RIA p2)

- $528 for each airline to modify print advertising.

These estimates reflect a lack of understanding of the complexities of creating online price displays and are inherently unreasonable. No allowance is made for planning, coding and testing (since DOT has recently fined airlines for trivial display errors) or for integration of new application technology with worldwide systems.[43] No allowance is made for training of departments, including revenue, planning, airports, reservations and IT staff. We estimate for airlines, more than 5,000 technical and reservations staff may need re-training. Many airlines have multiple foreign language web sites that require alteration. United operates 47 different individual domain name and language combinations for worldwide sites, many with differences in fare display, taxes and other components. Delta and American each offer similar capability.

Econometrica's subcontractor, HDR, likely recognized that $8,240 per large airline in compliance cost was unrealistic. As shown below in Table 4, EAPP-1 required that airlines fundamentally alter just the *flight selection* pages of booking websites to show on-time performance data for each flight. More complex changes to similar pages are now required for EAPP-2 for full-fare compliance.

**Table 4**
**EAPP-1 Required Website Changes Estimated by HDR at $400,000 per Carrier**
Southwest (www.southwest.com) and United (www.united.com): New Functionality Circled



HDR prepared the RIA for EAPP-1 and was the subcontractor for EAPP-2. So how did HDR estimate compliance cost for EAPP-1? As HDR stated in the RIA Appendix A:

**The cost to carriers to provide delay data on their websites is estimated at $400,000.** Assuming information is fed into their electronic infrastructure free of charge, there would only be the fixed cost to set up the website and infrastructure to receive delay data.[44]

---

[43] See Footnote 47.
[44] RIA for EAPP-1, Appendix A. Emphasis added.

HDR estimated **$400,000 per carrier** for a **narrower** scope of changes to the same web pages versus new full-fare requirements in EAPP-2. HDR's subcontractor role in EAPP-2 is established[45] and Econometrica references HDR's "subject matter experts" to justify other IT compliance costs.[46] Yet HDR's EAPP-1 estimates were either ignored or omitted by Econometrica for EAPP-2. This makes the lack of economic support or reasonable justification by Econometrica for its $8,240 estimate even more notable. **We conclude the DOT/Econometrica estimates have no basis in fact or rigorous analysis, and grossly understate compliance cost.**

To illustrate the un-reasonableness of this labor and time assumption, consider that at low-fare airlines such as Spirit, Allegiant, JetBlue, and AirTran, fundamental changes will be required to fare displays, since the airlines focus on providing customers with information about dozens of possible flight itineraries at once. This will be difficult, if not impossible, under the new regulations.

Specific changes to information technology platforms for low-fare airlines such as Spirit and Allegiant include:

- Labor to revise front-facing web sites, applications, fare management and pricing systems. Based on an industry sample of both low-fare and major legacy airlines, we estimate that at least 7,500 hours of labor is required for this component alone. Spirit estimates this cost at $850,000.

- At some carriers such as Spirit, new infrastructure will be required. Spirit estimates this cost at $250,000.

- Fees paid to booking systems will change as the number of pricing queries will increase (from sampling only fares to sampling both fares and associated taxes/PFCs). Spirit estimates this cost at $300,000.

- Fundamental software changes will be required by reservation system providers to adapt back-end hosting technology. Spirit estimates the relevant costs from its contractor, Navitaire, will exceed $750,000, plus the cost of internal integration and testing.

These estimates include more than simply coding changes: any fundamental change to IT requires a lengthy process of planning, documentation, implementation, deployment and testing that can add substantial time and resource demands.[47] We estimate that certain carriers such as Spirit will be strongly impacted, as their systems are built ground-up for tax-exclusive pricing. Others, such as Delta, which already estimate taxes and fees in the booking process, will have lower expenditures. We estimate that some carriers may have expenditures as low as $300,000 related to full-fare advertising, low-fare leaders such as Spirit face $2.6 million or more, and the industry average for airlines will be $750,000 per carrier.[48]

---

[45] RIA, Page 1

[46] RIA, Page A6

[47] DOT has established a recent pattern of fining airlines for violations of tax and fee displays. Fines and enforcement action force airlines to invest extra hours for quality assurance and correct fare displays, based on airline interviews. For more information, see http://aviationblog.dallasnews.com/archives/2011/06/dot-fines-continental-us-airwa.html.

[48] Our estimates are based on interviews with airline IT departments (including analysis by a former Chief Technology Officer of an airline with extensive experience developing customer-facing pricing and schedule tools) and by work requirements and task lists provided by Spirit and Allegiant for EAPP-2 full-fare compliance. Specifically, we estimate that revisions to individual web pages incorporating application calls (schedule, fare, and tax information) will take 100

We conclude that Econometrica's compliance cost estimate lacks any understanding of airline pricing, reservations system architecture, and the punitive fines assessed by DOT for material violations. We estimate that the EAPP-1 compliance time estimates of $400,000 per carrier is more realistic, but still understates total compliance given the increased scope of changes required by EAPP-2.[49]

This does not include the decisions that must be made by each carrier due to fundamental changes in product prices, and the potential destruction of significant amounts of passenger revenue due to higher shown fares inclusive of taxes. A full estimate of costs by carrier type is included in Exhibit D.[50]

There is a string of protests against DOT's and Econometrica's estimates of compliance cost. During the rulemaking process, airlines challenged that "the Regulatory Impact Analysis did not accurately reflect the IT costs associated with meeting all of the requirements" defined under EAPP-2 proposals. Then as stated by the three major airline trade associations in a recent joint filing,[51] there are "substantial technological problems" in the new rules that require "deployment of substantial IT resources" and the "development of new protocols/procedures." These statements confirm our estimates of significant compliance cost.

If Econometrica and HDR had used their IT compliance estimate from EAPP-1 in the EAPP-2 RIA, it would have swung public welfare from EAPP-2 from marginally positive to strongly negative.[52] Using our compliance cost estimates based on actual airline websites and systems, compliance cost exceeds $153 million for the industry. Yet any benefit to customers is trivial and masks transparency.

## LONG-TERM IMPLICATIONS FOR CONSUMERS

DOT also ignores the *long-term* implications of all-in pricing for airlines and consumers. We believe airlines will standardize all-in airfares on an origin-to-destination basis regardless of the itinerary chosen. Carriers will publish fares such that the total cost, including all taxes and fees, for a trip from Los Angeles to Washington will be identical regardless of whether the passenger travels nonstop, via Chicago, Denver, San Francisco or a combination of connecting points. The compliance advantages of such a strategy should be clear, but the consumer harm is

---

hours *per page* plus a 30% allowance for documentation and deployment testing. Application logic and callable services to estimate per-segment taxes will require at least 1,000 hours to design, code, integrate, test and deploy. Database revisions to store and serve new tax information will take at least 1,000 hours apiece to design, develop, deploy, test and link to middleware and front-end web servers. We also apply a 30% overhead allowance to application and database coding activities. Interviews with Spirit, Allegiant and Andrew Rae, CTO MAXjet Airways (2006-2008).

[49] Of most critical concern, the carriers must "determine how to display fares in city pairs where government charges and fees will be different for nonstop and connecting flights, and where connecting flight fees will vary depending on the intermediate airport(s)."[49] This represents the core of the problem: how to comply with a regulation that mandates the display of incomplete and sometimes inaccurate information. Airline trade groups are unanimous in their concern over this requirement.  In the first half of 2011, DOT Enforcement fined airlines $569,000 for airfare listing violations, raising concern by airlines for any mistakes.

[50] Airline trade associations state that compliance with full-fare advertising rules will "require the greatest IT investment because carriers will be changing the way fares are displayed" and will require airlines to "substantially reprogram and reconfigure their online search engines to incorporate the new advertising requirements." HDR's IT estimates during EAPP-1 demonstrate that the airline trade associations are *not* crying wolf.

[51] Request to Clarify the Final Rule, OST-2010-0140, June 2011 ATA/RAA/NACA

[52] See RIA, Table ES-1, p2 and Sections 4.7.3 and 4.7.4.

very significant. Prices would be higher. **Fares will reflect the worst-case tax, PFC and security fee likely to be chosen by customers.**

If forced to show all-in pricing for all options on the same route, **airlines and travel sites will show the highest fare**. This will dampen consumer demand.

As we show in Exhibit E, this fare increase is substantial – and has negative consumer implications in this highly price-sensitive industry. Based on Q4 2010 ticketing data, **we estimate that all-in pricing is likely to result in a 3 percent increase in systemwide fares**. Using price elasticity metrics (-1.47 for legacy carriers and Southwest, and -1.98 for Spirit and Allegiant) this would result in a 1.5% drop in system demand and a **revenue drop of more than $1.1 billion per year** for the U.S. airline industry.[53]

The impact will be very damaging for Spirit and Allegiant. These carriers target price-sensitive consumers with low fares.[54] For lower-income passengers, price sensitivity is significant. At the lowest price points favored by Spirit and Allegiant, we estimate route-level price elasticity at -1.98. This is supported both in theory and in practice by market price and quantity changes from entry into competitive markets and illustrated in Exhibits K and L.

Incorporating taxes and fees based on the worst-case connecting itineraries mean fares will go up. A $99 nonstop round-trip all-in fare currently advertised would jump to an all-in fare of $110.50 to internalize taxes and fees on a connecting itinerary. Passengers are harmed.

## The Threat to Smaller Airports

Low fares are key to sustaining jet service at small communities nationwide. Major legacy carriers cannot profitably sustain nonstop service from many of these communities with "mainline" aircraft – instead, they operate with small regional jets. Less capacity on regional jets means less available inventory for fare sales, so small communities face the unpleasant combination of poor connecting service and high fares to key destinations.

Low-fare airlines capitalize on this market opportunity by bringing access and affordability to small communities. Spirit and Allegiant operate nonstop to key tourism and business markets nationwide. These carriers distribute directly to consumers via telephone and Internet, offer low base fares that stimulate demand, and maximize flexibility to keep costs low. Forcing a fare increase and reducing carrier flexibility, as do DOT's package of rules, will disproportionately harm consumers in smaller markets.

Consider Allegiant's entry into key secondary markets such as Billings, Cedar Rapids, Des Moines, Springfield, Grand Junction and Fargo. These markets are historically underserved. Allegiant enters each market with nonstop service to Las Vegas, a key leisure and business

---

[53] Note we utilize route-based elasticity for the North American short- and long-haul markets in our elasticity metrics. Price Elasticity is the mean value of IATA/InterVISTAS *Estimating Air Travel Demand Elasticities Final Report* dated 28 December 2007, Page v for Route/Market Level Intra North America. Revenue decline based on Q4 2010 revenue, annualized and scaled for international traffic, based on 3.0% increase in system fares and 4.4% decline in system demand. Elasticity metrics for Spirit and Allegiant based on Q3 survey of fares and passengers for existing routes (controlling for new market entry) with significant price changes between 2006 and 2010. See Exhibits L and M.

[54] See Spirit S-1, Overview. "Our ultra low-cost carrier, or ULCC, business model allows us to offer a low-priced basic service combined with a range of optional services for additional fees, targeting price-sensitive leisure travelers and travelers visiting friends and relatives, or VFR."

market, brings significantly lower fares (from 11% to 61% less than incumbents) and passenger demand thrives (increases of 68% to 300%). Table 5 illustrates this impact.

**Table 5: Daily Passenger Count & Fare Change**
**One Year After Allegiant Enters Market, From DOT DB1B and T-100 Data**
PDEW = Passengers Daily Each Way

| Market | PDEW | Fare | PDEW | Fare | PDEW+ | Fare |
|--------|------|------|------|------|-------|------|
| Billings | 101 | $91.59 | 185 | $62.58 | 83% | -32% |
| Cedar Rapids | 104 | $150.66 | 272 | $125.24 | 162% | -17% |
| Des Moines | 219 | $133.22 | 367 | $118.80 | 68% | -11% |
| Springfield | 88 | $137.91 | 286 | $83.87 | 225% | -39% |
| Grand Junction | 23 | $167.25 | 92 | $65.86 | 300% | -61% |
| Fargo | 99 | $183.68 | 296 | $123.91 | 199% | -33% |

The dangers of DOT's standardization efforts should be clear for these small communities. By forcing carriers such as Allegiant to raise prices, both to comply with regulations and cover compliance costs, DOT will suppress demand from these underserved cities for important markets such as Las Vegas and Orlando. Small airports that are marginally viable for Spirit, Allegiant and other low-fare carriers risk losing service altogether.

**CONCLUSIONS FOR FULL-FARE ADVERTISING**

We conclude that:

- Changing the way airlines price and display fares will destroy the innovative business models of low-cost carriers, the growth segment of the U.S. airline industry.

- Today's tax regime based on per-segment fees with itinerary caps is not compatible with DOT's policy of listing prices inclusive of all taxes at every step of the booking process.

- Websites listed by both DOT and Econometrica as examples of full-fare advertising can provide **inaccurate** tax information during early stages of the round-trip booking process, reflecting uncertainty and incomplete information about the final return itinerary chosen.

- The economic justification for the rule is based on a trivial time savings (with no recognition of the inaccuracy of data provided) and grossly understated compliance costs.

- Compliance requires reconstruction of airline websites and changes in pricing to minimize differences among itineraries.

- We estimate total compliance cost by the industry at $153 million in the first year. This overwhelms any perceived gains from unsupported three minutes of time savings and "good will" between airlines and their consumers.

- Compliance cost will be disproportionately high for low-fare carriers. We estimate total compliance cost for full-fare advertising at Spirit to be $2.6 million, with similar metrics for other low-fare carriers.

- We estimate that long-term pricing changes to minimize connecting and nonstop itinerary all-in price differences will result in an effective 3% fare increase and cause the loss of more than $1.1 billion in industry revenue when elasticity is considered.

# Section Two:  24-Hour Holds

Under EAPP-2, DOT now requires that new reservations should "be held at the quoted fare without payment, or cancelled without penalty, for at least twenty-four hours after the reservation is made if the reservation is made one week or more prior to a flight's departure." DOT and its economic consultants provide **no economic assessment** of this change, even though this rule significantly changes airline reservation policies and practices.

Econometrica dodges this issue altogether.  The RIA states:  "Costs associated with changes to reservations systems necessary to allow holds without payment for 24 hours were not included in the preliminary RIA because the Department does not have adequate information to estimate these costs."[55]

We cannot explain why DOT accepted Econometrica's analysis given the profound policy change.  We show that forcing all airlines to permit holds or refunds requires significant technology changes.  We also show that offering refundable or held fares is a costly change in business models for low-cost airlines and will result in higher ticket prices.  Finally, we show that by publicizing free refunds, DOT encourages customers to make frivolous or speculative bookings that squat on seat inventory and drive up booking costs for all passengers.  It will result in more seats being left empty.  DOT and Econometrica ignore these implications.

## CURRENT AIRLINE POLICIES REGARDING REFUNDS AND HOLDS

Core to Econometrica's analysis is the assertion that "most reporting U.S. carriers currently allow travelers to hold a reservation for 24 hours… or to cancel ticket purchases within 24 hours without penalty."[56]  There are **three gross errors in this statement**:  it does not account for the significant number of *non-reporting* U.S. carriers that do not report on-time data to the government, it does not account for *foreign carriers* now covered by the rule, and it does not recognize that many carriers either offer travel vouchers instead of direct refunds, or do not offer refunds or holds for non-refundable tickets at all.

**Reporting carriers:**  Econometrica's analysis was limited to reporting carriers, which represent 1% or more of annual passenger volume.  Table 6 shows reporting carriers for 2011, along with those carriers selling tickets directly to the public.  Econometrica's analysis of *reporting* carriers ignored airlines that do not report to the government including Allegiant, Spirit, Virgin America, and Sun Country.  It also ignored *local* and *regional* carriers such as Cape Air, Direct Air and Vision Airlines that offer Part 121 scheduled service.

**Foreign carriers.**  EAPP-2 covers a "certificated carrier, a commuter carrier, or a foreign air carrier operating to, from or within the United States, conducting scheduled passenger service… with at least one aircraft having a designed seating capacity of 30 or more seats."[57]  There are **42 air carriers covered** by EAPP-1.[58]  Econometrica estimates that a total of **45 U.S. carriers and 130 foreign carriers** will now be covered by EAPP-2, who were not covered by EAPP-1.[59]

---

[55] RIA p5
[56] RIA p5
[57] 76 FR 23164
[58] Federal Register, Vol. 74 No. 249 Col 2.
[59] RIA, p12 (domestic carriers, consisting of 33 large and 12 small airlines) and p13 (international carriers).

Table 6:  2011 Reporting Carriers (www.bts.gov)

| Airline | Sells to the General Public? | Reporting Carrier (14 CFR Part 234) |
|---|---|---|
| AirTran | Yes | Yes |
| Alaska | Yes | Yes |
| American | Yes | Yes |
| Continental | Yes | Yes |
| Delta | Yes | Yes |
| Frontier | Yes | Yes |
| Hawaiian | Yes | Yes |
| JetBlue | Yes | Yes |
| Southwest | Yes | Yes |
| United | Yes | Yes |
| US Airways | Yes | Yes |
| American Eagle | No | Yes |
| Atlantic Southeast | No | Yes |
| Mesa | No | Yes |
| SkyWest | No | Yes |

**Changing standards.**  Econometrica also ignored a core component of the changes to Part 259.5(b)(4):  airlines will no longer be permitted to offer flight credits as an alternative to direct refunds or holds.  Several carriers, including Spirit and JetBlue, utilize future credits as a means to facilitate customer re-bookings.[60]  Shifting to reservation holds or 24-hour refunds will represent a significant change in business models in addition to having significant implementation costs.


## LOW-FARE AIRLINES ARE IMPACTED THE MOST BY THE NEW RULE

Changing reservations platforms built for non-refundable transactions is a massive project.  This is particularly true for low-fare airlines such as Spirit, AirTran and Allegiant that use ticketless reservations and travel distribution systems such as Navitaire's New Skies system.  These low-fare airline reservations systems incorporate many functions that are traditionally separated at legacy airlines.  By providing a single platform for call center bookings, Internet sales, revenue accounting, pricing and airport operations, these integrated platforms reduce cost and improve flexibility at low-fare airlines.  They are also ill-suited for the 24-hour refunds and reservation hold rules DOT now mandates.

Allowing customers to open a new reservation without making a payment may be straightforward for legacy airlines where reservations and financial transactions are separated, but they are fundamentally difficult for integrated systems.  Econometrica did not assess the implications of this rule on low-fare carriers, and on airlines that currently do not offer holds or refunds.

---

[60] Two-thirds of carriers we surveyed on June 24, 2011 offered refunds or reservation holds.  The remaining carriers offered credits for future flight travel to comply with EAPP-1.  Generally, low-fare carriers did not offer refunds, while legacy airlines based on GDS platforms did offer either holds or refunds.

Why do low-cost carriers generally prohibit ticket refunds, and why is EAPP-2 so damaging to low-fare competition and viability?

First, many low-fare carriers do not aggressively overbook seats on flights.[61] Instead of expecting a certain level of refunds, the airline locks in revenue from passengers. Passengers benefit from avoiding denied boarding, while the airline benefits from full confidence in its revenue base for each flight. Allowing refunds, even within 24 hours, removes inventory from the market during key booking periods.

Second, altering systems to permit 24-hour holds and refunds requires a significant investment in reservation systems. It requires new contracts with reservations hosting providers, because higher refunds change the way airlines pay distribution partners. We estimate that changing IT systems to permit refunds will require between 500 and 1,000 hours of IT resources, including the need to create a new database to track refunds and charge-backs.

Third, business bookings where 24-hour refunds are important are less relevant for price sensitive low-fare carriers. Most airline tickets by price sensitive passengers are booked between seven and nine weeks in advance of travel.[62] EAPP-2 demands 24-hour cancellations and holds up to 7 days before departure. By seven days before departure, most low-cost carriers have booked more than 90% of their seats.[63] Effectively *all* inventory offered by low-cost carriers is now refundable within 24 hours when booked by customers.

Finally, **refunding tickets creates costs that must be borne by all passengers**. Reducing costs is critical to low-fare airline competition. A March 2011 study by ATPCO, the industry repository for fare-related data, states that most airlines refund an average 9.9% of their overall tickets sold.[64] Most carriers report that flight cancellations cost between $25 and $40 per transaction, incorporating (1) credit card charge-back and merchant fees lost from the original booking and (2) resources in reservations and accounting to process the change.[65]

AAI assessed the cost of cancellations using financial metrics for credit-card processing fees, charge-backs and refunds, GDS segment-booking fees and reservation host fees charged by airline vendors. **In Exhibit F, we confirm that for low-cost carriers the direct and indirect cost of ticket refunds is $30 per ticket.**

The implications for low-fare airlines such as Spirit, AirTran, JetBlue and Allegiant are significant. Industry-wide, we estimate that refunds cost the industry $907 million yearly in transaction fees.[66] As shown in Exhibit G, this translates to $3.26 per passenger ticket sold. By not offering refunds, low-fare airlines avoid this cost and reduce ticket prices. In turn, lower fares stimulate demand, benefitting the consumer. <u>**For Spirit, we estimate that $3.26 per ticket reflects 1.4% of the average ticketing transaction**</u>.

---

[61] See DOT Consumer Reports, based on reporting under 14 CFR 250.10 for overbooking and denied boardings. See http://airconsumer.ost.dot.gov/reports/2010/December/2010DecemberATCR.PDF.
[62] Amadeus, ancillary revenue and advance bookings.http://shearwaterblog.files.wordpress.com/2009/06/seasonality-and-2009-bigger-bracket2.jpg
[63] Based on interview with Allegiant Airlines, June 29, 2011.
[64] ATPCO 2011 Ticket Refunds Industry Report, March 2011, pp3-4. Based on weighted average of ticket refund periods.
[65] See ATPCO 2011 Ticket Refunds. Also based on interviews with VP Revenue Management at Allegiant Airlines June 28, 2011.
[66] This is based on Econometrica's estimates for 2012 ticketing transactions and ATPCO's refund ratio.

**FARE INCREASES WILL RESULT**

Ticket non-refundability is a key competitive trait of low-fare airlines and has facilitated the rapid growth of price competition across both regional and cross-country routes. EAPP-2 forces all types of airlines to appear the same to consumers, lowering competitive advantages and marketing innovation. Under EAPP-2, low-fare airlines will likely pass new refund costs on to consumers. A fare increase of $3 per ticket will have a measurable impact on consumer demand and welfare. We estimate that a **3% reduction in passenger demand** will result for low-fare airlines. Lower demand will hurt small price-sensitive communities the most, since they have fewer travel options. These costs are **not** analyzed by Econometrica.[67]

DOT itself has noted the profound impact low-fare airlines have had on price competition. The lowest average airfares in the country are reported at airports such as Atlantic City, Orlando, and Fort Lauderdale, each dominated by low-fare carriers (Spirit, Allegiant, JetBlue and AirTran) that embrace non-refundability as a means to driving down cost and fares.[68]

**CONCLUSIONS: 24-HOUR REFUNDS AND HOLDS**

DOT and Econometrica should have properly assessed the impact of 24-hour refundability on non-reporting carriers, and on foreign airlines. We find that:

1. EAPP-2 **imposes significant changes** regarding ticket holds and refunds. The elimination of vouchers and forward credits as compliance options, and the imposition of a 24-hour window, create economic costs that should be estimated.

2. Compliance costs will be both short-term and long-term in nature.

3. Many carriers will need to invest significantly in IT resources to implement holds and automated 24-hour refunds. Manual processing will be required in many cases. These implementation costs are completely ignored by DOT.

4. Mandating 24-hour holds and/or refunds changes the dynamics of low-fare airlines, forcing them to behave like legacy network carriers and adding cost. We estimate refunds will add up to $3 per transaction in costs and correspondingly higher fares.

5. We estimate that low-fare and legacy carriers will lose revenue from travel insurance and other products that meet customer demand for risk management.

6. We believe that compliance costs for foreign airlines must be incorporated into economic analysis, particularly in cases where foreign airlines are party to immunized joint ventures with U.S. carriers. No analysis of foreign carrier expenses is conducted by either DOT or Econometrica. DOT also ignored the potential for foreign government retribution of U.S.-mandated higher costs on their airlines.

---

[67] See IATA price elasticity study.
[68] http://www.bts.gov/press_releases/2011/bts023_11/html/bts023_11.html#table_03

# Section Three:  Post-Purchase Price Increases

EAPP-2 prohibits airlines from post-purchase price increases in air transportation or air tours.  Currently, 14 CFR 253.7 permits airlines to increase prices post-purchase as long as the customer "receives direct notice on or with the ticket of any contract of carriage term that allows a carrier to increase the price after purchase."  Under EAPP-2, 14 CFR 399.88(a) now states that:

> It is an unfair and deceptive practice… for any seller of scheduled air transportation, within, to or from the United States… to increase the price of that air transportation, tour or tour component to a consumer, including but not limited to an increase in the price of the seat, an increase in the price for the carriage of passenger baggage, or an increase in an applicable fuel surcharge, after the air transportation has been purchased by the consumer, except in the case of an increase in a government-imposed tax or fee.  A purchase is deemed to have occurred when the full amount agreed upon has been paid by the consumer.

There is significant ambiguity and profound implications for both low-cost and legacy airlines.  While DOT defines a purchase as payment of the "full amount agreed" between the consumer and the airline, it does not define whether the rule applies in the situations where:

(1)  Purchasers are *presented* with a roster of ancillary service fees (such as baggage fees, seat selection fees, etc.) at the time of booking;

(2)  The purchaser *defers* a decision on one or more ancillary services at booking;

(3)  The fees for those ancillary services *increase* prior to departure; and

(4)  The passenger decides to *purchase* those services at departure.

As airlines drive an increasing percentage of revenue from ancillary fees (versus base fares), the question of whether un-purchased ancillary fees must be "frozen" at original ticketing-date levels until the passenger's departure date is of fundamental importance to airlines.  Volatile fuel prices, intense competition and other factors demand flexibility in ancillary fees.  In addition, airlines would have to invest enormous sums of money into IT infrastructure if they would be forced to track which ancillary rates were on the market – including car rental discounts – for each passenger when he/she booked a ticket many months before departure.

## PURCHASE EQUALS PAYMENT?

We interpret 14 CFR 399.88(a) to read that until a passenger has provided payment of the "full amount agreed upon" for a specific good or service, a purchase has not yet occurred.  For this reason, ancillary fee pricing presented are not binding onto the airline until such time as the passenger purchases the ancillary good or service.  Once the purchase of the ancillary good has occurred, the airline is barred from increasing the price of that good or service.

We believe such a reading of 14 CFR 399.88(a) provides a reasonable baseline for ensuring that customers are not held up at the time of travel for additional payments to airlines or other service providers.  It also protects airlines from changes in prices by third-party vendors, such as hotels, car rental services, travel insurance companies and other tourism businesses, between fare display and final ticketing.

**APPLIES TO UNPURCHASED ANCILLARY SERVICES?**

If DOT concurs with our reading of 399.88(a) – that post-purchase price increase restrictions only apply to ancillary products actually purchased by the consumer, not just offered by the airline – then we generally concur with the cost/benefit methodology employed by Econometrica, although we note Econometrica only assesses travel agency unit costs in its analysis. Airline compliance costs are not trivial, and should be incorporated into the analysis.

However, if DOT's intent was to restrict ancillary fee rates to the date of the original ticket sale, then we believe the implications for both legacy and low-fare airlines are significant. Relevant costs and implications include:

-  Design, coding, testing and deployment of parallel database systems and GDS-based infrastructure to track ancillary fees by both marketing and operating carriers as of the ticketing date for each new reservation. We estimate that such databases could require thousands of hours of technology resources and significant financial expenditure, since the database would be directly scaled alongside new bookings.

-  Loss of flexibility related to un-purchased baggage fees and other fees due to changes in input costs, such as fuel.

-  For Allegiant, 76.8% of its customers purchase ancillary products and this loss would threaten its business model.

-  Shorter booking windows available to consumers, as airlines restrict future bookings to avoid exposure from ancillary fees based on current-period input costs.

-  Removal of hotel, car rental, and travel agency complementary products from airline websites, with associated loss of ancillary revenues. Presence of these "ancillary" services introduces potentially *thousands* of offered-but-unpurchased goods and services that must be locked in price until the departure date. In the case of car rentals and hotels, this is an impossible requirement to meet for airlines.

-  Significant disruption to airline business models.

-  Significant opportunity and cost lost for consumers if, as a means of compliance, passengers no longer are offered significant travel bundles of flight-plus-car or flight-plus-hotel discounts.

**ESTIMATING COST FOR COMPLIANCE**

Based on interviews with airlines and technical experts, we calculate the potential cost of compliance at $2 million per airline if DOT in fact aims to "lock-in" all ancillary service pricing at the ticketing date. As Exhibit H demonstrates, compliance cost is focused on three categories:

-  Creation of an ancillary fee database to track the specific ancillary fees offered to the customer and their prices on the ticketing date. This database needs to span distribution channels (online sales, call center, airport and travel agency) and must be based on a highly scalable database system.

- Website overhaul and revisions to enable substitution of ancillary service fees as of the ticketing date, versus the current level offered by the airline.  We estimate that at least 20 front-end pages and 5 back-end databases (representing different ancillary service categories) would need substantial changes.

- Training and documentation for all customer-facing employees (online, call center and airport) to process revised ancillary fee transactions.

To estimate overall industry impact, we assess the compliance costs for only the 18 major U.S. carriers noted by Econometrica.  We do not include small carriers or foreign carriers because we cannot estimate what percentage of those entities unbundle product.  We estimate total compliance cost at $43 million over 10 years.

**CONCLUSIONS**

There is profound ambiguity in this provision.  If DOT intends to lock in ancillary service prices offered to consumers at ticketing, even if passengers do not purchase those ancillary services until a later time, the IT compliance costs for airlines will be significant.  We estimate one-time costs at $2 million per carrier, or $43 million over 10 years.   Econometrica estimates the 10-year benefits of the rule at $9.7 million, based on customer "certainty" about ancillary fees and ticket prices.  Compliance costs are likely to significantly exceed consumer benefits.

# Section Four:  Other Provisions

In addition to the provisions above, EAPP-2 contains two provisions of particular concern and potential cost for U.S. airlines: (1) Requiring airlines to disclose specific baggage fees (for both checked and carry-on luggage) in effect at the time of booking on every "e-ticket confirmation" provided to consumers. (2) Requiring airlines to notify customers of flight delays or cancellations within 30 minutes of first becoming aware of the delay/cancellation.

**Each of these elements has material costs for airlines that are neither acknowledged nor calculated** by Econometrica and DOT in their economic assessments.

EAPP-2 requires that airlines list on "all e-ticket confirmations... information regarding the passenger's free baggage allowance and/or the applicable fee for a carry-on bag and the first and second checked bag.  Carriers must provide this information in text form in the e-ticket confirmation."[69]

Econometrica estimates that airline compliance with e-ticket confirmation rules will require 40 direct labor hours.  They provide no detailed justification.  Econometrica's analysis is shown in Exhibit J.  Based on our interviews, the required implementation time for connecting website baggage data with outbound email systems is not trivial.  Spirit and Allegiant estimated the total compliance time as hundreds of hours. Annual maintenance would be significant.  Based on these estimates, AAI projects that <u>total compliance costs for all carriers and agencies will exceed $19 million</u>.  This is based on 800 man-hours of implementation time at an average rate of $103 per hour, fully burdened, across 42 U.S. carriers and 130 foreign carriers impacted by the rule.  Annual maintenance for the industry will exceed $1.9 million.

In addition to airline compliance, travel agencies must adapt their systems to provide email confirmations with baggage fees.  While we have no specific basis to judge whether Econometrica's hourly compliance estimates for travel agencies are reasonable, we doubt that travel agencies can adapt their systems to provide email confirmations with just 20-40 man-hours of technology time.  However, we do not materially adjust Econometrica's travel agency cost estimates in our methodology, shown in Exhibit J.  **Including both airlines and agencies, industry cost related to this rule would exceed $32.3 million over 10 years.**

We have not attempted to include the complexity of how airlines would need to alter the baggage fee disclosure based on whether the passenger was offered free baggage allowance due to their elite status level, their foreign airline connection or if their elite credit card benefits include free baggage allowances.

## 30-MINUTE PASSENGER NOTIFICATION

EAPP-2 requires airlines to "promptly provide to passengers who are ticketed or hold reservations and to the public information about a change in the status of a flight within 30 minutes after the carrier becomes aware of such a change in the status of a flight."  A change in the status means, "at a minimum, cancellation of a flight, a delay of 30 minutes or more in the planned operation a flight, or a diversion.  The flight status information must be provided in the boarding gate at a U.S. airport, on the carrier's website, and via the carrier's telephone reservation system upon inquiry by any person."

---

[69] 14 CFR 399.85(c)

DOT and Econometrica believe that since airlines already provide flight status information via these channels, establishing a 30-minute requirement for disclosure is a reasonable standard to ensure customers are notified. In DOT's opinion, mandating "all four methods" for communications "is not burdensome to carriers as it is our opinion [they] represent the most common ways by carriers to communicate with passengers and other interested parties."[70] There are two problems with this approach, reflecting DOT's (and Econometrica's) lack of consideration, due diligence or measurement of unintended consequences from the rule.

First, DOT provides no regulatory standard for "becoming aware" of a status change. DOT states that "[f]or enforcement purpose, we consider that the carrier has become aware of the flight status change as soon as the carrier's system operation control center… learns of it." DOT does not specify *which parties* are accountable, nor what *paperwork or procedures* airlines should maintain.

Second, requiring airlines to notify passengers within 30 minutes removes a critical tool in operations planning in advance of predicted weather and operational disruptions. Cancellations are planned internally and may be implemented from a crew staffing and equipment perspective, but customers are not notified until the weather event is certain. Winter blizzards, strong summer convective fronts and other extreme weather involve advance planning and the potential for multiple flight changes.

It is routine for airlines to adjust departure times for planned delays, as well as reinstate cancelled flights. EAPP-2 will in practice prevent airlines from bringing delayed flights back to scheduled departure times, since passengers will have been notified long before and may have made other plans. Reinstating a cancelled flight will risk significant revenue loss. This is relevant for Spirit and Allegiant, who focus on flight completion (avoiding cancellations) as a higher priority than on-time performance.

In Exhibit O, Spirit and Allegiant's strategy managing delays over cancellations imply that the airlines will be vulnerable to the loss of flexibility resulting from stringent 30-minute notice requirements. In Exhibit I, airline aware of just 20% of long flight delays more than 4 hours in advance, and cancel just 20% of flight with known delays, the annual impact is nearly $300 million. For Spirit and Allegiant, the impact would be $2.1 and $1.75 million respectively. Reducing airline flexibility increases costs, and higher costs increase passenger fares.

The profound harm on consumer welfare is substantial. Econometrica neither recognized nor estimated the loss of flexibility and increased cancellations that result from immediate notification. Econometrica states that since DOT "currently does not have information on the extent to which reporting carriers currently comply with this requirement… it is not possible to develop quantitative estimates of the benefits that passengers will receive from any changes." It also states "it is not possible to develop quantitative estimates of the compliance costs." Ignoring all costs and benefits related to 30-minute notification is unreasonable, given the operational and consumer impact of this rule.

---

[70] Final Rule, 76 FR 23154 Col 2

# Section Five:  Summary of Findings

We find that the economic analysis related to key components of EAPP-2 is incomplete, based on false assumptions and rife with material omissions of fact.

**Regarding DOT's mandate for <u>full-fare advertising</u>, we find that:**

- Changes to full-fare advertising carry significant IT compliance costs by airlines.  More realistic estimates for IT compliance used in EAPP-1 were ignored for EAPP-2.  While airlines and trade associations protested that EAPP-2 assumptions understated compliance cost, material changes were not incorporated.  Compliance costs for full-fare advertising require multi-million dollar investments by even small airlines such as Spirit and Allegiant.  For large airlines, and for foreign carriers, the costs may be significantly higher.   DOT estimated compliance cost at $6.8 million for the industry and travel agencies.  **We estimate compliance costs at more than $153 million, with disproportionate impact on low-fare carriers such as Spirit and Allegiant.**

- The benefits from full-fare advertising are based on unsupported assumptions.  DOT's analysis is based on customers learning the "true" fare including taxes three minutes earlier in the booking process.  As we demonstrate, tax and fee information at these early stages can change significantly based on the final itinerary chosen.  There is *no value* created from viewing incorrect or estimated data.   Airlines have the correct strategy today, displaying accurate fare information until such time as taxes and fees can be definitively calculated when an itinerary is fully selected.   DOT concurred with this approach for two decades. DOT now wants incorrect or incomplete information to be presented.

- Long-term impact from full-fare advertising will include higher fares to consumers as airlines meet compliance requirements by incorporating worst-case airport PFCs and segment taxes into all itineraries.  That is, under a government mandate to display only fully inclusive fares, airlines will calculate the highest possible combination of PFCs and segment taxes that can result from travel from origin to destination.  When passengers select nonstop trips or travel over itineraries with lower taxes, airlines will benefit.  But customer fares will rise by between 2.7% and 3.9%.  This creates profound harm that should be carefully analyzed by DOT.

**Regarding DOT's rules that <u>mandate 24-hour fare holds or refunds</u>, we find that:**

- Eliminating compliance by vouchers or future travel credits (without penalty) is a material change that significantly impacts key low-cost competitors such as JetBlue, Spirit, AirTran and Allegiant.

- Mandating a 24-hour window is also a material change, as key low-fare airlines such as JetBlue and AirTran offer a four-hour window today.

- EAPP-2 rules also impact foreign carriers, including those partnered with US airlines in metal-neutral, immunized joint venture agreements that pool expenses.

- Neither DOT nor Econometrica assess the significant compliance costs or consumer implications from changes in vouchers and 24-hour windows.

- IT compliance costs will be material ($45 million) and are ignored by DOT and Econometrica.

- DOT is forcing low-fare airlines to eliminate a key competitive advantage. Not allowing refunds saves carriers $3 per transaction.  Forcing refunds will increase fares.  It will also curtail sales of travel insurance and other ancillary products designed to meet customer demand for protection.  None of these costs are reflected in DOT's analysis.

**Regarding DOT's rules that <u>prohibit post-purchase price increases</u>, we find that:**

- Current DOT enforcement guidance raises important questions about the scope of new rules to prohibit post-purchase price increases, particularly related to ancillary goods and services offered to the consumer but not purchased at the original transaction.  It is ambiguous whether DOT intends to lock all ancillary services at the originally offered price until the date of travel.

- If this is DOT's intent, there are profound implications for the industry, for both low-fare carriers and for legacy airlines.  New database systems must be created to house ancillary product fees at a specific point in time.  Airlines are likely to shorten booking windows to mitigate risk against future input cost changes.  Airlines that offer hotel, car rentals, travel insurance and other products *over which they have no pricing control* will either (1) have to guarantee those prices or (2) will remove those products from booking sites, harming consumers and the travel industry.

- Total compliance costs will be $43 million over ten years as airlines implement and maintain database systems to track ancillary services presented to customers at the time of booking, then permit future transactions at historic price points.

**Regarding DOT's rules that <u>mandate e-ticket baggage</u> fees, we find that:**

- Airline compliance time will significantly exceed the 40-hour budget provided by DOT.  DOT does not provide independent justification for its metric, nor does it provide a reasonableness assessment.  We estimate compliance time at 800 hours for air carriers and 400 hours for OTAs.

- We estimate total compliance costs for the industry at $19.6 million, versus $4.7 million projected by Econometrica.  Including maintenance costs over 10 years, we estimate total costs at $32.3 million, versus $7.8 million in cost estimated by Econometrica.

- Econometrica does not incorporate other material costs from compliance, including (1) server resources and transmission time for longer and more complex messages; (2) opportunity costs related to lost marketing revenue from advertising displaced from email confirmations; and (3) environmental considerations from lengthy receipts.  To create valid comparisons, we exclude these material costs as well.

**Regarding DOT's rules that <u>mandate 30-minute notification of flight status</u>, we find:**

- DOT has not provided sufficient metrics or regulatory definitions for their vague standard of "becoming aware" of flight delays. A more precise definition (i.e. posted delays in internal flight planning systems) would eliminate key ambiguity.

- 30-minute status notification will eliminate a key aspect of operational flexibility for airlines when planning for predicted severe weather. Airline contingency plans for severe weather are often scaled back if weather does not materialize. Today, airlines notify customers of flight delays when a final flight time is reached. In the future, any preliminary flight change would significantly increase the likelihood of cancellations. **We estimate that this loss of flexibility could drive more than 20,000 annual cancellations with an industry cost of $300 million per year, or $2.1 billion present value for the next 10 years**. For Spirit and Allegiant, the loss of flexibility implies a cost increase of $2.1 and $1.75 million per year respectively.

## CONCLUSIONS

In conclusion, there have been material omissions and problems in the economic analysis conducted by DOT. We identify major gaps, such as the omission of any effect on 130 foreign airlines covered under the new rules. Before implementing the rules, DOT should pause, undertake a thorough cost-benefit analysis and revise existing economic metrics to validate the benefits from EAPP-2. Revised analysis will likely show that EAPP-2 rules, as currently defined, carry significant public welfare costs and should be modified or eliminated because of their severe harm to consumer.

We also recommend that further study be performed on the secondary impact of higher costs and fares on non-airline tourism businesses, such as hotels, car rental firms, and entertainment vendors. While beyond the immediate scope of our analysis, these industries are highly dependent upon low-fare carriers such as Spirit and Allegiant who bring significant numbers of passengers to tourism markets in Nevada, Florida, Arizona and other states nationwide. We also recommend that further study assess the impact of higher fares on international trade in Latin American and Caribbean markets served by low-cost airlines, where base fare advertising and product unbundling have driven a rapid increase in passenger volumes in price-sensitive ethnic communities.

## METHODOLOGY NOTES

Our analysis is based on a review of docketed materials and regulatory analyses for both EAPP-1 and EAPP-2; on interviews with, and information provided by, airlines during June 2011; publicly available passenger fare, enplanement, and federal taxation data in effect during 2011; and our comprehensive aviation databases. Funding for this report was provided in part by Spirit Airlines and Allegiant Airlines. The American Aviation Institute is a Washington-based commercial aviation think tank funded by airlines, labor groups and other industry stakeholders.

Principal work on this analysis was performed by:

- **Darryl Jenkins**, Chairman of AAI. He is the founder of the George Washington University Aviation Institute, a past professor at GWU and Embry Riddle Aeronautical University, adviser and consultant to airlines and aviation companies, founder of several travel agencies and author of the Handbook of Airline Economics.

- **Joshua Marks,** Executive Director of AAI. He was Associate Director, George Washington University, a senior executive at MAXjet Airways in finance, revenue, flight operations and IT, and has been an aviation consultant for airline revenue, operations management, safety, airspace management and business owner. He served in senior positions at two enterprise software companies. In addition, he is a licensed pilot.

- **Michael Miller** is Vice President, Strategy of AAI. He has been an aviation consultant for seven airlines and two aircraft makers, a journalist and editor having managed nine different aviation publications, including as Editor-In-Chief of *Aviation Daily*. In addition, he is a licensed pilot.

# Section Six: Exhibits

| Exhibit | Name | Description |
|---------|------|-------------|
| A | Summary of Harm and Revised Estimates | Recap of Econometrica estimates and revised compliance and long-term costs calculated by American Aviation Institute |
| B | Screen Shots from Major Travel Agencies | Overview and screen shots from Expedia, Travelocity and Priceline showing that **DOT's proposed solution for full-fare advertising causes incorrect fare estimates and customer confusion.** For comparison, screen shots from low-fare airlines including Spirit, Allegiant, Southwest and AirTran. |
| C | Econometrica Estimate: Full-Fare Advertising | Econometrica's estimate of welfare from changes to full-fare advertising rule, showing the full impact of unsubstantiated assumptions and arbitrary time savings without robust analysis or surveys. |
| D | Comparing Econometrica and AAI Compliance Cost Estimates: Full Fare Advertising | Comparing compliance cost estimates by Econometrica and AAI for technical and marketing changes to meet EAPP-2 full-fare rules. |
| E | Worst-Case Impact from Full-Fare Rule | Shows the worst-case scenario for consumers and airlines if airlines must pass on risk of high taxes and PFCs to customers through higher fares. |
| F | Estimating the cost of passenger refunds from the 24-hour rule | Estimates the direct costs (merchant fees and credit card refund charges) plus overhead required to process refunds. Calculates the increase in annual cost resulting from increased booking churn under EAPP-2. |
| G | Calculating the cost of refunds | Shows that fares at low-fare carriers will rise to cover refunds; shows that compliance cost will be substantial at carriers that do not offer 24-hour holds or refunds. |
| H | Compliance cost estimate: post-purchase ancillary increase prohibition | Calculates the compliance costs for airlines to track ancillary costs presented to customers at the time of ticketing, and allow future transactions at those levels. |
| I | Loss of Flexibility due to 30-minute notification | Shows that increased cancellations from the 30-minute notification requirement will materially damage U.S. carriers. |
| J | Estimating compliance cost with e-Ticket Baggage Disclosure Requirements | Estimates the cost of compliance for baggage disclosures. Compares Econometrica's estimates with AAI's revised estimates. |
| K | Systemwide change in airfares and revenue | Change in airfares and revenue between 2006 and 2010 on a systemwide basis. |
| L | Elasticity, Spirit Airlines | Reasonableness test: elasticity at Spirit Airlines |
| M | Elasticity, Allegiant Airlines | Reasonableness test: elasticity at Allegiant Airlines |
| N | Taxes and Fees | Lists differential taxes and fees |
| O | On-Time Performance | Compares on-time and cancellation data for Spirit, Allegiant and the industry |
| P | Airline Bankruptcies | Roster of post-deregulation airline bankruptcies |

### EXHIBIT A:  SUMMARY OF HARM AND REVISED ESTIMATES BY AAI

| COMPONENT | REVIEWED? | DOT/ECONOMETRICA | | | DOT ESTIMATES POSITIVE BENEFITS | AMERICAN AVIATION INSTITUTE | | | LONG-TERM IMPACT | TOTAL WELFARE |
|---|---|---|---|---|---|---|---|---|---|---|
| | | BENEFIT | COST | WELFARE | | BENEFIT | COST | WELFARE | | |
| **AREA 1:** TARMAC DELAY LIMIT FOR FOREIGN CARRIERS | NO | 1.20 | (3.00) | (1.80) | NO | | | | | |
| **AREA 2:** TARMAC DELAY REPORTING AND APPLICATION TO FOREIGN CARRIERS | NO | 0.00 | (0.80) | (0.80) | NO | | | | | |
| **AREA 3:** MINIMUM STANDARDS FOR CUSTOMER SERVICE & FOREIGN AIRLINES | NO | 7.70 | (7.40) | 0.30 | YES | | | | | |
| **AREA 4:** FOREIGN CARRIER POSTING OF TARMAC CONTINGENCY PLANS | NO | 0.00 | (1.00) | (1.00) | NO | | | | | |
| **AREA 5:** EXPANSION OF EAPP-1 TO COVER FOREIGN CARRIERS | NO | 0.00 | (1.90) | (1.90) | NO | | | | | |
| **AREA 6:** CHANGES IN DENIED BOARDING COMPENSATION REQUIREMENTS | NO | 0.00 | (1.00) | (1.00) | NO | | | | | |
| **AREA 11:** LIMIT ON VENUE PROVISIONS IN CONTRACT OF CARRIAGE | NO | 0.00 | 0.00 | 0.00 | NO | | | | | |
| **EAPP-2 COMPONENTS NOT REVIEWED BY AAI (TOTAL)** | | **8.90** | **(15.10)** | **(6.20)** | | | | | | |
| **AREA 7:** FULL-FARE ADVERTISING RULES FOR DOMESTIC & FOREIGN CARRIERS | YES | 29.00 | (6.80) | 22.20 | YES | 0.00 | (153.15) | (153.15) | (1,086) | **(1,239)** |
| **AREA 8:** DISCLOSURE OF BAGGAGE & OTHER OPTIONAL FEES | YES | 0.00 | (7.90) | (7.90) | NO | 0.00 | (32.29) | (32.29) | | **(32)** |
| **AREA 9:** LIMIT ON POST-PURCHASE PRICE INCREASES BY AIRLINES | YES | 7.20 | (1.10) | 6.10 | YES | 7.20 | (42.98) | (35.78) | | **(36)** |
| **AREA 10:** 30-MINUTE NOTIFICATION OF FLIGHT STATUS CHANGES | YES | 0.00 | 0.00 | 0.00 | NO | 0.00 | 0.00 | 0.00 | (2,102) | **(2,102)** |
| **EAPP-2 CHANGES NOT ASSESSED BY DOT** MANDATORY HOLD/REFUND FOR 24 HOURS | YES | 0.00 | 0.00 | 0.00 | NO | 0.00 | (45.07) | (45.07) | (323) | **(368)** |
| **EAPP-2 COMPONENTS REVIEWED BY AAI (TOTAL)** | | **36.20** | **(15.80)** | **20.40** | | **7.20** | **(273.50)** | **(266.30)** | **(3,510)** | **(3,777)** |
| **SUM OF INDIVIDUAL COMPONENTS** | | **45.10** | **(30.90)** | **14.20** | | **7.20** | **(273.50)** | **(266.30)** | **(3,510)** | **(3,777)** |

**(Sum of individual components includes rounding errors from DOT data provided)**

**Exhibit B 1-7:  Screen Shots from Major Travel Agencies and Airlines**

- Introduction
- B1:      Expedia
- B2:      Travelocity
- B3:      Priceline
- B4:      Spirit
- B5:      Allegiant
- B6:      Southwest
- B7:      AirTran



# Exhibit B:
## Taxes and Fees displayed by OTAs and airlines

- **Taxes are only known definitively once full itinerary selected**
  - PFC, 9/11 Security Fee and Federal Segment Taxes all calculated based on final routing

- The "full-fare" examples cited by DOT present misleading tax estimates during flight selection – they guess the return selection by customers

- OTA customers therefore receive incorrect and misleading tax information

- The airline solution is to present taxes only when full itinerary known
  - Range of tax estimates provided during booking – but not a final tax quote
  - Customer is presented with final taxes and fees only after full itinerary selected
  - No misleading tax information
  - No customer confusion

- The DOT RIA estimates consumer benefits off a false premise that per-segment tax information can be accurate and will reduce confusion.

- **The opposite is in fact true – invalidating the RIA and its economic conclusions**

## Taxes and Fees Display: Expedia.com
Snapshots taken July 3, 2011





**Outbound Flight Selection Page**

**Flight Summary**

**DOT identifies Expedia as an example of full-fare advertising during flight selection (RIA 4.7.1)**

**But Expedia presents estimates of taxes, not definitive calculations, <u>that cause customer confusion</u>.**

- **Itinerary priced:** r/t Washington DCA to Orlando MCO, September 7 through 12

- Taxes are <u>estimated</u> on the outbound selection page. Once customer itinerary complete, final taxes and fees are displayed

- Base fare does not change; **taxes vary**

- The taxes and fees on the first display **are not final – they are $10 too low**

- **DOT's new regulations force airlines to adopt this practice – estimating taxes incorrectly vs. presenting definitive fare when itinerary known**

Screen shots taken on July 3, 2011 for a round-trip ticket from Washington Naitonal (DCA) to Orlando (MCO) departing September 7, 2011 and returning September 12, 2011

## Taxes and Fees Display: Travelocity
Snapshots taken June 26, 2011



### Outbound Flight Selection Page



### Flight Summary



**DOT identifies Travelocity as an example of full-fare advertising during flight selection (RIA 4.7.1)**

**Like Expedia, Travelocity provides estimates of taxes, not definitive calculations, that cause confusion.**

- **Itinerary priced:** Delta DCA-MCO round-trip September 7-12

- Taxes are underlined estimated on the outbound selection page since final taxes and fees are not known

- Base fare is unchanged, taxes vary

- Once customer itinerary complete, final taxes and fees are displayed

- Final taxes and fees are higher!

- Forcing airlines to adopt this strategy creates more confusion

Screen shots taken on July 3, 2011 for a round-trip ticket from Washington Naitonal (DCA) to Orlando (MCO) departing September 7, 2011 and returning September 12, 2011

## Taxes and Fees Display: Priceline
Snapshots taken July 3, 2011



### Outbound Flight Selection Page



**DOT identifies Priceline as an example of full-fare advertising during flight selection (4.7.1)**

**But Priceline presents estimates of taxes, not definitive calculations, <u>that cause customer confusion</u>.**

- **Itinerary priced:** DCA-MCO-DCA, 9/7-9/12

- Taxes are <u>estimated</u> on the outbound selection page since final taxes and fees are not known

- Once customer itinerary complete, final taxes and fees are displayed

- Note no change in base fare

- The taxes and fees on the first display **are not final – they are incorrect**

- All GDS-based online travel agencies have this problem – compared to the airline's solution of only quoting taxes once full itinerary is known

### Flight Summary



Screen shots taken on July 3, 2011 for a round-trip ticket from Washington Naitonal (DCA)
to Orlando (MCO) departing September 7, 2011 and returning September 12, 2011

**Airline Solution to Avoid Consumer Confusion:
Present taxes and fees only when itinerary fully selected**





**Why has DOT permitted segment-based pricing in itinerary selection for the past two decades?**

**It avoids confusion among customers.**

Airlines present both nonstop and connecting itineraries to customers.

**It is impossible to calculate taxes on outbound flight segments underline the final number of itinerary flights are known**

• Sep. 11 security fee is capped at $10 per round-trip itinerary

• Airport PFCs are capped at $18 per round-trip itinerary

Spirit clearly notifies customers that taxes and fees are not included, and provides a range of fares including all taxes and fees.

Screen shots taken from Spirit on June 26, 2011





**Allegiant's model also avoids customer confusion.**

- Prices are displayed clearly on a pre-tax and fee basis, with additional display of a range of final airfares depending on travel date chosen

- Taxes and fees are clearly displayed after itinerary selection on a definitive basis before purchase



Screen shots taken from Allegiant on June 26, 2011



# DOT wants Southwest Airlines to Change



- Southwest offers complex routings (nonstop, direct, and connecting) **and displays its fares to customers on a <u>pre-tax basis</u>** during booking

- Separation of taxes is the *only* way to avoid customer confusion given varied PFCs, segment taxes

- Government fees and taxes are clearly displayed before purchase,

- Southwest is the consumer-rights leader - #1 in fewest complaints – and a perennial favorite of DOT. Yet their booking system will be obsoleted by DOT's new rules.

- **Does DOT know better than Southwest how to manage customer expectations?**



# Another Example: AirTran

Taxes and fees calculated only after full itinerary known
Factual tax data presented – not misleading estimates





**EXHIBIT C**
**ECONOMETRICA ANALYSIS:  Full-Fare Advertising Rule**

==Highlighted assumptions are not justified with external sources or references; these drive all consumer benefits from the EAPP-2 rules==
We dispute the relevance and non-triviality of core assumptions in this analysis.

| BENEFITS PRESENTED IN REGULATORY IMPACT ANALYSIS | Full Year 2012 | | 2012-2021 |
|---|---|---|---|
| *VALUE OF TIME SAVED BY POTENTIAL PURCHASERS* | | | |
| | | | |
| Tickets for domestic flights sold by reporting carriers | 260,838,061 | (a) | 2,962,820,014 |
|     Percent of passengers using reporting carriers | 87% | (b) | 87% |
|         Total passengers on domestic flights (a)/(b) | 299,813,863 | (c) | 3,408,286,734 |
|     Percent of domestic passengers to total | 88% | (d) | 88% |
|         Number of total tickets, US carriers (c)/(d) | 340,697,572 | (e) | 3,871,614,405 |
|         Percent of passengers booking via Internet | 52% | (f) | 62% |
|     Tickets purchased on websites (e) * (f) | 177,162,737 | (g) | 2,396,529,316 |
|         Average trip party size | 1.4 | | 1.4 |
|         **Purchasers of tickets on websites** | 126,544,812 | | 1,711,806,655 |
| | | | |
| Assumed percent of online purchasers who shop on multiple | | | |
| ==OTA and airline websites without full fares displayed== | ==2%== | | ==2%== |
|     Purchasers benefitting from full fare advertising | 2,530,896 | | 34,236,133 |
|         Value of Time per Hour | $24.15 | | $24.15 |
| ==Average time savings (hrs)== | ==0.05== | | ==0.05== |
|         Value of average time saved per hour | $1.21 | | $1.21 |
| | | | |
| **Total value of time saved** | **$3,056,057** | | **$41,340,131** |
|     Discounted 10 years @ 7% (includes rounding errors) | | | **$28.97 million** |

-    Public benefits are based on **2% of annual ticket purchasers** on websites saving **3 minutes of time each** (no independent data cited for either)
-    Negative impact of incorrect and/or incomplete tax information not incorporated into Econometrica analysis

**EXHIBIT D**
**ECONOMETRICA AND AAI ANALYSIS:  Full-Fare Advertising Rule Compliance Cost**

| | ECONOMETRICA | AAI |
|---|---|---|
| **COST OF LABOR, FULLY BURDENED** | $103.00 | $103.00 |
| | | |
| **Large carriers & large online travel agencies** | | |
| Labor hours for flight quotation pages (a) | 80 | 7,315 |
| Value of labor hours, *average* carrier (low-fare carriers significantly higher) | $8,240 | $753,445 |
| Number of large U.S. carriers | 18 | 18 |
| Number of large foreign carriers | 87 | 87 |
| Large OTAs | 4 | 4 |
| **Total cost, large carriers & OTAs** | **$898,160** | **$82,125,505** |
| | | |
| **Small carriers** | | |
| Labor hours for flight quotation pages | 20 | 5000 |
| Value of labor hours | $2,060.00 | $515,000.00 |
| Number of small U.S. carriers | 33 | 33 |
| Number of small foreign carriers | 2 | 2 |
| Other travel agencies with +20 employees | 893 | |
| **Total cost, small carriers** | **$1,911,680** | **$18,025,000** |
| | | |
| **Small agencies** | | |
| Labor hours for flight quotation pages | 10 | 200 |
| Value of labor hours | $1,030.00 | $20,600.00 |
| Small travel agencies (less than 20 employees) | 1567 | 2460 |
| **Total cost, small travel agencies** | **$1,614,010** | **$50,676,000** |
| | | |
| **Total Website Compliance Cost** | **$4,423,850** | **$150,826,505** |
| | | |
| *PRINTED MATERIALS* | **$2,328,480** | **$2,328,480** |
| | | |
| **TOTAL COMPLIANCE COST** | **$6,752,330** | **$153,154,985** |

(a) AAI 5,000 hour reasonableness test:  HDR Decision Economics EAPP-1, p57 (IT compliance cost estimate, flight status page updates)

**EXHIBIT E:  WORST-CASE SCENARIO FROM FULL-FARE ADVERTISING RULE**
**CHANGE IN ONGOING FARES <u>PER QUARTER</u> (BASED ON Q4 2010 SAMPLE SET)**

**Revenue and passenger count totals are based on Q4 2010 analysis of 9.1 million passenger journeys where carriers offered a combination of nonstop, direct and/or multi-stop itineraries to customers.  Revenue impact assumed zero for routes with only one routing offered.**

|  | SPIRIT | SOUTHWEST | OTHERS | ALL CARRIERS |
|---|---|---|---|---|
| **Passengers and Revenue, Q4 2010 Sample** | | | | |
| Total passengers | 1,287,870 | 22,808,980 | 66,973,060 | 91,069,910 |
| Total passenger revenue | $115,868,318 | $3,331,842,742 | $13,214,447,270 | $16,662,158,330 |
| Average fare per passenger | $89.97 | $146.08 | $197.31 | $182.96 |
| Total taxes collected | $14,069,099 | $289,400,338 | $864,531,028 | $1,168,000,465 |
| **Taxes/passenger** | **$10.92** | **$12.69** | **$12.91** | **$12.83** |
| | | | | |
| **Incremental fare to cover worst-case tax** | | | | |
| Worst-case segment/911/PFCs | $17,287,584 | $420,364,481 | $1,224,332,847 | $1,661,984,912 |
| Current segment/911/PFCs | $(14,069,099) | $(289,400,338) | $(864,531,028) | $(1,168,000,465) |
| **Fare increase required** | **$3,218,485** | **$130,964,143** | **$359,801,819** | **$493,984,447** |
| | | | | |
| **Elasticity** | | | | |
| Elasticity Measure (Sample & IATA) (a) | -1.98 | -1.98 | -1.47 | -1.47 |
| Change in price | 2.8% | 3.9% | 2.7% | 3.0% |
| Change in demand | -5.5% | -7.8% | -4.0% | -4.4% |
| Passengers, new | 1,217,039 | 21,033,814 | 64,292,461 | 87,100,972 |
| Average fare, new | $92.47 | $151.82 | $202.68 | $188.38 |
| New Q4 Revenue | $112,537,191 | $3,193,305,269 | $13,030,939,336 | $16,408,457,196 |
| | | | | |
| **Quarterly revenue change, sample** | **$(3,331,128)** | **$(138,537,472)** | **$(183,507,934)** | **$(253,701,133)** |
| **T-100 Domestic/Total Ratio** | **88.7%** | **100.0%** | **91.9%** | **92.7%** |
| **Quarterly system revenue change** | **$(3,755,499)** | **$(138,537,472)** | **$(199,769,142)** | **$(273,679,756)** |
| **Percent change** | **-2.9%** | **-4.2%** | **-1.4%** | **-1.5%** |

*(a) Price elasticity data based on fare change sample <u>for existing routes</u> by Spirit and Allegiant (See Exhibits L and M)*

**EXHIBIT F:  ESTIMATING THE COST OF PASSENGER REFUNDS FROM THE 24-HOUR RULE**

|  | All U.S Carriers |
|---|---|
| **Passengers, Full Year 2009** | 701,164,455 |
| **Operating Revenue, 2009** | $155,050,124,000 |
| Round-Trips (1.8 segments) | 389,535,808 |
| Parties per Transaction | 1.4 |
| Completed transactions (RTs/party size) | 278,239,863 |
| Transaction size (revenue/transactions) | $557 |
| Interchange fee, percent | 1.84% |
| Interchange fee (percent + $0.12) | $10.37 |
| Chargeback fee, percent | 2.00% |
| Refund/chargeback fee | $11.15 |
|  |  |
| % of Transactions GDS | 75% |
| Segment fees | $0.50 |
| GDS + Credit Card Fees | $22.02 |
|  |  |
| Time to process refund (minutes) | 5 |
| Cost per labor (RIA) | $103.00 |
| Labor cost for refunds | $8.58 |
|  |  |
| **Total cost of refunded ticket** | **$30.10** |
|  |  |
| Current refund ratio | 9.9% |
| Total refunds processed | 30,572,416 |
|  |  |
| **Assumed increase in holds due to EAPP-2** | **5%** |
| Increase in refunds, per year | 1,528,621 |
| Direct and indirect cost of new refunds, per year | $46,018,312 |
| **PV, 10 years, 7%** | **$323,213,367** |

Passengers and revenue based on full-year 2009 operating revenue and enplaned passengers by U.S. carriers (BTS)
Parties per transaction based on Econometrica RIA Table 30
Interchange fee based on data from merchantcouncil.org (1.84% + $0.12 average interchange rate for large enterprise)
Chargeback fees and GDS percentages based on airline interviews.
Time to process refunds assumed based on manual processes and airline interviews.

Current refund ratio based on ATPCO 2011 Ticket Refunds Industry Report (March 2011)

## EXHIBIT G1:  CALCULATING THE COST OF REFUNDS PER PASSENGER

**Assumptions:**

- Interchange fee, new transactions 1.84% + $0.12
- Refund fee, existing transactions 2.00%
- 75% of legacy transactions involve GDS fees
- Cost per hour of labor $103.00
- Five minutes to process refund transaction

| ITEM | UNIT IMPACT |
|---|---|
| Total tickets sold, 2012 (From Exhibit F) (a) | 278,239,863 |
| Percent refunded (From Exhibit F) (b) | 9.9% |
| Refunded tickets, 2012 (a * b) | 30,143,189 |
| Cost per refunded ticket (From Exhibit F) (c) | $30.10 |
| Total industry cost (a * b * c) | $908,116,486.96 |
| **Cost per Completed Ticketed Transaction (Total cost / completed tickets)** | **$3.26** |
| | |
| Average Transaction Size, Spirit Airlines Q4 2010 | $226.72 |
| **Percent of transaction reflecting refundability** | **1.4%** |
| Elasticity of demand, low-fare travel (See Exhibits K and L) | -1.98 |
| **Change in demand from allowing refunds** | **-2.8%** |

## EXHIBIT G2:  10-YEAR COMPLIANCE COST, AIRLINES THAT CURRENTLY DO NOT OFFER 24-HOUR REFUNDS/HOLDS

| Cost of Compliance for Airlines | |
|---|---|
| System modification for refunds/holds (non-compliant carriers) | $750,000 |
| Impacted Carriers | 8 |
| Total technology Cost | $6,000,000 |
| Increase in refunds systemwide due to EAPP-2 changes (assumed 5% of transactions) | 1,528,621 |
| Percentage share of customers, non-compliant airlines (BTS passengers, 2010) | 11% |
| Refunds processed, non-compliant airlines | 172,702 |
| Cost per refund transaction | $30.10 |
| Total cost, first year | $11,199,101 |
| Ongoing cost, years 2-10 | $5,199,101 |
| **Discounted cost, 10 years, 7%** | **$45,072,455** |

**EXHIBIT H:  COMPLIANCE COST ESTIMATE, IMPLEMENTATION OF ANCILLARY FEE TRACKING SYSTEMS AND MODIFICATION OF BOOKING PLATFORMS TO PRESENT ANCILLARY PRICES AT TIME OF TICKETING**

| Ancillary Fee Database | Units | Cost per Hour | Hours Required | Total Expenditure |
|---|---|---|---|---|
| Design and Development | | $103 | 1,000 | $103,000 |
| External Server/DB Platform (Oracle, Microsoft, NewSkies, etc.) | 1 | $500,000 | | $500,000 |
| Implementation, Testing and Quality Assurance | | $103 | 1,000 | $103,000 |
| Deployment and Integration | | $103 | 1,000 | $103,000 |
| | | | | |
| **Website links** | | | | |
| Front-end customer-facing pages requiring changes | 20 | $103 | 150 | $309,000 |
| Back-end applications | 5 | $103 | 500 | $257,500 |
| | | | | |
| **Training & Documentation** | | | | |
| Airport service systems | 5 | $103 | 250 | $128,750 |
| Re-training | 5,000 | $20 | 8 | $800,000 |
| | | | | |
| **Total Cost Per Airline** | | | **3,908** | **$2,304,250** |
| | | | | |
| **Total U.S. Carriers Estimated to Offer Unbundled Product (See note below)** | | | | **18** |
| | | | | |
| **Compliance Cost** | | | | **$41,476,500** |
| Maintenance cost (10%) | | | | $230,425 |
| 10-Year Compliance Cost (7%) | | | | **$42,977,772** |

18 carrier estimate consists of U.S. carriers offering scheduled service tickets directly to the public with ancillary components.  Includes AirTran, Alaska, Allegiant, American, Continental, Delta, Direct Air, Mesa/go!, Hawaiian, JetBlue, Frontier, Midwest, Southwest, Spirit, Sun Country, United, US Airways and Virgin America.

Cost of external server/DB platform based on airline interviews, June-July 2011.

Cost of labor ($103/hr) based on Econometrica RIA.

**EXHIBIT I:  LOSS OF FLEXIBILITY DUE TO 30-MINUTE NOTIFICATION REQUIREMENTS**


**Flight performance information is from FlightStats.com Monthly Report, September 2010
Percentage of known delays and cancellations resulting are based on airline interviews and AAI estimates**

**Cost of airline cancellation from Econometrica EAPP-2 RIA**

| | Spirit | Allegiant | Other Carriers |
|---|---|---|---|
| Flights scheduled, September 2010 (FlightStats.com) | 4,255 | 3,140 | 726,364 |
| Flights cancelled, September 2010 (FlightStats.com) | 0 | 0 | (7,047) |
| Runway departures, September 2010 (FlightStats.com) | 4,255 | 3,140 | 719,317 |
| Long Arrival Delays (45 minutes or greater) | 292 | 246 | 42,070 |
| Assumed percentage of long arrival delays known 4+ hours in advance | 20% | 20% | 20% |
| Assumed percentage of known long delays cancelled due to notification | 20% | 20% | 20% |
| Increase in monthly cancellations resulting from rule | 12 | 10 | 1,683 |
| Annualized impact | 140 | 118 | 20,194 |
| Cost per cancellation (Econometrica) | $14,818 | $14,818 | $14,818 |
| **Carrier Cost Per Year** | **$2,076,891** | **$1,749,709** | **$299,228,765** |
| | | | |
| **10 Year Present Value @ 7%** | **-$14.56 million** | **-$12.29 million** | **-$2.1 billion** |

**EXHIBIT J:  COMPLIANCE COSTS WITH E-TICKET BAGGAGE DISCLOSURES**
Modification hour estimates by AAI based on (1) industry estimates and (2) HDR EAPP-1 Cost Bases

|  | Large Carriers | Small Carriers | Online TAs | Lg. Agencies | Sm. Agencies | All Entities |
|---|---|---|---|---|---|---|
| **US-flag covered by rule** | 18 | 33 | 4 | 893 | 1,567 | 2,515 |
| **Foreign-flag covered by rule** | 87 | 2 | 0 | 0 | 0 | 89 |
| **Total entities covered by rule** | 105 | 35 | 4 | 893 | 1,567 | 2,604 |
| | | | | | | |
| **<u>Econometrica Estimates</u>** | | | | | | |
| **e-Ticket Modification** | | | | | | |
|   Hours Required | 40 | 20 | 40 | 20 | 10 | 130 |
|   Hourly Rate | $103 | $103 | $103 | $103 | $103 | $103 |
|   Compliance Cost (e-Tickets) | $4,120 | $2,060 | $4,120 | $2,060 | $1,030 | $13,390 |
| **Website Modification** | | | | | | |
|   Hours Required | 8 | 4 | 8 | 4 | 2 | 26 |
|   Hourly Rate | $103 | $103 | $103 | $103 | $103 | $103 |
|   Compliance Cost (websites) | $824 | $412 | $824 | $412 | $206 | $2,678 |
|   Total Cost per Entity | $4,944 | $2,472 | $4,944 | $2,472 | $1,236 | $16,068 |
| **Total Cost, Industry** | **$519,120** | **$86,520** | **$19,776** | **$2,207,496** | **$1,936,812** | **$4,769,724** |
| | | | | | | |
| Initial Compliance Cost | $4,769,724 | | | | | |
| Updates/Validation (10%) | $429,432 | | | | | |
| **Present Value** | **$7,785,873** | | | | | |
| | | | | | | |
| **<u>AAI Revised Estimates</u>** | | | | | | |
| **e-Ticket Modification** | | | | | | |
|   Hours Required | 800 | 800 | 400 | 20 | 10 | 2,030 |
|   Hourly Rate | $103 | $103 | $103 | $103 | $103 | $103 |
|   Compliance Cost (e-Tickets) | $82,400 | $82,400 | $41,200 | $2,060 | $1,030 | $209,090 |
| **Website Modification** | | | | | | |
|   Hours Required | 250 | 250 | 250 | 4 | 2 | 756 |
|   Hourly Rate | $103 | $103 | $103 | $103 | $103 | $103 |
|   Compliance Cost (websites) | $25,750 | $25,750 | $25,750 | $412 | $206 | $77,868 |
|   Total Cost per Entity | $108,150 | $108,150 | $66,950 | $2,472 | $1,236 | $286,958 |
| **Total Cost, Industry** | **$11,355,750** | **$3,785,250** | **$267,800** | **$2,207,496** | **$1,936,812** | **$19,553,108** |
| | | | | | | |
| Initial Compliance Cost | $19,553,108 | | | | | |
| Updates/Validation (10%) | $1,955,311 | | | | | |
| **Present Value** | **$32,292,412** | | | | | |

**Exhibit K:  Change in Airfares and Revenue, 2006-2010**

SOURCES:  DOT Bureau of Transportation Statistics Website (Airfares, Revenue, Passengers)
US Department of Labor BLS (CPI), US Department of Energy (Crude Oil)

|  | Q4 2010 | Q4 2006 | Change, 2006-2010 |
|---|---|---|---|
| Domestic Operating Revenue (BTS Website) | $119,073,502,000 | $120,906,925,000 | |
| Domestic Passengers (BTS Website) | 629,517,348 | 658,362,617 | |
| Operating Revenue per Passenger | $189.15 | $183.65 | |
| CPI (US Bureau of Labor Statistics) | 218.7 | 201.6 | |
| Real fare, 2006 Dollars | $174.41 | $183.65 | -5.0% |
| | | | |
| Systemwide Base Airfare (BTS Website) | $337 | $378 | |
| CPI (US Bureau of Labor Statistics) | 218.7 | 201.6 | |
| Real Airfare, 2006 Dollars | $310.73 | $378.00 | -17.8% |
| | | | |
| Crude Oil, US (December) (Dept. of Energy) | $84.16 | $49.42 | |
| CPI (US Bureau of Labor Statistics) | 218.7 | 201.6 | |
| Crude Oil, 2006 Dollars | $77.60 | $49.42 | 57.0% |

**EXHIBIT L: REASONABLENESS TEST FOR ELASTICITY METRICS, SPIRIT AIRLINES**

*Q3 Annual Sample, Spirit Markets from Databank 1B, with > 1000 passengers in 2006 and increase to 2010.*

| | TOTAL PASSENGERS (Q3 SUBSET) | | | | | TOTAL REVENUE (USD 000s) | | | | | AVERAGE FARE ($USD) | | | | | ELASTICITY | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 | 2007 | 2008 | 2009 | 2010 | 2006 | 2007 | 2008 | 2009 | 2010 | 2006 | 2007 | 2008 | 2009 | 2010 | Δ P | Δ Q |
| ORDFLL | 6,890 | 7,300 | 12,700 | 22,970 | 31,920 | $732 | $742 | $1,214 | $2,481 | $3,052 | $106 | $102 | $96 | $108 | $96 | -10% | 363% |
| DTWACY | 6,970 | 8,120 | | | 8,090 | $722 | $750 | | | $541 | $104 | $92 | $172 | $207 | $67 | -35% | 16% |
| DCAFLL | 7,100 | 16,660 | 18,900 | 22,510 | 22,930 | $752 | $1,670 | $1,508 | $1,800 | $1,757 | $106 | $100 | $80 | $80 | $77 | -28% | 223% |
| ATLFLL | 7,400 | 19,530 | 20,830 | 17,030 | 10,590 | $1,008 | $2,335 | $1,282 | $1,152 | $627 | $136 | $120 | $62 | $68 | $59 | -57% | 43% |
| FLLORD | 7,430 | 7,720 | 13,200 | 22,740 | 32,270 | $804 | $824 | $1,266 | $2,420 | $3,098 | $108 | $107 | $96 | $106 | $96 | -11% | 334% |
| FLLDCA | 7,510 | 17,140 | 19,320 | 22,700 | 22,790 | $824 | $1,827 | $1,560 | $1,804 | $1,719 | $110 | $107 | $81 | $79 | $75 | -31% | 203% |
| FLLATL | 8,020 | 19,550 | 20,940 | 16,980 | 9,850 | $1,112 | $2,362 | $1,319 | $1,152 | $523 | $139 | $121 | $63 | $68 | $53 | -62% | 23% |
| RSWACY | 9,170 | 10,880 | 10,900 | 11,160 | 12,980 | $1,161 | $1,171 | $1,016 | $1,064 | $1,064 | $127 | $108 | $93 | $95 | $82 | -35% | 42% |
| ACYRSW | 9,230 | 11,170 | 11,230 | 10,930 | 13,250 | $1,159 | $1,202 | $1,035 | $1,032 | $1,054 | $126 | $108 | $92 | $94 | $80 | -37% | 44% |
| DTWMYR | 9,230 | 9,990 | 9,120 | 9,740 | 11,200 | $1,025 | $1,014 | $781 | $712 | $854 | $111 | $102 | $86 | $73 | $76 | -31% | 21% |
| ORDRSW | 9,240 | 13,340 | 11,050 | 10,560 | 10,990 | $1,094 | $1,428 | $1,082 | $972 | $891 | $118 | $107 | $98 | $92 | $81 | -31% | 19% |
| RSWORD | 9,310 | 13,450 | 10,920 | 10,760 | 11,030 | $1,110 | $1,458 | $1,085 | $1,017 | $903 | $119 | $108 | $99 | $95 | $82 | -31% | 18% |
| RSWDTW | 9,600 | 12,300 | 9,330 | 9,950 | 11,610 | $1,094 | $1,209 | $794 | $913 | $866 | $114 | $98 | $85 | $92 | $75 | -35% | 21% |
| MYRDTW | 9,670 | 9,900 | 9,360 | 10,060 | 11,090 | $1,106 | $1,030 | $831 | $744 | $827 | $114 | $104 | $89 | $74 | $75 | -35% | 15% |
| TPAACY | 9,670 | 14,820 | 10,890 | 11,640 | 13,940 | $1,186 | $1,436 | $988 | $1,122 | $1,114 | $123 | $97 | $91 | $96 | $80 | -35% | 44% |
| DTWRSW | 9,700 | 12,150 | 9,230 | 9,870 | 12,130 | $1,095 | $1,177 | $754 | $874 | $905 | $113 | $97 | $82 | $89 | $75 | -34% | 25% |
| ACYTPA | 9,950 | 14,700 | 11,200 | 11,610 | 14,300 | $1,232 | $1,431 | $1,002 | $1,127 | $1,135 | $124 | $97 | $89 | $97 | $79 | -36% | 44% |
| MYRACY | 16,040 | 18,650 | 21,100 | 12,250 | 18,750 | $1,844 | $1,952 | $1,734 | $1,114 | $1,244 | $115 | $105 | $82 | $91 | $66 | -42% | 17% |
| ACYMYR | 16,070 | 18,270 | 21,180 | 12,180 | 18,810 | $1,825 | $1,884 | $1,709 | $1,119 | $1,222 | $114 | $103 | $81 | $92 | $65 | -43% | 17% |
| FLLACY | 19,050 | 20,800 | 26,040 | 25,360 | 34,820 | $2,363 | $2,568 | $2,407 | $2,461 | $2,882 | $124 | $123 | $92 | $97 | $83 | -33% | 83% |
| FLLSJU | 19,290 | 25,020 | 23,130 | 29,250 | 33,850 | $2,729 | $3,052 | $2,194 | $2,991 | $3,474 | $141 | $122 | $95 | $102 | $103 | -27% | 75% |
| SJUFLL | 19,560 | 25,420 | 23,530 | 29,650 | 35,710 | $2,755 | $3,112 | $2,249 | $3,063 | $3,692 | $141 | $122 | $96 | $103 | $103 | -27% | 83% |
| ACYFLL | 19,830 | 20,360 | 26,320 | 26,390 | 35,410 | $2,465 | $2,439 | $2,402 | $2,607 | $2,976 | $124 | $120 | $91 | $99 | $84 | -32% | 79% |
| DTWFLL | 20,100 | 26,180 | 26,370 | 22,760 | 23,980 | $2,318 | $2,826 | $2,370 | $1,865 | $1,858 | $115 | $108 | $90 | $82 | $77 | -33% | 19% |
| SJUMCO | 20,480 | 34,240 | 34,870 | 41,640 | 34,660 | $2,720 | $4,135 | $3,138 | $4,363 | $4,144 | $133 | $121 | $90 | $105 | $120 | -10% | 69% |
| LASDTW | 20,790 | 50,260 | 25,740 | 17,720 | 24,190 | $2,868 | $6,482 | $3,238 | $2,227 | $3,222 | $138 | $129 | $126 | $126 | $133 | -3% | 16% |
| FLLDTW | 20,920 | 26,990 | 26,280 | 21,980 | 23,840 | $2,425 | $3,082 | $2,395 | $1,797 | $1,794 | $116 | $114 | $91 | $82 | $75 | -35% | 14% |
| DTWLAS | 21,980 | 50,750 | 26,290 | 18,650 | 25,240 | $3,007 | $6,464 | $3,233 | $2,293 | $3,277 | $137 | $127 | $123 | $123 | $130 | -5% | 15% |
| MCOSJU | 22,510 | 34,110 | 34,760 | 40,040 | 36,030 | $2,975 | $4,190 | $3,098 | $4,271 | $4,350 | $132 | $123 | $89 | $107 | $121 | -9% | 60% |
| MCOACY | 24,380 | 24,710 | 32,410 | 27,900 | 36,680 | $2,861 | $2,701 | $2,737 | $2,477 | $2,872 | $117 | $109 | $84 | $89 | $78 | -33% | 50% |
| ACYMCO | 26,020 | 25,020 | 31,980 | 28,310 | 36,740 | $2,991 | $2,699 | $2,663 | $2,490 | $2,825 | $115 | $108 | $83 | $88 | $77 | -33% | 41% |
| LGAMYR | 29,510 | 31,560 | 30,170 | 24,570 | 37,280 | $3,780 | $3,529 | $3,148 | $2,545 | $2,719 | $128 | $112 | $104 | $104 | $73 | -43% | 26% |
| MYRLGA | 29,990 | 32,100 | 31,470 | 25,920 | 38,760 | $3,911 | $3,589 | $3,347 | $2,695 | $2,931 | $130 | $112 | $106 | $104 | $76 | -42% | 29% |
| LGAFLL | 41,400 | 48,930 | 54,340 | 55,630 | 58,140 | $5,114 | $5,616 | $5,252 | $5,725 | $5,186 | $124 | $115 | $97 | $103 | $89 | -28% | 40% |
| FLLLGA | 41,530 | 49,020 | 53,940 | 55,170 | 57,960 | $5,104 | $5,895 | $5,193 | $5,570 | $5,047 | $123 | $120 | $96 | $101 | $87 | -29% | 40% |
| Route Set | 575,540 | 781,110 | 759,050 | 746,590 | 871,810 | $71,269 | $89,282 | $70,028 | $72,064 | $76,645 | $0 | $0 | $0 | $0 | $0 | **-29%** | **51%** |

**EXHIBIT M:  REASONABLENESS TEST, ALLEGIANT AIRLINES**
Q3 CHANGE IN PRICE AND QUANTITY, ROUTES WITH ESTABLISHED SERVICE, BETWEEN 2008 AND 2010

**ROUTE SET ELASTICITY:  -19% CHANGE IN SEGMENT FARE, +41% CHANGE IN PASSENGERS**

|         | Δ P  | Δ Q  |         | Δ P  | Δ Q  |
|---------|------|------|---------|------|------|
| ABEPIE  | -19% | 42%  | LASPSC  | -26% | 25%  |
| ATWLAS  | -24% | 158% | LASRFD  | -12% | 25%  |
| AZABIL  | -11% | 24%  | LASSBN  | -13% | 25%  |
| AZABLI  | 3%   | 32%  | LASSCK  | -18% | 98%  |
| AZACID  | -13% | 65%  | LASSGF  | -17% | 21%  |
| AZAFAR  | -25% | 82%  | LASSHV  | -7%  | 13%  |
| AZAFSD  | -23% | 75%  | LASSMX  | -3%  | 4%   |
| AZAMSO  | -27% | 54%  | LRDLAS  | -21% | 40%  |
| AZARAP  | -17% | 3%   | MFELAS  | -15% | 18%  |
| BGRSFB  | -26% | 65%  | MFESFB  | -13% | 92%  |
| BILAZA  | -9%  | 15%  | MFRLAS  | -14% | 17%  |
| BISLAS  | -20% | 12%  | MSOAZA  | -33% | 42%  |
| BLIAZA  | 2%   | 36%  | PBGFLL  | -16% | 76%  |
| BLILAS  | -24% | 31%  | PBGSFB  | -17% | 75%  |
| BLIPSP  | -11% | 16%  | PIALAS  | -6%  | 11%  |
| CIDAZA  | -14% | 88%  | PIAPIE  | -21% | 133% |
| CIDSFB  | -38% | 109% | PIEABE  | -19% | 55%  |
| COSLAS  | -19% | 1%   | PIEDSM  | -21% | 59%  |
| DSMLAS  | -2%  | 4%   | PIEFWA  | -23% | 136% |
| DSMPIE  | -21% | 63%  | PIEGSO  | -12% | 4%   |
| EUGLAS  | -11% | 64%  | PIEHTS  | -29% | 128% |
| FARAZA  | -25% | 67%  | PIEPIA  | -23% | 165% |
| FLLGSP  | -26% | 54%  | PIERFD  | -16% | 25%  |
| FLLHTS  | -29% | 103% | PIESBN  | -22% | 103% |
| FLLPBG  | -14% | 86%  | PIESGF  | -31% | 216% |
| FLLTYS  | -21% | 15%  | PIETOL  | -7%  | 9%   |
| FSDAZA  | -26% | 84%  | PIETYS  | -38% | 21%  |
| FWAPIE  | -19% | 103% | PSCLAS  | -26% | 11%  |
| FWASFB  | -29% | 53%  | RAPAZA  | -13% | 15%  |
| GSOPIE  | -7%  | 20%  | RFDLAS  | -14% | 2%   |
| GSPFLL  | -17% | 68%  | RFDPIE  | -9%  | 18%  |
| GTFLAS  | -13% | 42%  | SBNLAS  | -13% | 31%  |
| HTSFLL  | -30% | 130% | SBNPIE  | -24% | 105% |
| HTSPIE  | -28% | 150% | SBNSFB  | -20% | 63%  |
| IDALAS  | -26% | 51%  | SCKLAS  | -17% | 83%  |
| ILMSFB  | -9%  | 50%  | SFBBGR  | -32% | 84%  |
| LASATW  | -23% | 210% | SFBCID  | -35% | 116% |
| LASBIS  | -18% | 24%  | SFBFWA  | -35% | 78%  |
| LASBLI  | -24% | 27%  | SFBILM  | -8%  | 58%  |
| LASCOS  | -20% | 0%   | SFBMFE  | -15% | 100% |
| LASDLH  | -2%  | 3%   | SFBPBG  | -18% | 74%  |
| LASEUG  | -6%  | 89%  | SFBSBN  | -24% | 52%  |
| LASGJT  | -24% | 2%   | SGFLAS  | -18% | 19%  |
| LASGTF  | -15% | 42%  | SGFPIE  | -30% | 204% |
| LASIDA  | -17% | 63%  | SHVLAS  | -10% | 14%  |
| LASLRD  | -20% | 42%  | SMXLAS  | -2%  | 22%  |
| LASMFE  | -14% | 12%  | TOLPIE  | -1%  | 18%  |
| LASMFR  | -10% | 25%  | TYSFLL  | -23% | 2%   |
| LASPIA  | -6%  | 10%  | TYSPIE  | -43% | 22%  |

**Group Result:  -19% Price Change, +41% Passenger Change**

## EXHIBIT N: TAX AND AIRPORT PFC RATES
## SURVEY 2011

### Taxes on Nonstop, Direct and Connecting Itineraries, on a One-Way Basis
Federal and Airport, 2011.  PFC tax represents legal maximum permitted.

|  | Nonstop | Direct One-Stop | 1x Connection | 2x Connections |
|---|---|---|---|---|
| Ad valorem | 7.5% of fare | | | |
| Segment | $3.70 | $7.40 | $7.40 | $11.10 |
| TSA 9/11 fee | $2.50 | $2.50 | $5.00 | $5.00 |
| Airport PFCs | $4.50 | $4.50* | $9.00* | $9.00* |
| Total | 7.5% + $10.70 | 7.5% + $14.40* | 7.5% + $21.40* | 7.5% + $25.10* |

* Or less, depending on other components of the trip purchased.

## EXHIBIT O:  ON-TIME PERFORMANCE

## SPIRIT AND ALLEGIANT VS. THE INDUSTRY

While major airlines are measured by DOT using arrivals within 15 minutes of schedule, DOT on-time metrics do not incorporate the percentage of flights scheduled that operate but are cancelled.

The story is very different for low-fare airlines like Spirit, Allegiant and Virgin America that do not report on-time statistics to the government.  Flight performance data from FlightStats.com measures the performance of Spirit and Allegiant versus both low-cost and major airline peers during September 2010.  As the table below shows, during September 2010, Spirit and Allegiant did not cancel any flights. On-time performance was lower than the major airlines, although most delays incurred by both Spirit and Allegiant were short (less than 30 minutes).

### Spirit and Allegiant Delay and Cancellation Performance vs. Peers
September 2010, FlightStats.com

| September 2010 | Spirit | Allegiant | Other LCCs | Regionals | Major Airlines | All Carriers |
|---|---|---|---|---|---|---|
| On-Time Arrivals | 82.2% | 73.7% | 80.6% | 83.1% | 84.4% | 83.0% |
| Late Arrival % | | | | | | |
| Short (15-30) | 8.0% | 12.7% | 9.7% | 6.1% | 6.6% | 7.0% |
| Moderate (30-45) | 2.8% | 5.4% | 3.7% | 2.8% | 2.9% | 3.0% |
| Long (45+) | 6.9% | 7.8% | 5.5% | 6.4% | 5.3% | 5.9% |
| Cancelled | 0.0% | 0.0% | 0.5% | 1.4% | 0.7% | 1.0% |

## EXHIBIT P: AIRLINE BANKRUPTCIES POST-DEREGULATION

Source: http://en.wikipedia.org/wiki/Airline_bankruptcies_in_the_United_States

| Airline | Date Bankruptcy filed | Airline | Date Bankruptcy filed |
|---|---|---|---|
| New York Airways | 18 May 1979 | Altair Airlines | 9 November 1982 |
| Aeroamerica | 19 November 1979 | Partnair | October 1989 |
| Florida Airlines | 24 January 1980 | Pan Am | 8 January 1991 |
| Indiana Airlines | 3 March 1980 | Trans World Airlines | 10 January 2001 |
| Air Bahia | 15 December 1980 | US Airways (1) | 11 August 2002 |
| Tejas Airlines | 31 December 1980 | United Airlines | 9 December 2002 |
| Mountain West | 6 March 1981 | Air Canada | 1 April 2003 |
| LANICA | 16 March 1981 | Flash Airlines | March 2004 |
| Coral Air | 13 July 1981 | US Airways (2) | 12 September 2004 |
| Pacific Coast | 11 September 1981 | Aloha Airlines | 30 December 2004 |
| Swift Air Line | 18 September 1981 | Northwest Airlines | 14 September 2005 |
| Golden Gate (Airline) | 9 October 1981 | Delta Air Lines | 14 September 2005 |
| Pinehurst Airlines | 26 January 1982 | MAXjet Airways | 26 December 2007 |
| Silver State Airlines | 3 March 1982 | Aloha Airlines | 31 March 2008 |
| Air Pennsylvania | 26 March 1982 | ATA Airlines | 3 April 2008 |
| Air South | 2 April 1982 | Skybus Airlines | 5 April 2008 |
| Cochise Airlines | 16 April 1982 | Frontier Airlines | 10 April 2008 |
| Braniff International | 13 May 1982 | Eos Airlines | 26 April 2008 |
| Astec Air East | 8 July 1982 | Sun Country Airlines | 6 October 2008 |
| Will's Air | 19 August 1982 | Primaris Airlines | 15 October 2008 |
| Aero Sun International | 15 October 1982 | Japan Airlines | 19 January 2010 |
| Aero Virgin Islands | 19 October 1982 | Arrow Air | 1 July 2010 |

Exhibit 6



7 of 7 DOCUMENTS

Request of the Air Transport Association of America for an exemption from 14 CFR
399.84; Petition of Balair, AG et al for emergency rulemaking and an exemption from 14
CFR 399.80 and 399.84

Order 85-12-68;
Docket 43585, Docket 43596

Department of Transportation

Policy and International Affairs

*1985 DOT Av. LEXIS 10*

December 24, 1985

**ACTION:** [*1]

ORDER GRANTING EXEMPTION

**ISSUEDBY:** Matthew V. Scocozza, Assistant Secretary for Policy and International Affairs

SERVED DECEMBER 31, 1985

On November 14, 1985, the Air Transport Association of America (ATA), on behalf of its members, filed a request for an exemption from 14 CFR 399.84, which states the Department of Transportation's policy with respect to price advertising. That section declares that any advertising of flights, tours, or component of tours must state the entire price of the flight, tour, or tour component; failure to comply is an unfair or deceptive trade practice under section 411 of the Federal Aviation Act, as amended, *49 U.S.C. 1381* (the Act). n1 ATA asks for an immediate blanket exemption with respect to the rule's applicability to air-only scheduled service by direct air carriers, pending initiation of a rulemaking proceeding to amend the regulation. ATA asserts that the rulemaking proceeding conducted in this matter by our predecessor, the Civil Aeronautics Board (CAB), was inadequate to support application of section 399.84 to air-only scheduled service. ATA claims that the thrust of the rulemaking proceeding was directed at charter tour operators, not scheduled [*2] air carriers, and that the $3 U.S. departure tax was not at the center of the controversy. Accordingly, it asserts that the air carrier industry had inadequate notice that the rule would apply to air-only scheduled service. ATA further maintains that application to air-only scheduled service is not justified or sensible, because the regulation was intended to curb abuses of the charter tour industry. Logistical problems are also alleged with respect to compliance with the rule.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n1 When it adopted the price advertising policy statement, the Civil Aeronautics Board (CAB) also

amended 14 CFR 380.30. *(49 Fed. Reg. 49440 and 49438,* December 20, 1984). Responsibility for these regulations transferred to the Department on January 1, 1985.

Part 380, which governs public charters, was amended to require that any solicitation material from a direct or indirect air carrier, or an agent of either, for a charter, charter tour or a charter tour component state the entire price to be paid by the consumer to the seller or agent for the travel purchased or component of the package. These changes were intended to reduce deceptive advertising by charter and tour operators, and direct and indirect air carriers.

[*3]
- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

On November 15, 1985, a group of charter airlines and tour operators (the "Joint Petitioners") n2 filed a petition to review and amend 14 CFR 399.84 and 380.30 to the extent necessary to permit all carriers--scheduled and charter--to advertise air fare and tour prices without international departure taxes, provided such taxes are stated elsewhere within each ad and promotional material. n3 They also request interim relief to permit them to advertise in such a manner immediately. In the alternative, they ask that the current regulation be applied to all segments of the industry in a uniform manner. The Joint Petitioners assert that scheduled service operators are not including the tax in their promotional materials, as required by our rule, while the Joint Petitioner are doing so. Thus, they argue, they are at an unfair competitive disadvantage. The Joint Petitioners further state that they do not object to the purpose of the regulation, but believe that the international departure tax is not "central to the substance or spirit" of sections 380.30 and 399.84.

- - - - - - - - - - - - - - - - -Footnotes-  [*4] - - - - - - - - - - - - - - - - -

n2 Balair, AG; Charter Travel Corp.; Condor Flugdienst GMBH; DER Travel Service, Inc.; German Charters, Inc.; Homeric Tourts; Schwaben Int'l, Inc.; Tourlite Int'l, Inc.; Travac Tours and Charters, Inc.; and Travel Impressions, Ltd.

n3 On November 18, the Joint Petitioners submitted additional examples of carriers allegedly not in compliance with the regulation.

Responsive Filings

Donald L. Pevsner: On November 22, Donald L. Pevsner filed comments in opposition to the requests of both the ATA and the Joint Petitioners. Mr. Pevsner, whose 1982 petition concerning deceptive price advertising practices led to the changes to Parts 380 and 399, argues that the $3 international departure tax should be included in the price of all foreign and overseas air transportation. Mr. Pevsner objects to permitting the $3 fee to be placed at the bottom of an ad in small print. He also alleges that by not including the departure tax in the price, carriers are violating section 411 of the Act and, therefore, should be enjoined from continuing the practice. Mr. Pevsner [*5] further argues that any fee included on a passenger's ticket should be included in any advertising.

Joint Petitioners: The Joint Petitioners filed an answer to the ATA request and argue that any relief granted should apply to the entire industry, not just a portion of the industry. They disagree that the air carrier industry had insufficient notice that the rulemaking was intended to apply to all services including scheduled services, since the NPRM indicated that the rule would be applied to all.

Transamerica Airlines: Transamerica, an air carrier with both scheduled and charter operations, filed a consolidated answer expressing support for an exemption for all segments of the industry, not just scheduled carriers. Granting relief only to scheduled carriers, Transamerica asserts, would give them a competitive advantage and, therefore, any relief should apply to all operations. Transamerica also points out that there have been no complaints about the treatment of

the $3 tax in advertisements.

People Express Airlines: People Express, a scheduled carrier, supports ATA and asserts that the industry was not given adequate notice of the handling of the $3 tax during the [*6] rulemaking process. It claims that the primary thrust of the changes to Parts 380 and 399 was to curb abuses in the passenger charter and tour package industry.

People Express asserts that there is no basis to support the rule with respect to air-only scheduled service, and that the amount in question is de minimus and regulation is not necessary to protect the public. n4

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n4 People Express also attached a copy of a letter it sent to the Department which questioned the applicability of the rule and the adequacy of notice. People Express did not include a copy of the response, however.

Carefree David Travel: Carefree David, et. al., filed in opposition to the ATA petition and in support of the Joint Petitioners' request. n5 Carefree also notes that the NPRM gave all carriers more than sufficient notice that the proposed rules would apply to all carriers. Carefree further argues that since, as the Department recently recognized in approving "half-round trip" advertising, consumers can distinguish  [*7] between an advertisement that gives a round-trip price and one that provides a one-way price based on the purchase of a round-trip ticket, consumers similarly should be able to recognize that they must pay the additional $3 tax. n6

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n5 Carefree David Travel Co., Inc.,; Emerald Tours, LTD.; Fantasy Holidays, Inc; Ferien-Service, LTD.; Hispanidad Holidays, Inc.; Rich International Airways, Inc.; Samson Tours, Inc.; Spanish Heritage Tours, Inc.; Spantax, S.A.; Trans National Travel, Inc.; Unitravel Corp.; and Vacation Travel Concepts, Inc.

n6 "Half-round trip" advertising enables, for example, a carrier to advertise a fare which can only be purchased as part of a round trip fare, i.e., New York to London - $99 (based on purchase of round trip ticket).

Upon consideration of the petitions and answers, we have decided to grant the request of the Joint Petitioners for an exemption from sections 380.30 and 399.84 to permit the exclusion of the U.S. international departure tax from the total advertised price, provided all [*8] advertisements clearly state the amount of tax elsewhere in the ad. If the price advertised does not include the U.S. international departure tax, the ad must indicate that the fee is payable by the customer. This means that the industry is free to advertise its services in a variety of ways. This exemption should permit greater flexibility for the industry to advertise its services, while ensuring that the traveling public is informed of the charges they must pay to take advantage of the service offered. This exemption applies to all those that offer service involving the $3 tax and not just scheduled carriers. n7 However, failure to include in the total price or disclose the $3 tax separately will continue to be a violation of section 411. We do not believe that other relief, such as amending the regulation, is dnecessary in light of the exemption granted by this order.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n7 While the Department agrees with the Joint Petitioners that the scheduled carriers had adequate notice of the effectiveness of section 399.84, the exemption addresses the question on an industry-wide basis, without giving one segment a competitive advantage over another.

1985 DOT Av. LEXIS 10, *9

[*9]

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

We therefore reject arguments advanced by Mr. Pevsner that allowing the $3 international departure tax to be stated separately is deceptive to the consumer. It has long been a common practice in the industry to state this tax separately, and we have received no complaints from consumers indicating that they have been deceived by advertisements or promotional materials that display the $3 tax clearly but separately. Under the circumstances, we have no basis at this time to conclude that the practice has a significant potential to deceive consumers. However, as noted above, failure to disclose the tax in some form will be considered a violation of section 411. This disclosure can be accomplished in a number of different ways, such as by including it in the generally-larger typeface stating the price of the trip, or by using an asterisk with a notation.

Therefore, under authority delegated to the Assistant Secretary for Policy and International Affairs under 49 CFR 1.56, I:

1. Consolidate dockets 43585 and 43596 into docket 43585;

2. Deny the petition of the Air Transport Association of America; [*10]

3. Grant the request of the Joint Petitioners for an exemption from the provisions of 14 CFR 380.30 and 399.84, so as to permit direct and indirect air carriers for scheduled and charter service and tour operators to state the United States international departure tax separately from other charges in advertisements and promotional materials provided that all such advertisements clearly state the amount of the tax elsewhere in the advertisement and indicate that it must be paid in addition to the advertised price; and

4. Except to the extent granted herein, deny all other requests in docket 43585.

**Legal Topics:**

For related research and practice materials, see the following legal topics:
GovernmentsLocal GovernmentsChartersTax LawState & Local TaxesGeneral OverviewTransportation LawAir TransportationCharters

Exhibit 7



6 of 6 DOCUMENTS

Amendment of exemption to allow separate listing of service fees in advertisements for
air transportation.

Order 88-3-25;
Dockets 43585, 43596

Department of Transportation

Policy and International Affairs

*1988 DOT Av. LEXIS 124*

March 10, 1988

**ACTION:**  [*1]

ORDER AMENDING EXEMPTION

**ISSUEDBY:** MATTHEW V. SCOCOZZA, Assistant Secretary for Policy and International Affairs

SERVED MARCH 16, 1988

On December 20, 1984, the Civil Aeronautics Board (CAB) adopted the price advertising policy statement, 14 CFR 399.84, declaring that any advertising of flights, tours, or components of tours must state the entire price of the flight, tour, or tour component; failure to comply is an unfair or deceptive practice within the meaning of section 411 of the Federal Aviation Act, as amended, *49 U.S.C. 1381* (the Act). n1 This order amends an exemption from that rule.  The amendment allows advertisers to separately list certain service fees and taxes in advertisements as long as the amounts of each charge are listed separately or in total.

- - - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

        n1 When it adopted the price advertising policy statement, the Civil Aeronautics Board (CAB) also amended 14 CFR 380.30.  *(49 Fed. Reg. 49440 and 49438,* December 20, 1984).  Responsibility for these regulations transferred to the Department on January 1, 1985.  Part 380, which governs public charters, was amended to require that any solicitation material from a direct or an indirect air carrier, or agent of either, for a charter tour or a charter tour component state the entire price to be paid by the consumer to the seller or agent for the travel purchased or component of the package. These changes were intended to reduce deceptive advertising by charter and tour operators, and direct and indirect air carriers.
 [*2]
- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

        BACKGROUND

On November 15, 1985, a group of charter airlines and tour operators (Joint Petitioners) n2 filed a petition with the Department of Transportation to review and amend 14 CFR 399.84 and 380.30 to the extent necessary to permit air carriers -- scheduled and charter -- to advertise air fare and tour prices without international departure taxes, provided such taxes are stated elsewhere within each ad and promotional material.  On December 24, 1985, the Department issued Order 85-12-68, granting an exemption from the provisions of 14 CFR 380.30 and 399.84, so as to permit direct and indirect air carriers for scheduled and charter service and tour operators to state the United States international departure tax separately from other charges in advertisements and promotional materials, provided that all such advertisements clearly state the amount of the tax elsewhere in the advertisement and indicate that it must be paid in addition to the advertised price.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n2 Balair, AG; Charter Travel Corp.; Condor Flugdienst GMBH; DER Travel Service, Inc.; German Charters, Inc.; Homeric Tours; Schwaben Int'l., Inc.; Tourlite Int'l., Inc.; Travac Tours and Charters, Inc.; and Travel Impressions, Ltd.

 [*3]
- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

Since the grant of the exemption in late December 1985, there has been a proliferation of other fees and charges, some suggested and imposed by airlines, but most charged for services provided by various U.S. government agencies. In some international markets, there is a security fee for each flight to and from the United States.  In addition, the U.S. government has imposed a $5 customs fee and a $5 immigration fee, and a $1 tourism fee has been proposed for certain international flights. Some States and municipalities have imposed fuel surcharges of varying amounts to ticket charges.

For advertisers to comply literally with current provisions of sections 380.30 and 399.84, they are obligated to include the total cost of all such fees and charges in the advertised price.  Advertisers find this difficult because they often advertise the each-way fare and state that roundtrip purchase is necessary to use the advertised price.  However, security charges do not apply in all international markets, and immigration and customs fees apply only on the return segment of the trip. Fuel surcharges generally [*4]  apply only on the flight leaving the State or city making such an assessment and not on the return.

As a result of the variety of additional fees and charges imposed on air travelers for a variety of services, advertisers are confused as to how the charges for such services must be presented (including the charges in the total advertised price for the reasons stated above) and in many instances, readers are not receiving the true picture of what their trip will cost.  Some advertisers are stating the total amount of additional charges separately and identifying them as departure tax, custom fees, immigration fees, etc.  Some advertisers are stating the total additional charge separately and merely identifying it as "tax and services." Still others do not state an additional charge separately but merely include the statement that "tax and service charges are not included." Finally, some advertisers make no mention of the additional fees and charges at all.  In many cases, readers are not aware of significant additional charges until after they have made their decision to travel based upon the only price stated.

AMENDMENT OF EXEMPTION

We want to continue to allow the industry the [*5]  freedom to advertise its services in a variety of ways and we want to encourage open price competition.  However, we must also ensure that the traveling public is informed of the total amount of charges they must pay to take advantage of services offered.  We believe this can best be accomplished in a fashion similar to that involving the $3 U.S. departure tax and mandatory service packages.

We have decided to amend the exemption from sections 380.30 and 399.84 in Order 85-12-68 to permit the exclusion of foreign departure taxes (if collected by the advertiser), customs fees, immigration fees, security fees,

1988 DOT Av. LEXIS 124, *5

agriculture inspection fees, tourist and fuel surcharges and any other surcharges that may be imposed by the U.S. Federal, State or local governments or foreign governments, from the total advertised price, provided all advertisements clearly identify and state the amount of the charges elsewhere in the ad, as a total or separately.

The cost of such surcharges may be included in the total advertised price. If so, the advertiser would not be required to list the charges separately but could state that they are included. However, if the total advertised prices does not include [*6] all amounts for such charges, the cost must be stated clearly and conspicuously elsewhere in one of two ways. First, the total of the additional charges may be stated as one amount, so long as the kinds of charges covered by that amount are itemized. Or if the advertisers choose, they may state separately each of the charges provided and the individual amount for each. The ad must clearly indicate that the additional charges are payable by the customers.

As long as the charges for such services are stated and the services are identified, readers should readily know what they will pay for their complete transportation package. Separate itemization is already required for services comprising "mandatory" package supplements and other special services under our rules. Such disclosure appears to cause no particular compliance problems for advertisers, and, at the same time, we have received few complaints from consumers indicating that they have been deceived by advertisements or promotional materials that in fact identify special services and display the additional charges separately in legible type. We therefore have no basis at this time to deny adequate separate disclosure as [*7] a practical remedy to a growing travel industry problem. Nevertheless, failure to disclose all additional costs clearly and conspicuously will be considered an unfair and deceptive practice in the sale of transportation within the meaning of section 411 of the Federal Aviation Act. This disclosure can be accomplished, for example, by including the additional costs in the generally-larger typeface stating the price of the trip or by using an asterisk with a notation showing the total cost of the additional charges with the kind of charges itemized, or the charges can be stated with each cost presented separately.

ACCORDINGLY:

1. The exemption from the provisions of 14 CFR 380.30 and 399.84 granted in Order 85-12-68 is amended to permit direct or indirect air carriers for scheduled and charter service, including tour operators, to state foreign departure taxes, security charges, custom fees, immigration fees, security fees, agricultural inspection fees, tourism and fuel surcharges, as well as any other surcharges (when these items are collected by offeror) that may be imposed by the U.S. Federal, State or local governments or foreign governments, separately from other charges [*8] in advertisements and promotional materials, provided that all such advertisements clearly and conspicuously state elsewhere in the advertisement the amount of such charges and the services such charges cover and indicate that such charges must be paid by the consumer in addition to the advertised price. n3

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n3 This action in no way alters the exemption already granted with respect to the $3 U.S. departure tax.

2. This amendment becomes effective 30 days after the service date of this order.

**Legal Topics:**

For related research and practice materials, see the following legal topics:
GovernmentsAgriculture & FoodProduct PromotionGovernmentsLocal GovernmentsChartersTransportation LawAir TransportationCharters



4 of 6 DOCUMENTS

Clarification of Amendment of Exemption to allow separate listing of service fees in
advertisements for air transportation.

Order 88-8-2;
Dockets 43585, 43596

Department of Transportation

Policy and International Affairs

*1988 DOT Av. LEXIS 556*

August 1, 1988

**ACTION:**  [*1]

ORDER CLARIFYING AMENDMENT TO EXEMPTION

**ISSUEDBY:** MATTHEW V. SCOCOZZA, Assistant Secretary for Policy and International Affairs

SERVED AUGUST 2, 1988

The Department's policy on advertising air transportation, 14 CFR 399.84, requires that all price advertisements of flights, tours, or components of tours state the entire price of advertised flights, tours, or any tour components. Similarly, our policy on public charters, 14 CFR 380.30, requires that all charter solicitation materials from direct or indirect air carriers or their agents state the entire price of their charters, tours, or any tour components.  These sections reflect the Department's view of what sort of price advertising constitutes an unfair or deceptive practice within the meaning of section 411 of the Federal Aviation Act.

By Order 85-12-68 (served December 31, 1985), we granted an exemption from sections 399.84 and 380.30 to permit price advertisements that exclude the U.S. international departure tax from the total advertised price as long as they clearly state elsewhere both the amount of the tax and that all passengers must pay it in addition to the price advertised. Subsequently, by Order 88-3-25 (served March 16,  [*2]  1988), we amended the exemption granted by Order 85-12-68 to allow price advertisements that list certain other taxes and government-imposed or government-approved fees separately, provided that the amount of each such charge is included in the advertisement, either separately or as a total. n1 We found that in the aftermath of Order 85-12-68, the number of "other charges" had risen significantly.  Most of the new charges were for services imposed or specifically approved by various U.S. government agencies -- for example, customs fees, immigration fees, and security charges.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n1 Neither Order 85-12-68 nor Order 88-3-25 superseded the requirement in the Internal Revenue Code that

the eight percent federal tax on all tickets for domestic air transportation be included in the advertised price (*see 26 U.S.C. § 7275*). The instant order likewise leaves this requirement unchanged: the eight percent federal tax may not be listed separately.

We found that these new charges made it difficult for advertisers to comply fully [*3]  with sections 399.84 and 380.30. Advertisers often advertise one-way fares, stating that the advertised price is only available as part of a round-trip purchase, but not all of the new charges apply to all itineraries or even to both parts of every round-trip itinerary. For example, security charges do not apply in all international markets. Immigration and customs fees apply only to flights to the United States. Fuel surcharges generally apply only to flights leaving the locale where they are imposed and not on incoming flights. With the variety of new charges and the variation in their applicability, advertisers' confusion over how to comply with sections 399.84 and 380.30 resulted in inconsistent and confusing advertising. Consumers often found it difficult if not impossible to determine precisely what their trips would cost: some advertisements gave no indication at all of additional charges.

Balancing the industry's need to advertise innovatively and competitively against the traveling public's need for accurate price information, in Order 88-3-25 we broadened the exemption we had granted in Order 85-12-68 to permit the exclusion from the total advertised price of foreign [*4]  departure taxes (if collected by the advertiser), customs fees, immigration fees, security fees, agriculture inspection fees, tourist and fuel surcharges, n2 and any other surcharges imposed by Federal, State, or local governments of the United States or by foreign governments. As in the case of the U.S. international departure tax, all price advertisements still must clearly describe the additional charges and state their amounts, either separately or as a total, and they must state explicitly that these charges must be paid by the consumer in addition to the advertised price. Advertisers still have the option of including surcharges in the total price, in which case they need not list them separately.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -


          n2 When we issued Order 88-3-25, we understood that certain governments had imposed fuel surcharges on each ticketed passenger using certain airports and that these surcharges were to be collected by the carriers. Although the U.S. government and foreign governments may impose per-passenger charges on air transportation, state and local governments are prohibited from doing so by section 1113 of the Federal Aviation Act. Section 1113 does not bar state and local governments from taxing the sale of tour components other than air transportation, however, or the sale of aviation fuel.

 [*5]
- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -


Since Order 88-3-25's issuance, confusion has arisen over the meaning of the order's first Ordering Paragraph. That paragraph provides as follows:

The exemption from the provisions of 14 CFR 380.30 and 399.84 granted in Order 85-12-68 is amended to permit direct or indirect air carriers for scheduled and charter service, including tour operators, to state foreign departure taxes, security charges, custom fees, immigration fees, security fees, agricultural inspection fees, tourism and fuel surcharges, as well as *any other surcharges (when these items are collected by offeror) that may be imposed by the U.S. Federal, State or local governments or foreign governments,* separately from other charges in advertisements and promotional materials, provided that all such advertisements clearly and conspicuously state elsewhere in the advertisement the amount of such charges and the services such charges cover and indicate that such charges must be paid by the consumer in addition to the advertised price [footnote omitted, emphasis added].

It has come to our attention that several carriers have interpreted [*6]  this ordering paragraph overbroadly, as license to list charges separately that are neither levied directly on passengers by a governmental entity nor specifically



1988 DOT Av. LEXIS 556, *6

approved by the U.S. government as separate, per-passenger charges. n3 Apparently, these carriers have reasoned that Order 88-3-25 covers all taxes, charges, fees, and surcharges that Federal, State, local, or foreign governments approve or impose, whether on individual passengers or on the carriers themselves.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n3 Order 88-3-25 expressly allows per-passenger security charges, which the Department has approved (Order 88-4-7), to be listed separately, but we intended to allow separate listing of any per-passenger surcharge that the U.S. government may expressly approve.  Security fees have been listed separately in price advertisements since long before Order 88-3-25 explicitly sanctioned this practice, but no consumers have filed complaints, and we have no other evidence that separate listing of these fees is in any way deceptive.

This broad interpretation [*7]  is incorrect and warrants clarrification of Order 88-3-25.  With respect to government-imposed charges, Order 88-3-25 only exempts those charges that are levied on individual passengers and that the advertisers collect and remit to the levying government.  Separate listing of these charges is not deceptive, because it informs consumers of the exact amount that will be collected and passed on to the government.  The carrier retains no part of these charges.  Not only is separate listing of these charges not deceptive, but we believe that passengers benefit from knowing how much they are paying government entities apart from the fares they pay the carriers.

Order 88-3-25 does not exempt per-passenger surcharges that carriers themselves set in response to charges which government entities levy on them without regard to individual passengers. Separate listing of these surcharges could well be deceptive. For one thing, it would give the impression, probably erroneous, that the carrier's own incremental costs were the same for every passenger in every market involved.  For another, we would have no reasonable way of determining whether or to what extent any carrier's surcharge accurately [*8]  reflected its per-passenger costs.  Carriers are entitled to recoup their costs, of course, but surcharges set by the carriers themselves and not approved by a government entity as separate surcharges must be included in the total airfare advertised. For example, if a local government imposes a per-gallon tax on aviation fuel purchased at its airport, a carrier is free to impose a surcharge on all tickets for flights departing from that airport. Regardless of such a surcharge's genesis, however, it must be included in the total advertised airfare.

Thus, our policies require the total price advertised to include all government-imposed charges collected from the passenger that are not passed directly to a government entity. We continue to regard separate listing of these government-imposed charges as an unfair or deceptive practice within the meaning of section 411.

ACCORDINGLY:

1.  We clarify Order 88-3-25 to exclude from the exemption it grants any price advertisement that lists government-imposed taxes, charges, fees, or surcharges separately when such taxes, charges, fees, or surcharges are not levied on individual passengers by a government entity and remitted directly to [*9]  the levying government, and

2.  We further clarify Order 88-3-25 to include in the coverage of its exemption not only security fees but any other carrier fee or surcharge that may be approved by the U.S. government for separate imposition on individual passengers.

**Legal Topics:**

For related research and practice materials, see the following legal topics:
GovernmentsAgriculture & FoodProduct PromotionGovernmentsLegislationOverbreadthTransportation LawAir TransportationCharters

Exhibit 8

## PART 50—DOMESTIC LICENSING OF PRODUCTION AND UTILIZATION FACILITIES

9. The authority citation for part 50 continues to read as follows:

**Authority:** Secs. 102, 103, 104, 161, 182, 183, 186, 189, 68 Stat. 936, 937, 938, 948, 953, 954, 955, 956, as amended, sec. 234, 83 Stat. 444, as amended (42 U.S.C. 2132, 2133, 2134, 2135, 2201, 2232, 2233, 2236, 2239, 2282); secs. 201, as amended, 202, 206, 88 Stat. 1242, as amended, 1244, 1246 (42 U.S.C. 5841, 5842, 5846); sec. 1704, 112 Stat. 2750 (44 U.S.C. 3504 note).

Section 50.7 also issued under Pub. L. 95–601, sec. 10, 92 Stat. 2951 (42 U.S.C. 5841). Section 50.10 also issued under secs. 101, 185, 68 Stat. 955, as amended (42 U.S.C. 2131, 2235); sec. 102, Pub. L. 91–190, 83 Stat. 853 (42 U.S.C. 4332). Sections 50.13, 50.54(dd), and 50.103 also issued under sec. 108, 68 Stat. 939, as amended (42 U.S.C. 2138). Sections 50.23, 50.35, 50.55, and 50.56 also issued under sec. 185, 68 Stat. 955 (42 U.S.C. 2235). Sections 50.33a, 50.55a and Appendix Q also issued under sec. 102, Pub. L. 91–190, 83 Stat. 853 (42 U.S.C. 4332). Sections 50.34 and 50.54 also issued under sec. 204, 88 Stat. 1245 (42 U.S.C. 5844). Sections 50.58, 50.91, and 50.92 also issued under Pub. L. 97–415, 96 Stat. 2073 (42 U.S.C. 2239). Section 50.78 also issued under sec. 122, 68 Stat. 939 (42 U.S.C. 2152). Sections 50.80–50.81 also issued under sec. 184, 68 Stat. 954, as amended (42 U.S.C. 2234). Appendix F also issued under sec. 187, 68 Stat. 955 (42 U.S.C. 2237).

10. In § 50.2, the definition of *Total Effective Dose Equivalent* is revised to read as follows:

### § 50.2 Definitions.

\* \* \* \* \*

*Total Effective Dose Equivalent* (TEDE) means the sum of the effective dose equivalent (for external exposures) and the committed effective dose equivalent (for internal exposures).

\* \* \* \* \*

Dated at Rockville, Maryland, this 13th day of September, 2006.

For the Nuclear Regulatory Commission.

**Annette L. Vietti-Cook,**

*Secretary of the Commission.*

[FR Doc. E6–15502 Filed 9–21–06; 8:45 am]

**BILLING CODE 7590–01–P**

## DEPARTMENT OF TRANSPORTATION

### Office of the Secretary

**14 CFR Part 399**

**[Docket No. OST–2005–23194]**

**RIN 2105–AD56**

### Price Advertising

**AGENCY:** Office of the Secretary (OST), U.S. Department of Transportation (DOT).

**ACTION:** Withdrawal of Notice of Proposed Rulemaking.

**SUMMARY:** This document withdraws the Notice of Proposed Rulemaking (NPRM) that sought comments on whether and, if so, how the Department should amend 14 CFR 399.84, its air-transportation price-advertising rule. As a matter of enforcement policy, the Department has long allowed limited exceptions to the strict terms of the rule. The NPRM called for comments on several options: Maintain the current practice with or without codifying all of its elements in the rule, enforce the rule as written, revise the rule to eliminate most or all requirements for airfare advertisements but to specify that consumers must be told the total price before any purchase is made, or eliminate the rule altogether. The Department has decided based on the comments that the public interest will best be served by maintaining the status quo.

**ADDRESSES:** You can get a copy of this document from the DOT public docket through the Internet at *http://dms.dot.gov*, docket number OST–20005–23194 (click "search," type just the last five digits, and click "search" again). If you do not have access to the Internet, you can get a copy of this document by United States mail from the Docket Management System, U.S. Department of Transportation, Room PL–401, 400 Seventh Street, SW., Washington, DC 20590. Specify Docket OST–2005–23194 and request a copy of the "Withdrawal of Proposed Rulemaking." You can review the public docket in person in the Docket office between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays. The Docket office is on the plaza level of the Department of Transportation. Finally, you can also get a copy of this document from the **Federal Register** Web site at *http://www.gpo.gov*.

**FOR FURTHER INFORMATION CONTACT:**
Betsy L. Wolf, Senior Trial Attorney, Office of the Assistant General Counsel for Aviation Enforcement and

Proceedings (C–70), U.S. Department of Transportation, 400 Seventh St. SW., Room 4116, Washington, DC 20590, tel: (202) 366–9342, fax: (202) 366–7152, e-mail: *Betsy.Wolf@DOT.GOV*.

**SUPPLEMENTARY INFORMATION:**

### Background

*The Current Rule and Enforcement Policy*

The Department's price-advertising rule for air transportation, 14 CFR 399.84 (adopted December 20, 1984), states that any advertisement of passenger air transportation which states a price that is not the entire price the consumer must pay is an unfair and deceptive practice in violation of 49 U.S.C. 41712. Section 41712 empowers the Department to ban unfair and deceptive practices and unfair methods of competition in air transportation and its sale. Congress modeled section 41712 on section 5 of the Federal Trade Commission ("FTC") Act, 15 U.S.C. 45. The FTC Act, however, by its own terms, cannot be enforced against air carriers. Moreover, as the States are preempted from regulating price advertising by air carriers, 49 U.S.C. 41713, *see Morales* v. *Trans World Airline*, 504 U.S. 374, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992), only this Department can adopt consumer-protection regulations in this area.

As a matter of enforcement discretion, the Office of Aviation Enforcement and Proceedings ("Enforcement Office"), has long allowed the following exceptions to the requirement that any advertised fare represent the consumer's total cost:

• Government-imposed taxes and fees that the carrier collects on a per-passenger basis may be excluded from the advertised fare, provided that they are not *ad valorem*, and provided that the advertisement shows the existence and amount of these charges clearly so that consumers can easily determine the total fare.

• If multiple destinations are advertised and not all entail the same government-imposed charges, the advertisement may state a maximum fee, a fee for each destination, or a range of fees. The word "approximately" or a range of amounts may be used to account for minor fluctuations in currency exchange.

• Advertising "two-for-one" fares where the fare that must be bought is higher than the carrier's other fares in the same market is deceptive unless this fact is prominently and clearly disclosed.

• Advertisements of each-way fares that are available only when bought for round-trip travel must disclose the

round-trip purchase requirement clearly and conspicuously.

• In Internet fare advertisements (including banner, pop-up, and e-mail advertisements in addition to Web sites), the per-person government charges that may be listed separately may be disclosed by a prominent hyperlink, proximate to the listed fare, that takes the viewer to a display showing the nature and amount of these charges.

• In advertisements of "free" air transportation in conjunction with the purchase of one or more other tickets, the restrictions, fees, and other conditions that apply to the "free" transportation must be disclosed prominently and close to the offer, at a minimum through an asterisk or other symbol directing the reader's attention to the information elsewhere in the advertisement. This requirement applies to advertisements in all media: The internet, billboards, print media, television, and radio. The information must appear in easily-readable print (except, of course, in the case of radio announcements).

• Advertisements of fares that are higher if purchased by telephone or in person than over the Internet must prominently disclose that these fares are only available over the Internet. The advertisements must also disclose that tickets cost more than the advertised price if purchased by telephone or in person, and they may disclose the price increment. If the advertisements state a price differential, they may not characterize this amount as a "service fee."

• In any billboard advertisement that breaks out taxes and fees, a sum of these must be legible to drivers passing the billboard at the posted speed limit.

• In television advertisements, the sum of any taxes and fees that are broken out must be disclosed, either on screen or audially.

• Radio advertisements must include the sum of any taxes and fees that are broken out.

The Enforcement Office has consistently declined to broaden these exceptions to allow carriers to break out any of their own cost elements, such as fuel surcharges, insurance surcharges, or service fees, from the fare.

## The Notice of Proposed Rulemaking

On December 14, 2005, following an informal request by the Air Transport Association that separate listing of fuel surcharges be permitted because of its air-carrier members' unprecedentedly high fuel costs, the Department issued a Notice of Proposed Rulemaking for the purpose of reexamining its longtime policy on price advertising (No. OST–2005–23194, RIN 2105–AD56, Price Advertising, 70 FR 73960 (December 14, 2005) ("NPRM")).

The NPRM called for comments on four options:

*Option I A:* Amend § 399.84 to codify the Enforcement Office's long-standing policy.

*Option I B:* Leave § 399.84 as written but continue the enforcement policy.

*Option II:* Change the long-standing enforcement policy to discontinue exceptions to the strict terms of § 399.84.

*Option III A:* Amend § 399.84 to require simply that the total price of air transportation be disclosed before the consumer makes the purchase; pursue enforcement action under section 41712 when separate listing of cost elements is unfair or deceptive.

*Option III B:* Amend § 399.84 to require both that the total price of air transportation be disclosed before the consumer makes the purchase and that price advertisements set forth all elements of the fare so that consumers can add them together to determine the total price; pursue enforcement action under section 41712 when separate listing of cost elements is unfair or deceptive.

*Option IV:* Rescind § 399.84; pursue enforcement action under section 41712 when separate listing of cost elements is unfair or deceptive.

## Comments

### Tally of Comments by Group of Commenters

The Department received well over 700 responsive comments on the NPRM, nearly all from individuals who are not travel professionals. The exceptions include 22 air carriers and tour operators, three travel agent associations, the National Association of Attorneys General, an individual who is a travel professional, and the Council of Better Business Bureaus.

Of the approximately 700 individuals who commented on the NPRM, nearly 500 favor Option II. Over 120 favor Option I, with only three specifying a preference for Option I A, and nearly 100 others deem either Option I or Option II to be acceptable, although most prefer the latter. Options III A and III B drew support from two and three individuals, respectively. No individual supports Option IV.

Of the 22 air carriers and tour operators that filed comments, 11 support Option I, with four (Air Pacific, Ltd., Apple Vacations, USA 3000, and Qantas Airways Ltd.) favoring Option I A, five (Alaska Airlines, Inc., Southwest Airlines Co., Singapore Airlines Ltd., Air New Zealand Ltd., and Midwest Airlines, Inc.) favoring Option I B, and two (Jet Blue Airways Corporation and Olympic Airways S.A.) expressing no preference. None of these commenters supports Option II. Option III drew support from four, split evenly between Option III A (Northwest Airlines, Inc., and Continental Airlines, Inc.) and Option III B (Cathay Pacific Airways Ltd. and Air Tahiti Nui). Option IV, too, drew support from four (Delta Air Lines, Inc., American Airlines, Inc., United Air Lines, Inc., and Deutsche Lufthansa AG). The other three (British Airways PLC, Aer Lingus Limited, and US Airways Group, Inc., which represents US Airways, Inc., America West Airlines, Inc., PSA Airlines, Inc., and Piedmont Airlines, Inc.) suggest hybrid approaches.

As for the remaining commenters, two (the American Society of Travel Agents, Inc., and the Interactive Travel Services Association, which represents several major Internet travel agencies) support Option I A, one (the Council of Better Business Bureaus) supports Option I B, and three (the United States Travel Agent Registry, Edward Hasbrouck, and the National Association of Attorneys General) support Option II.

### Summary of Comments by Group of Commenters

The individuals who favor Option I make the following arguments: There is value in knowing how much of what one pays for air transportation is going to the carrier and how much to government entities; airfares are confusing enough as is, and weakening or removing the rule might well harm consumers by permitting the advertisement of fares that are divorced from reality; carriers should not have to include government-imposed fees in their advertised fares since they have no control over them; conversely, because cost elements such as fuel surcharges are susceptible to the carriers' control, when these amounts must be included in advertised airfares, the carriers have a greater incentive to negotiate for lower costs in order to stay competitive; if consumers do not learn the full price of a ticket until the end of the purchase process, they will be unwilling or even unable to spend the time required to compare fares and will thus end up paying too much for air travel.

The individuals who favor Option II make the following arguments: Under the current regime, fare advertisements are confusing and deceptive to the point of amounting to "bait and switch" tactics; enforcing the rule as written would maximize the transparency of

prices, the ease of comparing fares, and the efficiency of the market; weakening or removing the rule could encourage carriers to pad fares with additional surcharges and fees, thereby increasing confusion and deception and frustrating competition; consumers expect cost elements such as fuel to be included in the price of a ticket; the Department could not protect consumers' interests via case-by-case enforcement under section 41712 (i.e., without § 399.84) absent, in the words of one commenter, ''an exponential increase in funds, and in staff hiring authority, for the Enforcement Office.''

Of the five individuals who favor Option III, the two who favor Option III A did not say why. One of the three who favor Option III B reasons that this approach strikes the best balance between the need for regulations to protect consumers (who can and should be expected to read advertisements carefully) and the need to avoid infringing on sellers' right to use marketing innovations.

The air carriers and tour operators that favor Option I make the following arguments: Requiring advertised fares to include all costs over which carriers have control but allowing government-imposed charges to be listed separately promotes direct competition on fares; this approach is consistent with the laws of other countries, which makes compliance easier for carriers; this approach has worked well for both consumers and sellers; Option II would create marketing difficulties; Option III B would frustrate true fare competition and make it harder for consumers to calculate the total fare, as would Options III A and IV to an even greater extent; this problem is exacerbated by the inability of the States or the FTC to regulate advertising by air carriers and the Department's lack of resources to monitor carriers' advertisements closely and mount individual challenges whenever carrier-imposed surcharges might appear to run afoul of section 41712. Some of these commenters seek permission to lump government-imposed charges together as one sum. Those that support Option I A argue that having a rule that is not enforced as written is not consistent with principles of good government. Those that support Option I B argue that the policy is already well known to industry practitioners, that keeping it uncodified will allow the Department to address evolving practices as quickly as possible, and that codifying it could retard legitimate marketing developments that exploit evolving technologies.

The carriers that favor Option III A make the following arguments: Once the consumer knows the total price of an itinerary, he or she has all the information necessary for deciding whether to buy or not and for comparing that price with others, and beyond this sellers should be free to configure their advertisements as they see fit; the prospect of enforcement action under section 41712 will deter bait-and-switch tactics; § 399.84 burdens sellers of air transportation unduly, as sellers in other industries with high taxes and government-imposed fees (e.g., hotels and rental-car agencies) are not required to disclose these amounts to the consumer before the sale is made.

The carriers that favor Option III B argue that it strikes the appropriate balance between carriers' wanting maximum flexibility to respond to market forces and consumers' wanting to obtain adequate fare information efficiently.

The carriers that favor Option IV make the following arguments: As a matter of principle, a price-advertising regulation is inappropriate for a deregulated air-transportation industry; § 399.84 and the enforcement policy bar some types of price advertising that are not deceptive and should thus be permitted; the status quo bars carriers from innovation in their fare offerings; the regulation as enforced imposes costs and practical difficulties that outweigh any benefits that detailed tax disclosure might provide; ''bait and switch'' and other modes of deceptive advertising are not likely to follow a removal of the rule because such tactics are contrary to the carriers' best interests, and in any event the Department can contain abusive practices through enforcement action; enforcement action will not become more cumbersome, as the Department must already prove violations on a case-by-case basis; Options III A and IV are functionally identical, as it would be illegal to consummate a sale without first disclosing the full price; the Department essentially rejected Option II over 20 years ago, and nothing in the NPRM suggests that its rationale for doing so has become any less valid; consumers know that advertised prices do not include taxes.

Of the carriers that suggest hybrid approaches, British Airways supports a hybrid of Options I and III, arguing as follows in support of its position: The rise of the Internet has increased consumer sophistication to the point of rendering § 399.84 and the enforcement policy obsolete; some regulation nevertheless remains appropriate due to consumers' long-time expectations, since the existence of a rule curbs even

marginal abuses and since uniform standards are superior to the multiplicity of rules that state and local intervention might foster; the Department should therefore require that consumers be informed of all elements of the total price early in the booking process but not specifically on the first screen that states a fare component, and it should drop both the requirements for hyperlinks in banner and popup advertisements and the detailed requirements for television and radio advertisements, as these are not effective.

Aer Lingus argues for an end to treating fare displays on carriers' Web sites as fare advertising, leaving only paid fare advertising in conventional advertising media subject to the rule as currently enforced. At most, it contends, carriers' Web sites should be subject to the equivalent of Option III A.

US Airways Group favors what it calls a modified version of Option III B but is actually closer to Option I A: Continuing the ban on separate listing of carrier-imposed surcharges, permitting carriers to advertise all government-imposed taxes, fees, and surcharges as a single amount or a single range of amounts, and ending the requirement of detailed disclosures in media that by nature are fleeting (such as radio, billboards, jumbo-trons, and movie screens), as in practice these disclosures are unintelligible.

The remaining commenters include three travel agent associations, one travel professional, the National Association of Attorneys General, and the Council of Better Business Bureaus. The two travel agent associations that support Option I A make the following arguments: The status quo works; developments in electronic communication have not eliminated the dangers of misleading and deceptive advertisements; weakening or eliminating the rule would invite abuse and chaos or, at the other extreme, inconsistent regulation by the FTC and one or more States; codifying the enforcement policy will ensure that sellers and consumers alike know what to expect; future changes to the policy should be made via notice-and-comment rulemaking procedures, and enforcement action should only be taken based on changes adopted in this manner; Option II would impose substantial burdens on sellers; Options III A and IV would invite deceptive advertisements, and even Option III B would make it harder for consumers to compare fares.

The third travel agent association, the travel professional, and the National Association of Attorneys General make

the following arguments in support of Option II: Under the status quo, consumers are all too frequently misled as to the total cost of air transportation; most Internet sites do not disclose the total price until the end of the process, making fare comparison difficult for both consumers and travel agents; travel agents bear the costly burden of explaining to frustrated consumers why the actual fare is higher than the fare advertised, which would not be the case if § 399.84 were enforced as written; Options III and IV would exacerbate this burden; even sophisticated travelers complain that fare advertisements mislead them; the harm to consumers from the Department's enforcement policy is increasing as government-imposed charges increase; in principle, the availability of information on the Internet should not lessen the level of protection that consumers receive; Option II would not harm competition among air carriers, as the same government-imposed charges apply to all of them; consumers do not benefit from the omission of government-imposed charges from advertised fares, and in any event, sellers would be free under Option II to disclose them in addition to the total price; Options III and IV would not be adopted because consumers expect advertised fares to include all of the carrier's cost elements; case-by-case enforcement under section 41712 alone would be significantly more costly and time-consuming than enforcement action for violation of § 399.84. Additionally, the National Association of Attorneys General says that were its members not preempted from enforcing their States' consumer-protection laws against air carriers, they would be enforcing a standard equivalent to Option II, as they have done in other industries.

The Council of Better Business Bureaus is the umbrella organization for 130 local Better Business Bureaus in North America and also numbers some 250 U.S.-based corporations among its members. The Council states that its members attempt to "foster an ethical marketplace that is fair to both consumers and businesses." It favors Option I B and makes the following arguments in support of its position: The enforcement policy has worked well for 20 years, protecting consumers from deceptive advertising and promoting price competition; Options III A and IV, which, since the full price must always be disclosed before a purchase is transacted, are functionally equivalent, would invite "come-on" ads that grossly understate fares and deceive consumers and garner the advertisers an

unfair advantage over their competitors; the Federal Trade Commission considers a representation, omission, or practice concerning a price claim to be deceptive if it is misleading to reasonable consumers under the circumstances, but the Commission is barred from regulating advertising by air carriers, as are the States; the competitive marketplace determines fares, not how they are advertised, and competition requires the free flow of information honestly disclosed by competitors; allowing carriers to advertise fares that exclude some of their own costs would make it harder for carriers with lower costs to compete and for reasonable consumers to compare fare offerings; nothing has changed since the adoption of § 399.84 to make omission of airline-imposed charges and concealment of government-imposed charges less deceptive; Option III B would allow the advertisement of unrealistically low fares that deceive consumers; as a practical matter, weakening or eliminating § 399.84 would leave consumers worse off than if the rule had never been adopted, because the change would be seen as an invitation to do what has long been barred; in the case of Internet advertising, since the consumer must frequently go through multiple pages or screens and sometimes even provide personal information before getting to the page where the purchase is made, a consumer checking prices for purposes of comparison might well stop short of finding the final price; maintaining the status quo would best serve the interests of consumers without unduly burdening advertisers or hampering the Department's enforcement efforts; codifying the exceptions to § 399.84 could significantly hamper enforcement by limiting what might be considered deceptive or unfair; Option II would burden advertisers and could increase both the complexity of advertisements and consumer confusion.

## Withdrawal

Having duly considered all comments, we have concluded that the public interest will best be served by our maintaining the status quo—*i.e.*, keeping § 399.84 as it is and allowing the Enforcement Office to exercise its prosecutorial discretion to permit exceptions to the rule as circumstances may warrant (Option I B). We are therefore withdrawing the Notice of Proposed Rulemaking.

We find the reasons for maintaining the status quo to be most compelling. As enforced, § 399.84 protects consumers, facilitates price comparison, fosters fare

competition, and affords sellers an appropriate degree of freedom to innovate. We have reviewed the Federal Trade Commission's written policies on pricing activities, including its guidelines for activities on the Internet, and have concluded that our enforcement policy produces approximately the same balance between consumers' and sellers' needs as that which would result if air carriers were subject to the Commission's jurisdiction. It would therefore be poor public policy to weaken or abolish our rule only to have to work our way back to the present equilibrium, case by slow and costly case, via enforcement under section 41712. Moreover, given the Enforcement Office's limited resources, to rely solely on section 41712 for effective fare-advertising enforcement would be unrealistic.

The supporters of Options III A and IV (which, we agree, are functionally equivalent) have not shown compelling reasons for eliminating a rule that has worked well for over 20 years. The argument that sellers in other industries with high taxes and government-imposed fees, such as hotels and rental-car agencies, are not required by Federal regulation to disclose these amounts to the consumer before a sale is made ignores the fact that both the Federal Trade Commission and the States may regulate advertising in these other industries. In fact, as the Council of Better Business Bureaus points out, the Commission has set standards for price advertising similar in kind to our rule and enforcement policy but by means other than adopting regulations. The Commission's Web site offers extensive advertising guidance to businesses; *see http://www.ftc.gov/bcp/guides/ guides.htm.* The Council also points out that advertisers in industries other than air transportation face a host of state statutes and regulations. It reports that in 1989, the National Association of Attorneys General adopted enforcement guidelines regarding the application of these laws to car-rental companies, including the following:

Any surcharge or fee that consumers must generally pay at any location in order to obtain or operate a rental vehicle must be included in the total advertised price of the rental.

The Council suggests that this guideline may account for the trend we have observed among rental-car Web sites, noted in the NPRM, "to give total prices for rental cars when giving quotes," 70 FR at 73964.

Those carriers that assert that under the status quo they are barred from innovating in their fare offerings and

advertising neglected to provide any example of putative innovations. The argument that the regulation as enforced imposes costs and practical difficulties that outweigh the benefits of detailed tax disclosure ignores the fact that the policy does not require that government-imposed fees be listed separately from the fare but merely permits this. The argument that enforcement action under section 41712 alone would not be any more cumbersome than it is now, since the Department must already prove violations on a case-by-case basis, ignores the considerable difference between having to prove only that conduct is prohibited by § 399.84, as interpreted, and having to prove that conduct has violated section 41712, which requires a showing of actual or likely consumer harm. With § 399.84 in place, any act that it prohibits is a per se violation of section 41712. The argument that consumers know that advertised prices do not include taxes ignores the vast difference between the sales tax applicable to most goods and services and the much higher taxes and fees—both absolutely and as a percentage of the base price—applicable to airfares. Aer Lingus does not explain why it believes that listings on carriers' Web sites should not be considered advertisements, nor does it specify how it believes Internet travel agencies' fare displays should be treated.

The supporters of Option III B have also not persuaded us to dilute § 399.84. We agree with the Council of Better Business Bureaus that sellers could advertise deceptively under this option, for example, by falsely implying that a carrier's own surcharges were government-imposed or by failing to meet the Federal Trade Commission's standards for prominence, readability, and clarity. As in the case of Options III A and IV, moreover, enforcement would be far more burdensome than under the status quo.

Similarly, the overwhelming support among individuals for enforcing § 399.84 as written notwithstanding, the comments fail to establish a rationale for undoing over 20 years of permitting exceptions to the rule's strict terms as a matter of enforcement policy. Strict enforcement of § 399.84 would still create marketing difficulties for sellers without necessarily making prices more transparent to consumers. Option II's strong support from consumers does, however, serve to fortify the case against eliminating or diluting the rule and enforcement policy.

We are maintaining the status quo and withdrawing the NPRM rather than codifying the current exceptions to

§ 399.84 allowed by the Enforcement Office. We do not think that codification is necessary to make the enforcement policy transparent and available. As we observed in the NPRM, sellers and lawyers practicing in this industry are already familiar with the policy and both consumers and newcomers to the industry can find the details of the policy on the Department's Web site at *http://airconsumer.ost.dot.gov/rules/guidance.htm*. 70 FR at 73963. As we also observed in the NPRM, given that enforcement is by nature discretionary, by not codifying the exceptions to § 399.84, we are retaining the flexibility within the Enforcement Office to continue refining its enforcement policy without the delays and costs that rulemaking would entail, *id.*

Two clarifications are in order. First, several commenters argue for leeway to lump all of the government fees and charges that may be broken out from the fare together as one sum rather than being required to list them individually. In practice, except for *ad valorem* taxes and the September 11th Security Fee, which under the Department of Homeland Security's regulations must be disclosed separately, the Enforcement Office already allows this. Second, several commenters argue that the requirements for disclosure of government-imposed charges in billboard, television, and radio advertisements should be dropped because as a practical matter these disclosures are invariably unintelligible. The fact remains, however, that failure to disclose these charges effectively renders an advertisement deceptive. Sellers always have the option of including these charges in the fares advertised (using a range of prices or using the word "from" with the minimum price if need be).

*Accordingly,* for the reasons set forth above, we are withdrawing the NPRM.

Issued this day of September 18, 2006, at Washington, DC, under authority delegated by 49 CFR 1.56a.

**Michael W. Reynolds,**

*Acting Assistant Secretary for Aviation and International Affairs.*

[FR Doc. 06–8041 Filed 9–21–06; 8:45 am]

**BILLING CODE 4910–9X–P**

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 52

[EPA–R08–OAR–2006–0210; FRL–8220–6]

## Approval and Promulgation of State Implementation Plans; Utah; Revised Definitions of Volatile Organic Compounds and Clearing Index; Proposed Rule

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule.

**SUMMARY:** EPA is proposing to approve State Implementation Plan (SIP) revisions submitted by the State of Utah on November 11 and November 23, 2005. The revisions are to the Utah Administrative Code (UAC) rule R307–101–2 and (1) incorporate by reference the Federal definition of "Volatile Organic Compounds" (VOC), and (2) update the definition of "Clearing Index". The intended effect of this action is to make federally enforceable those provisions that EPA is approving. This action is being taken under section 110 of the Clean Air Act.

In the "Rules and Regulations" section of this **Federal Register**, EPA is approving the State's SIP revisions as a direct final rule without prior proposal because the Agency views this as noncontroversial SIP revisions and anticipates no adverse comments. A detailed rationale for the approval is set forth in the preamble to the direct final rule. If EPA receives no adverse comments, EPA will not take further action on this proposed rule. If EPA receives adverse comments, EPA will withdraw the direct final rule and it will not take effect. EPA will address all public comments in a subsequent final rule based on this proposed rule. EPA will not institute a second comment period on this action. Any parties interested in commenting must do so at this time. Please note that if EPA receives adverse comment on an amendment, paragraph, or section of this rule and if that provision may be severed from the remainder of the rule, EPA may adopt as final those provisions of the rule that are not the subject of an adverse comment.

**DATES:** Written comments must be received on or before October 23, 2006.

**ADDRESSES:** Submit your comments, identified by Docket ID No. EPA–R08–OAR–2006–0210, by one of the following methods:

• *http://www.regulations.gov.* Follow the on-line instructions for submitting comments.

Exhibit 9

## DEPARTMENT OF TRANSPORTATION

### Office of the Secretary

### 14 CFR Parts 244, 250, 253, 259, and 399

[Docket No. DOT–OST–2010–0140]

RIN 2105–AD92

### Enhancing Airline Passenger Protections

**AGENCY:** Office of the Secretary (OST), Department of Transportation (DOT).

**ACTION:** Final rule.

**SUMMARY:** The Department of Transportation is issuing a final rule to improve the air travel environment for consumers by: Increasing the number of carriers that are required to adopt tarmac delay contingency plans and the airports at which they must adhere to the plan's terms; increasing the number of carriers that are required to report tarmac delay information to the Department; expanding the group of carriers that are required to adopt, follow, and audit customer service plans and establishing minimum standards for the subjects all carriers must cover in such plans; adding carriers to those required to include their contingency plans and customer service plans on their websites; increasing the number of carriers that must respond to consumer complaints; enhancing protections afforded passengers in oversales situations, including increasing the maximum denied boarding compensation airlines must pay to passengers bumped from flights; strengthening, codifying and clarifying the Department's enforcement policies concerning air transportation price advertising practices; requiring carriers to notify consumers of optional fees related to air transportation and of increases in baggage fees; prohibiting post-purchase price increases; requiring carriers to provide passengers timely notice of flight status changes such as delays and cancellations; and prohibiting carriers from imposing unfair contract of carriage choice-of-forum provisions. The Department is taking this action to strengthen the rights of air travelers in the event of oversales, flight cancellations and delays, ensure that passengers have accurate and adequate information to make informed decisions when selecting flights, prohibit unfair and deceptive practices such as post-purchase price increases and contract of carriage choice-of-forum provisions, and to ensure responsiveness to consumer complaints.

**DATES:** This rule is effective August 23, 2011 except for the amendments to 14 CFR 399.84 which become effective October 24, 2011.

**FOR FURTHER INFORMATION CONTACT:** Blane A. Workie, Tim Kelly or Daeleen Chesley, Office of the Assistant General Counsel for Aviation Enforcement and Proceedings, U.S. Department of Transportation, 1200 New Jersey Ave., SE., Washington, DC 20590, 202–366–9342 (phone), 202–366–7152 (fax), *tim.kelly@dot.gov* or *blane.workie@dot.gov* (e-mail).

**SUPPLEMENTARY INFORMATION:**

### Background

On December 30, 2009, the Department published a final rule in which it required certain U.S. air carriers to adopt contingency plans for lengthy tarmac delays; respond to consumer problems; post flight delay information on their websites; and adopt, follow, and audit customer service plans. The rule also defined chronically delayed flights and deemed them to be an "unfair and deceptive" practice. The majority of the provisions in that rule took effect on April 29, 2010. See 74 FR 68983 (December 30, 2009).

In the preamble to that final rule, the Department noted that it planned to review additional ways to further enhance protections afforded airline passengers and listed a number of subject areas that it was considering addressing in a future rulemaking. On June 8, 2010, the Department published a notice of proposed rulemaking (NPRM), 75 FR 32318, in which it addressed the following areas: (1) Contingency plans for lengthy tarmac delays; (2) reporting of tarmac delay data; (3) customer service plans; (4) contracts of carriage; (5) responding to consumer problems/complaints (6) oversales; (7) full fare advertising; (8) baggage and other ancillary fees; (9) post-purchase price increases; (10) notification to passengers of flight status changes; (11) choice-of-forum provisions; and (12) peanut allergies. In response to the NPRM, the Department received over 2100 comments, the vast majority of which were related to the proposal to address peanut allergies in air travel.

The Department received comments on the NPRM from the following: U.S. carriers and U.S. carrier associations; foreign air carriers and foreign carrier associations; U.S. and foreign consumer groups; travel agents and members of organizations in the travel industry; airports and various airport-related industry groups; members of Congress; embassies; peanut industry groups and allergy associations; as well as a number of individual consumers. In addition, the Department received a summary of the public discussion on the NPRM proposals that occurred on the Regulation Room Web site, *http://www.regulationroom.org.* The Regulation Room site is a site where members of the public can learn about and discuss proposed federal regulations and provide feedback to agency decision makers. To support this Administration's open government initiative, the Department partnered with Cornell University in this pilot project to discover the best ways to use Web 2.0 and social networking technologies to increase effective public involvement in the rulemaking process.

The Department has carefully reviewed and considered the comments received. The commenters' positions that are germane to the specific issues raised in the NPRM and the Department's responses are set forth below, immediately following a summary of regulatory provisions and a summary of the regulatory analysis.

### Summary of Regulatory Provisions

| Subject | Final rule |
|---|---|
| *Tarmac Delay Contingency Plans* ...................... | • Requires foreign air carriers operating to or from the U.S. with at least one aircraft with 30 or more passenger seats to adopt and adhere to tarmac delay contingency plans.<br>• Requires U.S. and foreign air carriers to not permit an international flight to remain on the tarmac at a U.S. airport for more than four hours without allowing passengers to deplane subject to safety, security, and ATC exceptions.<br>• Expands the airports at which airlines must adhere to the contingency plan terms to include small hub and non-hub airports, including diversion airports.<br>• Requires U.S. and foreign carriers to coordinate plans with Customs and Border Protection (CBP) and the Transportation Security Administration (TSA). |

| Subject | Final rule |
|---|---|
| | • Requires notification regarding the status of delays every 30 minutes while aircraft is delayed, including reasons for delay if known.<br>• Requires notification of opportunity to deplane from an aircraft that is at the gate or another disembarkation area with door open if the opportunity to deplane actually exists. |
| *Tarmac Delay Data* ............................................... | • Requires all carriers that must adopt tarmac delay contingency plans to file data with the Department regarding lengthy tarmac delays. |
| *Customer Service Plans* ....................................... | • Requires foreign air carriers that operate scheduled passenger service to and from the U.S. with at least one aircraft with 30 or more passenger seats to adopt, follow and audit customer service plans.<br>• Establishes standards for the subjects U.S. and foreign air carriers must cover in customer service plans. Examples include:<br>  • delivering baggage on time, including reimbursing passengers for any fee charged to transport a bag if the bag is lost;<br>  • where ticket refunds are due, providing prompt refunds including refund of optional fees charged to a passenger for services that the passenger was unable to use due to an oversale situation or flight cancellation; and<br>  • allowing reservations to be held at the quoted fare without payment, or cancelled without penalty, for at least twenty-four hours after the reservation is made if the reservation is made one week or more prior to a flight's departure date. |
| *Posting of Customer Service Plans and Tarmac Delay Contingency Plans.* | • Requires foreign carriers to post their required contingency plans, customer service plans, and contracts of carriage on their websites as is already required of U.S. carriers. |
| *Response to Consumer Problems* ...................... | • Expands the pool of carriers that must respond to consumer problems to include foreign air carriers operating scheduled passenger service to and from the U.S. with at least one aircraft with 30 or more passenger seats (*i.e.*, monitor the effects of irregular flight operations on consumers; inform consumers how to file a complaint with the carrier, and provide substantives responses to consumer complaints within 60 days). |
| *Oversales* .............................................................. | • Increases the minimum denied boarding compensation limits to $650/$1,300 or 200%/400% of the one-way fare, whichever is smaller.<br>• Implements an automatic inflation adjuster for minimum DBC limits every 2 years.<br>• Clarifies that DBC must be offered to "zero fare ticket" holders (*e.g.,* holders of frequent flyer award tickets) who are involuntarily bumped.<br>• Requires that a carrier verbally offer cash/check DBC if the carrier verbally offers a travel voucher as DBC to passengers who are involuntarily bumped.<br>• Requires that a carrier inform passengers solicited to volunteer for denied boarding about all material restrictions on the use of transportation vouchers offered in lieu of cash. |
| *Full Fare Advertising* ........................................... | • Enforces the full fare advertising rule as written (*i.e.*, ads which state a price must state the full price to be paid). Carriers currently may exclude government taxes/fees imposed on a per-passenger basis.<br>• Clarifies the rule's applicability to ticket agents.<br>• Prohibits carriers and ticket agents from advertising fares that are not the full fare and impose stringent notice requirements in connection with the advertisement of "each-way" fares available for purchase only on a roundtrip basis.<br>• Prohibits opt-out provisions in ads for air transportation. |
| *Baggage and Other Fees and Related Code-Share Issues.* | • Requires U.S. and foreign air carriers to disclose changes in bag fees/allowances on their homepage for three months, to include information regarding the free baggage allowance.<br>• Requires carriers (U.S. and foreign) and ticket agents to include on e-ticket confirmations information about the free baggage allowance and applicable fees for the first and second checked bag and carry-on but allows ticket agents, unlike carriers, to do so through a hyperlink.<br>• Requires carriers (U.S. and foreign) and ticket agents to inform passengers on the first screen on which the ticket agent or carrier offers a fare quotation for a specific itinerary selected by a consumer that additional airline fees for baggage may apply and where consumers can go to see these baggage fees.<br>• Requires U.S. and foreign air carriers to disclose all fees for optional services to consumers through a prominent link on their homepage.<br>• Requires that the same baggage allowances and fees apply throughout a passenger's journey.<br>• Requires the marketing carrier to disclose on its website any difference between its optional services and fees and those of the carrier operating the flight. Disclosure may be made through a hyperlink to the operating carriers' websites that detail the operating carriers' fees for optional services, or to a page on its website that lists the differences in policies among code-share partners. |

| Subject | Final rule |
|---|---|
| *Post-Purchase Price Increases* ......................... | • Bans the practice of post-purchase price increases in air transportation or air tours unless the increase is due to an increase in government-imposed taxes or fees and only if the passenger was provided full disclosure of the potential for the increase and affirmatively agreed to the potential for such an increase prior to purchase. |
| *Flight Status Changes* ......................................... | • Requires U.S. and foreign air carriers operating scheduled passenger service with any aircraft with 30 or more seats to promptly notify consumers through whatever means is available to the carrier for passengers who subscribe to the carrier's flight status notification services, in the boarding gate area, on a carrier's telephone reservation system and on its website of delays of 30 minutes or more, cancellations and diversions within 30 minutes of the carrier becoming aware of a change in the status of a flight. |
| *Choice-of-Forum Provisions* ................................ | • Prohibits U.S. and foreign air carriers from limiting a passenger's forum to pursue litigation to a particular inconvenient venue. |

**Summary of Regulatory Analysis**

The regulatory analysis shows that the monetized benefits of the proposed requirements exceed their monetized costs, even without considering non-quantifiable benefits. This analysis, outlined in the table below, has determined that the present value of monetized net benefits for a 10 year period at a 7% discount rate is $14.3 million. At a 3% discount rate, the present value of monetized net benefits is estimated to be $20.3 million.

|  |  | Present value (millions) |
|---|---|---|
| Monetized Benefits ................................................. | 10 Years, 7% discounting ............................................... | $45.0 |
|  | 10 Years, 3% discounting ............................................... | 53.5 |
| Monetized Costs ...................................................... | 10 Years, 7% discounting ............................................... | 30.7 |
|  | 10 Years, 3% discounting ............................................... | 33.2 |
| Monetized Net Benefits .......................................... | 10 Years, 7% discounting ............................................... | 14.3 |
|  | 10 Years, 3% discounting ............................................... | 20.3 |

A comparison of the monetized benefits and costs for each of the final requirements is provided in the Regulatory Analysis and Notices section, set forth below, along with information on additional benefits and costs for which quantitative estimates could not be developed.

**Comments and Responses**

*1. Tarmac Delay Contingency Plans*

A. Entities Covered

*The NPRM:* The NPRM proposed to require any foreign air carrier that operates scheduled passenger or public charter service to and from the U.S. using any aircraft originally designed to have a passenger capacity of 30 or more passenger seats to adopt and comply with a tarmac delay contingency plan for their flights to and from the U.S. that includes minimum assurances identical to those currently required of U.S. carriers. As proposed, it would apply to all of a foreign carrier's flights to and from a covered U.S. airport, including those involving aircraft with fewer than 30 seats if a carrier operates any aircraft originally designed to have a passenger capacity of 30 or more seats to or from the U.S.

We sought comment on whether the requirement to have a contingency plan should be narrowed or expanded, and if so, the cost burdens and benefits of doing so. For example, we proposed to include foreign carriers that operate aircraft originally designed to have a passenger capacity of 30 or more seats to and from the U.S., but we invited interested persons to comment on whether, in the event that we adopt a rule requiring foreign carriers to have contingency plans, we should limit its applicability to foreign air carriers that operate large aircraft to and from the U.S.—*i.e.,* aircraft originally designed to have a maximum passenger capacity of more than 60 seats. We also asked whether the requirement to adopt tarmac delay contingency plans should apply not only to U.S. and foreign air carriers but also to U.S. airports. We requested that proponents and opponents of these or other alternative proposals provide arguments in support of their positions.

*Comments:* A number of U.S. and foreign airlines and airline associations support requiring airports to develop their own contingency plans to address lengthy tarmac delays but generally agree that these plans should be limited to coordinating with airlines and government agencies and assisting airlines during tarmac delays. Some of these commenters note that airports are in the best position to address the logistics associated with lengthy delays, particularly with respect to diverted flights. For example, they argue that an airport authority is most likely to know the areas in the airport where international passengers can be allowed to deplane without resulting in U.S. Customs and Border Protection (CBP) or Transportation Security Administration (TSA) concerns. Commenters also note that requiring only carriers to have a contingency plan unreasonably places the burden of the operations of the entire air transport industry on carriers. Consumer groups are also in favor of requiring airports to adopt contingency plans. Of the airport and airport industry commenters, Dallas/Fort Worth Airport generally supports requiring U.S. airports to adopt a tarmac delay contingency plan but notes that U.S. airports do not have direct contact with airline passengers when they are on the aircraft and have no control over deplaning. Airports Council International (ACI) supports the airlines' plans being coordinated with airports but does not support requiring airports to adopt separate plans. ACI believes that separate airport and airline contingency plans could result in confusion and states that it is committed to supporting airlines in the development of their plans.

With regard to the adoption of a tarmac delay contingency plan by

foreign carriers, the views of foreign carrier associations and carriers differed significantly from those of other commenters. In general, the foreign carriers and foreign carrier association commenters object to the proposal that they adopt tarmac delay contingency plans as unnecessary and note that the same issues with tarmac delays do not arise as often with international flights as they do with domestic flights. The International Air Carrier Association (IACA) states that EU Regulation 261/2004 is an EU passenger rights provision to which EU carriers are subject on all their flights, including flights that depart from U.S. airports, and that the Department's proposals could conflict with EU laws. The International Air Transport Association (IATA) generally supports the principle of contingency plans, but believes such plans should be developed individually by each carrier according to its specific operations and conditions as opposed to having terms set by the government. The Arab Air Carrier Association (AACA) and the Latin American and Caribbean Air Transport Association (ALTA) concur with IATA, as do many foreign carriers. The Air Transport Users Council (AUC) and a number of European carriers point out, similar to IACA, that many of the provisions in the NPRM are covered under EU legislation. The National Airlines Council of Canada (NACC) supports the need for contingency plans in the event of irregular operations but states that they should be developed in the interest of enhanced customer service rather than being mandated by government regulation. TUI Travel notes that EU carriers must comply with EU regulations and asks that carriers originating outside the U.S. be excluded from the tarmac delay contingency plan rule. Monarch Airlines commented that an exception to any requirement should exist for flights that do not pick up passengers in the United States.

U.S. carrier associations such as the Air Transport Association of America (ATA) and National Air Carrier Association (NACA) indicated their support for requiring foreign air carriers to meet the same standards as U.S. carriers for adopting tarmac delay contingency plans. Of the U.S. carriers that commented, Spirit Airlines supports extending the rule to foreign carriers, while Virgin America states that DOT should not adopt any of the proposals related to tarmac delays.

Most of the comments received from individuals on this issue noted that a requirement to develop a tarmac delay contingency plan should be extended to foreign carriers because it is important to protect consumers on all flights to and from the United States, not merely on flights operated by U.S. airlines. Among the consumer group commenters, the Consumer Travel Alliance (CTA) supports the expansion of the tarmac delay rules to foreign carriers, as does the Association for Airline Passenger Rights (AAPR), National Business Travel Association (NBTA), Flyersrights.org, Consumers Union and Aviation Consumer Action Project (ACAP). The American Society of Travel Agents (ASTA) also supports extending the tarmac delay contingency plan provisions to foreign carriers and states that the rule should cover all aircraft types.

Among the airports and airport industry commenters, ACI supports requiring foreign air carriers to adopt plans that include minimum assurances as required of U.S. airlines and strongly supports extending the rule to foreign air carriers operating aircraft with 30 or more seats. The American Association of Airport Executives (AAAE) agrees that foreign carriers should comply with specified contingency plans in order to provide equal and fair competition. The New York State Consumer Protection Board supports requiring foreign carriers to adopt tarmac delay contingency plans that provide for passengers to receive the same basic necessities that U.S. carriers are required to provide.

*DOT Response:* After fully considering the comments received, the Department has decided not to promulgate a requirement that airports adopt contingency plans addressing lengthy tarmac delays. The Department is aware that many airports are voluntarily working with U.S. carriers to develop policies and procedures to address lengthy tarmac delays and to cooperate with U.S. carriers in the coordination of the carriers' contingency plans as required of U.S. airlines by the first tarmac delay rule. As such, it is not necessary to regulate in this area at this time.

However, the Department thinks it is reasonable and necessary to require foreign carriers that operate scheduled passenger or public charter service to and from the U.S. to adopt and adhere to tarmac delay contingency plans. International air travel is a large and increasingly significant market sector, and customers who use non-U.S. airlines deserve no less protection from lengthy tarmac delays at U.S. airports than do customers of U.S. airlines. We also wish to be consistent with the application of our rules. The lengthy tarmac delays experienced by a number of foreign carriers at John F. Kennedy International Airport (JFK) during and after the December 26, 2010, blizzard highlights the need to extend the rule to those carriers.

In order to address commenters' concerns that certain European laws (or laws of other countries) may conflict with this regulation, we want to clarify that the requirement to adopt and follow a plan applies only to tarmac delay events that occur at a covered U.S. airport. The rule should not conflict with EU Regulation 261/2004, the EU rule on compensation and assistance to be provided to passengers in the event of denied boarding, flight cancellation or long flight delays. The types of assistance required under the EU rule are for the most part services that would not be available on board an aircraft during a tarmac delay, *e.g.* phone calls, a hotel room, transportation between the airport and the hotel room, and rerouting on another flight. The context of the food and beverage requirement in regulation 261/2004 suggests that these services are to be provided in the airport terminal during a normal (*i.e.,* non-tarmac) flight delay before passengers have been boarded. As such, although EU 261/2004 applies to EU carriers departing from or traveling to an EU member state and to non-EU carriers departing from an EU member state airport, we see no conflict between that rule and this one. On a tarmac delay at a U.S. airport, EU and non-EU carriers can comply with all provisions of both rules.

With regard to charter flights, we agree with Monarch Airlines and TUI Travel that an exception should exist for foreign-originating charters that operate to and from the United States but do not pick up any U.S. originating passengers. Consequently, carriers will not be required to adopt a tarmac delay contingency plan as long as their operations fall within these parameters. This is consistent with 14 CFR 382.7(d) of the DOT rule on air travel by passengers with disabilities and with the minimal regulation of these flights by the Department's public charter rule in 14 CFR part 380.

## B. Time Frame for Deplaning Passengers on International Flights

*The NPRM:* Under the proposed rule, a covered foreign air carrier would be required to include in its tarmac delay contingency plan an assurance that it will not permit an aircraft to remain on the tarmac at a U.S. airport for more than a set number of hours as determined by the carrier in its plan before allowing passengers the opportunity to deplane. The proposal included appropriate safety, security, and ATC exceptions. This is already

required of U.S. carriers for their international flights under the Department's existing rule. As for domestic flights, U.S. carriers are required to provide an assurance that they will not permit an aircraft to remain on the tarmac for more than three hours without deplaning passengers subject to the same safety, security and ATC exceptions. In the NPRM, we noted that there are ongoing questions as to whether mandating a specific time frame for deplaning passengers on international flights as currently exists for domestic flights is in the best interest of the public. We asked for comments on whether any final rule that we may adopt should set a uniform standard for the time interval after which U.S. or foreign air carriers would be required to allow passengers on international flights to deplane rather than allowing the carriers to set their own tarmac delay time limit for such flights. We also asked commenters who support the adoption of a uniform standard to propose specific time limits and state why they believe these intervals to be appropriate.

*Comments:* Of the U.S. carriers and carrier associations that commented, ATA objects to a hard time limit on tarmac delays for international flights. NACA supports requiring foreign air carriers to meet the same standards as U.S. carriers for adopting tarmac delay contingency plans.

In general, the non-U.S. carriers and carrier associations object to the proposal as unnecessary, asserting that the same problems with tarmac delays do not exist with international flights as with domestic flights. For example, Condor Flugdienst Airlines (Condor) states that it sees no reason to enforce a mandatory deplaning requirement for a problem that occurs only very rarely. Many of these carriers also comment that a "one size fits all" approach is not practical and note that there are large differences between domestic and international operations, and between long-haul and short-haul operations. IATA and IACA object to a uniform time limit entitling passengers to deplane. IACA states that the proposal may conflict with EU passenger rights requirements since EU carriers must follow EU requirements on all their flights, including flights that depart from U.S. airports. The Association of European Airlines (AEA) and foreign airlines' comments are similar to IATA's. Many object to the proposal to require carriers to set a time limit to deplane due to various operational concerns. Specifically, a number of foreign industry groups and airlines noted the following:

• International flights operate less frequently and a cancellation could result in missed connections with serious consequences for passengers;
• Returning to the gate and/or a flight cancellation may result in the crew "timing-out" and many foreign carriers do not have U.S.-based crews, which could result in a delay of 24 hours or more;
• International flights have limited windows of opportunity to depart due to gate constraints at foreign airports;
• Larger aircraft used for international flights take much longer to enplane and deplane (up to 40 minutes), which can cause even further delay;
• International flights are often better equipped to meet passenger needs on-board the aircraft; and
• Long-haul and ultra-long haul operations can make up time while in the air.

Some carriers, such as Air New Zealand, support a 3 hour time limit, but note that consideration should be given to crew restrictions and gate allocations, or situations where resolution of the delay is less than an hour away and deplaning would further delay the flight. Qantas also supports the 3 hour limit in principle, but thinks such an assurance is limited by the carrier's ability to control the circumstances. Of the travel agents and other industry group commenters that commented on this issue, ASTA agrees that a specific standard for international flights is important but supports a four hour rather than three hour rule.

Among the consumer commenters, the Association for Airline Passenger Rights (AAPR) and Flyersrights.org strongly advocate for a maximum permissible tarmac delay of three hours for international flights. Flyersrights.org urges that tarmac delays of over three hours not be permitted for international flights and notes that the "health and inconvenience problems" are the same regardless of whether the flight is domestic or international. Consumer Action, along with Consumer Federation of America, the National Consumers League, Public Citizen, and U.S. PIRG support the extensive comments filed by Flyersrights.org. Some individual commenters also expressed concern about lengthy tarmac delays on international flights and advocated for a uniform time limit for deplaning passengers. Of the commenters on "Regulation Room," almost half noted, generally, that the Department should apply a uniform federal time limit on tarmac delays to all flights and airlines, regardless of aircraft size, airport size, and whether the flight is domestic or international.

*DOT Response:* As noted above, the Department is expanding its requirement to adopt a tarmac delay contingency plan to foreign carriers, as we believe that it is important to ensure that passengers on these carriers are also afforded protection from unreasonably lengthy tarmac delays. With regard to a required time period for deplaning passengers on international flights operated by U.S. or foreign carriers, we are requiring that these carriers provide an assurance that they will not permit an aircraft to remain on the tarmac at a U.S. airport for more than four hours without providing passengers an opportunity to deplane. As in our initial rulemaking to enhance airline passenger protections, this new requirement will allow exceptions for safety and security considerations and in instances where Air Traffic Control advises the pilot-in-command that returning to the gate or permitting passengers to disembark elsewhere would significantly disrupt airport operations. We decided to impose a uniform time limit for deplaning passengers on international flights rather than allowing carriers to establish their own tarmac delay time limits because we believe the consistency in standard will provide passengers with clearer expectations as to when they would be allowed off aircraft in the event of a tarmac delay. A uniform standard will also make it clearer to the other stakeholders such as airports of the need to assist airlines in deplaning passengers on international flights before the four hour mark. Further, the Department believes that a uniform time limit will reduce or prevent lengthy tarmac delay incidents such as those that occurred at JFK during and after the December 26, 2010, blizzard and the resulting impact on passengers traveling on those flights.

We decided to impose a four hour time limit for lengthy tarmac delays on international flights as opposed to the three hour limit that applies to lengthy tarmac delays on domestic flights for a number of reasons. First, because international flights are of much longer duration on average than domestic flights, it is possible that delays may not have as negative an impact on international passengers as they were already planning on spending a significant amount of time in the aircraft and some of the time spent on the tarmac can be made up while in the air. We also reviewed the contingency plans for the U.S. carriers as they are already required to establish their own tarmac delay time limits for international flights, and found that most of these carriers have chosen to set a four hour

time limit for deplaning passengers from their international flights that experience a tarmac delay. In addition, we are persuaded by comments of the different environment in which international flights operate and the need to provide greater leeway for international flights than we allow for domestic flights. For these reasons, we have decided to impose a four hour time limit for deplaning passengers on international flights and not allow U.S. and foreign carriers to establish their own longer tarmac delay time limits for international flights.

As clarified in the first rule to enhance airline passenger protections, an international flight for purposes of this requirement is nonstop flight segment that departs from the United States and lands in another country, or vice-versa, exclusive of non-traffic technical stops. For example, if a U.S. carrier operates a direct flight Chicago-New York-Frankfurt, with some Chicago-originating passengers destined for New York and others destined for Frankfurt, and the aircraft experiences a tarmac delay in Chicago, then we would consider the tarmac delay to be on a domestic flight. This is because Chicago-New York is a domestic flight segment even though the final destination of the flight is Frankfurt, Germany. If, on the other hand, the aircraft only stops for refueling or a crew change in New York and the flight carries no Chicago-New York traffic and no Frankfurt-bound passengers enplane in New York, then we would consider the tarmac delay in Chicago to be a tarmac delay on an international flight.

C. Provision for Adequate Food and Water, Operable Lavatories, and Medical Attention if Needed

*The NPRM:* As proposed in the NPRM, the tarmac delay contingency plans adopted by foreign air carriers for international flights that depart from or arrive at a U.S. airport would need to include: (1) An assurance that the carrier will provide adequate food and potable water no later than two hours after the aircraft leaves the gate in the case of departure or touches down in the case of an arrival if the aircraft remains on the tarmac, unless the pilot-in-command determines that safety or security considerations preclude such service; (2) an assurance of operable lavatory facilities while the aircraft remains on the tarmac; and (3) an assurance of adequate medical attention if needed while the aircraft remains on the tarmac. These requirements already apply to U.S. carriers under the current rule.

*Comments:* With regard to the provision for adequate food and water, ATA notes that generally aircraft used for international flights are able to comfortably accommodate passengers onboard for longer periods of time, with food service and entertainment options often available given the type of equipment used and the expected length of these flights. Among the foreign air carriers that commented, Condor Airlines notes that when a longer delay becomes inevitable, Condor has snacks and drinks available for passengers. Similarly, Qatar Airways notes that the logistics of the ultra long-haul flights operated to and from the U.S. already require that Qatar Airways provide extra catering and potable/bottled water to allow for extra time beyond that scheduled during which its customers and crew may have to spend in the aircraft. Qatar explains that it already ensures that its customers are regularly offered water and soft drinks by cabin crew. Qantas indicates that it too provides passengers access to potable water and refreshments during tarmac delays but does not consider it reasonable to impose a mandatory requirement to provide food to all passengers after two hours in all cases, as the commencement of a meal service may lead to further delays and missed opportunities for departure. The carrier also thinks that the term "adequate food" is too broad and open to different interpretations. South African Airways wants the Department to understand that foreign airlines have significantly less flexibility than U.S. airlines to store extra catering items onboard. In the absence of evidence that lengthy delays are a problem for passengers traveling on foreign airlines, the airline believes the Department is not justified in imposing the costs associated with these requirements.

Regarding assurance of operable lavatory facilities, a number of carriers noted that this is a reasonable requirement and that they have working lavatories and toilet serviceability is maintained at the highest levels. However, one carrier expressed concern about unforeseen maintenance issues.

With regard to providing medical attention, Condor states that its flight attendants are capable of providing basic first aid when needed and have access to remote medical advice for more serious medical emergencies. Similarly, Qatar Airways notes that its cabin crews are highly trained in first aid. Qantas Airlines believes that it is reasonable to require carriers to seek medical assistance for any onboard emergency and states that it engages the services of an external medical provider

to provide advice and assistance as required, but thinks the extent of this requirement needs clarification. South African Airways expresses similar concerns as Qantas and notes that the NPRM is not clear regarding what comprises medical attention within the meaning of the proposal. South African Airways states that while its in-flight crewmembers have basic first-aid capabilities, the carrier relies on consultations with remote medical-care contractors and other passengers with medical training to provide good-Samaritan assistance. South African explains that it sees no practical way to ensure medical attention during tarmac delays that exceeds this basic assistance. The National Airlines Council of Canada (NACC) states that many airlines are not in a position to provide adequate medical attention as airlines are not medical organizations and in-flight staff in not medical staff. As such, it believes that such assistance is up to local authorities to provide.

Among consumer groups and individual commenters, the AAPR urges the Department to require the tarmac delay contingency plans of U.S. and foreign air carriers contain minimum guidelines for accommodating passengers with disabilities. The New York State Consumer Protection Board states that foreign carriers should be required to adopt a plan that provides for passengers to receive the same basic necessities that U.S. carriers are required to provide, *i.e.,* adequate food and water, operable lavatories, and medical attention if needed. By and large, individual commenters also support the Department imposing identical requirements for foreign and U.S. carriers. Of those that commented on Regulation Room, they generally support the Department requiring airlines to provide working bathrooms, water, beverages, snacks and, in some cases, meals on delayed flights. A few commenters also mention the need for adequate temperature control and the ability to walk around an aircraft during a delay in order to stretch and use the restroom.

*DOT Response:* The Department continues to believe that passengers stuck on an aircraft during lengthy tarmac delays deserve to be provided some type of food, potable water, operable lavatories, and if necessary, medical care. It appears from the comments that most carriers already have procedures to provide food and water during long tarmac delays, and ensure that their lavatory facilities are operable while the aircraft remains on the tarmac. The concern expressed by South African Airways about storage

space for extra catering items seems to be based on a misconception that extensive supplies are needed. There also appears to be confusion as to what the Department means by the term "adequate food." The Department would consider snack foods such as granola bars that carriers typically provide on flights to suffice as "adequate" food. Carriers are, of course, free to provide more complete meals to passengers if they so wish. We note that the requirement to provide food and water within two hours would not apply if the pilot-in-command determines that safety or security precludes such service, so the commencement of a meal service should not lead to further delays or missed opportunities for departure as feared by at least one commenter. As for the requirement to provide medical care if necessary, the Department's expectation is that carriers would have the capabilities to provide basic first aid assistance on the aircraft and would seek further medical assistance as necessary for any onboard emergency, including disembarking the passenger for treatment if needed with the assistance of airport emergency personnel.

### D. Coordination With Covered Airports

*The NPRM:* In the initial rulemaking to enhance airline passenger protections, we required U.S. carriers to have contingency plans for tarmac delays to large-hub and medium-hub airports, as well as diversion airports that the carrier serves or utilizes. In the NPRM for the current proceeding, we proposed to extend this requirement to small hub and non-hub airports and to require all covered carriers (U.S. and foreign) to coordinate their plans with each covered U.S. airport that they serve or utilize for diversions. In making this proposal, the Department noted its belief that the same issues and discomfort to passengers during an extended tarmac delay are likely to occur regardless of airport size or layout. We also noted our strong belief that it is essential that airlines involve airports in developing their plans in order to enable them to effectively meet the needs of passengers. We invited comment on whether it was workable to require covered carriers coordinate with small hub and non-hub airports to which they regularly operate scheduled passenger or public charter service. We also asked if the rule should be expanded to include other commercial U.S. airports (*i.e.,* those with less than 10,000 annual enplanements). Finally, we specifically solicited comments from airlines, airports and other industry entities on whether there are any special

operational concerns affecting such airports.

*Comments:* Of the U.S. carriers and carrier association commenters, ATA supports expanding the number of airports where carriers must coordinate plans to include small hub and non-hub airports. The Regional Airline Association (RAA) opposes extending the rule to small-hub and non-hub airports because it believes there is no evidence that doing so is necessary or beneficial and believes that the cost to expand tarmac delay contingency plans to smaller airports outweighs the benefits, as requiring regional and other carriers serving small airports to coordinate plans with all such airports would require significant resources.

In general, non-U.S. carrier and carrier association commenters object to the proposal as unnecessary and note that they have limited presence or service at these smaller airports. Air France and KLM specifically oppose this provision. On the other hand, Alitalia supports the idea of coordination, but believes the proposal is extremely burdensome. Singapore Airlines supports coordinating contingency plans with airports to handle diverted flights, but states that the plans should focus on customer care such as swiftly disembarking passengers, returning baggage, accommodating passengers if necessary in hotels or on alternate flights, and ensuring that passengers continue their journey. Monarch Air disagrees and states that coordination with airports is not necessary, as it would let the airport determine what is best for the customer.

Of the travel agent interests that commented, ASTA supports expanding contingency plan coordination obligations to include small hub and non-hub airports. TUI Travel states that coordinating contingency plans is not necessary, as the airport can determine what is in the best interest of the airline customer and notes restrictions on gate availability that may be determined on the day of arrival, so pre-coordination will reduce operational flexibility.

Of the airport and airport industry commenters, Dallas/Fort Worth Airport supports requiring carriers to coordinate their contingency plans with all airports that they serve and notes that important airport factors such as terminal capacity, equipment, and government services are taken into account during such coordination. ACI also supports the need for airlines to coordinate with airports of all sizes and states that it is committed to supporting airline development of contingency plans with accurate and relevant information about the airports the carriers serve.

Of the consumer and consumer group commenters, CTA supports the expansion of the tarmac-delay rules to smaller airports. AAPR and Flyersrights.org fully support increasing the number of covered airports to include small hub and non-hub airports. NBTA also supports these provisions. The New York State Consumer Protection Board supports expanding the rule to all airports, as do many Regulation Room commenters, some of whom state that airlines and airports should be required to work together to develop and implement tarmac delay contingency plans.

*DOT Response:* The Department is adopting the requirement that covered carriers, both U.S. and foreign, include small hub and non-hub airports in their tarmac delay contingency plans and ensure that the plan has been coordinated with airport authorities at those airports. We continue to maintain that the same issues and discomfort to passengers during an extended tarmac delay are likely to occur regardless of airport size or layout. Similar to the expansion of the scope of the requirement to adopt contingency plans to include foreign carriers, this requirement will protect a greater number of passengers at more airports.

We are not convinced by commenters' concerns that requiring carriers to coordinate their plans with small hub and non-hub airports will have a significant financial impact on carriers. U.S. carriers are already required to coordinate plans with large-hub and medium-hub airports and should be able to tailor existing plans to apply to these smaller airports. We recognize that the requirement to coordinate contingency plans with airports is a new requirement for foreign carriers, but expect that it will not be overly burdensome for foreign carriers as the large-hub and medium-hub airports are familiar with the coordination process after having worked with the U.S. carriers on tarmac delay contingency plans this past year. The need for such coordination was recently highlighted by the events at JFK airport following the December 26, 2010 blizzard. Also, during the past two years significant amount of work has been done through a project funded by the Federal Aviation Administration (FAA) to produce a best-practice guidance document for developing coordinated contingency plans for tarmac delays at small hub and non-hub airports.

The benefit of airlines coordinating with airports on contingency plans becomes particularly clear when there are flight diversions. In situations where flights must be diverted from their

intended destination airports, it is imperative that airlines and the airports that regularly serve as their diversion airports have already discussed things such as locations within the airport where passengers are allowed to wait when TSA or CBP personnel are not present and the availability of equipment to deplane/bus passengers to the terminal to minimize the hardship to travelers. It is essential that airlines involve airports in developing their plans to enable them to effectively meet the needs of passengers. The rule on coordination with airports is also being clarified to ensure that at airports, like JFK, where operations such as snow removal and gate use are managed by entities other than the airport authority (e.g., a carrier, a consortium of carriers, or a contractor), carriers covered by this rule must also coordinate with these terminal operators.

E. Coordination With CBP and TSA

*The NPRM:* As recommended by the Tarmac Delay Task Force,[1] we proposed to require carriers to include TSA in their coordination efforts for any large, medium, small, and non-hub U.S. airports, including U.S. diversion airports which they regularly use. We also proposed to require carriers to coordinate with CBP for any U.S. airport that the carrier regularly uses for its international flights, including diversion airports. We proposed these measures as it had come to the Department's attention on more than one occasion that passengers on international flights were held on diverted aircraft for extended periods of time because there were reportedly no means to process these passengers and allow them access to terminal facilities. At that time, the U.S. Department of Homeland Security (TSA and CBP are part of DHS) had advised this Department that, subject to coordination with CBP regional directors, passengers on diverted international flights may be permitted into closed/sterile terminal areas without CBP screening. In the NPRM, we invited interested persons to comment on this proposal and asked what costs and benefits would result from imposing this requirement.

*Comments:* Of the U.S. carriers and carrier associations that commented, ATA states that carriers already coordinate with TSA and CBP and will continue to do so but stresses that interagency coordination between CBP and TSA as well as coordination between the airports and CBP/TSA is needed in order to get diverted passengers who so desire off airplanes. USA3000 suggests that airports may not be properly staffed by CBP during irregular operations and urges DOT to review this issue with CBP and local airports.

The non-U.S. carrier and carrier association commenters object in general to the proposal as unnecessary. IACA notes that tarmac delays of more than three hours are very rare and believes the NPRM imposes a disproportionate burden on airlines to coordinate plans not only with airports, but with federal agencies. IATA supports the need for the United States government to be more responsive to the needs of airline passenger who arrive at airports where TSA and CBP personnel are not normally stationed or are not present during off hours, but think it is the responsibility of those agencies to work together to put systems in place. The comments of the Association of European Airlines (AEA) and many foreign airlines' are similar to or support IATA, while NACA adds that DOT should work with CBP and other government agencies on a memorandum of understanding to address issues regarding extended tarmac delays. The National Airlines Council of Canada (NACC) adds that carriers have limited influence over TSA and CBP, so obligations should be on the U.S. government to ensure these agencies have their own contingency plans in place. The Arab Air Carrier Association (AACA) states that coordinating contingency plans with diversion airports as well as TSA and CBP will be very costly and suggests, along with other commenters, that CBP and TSA should design their own contingency plans for any airport that receives international flights.

Some foreign carriers assert that this proposal is flawed because TSA and CBP can provide only limited assistance at some airports due to limited after-hours federal inspection capabilities or limited federal personnel available at the smaller airports. Carriers also ask how they can ensure that passengers will remain in one area of the airport or that a sterile area will be available for containing such passengers. British Airways supports the proposal that passengers on diverted international flights be permitted into closed terminal areas without CBP screening and notes, as do some other foreign carriers, that these carriers generally do not have a presence at diversion airports. As such, British Airways and other carriers assert that CBP and the airport operator should be responsible to ensure that passengers can disembark the aircraft. Cathay Pacific adds that the burden to coordinate plans should be on all the stakeholders, while Malaysia Airlines does not support coordinating delay contingency plans with CBP and TSA, but thinks those agencies should design their own plans. Cathay Pacific notes that not all airports can handle aircraft carrying 300+ passengers and states that airports not suitable for deplaning international passengers should fall outside the scope of the proposed rules.

Of the travel agents and other industry group commenters, ASTA supports extending the rule to include coordination with CBP and TSA. NBTA expresses concern that costs associated with requiring coordination with TSA and CBP may outweigh the benefits and may be passed on to the business traveler. As such, NBTA thinks DOT should develop a clearer picture of cost-benefits before implementing this provision. TUI believes that it is not necessary to coordinate plans with TSA or CBP, and is concerned that this would add another layer of planning.

Of the consumer and consumer group commenters, CTA supports rules being promulgated by CBP and TSA that will allow passengers on inbound international flights forced to land at a diversion airport to be processed, as does the AAPR, Flyersrights.org and the Consumers Union. Dallas/Fort Worth Airport supports requiring carriers to coordinate plans with CBP and TSA and states that plans should be in place to deal with the process of handling international passengers and allowing them access to terminal facilities at small and medium size airports with no CBP services. ACI applauds DOT for proposing to expand coordination to TSA and CBP.

*DOT Response:* After considering all the comments, the Department is adopting the requirement that carriers coordinate plans with CBP and TSA at large, medium, small, and non-hub airports that they regularly serve, including at diversion airports they plan to utilize. Because tarmac delays are a particular problem in situations where flights must be diverted from their intended destination airports, this rule requires carriers to coordinate their plans with airports that serve as diversion airports for such operations. As recommended by the Tarmac Delay Task Force, it is also important for carriers to include in their coordination efforts appropriate government authorities such as Customs and Border Protection and the Transportation

---

[1] In January 2008, the Department established a Tarmac Delay Task Force to coordinate and develop contingency plans to deal with lengthy delays. The Task Force comprising of individuals who represented airlines, airports and consumer groups issued a report that set forth guidelines for airlines, airports, and other stakeholders to use when dealing with long ground delays.

Security Administration, when appropriate.

In adopting this requirement, we note that more than one incident of concern to the Department has occurred at a diversion airport where passengers could not deplane the aircraft due at least in part to security concerns or issues with processing international passengers. It is important to ensure that there is a contingency plan in place in order to address the objective of deplaning passengers in those situations. The Department is actively working with TSA and CBP to develop policies and procedures in order to assist carriers with coordinating their plans and complying with this regulation. We would consider an airline to have complied with the requirement to coordinate its plan with CBP and TSA if the carrier submits its plan to CBP's Regional Director and TSA's Federal Security Director for that airport and considers any issues raised in response to those agencies.

F. Passenger Notification

*The NPRM:* In the NPRM we proposed to require that U.S. and foreign air carriers update passengers every 30 minutes during a tarmac delay regarding the status of their flight and the reasons for the tarmac delay. We also proposed that carriers announce that passengers have the opportunity to deplane the aircraft when the flight is delayed and the doors are open. In proposing these requirements, the Department gave consideration to passengers' frustration with lack of communication by carrier personnel about the reasons a flight is experiencing a long tarmac delay. We noted that it did not seem unreasonable or unduly burdensome to require carriers to address this issue and verbally inform passengers as to the flight's operational status on a regular basis during a lengthy tarmac delay. We did not anticipate that a carrier's flight crews will know every nuance of the reason for the delay, but we noted our expectation that they inform passengers of the reasons of which they are aware and make reasonable attempts to acquire information about the reasons for that delay.

We also invited comment on whether carriers should be required to announce that passengers may deplane from an aircraft that is at the gate or other disembarkation area with a door open. The Department's Office of Aviation Enforcement and Proceedings had previously explained that a tarmac delay begins when passengers no longer have an option to get off an aircraft, which usually occurs when the doors of the aircraft are closed, and has

encouraged carriers to announce to passengers on flights that remain at the gate with the doors open for lengthy periods that the passengers are allowed off the aircraft if that is the case. However, we noted that such an announcement is not explicitly required in the existing rule. Consequently, we sought comment on the benefit to consumers of mandating such announcements and asked commenters, including carriers and carrier associations, to address any costs and/ or operational concerns related to implementing a rule requiring such announcements.

*Comments:* Non-U.S. carrier and carrier association comments generally object to the proposal to update passengers every 30 minutes during a tarmac delay regarding the status of their flight and the reasons for the tarmac delay, characterizing it as unnecessary. IACA states that notifying passengers every 30 minutes as to reason for a tarmac delay is unnecessary overregulation. Some foreign carriers, such as Air France and KLM note that requiring announcements every 30 minutes will have unintended consequences and state that keeping passengers informed is already important to carriers and a regulation is not needed. Other carriers, such as Qantas and JetStar, agree that notifying passengers every 30 minutes is reasonable, but state that too much detail may lead to false expectations on the part of the passengers. AACA expresses concern about the broad language regarding the format of communication and when a carrier should be aware of information to provide to the passenger, and the ability of airlines to prove they have relayed information to the passenger. NACC does not support updates every 30 minutes as this could result in relaying incomplete or inaccurate information to the passengers.

U.S. carriers and carrier association commenters generally agree that it would be beneficial for passengers to be updated frequently on flight status changes when there is a tarmac delay but expressed concern that carriers are not always updated by FAA on a timely basis. Of the travel agents and other industry group commenters, ASTA supports the provision for carriers to make tarmac delay announcements every 30 minutes. However, TUI Travel does not believe DOT should be overly prescriptive or detail the circumstances or time intervals upon which updates on delays should be given, but agrees that information needs to be given and updated at regular intervals.

Consumers and consumer group commenters support a requirement to provide updates every 30 minutes. More specifically, AAPR and Flyersrights.org fully support requiring carriers to communicate with passengers during delays. Of the airport industry commenters, the AAAE agrees that essential communication with passengers is necessary. The New York State Consumer Protection Board adds that communication with passengers during a delay is important because failure to update the flight's status adds to the frustration caused by the situation. As such, it strongly supports the proposal that air carriers update passengers every 30 minutes during a delay.

We received various differing comments on whether carriers should be required to announce that passengers may deplane from an aircraft that is at the gate or other disembarkation area with the door open. Spirit Airlines opposes DOT requiring carriers to permit passenger to leave an aircraft that remains at the gate for a delay of less than three hours but notes that its practice is to permit deplaning after two hours. It states that deplaning could create operational problems and raise costs and notes that the window of time to enplane may be small, passengers may be hard to locate and re-boarding will be time consuming and delay departure. Spirit believes that the airline can exercise the best judgment regarding whether passenger should be allowed to deplane.

IATA also does not support the proposal to announce that passengers may deplane from an aircraft with the door open and states that the option to deplane raises a number of issues (*e.g.* removing baggage if a passenger doesn't travel, DHS personal data accountability issues, passenger manifest issues, length of time to deplane and enplane large aircraft, short windows for departure). Comments of AEA and foreign airlines' comments are similar to IATA's. Many foreign carriers object to the proposal to notify passengers that they can deplane due to various operational concerns similar to those posited by IATA and other foreign carrier associations. ALTA raises additional concerns with safety issues, and questions who will have control over passengers that temporarily deplane and miss flights. Air France and KLM also state that a carrier should be given the option to make the announcement that passengers can deplane depending on the specific circumstances. Air Tahiti asks for clarification on whether there is a minimum duration an air carrier must wait for passenger to re-enplane the

aircraft and whether deplaned passengers' baggage must be deplaned.

CTA states carriers should be required to communicate with passengers on a regular basis and agrees that carriers should inform passengers during delays while the aircraft is at a loading bridge with its doors open that they may deplane at any time, to stretch their legs, to be rebooked on another flight or to cancel their flight and get a refund. NBTA also supports this provision.

*DOT Response:* After considering the comments received, the Department has decided to require that carriers notify passengers every 30 minutes about the status of a tarmac delay, including the reasons for the delay if known. In implementing this requirement, we note that we expect the carrier to make reasonable attempts to acquire information about the status of the delay and to provide this information to consumers. A carrier would not be held responsible for failing to provide a status that was not known to it so long as the carrier made reasonable efforts to find out the status.

We have also decided to require U.S. and foreign air carriers to notify passengers that they can deplane from an aircraft that is at the gate or another disembarkation area with the door open, if that is the case. The purpose of this requirement is to address problems that have arisen since the first tarmac delay rule has been in effect where U.S. carriers have asserted that the three hour clock should not yet be running but where passengers did not know that the door to the aircraft was open and that they had the option to get off of the aircraft, particularly on a departure delay at the gate or on large aircraft. We are not requiring carriers to provide passengers the opportunity to deplane in less than three hours but simply to inform them that the opportunity to deplane exists, if it does. Of course, in situations where an aircraft is at the gate with the door open and passengers are not allowed off the aircraft, the tarmac delay begins at the point when passengers are no longer permitted to deplane and not when the doors of the aircraft are shut.

As for commenters' concerns with reconciling passenger manifests and dealing with the checked baggage of passengers who choose to deplane, we are not requiring airlines to re-board a passenger who chooses to deplane and therefore misses a flight, or to remove the checked baggage of a passenger that has deplaned. DHS/TSA also doesn't require that passenger's checked baggage be removed if the passenger is no longer on that flight. We encourage airlines to announce to passengers that

they are deplaning at their own risk and that the flight could depart at any time without them if this is the case.

### G. Code-Share Flights

*The NPRM:* We sought comment on whether, in the case of a code-share flight, we should expand coverage of the requirement to adopt tarmac delay contingency plans so that the obligation to adopt such a plan and adhere to its terms is not only the responsibility of the operating carrier but also the carrier under whose code the service is marketed, if different.

*Comments:* Of the U.S. carrier and carrier association commenters, ATA states that the operating carrier has sole operating authority and is in sole control of how a passenger is treated, so it is unreasonable to also hold the marketing carrier accountable, especially if the contingency plans differ or are in conflict. The U.S. carriers that commented on this issue concur with ATA. RAA disagrees and states that, if DOT insists that operating carriers adopt contingency plans, it should place primary responsibility for adoption and compliance with the plan on the marketing carrier. RAA asserts that carriers that hold out, sell and ticket passengers should have sole responsibility to the Department and that liability of the operating carrier should be determined by its contract with the marketing carrier.

Of the non-U.S. carrier and carrier association commenters, IATA believes that only the operating carrier should be responsible for the terms of the contingency plan. AEA and ALTA, among others, concur with IATA. Of the foreign carriers that commented, most believe that only operating carriers should be responsible in a code-share situation based on their assertion that the operating carrier has responsibility for how the passengers are treated. Some commenters also note that the marketing carrier might not operate its own aircraft to all of the airports served by its code-share partners and thus would not have a relationship with those airport authorities. Others, such as Air Tahiti and Swiss International, note that the proposed regulations fail to consider the intricacies of the code-share relationship and suggest that there may be issues with collusion and antitrust concerns in some jurisdictions.

We received few comments from travel agents and other travel industry commenters on this issue. ASTA believes that code-share partners should be responsible for harmonizing their consumer protection processes so consumers don't worry about which carrier does the marketing, ticketing or

flying. Among the consumer and consumer group comments, CTA states that given the expansion of code-shares and with the antitrust immunity granted to airline alliances, there should be no difference between flights operated by U.S. or foreign carriers. AAPR supports expanding coverage of the requirement to adopt tarmac delay contingency plans to the carrier under whose code the service is marketed if different than the operating carrier.

*DOT Response:* After considering all the comments, the Department has decided to require that the tarmac delay contingency plan of the carrier under whose code the service is marketed governs if different from the plan of the operating carrier, unless the marketing carrier specifies in its contract of carriage that the operating carrier's plan governs. In adopting this rule, we have considered the comments stating that the operating carrier should be responsible for following the terms of a plan, as it is in the best position to address passenger concerns in the event of a tarmac delay. However, on balance, we have concluded that the expectation of the types of services a passenger will be provided is based on the information given to him or her by the marketing carrier, as this is the carrier that held out, sold, and ticketed passengers for the flight. It is reasonable for a consumer to expect the marketing carrier's tarmac delay contingency plan to apply unless the marketing carrier specifies in its contract of carriage that the operating carrier's tarmac delay plan governs. Irrespective of whether the marketing carrier's or operating carrier's contingency plan governs in a particular situation, we intend to hold both the marketing carrier and the operating carrier (*i.e.,* the carrier that sold the passenger a ticket under its name as well as the carrier that operates the aircraft in which that passenger travels) legally responsible. We encourage code-share partners to the extent possible to align their tarmac delay contingency plans. In situations where there are multiple marketing carriers on a single flight and the marketing carriers have not specified in their contracts of carriage that the operating carrier's plan governs, it becomes even more critical that the carriers' plans are aligned. If not, several different contingency plans may apply to passengers on the same flight.

### H. Retention of Records

*The NPRM:* As is the case for U.S. carriers under the existing rule, the NPRM proposed to require foreign carriers to retain for two years the following information on any tarmac

delay that lasts at least three hours: the length of the delay, the specific cause of the delay, and the steps taken to minimize hardships for passengers (including providing food and water, maintaining lavatories, and providing medical assistance); whether the flight ultimately took off (in the case of a departure delay or diversion) or returned to the gate; and an explanation for any tarmac delay that exceeded three hours, including why the aircraft did not return to the gate by the three-hour mark.

*Comments:* We received few comments on this issue. Of the carriers and carrier associations that did comment, they expressed concerns that this provision would be burdensome and time consuming.

*DOT Response:* The requirement to retain tarmac delay records already applies to U.S. carriers. We are extending it here to foreign carriers operating passenger service to and from the U.S. on at least one aircraft with a passenger capacity of 30 or more seats. The tarmac delay information that the Department is requiring foreign airlines to retain is not available to it through other means. This information will help the Department obtain a more complete picture about lengthy tarmac delays and ensure carrier compliance with the tarmac delay requirements. The Department also believes that the requirement to retain tarmac delay data would not be burdensome for carriers, since we believe most carriers would as a matter of good business practice, obtain this information for their own purposes and, in any event, there are relatively few tarmac delays of more than three hours. In addition, the Department is not prescribing the manner in which this information must be kept and there is no requirement that a carrier submit the information to the Department unless specifically requested to do so, all of which should reduce any costs associated with this requirement.

## 2. Tarmac Delay Data

*The NPRM:* The proposed rule would require any U.S. or foreign carrier that operates passenger service (charter or scheduled) to, from or within the U.S. using any aircraft with a passenger capacity of 30 or more seats to submit monthly to the Department a set of data regarding tarmac delays of three hours or more at a U.S. airport to the extent that the carrier doesn't already provide such data to the Department. If a covered carrier has no flight with 3-hour tarmac delays, the proposed rule would require the carrier to submit a negative report, *i.e.,* a report stating there are no

3-hour tarmac times. The report would be due within 15 days after the end of each month being reported.

Reporting carriers (carriers that account for at least one percent of domestic scheduled passenger revenue which in calendar year 2009 consisted of the 16 largest U.S. carriers by scheduled passenger revenue plus two carriers that voluntarily file under Part 234) already file with the Department on-time flight performance data which includes all the data fields proposed to be reported here and more for their domestic scheduled flights pursuant to 14 CFR part 234. In recognition of this fact, the NPRM proposed that these U.S. carriers file tarmac delay data only for other types of transportation covered by the proposed rule, *i.e.,* their charter and international flights. The NPRM proposed to require other U.S. carriers and foreign carriers to provide data on tarmac delays that occurred at a U.S. airport and lasted for three hours or more for any of their flights—scheduled and charter flights as well as domestic and international flights. We sought comments on whether we should limit the tarmac delay reporting requirement to U.S. and foreign air carriers that operate large aircraft, *i.e.,* aircraft originally designed to have a maximum passenger capacity of 60 seats or more.

*Comments:* Individual consumers or consumer groups who submitted comments on this proposal unanimously support this proposal. Consumers Union states that it supports expanding the pool of reporting carriers to all U.S. and foreign carriers that operate any aircraft with 30 or more seats. It maintains that such a requirement is particularly important because it will reach many airline passengers who are currently not protected by these policies. One individual commenter states that equal treatment for all carriers is necessary to ensure competitive equality. Consumers Union also supports requiring Part 234 reporting carriers to provide tarmac delay data for public charter and international flights.

The Association for Airline Passenger Rights points out that the Department is attentive to the potential burden to small carriers and has narrowed the data fields it proposed to be reported for tarmac delays from the comprehensive on-time reporting scheme that exists. One commenter adds that most carriers already collect some of the data required under this proposal so it should not be overly burdensome for carriers to comply with the requirements. Several commenters from the Regulation Room state that technology development makes compliance relatively easy.

A few consumers and consumer organization commenters believe that the Department should go further in this respect. FlyersRights.org suggests that, in addition to filing reports under this Part and complying with the record retention requirement in Part 259, the Department should require carriers to submit a comprehensive written report within 14 days of the occurrence of any lengthy tarmac delay. One individual commenter asserts that data should be reported for tarmac delays of one hour or more to reflect a better picture of the tarmac delay problem.

Among U.S. carriers and carrier associations that commented on this proposal, ATA states that it generally supports expanding the reporting carrier pool. RAA, on the other hand, argues that all carriers that are not required to report tarmac delay data under Part 234 should be exempted from this reporting requirement. RAA reasons that the new reporting requirements are not necessary because most carriers, including carriers not covered under Part 234, are already required to retain tarmac delay data for two years. Thus, according to RAA, the Department may request such information for policy-making purpose whenever necessary. Additionally, RAA contends that the Department failed to provide a quantifiable cost/benefit analysis in the NPRM to justify such a requirement. NACA expresses its uncertainty regarding the purpose of requiring smaller carriers (which it defines as those that operate fewer than 25 aircraft) to report tarmac delay data. As a compromise, NACA suggests that carriers should be required to file tarmac delay reports under any rule only if during any given month the occurrences of tarmac delays have exceeded a certain threshold, *e.g.,* more than 10 incidents.

Comments provided by foreign carriers and carrier associations generally oppose this proposal or request that the reporting obligation be limited. Several commenters contend that the Department has not provided justification as to how the proposed data collection from foreign carriers would address the causes of tarmac delays and benefit consumers. Some commenters take the position that requiring foreign carriers to report tarmac delay data is not necessary because international flights operate less frequently than domestic flights and tarmac delay incidents for international flights are rare. Thus, according to these commenters, the cost for carriers to set up a reporting infrastructure outweighs the benefit. Furthermore, they believe it is inappropriate to require smaller

carriers to submit and retain tarmac delay data due to their lesser administrative resources and the small segment of the market these carriers serve. A number of commenters state that tarmac delays usually occur as the result of airport infrastructure problems. Therefore, these commenters believe that the Department should require airports to report this data. Likewise, some carriers argue that the data collected from this proposal is readily available from FAA's Air Traffic Control System Command Center. A few commenters note that the burden on foreign carriers is increased if the Department maintains the proposal that negative reports must be filed when no reportable tarmac delay has occurred during a month.

Qantas and JetStar Airways state that they would not oppose a rule if it imposed the reporting responsibility on operating carriers instead of the marketing code-share partners and limited the reporting fields to the identification of aircraft, airport, relevant times, and a brief explanation for the tarmac delay. They also request that easy methods of report submission should be permitted, such as email submission.

Virgin Atlantic raises the concern that publishing reported data may be misleading to consumers who tend to judge a carrier's performance based on raw tarmac delay records, and overlook the causes for such delay, which could be factors that are not under carrier's control. Lufthansa also requests that any publication of the tarmac delay data by the Department should also include the cause of the delay. National Airlines Council of Canada further states that such misjudgments will cause undue commercial damage to Canadian carriers that face the most challenging weather conditions, which could contribute to more tarmac delays.

Monarch Airlines and TUI Travel contend that foreign charter carriers that operate roundtrip flights to limited U.S. destinations should be exempted from the reporting requirements. In addition to consumers and industry commenters, NBTA and ACI–NA both provided comments in support of the Department's proposal.

*DOT Response:* After thoroughly considering all the comments received, the Department continues to believe that the proposed data collection requirement is crucial to obtaining a more complete picture of the tarmac delays at U.S. airports. Without such data, we do not have adequate statistical foundations to support a determination regarding whether lengthy tarmac delays are or will be a significant

problem for consumers on international flights or charter flights. We reiterate that the causes of lengthy tarmac delays are comprehensive and there is not a universal solution that would cure all problems at all airports. We continue to believe that a more complete picture of lengthy tarmac delays is the first step to obtaining a baseline that the Department can use to analyze the issue by carrier, by region/airport, by month, or by the type of flight, as appropriate.

We note that several recent tarmac delays that attracted significant public attention were international arrivals. Tarmac delays involving international flights, although rare, tend to be particularly lengthy and complicated. In that regard, we reiterate that collecting tarmac delay information for international flights is important. The data that we are seeking to obtain here are not available to us through other means. Commenters are mistaken when they assert that the FAA has this information readily available. Furthermore, the publication of the tarmac delay data would increase public awareness of the issue, providing incentives for airline management to focus on addressing tarmac delay problems.

With respect to whether the costs for foreign carriers to set up the reporting infrastructure justifies the benefits obtained from such reports in light of the relatively less frequent occurrence of tarmac delay incidents on international flights, we note that none of the commenters opposing extension of the reporting requirement to foreign carriers has provided any cost/benefit analysis in support of their position. We understand that most data contained in the reporting fields under this proposal are already collected by the carriers internally. BTS already has a system in place to accept reports electronically. Reporting to the BTS would incur a one-time IT infrastructure setup cost and minimal maintenance expenditure. We do not expect these costs to be significant.

We have also considered some commenters' suggestion that we should not require a negative report to be filed when no reportable tarmac delay occurred during a given month. Based on data submitted by the reporting carriers, during the past six months the total number of tarmac delay incidents that lasted for two hours or more at U.S. airports was less than 0.1% of the total domestic scheduled passenger flights operated by those carriers for each month. We agree that these data indicate that international flights that experience reportable tarmac delays will only represent a fraction of the total number

of flights. As such, the vast majority of carriers filing reports if the rule is adopted as proposed would be filing a negative report for most months. Although negative reports are an effective enforcement tool for ensuring accurate reporting of tarmac delay, we have decided not to require negative reports to be filed, in order to further reduce the carriers' burden in complying with this rule.

With respect to some foreign carriers' suggestion that for code-share arrangements we should require the marketing carrier rather than the operating carrier to file the report, we are of the opinion that it is up to the code-share partners to designate who has the responsibility to file the report. Based on each carrier's resources and ability, it may be more convenient for a foreign carrier to use its U.S. code-share partner to file the reports, but the Department will not dictate which carrier has the reporting responsibility and will hold both marketing and operating carriers legally responsible if data for a reportable tarmac delay are not timely or accurately filed.

Regarding some foreign carriers' comments on roundtrip charter services between foreign points and U.S. destinations, we agree that as long as these flights carry only passengers that originate at a foreign point and do not pick up any U.S.- originating passengers, tarmac delays on those flights will have minimal impact on U.S. consumers. Moreover, the Department is not applying its requirement for carriers to adopt contingency plans for lengthy tarmac delays to such operations. Therefore, we have decided that this reporting requirement should not apply to such flights.

We have also considered some carriers' concern that publishing tarmac delay information may lead the public to compare carriers' performance quality based on the raw data, while carriers may not be at fault for all tarmac delay incidents. We are not convinced that this will create overall false perceptions. The public is generally well informed about the causes contributing to a lengthy tarmac delay, not only through Departmental reports and press releases, but also through supplemental resources such as the media and the Internet. This information will normally enable the public to look beyond the net number of tarmac delays by each carrier. Moreover, carriers are always free to provide the public information about the cause of their tarmac delays, so long as that information is correct and not misleading.

To address the suggestion of some consumer commenters that we should require carriers to report tarmac delays of less than three hours, we note that the three-hour standard is consistent with the current tarmac delay contingency plan regulations and have reached the conclusion that this threshold represents the proper balance between the reporting burden placed on carriers and the benefits to the public. In addition, we do not believe it is necessary to mandate that a detailed explanation for each tarmac delay be filed with the tarmac delay report. Such detailed explanation is of little use to BTS, which is a data collecting and analysis agency. If the Department believes that a particular tarmac delay warrants further investigation, its Aviation Enforcement Office will request information from the carrier, which the carrier is required to retain for tarmac delays of more than 3 hours.

Finally, we would like to provide further clarification regarding the reporting duties for carriers that are currently filing Part 234 Airline Service Quality Performance Reports. According to BTS Technical Directive #20, issued on November 5, 2010, and effective on January 1, 2011, there are 15 U.S. carriers whose domestic scheduled passenger revenues meet the threshold for mandatory filing of Part 234 reports. These carriers are identified as Part 234 "reporting air carriers." The carriers on this list may change from time to time due to carriers' revenue fluctuation and corporate restructuring, and BTS updates the list annually. In addition to the 15 reporting air carriers, Express Jet will submit on-time data under Part 234 in 2011 as a "volunteer air carrier." Although Part 234 only requires data for domestic scheduled passenger flights to and from a large hub U.S. airport, all reporting carriers, including the volunteer air carriers, are currently filing data for all domestic scheduled flights to and from all U.S. airports, including medium, small, and non-hub airports. As long as they continue to do so, they are only required to file tarmac delay data for international and charter flights to a U.S. airport under the new reporting regulation, 14 CFR part 244. However, if any Part 234 reporting carrier decides to report only the minimum required data under Part 234, *i.e.,* on-time performance data for domestic scheduled flights to and from large hub U.S. airports, it must report any tarmac delay of three hours or more for domestic scheduled flights to and from a medium, small, or non-hub U.S. airport under Part 244. The same rationale applies to any volunteer air

carriers under Part 234. If a volunteer air carrier ceases to file any or all reports under 234, it must file tarmac delay data for reportable flights under Part 244. As we have explained in the NPRM, the purpose of Part 244 is to fill in the tarmac delay data gap that is not covered by Part 234. In that regard, no carrier is required to file both Part 234 and Part 244 reports for the same flight.

*3. Customer Service Plans*

A. Entities Covered

*The NPRM:* The NPRM proposed to increase the protections afforded consumers in the first Enhancing Airline Passenger Protections rule by requiring foreign air carriers to adopt, follow, and audit customer service plans, as covered U.S. carriers have been required to do since April 2010. We proposed to cover foreign air carriers operating scheduled passenger service to and from the U.S. that use any aircraft designed to have a passenger capacity of 30 or more. We noted that the rule would apply to all flights to and from the U.S. of those carriers, including flights involving aircraft with fewer than 30 seats, if a carrier operates any aircraft with 30 or more passenger seats to and from the U.S. We asked interested persons to comment on whether the proposed requirement for foreign air carriers to adopt, follow and audit customer service plans should be narrowed in any fashion. (*e.g.,* should never apply to aircraft with fewer than 30 seats).

*Comments:* Of the foreign-carrier industry commenters, the majority expressed their strong belief that the customer service plans requirement should not be extended to foreign carriers. IACA states that DOT's regulatory proposals ignore the fact that airlines have designed customer service in a way to attract their customer and asserts that these provisions intervene in the airline's business and service practices. IATA strongly opposes any customer service requirements being imposed on foreign carriers unless those requirements are harmonized with the regulations of other jurisdictions. IACA and IATA also assert that the proposals are extraterritorial in that they would apply to all flights to and from the U.S. and could be interpreted in such a way that these obligations would also cover sales generated outside the U.S. AACO, AEA and ALTA concur with IATA.

Of the foreign air carrier commenters, LAN Airlines (LAN Ecuador, LAN Peru, LAN Argentina), Emirates, and SAS, among others, oppose DOT requiring them to adopt customer service provisions. Swiss International

contends that the application of customer service plans to the conduct of foreign carriers on foreign soil or in foreign airspace poses several issues under U.S. and international law related to extraterritorial application of U.S. regulations. TAP Portugal makes similar comments regarding extraterritorial concerns, as do, among others, Lufthansa and Austrian Airlines. Other carriers, such as British Airways, note that they are already subject to customer service provisions in their own countries (*e.g.* EU provisions) and, therefore, the Department's proposal is unnecessary and redundant, as well as potentially inconsistent with those countries' requirements. Singapore Airlines adds that competition is more effective than government mandates in improving customer service, and the Department does not need to be involved in customer service matters.

All Nippon states that the customer service provisions should apply only to sales made within the U.S. Qantas states that it is not necessary, practical or efficient to require foreign carriers to provide customers with additional or different customer service plans when carriers already have such provisions in place (*e.g.,* Qantas has a Customer Charter on its website) and states that any requirement should be limited to carriers that do not already have a customer service plan in place. JetStar essentially concurs with Qantas. JAL makes similar comments and notes that some of its standards are more stringent than the service requirements proposed and that foreign airlines compete on service and should determine their own service standards. JAL also expresses concern about the potential costs associated with this provision, characterizes it as an intrusive service regulation and states that it is not justified. VivaAerobus opposes the Department requiring small carriers to have a customer service plan. The Washington Aviation Assembly, representing 35 Embassies in the U.S., notes general issues with extraterritoriality, operational consequences for foreign airlines, and the potential economic burden for foreign airlines if they are required to comply with the customer service provisions.

As for U.S. airlines and associations, ATA expresses concern that DOT requiring foreign carriers to adopt a customer service plan could drive foreign governments to retaliate against U.S. carriers operating outside the U.S., which could create conflicting standards and unnecessarily drive additional costs. Among the travel agency interests that commented, ASTA

agrees that customer service plan rules and standards should apply equally to foreign air carriers, with no aircraft-size exceptions. ITSA supports in general the Department's efforts to provide passengers with the means to make better informed decisions and more informed choices in travel.

Commenters on "Regulation Room," who primarily identified themselves as air travelers, generally support DOT's proposal. However, some of those that commented oppose the regulation and fear the costs will be passed on to consumers. The consumer groups that commented on this issue generally supported the provision and note that passengers should have the ability to know that certain customer service standards will be defined and met regardless of the carrier that a passenger chooses to travel on. CTA notes that foreign carriers operating as members of any international airline alliance must be included in these rules. AAPR, Consumers Union and Flyersrights.org generally support the proposal to require foreign air carriers to adopt, follow, and audit customer service plans. NBTA supports extending customer service provisions to foreign carriers using aircraft with 30 or more passenger seats.

*DOT Response:* After fully considering the comments, we have decided to require foreign carriers that operate scheduled passenger service to and from the U.S. using any aircraft with 30 or more seats to adopt, follow and audit customer service plans. As noted previously, a substantial number of passengers travel to and from the U.S. on flights operated by foreign air carriers and the Department continues to believe that it is important to protect these passengers, as well as to be consistent with the application of our consumer protection rules to both U.S. and foreign carriers.

Foreign carriers' and others entities' concerns with extraterritoriality have persuaded us, however, that some clarifications are needed. First, we want to point out that out of the twelve customer service commitments in this final rule, the substance of two of them already applies to foreign air carriers under existing DOT rules, *i.e.,* 14 CFR part 250 concerning passengers who are "bumped" from flights that are oversold and 14 CFR part 382 which addresses air travel of passengers with disabilities. Prior to issuing those final rules, the Department addressed the issue of extraterritoriality and determined how best to apply each of these requirements to foreign air carriers. For instance, the Department determined not to apply its oversales rule to international flights

inbound to the United States and determined not to apply U.S. disability rules to a foreign carrier simply because a foreign carrier's flight between two foreign points carried passengers under a code-sharing arrangement with a U.S. carrier. The manner in which we are applying these existing requirements to foreign air carriers through the customer service commitments is not new and is not an extraterritorial extension of U.S. jurisdiction.

We note also that several of the other customer service commitments are merely reinforcing new requirements imposed elsewhere in this final rule, *i.e.,* 14 CFR 259.8 which addresses notification of delays and cancellations, 14 CFR 259.4 which addresses lengthy tarmac delays, and 14 CFR 259.7 which addresses responding to consumer complaints. Concerns with extraterritoriality are specifically addressed in those sections of this preamble that deal with those issues. In this final rule, for example, we explain in the tarmac delay section that the requirement to adopt and follow a tarmac delay contingency plan applies only to tarmac delay events that occur at a covered U.S. airport. Likewise, we clarify in the section on known delays, cancellations and diversions that the requirement to notify consumers of flight irregularities on a carrier's website and via the carrier's telephone reservation system applies to a foreign carrier only if the carrier markets to U.S. consumers. We also make clear that the requirement to make this information available in the boarding gate areas applies only to boarding gate areas at a U.S. airport. We believe that these types of clarifications address the foreign carriers' main objections, which are the application of the customer service plan to sales made outside the U.S. and to the conduct of foreign carriers on foreign soil.

We have made similar changes to other customer service commitments that involve foreign carriers' websites and reservation centers to ensure that we are not applying U.S. rules to a foreign carrier when that carrier does not market its services to the U.S. For example, the customer service commitment to disclose, among other things, cancellation policies and frequent flyer rules on the selling carrier's website and upon request from the selling carrier's telephone reservations staff or the commitment to disclose the availability of the lowest fare on a carrier's website or through its reservation center will apply to a foreign carrier only if it markets its services to U.S. consumers. We are also making changes to the customer service

commitments related to services to be provided generally or services to be provided at the ticket counter and boarding gate area to specify that such action is required only at U.S. airports.

Finally, we want to clarify that for purposes of this section, except as otherwise provided in individual customer service provisions in this section, a "flight" that a foreign carrier operates to and from the U.S. means a continuous journey in the same aircraft or with one flight number that begins or ends at a U.S. airport. For example, if a carrier were to operate flight 100, a direct flight from San Francisco to Singapore with a stop in Hong Kong, the customer service plan applies to both segments of this flight with respect to U.S.-originating passengers. It would not apply to any Hong Kong originating passengers who board the aircraft there and go to Singapore. On the reverse routing, the plan would apply to passengers who board in Singapore or Hong Kong and travel to the U.S.; it would not apply to passengers boarding in Singapore whose destination is Hong Kong. Temporarily deplaning at the intermediate stop on a direct flight (Hong Kong in the above example) does not break the journey for purposes of the applicability of the customer service plan requirements for passengers who re-board and continue on that same flight operation. If an international passenger whose journey originates or terminates in the U.S. makes a connection to a flight with a different flight number, the carrier's customer service plan applies only to the direct flight to or from the U.S. In the case of change of gauge, all flight segments with the same flight number that begin or end in the U.S. are covered by the Customer Service Plan even if passengers must change aircraft due to a change of gauge.

As for the comments concerning the cost involved in adopting customer service plans, we note that a number of carriers state that they already have customer service plans or similar plans in place and that these plans contain provisions similar or more stringent than those the Department is requiring them to adopt, or that their governments have similar requirements. To the extent provisions in existing plans are more stringent than the minimum standards set in this rule, carriers are encouraged to continue to apply these more stringent provisions. To the extent provisions in existing plans vary from our requirements, even if they are similar to them, it does not seem overly burdensome for a carrier to amend those plans with respect to flights to and from the U.S. to comply with this rule. Also, while we understand that some foreign

countries have rules requiring customer service standards in air carriage, we are not aware, nor are we convinced based on the comments received, that any of those rules or standards conflict with the requirements of this provision in a manner that would prevent a carrier from complying with both requirements.

## B. Content of Customer Service Plan

*The NPRM:* In the NPRM, we noted that under the final rule published on December 30, 2009, U.S. carriers are required to adopt customer service plans for their scheduled flights that address, at a minimum, the following service areas: (1) Offering the lowest fare available; (2) notifying consumers of known delays, cancellations, and diversions; (3) delivering baggage on time; (4) allowing reservations to be held or cancelled without penalty for a defined amount of time; (5) providing prompt ticket refunds; (6) properly accommodating disabled and special-needs passengers, including during tarmac delays; (7) meeting customers' essential needs during lengthy on-board delays; (8) handling "bumped" passengers in the case of oversales with fairness and consistency; (9) disclosing travel itinerary, cancellation policies, frequent flyer rules, and aircraft configuration; (10) ensuring good customer service from code-share partners; (11) ensuring responsiveness to customer complaints; and (12) identifying the services they provide to mitigate passenger inconveniences resulting from flight cancellations and misconnections. We proposed to extend the requirement to address these twelve subjects in the customer service plan to foreign air carriers and requested comment on whether any of these subjects would be inappropriate if applied to a foreign carrier.

The NPRM also proposed to require that U.S. and foreign carriers' customer service plans meet minimum standards to ensure that the plans are specific and enforceable. The minimum standards that we proposed are as follows: (1) Offering the lowest fare available on the carrier's website, at the ticket counter, or when a customer calls the carrier's reservation center to inquire about a fare or to make a reservation; (2) notifying consumers in the boarding gate area, on board aircraft, and via a carrier's telephone reservation system and its website of known delays, cancellations, and diversions; (3) delivering baggage on time, including making every reasonable effort to return mishandled baggage within twenty-four hours and compensating passengers for reasonable expenses that result due to delay in delivery; (4) allowing reservations to be

held at the quoted fare without payment, or cancelled without penalty, for at least twenty-four hours after the reservation is made; (5) where ticket refunds are due, providing prompt refunds for credit card purchases as required by 14 CFR 374.3 and 12 CFR part 226, and for cash and check purchases within 20 days after receiving a complete refund request; (6) properly accommodating passengers with disabilities as required by 14 CFR part 382 and other special-needs passengers as set forth in the carrier's policies and procedures, including during lengthy tarmac delays; (7) meeting customers' essential needs during lengthy tarmac delays as required by 14 CFR 259.4 and as provided for in each covered carrier's contingency plan; (8) handling "bumped" passengers with fairness and consistency in the case of oversales as required by 14 CFR part 250 and as described in each carrier's policies and procedures for determining boarding priority; (9) disclosing cancellation policies, frequent flyer rules, aircraft configuration, and lavatory availability on the selling carrier's website, and upon request, from the selling carrier's telephone reservations staff; (10) notifying consumers in a timely manner of changes in their travel itineraries; (11) ensuring good customer service from code-share partners operating a flight, including making reasonable efforts to ensure that its code-share partner(s) have comparable customer service plans or provide comparable customer service levels, or have adopted the identified carrier's customer service plan; (12) ensuring responsiveness to customer complaints as required by 14 CFR 259.7; and (13) identifying the services it provides to mitigate passenger inconveniences resulting from flight cancellations and misconnections.

In addition, we invited comment on whether the minimum standards for any of the subjects contained in the customer service plans should be modified or enhanced in some way. With regard to delivering baggage on time, we solicited comment on whether we should also include as standards (1) that carriers reimburse passengers the fee charged to transport a bag if that bag is lost or not timely delivered, as well as (2) the time when a bag should be considered not to have been timely delivered (*e.g.,* delivered on the same or earlier flight than the passenger, delivered within 2 hours of the passenger's arrival). With regard to providing prompt refunds, we sought comment on whether we should also include as a standard that carriers refund ticketed passengers, including

those with non-refundable tickets, for flights that are canceled or significantly delayed if the passenger chooses not to travel as a result of the travel disruption. In addition, we requested comment on whether it is necessary to include as a standard the requirement that when a flight is cancelled carriers must refund not only the ticket price but also any fees for optional services that were charged to a passenger for that flight (*e.g.,* baggage fees, "service charges" for use of frequent flyer miles when the flight is canceled by the carrier). With respect to notifying passengers on board aircraft of delays, we sought comment on how often updates should be provided and whether we should require that passengers be advised when they may deplane from aircraft during lengthy tarmac delays.

Finally, we requested comment as to whether it is workable to set minimum standards for any of the subjects contained in the customer service plans and invited those that oppose the notion of the Department setting minimum standards for customer service plans as unduly burdensome to provide evidence of the costs that they anticipate. We also sought comment on whether the Department should require airlines to address any other subject in their customer service plans. We specifically asked if mandatory disclosure to passengers and other interested parties of past delays or cancellations of particular flights before ticket purchase should be a new subject area covered in customer service plans.

*Comments:* U.S. carriers and carrier associations are generally opposed to the Department setting minimum standards for the customer service plans, particularly if the Department requires that the plans be incorporated into the carriers' contracts of carriage. ATA notes that, although U.S. carriers are already required under the current regulation to address each of the proposed customer service plan topics, the current regulation does not mandate minimum requirements and allows carriers to set their own standards for their customer service plans based on their own particular circumstances. ATA asserts that for the Department to set the minimum standards for carriers' plans would face a major change to existing carrier policies in areas where U.S. carriers currently compete and could dampen innovation, harm competition and reduce the flying public's options. Many U.S. carriers concur with ATA.

RAA is opposed not only to the establishment of minimum standards but also to any continued requirement for its members to adopt customer

service plans. RAA explains that most regional carriers do not offer fares, take reservations, ticket passengers, receive payment from passengers, provide refunds to passengers, or have their own frequent flyer rules or cancellation policies. RAA maintains that the subjects to be addressed in the customer service plan would be inappropriate if applied to an airline that does not hold out, market, sell tickets for its operations and asks that the customer service requirements apply only to carriers that hold out, market, sell and ticket air transportation.

Most foreign carriers and carrier associations expressed strong opposition both to the requirement to have a customer service plan and for that plan to meet minimum standards set by the Department. A number of foreign carriers such as Air Berlin and associations such as IATA and IACA raised the issue of extraterritoriality and argued that the Department was overreaching as the customer service requirements could be interpreted in such a way as to cover sales generated outside the U.S. and to cover the conduct of foreign carriers on foreign soil or in foreign airspace. There were also assertions that the Department's regulatory proposals ignore the fact that airlines have designed their customer service initiatives in a way to attract customers and the fact that carrier customer service plan provisions are a way for carriers to differentiate their services. South African Airways contends that prescriptive regulations should not take the place of competitive forces, especially when there is no evidence of market failure. Virgin Atlantic, while agreeing that defining a baseline standard is acceptable, states that forcing all carriers to be the same denies them the right to compete commercially and does not allow carriers to innovate.

Others raised the existence of customer service requirements imposed by other entities as a reason for the Department not to issue a rule in this area. For instance, Air France and KLM state that the customer service proposals should not be finalized as to EU carriers where they are inconsistent with or more stringent than EU regulations. Still other foreign carriers raised concerns that some of the minimum service levels are impracticable for a carrier to meet (for example, if a carrier sells a number of tickets via a travel agent and the passenger contact information is not passed on then the carrier may not have that passenger's contact information in order to advise them of a change in itinerary). Some carriers also expressed concerns that certain provisions may be

outside of a carrier's control (*e.g.*, "good customer service" from a code-share partner).

Travel agent organizations such as ASTA and consumer groups such as AAPR, Flyersrights.org, NBTA, and CTA all support requiring carriers to adopt customer service plans and for those plans to meet the minimum standards as proposed in the NPRM. Most individual commenters also support these DOT proposals, but a few oppose the regulation as burdensome and fear the costs will be passed on to consumers. Many "Regulation Room" commenters want the Department to go further in setting minimum standards and prohibiting certain practices.

The Department received a number of comments on some of the minimum standards proposed to be included in the customer service plans as well as some of the questions we posed on modifying or enhancing these standards and we address those issues more fully below.

1. Offering the Lowest Fare Available

Many foreign air carrier associations, including AACO and NACC, contend that requiring carriers to offer the lowest fare on the carrier's website, at the ticket counter, or when a customer calls the carrier's reservation center to inquire about a fare or make a reservation would interfere in airline business practices. ALTA seeks clarification on the meaning of "offering the lowest fare available" and asserts that a "one size fits all" fare will prejudice passengers by increasing fares and limiting competition.

Among the foreign air carriers that commented, Cathay Pacific states it can only publish the fare at the time a request is made, as fares are driven by complex inventory and fare managing systems and a fare guarantee cannot be made. JetStar basically concurs and states that the proposal fails to take account of legitimate distribution and pricing practices. Qantas strongly opposes this requirement on the basis that it fails to take into account the numerous possible options and fare constructions that may be applicable to a consumer, and there may be a false perception that a carrier is not quoting the best price when the lowest priced inventory sells out. It is also concerned that carriers will not be able to enforce the proposed requirement against ticket agents and should not be responsible for ticket agent actions. British Airways states that it offers the lowest fare that meets customers' needs and its website allows consumers to find the lowest fare. Similarly, JAL states that it already offers the lowest fare on its website, at

the ticket counter and via telephone reservations as appropriate. Singapore Airlines states that, if this requirement is adopted, the Department should confirm that this provision is intended to conform with ATA's Customers First initiative and should make it clear that the airline does not have to offer to a customer shopping via one point-of-sale the lowest fare available in any channel.

Of the U.S. carriers that commented, Spirit Airlines (Spirit) opposes a requirement that all fares available on its website should be made available through its telephone reservation service. Should DOT impose such a standard, it must be limited to a carrier's generally available fares and not apply to special sales fares because many of these lower fares cannot be purchased over higher-cost channels.

2. Allowing Reservations To Be Held at the Quoted Fare

A number of foreign carriers and carrier industry groups also expressed serious concerns with the proposal to allow reservations to be held at the quoted fare without payment, or cancelled without penalty, for at least twenty-four hours after the reservation is made and thought this provision may lead to inconsistent sales policies. For example, Air New Zealand strongly opposes this provision because it takes inventory off the market for the duration of the refund period, blocking it from sale to other customers and risking that the seat may not be sold again. The carrier points out that passengers have the option to buy refundable fares, and choosing whether to allow a passenger to hold a reservation without payment is a commercial decision. Air France and KLM oppose this proposal primarily for the reasons stated above, as does Qatar Airways. Alitalia opposes this proposal and thinks the airline should be the party that establishes commercial terms and conditions with its customers. Singapore Airlines states that it is not set up to permit reservation holds and reprogramming the system to do so is costly. It also notes that this proposal interferes with the free market and deprives other passengers of the lowest fare, as well as compromises an airline's ability to adjust to overnight currency fluctuations. British Airways notes that its current selling systems do not allow for reservations to be held without penalty, but passengers that book via call centers have a "24 hour cooling off" period. It also states that consumers that visit BA.com have several opportunities to review exactly what they are booking and to confirm knowledge of details prior to booking.

ATA strongly objects to a CSP proposal that would require a carrier to hold a reservation "at the quoted fare" for 24 hours for the following reasons: it eliminates the carrier's ability to sell these seats to another willing buyer; the DOT has not demonstrated a market failure that merits this action; a consumer could hold a reservation during the last 24 hours and then cancel, resulting in a seat that will never be sold; and this requirement would effectively prevent re-pricing, which ordinarily happens multiple times a day.

Of the U.S. carriers that commented, US Airways does not support adoption of a 24-hour standard as a rigid rule. The carrier suggests that DOT allow airlines flexibility to restrict refunds in certain situations in order to assure that the largest number of potential passengers have access to seats. Spirit states this proposal is an effort to impose on all airlines a practice that was common prior to deregulation. As a low cost carrier, it states that almost all low-fare carriers require payments at time of booking to guarantee the fare and that making tickets non-refundable is a practice that is critical to its ability to keep fares low. Should a consumer choose to, he or she can buy refundable tickets at a higher price. The carrier states that travel agents that book via global distribution systems (GDS) can hold a reservation (space only) for 24 hours without penalty and Spirit offers a 24 hour courtesy refund for bookings made via GDS, but no other provision for refunds via travel agents can be accomplished due to limited GDS functions. In order to comply with this provision, Spirit states that it would have to substantially change its business model and incur large IT cost.

Hawaiian Airlines (Hawaiian) notes that it has "on-demand" or "walk-up" flights that run on a high frequency basis. As proposed, this provision would put the carrier in the position of turning inventory over to passengers who will make several reservations for a flight (within a 24 hour time period) but will pay for only one of the reservations, even though Hawaiian must retain a seat for them on each flight. It notes the rule could result in forcing Hawaiian to oversell flights to protect against the loss of seats and revenue. The carrier suggests the proposal be modified to allow customers to hold seats for 24 hours up until 72 hours before the departure of the flight. Similar to Hawaiian, JetBlue suggest that the proposal be modified and that the "24 hour rule" apply not later than 120 hours prior to departure for carriers that have a no oversales

policy. JetBlue explains that it does not oversell seats on its flights and it is the company's policy not to issue refunds to passengers that cancel their reservations (in return for a guaranteed seat on the flight). It notes that the proposal would allow customers to hold a reservation without making a financial commitment and could cause lower load factors, which would threaten JetBlue's business model. ASTA supports the 24 hour "reservation hold" rule applying to travel agent bookings.

3. Refunding the Ticket Price for Flights That Are Canceled or Significantly Delayed

In discussing a commitment to provide prompt refunds, we asked for comments on whether we should require carriers to refund the ticket price for flights that are canceled or significantly delayed if the passenger chooses not to travel as a result of the travel disruption. ATA opposes including as a standard in the customer service plan a requirement that carriers automatically provide ticketed passengers holding non-refundable tickets a refund for flights that are canceled or significantly delayed. ATA notes that the regulatory effort to redefine restricted tickets as fully refundable even when cancellation is desirable due to impending weather or government order would impose obligations not present in any other mode of transportation. ATA adds that in most cases passengers on a cancelled flight are accommodated soon after the originally scheduled flight. In addition, ATA provides the following reasons for its opposition:

○ The cause of the delay could be out of the carrier's control;

○ Carriers often allow free rebooking for significant delays or cancellation;

○ This is a marketplace issue;

○ Imposing mandatory refunds when a passenger chooses not to fly would convert all tickets in cancel or delay situations to fully refundable tickets;

○ Passengers have a choice of what type of ticket to buy; and

○ The DOT is not authorized to interfere in the marketplace in this manner.

Of the foreign carriers and carrier associations that commented, AACO asserts that this provision intrudes in business practices and raises a risk that carriers cannot resell the seat post-cancellation. NACC is also concerned about this proposal. Malaysia Airlines strongly opposes this proposal because delays are often beyond airlines' control and carriers already make efforts to mitigate their impact. Similarly, Qantas

states that cancellations may also be out of the carrier's control.

Lufthansa and Austrian state that, if imposed, the final rule should allow carriers to accommodate passengers in ways other than refunding the fare. JetStar contends that it is unfair to place the entire burden of costs of unforeseen delays and cancellations on the carriers and states that mandatory refunds may result in the operation of delayed flights empty or at a net loss. The carrier also believes that it is not unfair or deceptive for consumers to share some of the risk in return for lower priced non-refundable tickets, provided fare rules are disclosed prior to purchase. VivaAerobus states that it is a no frills ultra low-fare carrier that only sells non refundable tickets and its policy is disclosed on its website so customers can comparatively shop prior to purchase. The carrier asserts that it never overbooks flights and contends that it cannot give refunds.

Of the U.S. carriers that commented, US Airways notes that many of its tickets are fully refundable and consumers that purchase non-refundable tickets are clearly informed of the risk. While the carrier supports the Department's efforts in the NPRM to enhance disclosure, it does not think DOT should restrict options available to passengers or competition among carriers by requiring refunds of non-refundable tickets. Spirit Air opposes requiring carriers to make refunds to passengers who choose to purchase non-refundable tickets but decide not to fly because of a flight cancellation or significant delay. Rather, Spirit gives passengers the option of re-accommodation or a voucher or refund, or a passenger can purchase travel insurance.

Of the consumers and consumer organizations that commented on this issue, Flyersrights.org thinks tickets should be refunded if the flight is cancelled or significantly delayed for reasons within the airline's control. However, it is concerned about passengers who don't receive refunds of taxes and fees collected by the government for services passengers do not receive due to cancelled reservations. Some "Regulation Room" commenters favor airlines providing full refunds as well as reimbursement for hotel rooms and meals if there is a significant flight delay.

With regard to defining a "significant delay" for purposes of ticket refunds, ATA opposes any definition of "significant" delay that would create a single government standard and eliminate a carrier's latitude to create its own policies on non-refundable tickets

that serve customer and commercial needs. It reiterates that the application of non-refundable tickets and carrier policies to re-accommodate passengers during an event beyond the carrier's control is best left to the marketplace in a deregulated industry, which will leave customers with more options. Of the foreign carriers that commented on defining a "significant delay," Cathay Pacific states the Department should take into account the length of delay, length of the flight and the circumstances. The longer the flight, then the greater the tolerance should be for the delay. TAP Portugal makes a similar comment and states that the definition should depend on the duration of the flight. It also notes that long-haul flights can make up for delays while in the air. Some commenters on "Regulation Room" suggest that any delay over three hours is "significant," while others note they are willing to let the Department define the term.

### 4. Refunding Fees for Optional Services for Flights That Are Canceled

In discussing prompt refunds, we specifically asked for comments on whether we should require, as part of any refund due a consumer, a refund of any optional fees charged a passenger in connection with the flight in question. ATA opposes including as a standard in the customer service plan that when a flight is cancelled carriers must refund not only the ticket price but also any fees for optional services that were charged to a passenger for that flight. ATA states that its members object to the Department's concept that cancellation in itself should create a right to the refund of optional fees. It urges the Department to clarify that a carrier has the opportunity to accommodate a passenger with other transportation options after a cancellation, instead of automatically refunding a ticket and ancillary fees. ATA also asks the Department to clarify that the proposed customer service plan requirement to provide prompt refunds "where ticket refunds are due" is meant to include only those situations where the passenger is unable to fly due to the carrier's decision to cancel. US Airways supports refunding fees for optional services for flights that are canceled, but only in cases where the services in question are not ultimately provided (*e.g.* baggage fees, seating fees). It asks the Department to clarify that if the services are provided, refunds are not mandated. Among the foreign carriers and carrier associations that commented, AACO states that fees should not be reimbursed for the ticket and ancillary services that have been

provided. Malaysia Airlines also states that this proposal should not require refunds of fees for services already delivered. ASTA thinks mandated refunds should include "optional fees" paid by a passenger.

### 5. Delivering Baggage on Time, Compensating Passengers for Expenses Due To Delay in Delivery of Baggage and Refunding Baggage Fees

Of the foreign air carriers and industry groups that commented, AACO states that the Department needs to define what "on time" delivery of baggage means and opposes any requirement that airlines bear the sole responsibility for areas of business that other parties have control over (*e.g.* bags may be handled by airport or TSA). Air Berlin notes that international baggage compensation is already governed by the Montreal Convention. South African Airways states that the proposal does not address Montreal or Warsaw and asks DOT to confirm that the rule does not apply where either Convention controls. Singapore Airlines offers similar comments. Air France and KLM state that the NPRM does not take into account vast differences between long-haul international flights and domestic U.S./transborder flights, and as such, returning bags within 24 hours may be impossible due to limited frequencies to a specific destination, absence of local services, and/or a passenger with a multi-stop and multi-country itinerary.

Among the U.S. industry groups and air carriers, US Airways believes that, before advancing new proposals in this area, DOT should articulate any additional facts warranting action beyond steps that the Department has already taken. It asserts that it is neither possible nor desirable to set a uniform maximum time for delivery of delayed bags or to impose remedies for failure to make delivery within a time frame because there are too many variables involved, and asks that the Department seek more input from stakeholders involved. Spirit Airlines notes that Part 254 already requires airlines to compensate passengers and airlines have incentives to locate and return bags. It also states that "every reasonable effort" to return bags is a vague standard, and points out that there is no evidence that the current rules are inadequate or passengers are being treated unfairly or with deception.

ATA notes that its members oppose including as a standard in the customer service plan that carriers reimburse passengers the fee charged to transport a bag if that bag is lost or not timely delivered. ATA states that bag fees are a competitive issue and whether a

carrier chooses to refund a fee in all instances is a matter the marketplace should determine. Spirit also opposes such a requirement although it notes that its policy is to refund fees when there is a delay in delivery. Flyersright.org states that fees should be refunded if the bag is not delivered on the same flight or an earlier one.

### 6. Notifying Passengers of Past Delays and Cancellations Prior to Ticket Purchase

We already require the reporting carriers (*i.e.,* largest U.S. carriers) to provide delay and cancellation information on their websites and upon request provide consumers on-time performance information during oral reservations. We asked for comment on whether all carriers required to have a customer service plan should be required to disclose past delays and cancellations of flights to consumers before the latter purchase a ticket. Many carriers oppose having a customer service commitment on disclosure to passengers of past delays or cancellations of particular flights before ticket purchase and do not see the need for it. They assert that past performance is not necessarily indicative of future performance. Swiss International also states that, if imposed, the requirement to disclose past delay and cancellation information should not apply to reservations agents via telephone because foreign carriers utilize call centers that often work with multiple carriers and the proposal is not feasible. Cathay Pacific does not support mandatory disclosure of past delays and cancellations before ticket purchase for international flights that have limited operations, but notes that for domestic services operated more frequently there may be value. ATA members oppose additional information notices regarding past flight delays or cancellations before purchase of a ticket, as the Department has recently adopted new flight information requirements and in accordance with those rules, the public will have access to information on flight delays, cancellations, and flights 30 minutes late more than 50% of the time before purchase on the largest U.S. carriers' websites. Of the U.S. carrier commenters, US Airways notes, similar to ATA, that this information is available on the carrier's website and that is sufficient to provide consumers with information. It also asserts that historic data is unreliable, the current rule is new and more time is needed to see how effective it is prior to initiating new rules, and DOT already decided further disclosures were not required.

7. Other Customer Service Provisions

With regard to the customer service requirement to notify consumers of itinerary changes in a timely manner, British Airways expressed support for this provision, but thinks it should be limited to passengers for which the carrier has reliable contact information. In situations where a passenger books his/her ticket through a travel agent, British Airways states that the travel agent and not the carrier should be held responsible for notifying the passenger of any itinerary changes. With respect to disclosing aircraft configuration, among other things, to consumers on the selling carrier's website and upon request from the selling carrier's telephone reservations staff, Singapore Airlines contends that there is no reason for its telephone reservations staff to provide this information as its customers can find this information on the carrier's website. With regard to responding to consumer complaints, Air Berlin is concerned that as drafted the proposed definition would obligate a carrier to react to complaints from non-passengers.

As for the requirement to ensure "good customer service" from code-share partners, a number of carriers and carrier associations expressed concerns with the definition of "ensuring good customer service" as it relates to code-share partners and claim that they cannot be held responsible for code-share partners' actions. More specifically, NACC contends that the provision to have "comparable service plans" could be an extraterritorial application of law if applied to more than flight segments to or from a U.S. airport. It states that the requirement to have comparable service is too prescriptive and is an unwarranted interference in commercial relationships, and may discourage such arrangements, leading to less flexibility and network connectivity. NACC also expresses concerns that aligning customer service plans with code-share partners may raise anti-trust issues. JetStar does not support requiring code-share participants to adopt each other's customer service plans or align their service levels and states that this is an issue of competition best left to the marketplace. It also notes that the marketing carrier has the primary relationship with the consumer. US Airways states that DOT should not adopt rules that marketing carriers are responsible for violations by operating carriers and says that marketing carriers cannot control the application of uniform standards of all operating carriers with which they work.

*DOT Response:* Having fully considered the comments, the Department has decided to adopt a final rule largely along the lines set forth in the NPRM, with some clarifications to address comments received about extraterritorial application of U.S. law and the appropriateness of individual customer service commitments. In adopting this approach, we believe that our action strikes a proper balance between ensuring that the traveling public is provided an adequate level of service and is not subjected to unfair or deceptive practices, while ensuring the marketplace governs to the extent possible. We also view our approach as striking the proper balance between protecting consumers on nearly all flights to and from the United States by requiring not just U.S. carriers but also foreign carriers to adopt and adhere to customer service plans, while ensuring that these requirements do not involve an extraterritorial application of U.S. law by limiting their application to foreign carriers to flights to and from the U.S., sales made within the U.S., and to the conduct of foreign carriers on U.S. soil.

Under the final rule, foreign carriers are required to address the same subjects in their customer service plan as U.S. carriers. The final rule also establishes minimum standards for the customer service plans of both U.S. and foreign carriers. In making this decision, we note that carriers are already required to address a number of the subjects and comply with the minimum standards imposed for these subjects through existing requirements [*e.g.,* 14 CFR part 250, Part 254 (for U.S. carriers), and Part 382] or requirements imposed by other sections of this rule (*e.g.,* 14 CFR 259.4, 259.7, and 259.8). Additionally, based on the comments received, many carriers already address many of the requirements in the customer service plans and, in some cases, their customer service commitment is more stringent than those we are adopting. Consequently, we are not persuaded that it would be unduly burdensome for carriers to adopt and adhere to these standards.

Commenters have convinced us that it is not appropriate to require U.S. or foreign air carriers to include in their customer service plans a commitment to ensure good customer service from their code-share partners by making certain that code-share partners have comparable customer service plans or provide comparable customer service levels. We agree with commenters that the requirement for code-share partners to have comparable service may unnecessarily restrict the marketplace

and may unduly discourage code-sharing arrangements. We have also decided against requiring covered carriers to include in their customer service plans an assurance that they will notify consumers of past delays and cancellations. We are persuaded that the current availability of data about past delays and cancellations provided by the largest U.S. carriers on their websites as a result of action of our recent consumer rulemaking is sufficient and additional requirements in this area would not materially benefit consumers.

While, as noted above, the Department has decided to establish minimum standards for the customer service plans of both U.S. and foreign carriers, we are modifying or clarifying a few of these standards based on comments received. For example, we are clarifying, as requested by U.S. and foreign carriers and associations, that the requirement to compensate passengers for reasonable expenses that result due to delay in baggage delivery comports with 14 CFR part 254 for domestic transportation and applicable international agreements for international transportation. We are also adding as a standard that carriers must reimburse passengers for any fee charged to transport a bag if the bag is lost. We have decided against requiring carriers to reimburse passengers for any fee charged to transport a bag that is not timely delivered. Arguably, as is the case with transporting passengers themselves, while delay in receiving baggage may be inconvenient, once the carrier delivers a bag the service has been performed. Consumers may, of course, seek reimbursement for damages caused by delay in the delivery of their baggage by filing a claim with the airline or, if dissatisfied with the airline's resolution of the matter, with an appropriate civil court.

With regard to carriers' obligation to notify passengers of known delays, cancellations and diversions, we specify that the minimum standard required to comply with this obligation is met through compliance with a requirement imposed elsewhere in this final rule, *i.e.,* 14 CFR 259.8. Under section 259.8, we explain that the obligation to notify passengers of delays applies only to delays of 30 minutes or more and that the carrier has the obligation to inform passengers of such delays, cancellations and diversions within 30 minutes of the carrier becoming aware of a change in the status of a flight. We also explain that carriers must inform consumers of cancellations and delays of 30 minutes or more and diversions in the boarding gate area at U.S. airports, on board

aircraft, via a carrier's telephone reservation system and on its website, and through whatever means made available by the carrier for passengers who subscribe to the carrier's flight status notification services.

With respect to providing prompt refunds, we conclude that the obligation to provide such refunds applies not only to refunding the basic price of a ticket but also to refunding optional fees charged to a passenger for services that the passenger is unable to use due to an oversale situation or a flight cancellation. For example, if a passenger pays for premium economy seating, but his flight is canceled or oversold and that seating is not available on the flight that he/she has agreed to be re-routed on, then the carrier must promptly refund the passenger the fee paid for the premium seating. In adopting this requirement, the Department believes it is unfair for a carrier to refuse to provide a refund to a passenger of fees paid for services not provided through no fault of the passenger.

We continue to believe that there are circumstances in which passengers would be due a refund, including a refund of non-refundable tickets and optional fees associated with those tickets due to a significant flight delay. However, we have been persuaded by industry commenters that the Department should not adopt a strict standard of what constitutes a significant delay as such a delay is difficult to define. We agree with the contention of carriers and carrier associations that the definition of a significant delay depends on a wide variety of factors such as the length of the delay, length of the flight and the passenger's circumstances. The Department's Aviation Enforcement Office will continue to monitor how carriers apply their non-refundability provision in the event of a significant change in scheduled departure or arrival time, and will determine on a case by case basis based on the facts and circumstances of the delay whether a failure to provide a refund in response to such a delay is an unfair and deceptive practice.

We reject some carriers' and carrier associations' assertions that carriers are not required to refund a passenger's fare when a flight is cancelled if the carrier can accommodate the passenger with other transportation options after the cancellation. We find it to be manifestly unfair for a carrier to fail to provide the transportation contracted for and then to refuse to provide a refund if the passenger finds the offered rerouting unacceptable (*e.g.,* greatly delayed or otherwise inconvenient) and he or she

no longer wishes to travel. Since at least the time of an Industry Letter of July 15, 1996 (see *http://airconsumer.dot.gov/rules/guidance*) the Department's Aviation Enforcement Office has advised carriers that refusing to refund a non-refundable fare when a flight is canceled and the passenger wishes to cancel is a violation of 49 U.S.C. 41712 (unfair or deceptive practices) and would subject a carrier to enforcement action.

We also have determined to modify the standard regarding the availability of the lowest fare from what was proposed in the NPRM. In the NPRM, we proposed that a carrier offer the lowest fare available on the carrier's website, at the ticket counter, or when a customer calls the carrier's reservation center to inquire about a fare or to make a reservation. Having taken into consideration the comments received about how this requirement could unduly interfere with airline business models by requiring airlines offer to a consumer shopping via one point-of-sale the lowest fare available via any channel, we are modifying this provision to require carriers to disclose to consumers who contact the carrier through any of these mediums that a lower fare may be offered by the carrier through another channel (for example, the carrier must reveal via its telephone reservation service that a lower fare may be available on the carrier's website if that is the case). Of course, wherever the carrier offers its lowest fare, the carrier should not state that the lowest fare may be available elsewhere as such a statement would likely confuse consumers and could result in increased search time by consumers for a nonexistent lower fare. In sum, we are not requiring carrier personnel to offer the lowest fare available via whatever sales channel a consumer chooses to use, but to inform all of its customers and prospective customers that a lower fare may be available elsewhere in the carrier's systems in order to give the consumer the opportunity to locate a lower fare offered by that carrier.

We have also decided to modify the customer service proposal which would require carriers to allow reservations to be held at the quoted fare without payment, or cancelled without penalty, for at least twenty-four hours after the reservation is made. We agree with commenters who expressed concerns that allowing consumers to hold a seat without payment for twenty-four hours could result in loss of sales and revenue by carriers and prevent other passengers from purchasing the seat if the seat is not released in a timely manner prior to the flight. We find persuasive the

comments submitted by JetBlue and Hawaiian Airlines suggesting that a set point in time should exist after which carriers would no longer be required to hold a passenger's reservation in order to give the carrier a more realistic opportunity to sell that seat in the final days before the flight departs. Accordingly, we are modifying this provision to require carriers to hold the reservation for twenty-four hours only if a consumer makes the reservation one week (168 hours) or more prior to a flight's scheduled departure. After that time, a carrier is no longer required to hold a reservation without payment for any period of time. The Department believes that this modification strikes the right balance between a consumer's desire to make travel plans and shop for a fare that meets his or her needs, and the carrier's need for adequate time to sell seats on its flights.

As for the remaining seven customer service requirements, we received very few comments on them and we are adopting them as proposed in the NPRM. These seven customer service requirements pertain to accommodating passengers with disabilities, meeting customers' essential needs during lengthy tarmac delays, handling "bumped" passengers with fairness and consistency, disclosing cancellation policies, frequent flyer rules, aircraft configuration, and lavatory availability, notifying consumers of changes in their travel itineraries, ensuring responsiveness to customer complaints, and identifying the services the carrier provides to mitigate passenger inconveniences resulting from flight cancellations and misconnections. In adopting these customer service commitments as proposed, we note our disagreement with comments stating that the requirement for carriers to notify consumers of itinerary changes should be limited to passengers who book their tickets directly with the carrier and not apply to passengers who book their tickets through a travel agent. A passenger has a right to know and benefit from knowing about changes in his/her itinerary whether that person purchased the ticket directly from a carrier or from a travel agent. We also disagree with comments that the disclosure of aircraft configuration be limited to the selling carrier's website. While most consumers will have access to the Internet and be able to obtain this information from carriers' websites, we also see benefit in requiring that aircraft configuration information be made available upon request from the selling carrier's telephone reservations staff, particularly for those passengers who do

not have access to the Internet or are not familiar with how to use it. With regard to the concern expressed by a carrier that it may be required to respond to complaints from non-passengers, we want to point out that "complaint" is defined in section 259.7 as a specific written expression of dissatisfaction concerning a difficulty or problem which a person experienced when using or attempting to use an airline's services.

## C. Self-Auditing of Plan

*The NPRM:* The NPRM proposed that foreign air carriers audit their adherence to their customer service plan annually and make the results of their audits available for the Department's review upon request for two years following the audit completion date. U.S. carriers are already required to self-audit their plans and to make the audit results available for the Department's review upon request for two years.

*Comments:* Of the foreign carriers that commented, TAP Portugal opposes self-auditing and contends that it is too burdensome to audit a dozen service standards, some of which involve hundreds of activities performed on a daily basis. Similarly, British Airways opposes self-auditing customer service plans on the basis that the plans cover many services and involve different departments that are responsible for these services, and as such would necessitate coordination at significant additional costs. Qatar Airways states that global surveys regarding customer service standards already exist and audits specific to a limited number of international routes will not add value to consumers. Swiss International and Air Tahiti note that there is no guidance as to what a "self-audit" requires.

A business travel organization supports requiring audits and states that its travel managers can provide their clients better protection on flights to and from the U.S. if they have this information available. Of the consumer groups, Flyersrights.org supports requiring foreign air carriers to audit customer service plans and thinks failure to adopt a plan, adhere to it, and make audit results available should be considered an unfair and deceptive practice.

*DOT Response:* We have decided to adopt the self-auditing requirements as proposed in the NPRM. The final rule requires each carrier to audit its own adherence to its plan annually and to make the results of each audit available for the Department's review upon request for two years afterwards. The Department believes that a system for verifying compliance with the customer service plans is essential. As noted in the first rule to enhance airline passenger protections, we believe that requiring covered carriers to audit their plans annually will further ensure that carriers will live up to their commitments. It will also enable an airline to quickly take action if it learns that it is not in compliance with its customer service plans or if it is not effectively implementing its plan. A self-audit is essentially a system for the carrier to verify its compliance with its customer service plan. We are not requiring that such audits be conducted "at similar times in the year" or even that there be a single unified audit of all the subjects covered in the customer service plans, in order to allow each airline the flexibility to design an audit program that fits its particular operational environment.

## 4. Contracts of Carriage

*The NPRM:* This NPRM was the second time that the Department proposed requirements regarding incorporation of tarmac delay contingency plans and customer service plans into carriers' contracts of carriage. In December 2008, the Department published in the Federal Register an NPRM proposing to require U.S. carriers to incorporate their tarmac delay contingency plans and customer service plans in their contracts of carriage, and make their contracts of carriage available on their websites. In December 2009, the Department issued a final rule where it decided not to require such incorporation. Instead, the Department strongly encouraged carriers to voluntarily incorporate the terms of their contingency plans and customer service plans in their contracts of carriage and required the carriers to post their plans and their contracts of carriage on their website. At that time, the Department also indicated its intention to address this matter again through rulemaking.

In this proceeding, the Department again proposed to require carriers to include their tarmac delay contingency plans and customer service plans in their contracts of carriage, and for foreign air carriers that have a website to post their entire contract of carriage on their website in an easily accessible form. U.S. carriers are already required to post their contract of carriage on their website under the existing rule.

The Department again sought comment on whether incorporation of the contingency plans and customer service plans in the contract of carriage would give consumers notice of what might happen in the event of a long delay on the tarmac and of passengers' rights under carriers' customer service plans. As in the past, we asked commenters to address whether and to what extent requiring the incorporation of contingency plans in carriers' contracts of carriage might weaken existing plans: that is, would the requirement encourage carriers to exclude certain key terms from their plans in order to avoid compromising their flexibility to deal with circumstances that can be both complex and unpredictable.

*Comments:* RAA questions whether DOT has authority to impose a requirement for carriers to incorporate their tarmac delay contingency plans or customer service plans into their contracts of carriage. If the Department nevertheless adopts such a requirement, RAA states that it should not apply to regional carriers, as most regional passengers are subject to the ticketing carrier's contract of carriage.

ATA contends that the Department would be exceeding its regulatory authority if it were to require that the contingency plans and customer service plans be incorporated into carriers' contracts of carriage as a means of creating a private right of action. ATA asserts that Congress did not create a private right of action for violations of 49 U.S.C. 41712 and the Department cannot substitute a different enforcement process than the one Congress intended. ATA also states that the Department has failed to demonstrate how a carrier's failure to incorporate either its tarmac delay contingency plan or its customer service plan in its contract of carriage could be viewed as an unfair and deceptive practice under 49 U.S.C. 41712 . ATA points out that if the Department is interested in ensuring that passengers are more aware of their rights, then it should be sufficient that both the contingency plan and customer service plan are available on carrier websites.

U.S. carriers that commented generally support ATA. For example, US Airways, like ATA, states that there is no reason to require incorporation of the contingency plans or customer service plans as U.S. carriers already post these plans on their websites. US Airways speculates that only a small percentage of visitors to its website review the page containing the Contract of Carriage, suggesting that the inclusion of the plans in carriers' contracts of carriage would not increase passenger awareness of their rights. US Airways as well as other carriers are particularly concerned that this requirement would create a private right of action and subject airlines to a multitude of lawsuits in a variety of jurisdictions.

Similar to the U.S. carriers and carrier association, foreign carriers and carrier associations strongly oppose the proposed requirement to incorporate plans into carriers' contracts of carriage. IATA asserts that the DOT exceeds its authority in proposing this requirement and that it would substantially increase airlines' legal costs. IATA also states that international airlines cannot be expected to adopt multiple contracts of carriage for each territory into and out of which they fly and that contracts of carriage are contracts between a carrier and all of its passengers, not just those that fly into the U.S. AEA generally supports and agrees with IATA. IACA states that placing contingency and customer service plans in a contract of carriage will make the contracts unreadable, as they are already detailed and will result in too much information for the consumer. IACA also states, similar to IATA, that for many airlines U.S. flights make up only a small share of the total flights, so it is inappropriate to incorporate information that is valid only for U.S. flights. IACA also notes that EU regulations already require carriers to provide customers with details of their rights, so the proposal is superfluous and counterproductive. IACA suggests that foreign carriers be exempted from this requirement.

The foreign air carriers that commented generally support IATA. Many carriers note that rules already exist in their countries regarding customer service issues. For example, Virgin Atlantic notes that EC Reg 261/2004 already has passenger rights requirements covering delays and oversales. Others raised concerns about extraterritoriality. More specifically, JAL and TAP Portugal note concerns about the proposal as their Conditions of Carriage are reviewed and approved by their homeland regulator and any changes would need to be approved by those bodies. Qatar Airways states that there should be global harmonization of different government regulatory standards before such plans are incorporated in each carrier's Contract of Carriage. Various carriers also expressed fears about the litigation risks that would exist. South African Airways notes that mandating terms of an airline's contract of carriage may improperly create a private right of action for minor lapses in service. Air France speculates that in order to avoid legal risks carriers may weaken plans if incorporation into carrier's contract of carriage is required. Air France as well as many other carriers who object to the proposal assert, similar to IATA, that the Department does not have authority

to impose this requirement. In a similar fashion, Lufthansa strongly opposes the proposal and fully supports ATA's and IATA's comments, as do Alitalia, British Airways and various other foreign carriers.

While most foreign air carriers are opposed to including the plans in their contract of carriage, a number of them did support the idea of placing the contingency plans and customer service plans on their respective websites or state that they have already done so. For example, Air France and KLM agree that the plans could be placed on a website. Virgin Atlantic states that its Conditions of Carriage are based on IATA standards and are available on its website, as does Qatar Airways. In addition, Virgin Atlantic suggests that contingency plans and customer service plans be provided, where there is a specific situation, to an affected passenger. South African Airways makes similar comments.

Of the consumer groups that commented, CTA and AAPR generally support the proposal to include tarmac delay contingency plans and customer service plans in a carrier's contract of carriage, or in the alternative on their websites. CTA also states that code-share rules should be included in the contract of carriage. Flyersrights.org, and its individual members that filed comments, support the proposal that carriers place both the tarmac delay contingency plans and the customer service plans in their contracts of carriage. The organization warns, however, that requiring carriers to incorporate plans into their contracts of carriage may result in carriers excluding key terms from the plan so as to make the plans unenforceable and asks that the Department review and monitor the plans.

*DOT Response:* Having considered all the comments, the Department has decided not to adopt the proposal requiring U.S. and foreign carriers to include their contingency plans and customer service plans in their contracts of carriage. In making this decision, we note that some carriers have voluntarily put not only their customer service plans but also their tarmac delay contingency plans into their contracts of carriage since we issued the first rule to enhance airline passenger protections. We will continue to monitor whether other carriers choose to do so, as well as determine if we need to revisit this issue in the future should a problem exist.

Further, with regard to the need to incorporate customer service plans into the contract of carriage, the Department believes that our decision to set minimum standards for the provisions

in a carrier's customer service plan gives consumers more certainty as to the quality and types of services they can expect. In addition, these minimum standards may make it easier for a consumer to demonstrate to the Department's Aviation Enforcement Office that a carrier has violated the law when that carrier does not meet its standard of service commitment as the requirements of the customer service plans are more exacting than in the past. If the minimum standards are not met by a given carrier, the Department can determine if enforcement action is appropriate in a given situation.

Although we are not requiring tarmac delay contingency plans and customer service plans to be incorporated in contracts of carriage, the Department has decided to require foreign carriers to post their tarmac delay contingency plans, customer service plans and contracts of carriage on their websites. The December 2009 rule to enhance airline passenger protections already requires U.S. carriers to post these plans on their websites. The purpose of this requirement is to ensure that interested consumers can easily review an airline's contract of carriage, customer service plan, and/or tarmac delay contingency plan. By having the ability to review these documents, consumers can find out an airline's stated obligations to passengers and be better informed about their rights and a carrier's responsibilities before purchasing tickets and whenever problems occur (for example, the passenger's rights and carrier's responsibilities if an airline delays or cancels a flight or loses a bag). The Department believes that having the plans and contracts of carriage on websites will lead to a better informed consumer. The Department's Aviation Enforcement Office will periodically monitor carriers' websites to ensure that the required information is available.

## 5. Response to Consumer Problems

### A. Designated Advocates for Passengers' Interests

*The NPRM:* The NPRM proposed to require foreign air carriers that operate scheduled passenger service to and from the United States using any aircraft with 30 or more seats to designate an employee who will be responsible for monitoring the effects of flight delays, flight cancellations and lengthy tarmac delays on passengers. We proposed that this employee have input into decisions about which flights to cancel and which will be delayed the longest. U.S. carriers must comply with this requirement under the existing rules.

*Comments:* IATA, IACA, and AEA generally state that the proposal to designate an advocate for passenger interests intervenes too much in an airline's operation as airlines organize themselves differently to monitor operational issues and address customer concerns. Lufthansa opposes this proposal and comments that the decision to designate an employee to monitor the effects of irregular operations should be left to the discretion of each carrier. Similarly, Air Tahiti states that requiring dedicated staff to monitor delays improperly interferes with internal airline operations. JAL does not think it makes sense to designate an employee for a non-problem and asks for additional information and clarification regarding the employee's responsibilities. Swiss International states that this proposal is a substantial burden and believes that one individual may not be effective because each airport has its own issues, so splitting these tasks makes more sense and would result in better data. The carrier urges the Department to require each airport to designate an employee responsible for monitoring delays and coordinate with carriers to reduce delays. Air France and KLM oppose this requirement and explain that it has limited resources in the U.S. to fulfill any such new role and contends that this requirement would impose substantial costs on foreign carriers. Air France and KLM state that, if this proposal is implemented, the Department should permit foreign carriers to comply by having an off-site employee in a specific department who is accessible by a specific telephone number assist in such matters, and by providing this advocacy only in the principal language of the carrier's homeland (French for Air France, Dutch for KLM) and in English. Of the travel agent interests that commented, ASTA generally supports the proposal to have a designated employee, but does not believe the employee should have to be available in the U.S. as long as he or she is accessible. We received a few comments from consumers and consumer groups, all of whom generally support the proposals.

*DOT Response:* The final rule requires foreign air carriers operating scheduled passenger service to and from the U.S. using any aircraft with 30 or more passenger seats to designate an employee to monitor the effects of flight delays, flight cancellations, and lengthy tarmac delays on passengers and to have input into decisions on which flights to cancel and which will be delayed the longest. It applies to all of a covered

foreign carrier's scheduled flights to and from the United States, including those involving aircraft with fewer than 30 seats if a carrier operates any aircraft with 30 or more passenger seats to/from the U.S.

We are not persuaded by commenters that the Department is excessively intervening in an airline's operation by requiring an employee or employees be designated to monitor performance of flights and that these employees have input into decisions such as which flights are cancelled or subject to the longest delays. Additionally, we have taken note of foreign carriers' concerns regarding the potential lack of carrier personnel located in the United States or at specific airports where the carrier does not have a large presence. We are not requiring that the employees responsible for monitoring irregular flight operations be located at a U.S. airport. As has been permitted for covered U.S. carriers, foreign carriers can determine where its employees are located, as long as the designated employees can monitor flight delays and cancellations for the carriers' flights to and from the U.S. throughout the carriers' system and have input into decisions regarding how to best meet the needs of passengers affected by any irregular operations. This requirement is intended to ensure that passenger interests are considered by carriers when decisions on irregular flight operations are made. We are not requiring that the designated employees make themselves available to speak with airport personnel or passengers and certainly are not prescribing the language to be used by the designated airline employees. By adopting this performance standard, the Department leaves it up to each carrier to determine the most efficient and effective method to monitor the effects of flight delays and cancellations (for example, designating one or more individuals at its systems operations center). This rule does not require carriers to hire new employees to comply with this provision as these responsibilities may be borne by current employees in addition to their other responsibilities.

## B. Informing Consumers How To Complain

*The NPRM:* Under the proposed rule, a foreign air carrier that operates scheduled passenger service to and from the U.S. using any aircraft with 30 or more passenger seats would be required to inform consumers how to file a complaint with the carrier (name of department, address, and email or web-mail address) on its website, on all

e-ticket confirmations, and, upon request, at each ticket counter and gate.

*Comments:* As with other sections of this proposal, carrier association commenters, such IATA, IACA, and AEA, generally state that the proposal to inform consumers how to complain unnecessarily and excessively intervenes in an airline's operations. Many foreign carriers concur. For example, Qantas and JetStar state that if a carrier has given a consumer reasonable access for lodging complaints, there is no need for the Department to mandate a particular form of communication. Qatar Airways, among others, notes that foreign carriers already offer passengers a number of means by which to file a complaint.

Foreign carriers and carrier associations also oppose the requirement to inform consumers how to complain as an extraterritorial application of U.S. law. IATA asserts that this requirement would violate the Chicago Convention and U.S. Open Skies Agreement as it would necessitate foreign carriers modifying procedures and operations that take place outside the U.S. to meet U.S. regulatory requirements. For example, IATA states that this requirement would mandate that foreign carriers modify their home websites and foreign-issued tickets to include information mandated by the Department.

NBTA generally supports the provisions, as do Consumers Union and AAPR. Flyersrights.org, in addition to supporting a requirement for foreign airlines to make the mailing address and email or web address for filing a complaint available on their website and e-ticket confirmations, thinks there should be contact information for the Department's Aviation Consumer Protection Division on e-ticket confirmations and boarding passes.

*DOT Response:* The Department is extending this provision to foreign carriers as proposed in the NPRM, with some clarifications to address concerns about extraterritoriality. First, we are requiring foreign carriers to inform consumers how to complain, upon request, at each ticket counter and boarding gate at U.S. airports. We are not seeking to govern the activities of foreign carriers outside the United States. U.S. carriers are still required to inform consumers how to complain upon request at all ticket counters and boarding gates staffed by the carrier or a contractor of the carrier, whether or not those locations are within the U.S. We are also specifying that the requirement to make information about how to file a complaint available on a carrier's website applies to a foreign

carrier only if its website markets to U.S. consumers. Foreign carriers would not need to modify their home websites to ensure that they are complying with this requirement unless those sites market to U.S. consumers. We expect foreign carriers to follow U.S. law in the U.S. when marketing within the U.S. and when flights are entering, operating within or departing from the U.S.

Also, while we acknowledge foreign commenters' concerns with the Department mandating answers by which a consumer can file a complaint, we believe it is important that consumers have more than one avenue for registering their service-related concerns. As commenters note, since some foreign carriers already provide a number of means by which to file a complaint, the requirements of this rule should not prove overly burdensome. As with the December 2009 rule to enhance airline passenger protections, this rule requires carriers to only provide passengers their email or web-form address and their mailing address. We did not propose and are not now requiring that carriers provide passengers a telephone number for complaint calls because of concerns that telephone "talk time" would impose a high cost on airlines when there are other more-efficient and effective complaint processing methods available. Of course, in addition to accepting complaints through the Internet and postal mail, airlines are free to voluntarily accept customer complaints through other methods such as telephone. We also point out that, as is currently allowed for U.S. carriers, a foreign carrier can comply with the requirement to provide contact information on an e-ticket confirmation or itinerary by including a link to a website containing the complaint information in lieu of displaying the entire text of the contact information, which will take up even less space on an e-ticket and reduce cost. It is our opinion that requiring complaint contact information on e-tickets and, upon request, at each ticket counter and boarding gate instead of just on websites will be beneficial to consumers since a large number of passengers do not have access to the Internet while traveling and would not be able to access the complaint contact information through the airlines' websites.

We are not adopting the suggestion that carriers be required to provide consumers information as a general matter on how to file complaints with DOT. That suggestion is beyond the scope of the notice and is not wise since it might direct consumers away from contacting carriers that are in the best position to quickly resolve problems.

## C. Responding to Consumer Complaints

*The NPRM:* Under the NPRM, a foreign air carrier that operates scheduled passenger service to and from the U.S. using any aircraft with 30 or more passenger seats would be required to acknowledge receipt of a complaint within 30 days of receiving it and send a substantive response to each complainant within 60 days of receiving it. We proposed to define a complaint as a specific written expression of dissatisfaction concerning a difficulty or problem which the person experienced when using or attempting to use an airline's services. We solicited comments on any operational difficulties U.S. and foreign airlines may face in responding to such complaints when received through social networking mediums such as Facebook and Twitter.

*Comments:* We received a number of comments on this issue from foreign carriers and carrier associations, some of whom supported this requirement. IATA, IACA, AEA, and many foreign carriers generally state that the proposal to respond to consumer complaints within a set timeframe excessively intervenes into an airline's business practices and disregards procedures carriers already have in place to respond to consumer complaints. They also contend that the Department has not shown that this type of requirement is needed. More specifically, British Airways notes that the timeline is unnecessary and overly burdensome and would force carriers to divert personnel to unnecessary administrative and recordkeeping functions. Qantas states that it does not see the need to single out the airline industry for mandatory requirements related to customer response times and that the carrier already aims to provide substantive responses in less than 60 days. IATA suggests that, if adopted, any final rule should include a provision allowing an airline to stop the clock by providing a provisional response. Lufthansa makes a similar suggestion that the Department allow for a "provisional" response to a customer's concerns within the 60 day time frame in the event it cannot provide a full detailed response. A number of carriers such as Virgin Atlantic also recommend that any final rule adopted include an exception to the time frame established to respond to complaints for extraordinary circumstances, such as the Icelandic volcano incident, as the volume of complaints resulting from such events requires a longer response time.

Some carriers generally agree with the proposal or note that they respond to consumers in a shorter time period. For example, Singapore Airlines states that it would not oppose the Department's proposal to provide a substantive response in 60 days if complaints are limited to actual customers and flights to or from the U.S. Japan Airlines states that its response time of 14 days surpasses the Department's proposal and that it has many mediums by which passengers can contact it. Air France notes that it tries to reply to complaints within 28 days. Virgin Atlantic states that it already has a robust complaint handling process and generally replies to all written complaints within 28 days of receipt. Air New Zealand states that the suggested timeframes to respond to complaints are generous.

A number of carriers expressed concern regarding the definition of a complaint. Swiss International states that complaints need to include the passenger's name, mailing address or email address, a copy of the ticket or boarding pass and the applicable flight number. Qatar Airways generally supports the principles stated in the NPRM, but states that it should only have to respond to complaints from passengers who use its service, *i.e.,* the definition of a complaint should be limited to a difficulty or problem which the person experienced when using an airline's service. Similarly, South African Airways and Condor state the proposal as drafted is burdensome and flawed because carriers would have to respond in 60 days to both customers and anyone else that "attempted" to use their service. They also note that the proposal fails to give carriers any discretion in refusing to respond to repetitive or frivolous complaints. With regard to complaints received through social networking mediums, U.S. and foreign carriers and carrier associations all oppose any mandate to communicate to passengers through such mediums. They recommend that the definition of complaint exclude complaints sent by passengers to carriers' Facebook or Twitter accounts.

The consumers and consumer groups that commented generally support requiring carriers to acknowledge and respond to complaints within the time frame set forth in the NPRM. Flyersrights.org states that U.S. passengers should have an avenue to file a complaint with a foreign carrier and to expect a timely and substantive response. CTA states that U.S. airline customer service personnel should be responsible for handling any foreign

alliance partner complaint and believes there should be a clear way to contact foreign carriers through the Internet or by telephone number provided on the homepage of the airline. Very few consumers or consumer groups commented on the issue of complaints sent through social networking sites. Of those that did, AAPR states that social networking sites are not an appropriate venue for filing complaints though it supports the requirement for foreign carriers to acknowledge a complaint within 30 days and send a substantive response within 60 days, as does the NBTA.

*DOT Response:* We have decided to require foreign carriers to acknowledge receipt of a complaint within 30 days and provide a substantive response to passengers within 60 days, as is currently required of U.S. carriers. We believe that 30 days to acknowledge a complaint and 60 days to provide a passenger with a substantive response allows carriers adequate time to investigate and respond appropriately. We are not convinced by arguments put forth by commenters that suggest 60 days is not enough time to provide a substantive response. We note that more than one carrier suggests that 60 days is a reasonable amount of time in which to respond.

We acknowledge and agree with industry commenters that it may not be possible in all instances to provide a final reply to a passenger within 60 days. The rule speaks of a substantive reply, which is not necessarily a final reply. By substantive response, we mean a response that addresses the specific problems about which the consumer has complained. This type of response often but not always results in a resolution of the complaint. If a carrier is actively investigating a complex complaint and is not able to conclude the investigation within 60 days, it is still likely to know more at the 60-day point than it did when it acknowledged the complaint. The airline can update the complainant with all known information prior to the 60-day mark by sending a substantive response, continue its investigation, and thereafter send the final reply later. Regarding carriers' suggestions for an exception for complaints concerning unusual events such as the Icelandic volcano, the Department believes that such an exception is not necessary as many consumers complain about similar issues associated with such events (*e.g.,* delays, cancellations) and carriers generally create form letters in which to respond substantively to most such complaints.

As for the definition of a complaint to which carriers must respond, the Department continues to believe that it is important that this definition include not just problems which a person experiences when using an airline's services but also problems encountered by a person attempting to use an airline's services (for example, if he or she had problems while attempting to book or cancel a flight on the carrier's website). Carriers are not required to respond to general complaints from members of the public. We are requiring a carrier to respond to complaints from individuals that had a problem when they used or attempted to use its services. As with other portions of this section, foreign air carriers are only required to respond to complaints from consumers that are related to a carrier's services being marketed in the U.S. and its flight to or from the U.S.

We are persuaded by the commenters that the Department should not mandate that U.S. and foreign carriers respond to complaints sent through social networking sites. Carriers do use such sites to invite the public to communicate with them and perhaps even to monitor public opinion about their practices. However, we can appreciate concerns that such sites are not intended to be a mechanism for handling individual consumer complaints. In recognition of these somewhat competing interests, the final rule makes it clear that U.S. and foreign carriers need not to respond to such complaints so long as (1) the carrier's primary page on that social networking site clearly indicates that it will not reply to complaints filed via that medium, and (2) on that page the carrier directs the consumer to the mailing address, e-mail address, or website location for filing written complaints. The Department believes this approach takes into account the difference between social networking sites and the traditional one-on-one methods of text communication (*e.g.* a letter, email, printed complaint form, or Internet complaint form) while ensuring passengers know how to file a complaint that will result in a response from the carrier.

*6. Oversales*

A. Denied Boarding Compensation Limits, Rates, and CPI–U Adjuster

*The NPRM:* We proposed to increase the minimum for denied boarding compensation (DBC) limits from the current amounts of $400 or $800 depending on the length of the bumped passenger's delay to $650/$1,300 to take into account fully the increase in the Consumer Price Index—All Urban Consumers (CPI–U) since 1978. We also proposed to implement an inflation adjuster for these minimum DBC limits. We sought comments on whether the proposed increases in the DBC limits and the periodic adjustment are called for and, if so, whether the increased amounts are reasonable. We asked whether we should completely eliminate the DBC limits and require carriers to pay DBC based on 100%/200% of a passenger's fare without limit, and whether the current 100%/200% formula (depending again on the length of the bumped passenger's delay) should be increased to, for example, 200%/400% of a passenger's fare.

*Comments:* Eighteen individuals and consumer organizations, in addition to over 60 individuals who participated on the Regulation Room website, provided comments on the oversales proposals. The majority of these commenters support increasing DBC limits. Some commenters, however, oppose calculating DBC amounts based on the passenger's fare, arguing that it will provide carriers an incentive to bump passengers with the lowest fare. As an alternative, one individual suggests that DBC should be based on a fixed amount. Another commenter suggests that DBC amounts should be based on the length of delay.

A number of individual commenters go further by suggesting that the Department should abandon the oversales rule and ban oversales. These commenters reason that a ticket is a contract between a passenger and a carrier and that when the carrier cannot honor the ticket, it should run a bid or auction by continuously increasing the offer to volunteers until enough volunteers come forward. Most commenters on Regulation Room support eliminating DBC limits though a number of these commenters support a DBC amount based on 200%/400% of the passenger's fare instead of the current 100%/200% of the passenger's fare.

Among the few individual commenters who oppose increasing DBC limits, one commenter questions whether raising DBC limits would result in the reduction of the number of passengers being bumped. Another commenter states that increasing DBC limits to $650/$1,300 would only benefit passengers whose fare is more than the current limits (*i.e.,* $400/$800 one way). One commenter is concerned about the possibility that in response to the raised DBC limits and amounts, carriers would increase the required check-in time for the purpose of being eligible for DBC.

We also received comments on a variety of other issues. With respect to

the proposed bi-annual adjustment on DBC amounts based on CPI–U, Consumers Union as well as several commenters on Regulation Room expressed their full support for the proposal. FlyersRights.org suggests that we should declare it to be a deceptive practice to give boarding priority to passengers who checked in later but paid a higher fare. In addition, FlyersRights.org recommends that we ask carriers to increase offers to passengers solicited to volunteer.

Nine U.S. carriers and carrier associations as well as 27 foreign carriers and carrier associations commented on the oversales proposals. ATA states that it does not oppose the proposed increase to the DBC limits to $650/$1,300 but questions the effectiveness of such an increase in reducing the number of passengers being involuntarily bumped. According to ATA, increasing DBC limits may provide incentives to passengers who would have otherwise volunteered to hold out, hoping to be bumped involuntarily. ATA opposes eliminating the DBC limits, contending that DBC is meant to compensate passengers for the loss of time only, because passengers retain the value of the fare by accepting alternate transportation provided by carriers. Delta Air Lines does not oppose the proposed increase of DBC limits but suggests that the new DBC limits should not be applied to airfare purchases that occur before the effective date of the final rule. On the other hand, the Regional Airline Association (RAA) opposes the increase of DBC limits to $650/$1,300, asserting that these increases far exceed the costs of most regional airfares.

Southwest Airlines asserts that the current 100%/200% of one-way fare formula works well and if the Department worries about the impact of fare unbundling practices on the DBC value, it should require that the carriers refund all ancillary fees in the event of oversales, instead of raising the 100%/200% rates to 200%/400%. RAA avers that the DBC limits should be 100%/200% of the fare, and any adjustment to DBC limits should be based on fare changes. Spirit Airlines and Virgin America both oppose the increase of DBC limits, questioning the economic soundness of such increases. Virgin America argues that the new proposal is a departure from the hybrid calculation method that the Department established in 2008. Virgin America also points out that in 2007 the Department rejected the proposal to implement a CPI-based adjuster on the DBC limits. Spirit Airlines takes a similar position as Virgin America and further contends

that as a result of the proposal, many consumers will be harmed by increased fares due to the windfall that the new DBC proposal will provide to a small number of passengers.

The majority of foreign carriers and carrier associations oppose the proposed increase in the DBC limits to $650/$1,300. Several commenters argue that increasing DBC limits will reduce the number of passengers who volunteer to be denied boarding and in turn increase the number of passengers who are involuntarily bumped, a result that is counter to the goal of the oversales rule. Some commenters contend that the Department has failed to provide evidence showing that the current DBC amounts are inadequate and also failed to recognize that air fares have decreased in "real" terms during the past decade. IATA and several foreign carriers operating long haul international flights to and from the U.S. raise the concern that passengers on those flights will most likely get the higher limit of $1,300 in an oversales situation due to the infrequent schedule, and these passengers, according the commenters, will get a windfall for their mild inconvenience. Some long haul carriers also insist that the Department's proposal is aimed at addressing the fare unbundling practice by most U.S. carriers and these foreign carriers' bundled fares would be subject to inequitable and discriminatory treatment under this proposal. IATA further comments that the proposed $1,300 DBC limit is disproportionate to the value of time that a passenger denied boarding involuntarily may lose due to the delay. The Air Transportation Association of Canada and National Airline Council of Canada, on the other hand, argue that the increased DBC limits will penalize foreign carriers operating short flights, as these limits far exceed the cost of air fare for those flights. IACA argues that the proposal interferes with the European Union (EU) laws and may create uncertainty for carriers and passengers. Several European carriers suggest that the U.S. oversales rule should be harmonized with the EU rule.

The majority of foreign carrier commenters firmly oppose eliminating DBC limits, averring that without a limit, the DBC amounts would be exorbitant, especially for many long-haul carriers who do not unbundle fares. Virgin Atlantic and Air New Zealand prefer a fixed amount for all involuntary denied boarding situations, reasoning that this approach will avoid the complexity in calculating DBC amounts based on fares.

Most foreign carrier commenters also oppose the CPI-based bi-annual adjuster, arguing that air fare changes in the past are not related to CPI. The National Airlines Council of Canada argues that the proposal ignores the fact that fares paid by passengers are significantly lower than what they were ten or fifteen years ago, accounting for the inflation. Qantas and JetStar Airways state that the interval for the CPI–U based adjuster should be every five years instead of two years to avoid excessive administrative costs to implement the changes.

*DOT Response:* With respect to the DBC limits increase, we have come to the conclusion that the proposed $650/$1,300 amounts are not only reasonable but also necessary. We disagree with carriers' remarks that the increase in the DBC limits is a disincentive for passengers to volunteer for denied boarding and will result in an increase in the number or rate of passengers who are involuntarily denied boarding. To the contrary, if the DBC limits are increased, carriers will have a greater incentive to seek volunteers through increasing the value of the compensation they offer to volunteers in order to avoid the higher DBC payments to involuntarily bumped passengers. The ultimate result is that involuntary denied boarding should decrease while both volunteers and passengers who must involuntarily be denied boarding will receive increased compensation that more accurately reflects their inconvenience.

Although it is our firm belief that the DBC limits at the level of $400/$800 tend to be insufficient to compensate the passengers who are involuntarily denied boarding for their inconvenience and loss of time, we maintain that the basic structure of the regulatory regime for oversales remains sound. In that regard, we are declining to adopt the suggestion of some commenters that the Department should eliminate involuntary denied boarding and require carriers to run auctions until they obtain sufficient numbers of volunteers. As we have repeatedly stated in the past, the benefits to most consumers of a well-controlled oversales system outweigh the inconvenience experienced by a few. By contrast, an unlimited auction system could increase the cost of oversales to carriers to a prohibitive level, which would cause airlines to be much more conservative in overbooking flights. Considering the reduced schedule frequency and capacity during recent years, such an approach would result in fewer affordable seats being available to the public in general. Running an

unlimited auction for volunteers is both time-consuming and complex, and requiring such a system may impose other negative impacts on all passengers, such as causing more flight delays, increasing the number of misconnections, and requiring earlier check-in times.

We are also not adopting some consumer commenters' suggestion that we should set a minimum standard for the amount of compensation offered to passengers solicited to volunteer for denied boarding. We maintain that other than the requirement that carriers must solicit volunteers before bumping any passengers involuntarily, the procedures for solicitation of volunteers and the amounts of incentive offered to potential volunteers should remain within carriers' discretion because this aspect of the system has worked well. The Department believes that the involuntary DBC rates and limits set by the regulation are effective tools to motivate carriers to offer adequate compensation for volunteers.

This final rule also provides that carriers must pay DBC equal to 200%/400% of the fare based on the length of delay experienced by passengers up to the maximum of $650/$1,300. We are unconvinced by the argument of some industry commenters that the regulatory mandated DBC limits should not be increased because airfares have not increased "in real terms." Although the "fare," in terms of the dollar amount reflected on a passenger's ticket confirmation or ticket receipt, may not seem to be increasing over the past decade, the actual cost for a passenger to travel by air, however, has indeed increased. Such increase in air travel cost is not reflected in the base ticket prices that are used as the basis for calculating DBC amounts. The increase of the cost to passengers is evident by the fact that a passenger now must pay, in addition to the base airfare, for many items that were included in the fare before the unbundling practice became widespread, such as for checked baggage, food and beverage, in-flight entertainment, preferred seating, advance seat selection, telephone reservations, etc. It is the Department's view that carriers may continue to explore other ways to further unbundle fares, thus leading to base ticket prices staying flat or declining. The Department believes that DBC amounts based on 100%/200% of the base fare are no longer adequate, under many circumstances, to address the inconvenience and consequential damages suffered by passengers who are denied boarding involuntarily, especially passengers who purchased

the most deeply discounted fares, and who, by virtue of the low fares, are most likely to be selected as the candidates for involuntary denied boarding. Realistic DBC rates are also a necessary incentive to encourage careful overbooking practices on the part of carriers. Precisely for these reasons, we are raising the 100%/200% rates in the involuntary DBC calculation to 200%/400%. In our opinion, this new formula, in conjunction with the raised DBC limits of $650/$1,300, strikes a balance between permitting carriers to continue to overbook flights, but limiting the carriers' financial burden from compensating passengers due to oversales, and adequately protecting passengers' interests in oversales situations.

We are aware that the amended DBC formula and limits may have a larger impact on carriers operating regional and international short-haul flights, because these flights' base fares are lower in general than the fares of long haul flights. RAA has argued in its comments that the DBC amounts should be based on 100%/200% of the fare and that the $650/$1,300 limits far exceed the costs of tickets on most regional flights. Several Canadian carriers and carrier associations also contended that the oversales rule as proposed unfairly discriminates against carriers operating shorter flights by requiring the same limits of compensation depending on the length of delay, regardless of the length of the flights from which the passengers were involuntarily denied boarding. The Department has fully considered these comments but remains unconvinced that the consequences of our amendment would be detrimental to these carriers. It is important to understand that the $650/$1,300 limits come into play only when the DBC formula would cause a passenger's DBC to exceed the limit. To the extent the fare paid by a passenger is low, the new $650/$1,300 limits have no effect. Fares in the $49–$59 range are still regularly sold and even under the 400% calculation formula, the DBC amounts would not even come close to the $800 limit under the previous rule. Furthermore, compared to long-haul flights that are usually less frequently scheduled, regional and low cost carriers typically have more options with regard to finding alternate transportation in a timely fashion for passengers who are denied boarding involuntarily. Thus, passengers on these short haul flights often have a better chance of getting to their destination or the next stopover without extensive delay. Consequently, regional and low

cost carriers have a better chance of limiting their DBC exposure to the lower rate of 200% of the fare with a $650 limit.

To ensure that there isn't any confusion as to how DBC is calculated, we have added a definition for "fare" in section 250.1. Under this definition, carriers do not need to take into account any ancillary fees and/or charges for optional service paid by passengers when calculating DBC amounts based on the passenger's fare. In relation to this definition, however, we emphasize in section 250.5 that when a passenger is denied boarding involuntarily, the carrier must refund all unused ancillary fees paid by that passenger. Carriers do not have to refund any ancillary fees that will be applied to the alternate transportation to the extent those same services are provided to the passenger. For instance, when a passenger denied boarding involuntarily has paid for seat selection and checked baggage for the original flight, the passenger should receive a refund for the seat selection fee if the alternate transportation arranged by the carrier does not allow the passenger to select his/her seat. Conversely, the carrier does not need to refund the checked baggage fee if the passenger was able to check in the same number of bags for the substitute flight at no additional cost.

We are also clarifying the meaning of the term "minimum DBC amounts" in this final rule as some commenters seem to be confused by the term. These commenters believe that the Department is mistaken in referring in the NPRM preamble to "minimum" DBC amounts when it should be referring to "maximum" DBC amounts. We recognize that the source of the confusion was the term "maximum" used in the rule text under section 250.5. The term "minimum DBC amounts" as used in the preamble of the NPRM refers to the lowest amount of DBC that is due an involuntarily oversold passenger when the DBC calculation based on the passenger's one-way fare results in an amount exceeding the DBC limits (previously $400/$800 and increased to $650/$1,300 in this Final Rule). For example, when a passenger on a domestic flight who paid $550 one-way for a non-stop flight is delayed for 1 hour 20 minutes due to having been involuntary denied boarding, the initial calculation of DBC due is based on 200% of the fare, which amounts to $1,100. However, the maximum amount of DBC a carrier is required to pay this passenger under our rule would be $650. We continue to use the term "maximum" in the rule text. Accordingly, in order to avoid further

confusion, we have used the term "DBC limits" instead of the term "minimum DBC amounts" in the preamble of this final rule.

With regard to an automatic inflation adjustor for DBC limits, the Department has decided to adopt the proposed bi-annual adjustment on DBC limits. In doing so, we note our disagreement with some carriers' comments that such an adjuster is not justified because air fares do not reflect changes in the CPI–U. DBC is not meant to fully compensate passengers for the loss of transportation, because carriers are obligated to offer alternate transportation for the passengers or refund the passengers' fare; therefore, fare value change is not directly relevant. DBC is meant as a form of liquidated damages to compensate passengers for their inconvenience, loss of time, and other incidental and consequential costs associated with the delay (*e.g.*, food, lodging, ground transportation, communication etc.). To simplify the DBC calculation and to expedite the process, the Department uses a formula that is tied to the one-way airfare paid by the passenger, which does not necessarily mean DBC amounts should be changed according to the levels at which the average airfare has changed. We observe that the costs for food, lodging and other accommodations and commodities passengers need in an oversales situation have all increased in correlation with inflation. In addition, as noted in the NPRM and further discussed above, the actual total cost of flying is likely to have increased, while what is commonly referred to as the "fare" may not have increased or increased as much as a result of the carriers' current practice of unbundling fares, *i.e.*, charging extra for services once provided as part of the airfare. Our decision to adopt the bi-annual inflation adjustment provision for DBC limits is also not contradictory to our decision made two years ago that we would take up the issue de novo. We have indeed taken a fresh look at the issue during this rulemaking and ultimately reached the conclusion that the bi-annual inflation adjustment is the most efficient way to address the impact of inflation on the DBC limits.

We are also addressing the issue of airline travel vouchers vis-à-vis DBC in this final rule. Carriers frequently offer free or reduced-rate air transportation, most commonly in the form of airline travel vouchers, to passengers denied boarding involuntarily as an alternative to the cash or check DBC payment required by our rule. Our previous rule required that the value of such a voucher must be equal to or greater than

the cash or check DBC payment otherwise required. One issue we did not address in the previous rule is whether any mandatory fees, such as service fees, that some carriers charge for using the voucher should be taken into account when considering the value of the benefit of the voucher offered. In this final rule, we clarify that any fees that passengers must pay in order to use the voucher for future travel must be considered when determining the value of the voucher. For instance, if the cash or check DBC payment for a passenger involuntarily denied boarding is required to be $400 under the 200%/400% calculation, and the passenger agrees to accept a travel voucher in lieu of that cash or check payment and there is a service fee of $50 to redeem the voucher, the minimum voucher value that the carrier must offer to the passenger is $450. The carrier must inform passengers, whether volunteers or involuntarily oversold, of any restrictions imposed on the use of the voucher. In addition, as described in detail below, it is unfair and deceptive for a carrier to offer a travel voucher as compensation, particularly in an oversale situation, without advising the person to whom the voucher is offered of any restrictions that may apply to the use of the voucher, such as service fees to redeem the voucher, and advance notice requirements or expiration dates.

Finally, we have made non-substantive revisions to the text of sections 250.5 and 250.9 in order to provide the most straightforward explanations of the methodology applicable under different circumstances for calculating DBC amounts. In a counterintuitive way, the previous rule describes the maximum DBC rate (200% at that time) and then states the circumstances under which the DBC amount will be reduced by half. We have encountered confusion on the part of both carriers and the public regarding this somewhat convoluted description. In this final rule, we discuss the DBC calculation for domestic flights and for international flights separately. In each category, we specify the amounts of DBC required under each of the three circumstances based on the length of delays incurred by a passenger using alternate transportation due to the involuntary denied boarding: no compensation; 200% of the fare subject to the $650 limit; and 400% of fare subject to the $1,300 limit. These categories and classifications are summarized in the two tables that we added in the written notice that carriers must provide to passengers who are denied boarding

involuntarily and to anyone else upon request. These tables are meant to be used by carriers as a quick reference to assist bumped passengers so they can better understand the DBC limits and calculations when those passengers may be confused and under time pressure during an involuntary bumping situation.

We have also added a definition for "alternate transportation" in section 250.1 to capture the two components of this term. The first component is what was described as "comparable air transportation" under the previous rule. In order to qualify as "alternate transportation" and consequently allow the carrier to limit its DBC exposure to less than the 400% rate, any air transportation offered to passengers involuntarily denied boarding as a substitute for the original flight must be operated by a carrier as defined in Part 250, *i.e.*, a U.S. certificated or commuter air carrier or a foreign carrier that has been duly authorized by the Department to operate scheduled air services. Thus, if the carrier offered a substitute flight operated by an air taxi operator that is not a commuter carrier, that flight would not qualify as "alternate transportation." Furthermore, in order to qualify as "alternate transportation" carriers must offer a confirmed reservation on that alternative flight. The second component of the concept of "alternate transportation" includes non-air transportation (such as bus, rail, or taxi) and air transportation that does not meet the definition above of "alternate transportation" arranged by the carrier. In order for these modes of transportation to qualify as "alternate transportation," the carrier must obtain the passenger's consent that the passenger will accept the proposed form of transportation in lieu of air transportation. To further explain the concept and application of "alternate transportation," we emphasize that carriers are free to offer substitute transportation that does not meet the definition of "alternate transportation" in this rule (*e.g.*, a flight on an air taxi that is not a commuter carrier, transportation on a scheduled flight without a confirmed reservation, or on a charter flight, or surface transportation), but the bumped passenger has "veto rights" over such arrangements. If the bumped passenger declines this "non-alternate" transportation, he or she is due DBC at the 400% rate because the carrier did not offer "alternate transportation" as defined in section 250.1. However, if the passenger chooses to accept the carrier-offered transportation that does not

qualify as "alternate transportation," the carrier is free to avail itself of the lower 200% DBC rate in the case of rerouting within 2/4 hours, and need not pay DBC at all if the non-alternate transportation accepted by the passenger will arrive at the passenger's destination less than one hour after the planned arrival time of the passenger's original flight. The passenger has no such veto right over "alternate transportation." If the carrier offers alternate transportation and the passenger declines it, the carrier is still free to limit DBC to 200% or zero as applicable.

Also in section 250.1, we have deleted the definitions for "sum of the values of the remaining flight coupons" and "comparable air transportation" as these terms are no longer used in the rule text.

## B. Zero Fare Tickets

*The NPRM:* We proposed to clarify in the rule text that DBC must be offered to "zero fare ticket" holders who are involuntarily denied boarding. We asked the public to comment on whether these passengers should be protected by the oversales rule, and whether the proposed calculation method for their DBC amounts is reasonable (*i.e.,* the "passenger fare" for purposes of DBC would be the fare of the lowest priced ticket paid for a comparable class of ticket on the same flight). We also invited the public to suggest any alternative method of establishing denied boarding compensation for zero fare ticket holders, including whether we should allow carriers to compensate these passengers using the same "currency" (*e.g.,* frequent flyer miles or vouchers) in which the tickets were obtained.

*Comments:* The individual and consumer organization commenters generally support affording zero fare ticket holders who are involuntarily denied boarding the same protection and rights as passengers with other tickets. Regarding the form of compensation, some commenters suggest that compensation may be in the same form of "currency" as that was used in acquiring the tickets; others are in support of the Department's proposal, *i.e.,* providing zero fare tickets holders DBC in the form of cash or check based on the lowest fare paid for a ticket on the same flight for a comparable class of service. Some commenters support payment in either form.

The majority of the industry commenters do not oppose applying the oversales rule to zero fare ticket holders who are involuntarily denied boarding. However, these commenters are adamant that zero fare tickets covered under the oversales rule should not include non-revenue tickets such as airline employee passes. With respect to the form of DBC payment to zero fare ticket holders, several commenters are in support of compensating those passengers in the same form of "currency" that they used to acquire the tickets. ATA state that carriers should have the discretion to pay DBC in the same form of "currency," in travel vouchers, in cash/check, or in any combination thereof. ATA reasons that a mandatory cash payment requirement would create problems for carriers because gate agents cannot assign a cash value to the passenger's fare as they do not have information on the lowest comparable fare sold on the same flight. On similar grounds, the National Airlines Council of Canada avers that it is virtually impossible to figure out the value of a ticket in the comparable class of service "on the spot" as it is subject to a wide range of variables.

JAL opposes the inclusion of zero fare ticket holders under the oversales rule, stating that it should be left to a carriers' commercial judgment as to whether to compensate zero fare ticket holders; JAL further states that the Department should not assume that carriers' decisions would be adverse to passengers' interests. Also in opposition to the proposal, South African Airways states that such a requirement would drastically reduce the carriers' ability to offer zero fare tickets.

*DOT Response:* The majority of commenters from both consumer and industry representatives seem to agree that certain types of zero fare ticket holders should be compensated when they are denied boarding involuntarily in an oversale situation. The Department agrees with most industry commenters that compensable zero fare tickets should exclude "non-revenue" tickets as that term has traditionally been used in the industry. In that regard, we have added a definition in the final rule that defines "zero fare tickets" to cover only tickets acquired with frequent flyer miles and airline travel vouchers, as well as consolidator tickets that are purchased with money but do not display a dollar amount on the ticket. In our view and the view of most commenters, zero fare ticket holders provided something of value in exchange for their air transportation and when they are bumped, they should be compensated. The Department also wishes to point out that, for most non-revenue tickets such as airline employee and employee family travel vouchers, the terms and conditions accompanying these tickets have already explicitly excluded them from any compensation for involuntarily denied boarding. We note that under the definition of "zero fare ticket," a passenger who paid a nominal monetary amount in connection with a ticket may still qualify as a zero fare ticket holder. Therefore, a carrier must in those cases treat a passenger as a zero fare ticketholder even if the passenger's fare is not "zero" in a literal sense, *e.g.,* where the passenger has paid by cash or credit card the requisite taxes or "processing fees" or "service fees" for the redemption of travel vouchers or frequent flyer miles. On the other hand, if a passenger has paid substantial monetary value for the air transportation, *e.g.,* paid cash for an economy class seat and used frequent flyer miles to upgrade to a business class seat, this passenger should not be treated as a zero fare ticket holder if bumped from the flight and the amount of DBC the passenger receives should be based on the economy class fare paid by that passenger. However, the carrier must credit the amount of frequent flyer miles used for an upgrade back to the passenger's account if any substitute transportation provided is not in the class of service that he or she used the frequent-flyer miles to acquire.

With respect to the form of DBC for zero fare ticket holders, some consumer commenters urge the Department to require all DBC to be paid in cash or check while many industry commenters either oppose paying DBC to zero fare ticket holders or at a minimum, argue that the Department should allow those passengers to be compensated by means other than cash or check. The Department has fully evaluated the reasons presented by the carriers for why we should not mandate cash or check DBC payments to zero fare ticket holders, but we have decided to apply the same DBC standard by requiring carriers to offer DBC to these passengers in the form of cash or check. DBC in non-monetary forms such as frequent flyer miles would not compensate a passenger for food, lodging and other expenses that may be associated with delays caused by the denied boarding. Furthermore, we reject some commenters' notion that requiring carriers to pay cash to these passengers may result in harm to consumers, such as making frequent flyer tickets more expensive and restrictive for consumers. We note that under section 250.5(c), carriers may offer free or reduced rate air transportation to any involuntarily bumped passengers, including zero fare ticket holders, in lieu of cash payment. Carriers should not assume that zero fare ticket holders would almost always opt to receive cash or check

compensation, as the cash or check DBC amount is calculated with the lowest comparable fare as the base amount. We also disagree with some carriers' suggestion that procedurally paying DBC in cash or by check based on the lowest comparable fare is unworkable because the gate agents may not have the lowest fare information "on the spot." Just as it is permitted for DBC payment to passengers who purchased their tickets with money, carriers are being afforded up to 24 hours after the involuntary denied boarding occurred to tender a check to the affected passengers. We believe the 24-hour window is sufficient for the carriers to obtain necessary fare information and calculate the appropriate DBC amount for the zero fare ticket holders.

In calculating the DBC amounts for zero fare ticket holders, we clarify in the rule text as well as here that the applicable lowest comparable fare paid by cash, check, or credit card refers to the fare in the same class of service as the zero fare ticket. By adding a new definition for "class of service," we explain that we are referring to the lowest fare within the same service class or cabin such as first class, business class, economy/coach class, or economy plus (premium economy) class. For instance, when a passenger holding a zero fare ticket in economy plus class is bumped, as the base fare for DBC calculation purposes, the carrier should identify the lowest fare paid by cash, check, or credit card in the economy plus class on that flight, not the economy class.

## C. Disclosure Requirements

*The NPRM:* In the NPRM we proposed to require that (1) carriers offer cash/check DBC options verbally if they verbally offer a travel voucher as DBC to passengers who are involuntarily denied boarding, and (2) carriers inform passengers solicited to volunteer for denied boarding about their principal boarding priority rules applicable to that specific flight, the availability of alternate transportation, and all material restrictions on the use of any transportation vouchers that may be offered as compensation for giving up the passenger's reservation. We asked whether there are any other forms of disclosure that may better inform passengers being solicited to volunteer or those involuntarily bumped of their rights and carriers' obligations.

*Comments:* Most consumer advocacy groups and associations support imposing more disclosure rules regarding oversales. CTA proposes more disclosure to passengers solicited as volunteers, such as informing them of

the oversales rule in writing and orally prior to the negotiation, and providing them information on whether they will receive confirmed seats and when they are expected to arrive at the destination on the alternative flight. CTA also recommends that carriers provide their boarding priority rules to the passengers when soliciting volunteers. FlyersRights.org suggests that carriers should be required to publish their principal boarding priority rules on their websites and inform passengers of their risks of being bumped before ticket sales. Comments posted on the website of Regulation Room generally support our proposal of requiring carriers to verbally inform passengers of the cash or check option for DBC payment if carriers verbally offer these passengers travel vouchers as DBC. These commenters also support the proposal that both passengers solicited as volunteers and passengers denied boarding involuntarily should be clearly informed of their options, the amount of compensation they can receive, and details of alternative flights. They also recommend enhancing disclosures regarding oversales prior to and at the time of ticket sales, such as requiring carriers to ask whether a passenger is willing to be bumped at the time of making the reservation and to provide notice to all passengers 24 hours before the departure if the flight is oversold.

ASTA supports the idea of disclosing oversales rule at the time of ticket purchase and advising passengers of the risk involved if they do not secure a seat assignment. ASTA also recommends that carriers be prohibited from "gaming the system" by making it impossible to obtain seat assignments. ASTA points out that all disclosures regarding oversales should be made earlier because providing an explanation to passengers at the gate is time consuming and it may create chaos and passenger confusion.

Most carrier and carrier association commenters oppose all the proposed verbal disclosure requirements. These commenters are generally concerned about the additional time they assert would be needed for gate agents to comply with the various verbal notification requirements, arguing that these requirements would impose hardship on the agents who are under time pressure to board passengers and close out the flight. These commenters also contend that this information is available in the written notice and assert that verbal notification is not necessary and may be hard to enforce. Some carriers also point out that if the gate agents are not familiar with the oversales rule, verbal notification may

result in inaccurate or incomplete information being passed on to consumers, causing further confusion.

*DOT Response:* As we have stated in the NPRM, we believe disclosure in an oversales situation is essential for the passengers to fully understand their rights and options. After thoroughly evaluating all the comments, we have decided to adopt some but not all of our proposals in this regard. We will discuss each proposal individually.

With respect to the requirement that carriers must verbally offer the cash option when they verbally advise passengers bumped involuntarily that a carrier voucher as a form of DBC is available, we have reached the conclusion that this requirement is in fact critical to ensuring that passengers are fully informed when they are given the opportunity to choose what form of DBC they are willing to take. Although the cash option is clearly stated in the written notice that carriers are required to provide to passengers denied boarding involuntarily, it is likely that due to the time pressure and occasional confusion associated with involuntarily denied boarding, passengers may not have the opportunity to fully review the written notice before they choose the form of DBC that they are willing to accept. Thus, it is the Department's view that when carriers verbally offer a voucher option but omit (either inadvertently or intentionally) mentioning the cash option, it is unfair and deceptive to the passengers. Furthermore we consider that to the extent carriers are willing to explain to passengers their option of receiving carrier vouchers as DBC payment, the additional time needed to add a few words about the cash/check option should not be substantial. In any event, if carriers are concerned about the additional time needed to verbally inform passengers of all options, it is permissible to not verbally advise passengers of DBC options at all. They can simply hand the passengers a written notice.

On similar grounds we have decided to adopt the proposed requirement that carriers must disclose any material restrictions on airline travel vouchers offered to both passengers solicited to be volunteers and passengers denied boarding involuntarily. Some carriers argue that the process of informing passengers is too time-consuming. The Department disagrees although we note that the more time-consuming such a notice is, the more restrictions must apply to the voucher, necessitating more than ever that notice of such restrictions be provided. To provide a brief summary covering all the material

restrictions on vouchers should not take more than a few moments. For example, when the carrier announces at the gate that it needs volunteers who will receive a roundtrip voucher for any destination within the continental U.S., to add a description of conditions on the use of vouchers such as "the vouchers are not transferrable, subject to certain blackout dates and service charges and will expire after two years * * *" would not require more than a few moments, and carriers may encourage anyone who wants to learn more details to speak to the gate agent directly. Typical examples of material restrictions and conditions are expiration dates, blackout dates, advance booking requirements, transferability restrictions, administrative fees and flight choice restrictions. We emphasize that this is not an exhaustive list and by the term "material" we refer to all the restrictions and conditions that might reasonably be expected to affect a passenger's decision regarding whether to accept the voucher.

Since the substance of any restrictions and conditions on the airline vouchers varies by carrier and is not incorporated in the general written notice mandated by section 250.9, we require that any verbal offer of a travel voucher by carriers, either to passengers solicited to volunteer or to passengers denied boarding involuntarily, must be accompanied by a verbal explanation of any material restrictions and conditions imposed on that voucher. In the event carriers make a written offer of travel vouchers, but no verbal offer, carriers should provide a written explanation of the restrictions and conditions on travel vouchers, along with the general written notice required by section 250.9.

In adopting these disclosure requirements, we clarify that we do not intend to require carriers to give every passenger who is in danger of being denied boarding involuntarily a "personal presentation" of their rights. The Department's goal is to ensure that when carriers opt to verbally provide any information to the passengers, the information is not presented in a misleading manner regarding any material terms.

In the NPRM, we also proposed to require carriers to inform passengers solicited to volunteer of their principal boarding priority rules and the availability of comparable air transportation. Our intention in proposing these two requirements was to provide passengers more information upon which they would be able to determine whether volunteering to give up their confirmed reservations would be in their best interests. After

considering all the comments in this regard, we are convinced that these proposals, as well as some other disclosure measures not proposed by us but recommended by consumer commenters, may not achieve the expected goal. Although we disagree with some carriers' comments that providing such information will only assist some passengers to "game" the system to the detriment of the majority of other passengers, we note that providing such information at the gate is time consuming and carriers' principal boarding priority rules can be found in the written notice prescribed in section 250.9, as well as on most carriers' websites and/or in the contracts of carriage. We conclude that the burden on carriers of verbally providing such information at the boarding gates outweighs the benefits. Furthermore, we reject some commenters' suggestions that all passengers should be informed of the carriers' principal boarding priority rules and whether a particular flight was oversold at the time they make their reservations. We note that oversales might not occur until close to the departure time or date and, due to no-shows, many overbooked flights will not be oversold on the day of departure. We believe requiring carriers to provide these two types of information through their reservation systems may not be beneficial to consumers yet will increase the operational costs of carriers, depress revenues and limit seat availability. These costs and restrictions ultimately will be borne by the consumers.

Related to the boarding priority rule disclosure proposal, FlyersRights.org and some other consumer commenters also suggested that we should not allow carriers to set their boarding priority rules based on the amounts of passengers' fares. FlyersRights.org went further to urge the Department to declare that bumping a passenger who checked in earlier but who paid a lower fare is an unfair and deceptive practice. We cannot agree. With the exception of unlawful discrimination, the Department has traditionally allowed carriers extensive flexibility to set their boarding priority rules based on several criteria, including passengers' fares. We believe affording carriers such flexibility is an important marketplace tool and permits carriers to proactively control the costs of oversales so they are able to continue to offer the maximum numbers of seats to the traveling public. It makes perfect sense that passengers who pay more for a ticket to get the last available seat and the right to obtain a full refund also want to be assured that they will be

the last person to be bumped from an oversold flight. We do agree that passengers seeking the lowest fare on a flight are most likely budget-conscious consumers and are most likely to be the ones bumped by some carriers. In this final rule, we have adopted provisions to increase the DBC limits and rates based on the passengers' fare which should help them.

With respect to the proposal to require disclosure of the availability of alternate transportation at the time of volunteer solicitation, we have come to the conclusion that such a requirement is unworkable under most circumstances. The availability of alternate transportation is a fluid issue and is subject to many variables. Due to these variables, what carriers may offer at the time of volunteer solicitation could change by the time the alternate transportation is provided to the volunteer. Should such change occur, the expectation created by the earlier information may cause passengers further confusion and frustration. Thus, we are not going to require such information to be provided at the time of volunteer solicitation.

### D. Covered Entities and Other Miscellaneous Issues

*The NPRM:* The oversales rule currently covers scheduled passenger service using aircraft with 30 or more seats. We solicited comments on whether the oversales rule should be expanded, either in its entirety or partially, to cover scheduled services using aircraft with 19–29 seats and whether we should allow these flights to be oversold at all.

*Comments:* CTA believes that the oversales rule should apply to all flights of major carriers, regardless of the size of the aircraft. Comments from RegulationsRoom.org generally support applying the oversales rule to all aircraft sizes. Some of these commenters urge the Department to ban oversales on small aircraft, arguing that being bumped from those flights is more disruptive and costly to passengers. ASTA supports extending the oversales rule to aircraft with 19–29 seats, stating that involuntary denied boarding on short-haul flights operated by small aircraft has drastic effects on passengers who are connecting to long-haul flights and these passengers are often surprised after being bumped to discover they have no protection from the Department's oversales rule.

On the carriers' side, ATA supports maintaining the status quo, *i.e.,* allowing overbooking on flights operated with aircraft with 19–29 seats and not applying the oversales rule to

these flights. ATA argues that banning oversales on these flights will threaten the existence of small community air services and imposing the oversales rule on these flights would be too costly to carriers. RAA also opposes banning oversales on regional flights, arguing that such a ban would eliminate the ability of carriers to serve small communities, as carriers would not be able to bear the costs of running flights with empty seats. RAA also contends that the denied boarding risk is low on regional flights operated by small aircraft because regional carriers' load factors lag behind large aircraft operators.

*DOT Response:* The Department has been persuaded that it should not extend the oversales rule to flights operated with aircraft with 19–29 seats. Aircraft of this size make up a small and diminishing portion of scheduled-service operations, particularly in the case of the code-share partners that were the predicate for this proposal. After being bumped from a short-haul segment, the cost of paying DBC based on the fare to a passenger's downline destination — up to 400% of the fare and $1,300 under the final rule — would be an unreasonable burden for operators of 19–29-seat aircraft. These carriers are most likely to be the very small entities to which the Regulatory Flexibility Act requires federal agencies to afford special consideration in rulemaking. Based on similar rationale, we have also decided that it is not in the best interests of the public to ban oversales on these flights because doing so will further reduce the capacity of flights serving smaller airports and communities and cause price increases.

Although not proposed in the NPRM, there are several issues raised by the commenters that the Department feels it is important to address in order to clarify what appears to be confusion associated with the oversales rule. First, several foreign carriers urge the Department to harmonize its oversales rule with the rules of other jurisdictions, such as the European Union. The Department agrees in principle that the U.S. oversales rule should not conflict with the rules of other jurisdictions. The Department has worked diligently to that end, and sees no direct conflict between our oversales rule and the rules of other jurisdictions. We disagree with some commenters' claim that the rule as proposed and finalized here will cause confusion among carrier staff and passengers. With respect to both domestic and international flights, the U.S. rule applies only to denied boardings that occur at a U.S. airport, a relatively straightforward applicability

standard that is similar to the approach taken in the EU oversales rule for flights of non-EU carriers. Thus, passengers are clear that when they are denied boarding at a U.S. airport, the U.S. oversales rule applies. The carriers have the responsibility to train their staffs to be familiar with rules of the jurisdictions to and from which they operate. We note that the EU oversales rule has an exception for denied boardings that are subject to compensation requirements of other jurisdictions. To the extent that flights of EU carriers from the U.S. to an EU state may also be subject to the EU oversales rule, those carriers should be able to comply with both the U.S. and EU rules (*e.g.,* by paying the higher compensation amount if the required amounts differ).

CTA and FlyersRights.org both suggest that the Department should not exempt carriers from complying with the oversales rule when the involuntary denied boarding is caused by an equipment change due to factors that are within carriers' control, *e.g.,* crew schedule or maintenance issues. We have carefully examined this suggestion but are not convinced that this proposal is consistent with the underlying rationale of our oversales rule. The Department's longstanding policy of exempting carriers from paying DBC when an involuntary denied boarding was caused by equipment change is based on the grounds that in this situation, the resulting denied boardings were not caused by overbooking, a practice that absent compensation is fundamentally unfair to the passengers who have paid for confirmed seats but are not permitted to board the flight because their promised seat was sold to another person. Accordingly, we will not change our rule involving oversales that result from substitution of equipment of lesser capacity.

Also raised by several foreign carriers is the issue of an alternative to "cash" payment of DBC. These carriers are under the impression that in order to comply with our rule, they must keep a large amount of cash (currency) at the U.S. airports they serve for the purpose of making cash payments to passengers denied boarding involuntarily. These carriers assert that such a cash reserve at their stations in U.S. airports, many of which are staffed by third-party contractors, imposes security concerns. Thus, these carriers urge the Department to allow them to tender DBC payments to passengers in the form of a debit card or other forms of electronic funds. The Department wishes to clarify that under our rule, carriers are permitted to tender a check, in lieu of cash payment, to

passengers denied boarding involuntarily, and to do so up to 24 hours after the denied boarding occurred. The check may be mailed to the address that a passenger has provided. Therefore, it is not required that carriers maintain large amounts of cash at airports. We acknowledge the convenience and security features offered by electronic funds, but have not had the opportunity to fully examine the benefits and limitations of using this procedure as an alternative to cash/check DBC payments in this rulemaking proceeding. We may further explore this issue in future rulemaking.

Finally, we have decided not to adopt Delta's recommendation that the revised oversales rule should be applied only to tickets purchased on or after the effective date of the final rule. Such application would inevitably result in the situation where passengers bumped from the same flight will be subject to different rules. Additional delays may occur at the boarding gates when the gate agents have to spend additional time to determine the purchase dates of the tickets in order to determine which rule applies. For this reason, we will require that all denied boardings and other DBC-related processes covered by this rule that occur on or after the effective date of the final rule must comply with the new rule, regardless of the transaction dates of the ticket sales.

We note that this final rule also includes a technical amendment concerning reporting of oversales. We are correcting a technical inconsistency in the oversales reporting requirements in section 250.10. One sentence in that section states "The reporting basis shall be flights originating or terminating at or serving, a point within the United States." The last sentence of that section reads: "No reports need be filed for inbound international flights on which the protections of this part do not apply." Apparently, when the rule was amended many years ago to remove applicability to international flights inbound to the United States, the second sentence quoted above was added but the first sentence was not revised to remove the reference to flights "terminating in" or "serving a point within" the United States. The intent and the practice has been not to include international flights that terminate in the U.S. (*i.e.,* inbound international flights) in these Form 251 data. This has been clear in paragraphs (A) and (E) in the instructions to the form (see *http://www.bts.gov/programs/ airline_information/forms/pdf/ form_251.pdf*). We are not aware of any instances in which data for inbound international flights have been

inadvertently included in Form 251 reports.

## 7. Full Fare Advertising

### A. Change in Enforcement Policy

*The NPRM:* The Department's price advertising rule (14 CFR 399.84) states that any advertised price for air transportation, an air tour or an air tour component must be the entire price to be paid by the customer for that transportation, tour or tour component. However, the department's enforcement policy with regard to this rule has permitted sellers of air transportation to state separately from the advertised price government-imposed taxes and fees, provided that they are not ad valorem in nature, are collected by the seller on a per-passenger basis, and their existence and amount are clearly indicated in the advertisement so that the consumer can determine the full price to be paid. The Department has prohibited sellers of air transportation from breaking out any other seller imposed fees, including fuel surcharges and service fees, and taxes imposed on an ad valorem basis.

In the NPRM, the Department proposed enforcing the price adverting rule as it is written. This proposal would change the existing enforcement policy by ending the practice of permitting sellers to exclude government taxes and fees from the advertised price, and would instead require that the price advertised include all mandatory fees. The Department invited comments on how sellers of air transportation foresee this change in enforcement policy affecting the methods they use to advertise fares and how consumers view the change. The Department also requested comment on the potential cost of changing the current advertising structures that carriers and ticket agents have in place in order to adhere to the proposed policy shift.

*Comments:* Individuals and consumer organizations such as Flyersrights.org, in addition to individuals who participated on Regulation Room, support the proposal that advertisements for air transportation state the total price to be paid by the consumer. Some commenters participating in discussions through Regulation Room reported that there were occasions when they thought they were going to pay one price for air transportation, but the final price was much higher due to additional taxes and fees. Regulation Room commenters also stated that the current advertising method borders on bait-and-switch tactics. Some individual commenters

expressed similar sentiments, noting how they have been surprised by the total amount to be paid at the end of a purchase online and their preference to know the total amount to be paid earlier. Some consumers and consumer groups go further by suggesting that the Department should require that the true cost of travel, including ancillary fees, be disclosed earlier in the booking process. For example, CTA states that even if the price advertising rule requires the disclosure of all mandatory fees, consumers may still have trouble finding out the true cost of travel due to the proliferation of many kinds of ancillary fees for optional services.

U.S. carriers and carrier associations generally oppose the Department changing its enforcement policy to enforce the full price advertising rule as written. ATA states that its members support fare transparency, but notes that the Department declined to revise its full-fare rule four years ago and contends that the airfare advertising landscape has not changed since that time in a manner that would justify a change in 25 years of enforcement policy. ATA notes that several other industries advertise without including government-imposed taxes and fees, and states that the air transportation industry should not be treated differently. It asserts that this policy shift would suppress valuable information to consumers about how much of their total price consists of government-imposed taxes and fees. In addition, ATA argues that this policy shift would negatively impact competition because government-imposed taxes and fees vary from airport to airport and routing to routing. ATA contends that this means that an airline that has a competitive fare, but also has a routing that subjects the fare to higher taxes and fees, will be disadvantaged if it is required to include those taxes and fees in the advertised price. It remarks that this could negatively impact service to smaller communities. ATA also raised concerns about the cost implications of the proposal, because the proposal would require airlines to perform additional route pricing analysis, programming changes, website changes, and auditing and testing of changes. Many U.S. carriers raise similar points.

The views of foreign carriers and associations varied, with many opposing the proposed mandate that the advertised fare be the full fare to be paid by the customer but some supporting it. IATA believes that there is no evidence of widespread advertising deception to justify a change in the Department's enforcement policy. Additionally IATA

notes that the complexity of non-airline charges makes listing a full fare with "all mandatory fees" difficult, and would only confuse air travel consumers because this complexity prevents a true fare comparison as the actual fare is obscured by the additional government-imposed taxes and fees. IATA also notes that passengers are made fully aware of the purchase price before purchase. Most foreign airlines support IATA's comments. Some foreign carriers, such as Singapore Airlines, Qatar Airways, and Jetstar Airways, support the proposed mandate that advertisements state the total price to be paid by the consumer. Many of these airlines state that they already advertise the total price to be paid by consumers due to regulations of other governments. Some foreign carriers expressed concerns about the applicability of this rule to advertisements on websites that are not domiciled in the United States or directed to United States customers.

Among other industry interests that commented, ASTA and ITSA support this policy shift and note that full fare disclosure is the best way to eliminate passenger confusion and ensure that passengers understand the total cost of their air travel. ASTA asserts that the full fare displayed in advertisements should include all mandatory fees, regardless of their source. The United States Tour Operators Association (USTOA) disagrees and states that the proposed change will place costly burdens on travel agents while doing very little to ease customer confusion in airline pricing. USTOA contends, as does ATA and many U.S. airlines, that ending the practice of permitting sellers to exclude government taxes and fees from the advertised price is not justified because the airfare advertising landscape has not changed since the Department last declined to revise the full-fare advertising rule. USTOA states that tour operators would be especially negatively affected by this shift in policy because government-imposed fees vary widely depending on where the consumers choose to start their trip, and therefore a tour operator would not be able to advertise a tour effectively since the purchaser usually has the option of a number of gateways.

*DOT Response:* The Department has decided to adopt the proposed policy change in relation to the full-fare advertising rule. We disagree with comments that the Department has not shown true harm to consumers in not having the full price quoted to them up front. On the contrary, comments from individual commenters and persons participating in Regulation Room show consumers feel deceived when the total

price, including taxes and fees, is not quoted to them after an initial fare inquiry. Many consumers feel that advertising fares that exclude mandatory charges is a "bait and switch" tactic by travel sellers. The Department has also received complaints regarding fare advertising, some of which specifically mention feeling deceived when they are not quoted the full price to be paid after an initial inquiry.

Also, contrary to the assertions of some commenters, the Department has seen changes in the advertising methods used by sellers of air transportation since the Department declined to revise its full-fare rule in 2006. Sellers are now marketing air transportation through a variety of methods that they were not using then. For example, some carriers have started to sell tickets through Facebook and some have Twitter feeds dedicated solely to advertising sale fares. Additionally, in recent years, carriers are increasingly unbundling the cost of air travel, which further obscures the total fare to be paid by the consumer. Carriers and online travel agencies have also started to offer more complicated routings with multiple connections in order to provide the "lowest" airfare to consumers. However, with these changes in routings, taxes and fees can increase and become a significant portion of the price to be paid by consumers. In those cases, consumers need a full picture of the total price to be paid in order to compare fares and routings. In order to understand the true cost of travel, consumers need to be able to see the entire price they need to pay to get to their destination the first time the airfare is presented to them.

We also are not persuaded by argument that the Department should not require that the advertised price for air transportation, a tour or tour component be the total price to be paid by the customer for that transportation, tour or tour component because other industries advertise without including government-imposed taxes and fees. Airfares are different from products in other industries for a variety of reasons, including the multitude of methods of advertising that sellers of air transportation employ and the various taxes and government fees that apply. We believe that consumers are deceived when presented with fares that do not include numerous required charges and, in our view, air travelers will be better able to make price comparisons when they can see the entire price of the air transportation, tour or tour component being advertised. The advertised fare under this policy shift must include all government-imposed taxes and fees as

well as mandatory carrier-imposed charges, including booking fees if the only way the consumer can obtain the air transportation is by paying the booking fee. While a carrier or ticket agent generally is not required to include a booking fee in its advertised fare if there are other means for the passenger to obtain the air transportation (*e.g.*, a booking fee only applies for tickets that are purchased over the telephone), where airfares are advertised via an Internet site that permits consumers to purchase fares, the fares advertised on the site must include all charges required to make the purchase on the site. For example, it would be unfair and deceptive to hold out on such an Internet site a fare that can be purchased only at airport ticket counters but that excludes a convenience fee that is applied to Internet sales.

In regard to the costs related to this change, online travel agencies that will face many of the same marketing and programming challenges as carriers do, if not more, feel that the operational costs of adhering to the rule will be overly burdensome. Sellers of air transportation are constantly updating their fare matrices and the methods by which they display fares. In addition, we believe many carriers may already have programs in place to accommodate this policy shift, as some foreign governmental entities such as Australia and the European Union already require the total price to be shown to consumers. We note also that the requirement for advertisements to state the total price is limited to advertisements published in the United States, including via the Internet if accessible in the U.S. Further, recognizing the amount of print advertising slated for use by tour operators that would need to be pulled thereby increasing costs of print advertising revision, we have decided that the new full fare adverting requirements will not take effect until 180 days after the publication of this final rule in the **Federal Register**. This should reduce the costs related to this requirement.

Some airlines were concerned that passengers would not know how much of their total price consists of government imposed taxes and fees. We want to assure these carriers that nothing in this rule prohibits them from making this information available to consumers. This final rule allows carriers to advise the public in their fare solicitations about government taxes and fees, or other mandatory carrier or ticket agent imposed charges applicable to their airfares. Sellers of air

transportation may have pop-ups or links adjacent to an advertised price to take the consumer to a listing of such charges, or they may display these charges on the same page in fine print if they prefer. Such charges must accurately reflect the actual costs to the carrier of the service or matter covered, be displayed on a per passenger basis, and be displayed in a manner that otherwise does not deceive consumers. Consequently, the rule requires that any such listing not be displayed prominently and be presented in significantly smaller type than the listing of the total price to ensure that consumers are not confused about the total price they must pay. Also, we are prohibiting the presentation of any "total" fares in advertising that exclude taxes, fees or other charges since the major impact of such presentations is to confuse and deceive consumers.

### B. Explicit Inclusion of Ticket Agents

*The NPRM:* The Department proposed to explicitly apply the price adverting rule to ticket agents. We have for years considered ticket agents to be subject to the price advertising rule since the Department's statutory authority to prohibit unfair and deceptive practices and unfair methods of competition applies to both carriers and ticket agents. However, the Department's price advertising rule doesn't specifically indicate that ticket agents are covered by the rule.

*Comments:* Comments received from airlines, travel agents, consumer groups and others all supported the inclusion of ticket agents in the price advertising rule. Air New Zealand and Qantas indicate that their support for including ticket agents in the rule is contingent on airlines not being responsible for the compliance of ticket agents.

*DOT Response:* The final rule explicitly includes ticket agents in the price advertising rule. This is consistent with longstanding Department policy and we did not receive any adverse comments. This inclusion will ensure that consumers are more fully protected. With regard to the Air New Zealand and Qantas comment, airlines have always been legally responsible along with their agents for their agents' advertising violations and they will continue to be under the revised rule.

### C. Each-Way Advertising

*The NPRM:* The Department proposed to codify its enforcement policy on each-way airfare advertising. Under this policy, advertisement of an each-way airfare that is contingent on a round-trip purchase is an unfair and deceptive practice unless the airfare is advertised

as "each way" and the round-trip purchase requirement is clearly and conspicuously disclosed in a location that is prominent and proximate to the advertised fare amount. The Department invited interested parties to comment on this proposal and on whether the Department should adopt a similar rule for air/hotel packages that advertise a single price but are sold at that price on a double occupancy basis, *i.e.,* two individuals must purchase the package to obtain the advertised fare.

*Comments:* Individual consumers and consumer groups had divergent views on whether the Department should allow each-way airfare advertising even if the round-trip purchase requirement is clearly and conspicuously disclosed proximately and prominently to the advertised fare. Flyersrights.org opposes this proposal, believing that disclosure of the full round-trip purchase price is most helpful to consumers. Consumers Union and AAPR support the proposed regulation, as long as the round-trip purchase requirement is clear and conspicuous. Most of the commenters on Regulation Room and individual commenters generally support this proposal but some, like Flyersrights.org, suggest the Department require that the full round-trip purchase price be disclosed. Airlines, airline associations and travel agency groups express support for the each-way advertising regulation. ATA requests clarification as to whether "one way" advertising would be allowed if there was no round-trip purchase requirement. ASTA supports this proposal as well, noting that specifically prohibiting the use of "one way" to advertise fares that are contingent on round-trip purchases will allow consumers to better comparison shop among fare quotes.

We received relatively few comments on whether the Department should adopt a rule requiring specific disclosure for air/hotel packages that advertise a single price but are sold at that price only on a double occupancy basis. Some commenters participating in the Regulation Room discussion state that clear and conspicuous disclosure concerning occupancy-related rates should be required. ASTA comments that double occupancy rates should still be allowed, as long as the "per person" requirement is disclosed.

*DOT Response:* The Department is codifying existing enforcement policy allowing sellers of air transportation to advertise an each-way price that is contingent on a round-trip ticket purchase so long as the round-trip purchase requirement is clearly and conspicuously disclosed in a location that is prominent and proximate to the advertised fare. This codification of longstanding enforcement policy allows sellers of air transportation to be flexible in the way they advertise round-trip fares while still requiring all pertinent disclosures to consumers. While the Department understands that some consumers would prefer the full round-trip price to be displayed, the Department has not found that the current regime has led to consumer confusion or deception and it does permit certain types of advertising that are beneficial. We note also that this final rule specifically prohibits referring to such an airfare as "one way" even if the round-trip purchase requirement is clearly disclosed, which should minimize or prevent consumer confusion. In response to ATA's request for clarification, we agree that "one way" advertising is allowed when purchase of that fare is not contingent on a round-trip purchase. We are deferring to a later date any requirement regarding double occupancy advertisements as we received few comments on this matter. We do not have enough information at this point to determine if consumers feel deceived by double occupancy rates, and consequently we will not formulate a specific regulation regarding the methods of such advertising at this time. "Double occupancy" advertising will still be subject to the general provisions of 49 U.S.C. 41712.

### D. Opt-Out Provisions

*The NPRM:* The Department proposed to prohibit "opt-out" provisions by sellers of air transportation. "Opt-out" provisions involve situations where a consumer is purchasing air travel or an air tour package online and certain fees for ancillary services or products are pre-selected for the consumer and added to the total price to be paid by the consumer at the end of the transaction. The consumer is deemed to have selected these services (and the charges for them) unless the consumer "unchecks" the pre-selected box or boxes for the relevant services. The NPRM proposed prohibiting this practice as unfair and deceptive in violation of 49 U.S.C. 41712 and allowing carriers and ticket agents to add an optional service to the total airfare to be paid by the consumer only if the consumer affirmatively "opts in" to accept and purchase that service.

*Comments:* There was wide support among individual commenters and consumer groups for a prohibition against opt-out provisions. A few individual commenters noted that this prohibition will allow consumers to avoid unwanted fees. All of the individuals commenting through the discussion on Regulation Room stated that all optional services should be presented to consumers as an "opt-in" choice. Individual consumers recounted how they were sometimes faced with paying for travel insurance they did not need or a seat selection fee they were not aware of because those options were "pre-selected" by the seller of air transportation.

Many industry commenters, though not all, also agree with a prohibition on "opt-out" features in advertising. ATA and most U.S. carriers, such as US Airways and Delta Air Lines, support this proposal. American Airlines states that non-aviation services should be offered on an "opt in" basis, but that aviation services that most consumers expect as part of their travel should be pre-selected. American notes that this will allow consumers to customize their travel options. IATA does not oppose the prohibition on opt-out provisions. AEA notes that EU Regulation 1008/2008 already has an opt-in requirement. Qantas Airlines opposes this regulation, stating that it feels customers appreciate pre-selected options. ASTA supports a prohibition on "opt-out" features in price advertising.

*DOT Response:* The Department has decided to prohibit the use of opt-out provisions by carriers and ticket agents. The fact that consumers often don't realize that optional services are included in the total price of the ticket due to the deceptive nature of such opt-out provisions, is borne out by consumer comments. Many industry organizations also support prohibiting opt-out provisions. In addition, this action will align the United States with the consumer protection laws of other jurisdictions which prohibit opt-out provisions, including the European Union through its regulation 1008/2008. We do not agree with airline comments that consumers like having certain airline related services preselected for convenience sake so that they can see the total cost of travel with those services. We believe that having opt-in selections achieves the same goals of allowing travelers to customize their air transportation packages to their travel needs and see the total cost of travel with those service while eliminating the unfair and deceptive practice of pre-selecting items that the consumer has not selected and does not necessarily realize are pre-selected until late in the process — sometimes after a purchase is complete. This rule would prohibit opt-out provisions for any ancillary fee for an optional service such as seat selection, seat upgrades, pre-boarding, travel insurance, rental cars, and transfers to and from the airport. Under

this rule, an optional service can be added to the total airfare to be paid by the consumer only if the consumer affirmatively agrees to pay a fee for such service, *i.e.* by checking a box for that service or other concrete action.

### 8. Baggage and Other Fees and Related Code-Share Issues

#### A. Covered Entities

*The NPRM:* In the NPRM, the Department proposed to require all U.S. and foreign air carriers that have websites accessible to the general public in the United States through which tickets are sold to provide notice to consumers about baggage fees and allowances and other ancillary fees that the carrier may charge. More specifically, the NPRM proposed: (1) Disclosure on the homepage for at least three months of any increase in the fee for passenger baggage or any change in the free baggage allowance for checked or carry-on baggage; (2) notice on e-ticket confirmations regarding the free baggage allowance for that flight and any applicable fee for the first and second checked bag and carry-on; and (3) disclosure of all fees for optional services in one central place on the seller's website. The Department noted that the recent trend to unbundle services and charge separate fees for services that may have once been included in the cost of a ticket has led to consumers having difficulty determining the total price they must pay to travel by air. The Department requested comment on whether these requirements to disclose baggage and other fees should apply to ticket agents as well as carriers. We also invited comment on alternative proposals, including whether the Department should limit the applicability of the disclosure requirements to all flights operated by U.S. carriers, U.S. and foreign carriers that operate any aircraft with 60 or more seats, or U.S. and foreign air carriers that operate any aircraft with or 30 or more seats.

*Comments:* Many consumers state that the type of fee disclosures contemplated in the proposed rule should apply to all sellers of air transportation. Some consumers relayed experiences where they felt fees were hidden when booking on online travel agency websites. CTA and BTC state that this section should apply to ticket agents as well as carriers, but they both note that the agents need accurate and up to date information from the airlines via the GDSs in order to provide accurate information to consumers.

USTOA contends that the disclosure requirements, as proposed, should not

be applied to ticket agents because the airlines are updating and changing fees constantly, and the cost to agents to ensure that the various airline fees they display are correct would be burdensome. USTOA proposes that instead ticket agents simply be required to inform consumers on their websites and on e-ticket confirmations that baggage and other charges may apply by stating that "airline fees for baggage and other optional services may apply to your journey; please consult with your airline for information on those fees." USTOA further states that in the event that the Department concludes that additional specific information should be provided by ticket agents, it should allow ticket agents to provide hyperlinks to the locations on the airline websites where specific information may be obtained. ITSA does not object to extending the requirements to disclose baggage and other fees to ticket agents, but notes that if the information is not provided to the GDSs, the costs associated with agencies constantly updating information are high and the possibility exists that the information may not be accurate. ASTA takes a similar position to ITSA in regards to applying the disclosure requirements to ticket agents.

*DOT Response:* The Department has decided that the requirements to provide specific notice to consumers about baggage fees and allowances and other ancillary fees shall apply to all U.S. and foreign carriers that advertise or sell air transportation in the U.S. We are not limiting the applicability of the disclosure requirements to flights of only U.S. carriers, as the harm to the consumer is the same whether the lack of information about baggage and other ancillary fees involve flights operated by a U.S. carrier or a foreign carrier. We are also not limiting the applicability of these requirements based on the size of the aircraft that carriers operate as we believe that disclosure of add-on fees is an issue of sufficient significance to warrant application of this requirement to aircraft of all sizes. Consumers want to be informed of the fees that they will be required to pay for optional services regardless of the size of the aircraft on which they travel.

The Department also believes that it is important to ensure that consumers are alerted to airline-imposed fees that may be applicable to itineraries purchased through ticket agencies. However, we are persuaded by USTOA and others to apply a more limited requirement to ticket agents, particularly since the Department is deferring decision on whether to require U.S. and foreign carriers to give ancillary fee information

to GDSs. Therefore, unlike the case for U.S. and foreign air carriers, this final rule does not require ticket agents to disclose on their website information about changes in baggage fees or allowances or to list on their website all of the airlines' fees for optional services. The final rule does, however, require ticket agents (and carriers) to inform passengers on the first screen in which the ticket agent or carrier offers a fare quotation for a specific itinerary selected by a consumer that additional airline fees for baggage may apply and where consumers can go to see these baggage fees. This notification on the website must be clear, conspicuous and prominent. To comply with this requirement, ticket agents can choose between referring consumers to their own site where the baggage fees are displayed or to the airline websites where specific information may be obtained. This requirement is consistent with prior guidance provided by the Department's Aviation Enforcement Office. See, Notice of the Assistant General Counsel for Aviation Enforcement and Proceedings, *Guidance on Disclosure of Policies and Charges Associated with Checked Baggage,* May 13, 2008, *http://airconsumer.dot.gov/rules/guidance.htm.* The final rule also requires ticket agents (and carriers) to include on e-ticket confirmations information about the free baggage allowance and the applicable fee for the first and second checked bag and carry-on but allows ticket agents, unlike carriers, to do so through a hyperlink. We also want to make clear that when using the term "ticket agents" we are referring not only to agents of the carriers but also others who meet the definition of "ticket agent" contained at 49 U.S.C. 40102 (a)(40), *i.e.,* one who as a principal sells, offers for sale, negotiates for or holds itself out as selling, providing or arranging for air transportation.

#### B. Disclosure of Baggage Fees

*The NPRM:* In 2008, the Department's Aviation Enforcement Office issued guidance concerning the disclosure of baggage fees to the public. In that notice, the office stated that it views a carrier's failure to clearly disclose significant conditions applicable to air fares, such as baggage fees, to be an unfair and deceptive practice and unfair method of competition in violation of 49 U.S.C. 41712. It described steps that carriers should take to ensure that they are providing prominent and timely notice of their baggage policies and charges. For example, the office suggested carriers place a notice on the home page of their website highlighting new

baggage policies and charges. See, Notice of the Assistant General Counsel for Aviation Enforcement and Proceedings, *Guidance on Disclosure of Policies and Charges Associated with Checked Baggage,* May 13, 2008, *http://airconsumer.dot.gov/rules/guidance.htm.*

In the instant proceeding, the Department proposed to codify this guidance document by requiring carriers that maintain a website that is accessible to the general public to prominently disclose on the homepage of that website for at least three months any increase in the fee for passenger baggage or any change in the free baggage allowance for checked or carry-on baggage. The Department proposed that this notice could appear in its entirety on the home page or could be accomplished through a prominent, conspicuous hyperlink (*e.g.,* "Revised Baggage Fees") that leads to an explanation of the carrier's baggage policies and fees. The Department invited comment on this proposal, including comment on how long the notice should remain on the page and the best options for displaying the information to consumers.

The NPRM also proposed to require carriers that issue e-ticket confirmations to include information on that confirmation regarding the free baggage allowance for that flight and the applicable fee for the first and second checked bag and carry-on bag. The goal of this proposed rule was to provide the specific information regarding a particular consumer's baggage allowance well before that consumer arrives at the airport with bags packed. The Department invited comment on this proposed section.

*Comments:* Most individual commenters and commenters from consumer groups did not address this proposal specifically, but overwhelmingly commented that, in general, they supported more disclosures. Individual commenters, through the Docket and through Regulation Room, noted how they are sometimes surprised by additional baggage fees when they check-in at the airport. CTA states that two out of three travelers responding to their survey were surprised by fees upon checking in for a flight at the airport. Many commenters wanted the Department to limit the carrier's ability to unbundle certain fees from the base fare, particularly baggage fees for the first checked bag. These commenters feel that carriers are "nickel and diming" passengers instead of trying to improve service. Other commenters found value in the a la carte pricing models of

carriers because the models allow travelers to customize their trips. The individual commenters who were not opposed to unbundling fees generally support more disclosure of fees to the consumer before purchase.

ATA and most U.S. carriers support more disclosure regarding changes in baggage fees. ATA supports the proposal to put notice of fee changes on a carrier's homepage and states that the best method for providing this notice is to put a hyperlink on the homepage. ATA notes that three months is a long enough time to require the information on the change to be on the website. Most U.S. carriers submitted comments similar to ATA's on the proposal to disclose baggage fee changes. Virgin America states, however, that the Department should refrain from establishing too much specificity or detail because such a regulation would detract from competitive market forces on how airlines design and set up their own websites. Furthermore, Virgin America notes that many carriers are developing mobile applications where screen space is limited. Allegiant Airlines opposes what it sees as attempts by the Department to micromanage how websites appear and how information is shared with consumers in the absence of a clear attempt by carriers to deceive consumers.

Foreign carriers and carrier associations generally were not in favor of what they view as increased U.S. government regulation of the appearance of websites that are not maintained in the United States. IATA warns that this proposal could be an extraterritorial application of U.S. law. IATA further states that most carriers already have baggage fee information readily available on their website, and most carriers do not charge for one or two checked pieces of baggage to or from the United States, so adding extra notice and advertising requirements to a carrier's website would increase costs greatly. The National Airlines Council of Canada agrees with disclosure of fees on websites, but disagrees with the requirement to place a link to the disclosure on the homepage. Jetstar Airways opposes posting notice about the change directly on the homepage of the carrier, asserting that space issues could limit airlines' ability to clearly disclose the changes and advertise products and services. Qantas raises similar concerns, noting that the Department should not dictate the content of a carrier's website or homepage. Lufthansa believes that the Department did not establish why these disclosure rules are necessary, but does

note that it already provides most of this information. Condor Flugdienst notes its objection to requiring changes to baggage allowances to be posted on the homepage, stating that failure to provide notice of a change is a violation of 49 U.S.C. § 41712 under Department guidance and that there is no need, therefore, for the Department to codify this requirement. Air France and KLM contend that having the information regarding baggage fee changes stand alone on the homepage would be costly. Those carriers suggest that this information's location on the website should be left to the airline's discretion and that a time period of one to two months would be enough time for consumers to be aware of the change.

With regard to disclosure of baggage information on e-ticket confirmations, as with the proposal to disclose such information on carriers' websites, most individual consumers and consumer groups support any provision that provides the consumer with more information and prevents consumers from being surprised about hidden fees. Some individuals specifically contend that baggage allowance disclosures should also include information regarding excess weight and excess baggage charges. Many consumers feel that the disclosure of baggage fees should occur earlier in the process, not after purchasing the ticket. One commenter noted that e-ticket confirmations are not required, and that some carriers still use paper tickets. This commenter noted that any requirement for disclosure of baggage fees on an e-ticket confirmation would not help consumers who are provided paper tickets because those consumers would not have that information. This commenter believes that the Department should clearly define what a ticket is, and then require baggage fee disclosures to be in the same method as the purchaser receives the ticket.

ATA and most U.S. airlines do not have an objection to this requirement, as many carriers currently provide this information in the e-ticket confirmation. US Airways and Delta Air Lines support baggage disclosures on e-tickets. Spirit Airlines supports baggage fee disclosures on e-tickets through a hyperlink to baggage information. IATA is not opposed to a provision requiring airlines to include information regarding optional services in e-tickets after a purchase is complete. AEA also states that it is not opposed to providing this information on an e-ticket. AEA points out that EU Regulation 1008/2008 mandates that optional price supplements be communicated in a "clear, transparent and unambiguous

way." Some foreign carriers assert that requiring the information on the e-ticket confirmation is regulatory overkill, as a consumer cannot complete a purchase without becoming aware of the fees due to other government regulations. Other carriers state that due to the abundance of disclosure prior to completion of purchase, a carrier should not be required to provide all of the information in full on an e-ticket as that would be costly. All Nippon Airways expressed concerns about the costs of redesigning their e-ticket confirmations, noting that a recent overhaul cost upwards of $145,000. Some carriers, such as Air France and KLM, note that they already have a system in place to provide information about baggage on the e-boarding pass issued via Internet check-in.

*DOT Response:* The Department has decided to require U.S. and foreign carriers that advertise or sell air transportation in the United States to promptly and prominently disclose any increase in its fees for carry-on or checked baggage and any change in the checked baggage allowance for a passenger on the carrier's homepage. Such notice must remain on the homepage for at least three months after the change becomes effective. This rule is consistent with current enforcement policies regarding the disclosure of changes in baggage fees. Additionally, the Department feels that this rule will prevent passenger surprise about changes in baggage fees or allowances. We agree with consumers and consumer groups, who advocate that greater disclosure of fees, and particularly baggage fees, is needed. Recognizing the concerns raised by carriers, particularly foreign carriers, about space on a carrier's homepage and a carrier's legitimate need to be able to design a website that is competitive and presents information in a clear way, the Department will allow carriers to fulfill the notice requirements by providing a link from the homepage directly to a pop-up or a place on another webpage that details the change in baggage allowance or fees and the effective dates of such changes. The link on the homepage needs to be descriptive, clear and conspicuous, *i.e.,* easy for a consumer to locate. The link need only remain on the homepage for a period of three months after the change becomes effective. Most commenters agreed that three months is a long enough time to ensure that consumers are aware of any change in baggage fees or allowances.

The Department disagrees with Air France and KLM, which suggest that the carriers be allowed to decide where on their website to display the information and that the information should only remain active on the website for one or two months. Changes that occur need to be posted on the website for a sufficient time in order to allow consumers to review the changes not only prior to choosing a flight but also after they chose a flight and are preparing to travel. The Department believes that allowing carriers to decide where the notice should be given may result in some carriers placing the information in an inconspicuous location on the website. If such information is difficult for consumers to find, they may not be aware of the change until after arrival at the airport and the consumer cannot evaluate the impact of the change in baggage fees and allowances on his or her scheduled transportation, which limits consumer choice.

The Department has also determined that there is value in providing a consumer information regarding baggage fees and allowances after the consumer completes a purchase for air travel. Therefore, the final rule requires U.S. carriers and foreign carriers and ticket agents that advertise or sell air transportation in the United States to provide information on e-ticket confirmations regarding the passenger's free baggage allowance and/or the applicable fee for a carry-on bag and the first and second checked bag. By "applicable fee," we mean the baggage fee information provided on the e-ticket confirmation cannot simply be a range of fees but must include information about any price that may exist for a carry-on bag and the first and second checked bag and any differing price that may exist depending on the passenger's status (*e.g.,* frequent flyer, military personnel), on when the payment for the bag is made, or and on whether a consumer checks his or her bag online rather than at the airport. As explained in the section on covered entities, because they may not know the most recent carrier baggage policies, ticket agents may provide details on where to obtain this information by a hyperlink to the locations on the airline websites where specific information may be obtained since the airlines often update and change fees. The Department notes that this requirement will benefit consumers because it will reduce confusion over whether, and, if so, how much they will have to pay to check or carry-on bags. Additionally, this will save the time of both consumers and airline employees at the airport, because consumers will be notified in advance of check-in what the applicable fees are for a carry-on bag and the first and second checked bags. The Department

notes that carriers are already providing this information to consumers in compliance with existing enforcement policies. We disagree with the assertion by some carriers that consumers cannot complete a purchase without first becoming aware of the applicable baggage fees. Given the advent of new fees, such as fees for carry-on bags, the differing price for first and second checked bags, and the price difference that sometimes exists if a consumer checks his or her bag online versus checking the bag in at the airport, the Department believes that it is not a simple matter for consumers to determine the total price to transport their baggage. Additionally, the Department disagrees with airlines that assert that the disclosure requirements are burdensome, as most carriers already provide this information in one form or another.

## C. Disclosure of all Ancillary Fees

*The NPRM:* The Department proposed to require carriers that have a website accessible to the general public to disclose all fees for optional aviation services in one central place on their website, so that consumers have an easily accessible reference guide for the cost of these services. This disclosure was proposed to be made through a link from the carrier's homepage directly to a listing of those fees. The Department invited general comment on this proposal. We also asked for comment on whether only "significant" fees for optional services should have to be listed and, if so, how to define a "significant fee." The Department also asked for suggestions for alternatives to the easily accessible link from the homepage for this disclosure.

*Comments:* Generally, the majority of consumers and consumer groups agreed with requiring carriers to disclose ancillary fees on their website. They contend that airlines hide their fees, and that requiring disclosure will benefit consumers' ability to comparison shop and avoid surprise fees. Many consumer commenters urge the Department to require that the listing of optional fees on carriers' websites be standardized. However, some commenters, commenting through the discussion on Regulation Room, expressed concern that a large fee table could be confusing to inexperienced or unsavvy casual travelers. Some consumers and consumer organizations assert that requiring the disclosure of ancillary fees does not go far enough and ask that the Department establish a list of ancillary services for which airlines are prohibited from charging a fee.

ATA generally supports the proposal requiring airlines to disclose fees for ancillary services on a carrier's website through a link, but feels that disclosure of such fees on e-ticket confirmations would be burdensome. ATA contends that some fees vary based on the flight and itinerary, such as food and beverage items. ATA, as well as industry groups such as ASTA and ITSA, do not see a reason why the disclosure should be limited to significant fees. US Airways generally supports this proposal, but requests sufficient lead time to fully implement the website changes required to list the fee information. US Airways notes that if the Department requires disclosure of these fees earlier in the process, the programming costs would increase to cover the complexity of new programming, and sufficient lead time would be required. Delta states that it already has a page that lists these fees, and does not object to a requirement that all carriers maintain such pages.

*DOT Response:* The Department has decided to require U.S. and foreign carriers to have one, central webpage on their website, linked from the carrier's homepage, which lists all ancillary fees. The reason for this requirement is that Department considers it too difficult currently for consumers to effectively comparison shop and determine the total cost for travel, including ancillary fees for optional services. Not all carriers provide information regarding charges for various services, such as seat assignments, extra leg room, priority boarding, telephone reservations, and seat upgrades in a centralized location so that it is easily accessible for the consumer to review prior to purchase. The Department considers it to be unfair and deceptive to charge an ancillary fee to a consumer, when that consumer had no simple, practical, and reasonable way of knowing about the fee prior to purchasing the ticket. Having a single listing of all of the ancillary fees that a carrier charges for optional services allows the consumer access to greater information without unduly burdening the carrier or stifling the carrier's need to compete on such services.

The Department agrees with commenters that state that all fees should be listed. We believe that there is no practical way to identify what is "significant," as each traveler, and even airline, might differ over what is significant. Therefore, the Department believes that to ensure adequate protection of consumers, as well as to ensure a level playing field among airlines, it is best to require carriers to list all fees. This includes, but is not limited to, fees for checked baggage, carry-on baggage, overweight bags,

meals, on-board entertainment, Internet connections, pillows, blankets, advanced or upgraded seating assignments, telephone reservations, early boarding, canceling or changing reservations, unaccompanied minors, and pet transportation. ATPCO has identified more than a hundred optional services and assigned each of those services a code. While the ATPCO list may not be an exhaustive list of services that are now offered or that will in the future be offered, the Department suggests that carriers may wish to use the ATPCO list of charges as a reference in developing a list of all optional services and fees to put on their websites.

The Department understands the carriers' concern that the availability and price of some items vary depending on a number of factors such as the type of aircraft being used, the frequent flyer elite status of a passenger, the flight on which a passenger is booked, or the time at which a passenger pays for the optional service. For non-baggage related optional services, carriers can provide a range of fees, acknowledging that they vary based on those types of factors. For example, if food and beverage service prices vary among flights, an airline can state that meals or snacks are available for purchase, and then give a range of prices for such meals and snacks.

This use of a range of fees would not, however, be acceptable under the rule with regard to fees in connection with checked or carry-on baggage, which are so fundamental to air travel and have until relatively recently been included in the price paid for travel on all carriers. With regard to those fees, we are specifically requiring that carriers, at a minimum, provide information about (1) any differing price that may exist for the first, second, third, or more checked and carry-on bag or overweight/oversized bag and (2) any differing price and allocation (*e.g.,* whether or not a bag checked for free counts toward overall allowance) that may exist for each bag depending on the passenger's status (*e.g.,* frequent flyer, military personnel), on when the payment for the bag is made, or whether a consumer checks his or her bag online versus checking the bag at the airport. If an airline offers discounted baggage fees through status as a member in a paid or unpaid membership "club," information regarding these programs should be offered as well. The Department believes that listing the fees in one place will allow consumers greater access to information, prevent the problem of hidden fees, and prevent confusion at the airport or in-flight due to an

unexpected charge. It should also enhance competition, as consumers will be better able to compare costs among carriers for the trip that they plan to take with the services that they would like to have. With regard to commenters who wanted the Department to mandate certain ancillary items that must be free, the law does not provide us the authority to do so.

D. Global Distribution Systems

*The NPRM:* The Department stated in the NPRM that it was considering requiring carriers to make information about charges for optional services available to global distribution systems (GDSs). The Department considered this proposal due to the fact that a significant portion of consumers purchase their air travel and air tours though travel agencies, both online and traditional brick-and-mortar agencies. The Department invited comments on the ability of carriers to provide this information in a usable format and the potential costs and benefits associated with providing this information to GDSs.

*Comments:* ATA and most of its members strongly oppose a requirement that forces airlines to provide ancillary fee information to GDSs. First, ATA notes that this is a competitive issue and would interfere with ongoing negotiations among carriers, GDSs, and travel agents, and would inject government regulation into private market decision making. ATA notes that GDSs already have a great share of the market for air transportation bookings, and warns that fares could increase to cover the charges the GDSs would likely levy on carriers that are required to provide this information to them. ATA also questions the existence of any unfair or deceptive practice this requirement would prevent.

Most U.S. carriers agree with ATA's position. US Airways does not believe the Department should mandate disclosure in a particular format, seeing this as interference with market forces. Delta Air Lines believes that this rule would affect its bargaining position with the GDSs and their ability to explore different options for sharing of this information with the GDSs. American Airlines contends that a carrier should have the ability and power to decide how to market its ancillary services. American states that requiring disclosure would unfairly bolster the GDS market power. In a joint filing, American Airlines, Continental Airlines, Delta Air Lines, United Air Lines, and US Airways reiterate the carriers' commitment to providing fee information to consumers, but assert

that interfering in market negotiations would harm competition and ultimately would harm consumers. These airlines note that providing fee information about optional services to consumers is good for the airlines because airlines are in the business of selling tickets and selling these ancillary services. They assert that carriers should be allowed to market their services how they see fit and to decide how to provide their customers with the greatest access to information and choice. The carriers reiterate ATA's point that requiring airlines to furnish this information to GDSs would harm consumers by increasing airline distribution costs, arguing that GDSs would charge the airlines fees to upload the information into the GDS system. The carriers note that many travel agents, including online travel agents, already have access to and disclose fee information, referring to the Expedia website which has a chart of baggage fees. The carriers contend that the GDS distribution system is anti-competitive and not efficient, and that requiring the airlines to provide fee information will further bolster the market power of the GDSs without allowing for substantive competition from third-party vendors.

Two U.S. carriers did not object to providing ancillary fee information to GDSs. Spirit Airlines does not oppose the proposal, unless it would impose significant costs on carriers to change the format the carriers already use to provide the information to the GDSs. Southwest Airlines supports limited transmittal of fee information to GDSs in order to provide information to all consumers, regardless of how they book their flights. Southwest states, however, that the requirement should only obligate carriers to furnish this information to existing GDS partners. Southwest opposes allowing GDSs to charge fees for collecting data on ancillary services. Southwest notes that carrier participation in GDSs and other distribution channels for selling air transportation is a strategic business decision by each carrier. The carrier also supports a provision that would require all carrier-imposed surcharges, such as seasonal fare adjustments, to be included in the fare information provided to GDSs.

IATA and most of the other foreign air carrier organizations oppose requiring carriers to provide ancillary fee information to GDSs as well, although they support carriers providing information about ancillary fees and services on carrier websites. The National Airlines Council of Canada agrees with the disclosure of fees in general, but recommends that the

Department not mandate the method of disclosure. It notes that this information is most effective when presented to the customer within the flow of the transaction, as Air Canada does on its website. Some carriers, such as Jetstar Airways and Qantas, oppose providing the fees for optional services to consumers via a static webpage, stating that it is more helpful for consumers and airlines to focus ancillary fee information to a particular booking. Other carriers, such as Virgin Atlantic, note that they already file this information with ATPCO, thus allowing for access by GDSs.

The vast majority of consumers and consumer groups (*e.g.*, BTC, CTA, Flyersrights.org) support the Department requiring airlines to disclose their ancillary fee information to the GDSs. BTC and CTA urge the Department to establish uniform standards for fee disclosures, on the basis that airlines may add new fees in the future. Both of those organizations state that airlines artificially deflate the cost of a fare so that they can tack on high ancillary fee charges that are hidden from the consumer during an initial fare search.

ITSA and ASTA implore the Department to require airlines to share ancillary fees with the GDSs. ITSA notes that a passenger who wants to search for a fare that includes a checked bag and a pre-assigned seat will have to spend a great deal of time and have to be especially computer savvy to find the total amount he or she would have to pay for their travel because the fees are hidden on carriers' websites. ITSA, representing GDSs, states that at least 50% and possibly as high as 60% of the traveling public relies on travel agents to comparison shop for fares. ITSA argues that without this information from GDSs, brick and mortar travel agencies and online travel agencies cannot adequately state the total cost of travel to their clients. ITSA notes that the Department already requires information beyond the base fare to be provided to the GDSs such as code-share information and change of gauge information. ITSA asserts that the costs of this requirement would be low as it believes the technology is already in place to distribute the fee information. ITSA further adds that the Department's mandate to prevent unfair and deceptive practices trumps claims that disclosure should be left to private market negotiations. ITSA believes that merely requiring carriers to post the fee information on a webpage is not adequate to alleviate the problems of hidden fares or reduce the time it takes to comparison shop. Uniglobe Travel,

Travizon, Inc., and individual travel agents that commented in the docket support the proposal to require that carriers provide ancillary fee information to GDSs.

Many third party commenters submitted comments related to providing ancillary fee information to GDSs. Several members of Congress wrote in support of a requirement obligating carriers to submit their ancillary fee information to GDSs. A member of the European Parliament also expressed his support for issuing a rule so that passengers booking through a GDS system are aware of the total price of the ticket before purchase. The New York State Consumer Protection Board states a similar position that information about fees should be distributed to consumers through a wide variety of channels, not just through a link on the carrier's website.

Farelogix, a third party distribution and management technology firm, opposes the proposal to require that the carriers provide information to GDSs. Farelogix believes that GDSs should coordinate directly with the airline. The firm does not think that the GDSs should be able to mandate the format of the information. Farelogix notes that the GDSs are resistant to third party technology to transfer information in order to preserve their place in the travel market, and states that this proposed requirement will further limit third parties from entering the travel technology marketplace. An airline consultant makes several similar points. This consultant points out that if the Department requires carriers to provide information about fees for optional services to GDSs, the airlines' bargaining leverage is eroded and the higher distribution costs the airlines will face will be passed on to consumers. The consultant notes that negotiations to sell ancillary services are working in some respects, using examples of United Airlines selling Economy Plus service through Sabre, Midwest Airlines selling seat assignments through Sabre, and Finnair selling ancillary services through Amadeus. This individual believes that these fees are not hidden, and notes that most of these fees are not charged until check-in or onboard the flight. A professor at Harvard Business School comments that compelling airlines to provide fee information to GDSs will have far-reaching and unintended consequences on existing contractual structures between airlines and GDSs. He believes that if a requirement to provide fees for optional services is adopted, the GDSs will mark up prices considerably because airlines will be

forced to disclose pursuant to government rule. The Airline Tariff Publishing Company (ATPCO), without taking a position on the merits of the proposal, notes that it has systems in place that could help implement any requirement regarding carriers sharing fee information with GDSs.

*DOT Response:* We have decided to defer final action on this proposal. The Department's goal is to protect consumers from hidden and deceptive fees and to allow consumers to price shop for air transportation in an effective manner remains paramount. The Department's goal is to provide all air travel consumers with easy access to information about fares and optional fees, particularly baggage fees. As discussed earlier, this final rule requires U.S. and foreign carriers to disclose on their website information about changes in baggage fees or allowances and to list on their website all of the airlines' fees for optional services. The final rule also requires both carriers and ticket agents to provide information on the first screen in which the ticket agent or carrier offers a fare quotation for a specific itinerary selected by a consumer that additional airline fees for baggage may apply and where consumers can go to access these baggage fees. In addition, ticket agents and carriers must include on e-ticket confirmations information about the free baggage allowance and the applicable fee for the first and second checked bag and carry-on. We believe that these steps partially address the problem of hidden and deceptive fees and allow consumers to price shop for air transportation. The Department is cognizant that some parties feel that requiring carriers to provide information on their ancillary fees to GDSs would be a reasonable way, if not the best way, to ensure consumers can easily comparison shop for air fares. We cannot at this time agree that it is in the public interest to mandate that step, since we lack information critical to a decision on the issue. Thus, in order to permit us time to obtain additional information about costs, benefits and consequences of requiring U.S. and foreign carriers to provide ancillary fee information to GDSs, including those involving competition, the Department is deferring final action on this matter. The Department wants to ensure that any action it takes does not have unintended consequences, particularly given the sensitive nature of the market and the negotiations currently taking place between carriers and the GDSs.

**E. Display of Two Fares in Advertising**

*The NPRM:* The Department asked for comment on the costs and benefits of displaying two fares in airfare advertising. The first price would be the full fare (*i.e.,* fare with all mandatory charges) and the second price would be that full fare plus the cost of baggage charges that traditionally have been included in the price of the ticket, if these prices differ. The Department asked whether the second fare should only include the price of baggage charges or whether it should also include other services traditionally included in air travel such as obtaining a seat assignment in advance. The Department also solicited comment on the cost and feasibility of requiring sellers of air transportation to allow consumers to conduct fare queries for their specific needs (*e.g.,* airfare and two checked bags, or airfare, one checked bag and extra legroom) and select the services they wish to include in the price of the travel.

*Comments:* Individual consumers and consumer groups are divided on the helpfulness of any requirement for a carrier to display two fares in response to a fare inquiry. Some commenters and groups assert that this type of fare display system could be helpful for comparison shopping. Commenters who participated in the discussion on the Regulation Room site were divided. Some state that such a dual fare display could be helpful, but others claim it would be confusing. Individuals commenting to the docket expressed similar opinions. Most were in favor of more robust disclosure, especially regarding baggage fees. Many who favored a dual fare disclosure disagreed, however, on what should be included in the second fare of a two-fare display system. Some state that just the cost of baggage should be included. Others contend that baggage, blankets, pillow, and a seat assignment should also be included. The idea that consumers could select the ancillary services they wished before receiving a fare quote had many supporters. CTA supports the approach to airfare searching that would allow a consumer to select the services and fees they wish to be included in their travel.

ATA does not support the two-fare model. ATA states it would be confusing for passengers. It adds that the Department does not have enough information to impose this requirement. ATA and certain U.S. carriers note that there are questions and ambiguities as to what is "traditionally included in the price of a ticket." As many U.S. carriers noted, each passenger's needs are different, so the second fare would be confusing or of little help to many consumers.

IATA contends that a two-fare display system could be confusing and should not be mandated, as many carriers already have an established online advertising regime that includes an online menu of optional services presented to the consumer through the course of their purchase. IATA asserts that requiring a two-fare model would be an unwarranted government intrusion on business practices. The Arab Air Carriers Organization states that a two-fare model would be unworkable and prohibitively expensive, as most carriers' reservations systems would have to be reworked to accommodate a two-fare requirement. Many individual foreign carriers echoed the sentiments of IATA, including South African Airways and Lufthansa, which note that a carrier can always choose to adopt a two-fare system. British Airways states that if this proposal were to become a requirement, the requirement should only apply to fares that do not include one checked bag, and this requirement should apply to GDSs and travel agents as well as carriers. ITSA is not opposed to a two-fare system, as long as the Department is clear about what would be included in the price. ATPCO notes that it has technology that could implement any required two-fare pricing model or a consumer self-selection model.

*DOT Response:* The Department agrees with the commenters who feel that a "two-fare" display system would be too confusing for travelers. We agree that each traveler is unique with regard to what ancillary services he or she needs or wants on a particular flight, and therefore one "all-inclusive" price that includes baggage and a seat assignment may not be helpful to most passengers. The Department will also not require, at this time, that sellers of air transportation revise their online systems to allow consumers to conduct queries for specific optional services and the fees for those services before displaying a price. Although the Department understands that some Web sites may exist that have these capabilities and that some carriers utilize online menus for consumers from which to choose services during the booking process, the Department does not have enough information regarding the costs of implementing such a system to require that every carrier implement such an online system.

**F. Services Provided by Code-Share Partners**

*The NPRM:* The Department sought comments as to whether in a code-share situation the marketing/ticketing carrier should be required to disclose through reservation agents, Web sites, and/or e-ticket confirmations any differences in services and fees applicable to a consumer between the marketing carrier and the operating carrier. The Department also asked whether there were any ancillary fees for services that should not be permitted to vary among code-share partners, such as the allowances and charges for baggage. The Department noted that its policy states that, for passengers whose ultimate ticketed origin or destination is a U.S. point, the baggage rules that apply at the beginning of the itinerary apply throughout the itinerary and provides that the marketing carrier's rules take precedence.

*Comments:* Most individual commenters and consumer groups, including Flyersrights.org, favor a rule that would require the marketing or ticketing carrier's fees to apply for the whole trip. Some commenters, through Regulation Room, expressed the opinion that the lesser of the two fees should apply if the marketing carrier's fees differ from the operating carrier's fees. Most commenters support greater notice requirements regarding differing fee structures between code-share partners. Some commenters on Regulation Room specifically felt that the marketing carrier should provide greater information, especially if the operating carrier has more stringent or restrictive luggage requirements.

ATA believes that disclosure of fees between code-share partners can be accomplished effectively through a hyperlink on the marketing carrier's website directly to the operating carrier's fee list. It opposes any attempt by the Department to standardize optional fees amongst code-share partners. ATA notes that attempts at standardization would be counter to the goals of deregulation and could be anti-competitive. It further states that standardization of fees could be impractical and costly for flights that have multiple code-share partners selling tickets on the same flight. US Airways comments that applying the marketing carrier's rule is not feasible and would create different classes of passengers on the same aircraft. Delta states that ancillary fees should not be uniform amongst carriers and code-share partners as that requirement would stifle competition.

IATA states that requiring the marketing carrier to disclose fees of operating carriers is consistent with the Department's policy regarding code-share situations. IATA believes this notice can be accomplished through a hyperlink to the code-share partner's website that details their fees. Singapore Airlines notes that it already provides information to consumers regarding significant differences in services and fees among partners. It states that the best way to accomplish this is to provide a link to the partner's listing. The carrier also notes that its call center agents are trained to provide this information. However, Singapore Airlines states that if the Department proposes a harmonized scheme it should incorporate reasonable and commercially viable allowances and fees. Qatar Airways refers the Department to IATA Resolution 302 ("Baggage Provisions Selection Criteria") which will go into effect in April 2011. The carrier states that under this resolution, there will be no standard baggage allowances or charges, and each carrier will publish its own rules. Qatar Airways notes that in the event of a conflict between baggage allowances, the provision of the "Most Significant Carrier," as determined by the Resolution, would apply. Qatar Airways urges the Department to adopt a similar proposal. Many foreign carriers such as Qantas, Air France, and KLM oppose a Department rule that would prohibit differences in baggage fees between the marketing and operating carrier, but do support disclosure of any differences between the carriers.

*DOT Response:* After considering the comments regarding the differences between the ancillary services and fees between code-share and interline carriers, the Department has decided not to require code-share carriers to standardize their optional services and fees but to specify with respect to baggage which carrier's allowances and fees apply. We believe that baggage rules and fees should be treated differently from fees for other optional services, as variations in baggage fees among code-share and interline partners are likely to result in significant inconvenience and confusion for many passengers. The Department has received complaints from consumers who have been faced with multiple, differing, and uncertain baggage allowances and charges on both code-share and interline flights. Passengers experience significant difficulties when the baggage allowances and fees that apply at the beginning of their trip differ from what is applied later because their itineraries include sectors where the baggage rules differ, notwithstanding the fact that the passenger was traveling on a single, code-share or interline ticket, service that carriers continue to tout as "seamless."

This final rule requires that for passengers whose ultimate ticketed origin or destination is a U.S. point, the baggage allowances and fees that apply at the beginning of the itinerary apply throughout the itinerary. In the case of code-share flights that form part of an itinerary whose ultimate ticketed origin or destination is a point in the U.S., the final rule requires that the baggage allowances and fees of the marketing carrier apply throughout the itinerary to the extent that they differ between the marketing carrier and the operating carrier. The Department is aware that these requirements may result in the situation foreseen by ATA and US Airways of consumers on the same flight being subject to different baggage allowances or fees. The Department does not find anything unfair or deceptive about passengers on the same flight being subject to different baggage provisions — just as many passengers on the flight would have typically paid different fares. Further, we believe this method of determining baggage rules is consistent with Department policy and affords the greatest protection to consumers from unfair application of baggage rules throughout their itineraries. The Department also believes these requirements align with the goals of IATA Resolution 302, which was adopted by IATA members to bring transparency and clarity to baggage rules on code-share and interline itineraries.

As to whether in the case of code-share flights whether the marketing/ticketing carrier should be required to disclose all of the operating carrier's fees for optional services, we have decided to require the marketing carrier to disclose on its website any difference between its optional services and fees and those of the carrier operating the flight. This disclosure may be made through providing a hyperlink to the operating carriers' websites that detail the operating carriers' fees for optional services, or to a page on its website that lists the differences in policies amongst code-share partners. A marketing/ticketing carrier may also choose to make this information available to consumers through notice on its own website of differences between its optional services and fees and those of the carrier operating the flight. We are not requiring disclosure of the fees for optional services of the operating carrier through reservation agents or e-ticket

confirmations because we believe the costs to carriers of providing this information in those formats far outweigh the benefit to consumers, particularly since this final rule already requires U.S. and foreign carriers to list on their website all of their fees for optional services. Further, of all the fees for optional services charged by airlines, consumers are generally most interested in fees charged for baggage and the final rule already requires ticket agents and carriers to disclose baggage fees and allowances on e-ticket confirmations. As discussed earlier, the final rule also requires carriers and ticket agents to inform passengers on the first screen in which the ticket agent or carrier offers a fare quotation for a specific itinerary selected by a consumer that additional airline fees for baggage may apply and where consumers can go to see these baggage fees.

### 9. Post-Purchase Price Increase

*The NPRM:* The Department proposed to revise its current regulation in 14 CFR 253.7 which allows post purchase price increases as long as the consumer receives direct notice on or with the ticket of any contract of carriage term that allows a carrier to increase the price after purchase. Under the proposed rule, the Department would prohibit all post-purchase price increases by carriers, tour operators, or other sellers of air transportation, tours or tour components. The seller would be prohibited from increasing the price after the consumer completes the purchase. The Department asked for comment on the proposal to ban post-purchase price increases as well as two alternatives. The first proposed alternative would allow post-purchase price increases, as long as the seller of air transportation conspicuously disclosed to the consumer the potential for such an increase and the maximum amount of such increase before the consumer purchased the air transportation, and the consumer affirmatively agreed to such an increase prior to the completion of the purchase. The second alternative would allow post-purchase price increases (with disclosure) that the consumer agrees to in advance of purchasing the ticket, but would prohibit such an increase within thirty or sixty days of the first flight in the purchased itinerary.

*Comments:* Individual travelers and consumer organizations representing travelers support the proposal to ban post-purchase price increases in air transportation or tours by carriers and ticket agents. Most consumer commenters state that an outright ban on post-purchase price increases is fair.

One commenter asserts that the practice of increasing the price after purchase is egregious, especially in the case of tour operators that raise prices due to fuel surcharges. Another commenter asks for clarification on what an increase in the price of the ticket means, because the commenter is concerned about change fees being applied to an already purchased ticket. Most commenters participating in Regulation Room favor an outright ban, rejecting the alternatives that allow for conspicuous disclosure of a potential price increase. A small number felt that the proposed alternative of requiring conspicuous notice of a potential maximum amount of an increase would adequately protect consumers.

We also received comments from carriers and carrier organizations regarding this proposal. ATA and its members support the primary proposal to ban post-purchase price increases outright, and do not feel that any alternative is necessary. ATA states that this is consistent with industry practice. IATA and many foreign carriers are not opposed to this proposal, but they do request that an exception be made for post-purchase imposition of government-imposed taxes and fees. AEA, ALTA, and AACO all support a limited exception to a complete ban in the case of an increase in government-imposed taxes and fees. IACA states that an outright ban on post-purchase increases is not consistent with the European Union regulations which allow post-purchase price increases in limited circumstances and with certain disclosures. IACA seems to support one of the alternatives which would allow some increase in the purchase price after purchase is completed.

Air France, KLM and Qantas generally support the proposal with the exception of government-imposed taxes and fees. Additionally Air France, KLM and Qantas ask for clarification on when a "purchase" is complete. Both airlines suggest that a booking that is being "held" by the airline but has not been purchased should not be a completed purchase for purposes of this rule. Air New Zealand further comments that change fees should be allowed because those apply when a consumer is purchasing a new ticket and not traveling on the same ticket.

USTOA is against the proposal for an outright ban without some contingency built into the rule regarding tax increases and partial customer payments. USTOA views a purchase as being complete if the consumer has paid in full. USTOA also states that an exception to a ban on post-purchase increases should be made for increases

in government taxes and fees, provided that the consumer is made aware of such a potential increase. USTOA points out that the tour operators have no control over the increase of the price of scheduled air transportation. USTOA supports the alternatives, but believes that sellers should not be required to state the maximum amount of a price increase because the tour operator will not know the maximum amount.

ASTA contends that in order to protect all sellers, a post-purchase price increase should only be applied on ticketed reservations, contracted group travel arrangements, and business to business transactions between tour operators and airlines. ASTA states that a travel agent does not impose the additional increases in price; rather, the government or carriers impose taxes, fees and fuel surcharges. ASTA prefers the first alternative which allows a post-purchase price increase with specific notice of the increase and a maximum amount of such increase identified to the consumer. ASTA suggests modifying the first alternative so that the sellers of air transportation also identify when they have imposed such post-purchase price increases in the past.

*DOT Response:* After fully considering the comments received, the Department has decided to adopt the rule as proposed, but allow for an exception related to an increase in government-imposed taxes and fees. Although taxes and fees are not retroactively applied in the United States, the Department is aware that government-imposed taxes and fees levied by entities outside of the United States might be applied retroactively to a completed ticket purchase. As these fees and taxes are outside of the control of the seller of air transportation, the Department agrees with ASTA and foreign carriers that sellers should be protected from having to absorb the costs imposed by retroactive application of government taxes and fees. This exception to a total ban on post-purchase price increases is limited to government-imposed taxes and fees imposed on a per-passenger basis. It does not include increases in fuel surcharges or other carrier or ticket agent imposed charges. The Department recognizes that changes may be necessary in the way a tour operator prices or advertises packages to comply with the prohibition on post-purchase prices increases with an exception only for government-imposed taxes and fees imposed on a per-passenger basis.

The final rule also requires sellers of air transportation to disclose the potential for a post-purchase price increase related to an increase in a

government-imposed tax or fee in a clear and conspicuous manner to the consumer. The consumer must affirmatively agree to the potential for such an increase prior to the purchase, for example by checking a box on the final page prior to purchase. After purchase, the seller of air transportation can only impose an increase due to government-imposed taxes or fees if such an increase applies to that particular consumer (*e.g.*, the increase cannot be collected from consumers to whom a general increase did not apply because they had purchased and fully paid for their ticket months earlier, and/ or because an increase has been announced but is not yet in effect). For purposes of this section, a purchase is not deemed to have occurred until the full amount agreed upon has been paid by the consumer. Therefore, in the context of a tour that contains an air component, a purchase is complete when the consumer tenders the entire amount paid for the tour to the tour operator. The Department finds it to be unfair for consumers to bear the brunt of any increase in price after they have paid the full amount agreed upon for air transportation or a tour.

To further protect consumers, the final rule requires sellers of air transportation, tours or tour components to notify a consumer of the potential for a price increase that could take place prior to the time that the full amount agreed upon has been paid by the consumer, including but not limited to an increase in the price of the seat, an increase in the price for the carriage of passenger baggage, an increase in an applicable fuel surcharge, or an increase in a government-imposed tax or fee. These entities must provide the consumer an opportunity to decline the purchase without penalty or affirmatively agree to the potential for such an increase prior to making any payment for the scheduled air transportation, or tour or tour component that includes scheduled air transportation. The Department believes that such a disclosure will provide consumers with important information to help them determine whether they want to purchase the air transportation or tour and if so, the appropriate time to make payment.

With regard to the comments relating to change fees, the Department agrees with commenters that change fees do not constitute an increase in the price of an already-purchased ticket, as technically the consumer is purchasing a new ticket for new travel. However, the Department considers it to be an unfair and deceptive practice within the meaning of 49 U.S.C. 41712 for a seller

of air transportation to impose any fee on a consumer to change a travel itinerary unless this possibility was disclosed to the consumer prior to purchase. Additionally, to address the comments about the applicability of this section to tickets marketed and sold in Europe, the final rule specifies that with respect to ticket agents and foreign air carriers, these requirements only apply to advertising or selling in the United States of air transportation or tours.

### 10. Flight Status Change

*The NPRM:* In the NPRM we proposed to require U.S. carriers that account for at least 1 percent of domestic scheduled passenger revenues (reporting carriers) to promptly provide passengers and other interested parties notice of flight status changes, defined as a cancellation of a flight or a delay of 30 minutes or more, for their domestic scheduled passenger flights. We proposed to require that this notification take place within 30 minutes after the carrier becomes aware or should have become aware of the status change. A carrier would be required to provide such information updates at boarding gate areas, on airport display boards that are under a carrier's control, on the homepage of a carrier's websites and through a carrier's telephone reservation systems. To the extent that carriers permit passengers and other interested persons to subscribe to receive flight information updates, we proposed that carriers provide those updates in a timely fashion, *i.e.*, providing the information and subsequent updates within 30 minutes after the carrier becomes aware or should have become aware of such information.

We sought comments on whether these flight status notification requirements should be extended to smaller U.S. carriers and/or international operations of U.S. and foreign carriers, particularly since we proposed to require U.S. and foreign air carriers conducting scheduled passenger service with at least one aircraft with 30 or more seats to adopt a customer service plan that pledged to notify consumers in the boarding gate area, on board aircraft, via a carrier's telephone reservation system and on a carrier's website of known delays, cancellations and diversions. We specifically asked for information about the cost or benefit of applying these requirements to smaller carriers. We also asked for comments on whether the proposed means of notification, *i.e.*, website, telephone reservation system, airport display boards under carriers' control, and boarding area, should be mandatory, or whether we should leave

it to the carriers to determine what means they prefer to use. With respect to the timeliness standard, we invited the public to comment on whether "within 30 minutes after the carrier becomes aware or should have become aware" is a reasonable standard. We also sought public opinion on whether the proposed requirement that updated information should be provided for flight delays of 30 minutes or more is an appropriate standard.

*Comments:* Comments from consumers and consumer rights advocacy groups overwhelmingly support our proposal for the largest U.S. carriers to promptly notify passengers of changes in the status of particular flights as a result of delays or cancellations. The New York State Consumer Protection Board, AAPR, FlyersRights.org, Consumers Union, and most commenters on RegulationRoom.org support expanding the requirements to cover smaller U.S. carriers and international operations of U.S. and foreign carriers. ACI–NA suggests that the rule should include small carriers that serve small and non-hub airports, arguing that the impact of delays and cancellation occurring at those airports may have great adverse effect on larger connection hubs.

Several foreign carriers specifically oppose applying the notification requirements to foreign carriers. IACA states that the proposed rule may potentially be an extraterritorial application of U.S. law to activities in a foreign jurisdiction. Qantas and JetStar Airways aver that the rule should not apply to foreign marketing code-share partners, as the operating carriers are in the best position to notify passengers of any flight status changes. ATA, on the other hand, states that the marketing carrier should have the responsibility to update flight information up until the date of flight departure, at which point the operating carrier should be responsible for the notification. ANA raises the issue of technical difficulties faced by foreign carriers in complying with the electronic notification rule when they must conduct extensive automation modifications including sharing data with code-share partners. Many carriers contend that when information is not timely transmitted to carriers by FAA, carriers should not be held liable. TUI Travel asks that foreign leisure travel charter passengers be exempted from the rule based on its assertion that there are already established communication channels between passengers and carriers through the tour operators.

With respect to the means of notification, many commenters from the

consumer side urge the Department to mandate all four methods (*i.e.,* at gate boarding areas, on airport display boards that are under carriers' control, and through carriers' website and telephone reservation systems). The New York State Consumer Protection Board also recommends that we require carriers to offer passengers the opportunity to subscribe to flight status service updates via voicemail and electronic media. Industry commenters, however, argue that the Department should provide carriers flexibility in choosing what means they use. ATA specifically requests that the Department not require any new technology or program that is not currently implemented by the carriers.

ATA raises concern that our proposal on flight status change notification may conflict with the Federal Communication Commission (FCC)'s Telephone Consumer Protection Act rule. In a March 2010 NPRM, the FCC proposed to require consumers' prior written consent for prerecorded calls, eliminating the exemption for parties that have already established business relationships (75 FR 13471, March 22, 2010). If adopted, the FCC rule would prohibit carriers from leaving prerecorded telephone messages concerning flight delays and cancellations with any passengers from whom carriers do not have prior written consent.

Regarding the proposed timeliness standard, the New York State Consumer Protection Board states that the 30-minute standard is good but urges the Department to adopt a more stringent standard that requires notification to be provided "no later than 20 minutes" after the carrier is aware or should have become aware of the flight status change. Other commenters from the consumer side generally welcome the 30-minute standard as being reasonable and not too burdensome to the carriers. Among the carriers and carrier associations that commented on this proposal, there is little objection to the "30 minutes after the carrier becomes aware" requirement. However, most of those commenters are concerned about the "30 minutes after the carrier should have become aware of the flight status change" standard. IATA asks the Department to clarify the meaning of this standard, and ATA argues that this is a subjective standard that makes compliance difficult. Southwest Airlines supports ATA's position and states that this standard is too vague and is likely to be inconsistently applied and enforced.

Regarding the proposal that notification should be provided to passengers for any flight delays that are expected to last for 30 minutes or more, both consumers and carrier commenters are supportive of this standard. ATA also recommends that the Department require the airports to update display boards under the airports' control every 30 minutes when a flight's status changes. ASTA supports ATA's position and states that it is important that the information provided by the carriers and airports be current in order to avoid passenger confusion.

*DOT Response:* The final rule requires U.S. and foreign carriers conducting scheduled passenger service to and from the U.S. with any aircraft with 30 or more seats to make information available to passengers and other interested parties about a change in flight status. It is important for passengers as well as persons dropping passengers off for outbound flights or meeting passengers on incoming flights to stay informed on a timely basis of delays, diversions or cancellations affecting their flights in order to avoid unnecessary waits at, or pointless trips to, an airport. The need for, and importance of timely notification regarding flight delays, diversions and cancellations exists whether it is a U.S. or foreign carrier operating the flight and whether it is a non-reporting or reporting carrier operating the flight. On code-shares, the final rule leaves it up to the carriers to determine whether the marketing or operating carrier will provide the required notification about change in flight status. We expect that foreign carriers and non-reporting U.S. carriers will work with their code-share reporting-carrier partners, most of which already have the necessary systems in place, to comply with the notification requirements contained in this final rule. For enforcement purposes, the Department's Aviation Enforcement Office will hold both the code-share marketing carrier and the operating carrier responsible, jointly and severally, for failure to comply with this rule.

The final rule mandates that the flight status notifications be provided through the four methods proposed: at the boarding gate area, on carriers' websites, through carriers' telephone reservations systems, and by airport display boards that are under the carriers' control. If an airport-controlled display system accepts flight status updates from carriers, covered carriers must furnish this information to that airport within the timeframes provided in this rule. We do not believe mandating all four methods is burdensome to carriers as it is our opinion that these four methods represent the most common ways used by carriers to communicate with passengers and other interested parties who seek and obtain information about the status of the schedules for their flights.

These varied flight status notification methods make it more likely that passengers and other interested parties will be able to access this information when they need it. For example, individuals who do not have access to the Internet may call a carriers' reservation telephone system to learn about delays, cancellations, or diversions. Notification at the airports through the airport display boards and in the boarding gate area is also essential when passengers are already at the airports. Regarding notification at the boarding gate area, the responsibility of a carrier to notify passengers does not begin until the gate is staffed for the specific flight in question. With respect to notification provided through carriers' telephone reservation systems, we clarify that such notification is only required upon the request by a consumer.

In addition to these four methods, we are also requiring carriers that offer passengers the opportunity to subscribe to a flight status update service to ensure that required information is provided promptly and accurately. We note that many carriers already have in place subscription services for passengers to receive flight status notifications through various widely used media, including computer-generated telephone/voicemail, text messages and emails. To the extent such services are offered to the public, this final rule requires that the notifications be delivered to the passenger by whatever means is available to the carrier and of the passenger's choice within 30 minutes after the carrier becomes aware of a change in the status of a flight. We do not believe, as asserted by some commenters, that applying this standard will dissuade carriers from voluntarily providing such subscription services for fear of the potential enforcement consequences. We are confident that market forces and competition will continue to be the driving force for carriers to improve the quality of their customer care.

In response to ATA's concern that the Department's flight status notification requirement may conflict with the FCC's rule, the Department wishes to provide the following clarification. The Department has submitted comments on the FCC's rulemaking, requesting the FCC to maintain its current "established business relationship" exemption to the extent necessary to permit carriers to notify their customers of flight status

changes through telephone messages without obtaining each customer's prior written consent. To the extent FCC adopts a final rule as it proposed, the Department does not see a direct conflict between the FCC rule and our rule. In this final rule, we do not require carriers to call each passenger on the affected flight to notify them about the flight status change. Likewise we do not mandate subscription services. Therefore, if carriers choose to provide subscription services, they could either eliminate the voice message choice from the choices of contact available to subscribers, or obtain the subscribers' written consent at the time of subscription.

Most carriers that commented on the proposals objected to the "30 minutes after the carrier should have become aware of flight status change" standard for notifying consumers about the flight irregularity, arguing that it is vague and subjective. The Department agrees with the concerns expressed that this standard may become challenging to comply with and enforce. Therefore, we are removing the "should have become aware" standard from the final rule. With respect to the "30 minutes after the carrier becomes aware" standard, we believe further clarification is necessary. For enforcement purpose, we consider that the carrier has become aware of the flight status change as soon as the carrier's system operation control center (SOCC) or equivalent facility, if it goes by another name, learns of it. We recognize that carriers cancel, delay and divert flights based on information from many sources, both internal as well as from third parties, such as FAA and airports. Whatever the source of information leading to the decision for a flight status change, it is the carrier's sole responsibility to distribute the information, within 30 minutes, to the downstream operational staff, such as webmasters, airport station managers, reservation system managers, and gate agents. A carrier has an affirmative duty at all times to keep track of flight status changes and maintain open channels of communication. We consider it an unfair and deceptive practice when the carrier's failure to obtain and pass on to consumers up-to-date and accurate information is caused by the carrier's own procedural shortcomings.

Much less contested is our proposed standard that carriers notify passengers and other interested parties regarding flight delays of 30 minutes or more. Many consumer and industry commenters agree that this is a reasonable standard that strikes a balance between providing the most useful and accurate update to the

passengers and the costs incurred by the carriers associated with providing such information. Consequently, the final rule maintains this standard. We emphasize that this is a minimum standard and carriers are free to and urged to provide notification about briefer delays, as many already have done for their subscription services.

Under the final rule, the "30 minutes after the carrier becomes aware of the flight status change" standard also applies to any information updates provided to passengers who have already received previous notification regarding the status change of their flights. We disagree with some commenters' contention that updating flight status change every 30 minutes if the flight is delayed again is not necessary if it is close to the scheduled departure time and passengers are already at the airport. This information is important for passengers whose flights downline depend on the schedule of aircraft used for the flight experiencing the irregularity, as well as for persons who may be meeting passengers on the affected flight. Finally, we note that the Department does not directly have the authority to require airports to provide flight status information to consumers as some commenters suggested.

### 11. Choice-of-Forum Provisions

*The NPRM:* The Department proposed to codify the policy of the Department's Aviation Enforcement Office that choice-of-forum provisions are unfair and deceptive for air transportation sold in the U.S. when used to limit a passenger's legal forum to a particular inconvenient venue. The proposed rule would specifically permit consumers to file suit where they live provided that the carrier does business within that jurisdiction. The Department requested comments on this proposal and on the use of such choice-of-forum provisions in contracts of carriage.

*Comments:* Consumer groups and individual consumers support this proposal. Flyersrights.org, while supporting the proposal, does not think the proposal goes far enough to address the real barrier to legal relief for consumers in court, which they say is Federal preemption of state laws. ATA and most carriers support this proposal, most noting that they do not have such restrictive choice-of-forum provisions in their contracts of carriage. Spirit Airlines opposes this provision. Spirit believes small carriers should not have to face the costs and burdens associated with litigating complaints in jurisdictions far from their headquarters location. IATA and IACA, in addition to

many foreign airlines, expressed concerns about this provision's applicability to foreign airlines and interference with European rules governing the forum for claims. The Air Transport Association of Canada does not feel the use of choice-of-forum restrictions should be banned and feels that making clear the forum in which consumers must litigate consumer complaints is helpful to consumers.

*DOT Response:* The Department has decided to adopt the rule as proposed, *i.e.,* to prohibit a U.S. carrier from including language in its contract of carriage precluding a passenger from bringing a consumer-related claim involving a domestic flight against the carrier in any court of competent jurisdiction. The Department feels that if a carrier reaches out to do business in a particular jurisdiction, *i.e.,* reaches out to solicit business within that jurisdiction, and sells tickets in a jurisdiction, then it is fair and reasonable to expect that the carrier can defend itself against litigation brought by a consumer who resides in that jurisdiction. The cost of this proposal is minimal, as most U.S. carriers already face litigation throughout the United States. As a point of clarification, the forum for consumer claims related to travel on international flights to or from the United States is governed by the Montreal Convention or Warsaw Convention, depending on the type of flight and its origination/destination. Additionally this change does not apply to charter flights. The choice of forum for charter flights can be addressed in the individual contracts between the charter operator and the participant.

### 12. Peanut Allergies

*The NPRM:* In the NPRM, the Department described various measures to provide greater access to air travel for individuals with severe peanut allergies. The Department solicited comment on several alternatives to accommodate air travelers with severe peanut allergies including (1) banning the serving of peanuts and all peanut products by both U.S. and foreign carriers on flights covered by the Department's disability rule; (2) banning the serving of peanuts and all peanut products on all such flights where a passenger with a peanut allergy is on board and has requested a peanut-free flight in advance; or (3) requiring a peanut-free buffer zone in the immediate area of a passenger with a medically documented severe allergy to peanuts if the passenger has requested a peanut-free flight in advance. The Department asked several questions associated with accommodating passengers who have a

severe peanut allergy on flights. For instance, we asked about the likelihood of a person with a severe allergy experiencing a serious adverse health reaction due to exposure to airborne peanut particles onboard an aircraft. The Department asked about steps a person with a severe peanut allergy could take to prepare for a flight. We also asked about how we should define a peanut product if we chose to take action on the issue.

*Comments:* Most of the comments regarding accommodations for persons with peanut allergies were from individual consumers who favor a total ban on peanuts and peanut products on aircraft, including peanut products that other passengers bring on board aircraft. Most of these consumers either suffer from a peanut allergy or are related to someone with an allergy. A smaller number of individual commenters oppose any ban on peanut products while others support prohibiting carriers from serving peanuts or peanut products on aircraft. Commenters who oppose a ban on peanut and peanut products as well as commenters who favor only a service ban on peanut and peanut products contend that a total ban on peanuts and peanut products is impractical and unenforceable because there is no way to stop passengers from bringing peanut products into the cabin. There was also disagreement as to whether peanut-free flights or peanut buffer zones are a viable option. Many commenters assert that neither peanut-free flights nor peanut buffer zones are a feasible option since the peanut protein could be present in the buffer zones or on the 'peanut free' flight as residue from previous flights. These consumers state that it is unreasonable to expect, and unlikely, that a carrier would thoroughly clean the aircraft between each flight to ensure that all peanut residue is removed from the cabin.

The peanut trade organizations, led by the American Peanut Council (APC), Peanut & Tree Nut Processors Association (PTNPA) and the Western Peanut Growers Association (WPGA), oppose any Department action that would limit the availability of peanuts on commercial aircraft. All three organizations point out the Department is restricted from issuing any regulation regarding the service of peanuts on aircraft per Public Law 106–69, which is discussed below. APC also states that research indicates that a severe anaphylactic reaction to peanuts can only occur when there is oral ingestion.

The Food Allergy & Anaphylaxis Network (FAAN) states that the scientific literature does not, at this time, address whether a passenger would have a severe adverse reaction by being exposed to airborne peanut particles but notes that airborne reactions have been anecdotally reported. FAAN, and other allergy support organizations, believe that the most practical solution is for carriers not to serve packaged peanut snacks on flights. FAAN acknowledges that many carriers, both U.S. and foreign, are already taking this approach. FAAN is opposed to the creation of "buffer zones" as it believes that to be effective the seats in a buffer zone would need to be peanut-free for all flights on a particular aircraft.

Twenty-five members of the U.S. House of Representatives submitted a joint letter expressing their opposition to any ban on peanuts and peanut products and requesting that the Department not proceed with a rulemaking or any other anti-peanut measures pending the completion of a peer-reviewed study as described in Public Law 106–69. Senator Christopher Dodd also commented, stating that a complete ban on peanuts and tree nuts would be the most direct solution but that this step is drastic in nature and impractical. Senator Dodd suggests that DOT encourage a focus on further education and training for airline employees regarding passengers with peanut allergies as well as a consistent application of policies by individual airlines.

ATA, the Air Transport Association of Canada, and IACA are against a ban on peanuts, stating that carriers cannot ensure that other passengers will not bring their own peanut products on board for consumption. ATA and IACA also state that carriers have adopted their own policies and procedures to handle accommodations for peanut allergies. In general, individual carriers have deferred this topic to their respective trade organizations. However, some carriers such as Southwest and Delta point out that they already have voluntarily adopted policies regarding buffer-zones for peanut allergy sufferers. Some foreign carriers, such as Lufthansa, Air France and KLM, state that a service ban on peanut products is not efficient and would create increased burdens and costs for airlines. Additionally Lufthansa points out that the creation of a service ban on peanut products could give a passenger the false impression that the flight is totally safe and free of peanuts.

*DOT Response:* On June 25, 2010, DOT published a clarification notice stating that the Department will comply with the requirements of the Department of Transportation and Related Agencies Appropriations Act of 2000, Public Law 106–69—Oct. 9, 1999. This law states:

Hereafter, none of the funds made available under this Act, or any other Act, may be used to implement, carry out, or enforce any regulation issued under section 41705 of title 49, United States Code, including any regulation contained in Part 382 of title 14, Code of Federal Regulations, or any other provision of law (including any Act of Congress, regulation, or Executive order or any official guidance or correspondence thereto), that requires or encourages an air carrier (as that term is defined in section 40102 of title 49, United States Code) to, on intrastate or interstate air transportation (as those terms are defined in section 40102 of title 49, United States Code)—(1) provide a peanut-free buffer zone or any other related peanut-restricted area; or (2) restrict the distribution of peanuts, until 90 days after submission to the Congress and the Secretary of a peer-reviewed scientific study that determines that there are severe reactions by passengers to peanuts as a result of contact with very small airborne peanut particles of the kind that passengers might encounter in an aircraft.

At this time, given the provisions of Public Law 106–69, the Department will decline to take action due to a lack of the peer-reviewed study referred to in the law.

*13. Effective Date of Rule*

*The NPRM:* In the NPRM, we proposed that the final rule take effect 180 days after its publication in the **Federal Register.** We stated that we believe 180 days would allow sufficient time for carriers to comply with the various proposed requirements and invited comment on whether 180 days is the appropriate interval for completing the changes.

*Comments:* We received few comments on the effective date of the final rule. Among carrier and carrier association commenters, RAA states that its members need a minimum of 180 days to implement the new rule. On the consumer side, AAPR supports the Department's 180-day proposal. FlyersRights.org and its supporters suggest that the effective date should be no longer than 120 days after the final rule's publication date. CTA believes the rule should become effective 120–150 days after the publication date so it will become effective before the summer travel season starts. One consumer stated that 180 days is reasonable for implementing most items but carriers may need additional time for some of the proposed changes.

*DOT Response:* Based on our experience in implementing the December 2009 final rule, which became effective on April 29, 2010, we believe that 120 days is sufficient for

U.S. and foreign carriers to implement the various requirements in this final rule, with the exception of the requirements pertaining to full-fare advertising. The new full fare advertising requirements will not take effect until 180 days after the publication of this final rule in the **Federal Register** to mitigate the costs of print advertising revision by reducing the amount of advertising slated for use that will have to be pulled. We are imposing a 120-day effective date for the other requirements in the final rule to enable consumers to begin benefiting from these requirements as soon as possible.

## Regulatory Analyses And Notices

### A. Executive Order 12866 (Regulatory Planning and Review), DOT Regulatory Policies and Procedures, and Executive Order 13563 (Improving Regulation and Regulatory Review)

This action has been determined to be significant under Executive Order 12866 and the Department of Transportation's Regulatory Policies and Procedures. It has been reviewed by the Office of Management and Budget in accordance with Executive Order 12866 (Regulatory Planning and Review) and Executive Order 13563 (Improving Regulation and Regulatory Review) and is consistent with the requirements in both orders. Executive Order 13563 refers to nonquantifiable values, including equity and fairness. This rule promotes such values by improving transparency, and by preventing unexpected charges to passengers. The final Regulatory Evaluation concludes that the monetized benefits of the final rule exceed its monetized costs, even without considering non-quantifiable benefits. The expected present value of monetized passenger benefits from the final rule over a 10 year period using a 7% discount rate is estimated at $45.0 million and the expected present value of monetized costs incurred by carriers and other sellers of air transportation to comply with the final rule over a 10 year period using a 7% discount rate is $30.7 million. The present value of monetized net benefits over a 10 year period at a 7% discount rate is $14.3 million.

Below, we have included a table outlining the costs and benefits of the requirements in this final rule. A copy of the final Regulatory Evaluation has been placed in the docket.

## COMPARISON OF REQUIREMENT-SPECIFIC BENEFITS AND COSTS, 2012–2021

[Discounted at 7 percent annually to 2012 $ millions]

| | Total |
|---|---|
| Area 1: Expansion of tarmac contingency plan requirements and extension of EAPP1 requirements to cover foreign carriers: | |
| Monetized Benefits | $1.2 |
| Monetized Costs | 3.0 |
| Monetized Net Benefits | −1.8 |
| Additional unquantifiable benefits and costs that are directly or indirectly related to this rulemaking, which result in benefits that the Department has determined justify the costs: | |
| Improved Management of Flight Delays | |
| Decreased Anxiety With Regard to Flying | |
| Reduced Stress Among Delayed Passengers and Crew | |
| Improved Overall Carrier Operations | |
| Improved Customer Good Will Toward Carriers | |
| Additional Gate Return Costs Incurred by Carriers | |
| Time Required for Airport/Terminal Authorities, CBP/TSA to Coordinate Plans | |
| Area 2: Expanded tarmac delay reporting and application to foreign carriers: | |
| Monetized Benefits* | 0.0 |
| Monetized Costs | 0.8 |
| Monetized Net Benefits | −0.8 |
| Additional unquantifiable benefits that are directly or indirectly related to this rulemaking, which result in benefits that the Department has determined justify the costs: | |
| Increased Efficiency of US DOT Oversight and Enforcement Office Operations | |
| Improved Management of Flight Delays | |
| Area 3: Establishment of minimum standards for customer service plans (CSPs) and extension of EAPP1 Final Rule Areas to cover foreign carriers: | |
| Monetized Benefits | 7.7 |
| Monetized Costs | 7.4 |
| Monetized Net Benefits | 0.3 |
| Additional unquantifiable benefits that are directly or indirectly related to this rulemaking, which result in benefits that the Department has determined justify the costs: | |
| Decreased Confusion and Uncertainty Regarding Department CSP Requirements | |
| Improved Customer Service From Foreign Carrier Self-Auditing of Adherence to CSPs | |
| Improved Customer Good Will Toward Carriers | |
| Area 4: Foreign carrier posting of tarmac delay contingency plans, CSPs, and contracts of carriage on websites: | |
| Monetized Benefits* | 0.0 |
| Monetized Costs | 1.0 |
| Monetized Net Benefits | −1.0 |
| Additional unquantifiable benefits that are directly or indirectly related to this rulemaking, which result in benefits that the Department has determined justify the costs: | |
| Decreased Occurrence of and Improved Resolution of Customer Complaints | |
| Area 5: Extension of EAPP1 Final Rule Areas for carriers to respond to consumer complaints to cover foreign carriers: | |
| Monetized Benefits | 0.0 |
| Monetized Costs | 1.9 |
| Monetized Net Benefits | −1.9 |
| Additional unquantifiable benefits that are directly or indirectly related to this rulemaking, which result in benefits that the Department has determined justify the costs: | |

COMPARISON OF REQUIREMENT-SPECIFIC BENEFITS AND COSTS, 2012–2021—Continued

[Discounted at 7 percent annually to 2012 $ millions]

| | Total |
|---|---|
| Decreased Anger Toward Carriers During Resolution of Complaints | |
| Area 6: Changes in denied boarding compensation (DBC) requirements: | |
| Monetized Benefits* | 0.0 |
| Monetized Costs | 1.0 |
| Monetized Net Benefits | −1.0 |
| Additional unquantifiable benefits and costs that are directly or indirectly related to this rulemaking, which result in benefits that the Department has determined justify the costs: | |
| Decreased Confusion Regarding DBC Provisions | |
| Decreased Resentment Among Some Passengers Regarding Different Compensation Received | |
| Programming and Training Costs for Foreign Carriers | |
| Area 7: Full-fare advertising and prohibition on opt-out provisions: | |
| Monetized Benefits | 29.0 |
| Monetized Costs | 6.8 |
| Monetized Net Benefits | 22.2 |
| Additional unquantifiable benefits that are directly or indirectly related to this rulemaking, which result in benefits that the Department has determined justify the costs: | |
| Travelers Less Likely to Mistakenly Purchase Unwanted Services and Amenities | |
| Improved Customer Good Will Toward Carriers | |
| Area 8: Expanded disclosure of baggage and other optional fees: | |
| Monetized Benefits* | 0.0 |
| Monetized Costs | 7.9 |
| Monetized Net Benefits | −7.9 |
| Additional unquantifiable benefits that are directly or indirectly related to this rulemaking, which result in benefits that the Department has determined justify the costs: | |
| Decreased Time at Check-in | |
| Improved Customer Good Will Toward Carriers | |
| Area 9: Limitations on post-purchase price increases: | |
| Monetized Benefits | 7.2 |
| Monetized Costs | 1.1 |
| Monetized Net Benefits | 6.1 |
| Additional unquantifiable benefits that are directly or indirectly related to this rulemaking, which result in benefits that the Department has determined justify the costs: | |
| Improved Customer Good Will Toward Carriers | |
| Area 10: Prompt passenger notification of flight status changes: | |
| Monetized Benefits* | 0.0 |
| Monetized Costs* | 0.0 |
| Monetized Net Benefits | 0.0 |
| Additional unquantifiable benefits that are directly or indirectly related to this rulemaking, which result in benefits that the Department has determined justify the costs: | |
| Greater Comfort and Certainty From Knowing That Information Will Be Available in Timely Manner | |
| Area 11: Limitations on venue provisions in contracts of carriage: | |
| Monetized Benefits* | 0.0 |
| Monetized Costs* | 0.0 |
| Monetized Net Benefits | 0.0 |
| Additional unquantifiable benefits and costs that are directly or indirectly related to this rulemaking, which result in benefits that the Department has determined justify the costs: | |
| Improved Customer Good Will Toward Carriers | |
| Reduced Costs for Consumers to File/Adjudicate Claims | |
| Increased Costs for Carriers to Settle/Adjudicate Claims | |
| Requirement Areas 1–11 Total: | |
| Monetized Benefits | 45.0 |
| Monetized Costs | 30.7 |
| Monetized Net Benefits | 14.3 |

*Monetized estimates could not be developed from the information available on the record.

## B. Regulatory Flexibility Act

The Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*) requires an agency to review regulations to assess their impact on small entities unless the agency determines that a rule is not expected to have a significant economic impact on a substantial number of small entities. Our analysis identified a total of 50 small U.S. air carriers (*i.e.,* carriers that provide air transportation exclusively with aircraft that seat no more than 60 passengers), 50 small airports (*i.e.,* privately-owned airports that have annual revenues of no more than $7 million or publicly-owned airports owned by jurisdictions with less than 50,000 inhabitants), as many as 11,625 small travel agencies (*i.e.,* travel agencies with no more than $3.5 million in annual revenues) and as many as 2,720 small tour operators (*i.e.,* tour operators with no more than $7.0 million in annual revenues) potentially affected by the requirements of the final rule. While most regulation of the air transportation sector is concerned with carriers, certain elements of this final rule impose new requirements on small travel agents and tour operators. Small U.S. carriers will need to comply with additional requirements relating to coordination of tarmac contingency plans, reporting tarmac delays, specific customer service plan provisions, denied boarding compensation,

advertising of air fares, and disclosure of baggage and other optional fees. Small travel agents and tour operators will have to comply with the requirements relating to advertising of air fares, disclosure of baggage and other optional fees, and pre-purchase disclosures on price increases.

The Department believes that the economic impact will not be significant for a number of reasons. First, most small U.S. air carriers operate passenger service exclusively with aircraft that have fewer than 30 seats. The requirements relating to tarmac contingency plans, reporting tarmac delays, specific customer service plan provisions, and denied boarding compensation will not apply to these carriers. In addition, the per-carrier and per-ticket agent compliance costs estimated in the final regulatory analysis for the remaining requirements are very small—less than $17,000 per affected small carrier operating aircraft with between 30 and 60 seats, less than $4,500 per small carrier operating aircraft with fewer than 30 seats, and about $3,500 per small travel agent or tour operator with online booking capability to achieve compliance during the first year the final rule takes effect and no more than a few hundred dollars to maintain compliance in subsequent years. On the basis of this examination, the Department certifies that this rule will not have a significant economic impact on a substantial number of small entities. A copy of the Final Regulatory Flexibility Analysis has been placed in docket.

### C. Executive Order 13132 (Federalism)

This Final Rule has been analyzed in accordance with the principles and criteria contained in Executive Order 13132 ("Federalism"). This final rule does not include any provision that: (1) Has substantial direct effects on the States, the relationship between the national government and the States, or the distribution of power and responsibilities among the various levels of government; (2) imposes substantial direct compliance costs on State and local governments; or (3) preempts State law. States are already preempted from regulating in this area by the Airline Deregulation Act, 49 U.S.C. 41713. Therefore, the consultation and funding requirements of Executive Order 13132 do not apply.

### D. Executive Order 13084

This final rule has been analyzed in accordance with the principles and criteria contained in Executive Order 13084 ("Consultation and Coordination with Indian Tribal Governments").

Because this final rule does not significantly or uniquely affect the communities of the Indian Tribal governments or impose substantial direct compliance costs on them, the funding and consultation requirements of Executive Order 13084 do not apply.

### E. Paperwork Reduction Act

As required by the Paperwork Reduction Act of 1995, DOT has submitted the Information Collection Requests (ICRs) abstracted below to the Office of Management and Budget (OMB). Before OMB decides whether to approve those proposed collections of information that are part of this final rule and issue a control number, the public must be provided 30 days to comment. Organizations and individuals desiring to submit comments on the collection information requirements should direct them to the Office of Management and Budget, Attention: Desk Officer for the Office of the Secretary of Transportation, Office of Information and Regulatory Affairs, Washington, DC 20503, and should also send a copy of their comments to: Department of Transportation, Office of Aviation Enforcement and Proceedings, Office of the General Counsel, 1200 New Jersey Avenue, SE., Washington, DC 20590. OMB is required to make a decision concerning the collection of information requirements contained in this rule between 30 and 60 days after publication of this document in the **Federal Register**. Therefore, a comment to OMB is best assured of having its full effect if OMB receives it within 30 days of publication.

We will respond to any OMB or public comments on the information collection requirements contained in this rule. OST may not impose a penalty on persons for violating information collection requirements which do not display a current OMB control number, if required. OST intends to renew current OMB control numbers for the three new information collection requirements resulting from this rulemaking action. The OMB control number, when renewed, will be announced by separate notice in the **Federal Register**.

The ICRs were previously published in the **Federal Register** as part of NPRM (75 FR 32318, June 8, 2010) and the Department invited interested persons to submit comments on any aspect of each of these three information collections, including the following: (1) The necessity and utility of the information collection, (2) the accuracy of the estimate of the burden, (3) ways to enhance the quality, utility, and clarity of the information to be collected, and (4) ways to minimize the burden of collection without reducing the quality of the collected information.

The final rule contains three new information collection requirements. The first is a requirement that foreign air carriers that operate passenger service (scheduled and charter) to or from the U.S. using any aircraft with 30 or more seats collect and retain for two years the following information about any ground delay that lasts at least three hours: the length of the delay, the precise cause of the delay, the actions taken to minimize hardships for passengers, whether the flight ultimately took off (in the case of a departure delay or diversion) or returned to the gate; and an explanation for any tarmac delay that exceeded 3 hours. The Department plans to use the information to investigate instances of long delays on the ground and to identify any trends and patterns that may develop. The assumptions upon which the calculations for this requirement are based as well as the information collection burden hours have changed. We have increased our estimate for the maximum number of tarmac delays that a single carrier may experience.

The second is a requirement that U.S. carriers and foreign carriers that operate any aircraft originally designed to have a passenger capacity of 30 or more seats report monthly tarmac delay data to the Department with respect to their operations at a U.S. airport for any tarmac delay of three hours or more, including diverted flights. This requirement would apply to reporting carriers under 14 CFR part 234 only with respect to their public charter service and international service, as reporting carriers already submit tarmac delay data to the Department for their domestic scheduled passenger service. The Department plans to use this information to obtain more precise data to compare tarmac delay incidents by carrier, by airport, and by specific time frame, for use in making future policy decisions and developing rulemakings. We have modified the information collection burden hours for this requirement because carriers are not required to file regular reports as proposed in the NPRM. Covered carriers will only need to submit the report if one or more flights experience delays that exceed 3 hours.

The third is a requirement that any foreign air carrier that operates scheduled passenger service to and from the U.S. using any aircraft with 30 or more seats adopt a customer service plan, audit its adherence to the plan annually, and retain the results of each audit for two years. The Department

plans to review the audits to monitor carriers' compliance with their plans and take enforcement action when appropriate. Although we have made some modest changes to the customer service plan requirements from what was proposed in the NPRM, these changes do not impact the assumption upon which the calculations for retaining the results of each audit are based. The information collection burden hours have increased slightly as our estimate of the number of carriers covered by this requirement has changed.

For each of these information collections, the title, a description of the respondents, and an estimate of the annual recordkeeping and periodic reporting burden is set forth below:

*1. Requirement to retain for two years information about any ground delay that lasts at least three hours.*

*Respondents:* Foreign air carriers that operate passenger service to and from the U.S. using any aircraft originally designed to have a passenger capacity of 30 or more seats.

*Estimated Annual Burden on Respondents:* A maximum of 54 hours per respondent.

*Estimated Total Annual Burden:* 2,226 hours for all respondents.

*Frequency:* One information set to retain per three hour plus tarmac delay for each respondent.

*2. Requirement that carrier report certain tarmac delay data for tarmac delays exceeding 3 hours to the Department on a monthly basis.*

*Respondents:* U.S. carriers that operate passenger service using any aircraft with 30 or more seats, and foreign air carriers that operate passenger service to and from the United States using any aircraft originally designed to have a passenger capacity of 30 or more seats.

*Estimated Annual Burden on Respondents:* 0.5 to 10 hours per domestic respondent and 0.5 to 4.5 hours per foreign respondent.

*Estimated Total Annual Burden:* 134 4 hours for all respondents.

*Frequency:* One information set to submit per month for each respondent that experiences a tarmac delay of more than 3 hours at a U.S. airport.

*3. Requirement that carrier retain for two years the results of its annual self-audit of its compliance with its Customer Service Plan.*

*Respondents:* Foreign air carriers that operate scheduled passenger service to and from the U.S. using any aircraft originally designed to have a passenger capacity of 30 or more seats.

*Estimated Annual Burden on Respondents:* 15 minutes per year for each respondent.

*Estimated Total Annual Burden:* A maximum of 25 hours and 15 minutes for all respondents.

*Frequency:* One information set to retain per year for each respondent.

## F. Unfunded Mandates Reform Act

The Department has determined that the requirements of Title II of the Unfunded Mandates Reform Act of 1995 do not apply to this notice.

Issued this 18th day of April 2011, in Washington, DC.

**Ray LaHood,**

*Secretary of Transportation.*

## List of Subjects

### 14 CFR Parts 250 and 259

Air carriers, Consumer protection, Reporting and recordkeeping requirements.

### 14 CFR Part 244

Air carriers, Consumer protection, Tarmac delay data.

### 14 CFR Part 253

Air carriers, Consumer protection, Contract of carriage.

### 14 CFR Part 399

Administrative practice and procedure, Air carriers, Air rates and fares, Air taxis, Consumer protection, Small businesses.

For the reasons set forth in the preamble, the Department amends 14 CFR Chapter II as follows:

■ 1. Add part 244 to read as follows:

## PART 244—REPORTING TARMAC DELAY DATA

Sec.
244.1  Definitions.
244.2  Applicability.
244.3  Reporting of tarmac delay data.

**Authority:** 49 U.S.C. 40101(a)(4), 40101(a)(9), 40113(a), 41702, and 41712.

## § 244.1  Definitions.

*Arrival time* is the instant when the pilot sets the aircraft parking brake after arriving at the airport gate or passenger unloading area. If the parking brake is not set, record the time for the opening of the passenger door. Also, for purposes of section 244.3 carriers using a Docking Guidance System (DGS) may record the official "gate-arrival time" when the aircraft is stopped at the appropriate parking mark.

*Cancelled flight* means a flight operation that was not operated, but was listed in an air carrier or a foreign air carrier's computer reservation system within seven calendar days of the scheduled departure.

*Certificated air carrier* means a U.S. carrier holding a certificate issued under 49 U.S.C. 41102 to conduct passenger service or holding an exemption to conduct passenger operations under 49 U.S.C. 40109.

*Commuter air carrier* means a U.S. carrier that has been found fit under 49 U.S.C. 41738 and is authorized to carry passengers on at least five round trips per week on at least one route between two or more points according to a published flight schedule using small aircraft as defined in 14 CFR 298.2.

*Covered carrier* means a certificated air carrier, a commuter carrier, or a foreign air carrier operating to, from, or within the United States, conducting scheduled passenger service or public charter service with at least one aircraft having a designed passenger seating capacity of 30 or more seats.

*Diverted flight* means a flight which is operated from the scheduled origin point to a point other than the scheduled destination point in the carrier's published schedule. For example, a carrier has a published schedule for a flight from A to B to C. If the carrier were to actually fly an A to C operation, the A to B segment is a diverted flight, and the B to C segment is a cancelled flight. The same would apply if the flight were to operate from A to an airport other than B or C.

*Foreign air carrier* means a carrier that is not a citizen of the United States as defined in 49 U.S.C. 40102(a) that holds a foreign air carrier permit issued under 49 U.S.C. 41302 or an exemption issued under 49 U.S.C. 40109 authorizing direct foreign air transportation.

*Gate departure time* is the instant when the pilot releases the aircraft parking brake after passengers have boarded and aircraft doors have closed. In cases where the flight returned to the departure gate before wheels-off time and departs a second time, the reportable gate departure time for purposes of this Part is the last gate departure time before wheels-off time. In cases of a return to the gate after wheels-off time, the reportable gate departure time is the last gate departure time before the gate return. If passengers were boarded without the parking brake being set, the reportable gate departure time is the time that the last passenger door was closed. Also, the official "gate-departure time" may be based on aircraft movement for carriers using a Docking Guidance System (DGS). For example, one DGS records gate departure time when the aircraft moves more than 1 meter from the appropriate parking mark within 15 seconds. Fifteen

seconds is then subtracted from the recorded time to obtain the appropriate "out" time.

*Gate Return time* means the time that an aircraft that has left the boarding gate returns to a gate or other position at an airport for the purpose of allowing passengers the opportunity to disembark from the aircraft.

*Large hub airport* means an airport that accounts for at least 1.00 percent of the total enplanements in the United States.

*Medium hub airport* means an airport accounting for at least 0.25 percent but less than 1.00 percent of the total enplanements in the United States.

*Non-hub airport* means an airport with 10,000 or more annual enplanements but less than 0.05 percent of the total enplanements in the United States.

*Small hub airport* means an airport accounting for at least 0.05 percent but less than 0.25 percent of the total enplanements in the United States.

*Tarmac delay* means the holding of an aircraft on the ground either before taking off or after landing with no opportunity for its passengers to deplane.

### § 244.2   Applicability.

(a) Except as provided in paragraph (b) of this section, this part applies to U.S. certificated air carriers, U.S. commuter air carriers and foreign air carriers that operate passenger service to or from a U.S. airport with at least one aircraft that has an original manufacturer's design capacity of 30 or more seats. Covered carriers must report all passenger operations that experience a tarmac time of 3 hours or more at a U.S. airport.

(b) For foreign air carriers that operate charter flights from foreign airports to U.S. airports, and return to foreign airports, and do not pick up any new passengers in the U.S., the charter flights are not flights subject to the reporting requirements of this part.

(c) U.S. carriers that submit Part 234 Airline Service Quality Performance Reports must submit 3-hour tarmac delay information for public charter flights and international passenger flights to or from any U.S. large hub airport, medium hub airport, small hub airport and non-hub airport. These carriers are already required to submit such information for domestic scheduled flights to or from U.S. large hub airports under art 234 of this chapter. These carriers that are covered by part 234 need only submit information for flights with tarmac delays of more than 3 hours under this part 244 for domestic scheduled

passenger flights to or from any U.S. medium hub airport, small hub airport and non-hub airport to the extent they do not report such information under 14 CFR 234.7.

### § 244.3   Reporting of tarmac delay data.

(a) Each covered carrier shall file BTS Form 244 "Tarmac Delay Report" with the Office of Airline Information of the Department's Bureau of Transportation Statistics on a monthly basis, setting forth the information for each of its covered flights that experienced a tarmac delay of three hours or more, including diverted flights and cancelled flights on which the passengers were boarded and then deplaned before the cancellation. The reports are due within 15 days after the end of the month during which the carrier experienced any tarmac delay of three hours or more. The reports shall be made in the form and manner set forth in accounting and reporting directives issued by the Director, Office of Airline Information, and shall contain the following information:

(1) Carrier code

(2) Flight number

(3) Departure airport (three letter code)

(4) Arrival airport (three letter code)

(5) Date of flight operation (year/month/day)

(6) Gate departure time (actual) in local time

(7) Gate arrival time (actual) in local time

(8) Wheels-off time (actual) in local time

(9) Wheels-on time (actual) in local time

(10) Aircraft tail number

(11) Total ground time away from gate for all gate return/fly return at origin airports including cancelled flights

(12) Longest time away from gate for gate return or canceled flight

(13) Three letter code of airport where flight diverted

(14) Wheels-on time at diverted airport

(15) Total time away from gate at diverted airport

(16) Longest time away from gate at diverted airport

(17) Wheels-off time at diverted airport

(b) The same information required by paragraph (a)(13) through (17) of this section must be provided for each subsequent diverted aircraft landing.

### PART 250—OVERSALES

■ 2. The authority citation for 14 CFR Part 250 continues to read as follows:

**Authority:** 49 U.S.C. chapters 401, 411, 413 and 417.

■ 3. Section 250.1 is amended by removing the definition of "sum of the values of the remaining flight coupons" and "comparable air transportation," revising the definition for "confirmed reserved space," and adding a definition for "alternate transportation," "class of service," "fare," and "zero fare ticket" to read as follows:

### § 250.1   Definitions.

\*      \*      \*      \*      \*

*Alternate transportation* means air transportation with a confirmed reservation at no additional charge, operated by a carrier as defined below, or other transportation accepted and used by the passenger in the case of denied boarding.

\*      \*      \*      \*      \*

*Class of service* means seating in the same cabin class such as First, Business, or Economy class, or in the same seating zone if the carrier has more than one seating product in the same cabin such as Economy and Premium Economy class.

*Confirmed reserved space* means space on a specific date and on a specific flight and class of service of a carrier which has been requested by a passenger, including a passenger with a "zero fare ticket," and which the carrier or its agent has verified, by appropriate notation on the ticket or in any other manner provided therefore by the carrier, as being reserved for the accommodation of the passenger.

*Fare* means the price paid for air transportation including all mandatory taxes and fees. It does not include ancillary fees for optional services.

\*      \*      \*      \*      \*

*Zero fare ticket* means a ticket acquired without a substantial monetary payment such as by using frequent flyer miles or vouchers, or a consolidator ticket obtained after a monetary payment that does not show a fare amount on the ticket. A zero fare ticket does not include free or reduced rate air transportation provided to airline employees and guests.

■ 4. Section 250.2b is amended by adding paragraph (c) to read as follows:

### § 250.2b   Carriers to request volunteers for denied boarding.

\*      \*      \*      \*      \*

(c) If a carrier offers free or reduced rate air transportation as compensation to volunteers, the carrier must disclose all material restrictions, including but not limited to administrative fees, advance purchase or capacity restrictions, and blackout dates applicable to the offer before the passenger decides whether to give up his or her confirmed reserved space on

that flight in exchange for the free or reduced rate transportation.

■ 5. Section 250.5 is revised to read as follows:

**§ 250.5   Amount of denied boarding compensation for passengers denied boarding involuntarily.**

(a) Subject to the exceptions provided in § 250.6, a carrier to whom this part applies as described in § 250.2 shall pay compensation in interstate air transportation to passengers who are denied boarding involuntarily from an oversold flight as follows:

(1) No compensation is required if the carrier offers alternate transportation that, at the time the arrangement is made, is planned to arrive at the airport of the passenger's first stopover, or if none, the airport of the passenger's final destination not later than one hour after the planned arrival time of the passenger's original flight;

(2) Compensation shall be 200% of the fare to the passenger's destination or first stopover, with a maximum of $650, if the carrier offers alternate transportation that, at the time the arrangement is made, is planned to arrive at the airport of the passenger's first stopover, or if none, the airport of the passenger's final destination more than one hour but less than two hours after the planned arrival time of the passenger's original flight; and

(3) Compensation shall be 400% of the fare to the passenger's destination or first stopover, with a maximum of $1,300, if the carrier does not offer alternate transportation that, at the time the arrangement is made, is planned to arrive at the airport of the passenger's first stopover, or if none, the airport of the passenger's final destination less than two hours after the planned arrival time of the passenger's original flight.

(b) Subject to the exceptions provided in § 250.6, a carrier to whom this part applies as described in § 250.2 shall pay compensation to passengers in foreign air transportation who are denied boarding involuntarily at a U.S. airport from an oversold flight as follows:

(1) No compensation is required if the carrier offers alternate transportation that, at the time the arrangement is made, is planned to arrive at the airport of the passenger's first stopover, or if not, the airport of the passenger's final destination not later than one hour after the planned arrival time of the passenger's original flight;

(2) Compensation shall be 200% of the fare to the passenger's destination or first stopover, with a maximum of $650, if the carrier offers alternate transportation that, at the time the arrangement is made, is planned to

arrive at the airport of the passenger's first stopover, or if not, the airport of the passenger's final destination more than one hour but less than four hours after the planned arrival time of the passenger's original flight; and

(3) Compensation shall be 400% of the fare to the passenger's destination or first stopover, with a maximum of $1,300, if the carrier does not offer alternate transportation that, at the time the arrangement is made, is planned to arrive at the airport of the passenger's first stopover, or if not, the airport of the passenger's final destination less than four hours after the planned arrival time of the passenger's original flight.

(c) Carriers may offer free or reduced rate air transportation in lieu of the cash or check due under paragraphs (a) and (b) of this section, if—

(1) The value of the transportation benefit offered, excluding any fees or other mandatory charges applicable for using the free or reduced rate air transportation, is equal to or greater than the cash/check payment otherwise required;

(2) The carrier fully informs the passenger of the amount of cash/check compensation that would otherwise be due and that the passenger may decline the transportation benefit and receive the cash/check payment; and

(3) The carrier fully discloses all material restrictions, including but not limited to, administrative fees, advance purchase or capacity restrictions, and blackout dates applicable to the offer, on the use of such free or reduced rate transportation before the passenger decides to give up the cash/check payment in exchange for such transportation.

(d) The requirements of this section apply to passengers with "zero fare tickets." The fare paid by these passengers for purposes of calculating denied boarding compensation shall be the lowest cash, check, or credit card payment charged for a ticket in the same class of service on that flight.

(e) The Department of Transportation will review the maximum denied boarding compensation amounts prescribed in this part every two years except for the first review, which will take place in 2012 in order to put the reviews specified in this section on the same cycle as the reviews of domestic baggage liability limits specified in 14 CFR 254.6. The Department will use any increase in the Consumer Price Index for All Urban Consumers (CPI–U) as of July of each review year to calculate the increased maximum compensation amounts. The Department will use the following formula:

(1) Current Denied Boarding Compensation limit in section 250.5(a)(2) multiplied by (a/b) rounded to the nearest $25 where:

a = July CPI–U of year of current adjustment
b = the CPI–U figure in August, 2011 when the inflation adjustment provision was added to Part 250.

(2) The Denied Boarding Compensation limit in § 250.5(a)(3) shall be twice the revised limit for § 250.5(a)(2).

(f) In addition to the denied boarding compensation specified in this part, a carrier shall refund all unused ancillary fees for optional services paid by a passenger who is voluntarily or involuntarily denied boarding. The carrier is not required to refund the ancillary fees for services that are provided with respect to the passenger's alternate transportation.

■ 6 . In § 250.9, the section heading and paragraph (b) are revised and paragraph (c) is added to read as follows:

**§ 250.9   Written explanation of denied boarding compensation and boarding priorities, and verbal notification of denied boarding compensation.**

*    *    *    *    *

(b) The statement shall read as follows:

**Compensation for Denied Boarding**

If you have been denied a reserved seat on (name of air carrier), you are probably entitled to monetary compensation. This notice explains the airline's obligation and the passenger's rights in the case of an oversold flight, in accordance with regulations of the *U.S. Department of Transportation.*

**Volunteers and Boarding Priorities**

If a flight is oversold (more passengers hold confirmed reservations than there are seats available), no one may be denied boarding against his or her will until airline personnel first ask for volunteers who will give up their reservation willingly, in exchange for compensation of the airline's choosing. If there are not enough volunteers, other passengers may be denied boarding involuntarily in accordance with the following boarding priority of (name of air carrier): (In this space the carrier inserts its boarding priority rules or a summary thereof, in a manner to be understandable to the average passenger.)

**Compensation for Involuntary Denied Boarding**

If you are denied boarding involuntarily, you are entitled to a payment of "denied boarding compensation" from the airline unless:

(1) you have not fully complied with the airline's ticketing, check-in and reconfirmation requirements, or you are not acceptable for transportation under the airline's usual rules and practices; or

(2) you are denied boarding because the flight is canceled; or

(3) you are denied boarding because a smaller capacity aircraft was substituted for safety or operational reasons; or

(4) on a flight operated with an aircraft having 60 or fewer seats, you are denied boarding due to safety-related weight/balance restrictions that limit payload; or

(5) you are offered accommodations in a section of the aircraft other than specified in your ticket, at no extra charge (a passenger seated in a section for which a lower fare is charged must be given an appropriate refund); or

(6) the airline is able to place you on another flight or flights that are planned to reach your next stopover or final destination within one hour of the planned arrival time of your original flight.

**Amount of Denied Boarding Compensation**

*Domestic Transportation*

Passengers traveling between points within the United States (including the territories and possessions) who are denied boarding involuntarily from an oversold flight are entitled to: (1) No compensation if the carrier offers alternate transportation that is planned to arrive at the passenger's destination or first stopover not later than one hour after the planned arrival time of the passenger's original flight; (2) 200% of the fare to the passenger's destination or first stopover, with a maximum of $650, if the carrier offers alternate transportation that is planned to arrive at the passenger's destination or first stopover more than one hour but less than two hours after the planned arrival time of the passenger's original flight; and (3) 400% of the fare to the passenger's destination or first stopover, with a maximum of $1,300, if the carrier does not offer alternate transportation that is planned to arrive at the airport of the passenger's destination or first stopover less than two hours after the planned arrival time of the passenger's original flight.

| 0 to 1 hour arrival delay. | No compensation. |
|---|---|
| 1 to 2 hour arrival delay. | 200% of one-way fare (but no more than $650). |
| Over 2 hours arrival delay. | 400% of one-way fare (but no more than $1,300). |

*International Transportation*

Passengers traveling from the United States to a foreign point who are denied boarding involuntarily from an oversold flight originating at a U.S. airport are entitled to: (1) No compensation if the carrier offers alternate transportation that is planned to arrive at the passenger's destination or first stopover not later than one hour after the planned arrival time of the passenger's original flight; (2) 200% of the fare to the passenger's destination or first stopover, with a maximum of $650, if the carrier offers alternate transportation that is planned to arrive at the passenger's destination or first stopover more than one hour but less than four hours after the planned arrival time of

the passenger's original flight; and (3) 400% of the fare to the passenger's destination or first stopover, with a maximum of $1,300, if the carrier does not offer alternate transportation that is planned to arrive at the airport of the passenger's destination or first stopover less than four hours after the planned arrival time of the passenger's original flight.

| 0 to 1 hour arrival delay. | No compensation. |
|---|---|
| 1 to 4 hour arrival delay. | 200% of one-way fare (but no more than $650). |
| Over 4 hours arrival delay. | 400% of one-way fare (but no more than $1,300). |

*Alternate Transportation*

"Alternate transportation" is air transportation with a confirmed reservation at no additional charge (by any scheduled airline licensed by DOT), or other transportation accepted and used by the passenger in the case of denied boarding.

**Method of Payment**

Except as provided below, the airline must give each passenger who qualifies for involuntary denied boarding compensation a payment by cash or check for the amount specified above, on the day and at the place the involuntary denied boarding occurs. If the airline arranges alternate transportation for the passenger's convenience that departs before the payment can be made, the payment shall be sent to the passenger within 24 hours. The air carrier may offer free or discounted transportation in place of the cash payment. In that event, the carrier must disclose all material restrictions on the use of the free or discounted transportation before the passenger decides whether to accept the transportation in lieu of a cash or check payment. The passenger may insist on the cash/check payment or refuse all compensation and bring private legal action.

**Passenger's Options**

Acceptance of the compensation may relieve (name of air carrier) from any further liability to the passenger caused by its failure to honor the confirmed reservation. However, the passenger may decline the payment and seek to recover damages in a court of law or in some other manner.

(c) In addition to furnishing passengers with the carrier's written statement as specified in paragraphs (a) and (b) of this section, if the carrier orally advises involuntarily bumped passengers that they are entitled to receive free or discounted transportation as denied boarding compensation, the carrier must also orally advise the passengers of any material restrictions or conditions applicable to the free or discounted transportation and that they are entitled to choose a check instead (or cash if that option is offered by the carrier).

■ 7. Section 250.10 is revised to read as follows:

**§ 250.10    Report of passengers denied confirmed space.**

Every reporting carrier as defined in § 234.2 of this chapter and any carrier that voluntarily submits data pursuant to § 234.7 of this chapter shall file, on a quarterly basis, the information specified in BTS Form 251. The reporting basis shall be flight segments originating in the United States. The reports are to be submitted within 30 days after the end of the quarter covered by the report. The calendar quarters end March 31, June 30, September 30 and December 31. "Total Boardings" on Line 7 of Form 251 shall include only passengers on flights for which confirmed reservations are offered. Data shall not be included for inbound international flights.

**PART 253—NOTICE OF TERMS OF CONTRACT OF CARRIAGE**

■ 8. The authority citation for 14 CFR Part 253 continues to read as follows:

**Authority:** 49 U.S.C. 40113; 49 U.S.C. Chapters 401, 415 and 417.

■ 9. Section 253.7 is revised to read as follows:

**§ 253.7    Direct notice of certain terms.**

A carrier may not impose any terms restricting refunds of the ticket price, imposing monetary penalties on passengers, or raising the ticket price consistent with § 399.87 of the chapter, unless the passenger receives conspicuous written notice of the salient features of those terms on or with the ticket.

■ 10. Section 253.10 is added to read as follows:

**§ 253.10    Notice of contract of carriage choice-of-forum provisions.**

No carrier may impose any contract of carriage provision containing a choice-of-forum clause that attempts to preclude a passenger, or a person who purchases a ticket for air transportation on behalf of a passenger, from bringing a claim against a carrier in any court of competent jurisdiction, including a court within the jurisdiction of that passenger's residence in the United States (provided that the carrier does business within that jurisdiction).

**PART 259—ENHANCED PROTECTIONS FOR AIRLINE PASSENGERS**

■ 11. The authority citation for 14 CFR Part 259 continues to read as follows:

**Authority:** 49 U.S.C. 40101(a)(4), 40101(a)(9), 40113(a), 41702, and 41712.

■ 12. Section 259.2 is revised to read as follows:

## §259.2 Applicability.

This part applies to all the flights of a certificated or commuter air carrier if the carrier operates scheduled passenger service or public charter service using any aircraft originally designed to have a passenger capacity of 30 or more seats, and to all flights to and from the U.S. of a foreign carrier if the carrier operates scheduled passenger service or public charter service to and from the U.S. using any aircraft originally designed to have a passenger capacity of 30 or more seats, except as otherwise provided in this part. This part does not apply to foreign carrier charters that operate to and from the United States if no new passengers are picked up in the United States.

■ 13. Section 259.3 is revised to read as follows:

## §259.3 Definitions.

*Certificated air carrier* means a U.S. carrier holding a certificate issued under 49 U.S.C. 41102 to conduct passenger service or holding an exemption to conduct passenger operations under 49 U.S.C. 41102.

*Commuter air carrier* means a U.S. carrier that has been found fit under 49 U.S.C. 41738 and is authorized to carry passengers on at least five round trips per week on at least one route between two or more points according to a published flight schedule using small aircraft as defined in 14 CFR 298.2.

*Covered carrier* means a certificated carrier, a commuter carrier, or a foreign air carrier operating to, from or within the United States, conducting scheduled passenger service or public charter service with at least one aircraft having a designed seating capacity of 30 or more seats.

*Foreign air carrier* means a carrier that is not a citizen of the United States as defined in 49 U.S.C. 40102(a) that holds a foreign air carrier permit issued under 49 U.S.C. 41302 or an exemption issued under 49 U.S.C. 40109 authorizing direct foreign air transportation.

*Large hub airport* means an airport that accounts for at least 1.00 percent of the total enplanements in the United States.

*Medium hub airport* means an airport accounting for at least 0.25 percent but less than 1.00 percent of the total enplanements in the United States.

*Non-hub airport* means an airport with 10,000 or more annual enplanements but less than 0.05 percent of the country's annual passenger boardings.

*Small hub airport* means an airport accounting for at least 0.05 percent but less than 0.25 percent of the total enplanements in the United States.

*Tarmac delay* means the holding of an aircraft on the ground either before taking off or after landing with no opportunity for its passengers to deplane.

■ 14. Section 259.4 is revised to read as follows:

## §259.4 Contingency Plan for Lengthy Tarmac Delays.

(a) *Adoption of Plan.* Each covered carrier shall adopt a Contingency Plan for Lengthy Tarmac Delays for its scheduled and public charter flights at each U.S. large hub airport, medium hub airport, small hub airport and non-hub airport at which it operates or markets such air service and shall adhere to its plan's terms.

(b) *Contents of Plan.* Each Contingency Plan for Lengthy Tarmac Delays shall include, at a minimum, the following:

(1) For domestic flights, assurance that the covered U.S. air carrier will not permit an aircraft to remain on the tarmac for more than three hours before allowing passengers to deplane unless:

(i) The pilot-in-command determines there is a safety-related or security-related reason (e.g. weather, a directive from an appropriate government agency) why the aircraft cannot leave its position on the tarmac to deplane passengers; or

(ii) Air traffic control advises the pilot-in-command that returning to the gate or another disembarkation point elsewhere in order to deplane passengers would significantly disrupt airport operations.

(2) For international flights operated by covered carriers that depart from or arrive at a U.S. airport, assurance that the carrier will not permit an aircraft to remain on the tarmac at a U.S. airport for more than four hours before allowing passengers to deplane, unless:

(i) The pilot-in-command determines there is a safety-related or security-related reason why the aircraft cannot leave its position on the tarmac to deplane passengers; or

(ii) Air traffic control advises the pilot-in-command that returning to the gate or another disembarkation point elsewhere in order to deplane passengers would significantly disrupt airport operations.

(3) For all flights, assurance that the carrier will provide adequate food and potable water no later than two hours after the aircraft leaves the gate (in the case of a departure) or touches down (in the case of an arrival) if the aircraft remains on the tarmac, unless the pilot-in-command determines that safety or security considerations preclude such service;

(4) For all flights, assurance of operable lavatory facilities, as well as adequate medical attention if needed, while the aircraft remains on the tarmac;

(5) For all flights, assurance that the passengers on the delayed flight will receive notifications regarding the status of the delay every 30 minutes while the aircraft is delayed, including the reasons for the tarmac delay, if known;

(6) For all flights, assurance that the passengers on the delayed flight will be notified beginning 30 minutes after scheduled departure time (including any revised departure time that passengers were notified about before boarding) and every 30 minutes thereafter that they have the opportunity to deplane from an aircraft that is at the gate or another disembarkation area with the door open if the opportunity to deplane actually exists;

(7) Assurance of sufficient resources to implement the plan; and

(8) Assurance that the plan has been coordinated with airport authorities (including terminal facility operators where applicable) at each U.S. large hub airport, medium hub airport, small hub airport and non-hub airport that the carrier serves, as well as its regular U.S. diversion airports;

(9) Assurance that the plan has been coordinated with U.S. Customs and Border Protection (CBP) at each large U.S. hub airport, medium hub airport, small hub airport and non-hub airport that is regularly used for that carrier's international flights, including diversion airports; and

(10) Assurance that the plan has been coordinated with the Transportation Security Administration (TSA) at each U.S. large hub airport, medium hub airport, small hub airport and non-hub airport that the carrier serves, including diversion airports.

(c) *Code-Share Responsibility.* The tarmac delay contingency plan of the carrier under whose code the service is marketed governs, if different from the operating carrier, unless the marketing carrier specifies in its contract of carriage that the operating carrier's plan governs.

(d) *Amendment of plan.* At any time, a carrier may amend its Contingency Plan for Lengthy Tarmac Delays to decrease the time for aircraft to remain on the tarmac for domestic flights covered in paragraph (b)(1) of this section, for aircraft to remain on the tarmac for international flights covered in paragraph (b)(2) of this section, and for the trigger point for food and water covered in paragraph (b)(3) of this section. A carrier may also amend its plan to increase these intervals (up to the limits in this rule), in which case the

amended plan shall apply only to departures that are first offered for sale after the plan's amendment.

(e) *Retention of records.* Each carrier that is required to adopt a Contingency Plan for Lengthy Tarmac Delays shall retain for two years the following information about any tarmac delay that lasts more than three hours:

(1) The length of the delay;

(2) The precise cause of the delay;

(3) The actions taken to minimize hardships for passengers, including the provision of food and water, the maintenance and servicing of lavatories, and medical assistance;

(4) Whether the flight ultimately took off (in the case of a departure delay or diversion) or returned to the gate; and

(5) An explanation for any tarmac delay that exceeded 3 hours (i.e., why the aircraft did not return to the gate by the 3-hour mark).

(f) *Unfair and deceptive practice.* A carrier's failure to comply with the assurances required by this rule and contained in its Contingency Plan for Lengthy Tarmac Delays will be considered to be an unfair and deceptive practice within the meaning of 49 U.S.C. 41712 that is subject to enforcement action by the Department.

■ 15. Section 259.5 is revised to read as follows:

### § 259.5   Customer Service Plan.

(a) *Adoption of Plan.* Each covered carrier shall adopt a Customer Service Plan applicable to its scheduled flights and shall adhere to the plan's terms.

(b) *Contents of Plan.* Each Customer Service Plan shall address the following subjects and comply with the minimum standards set forth:

(1) Disclosing on the carrier's website, at the ticket counter, or when a customer calls the carrier's reservation center to inquire about a fare or to make a reservation, that the lowest fare offered by the carrier may be available elsewhere if that is the case;

(2) Notifying consumers of known delays, cancellations, and diversions as required by 14 CFR 259.8 of this chapter;

(3) Delivering baggage on time, including making every reasonable effort to return mishandled baggage within twenty-four hours, compensating passengers for reasonable expenses that result due to delay in delivery, as required by 14 CFR part 254 for domestic flights and as required by applicable international agreements for international flights, and reimbursing passengers for any fee charged to transport a bag if that bag is lost;

(4) Allowing reservations to be held at the quoted fare without payment, or cancelled without penalty, for at least twenty-four hours after the reservation is made if the reservation is made one week or more prior to a flight's departure;

(5) Where ticket refunds are due, providing prompt refunds, as required by 14 CFR 374.3 and 12 CFR part 226 for credit card purchases, and within 20 days after receiving a complete refund request for cash and check purchases, including refunding fees charged to a passenger for optional services that the passenger was unable to use due to an oversale situation or flight cancellation;

(6) Properly accommodating passengers with disabilities, as required by part 382 of this chapter, and other special-needs passengers as set forth in the carrier's policies and procedures, including during lengthy tarmac delays;

(7) Meeting customers' essential needs during lengthy tarmac delays as required by § 259.4 of this chapter and as provided for in each covered carrier's contingency plan;

(8) Handling "bumped" passengers with fairness and consistency in the case of oversales as required by part 250 of this chapter and as described in each carrier's policies and procedures for determining boarding priority;

(9) Disclosing cancellation policies, frequent flyer rules, aircraft seating configuration, and lavatory availability on the selling carrier's website, and upon request, from the selling carrier's telephone reservations staff;

(10) Notifying consumers in a timely manner of changes in their travel itineraries;

(11) Ensuring responsiveness to consumer problems as required by § 259.7 of this chapter; and

(12) Identifying the services it provides to mitigate passenger inconveniences resulting from flight cancellations and misconnections.

(c) *Self-auditing of plan and retention of records.* Each carrier that is required to adopt a Customer Service Plan shall audit its own adherence to its plan annually. Carriers shall make the results of their audits available for the Department's review upon request for two years following the date any audit is completed.

■ 16. Section 259.6 is revised to read as follows:

### § 259.6   Posting of Contracts of Carriage, Tarmac Delay Contingency Plans and Customer Service Plans on websites.

(a) Each U.S. air carrier that has a website and each foreign air carrier that has a website marketed to U.S. consumers, and that is required to adopt a contingency plan for lengthy tarmac delays, shall post its current contingency plan on its website in easily accessible form.

(b) Each U.S. air carrier that has a website and each foreign air carrier that has a website marketed to U.S. consumers, and that is required to adopt a customer service plan, shall post its current customer service plan on its website in easily accessible form.

(c) Each U.S. air carrier that has a website and each foreign air carrier that has a website marketed to U.S. consumers shall post its current contract of carriage on its website in easily accessible form.

■ 17. Section 259.7 is revised to read as follows:

### § 259.7   Response to consumer problems.

(a) *Designated advocates for passengers' interests.* Each covered carrier shall designate for its scheduled flights an employee who shall be responsible for monitoring the effects of flight delays, flight cancellations, and lengthy tarmac delays on passengers. This employee shall have input into decisions on which flights to cancel and which will be delayed the longest.

(b) *Informing consumers how to complain.* Each covered carrier shall make available the mailing address and e-mail or web address of the designated department in the airline with which to file a complaint about its scheduled service. This information shall be provided on the U.S. carrier's website (if any) and the foreign carrier's website (if marketed to U.S. consumers), on all e-ticket confirmations and, upon request, at each ticket counter and boarding gate staffed by the carrier or a contractor of the carrier.

(c) *Response to complaints.* Each covered carrier shall acknowledge in writing receipt of each complaint regarding its scheduled service to the complainant within 30 days of receiving it and shall send a substantive written response to each complainant within 60 days of receiving the complaint. A complaint is a specific written expression of dissatisfaction concerning a difficulty or problem which the person experienced when using or attempting to use an airline's services.

(d) *Social networking sites.* Each covered carrier that uses a social networking site (e.g. Facebook, Twitter) and that does not intend for that site to be a vehicle for receipt of written consumer complaints subject to this section shall clearly indicate on the carrier's primary page on that social networking site that it will not reply to consumer complaints on that site and shall direct consumers to the carrier's mailing address and e-mail or website location for filing written complaints.

■ 18. Section 259.8 is added to read as follows:

### § 259.8  Notify passengers of known delays, cancellations, and diversions.

(a) Each covered carrier for its scheduled flights to, from or within the U.S. must promptly provide to passengers who are ticketed or hold reservations, and to the public, information about a change in the status of a flight within 30 minutes after the carrier becomes aware of such a change in the status of a flight. A change in the status of a flight means, at a minimum, cancellation of a flight, a delay of 30 minutes or more in the planned operation of a flight, or a diversion. The flight status information must at a minimum be provided in the boarding gate area for the flight at a U.S. airport, on the carrier's website, and via the carrier's telephone reservation system upon inquiry by any person.

(1) With respect to any U.S. carrier or foreign air carrier that permits passengers to subscribe to flight status notification services, the carrier must deliver such notification to such passengers, by whatever means is available to the carrier and of the passenger's choice, within 30 minutes after the carrier becomes aware of such a change in the status of a flight.

(2) The U.S. carrier or foreign air carrier shall incorporate such notification service commitment into its Customer Service Plan as specified in section 259.5 of this chapter.

(b) For its scheduled flights to, from or within the U.S, within 30 minutes after the carrier becomes aware of a flight cancellation, a flight delay of 30 minutes or more, or a flight diversion, each covered carrier must update all flight status displays and other sources of flight information that are under the carrier's control at U.S. airports with information on that flight irregularity.

(c) If an airport-controlled display system at a U.S. airport accepts flight status updates from carriers, covered carriers must provide flight irregularity information to that airport for the carrier's scheduled flights to, from or within the U.S. within 30 minutes after the carrier becomes aware of such a change in the status of a flight. Flight irregularity refers to flight cancellations, flight delays of 30 minutes or more, and diversions.

## PART 399—STATEMENTS OF GENERAL POLICY

■ 19. The authority citation for 14 CFR Part 399 continues to read as follows:

**Authority:** 49 U.S.C. 40101 *et seq.*

■ 20. Effective October 24, 2011, § 399.84 is revised to read as follows:

### § 399.84  Price advertising and opt-out provisions.

(a) The Department considers any advertising or solicitation by a direct air carrier, indirect air carrier, an agent of either, or a ticket agent, for passenger air transportation, a tour (i.e., a combination of air transportation and ground or cruise accommodations) or tour component (e.g., a hotel stay) that must be purchased with air transportation that states a price for such air transportation, tour, or tour component to be an unfair and deceptive practice in violation of 49 U.S.C. 41712, unless the price stated is the entire price to be paid by the customer to the carrier, or agent, for such air transportation, tour, or tour component. Although charges included within the single total price listed (e.g., government taxes) may be stated separately or through links or "pop ups" on websites that display the total price, such charges may not be false or misleading, may not be displayed prominently, may not be presented in the same or larger size as the total price, and must provide cost information on a per passenger basis that accurately reflects the cost of the item covered by the charge.

(b) The Department considers any advertising by the entities listed in paragraph (a) of this section of an each-way airfare that is available only when purchased for round-trip travel to be an unfair and deceptive practice in violation of 49 U.S.C. 41712, unless such airfare is advertised as "each way" and in such a manner so that the disclosure of the round-trip purchase requirement is clearly and conspicuously noted in the advertisement and is stated prominently and proximately to the each-way fare amount. The Department considers it to be an unfair and deceptive practice to advertise each-way fares contingent on a round-trip purchase requirement as "one-way" fares, even if accompanied by prominent and proximate disclosure of the round trip purchase requirement.

(c) When offering a ticket for purchase by a consumer, for passenger air transportation or for a tour (i.e., a combination of air transportation and ground or cruise accommodations) or tour component (e.g., a hotel stay) that must be purchased with air transportation, a direct air carrier, indirect air carrier, an agent of either, or a ticket agent, may not offer additional optional services in connection with air transportation, a tour, or tour component whereby the optional

service is automatically added to the consumer's purchase if the consumer takes no other action, i.e., if the consumer does not opt out. The consumer must affirmatively "opt in" (i.e., agree) to such a service and the fee for it before that fee is added to the total price for the air transportation-related purchase. The Department considers the use of "opt-out" provisions to be an unfair and deceptive practice in violation of 49 U.S.C. 41712.

■ 21. Section 399.85 is added to read as follows:

### § 399.85  Notice of baggage fees and other fees.

(a) If a U. S. or foreign air carrier has a website accessible for ticket purchases by the general public in the U.S., the carrier must promptly and prominently disclose any increase in its fee for carry-on or first and second checked bags and any change in the first and second checked bags or carry-on allowance for a passenger on the homepage of that website (e.g., provide a link that says "changed bag rules" or similarly descriptive language and takes the consumer from the homepage directly to a pop-up or a place on another webpage that details the change in baggage allowance or fees and the effective dates of such changes). Such notice must remain on the homepage for at least three months after the change becomes effective.

(b) If a U.S. carrier, a foreign air carrier, an agent of either, or a ticket agent has a website accessible for ticket purchases by the general public in the U.S., the carrier or agent must clearly and prominently disclose on the first screen in which the agent or carrier offers a fare quotation for a specific itinerary selected by a consumer that additional airline fees for baggage may apply and where consumers can see these baggage fees. An agent may refer consumers to the airline websites where specific baggage fee information may be obtained or to its own site if it displays airlines' baggage fees.

(c) On all e-ticket confirmations for air transportation within, to or from the United States, including the summary page at the completion of an online purchase and a post-purchase email confirmation, a U.S. carrier, a foreign air carrier, an agent of either, or a ticket agent that advertises or sells air transportation in the United States must include information regarding the passenger's free baggage allowance and/or the applicable fee for a carry-on bag and the first and second checked bag. Carriers must provide this information in text form in the e-ticket confirmation. Agents may provide this information in

text form in the e-ticket confirmations or through a hyperlink to the specific location on airline websites or their own website where this information is displayed. The fee information provided for a carry-on bag and the first and second checked bag must be expressed as specific charges taking into account any factors (e.g., frequent flyer status, early purchase, and so forth) that affect those charges.

(d) If a U.S. or foreign air carrier has a website marketed to U.S. consumers where it advertises or sells air transportation, the carrier must prominently disclose on its website information on fees for all optional services that are available to a passenger purchasing air transportation. Such disclosure must be clear, with a conspicuous link from the carrier's homepage directly to a page or a place on a page where all such optional services and related fees are disclosed. For purposes of this section, the term "optional services" is defined as any service the airline provides, for a fee, beyond passenger air transportation. Such fees include, but are not limited to, charges for checked or carry-on baggage, advance seat selection, in-flight beverages, snacks and meals, pillows and blankets and seat upgrades. In general, fees for particular services may be expressed as a range; however, baggage fees must be expressed as specific charges taking into account any factors (e.g., frequent flyer status, early purchase, and so forth) that affect those charges.

(e) For air transportation within, to or from the United States, a carrier marketing a flight under its identity that is operated by a different carrier, otherwise known as a code-share flight, must through its website disclose to consumers booked on a code-share flight any differences between its optional services and related fees and those of the carrier operating the flight. This disclosure may be made through a conspicuous notice of the existence of such differences on the marketing carrier's website or a conspicuous hyperlink taking the reader directly to a page on the marketing carrier's website

that lists the differences in policies among code-share partners.

(f) The Department considers the failure to give the appropriate notice described in paragraphs (a) through (e) of this section to be an unfair and deceptive practice within the meaning of 49 U.S.C. 41712.

■ 22. Section 399.87 is added to read as follows:

### § 399.87  Baggage allowances and fees.

For passengers whose ultimate ticketed origin or destination is a U.S. point, U.S. and foreign carriers must apply the baggage allowances and fees that apply at the beginning of a passenger's itinerary throughout his or her entire itinerary. In the case of code-share flights that form part of an itinerary whose ultimate ticketed origin or destination is a U.S. point, U.S. and foreign carriers must apply the baggage allowances and fees of the marketing carrier throughout the itinerary to the extent that they differ from those of any operating carrier.

■ 23. Section 399.88 is added to read as follows:

### § 399.88  Prohibition on post-purchase price increase.

(a) It is an unfair and deceptive practice within the meaning of 49 U.S.C. 41712 for any seller of scheduled air transportation within, to or from the United States, or of a tour (i.e., a combination of air transportation and ground or cruise accommodations), or tour component (e.g., a hotel stay) that includes scheduled air transportation within, to or from the United States, to increase the price of that air transportation, tour or tour component to a consumer, including but not limited to an increase in the price of the seat, an increase in the price for the carriage of passenger baggage, or an increase in an applicable fuel surcharge, after the air transportation has been purchased by the consumer, except in the case of an increase in a government-imposed tax or fee. A purchase is deemed to have occurred when the full amount agreed upon has been paid by the consumer.

(b) A seller of scheduled air transportation within, to or from the United States or a tour (i.e., a combination of air transportation and

ground or cruise accommodations), or tour component (e.g., a hotel stay) that includes scheduled air transportation within, to or from the United States, must notify a consumer of the potential for a post-purchase price increase due to an increase in a government-imposed tax or fee and must obtain the consumer's written consent to the potential for such an increase prior to purchase of the scheduled air transportation, tour or tour component that includes scheduled air transportation. Imposition of any such increase without providing the consumer the appropriate notice and without obtaining his or her written consent of the potential increase constitutes an unfair and deceptive practice within the meaning of 49 U.S.C. 41712.

■ 24. Section 399.89 is added to read as follows:

### § 399.89  Disclosure of potential for price increase before payment.

Any seller of scheduled air transportation within, to or from the United States, or of a tour (i.e., a combination of air transportation and ground or cruise accommodations), or tour component (e.g., a hotel stay) that includes scheduled air transportation within, to or from the United States, must notify a consumer of the potential for a price increase that could take place prior to the time that the full amount agreed upon has been paid by the consumer, including but not limited to an increase in the price of the seat, an increase in the price for the carriage of passenger baggage, an increase in an applicable fuel surcharge, or an increase in a government-imposed tax or fee and must obtain the consumer's written consent to the potential for such an increase prior to accepting any payment for the scheduled air transportation, or tour or tour component that includes scheduled air transportation. Imposition of any such increase without providing the consumer the appropriate notice and obtaining his or her written consent to the potential increase constitutes an unfair and deceptive practice within the meaning of 49 U.S.C. 41712.

[FR Doc. 2011–9736 Filed 4–20–11; 8:45 am]

**BILLING CODE P**

Exhibit 10

The FAA's authority to issue rules regarding aviation safety is found in Title 49 of the United States Code. Subtitle I, section 106 describes the authority of the FAA Administrator. Subtitle VII, Aviation Programs, describes in more detail the scope of the agency's authority.

This rulemaking is promulgated under the authority described in subtitle VII, part A, subpart I, section 40103. Under that section, the FAA is charged with prescribing regulations to assign the use of the airspace necessary to ensure the safety of aircraft and the efficient use of airspace. This regulation is within the scope of that authority as it would remove a colored Federal airway in Alaska.

**Environmental Review**

This proposal will be subject to an environmental analysis in accordance with FAA Order 1050.1E, "Environmental Impacts: Policies and Procedures," prior to any FAA final regulatory action.

**List of Subjects in 14 CFR Part 71**

Airspace, Incorporation by reference, Navigation (air).

**The Proposed Amendment**

In consideration of the foregoing, the Federal Aviation Administration proposes to amend 14 CFR part 71 as follows:

**PART 71—DESIGNATION OF CLASS A, B, C, D, AND E AIRSPACE AREAS; AIR TRAFFIC SERVICE ROUTES; AND REPORTING POINTS**

1. The authority citation for part 71 continues to read as follows:

**Authority:** 49 U.S.C. 106(g), 40103, 40113, 40120; E.O. 10854, 24 FR 9565, 3 CFR, 1959–1963 Comp., p. 389.

**§ 71.1    [Amended]**

2. The incorporation by reference in 14 CFR 71.1 of FAA Order 7400.9T, Airspace Designations and Reporting Points, signed August 27, 2009, and effective September 15, 2009, is amended as follows:

*Paragraph 6009(a)—Green Federal Airways.*

\* \* \* \* \*

**G–4    [Removed]**

Issued in Washington, DC, May 27, 2010.

**Kenneth McElroy,**

*Acting Manager, Airspace and Rules Group.*

[FR Doc. 2010–13609 Filed 6–7–10; 8:45 am]

**BILLING CODE 4910–13–P**

**DEPARTMENT OF TRANSPORTATION**

**Office of the Secretary**

**14 CFR Parts 234, 244, 250, 253, 259, and 399**

**[Docket No. DOT–OST–2010–0140]**

**RIN No. 2105–AD92**

**Enhancing Airline Passenger Protections**

**AGENCY:** Office of the Secretary (OST), Department of Transportation (DOT).

**ACTION:** Notice of Proposed Rulemaking (NPRM).

**SUMMARY:** The Department of Transportation is proposing to improve the air travel environment for consumers by: increasing the number of carriers that are required to adopt tarmac delay contingency plans and the airports at which they must adhere to the plan's terms; increasing the number of carriers that are required to report tarmac delay information to the Department; expanding the group of carriers that are required to adopt, follow, and audit customer service plans and establishing minimum standards for the subjects all carriers must cover in such plans; requiring carriers to include their contingency plans and customer service plans in their contracts of carriage; increasing the number of carriers that must respond to consumer complaints; enhancing protections afforded passengers in oversales situations, including increasing the maximum denied boarding compensation airlines must pay to passengers bumped from flights; strengthening, codifying and clarifying the Department's enforcement policies concerning air transportation price advertising practices; requiring carriers to notify consumers of optional fees related to air transportation and of increases in baggage fees; prohibiting post-purchase price increases; requiring carriers to provide passengers timely notice of flight status changes such as delays and cancellations; and prohibiting carriers from imposing unfair contract of carriage choice-of-forum provisions. The Department is proposing to take this action to strengthen the rights of air travelers in the event of oversales, flight cancellations and long delays, and to ensure that passengers have accurate and adequate information to make informed decisions when selecting flights. In addition, the Department is considering several measures, including banning the serving of peanuts on commercial airlines, to provide greater access to air travel for the significant number of individuals with peanut allergies.

**DATES:** Comments should be filed by August 9, 2010. Late-filed comments will be considered to the extent practicable.

**ADDRESSES:** You may file comments identified by the docket number DOT–OST–2010–0140 by any of the following methods:

• *Federal eRulemaking Portal:* go to *http://www.regulations.gov* and follow the online instructions for submitting comments.

• *Mail:* Docket Management Facility, U.S. Department of Transportation, 1200 New Jersey Ave., SE., Room W12–140, Washington, DC 20590–0001.

• *Hand Delivery or Courier:* West Building Ground Floor, Room W12–140, 1200 New Jersey Ave., SE., between 9 a.m. and 5 p.m. ET, Monday through Friday, except Federal Holidays.

• *Fax:* (202) 493–2251.

*Instructions:* You must include the agency name and docket number DOT–OST–2010–XXXX or the Regulatory Identification Number (RIN) for the rulemaking at the beginning of your comment. All comments received will be posted without change to *http://www.regulations.gov,* including any personal information provided.

*Privacy Act:* Anyone is able to search the electronic form of all comments received in any of our dockets by the name of the individual submitting the comment (or signing the comment if submitted on behalf of an association, a business, a labor union, etc.). You may review DOT's complete Privacy Act statement in the **Federal Register** published on April 11, 2000 (65 FR 19477–78), or you may visit *http://DocketsInfo.dot.gov.*

*Docket:* For access to the docket to read background documents or comments received, go to *http://www.regulations.gov* or to the street address listed above. Follow the online instructions for accessing the docket.

**FOR FURTHER INFORMATION CONTACT:** Daeleen Chesley or Blane A. Workie, Office of the Assistant General Counsel for Aviation Enforcement and Proceedings, U.S. Department of Transportation, 1200 New Jersey Ave., SE., Washington, DC 20590, 202–366–9342 (phone), 202–366–7152 (fax), *daeleen.chesley@dot.gov* or *blane.workie@dot.gov* (e-mail).

**SUPPLEMENTARY INFORMATION:**

**Pilot Project on Open Government and the Rulemaking Process**

On January 21st, 2009, President Obama issued a *Memorandum on*

*Transparency and Open Government* in which he described how "public engagement enhances the Government's effectiveness and improves the quality of its decisions" and how "knowledge is widely dispersed in society, and public officials benefit from having access to that dispersed knowledge." To support the President's open government initiative, DOT plans to continue its partnership with the Cornell eRulemaking Initiative (CeRI) in a pilot project, Regulation Room, to discover the best ways of using Web 2.0 and social networking technologies to: (1) Alert the public, including those who sometimes may not be aware of rulemaking proposals, such as individuals, public interest groups, small businesses, and local government entities, that rulemaking is occurring in areas of interest to them; (2) increase public understanding of each proposed rule and the rulemaking process; and (3) help the public formulate more effective individual and collaborative input to DOT. We anticipate, over the course of several rulemaking initiatives, that CeRI will use different Web technologies and approaches to enhance public understanding and participation, work with DOT to evaluate the advantages

and disadvantages of these techniques, and report their findings and conclusions on the most effective use of social networking technologies in this area.

DOT and the Obama Administration are striving to increase effective public involvement in the rulemaking process and strongly encourage all parties interested in this rulemaking to visit the Regulation Room Web site, *http:// www.regulationroom.org*, to learn about the rule and the rulemaking process, to discuss the issues in the rule with other persons and groups, and to participate in drafting comments that will be submitted to DOT. A Summary of the discussion that occurs on the Regulation Room site and participants will have the chance to review a draft and suggest changes before the Summary is submitted. Participants who want to further develop ideas contained in the Summary, or raise additional points, will have the opportunity to collaboratively draft joint comments that will be also be submitted to the rulemaking docket before the comment period closes.

Note that Regulation Room is not an official DOT Web site, and so participating in discussion on that site

is not the same as commenting in the rulemaking docket. The Summary of discussion and any joint comments prepared collaboratively on the site will become comments in the docket when they are submitted to DOT by CeRI. At any time during the comment period, anyone using Regulation Room can also submit individual views to the rulemaking docket through the federal rulemaking portal Regulations.gov, or by any of the other methods identified at the beginning of this Notice. For questions about this project, please contact Brett Jortland in the DOT Office of General Counsel at 202–421–9216 or *brett.jortland@dot.gov*.

**Summary of Preliminary Regulatory Analysis**

The preliminary regulatory analysis suggests that the benefits of the proposed requirements exceed its costs, even without considering non-quantifiable benefits. This analysis, outlined in the table below, finds that the expected net present value of the rule for 10 years at a 7% discount rate is estimated to be $61.6 million. At a 3% discount rate, the expected net present value of the rule is estimated to be $75.7 million.

|  | Present value (millions) |
|---|---|
| Total Quantified Benefits: |  |
| 10 Years, 7% discounting | $87.6 |
| 10 Years, 3% discounting | 104.2 |
| Total Quantified Costs: |  |
| 10 Years, 7% discounting | 26.0 |
| 10 Years, 3% discounting | 28.5 |
| Net Benefits: |  |
| 10 Years, 7% discounting | 61.6 |
| 10 Years, 3% discounting | 75.7 |

A comparison of the estimated benefits and costs for each of the 11 proposed requirements is provided in the Regulatory Analysis and Notices section, along with information on additional benefits and costs for which quantitative estimates could not be developed.

**Background**

On December 8, 2008, the Department published a Notice of Proposed Rulemaking (NPRM) on enhancing airline passenger protections. *See* 73 FR 74586 (December 8, 2008). After reviewing and considering the comments on the NPRM, on December 30, 2009, the Department published a final rule in which the Department required certain U.S. air carriers to adopt contingency plans for lengthy tarmac delays; respond to consumer

problems; post flight delay information on their Web sites; and adopt, follow, and audit customer service plans. The rule also defined chronically delayed flights and deemed them to be an "unfair and deceptive" practice. That rule took effect on April 29, 2010. *See* 74 FR 68983 (December 30, 2009).

In the preamble to the final rule, the Department noted that it planned to review additional ways to further enhance protections afforded airline passengers and listed a number of subject areas that it was considering addressing in a future rulemaking. The areas specifically mentioned as being under consideration were as follows: (1) DOT review and approval of contingency plans for lengthy tarmac delays ; (2) reporting of tarmac delay data; (3) standards for customer service plans; (4) notification to passengers of

flight status changes; (5) inflation adjustment for denied boarding compensation; (6) alternative transportation for passengers on canceled flights; (7) opt-out provisions where certain optional services are pre-selected for consumers at an additional cost (*e.g.*, travel insurance, seat selection); (8) contract of carriage venue designation provisions; (9) baggage fees disclosure; (10) full fare advertising; and (11) responses to complaints about charter service. This NPRM addresses most of those issues, as well as other matters that we believe are necessary to ensure fair treatment of passengers. We have described each proposal in this NPRM in detail below and invite all interested persons to comment.

**32320** **Federal Register** / Vol. 75, No. 109 / Tuesday, June 8, 2010 / Proposed Rules

**Notice of Proposed Rulemaking**

*1. Tarmac Delay Contingency Plans*

The Department's final rule entitled "Enhancing Airline Passenger Protections," which was published in the **Federal Register** on December 30, 2009 (74 FR 68983), requires, among other things, that U.S. carriers adopt tarmac delay contingency plans that include, at a minimum, the following: (1) An assurance that, for domestic flights, the U.S. carrier will not permit an aircraft at a medium or large hub-airport to remain on the tarmac for more than three hours unless the pilot-in-command determines there is a safety-related or security-related impediment to deplaning passengers, or Air Traffic Control advises the pilot-in-command that returning to the gate or permitting passengers to disembark elsewhere would significantly disrupt airport operations; (2) for international flights that depart from or arrive at a U.S. airport, an assurance that the U.S. carrier will not permit an aircraft to remain on the tarmac for more than a set number of hours, as determined by the carrier in its plan, before allowing passengers to deplane, unless the pilot-in-command determines there is a safety-related or security-related reason precluding the aircraft from doing so, or Air Traffic Control advises the pilot-in-command that returning to the gate or permitting passengers to disembark elsewhere would significantly disrupt airport operations; (3) for all flights, an assurance that the U.S. carrier will provide adequate food and potable water no later than two hours after the aircraft leaves the gate (in the case of a departure) or touches down (in the case of an arrival) if the aircraft remains on the tarmac, unless the pilot-in-command determines that safety or security requirements preclude such service; (4) for all flights, an assurance of operable lavatory facilities, as well as adequate medical attention if needed, while the aircraft remains on the tarmac; (5) an assurance of sufficient resources to implement the plan; and (6) an assurance that the plan has been coordinated with airport authorities at all medium and large hub airports that the U.S. carrier serves, including medium and large hub diversion airports. The final rule also requires U.S. carriers to retain for two years the following information on any tarmac delay that lasts at least three hours: the length of the delay, the specific cause of the delay, and the steps taken to minimize hardships for passengers (including providing food and water, maintaining lavatories, and providing medical assistance); whether the flight ultimately took off (in the case of a departure delay or diversion) or returned to the gate; and an explanation for any tarmac delay that exceeded three hours, including why the aircraft did not return to the gate by the three-hour mark.

This NPRM proposes to strengthen the protections for consumers by making substantive changes in four areas: Requiring foreign air carriers to adopt tarmac delay contingency plans, increasing the number of airports at which carriers must adhere to their plans to include U.S. small and non-hub airports, requiring carriers to coordinate their tarmac delay contingency plans with all U.S. airports they serve, and requiring carriers to communicate with passengers during tarmac delays. More specifically, the NPRM proposes to require any foreign air carrier that operates scheduled passenger or public charter service to and from the U.S. using any aircraft originally designed to have a passenger capacity of 30 or more passenger seats to adopt a tarmac delay contingency plan that includes minimum assurances identical to those currently required of U.S. carriers for the latter's international flights. As proposed, it would apply to all of a foreign carrier's flights to and from the U.S., including those involving aircraft with fewer than 30 seats if a carrier operates any aircraft originally designed to have a passenger capacity of 30 or more seats to or from the U.S. The NPRM also proposes to require that U.S. and foreign air carriers coordinate their contingency plans with all airports they serve (small and non-hub airports as well as the medium and large hub airports covered by the existing rule) and with the Transportation Security Administration (TSA) and U.S. Customs and Border Protection (CBP) for any U.S. airport that the carrier regularly uses for its international flights, including diversion airports.

Under the proposed rule, the tarmac delay contingency plans would cover operations at each U.S. large hub airport, medium hub airport, small hub airport and non-hub U.S. airport. Further, the NPRM proposes to require that U.S. and foreign air carriers update passengers every 30 minutes during a tarmac delay regarding the status of their flight and the reasons for the tarmac delay. The regulation would specify that the Department would consider failure to comply with any of the assurances that are required by this rule to be contained in a carrier's tarmac delay contingency plan to be an unfair and deceptive practice within the meaning of 49 U.S.C. 41712 and subject to enforcement action.

We are proposing these regulations because the Department believes that it is important to ensure that passengers on all international flights to and from the United States are afforded protection from unreasonably lengthy tarmac delays. As is the case under the existing rule for international flights of covered U.S. carriers, at this time, we intend to allow foreign carriers to develop and implement a contingency plan for lengthy tarmac delays that has more flexible requirements than those that apply to domestic flights with regard to the time limit to deplane passengers. Also, as in our initial rulemaking to enhance airline passenger protections, this limit will allow exceptions for considerations of safety, security and for instances in which Air Traffic Control advises the pilot-in-command that returning to the gate or permitting passengers to disembark elsewhere would significantly disrupt airport operations. It is worth noting that there are ongoing questions as to whether mandating a specific time frame for deplaning passengers on international flights is in the best interest of the public; a number of arguments have been presented for not imposing such a limit. Most international flights operate less frequently than most domestic flights, potentially resulting in much greater harm to consumers if carriers cancel these international flights (*e.g.*, passengers are less likely to be accommodated on an alternate flight in a reasonable period of time). We ask interested persons to comment on whether any final rule that we may adopt should include a uniform standard for the time interval after which U.S. or foreign air carriers would be required to allow passengers on international flights to deplane. Commenters who support the adoption of a uniform standard should propose specific amounts of time and state why they believe these intervals to be appropriate.

We also seek comment on the cost burdens and benefits should the requirement to have a contingency plan be narrowed or expanded. For example, while we are proposing here to include foreign carriers that operate aircraft originally designed to have a passenger capacity of 30 or more seats to and from the U.S., we invite interested persons to comment on whether, in the event that we adopt a rule requiring foreign carriers to have contingency plans, we should limit its applicability to foreign air carriers that operate large aircraft to and from the U.S.—*i.e.*, aircraft originally designed to have a maximum passenger capacity of more than 60

seats. We also seek comment on whether we should expand coverage of the requirement to adopt tarmac delay contingency plans so that the obligation to adopt such a plan and adhere to its terms is not only the responsibility of the operating carrier but also the carrier under whose code the service is marketed if different. In addition, should coverage be further expanded to require U.S. airports to adopt tarmac delay contingency plans? Proponents of these or other alternative proposals should provide arguments and evidence in support of their position, as should opponents.

In the initial rulemaking to enhance airline passenger protections, we decided to implement a rule requiring certain U.S. carriers to coordinate their contingency plans with large-hub and medium-hub airports, as well as diversion airports that the carrier serves. Those airports are the only ones covered by the current rule. We are proposing to extend this requirement to small and non-hub airports and to require all covered carriers (U.S. and foreign) to coordinate their plans with each U.S. large hub airport, medium hub airport, small hub airport and non-hub U.S. airport that they serve as well as TSA and CBP. The Department believes that the same issues and discomfort to passengers during an extended tarmac delay are likely to occur regardless of airport size or layout. We also strongly believe that it is essential that airlines involve airports and appropriate Federal agencies in developing their plans to enable them to effectively meet the needs of passengers. As such, we are proposing to extend this rule to require covered carriers to coordinate their plans with each U.S. large hub airport, medium hub airport, small hub airport and non-hub U.S. airport to which they regularly operate scheduled passenger or public charter service.

As recommended by the Tarmac Delay Task Force, we are also proposing to require carriers to include CBP and TSA in their coordination efforts for any U.S. diversion airport which they regularly use. We believe this proposal is necessary, as it has come to the Department's attention on more than one occasion passengers on international flights were held on diverted aircraft for extended periods of time because there was no means to process those passengers and allow them access to terminal facilities. The Department of Homeland Security has advised this Department that, subject to coordination with CBP regional directors, passengers on diverted international flights may be permitted into closed terminal areas without CBP

screening. We invite interested persons to comment on this proposal. What costs and benefits would result from this requirement? Is it workable to include small and non-hub airports served by a carrier? Should the rule be expanded to include other commercial U.S. airports (*i.e.*, those with less than 10,000 annual enplanements)? We are soliciting comments from airlines, airports and other industry entities on whether there are any special operational concerns affecting such airports.

The Department has also given consideration to passengers' frustration with lack of communication by carrier personnel about the reasons a flight is experiencing a long tarmac delay. It does not seem unreasonable or unduly burdensome to require carriers to address this issue and verbally inform passengers as to the flight's operational status on a regular basis during a lengthy tarmac delay. As such, the Department is proposing a rule requiring carriers to announce to passengers on covered flights every 30 minutes the reasons for the delay, and/ or the operational status of the flight. We do not anticipate that a carrier's flight crews will know every nuance of the reason for the delay, but we do expect them to inform passengers of the reasons of which they are aware and to make reasonable attempts to acquire information about the reason(s) for that delay. We also invite comment on whether carriers should be required to announce that passengers may deplane from an aircraft that is at the gate or other disembarkation area with the door open. The Department's Office of Aviation Enforcement and Proceedings has previously explained that a tarmac delay begins when passengers no longer have an option to get off of the aircraft, which usually occurs when the doors of the aircraft are closed, and encouraged carriers to announce to passengers on flights that remain at the gate with the doors open that the passengers are allowed off the aircraft if that is the case. However, such an announcement is not explicitly required in the existing rule. We seek comment on the benefit to consumers of mandating such announcements. Commenters, including carriers and carrier associations, should also address any costs and/or operational concerns related to implementing a rule requiring such announcements.

## 2. Tarmac Delay Data

We are proposing to require all carriers that must comply with 14 CFR 259.4, which requires carriers to adopt contingency plans for lengthy tarmac

delays, file tarmac delay data with the Department to the extent they are not already required to file such data pursuant to 14 CFR part 234. Incidents of lengthy tarmac delays have captured much public attention in recent years and have been the focus of considerable Department attention as well. On October 1, 2008, the Department's Bureau of Transportation Statistics (BTS) began collecting more detailed tarmac delay information from all U.S. carriers that file the "On-Time Flight Performance Report" (BTS Form 234) under 14 CFR part 234, "reporting carriers". The data do not, however, provide a complete picture of tarmac delays, as the reporting carriers only submit data concerning their scheduled domestic flights as a function of their being required to report on-time performance data. These reporting carriers currently constitute the 16 largest U.S. carriers by scheduled-service passenger revenue, plus two carriers that voluntarily file the report. In addition, smaller U.S. carriers which are subject to the Department's contingency plan rule that was effective April 29, 2010, do not currently submit any tarmac delay data to the Department and foreign air carriers which we are proposing in this NPRM adopt tarmac delay contingency plans also do not submit tarmac delay data to the Department.

While a single incident of tarmac delay may be attributed to one or more causes, such as air traffic congestion, weather related delays, mechanical problems, and/or flight dispatching logistic failures, we believe that an initial and essential step toward finding solutions for the tarmac delay problem, whether by government regulations and/ or through voluntary actions by the airlines, and monitoring the effect on consumers of lengthy tarmac delays, is to obtain more complete data on these incidents. Therefore, we are tentatively of the opinion that we should expand the pool of carriers that must file information with the Department regarding tarmac delays to U.S. carriers and foreign carriers that operate any aircraft originally designed with a passenger capacity of 30 or more passenger seats with respect to their operations at U.S. airports. The more complete picture of lengthy tarmac delays afforded by these new data will help establish a vital platform for the Department's future rulemaking and policy decision-making, for FAA airport and air traffic control infrastructure and technology modification and improvement, and for system operating improvements and reform by the airline

industry. Furthermore, the result of such analysis will provide the Department, the industry, and the public more precise data with which to compare tarmac delay incidents by carrier, by airport, and by specific time frame.

This rule as proposed would apply to all U.S. carriers that are covered by the Department's existing rule requiring tarmac delay contingency plans, as well as foreign carriers that we are proposing, in this NPRM, be required to adopt tarmac delay contingency plans (see proposed changes to 14 CFR 259.4). Thus, this proposal would cover tarmac delays at U.S. airports by all U.S. certificated and commuter carriers that operate any aircraft originally designed to have a passenger capacity of 30 or more seats. It also would cover tarmac delays at U.S. airports by all foreign carriers that operate passenger service to and from the U.S. using any aircraft originally designed to have a passenger capacity of 30 or more seats. We seek comment on whether we should limit the requirement to file tarmac delay data to U.S. and foreign air carriers that operate large aircraft to and from the U.S.—*i.e.,* aircraft originally designed to have a maximum passenger capacity of more than 60 seats. Commenters should explain why they favor such a limitation and suggest alternate approaches to capturing tarmac delay data.

We note that using just one qualifying aircraft (*i.e.,* originally designed to have a passenger capacity of 30 or more passenger seats) will cause all of a U.S. carrier's flights to be covered by this rule. The same is true of a foreign carrier's flights that originate or terminate at a U.S. airport. For example, if a foreign carrier operates any aircraft to or from the U.S. that was originally designed to have a passenger capacity of 30 or more seats, all of its flight taking off or landing at a U.S. airport, regardless of size of aircraft and seating capacity, will be subject to the reporting requirements of the proposed rule.

We are mindful of the costs associated with submitting data to the Department, especially in light of the relatively limited resources of smaller carriers and the relatively fewer flights to and from the U.S. by foreign carriers and we do not intend with this proposal to impose a comprehensive on-time reporting scheme, as exists for the largest U.S. carriers now covered by Part 234. With this concern in mind, using the Part 234 requirements as a model, we have narrowed the data fields we propose to be reported to those we believe are necessary for us to extract necessary tarmac delay information. In addition, we propose to require these tarmac

delay data to be reported each month only with respect to tarmac delays of 3 hours or more.

We recognize that carriers subject to our new contingency plan rule that went into effect April 29, 2010, are required to retain for two years certain information regarding tarmac delays of 3 hours or more. We note that the reporting requirement proposed in this notice is separate and distinct from that information retention requirement, with a different purpose. Where that rule is focused on carrier compliance with consumer protection-related requirements and requires only that carriers retain the information for a limited period of time, we propose here that carriers report monthly a set of data regarding tarmac delays that will provide the Department more complete information on lengthy tarmac delays throughout the air transportation system in the U.S. The Department plans to publish a summary of this information in its Air Travel Consumer Report, a monthly publication product of the Department of Transportation's Office of Aviation Enforcement and Proceedings that is designed to assist consumers with information on the quality of services provided by airlines. We welcome suggestions from the public and the industry on whether there are other means to further reduce the carriers' burden yet still effectively achieve the goal of this proposal.

### 3. Customer Service Plans

Under the final rule published on December 30, 2009, U.S. carriers are required to adopt customer service plans for their scheduled flights that address, at a minimum, the following service areas: (1) Offering the lowest fare available; (2) notifying consumers of known delays, cancellations, and diversions; (3) delivering baggage on time; (4) allowing reservations to be held or cancelled without penalty for a defined amount of time; (5) providing prompt ticket refunds; (6) properly accommodating disabled and special-needs passengers, including during tarmac delays; (7) meeting customers' essential needs during lengthy on-board delays; (8) handling "bumped" passengers in the case of oversales with fairness and consistency; (9) disclosing travel itinerary, cancellation policies, frequent flyer rules, and aircraft configuration; (10) ensuring good customer service from code-share partners; (11) ensuring responsiveness to customer complaints; and (12) identifying the services they provide to mitigate passenger inconveniences resulting from flight cancellations and misconnections. The rule also requires

U.S. carriers to audit their plan annually and make the results of the Department's audits available for the Department's review upon request.

This NPRM proposes to increase the protections afforded consumers in that recent final rule by requiring foreign air carriers to adopt, follow, and audit customer service plans and establishing minimum standards for what must be included in the customer service plans of all covered carriers (U.S. and foreign). We are proposing to cover foreign air carriers operating scheduled passenger service to and from the U.S. using any aircraft originally designed to have a passenger capacity of 30 or more passenger seats. The rule would apply to all flights to and from the U.S. of those carriers, including flights involving aircraft with fewer than 30 seats if a carrier operates any aircraft with 30 or more passenger seats to and from the U.S. We ask interested persons to comment on whether the proposed requirement for foreign air carriers to adopt, follow and audit customer service plan should be narrowed in some fashion—*e.g.,* should never apply to aircraft with fewer than 30 seats?

Each foreign carrier's plan would have to address the same subjects currently required of U.S. carriers in the Department's rule to enhance airline passenger protections. We are also proposing to require that foreign air carriers make the results of their audits of their customer service plans available for the Department's review upon request for two years following the date any audit is completed. A carrier's failure to adopt a customer service plan for its scheduled service, adhere to its plan's terms, audit its own adherence to its plan annually or make the results of its audits available for the Department's review upon request would be considered an unfair and deceptive practice within the meaning of 49 U.S.C. 41712 and subject to enforcement action.

A substantial number of air travelers fly to and from the United States on flights operated by foreign carriers, whether through a code-share arrangement or by directly arranging for that transportation. By requiring foreign carriers to adopt plans, audit their own compliance, and make the results of their audits available for us to review, we intend to afford consumers better protection on nearly all flights to and from the United States, not just those of the U.S. carriers to which the rule is currently applicable. The Department is soliciting comment on the costs and benefits associated with this requirement. We would like foreign carriers to comment on whether similar

plans already exist, and if so, how they currently implement such plans.

The Department also proposes to require covered carriers' customer service plans meet minimum standards to ensure that the carriers' (U.S. and foreign) plans are specific and enforceable. The Department is concerned that many carriers' customer service plans are not specific enough for a consumer to have realistic expectations of the types of services a carrier will provide under its plan, or that some carriers may not be living up to their customer service commitments. Based on a review of existing customer service plans, the Department found that some carriers' plans do contain specifics regarding the type of services a consumer can expect (*e.g.,* returning baggage by a specified time after the flight or holding reservations without charge for a specific period of time), while others carriers' plans are vaguely written making it difficult for a consumer to know how a carrier will address those subjects or whether a carrier has fulfilled its promises. As such, the Department believes establishing minimum standards for the plans will result in consumers being better informed and protected. As always carriers are free to set higher standards than those mandated by the Department. We also note that all of the subjects for which we are proposing to require a standard are already required to be included in the customer service plans for U.S. carriers (*e.g.,* oversales/denied boarding compensation, refunds), which should minimize the burden on these carriers to comply with the proposed new requirement to establish standards for those subjects. In addition, when determining what minimum standards to apply to these plans, the Department reviewed customer service plans as currently implemented by a number of carriers, and chose the services already provided by some carriers that appear to be "best practices."

We seek comment on both the costs and benefits of requiring carriers to adopt these minimum standards. The minimum standards that we are proposing are as follows: (1) Offering the lowest fare available on the carrier's Web site, at the ticket counter, or when a customer calls the carrier's reservation center to inquire about a fare or to make a reservation; (2) notifying consumers in the boarding gate area, on board aircraft, and via a carrier's telephone reservation system and its Web site of known delays, cancellations, and diversions; (3) delivering baggage on time, including making every reasonable effort to return mishandled baggage within twenty-four

hours and compensating passengers for reasonable expenses that result due to delay in delivery; (4) allowing reservations to be held at the quoted fare without payment, or cancelled without penalty, for at least twenty-four hours after the reservation is made; (5) where ticket refunds are due, providing prompt refunds for credit card purchases as required by 14 CFR 374.3 and 12 CFR part 226, and for cash and check purchases within 20 days after receiving a complete refund request; (6) properly accommodating passengers with disabilities as required by 14 CFR part 382 and for other special-needs passengers as set forth in the carrier's policies and procedures, including during lengthy tarmac delays; (7) meeting customers' essential needs during lengthy tarmac delays as required by 14 CFR 259.4 and as provided for in each covered carrier's contingency plan; (8) handling "bumped" passengers with fairness and consistency in the case of oversales as required by 14 CFR part 250 and as described in each carrier's policies and procedures for determining boarding priority; (9) disclosing cancellation policies, frequent flyer rules, aircraft configuration, and lavatory availability on the selling carrier's Web site, and upon request, from the selling carrier's telephone reservations staff; (10) notifying consumers in a timely manner of changes in their travel itineraries; (11) ensuring good customer service from code-share partners operating a flight, including making reasonable efforts to ensure that its code-share partner(s) have comparable customer service plans or provide comparable customer service levels, or have adopted the identified carrier's customer service plan; (12) ensuring responsiveness to customer complaints as required by 14 CFR 259.7; and (13) identifying the services it provides to mitigate passenger inconveniences resulting from flight cancellations and misconnections.

With regard to delivering baggage on time, we solicit comment on whether we should also include as standards (1) that carriers reimburse passengers the fee charged to transport a bag if that bag is lost or not timely delivered, as well as (2) the time when a bag should be considered not to have been timely delivered (*e.g.,* delivered on same or earlier flight than the passenger, delivered within 2 hours of the passenger's arrival). With regard to providing prompt refunds, we seek comment on whether we should also include as a standard that carriers refund ticketed passengers, including those with non-refundable tickets, for

flights that are canceled or significantly delayed if the passenger chooses not to travel as a result of the travel disruption. The Department's Aviation Enforcement Office has issued notices in the past advising airlines that it would be an unfair and deceptive practice in violation of 49 USC 41712 for a carrier to apply its non-refundability provision in the event of a significant change in scheduled departure or arrival time, whether it be due to carrier action or a matter out of the carrier's control, including "acts of god." We request comment on the methodology for defining a significant delay in the event such a standard is adopted. Should the Department establish a bright line rule that any delay of 3 hours or more is a significant delay? Should the determination of whether a flight has been significantly delayed be based on the duration of the flight (*e.g.,* is 3 hours a significant delay on flights of two hours or less and 4 hours a significant delay on flights of more than two hours)?

With respect to notifying passengers on board aircraft of delays, we seek comment on how often updates should be provided and whether we should require that passengers be advised when they may deplane from aircraft during lengthy tarmac delays. For example, we have received complaints from passengers that their aircraft has returned to the gate less than three hours after departure for emergency or mechanical reasons but they were not advised that they could deplane. Carriers may feel the 3-hour tarmac delay limit has been tolled by such a gate return, but passengers feel they were not truly afforded the opportunity to deplane within the meaning of this rule.

As for the customer service commitment to provide prompt refunds where ticket refunds are due, we invite comment on whether it is necessary to include as a standard the requirement that when a flight is cancelled carriers must refund not only the ticket price but also any optional fees charged to a passenger for that flight (*e.g.,* baggage fees, "service charges" for use of frequent flyer miles when the flight is canceled by the carrier). Irrespective of whether such a standard is included in a carrier's customer service commitment, the Department would view a carrier's failure to provide a prompt refund to a passenger of the ticket price and related optional fees when a flight is canceled to be an unfair and deceptive practice. We request comment as to whether it is workable to set minimum standards for any of the subjects contained in the customer

service plans and invite those that oppose the notion of the Department setting minimum standards for customer service plans as unduly burdensome to provide evidence of the costs that they anticipate. We further invite comment or suggestions on the type of standards that should be set.

Although the subjects we are proposing that foreign air carriers address in their customer service plans are identical to those U.S. carriers already are required to include in their customer service plans, we request comment on whether any of these subjects would be inappropriate if applied to a foreign air carrier. Why or why not? Moreover, we seek comment on whether the Department should require that all airlines address any other subject in their customer service plans. For example, should mandatory disclosure to passengers and other interested parties of past delays or cancellations of particular flights before ticket purchase be a new subject area covered in customer service plans? If so, what should be the minimum timeliness/cancellation standard? In this regard, there is already a requirement for reporting carriers (*i.e.,* the largest U.S. carriers) to post flight delay data on their Web sites and for their reservation agents to disclose to customers, upon request, the on-time performance code of a flight. Should more direct and mandatory disclosure be required, *e.g.,* a required warning before the final purchase decision is made regarding chronically late or routinely canceled flights? We also seek comment on the appropriate minimum timeliness/ cancellation standard for U.S. carriers and foreign air carriers that do not report on time performance data to DOT if we were to adopt a requirement that airlines address notification to consumers of past delays or cancellation in their customer service plans.

### 4. Contracts of Carriage

The Department is proposing to adopt a rule requiring carriers (U.S. and foreign) to include their contingency plans and customer service plans in their contracts of carriage. We first proposed this requirement in the notice of proposed rulemaking on enhancing airline passenger protections which was published in the **Federal Register** on December 8, 2008. Ultimately, the Department decided not to require such incorporation at that time and instead strongly encouraged carriers to voluntarily incorporate the terms of their tarmac delay contingency plans in their contracts of carriage, as most major carriers had already done with respect to their customer service plans. The

Department did require that each U.S. carrier with a Web site post its entire contract of carriage on its Web site in easily accessible form, including all updates to its contract of carriage. The Department also indicated that it would address this issue in a future rulemaking and take into account, among other things, whether the voluntary incorporation of contingency plan terms had resulted in sufficient protections for air travelers.

The Department continues to believe that the airlines' incorporation of their contingency plans into their contracts of carriage is an important means of providing notice to consumers of their rights, since that information will then be contained in a readily available source. Carriers' contracts of carriage are generally posted online and must, by Department rule, be available at airports. Better informed consumers will further improve the Department's enforcement program as consumers are more likely to know of and report incidents where airlines do not adhere to their plans. Better consumer information will also create added incentive for carriers to adhere to their plans. Further, by placing the contingency plan terms in the U.S. selling carrier's contract of carriage both that carrier and its foreign code share partner carrier are responsible in an enforcement context for compliance, which we view as a beneficial aspect of this proposal. We also continue to be confident that we have the authority to require such incorporation based on our broad authority under 49 U.S.C. 41712 to prohibit unfair and deceptive practices, and under 49 U.S.C. 41702 to ensure safe and adequate transportation, which clearly encompasses the regulation of contingency plans.

In the December 30, 2009, final rule to enhance airline passenger protections, we stated that we intended to closely monitor carriers' responses to our efforts in this regard and that we would not hesitate to revisit our decision in another rulemaking. As it appears that many carriers are choosing not to place their contingency plans and/or customer service plans in their contracts of carriage, or have little incentive to do so, and because we believe the incorporation of airline contingency plans in contracts of carriage to be in the public interest, we are again proposing the implementation of this requirement.

As stated previously, the Department recognizes that many passengers travel to and from the U.S. on flights operated by foreign carriers, and they should have adequate passenger protections on those flights. As such, we propose to

include foreign carriers in the requirement for airlines to place their contingency plans and customer service plans in their contracts of carriage. The Department is seeking comment on whether the incorporation of the contingency plans and customer service plans in the contract of carriage gives consumers adequate notice of what might happen in the event of a long delay on the tarmac and/or of passengers' rights under carriers' customer service plans. As in the past, commenters should also address whether and to what extent requiring the incorporation of contingency plans in carriers' contracts of carriage might weaken existing plans: That is, would the requirement encourage carriers to exclude certain key terms from their plans in order to avoid compromising their flexibility to deal with circumstances that can be both complex and unpredictable? We are also soliciting comment on the proposal to extend this provision to foreign carriers.

### 5. Response to Consumer Problems

The recently issued final rule on enhancing airline passenger protections requires U.S. carriers that operate scheduled passenger service using any aircraft originally designed to have a passenger capacity of 30 or more seats to designate an employee to monitor the effects on passengers of flight delays, flight cancellations, and lengthy tarmac delays and to have input into decisions such as which flights are cancelled and which are subject to the longest delays. It also requires U.S. carriers to make available the mailing address and e-mail or Web address of the designated department in the airline with which to file a complaint about its scheduled service and to acknowledge receipt of each complaint regarding its scheduled service to the complainant within 30 days of receiving it and to send a substantive response to each complainant within 60 days of receiving it. A complaint is defined as a specific written expression of dissatisfaction concerning a difficulty or problem which the person experienced when using or attempting to use an airline's service.

This proposal would require a foreign air carrier that operates scheduled passenger service to and from the United States using any aircraft originally designed to have a passenger capacity of 30 or more seats to do the same for its flights to and from the U.S. We are proposing to extend these provisions to foreign carriers as the Department believes passengers should also be afforded adequate consumer protection when issues arise with delays

or cancellations on flights to and from the U.S. operated by a foreign carrier, and should also have an avenue to file a complaint with a foreign carrier and to expect a timely and substantive response to that complaint. We invite interested persons to comment on this proposal. What costs and/or operational concerns would it impose on foreign carriers and what are the benefits to consumers? In particular, we are soliciting comments on any operational difficulties U.S. and foreign airlines may face in responding to consumer complaints received through social networking mediums such as Facebook or Twitter. Do airlines currently communicate to customers and prospective customers through social networking mediums?

### 6. Oversales

Part 250 establishes the minimum standards for the treatment of airline passengers holding confirmed reservations on certain U.S. and foreign carriers who are involuntarily denied boarding ("bumped") from flights that are oversold. In adopting the original oversales rule in the 1960s, the Civil Aeronautics Board (CAB), the Department's predecessor in aviation consumer matters, recognized the inherent unfairness to passengers if carriers were allowed to sell more confirmed seats than were available. To balance the inconvenience and financial loss to passengers against the potential benefits brought about by a controlled overbooking system, *i.e.,* achieving higher load factors, avoiding the losses caused by last-minute cancellations and no-shows, enabling more passengers to obtain a reservation on the flight of their choice, and ultimately reducing fares, the CAB prescribed a two-part oversales system: Soliciting volunteers first, then involuntarily "bumping" passengers if there are not enough volunteers, with a minimum standard for denied boarding compensation (DBC). This system has been in effect for almost half a century and we believe that its basic structure remains sound.

In this NPRM, we propose to expand the rule's applicability and add, modify and clarify certain elements of the rule as part of our continuing efforts to improve and perfect the system. Specifically, we are proposing to make five changes to Part 250: (1) Increase the minimum DBC limits to take account of the increase in the Consumer Price Index (CPI) since 1978; (2) implement an automatic inflation adjuster for minimum DBC limits; (3) clarify that DBC must be offered to "zero fare ticket" holders who are involuntarily bumped; (4) require that a carrier verbally offer

cash/check DBC if the carrier verbally offers a travel voucher as DBC to passengers who are involuntarily bumped; and (5) require that a carrier inform passengers solicited to volunteer for denied boarding about its principal boarding priority rules applicable to the specific flight and all material restrictions on the use of that transportation.

The last time the Department revised the minimum DBC amounts was in a proceeding that began in 2007 and concluded in 2008. Prior to that date, the DBC limits had not been revised since 1978. In that latest proceeding, because inflation had eroded the value of the $200 and $400 limits that were established in 1978, we considered various methods for calculating an increase in the minimum DBC limits (*i.e.,* increasing the limits on denied boarding compensation based on the consumer price index (CPI) or on the increase in fare yields, doubling the current limits, eliminating the limits so there would be no cap on denied boarding compensation payments). We settled on a rule under which an eligible passenger who encounters a delay of over one hour due to the involuntary denied boarding is entitled to compensation equal to either 100% of the passenger's one-way fare up to $400, or 200% of the fare up to $800, depending on the length of the delay caused by the involuntary denied boarding. Since May 2008 when the new rule was issued, despite these higher DBC amounts, we have seen an increase in involuntary denied boardings. Load factors are also increasing, making it less likely that "bumped" passengers are being conveniently accommodated on other flights. We are therefore concerned about whether the current rule adequately encourages carriers to seek volunteers to give up their seats and whether the minimum DBC amount adequately compensates those passengers that are involuntarily "bumped" from their flights.

Accordingly, we are proposing to revise the minimum DBC amounts to more accurately reflect inflation's effect on those amounts since 1978, the last year those amounts were raised before the most recent rule. We propose to do so by using the Consumer Price Index for All Urban Consumers (CPI–U), rounded to the nearest $25, with the base of $200/$400 for the maximum DBC amounts in the year 1978. This would bring the maximum DBC amounts for involuntary oversold passengers to $650/$1,300 as of January 1, 2010. In addition, we propose to add a provision to Part 250 that would

provide for periodic adjustments to the minimum DBC limits using the CPI–U, similar to that applied to minimum baggage liability limits pursuant to 14 CFR part 254. We believe these amendments will set up the most efficient method to ensure that the DBC minimum limits, and the monetary incentive for carriers to reduce involuntary denied boardings, remain current. Since the periodic adjustments would be the product of a published mathematical formula, there would be no need to engage in a notice and comment rulemaking proceeding for each future adjustment.

We seek comments on whether the proposed increase in DBC minimum limits is called for and whether any such increase based on the CPI–U calculation is a reasonable basis for updating those limits or whether some other amounts would be more appropriate to adequately compensate passengers for the inconvenience and financial loss brought about by involuntary denied boarding. If not, by how much should the amounts be increased, if at all? We also ask for comment on whether we should completely eliminate minimum compensation limits and simply require that carriers base DBC to be paid to involuntarily bumped passengers on 100% or 200% of a passenger's fare, without limit, and/or whether the 100% and 200% rates need to be increased in line with the proposed increase in the $400/$800 compensation limits proposed above, perhaps to 200% and 400% of the passenger's fare, or higher. This would account for the fact that the actual cost for flying is likely to have increased while what is commonly referred to as the "fare" may not have increased as a result of the carriers' current practice of unbundling fares, *i.e.,* charging extra for once-free amenities, *e.g.,* checked baggage, food, preferred seats, etc.

We are also proposing to clarify that Part 250 applies to passengers who hold "zero fare tickets," *e.g.,* passengers who "purchased" air transportation with frequent flyer mileage or airline travel vouchers, passengers who travel on so-called "free" companion tickets, or passengers who hold a "consolidator" ticket that does not display a monetary price. For the most part, these ticket holders have "paid" only government taxes and fees and, perhaps, carrier-imposed administrative fees for ticketing. In this regard, we propose to amend the definition of "confirmed reserved space" to specify that zero fare ticket holders have the same rights and eligibility for DBC as any other passenger who used cash, check or

credit card to purchase his or her airfare. Passengers with zero-fare tickets earned those tickets in some fashion, *e.g.* by exceeding a particular frequent-flyer threshold, agreeing to accept a travel voucher as settlement of a consumer claim or complaint, etc.

When these passengers are involuntarily denied boarding, they, like passengers who paid fully in money for the tickets, suffer inconvenience and/or financial losses. We propose that the basis for determining the amount of DBC due a passenger holding a zero fare ticket who is involuntarily bumped, *i.e.,* the "passenger's fare," be the fare of the lowest priced ticket available (paid by cash, check, or credit card) for a comparable class of ticket on the same flight. For example, if an involuntarily bumped passenger used frequent flyer miles to obtain a confirmed, non-refundable roundtrip coach ticket having no restrictions, the basis for calculating the DBC amount due to that passenger would be the lowest fare that was available for a confirmed, roundtrip coach ticket on the same flight. Under this proposal, a carrier would be required to provide the same form of DBC to zero-fare passengers as to other passengers denied boarding involuntarily, *i.e.* cash or check, or a travel voucher of the passenger's choice under the conditions described in existing section 250.5(b) if the passenger agrees. We seek comment not only on whether zero fare ticket holders should receive DBC under part 250, but also on whether the cash method described above for calculating DBC to be paid such zero fare ticket holders is reasonable and would truly capture these passengers' losses due to being bumped involuntarily to the same extent as for cash/check/credit ticket holders. This proposal is consistent with guidance DOT has given to carriers in the past.

A possible alternative to the above proposed method of compensation would be to allow carriers to compensate zero fare ticket holders using the same "currency" in which the tickets were obtained. For instance, under this alternative an involuntarily bumped passenger who used frequent flyer miles to purchase a ticket would be eligible to be compensated with mileage, the currency used to obtain that flight. Under the current rule, this would amount to 100% or 200% of the amount of mileage that was used to purchase the ticket, plus a cash amount if appropriate to account for any taxes, fees and administrative costs paid to obtain the ticket. Similarly, involuntarily bumped passengers who used a voucher to purchase a ticket, in

whole or in part, would be eligible to be compensated with a voucher worth 100% or 200% of the value of their original voucher, and an appropriate cash payment if a portion of the ticket was paid for in that manner. We also seek comment on any other alternative method of calculating DBC for zero fare ticket holders that would best quantify the financial loss and inconvenience to those passengers. How should the rule quantify the value of the remaining travel portion (either to the next stopover, or if none, to the final destination) if the DBC were to be paid with frequent flyer miles?

Another area that we believe needs further improvement is the disclosure provisions in our current oversales rule. These provisions were established because passengers deserve to know about the possibility, however remote, of an oversale occurring and because only a well-informed passenger can make a proper choice when faced with the option of volunteering to be bumped from a flight. We propose in this proceeding to reinforce required disclosures to ensure that passengers will be aware of their rights when making decisions regarding whether to volunteer for denied boarding and/or whether to accept a travel voucher in lieu of cash or a check as DBC if they are bumped involuntarily.

The existing required disclosures can be found in sections 250.2b 250.9 and 250.11. Section 250.2b(b) sets forth conditions and requirements that carriers must comply with when soliciting volunteers on an oversold flight. Specifically, it requires that carriers inform each passenger who is solicited to volunteer to be bumped whether he or she is in danger of being involuntarily denied boarding and the compensation to which they would be entitled in that event. In addition, section 250.9 specifies the written explanation of DBC and boarding priorities that must be provided to passengers involuntarily oversold, which statement also must be provided to any person who requests it at any location a carrier sells tickets and at its boarding gates. Section 250.11 requires that carriers provide at each station they or their agents sell tickets a prescribed notice advising persons of their basic rights in an oversale situation and that they are entitled to detailed information upon request.

Despite these required disclosures, we are concerned that passengers may not be aware of their rights when making decisions regarding whether to volunteer for denied boarding and/or accept a travel voucher because of the manner in which carriers offer free or

reduced air transportation. Agents often verbally advise passengers of the offer of a travel voucher and its amount. Although in the case of involuntarily bumped passengers, this offer must be accompanied by the written notice of the passenger's right to insist on DBC by cash or check, there currently is no express requirement that this notice be given verbally. We are concerned that these passengers who are verbally offered a travel voucher may not have time to read the written notice and are not in fact verbally told by an agent that they are entitled to compensation by cash or check. Likewise, they may not be adequately informed of any conditions or limitations placed on the vouchers they are receiving. Accordingly, we are proposing that in any case in which a carrier verbally offers an involuntarily bumped passenger free or reduced-rate air transportation as an alternative to cash DBC, it also must at the same time verbally advise that passenger of his or her right to insist on compensation by cash or check and the actual amount of such compensation that would be due and of any conditions or restrictions applicable to the vouchers. This proposed requirement would not, if adopted, alter the carriers' responsibility to provide the written DBC notice required by section 250.9, nor would it require carriers in all instances to provide verbal advice to passengers. But as a practical matter, verbal exchanges between carrier agents and passengers in oversale situations are the quickest and easiest form of communication and consumers are entitled to a fair presentation of their options during such situations. Therefore, if a carrier chooses to offer a passenger DBC in a form other than cash or check and to do so verbally, under this proposal it must also verbally advise the passenger about the cash/check option.

Furthermore, we are proposing to prohibit carriers from offering or providing to volunteers solicited to be bumped, or to passengers involuntarily bumped, free or reduced-rate air transportation other than on an unrestricted basis, unless the carrier provides direct verbal notice to such passengers of any restrictions on such free or reduced rate air transportation. While the written notice required to be provided passengers under section 250.9 suggests that carriers must disclose material restrictions in any free or reduced rate compensation offered, the requirement is not specifically reflected in any section of the rule itself, a shortcoming that we believe should be remedied. We ask for comment on our

proposals here as well as on whether there are any other forms of notice that might better inform passengers being requested to volunteer to be bumped, or those involuntarily bumped, of their rights and carriers' obligations.

The current disclosure rule does not define how the carriers should describe to passengers who are solicited to volunteer to be bumped the likelihood of being involuntarily denied boarding. In this NPRM, we propose to specifically require that carriers must inform the solicited passengers about their principal boarding priority rules applicable to the specific flight. Hence, the passengers can apply the boarding priority rules to their situations and more accurately estimate the likelihood of their being involuntarily denied boarding. By "principal boarding priority rules" we are referring to procedures such as bumping passengers involuntarily based on their fare, on when they checked in, or on whether they held seat assignments. Carriers need not recite specialized priorities such as those for unaccompanied minors or passengers with disabilities except where those priorities apply to a particular passenger. This information is significant if a passenger is willing to give up his or her confirmed reserved space but could not determine whether to accept the volunteer compensation offer or to wait until he or she would be involuntarily bumped. For instance, if the carrier informs the passengers that it will use the check-in time as its principal boarding priority criterion, a passenger willing to give up his or her seat on the flight in exchange for a sufficiently large cash compensation amount may choose to reject the volunteer compensation offer if he or she checked in at the last minute, knowing that the chance of being denied boarding involuntarily is high and that being involuntarily bumped would require a higher amount of compensation in cash from the carrier.

Also material to the solicited passengers as decision makers is the availability of "comparable air transportation" provided to passengers who are involuntary denied boarding. Under the current DBC structure, if the passengers can reach their next stopover or, if none, their final destination within one hour of the planned arrival time of the original flight, the passengers are not required to be provided DBC. If the delay for a domestic flight is more than one hour but less than two hours (four hours for an international flight), the DBC is 100% of the passenger's one-way fare. For delays that exceed this two/four hour timeframe, the DBC rate is 200% of the passenger's one-way

fare. Thus for a passenger who is considering rejecting the volunteer offer in hopes of receiving involuntary DBC, it is material to know how likely it is, if involuntarily denied boarding, that the passenger's delay would exceed the one/two/four hour(s) limits. We seek comments on whether we should require this disclosure to every passenger the carrier solicits to volunteer and if so, what form, *e.g.,* verbal or written, the disclosure should take.

We are also considering expanding the applicability of the oversales rule to the operations of U.S. certificated and commuter carriers and foreign carriers using aircraft originally designed for 19 or more seats. Currently, Part 250 applies to all U.S. certificated and commuter air carriers and foreign carriers with respect to specified scheduled flight segments using an aircraft originally designed to have a passenger capacity of 30 or more seats. We have concerns that many carriers use code-share partners for their connecting services to smaller points, some of whom operate aircraft with 19–29 seats. Such flight segments are not covered by part 250, but are associated with the identity of a large carrier and many, if not most, are "fee for service" flights under the total control of the large carrier, which controls booking. Should we allow those flights to be oversold at all? If we do, should Part 250 be applicable in its entirety?

### 7. Full Fare Advertising

The Department is proposing to amend its rule on price advertising (14 CFR 399.84). The Department adopted this rule in 1984, pursuant to 49 U.S.C. 41712 (formerly section 411 of the Federal Aviation Act), which empowers the Department to prohibit unfair and deceptive practices and unfair methods of competition in air transportation and its sale. The rule states that the Department considers any advertisement that states a price for air transportation that is not the total price to be paid by the consumer to be an unfair and deceptive practice in violation of 49 U.S.C. 41712. However, the Department's enforcement policy regarding this rule has permitted certain government-imposed charges to be stated separately from this total price. Under this policy, taxes and fees that are collected by a carrier on a per-person basis, are imposed by a government entity, and are not *ad valorem* in nature are allowed to be excluded from an advertised fare. The existence, nature, and amount of these additional taxes and fees must be clearly indicated where the airfare first appears

in the ad, so that the consumer can easily calculate the total price to be paid. The Department has consistently prohibited sellers of air transportation from breaking out any other fee, including fuel surcharges, service fees, and taxes imposed on an *ad valorem* basis. This policy has been articulated in a number of industry letters and guidance documents; *see http:// airconsumer.dot.gov/rules/ guidance.htm.*

The Department is considering changing its enforcement policy concerning this rule to enforce the "full price advertising" provision of the rule as it is written and, consistent with longstanding Department enforcement policy, to clarify that the rule applies to ticket agents. This change in enforcement policy would also include a requirement that all advertisers include all mandatory fees in the advertised price. Given technological innovations and new methods of communication, carriers and ticket agents are finding new and creative ways to advertise airfares, some of which circumvent the spirit if not the letter of the full-price advertising rule and Department enforcement policy. Consumers now receive airfare solicitations through print advertisements, radio advertisements, internet advertisements, and solicitations sent directly to consumers via e-mail newsletters, social networking Web sites, text messages, and applications designed for many different kinds of cell phones. The ease and speed of information sharing also allows airfare information to be presented to consumers in many different forms. Even in cases where those forms of advertising comply in a technical sense with our enforcement policy with regard to the full-price advertising rule, we are concerned that in many cases consumers are not easily able to determine the total cost of air transportation services or are deceived regarding the true price. Accordingly, we believe consumers would be better served if we enforce our existing full-price rule as written and prohibit the practice of advertising fares that exclude any mandatory fees or surcharges, regardless of the source. In proposing this change in policy, we do not intend to foreclose carriers and ticket agents from advising the public in their fare solicitations about government taxes and fees, or other mandatory carrier- or ticket agent-imposed charges applicable to their airfares. However, we no longer see a useful purpose in presenting what purportedly are "fares" to consumers that do not include numerous required

charges and, in our view only act to confuse or deceive consumers regarding the true full price and to make price comparisons difficult or improbable. Our objective is to ensure that consumers are not be deceived or confused about the total fare they must pay, which we believe can best be ensured by requiring that consumers be able to see clearly the entire price of the air transportation being advertised whenever a price is displayed rather than having to wade through a myriad of footnotes and/or hyperlinks regarding government taxes and fees and make the full-price calculation themselves to try to establish which among many displayed "fares" is the real fare or wait until the purchase screen to see the total fare.

The Department's statutory authority under 49 U.S.C. 41712 to prohibit unfair and deceptive practices and unfair methods of competition applies not only to air carriers but also to "ticket agents" which includes those persons other than a carrier "that as a principal or agent sells, offers for sale, negotiates for, or holds itself out as selling, providing, or arranging for air transportation." 49 U.S.C. 40102(a)(40). Although the Department's full-price advertising rule applies on its face to direct and indirect air carriers as well as "an agent of either," it has been the longstanding policy of the Department to consider ticket agents as defined in title 49 to be subject to that rule. The Department believes it appropriate to specifically name "ticket agents" as being covered by the rule in order to ensure there is no confusion about their inclusion under the deceptive practice prohibitions of the rule.

Air transportation is unlike any other industry in that the Department has the sole authority to regulate airlines' fare advertisements by prohibiting practices that are unfair or deceptive. Congress modeled section 41712 on section 5 of the Federal Trade Commission (FTC) Act, 15 U.S.C.A. 45, but by its own terms, that statute cannot be enforced by FTC against "air carriers and foreign air carriers," 15 U.S.C. 45(a)(2). The States are preempted from regulating in this area (49 U.S.C. 41713, *see Morales* v. *Trans World Airlines,* 504 U.S. 374, 112 S.Ct.2031, 119 L.Ed.2d 157 (1992)). Thus, unlike advertising in other industries, where either the States or the FTC, or both, can take action against abusive practices, if we do not exercise our authority, consumers and competitors have no governmental recourse against advertising that is unfair or deceptive. Further, we do not believe that 49 U.S.C. 41712 gives rise to a private right of action; *see Love* v.

*Delta Air Lines,* 310 F.3d 1347 (11th Cir.2002), *Boswell* v. *Skywest Airlines,* Inc., 361 F.3d 1263 (10th Cir. 2004); *see also Alexander* v. *Sandoval* 532 U.S. 275, 286, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001).

The Department invites comments on its proposal to change its enforcement policy under section 399.84 from one of permitting limited exceptions to disclosing the full price in all advertising of air transportation and air tours to requiring disclosure of the full price to be paid by a consumer whenever a price is displayed, and its proposal to specify in the rule that it applies to "ticket agents." Specific questions on which the Department invites comments regarding this policy shift include how sellers of air transportation foresee this affecting the methods they use to advertise fares, how consumers view the proposed change, and the potential cost in changing the current advertising structures that carriers and ticket agents have in place to ensure compliance with the current policy of the Department.

Additionally, the Department is considering adding two new paragraphs to the price advertising rule. We propose adding paragraph (b) which would codify the Department's current enforcement policy on each-way airfare advertising. Currently, the Department allows sellers of air transportation to advertise an each-way price that is contingent on a roundtrip ticket purchase, so long as the roundtrip purchase requirement is clearly and conspicuously disclosed in a location that is prominent and proximate to the advertised fare amount. This proposal would codify existing enforcement policy and would also preclude carriers from referring to such fares as "one-way" fares, which they are not. The Department invites interested persons to comment on adding this paragraph on each-way airfare advertising policy to the price advertising rule. The Department also invites comment on whether a rule similar to that proposed for each-way fare advertising disclosure should be applied to air/hotel packages that advertise a single price, but are sold at that price only on a double occupancy basis, *i.e.,* where two people must purchase the package in order to obtain the advertised price.

The second provision the Department proposes to add to the price advertising rule in section 399.84 would prohibit so-called "opt-out" provisions in price advertising. The Department has noticed a trend lately in the air transportation industry to add fees for ancillary services and products to the total price of air transportation, which charges the

consumer is deemed to have accepted unless he or she affirmatively opts out of the service and related charges. For example, carriers may allow a consumer to select a preferred seat or receive priority boarding status if he or she pays a predetermined fee. In some cases the optional services and accompanying charges for those services is pre-selected and added to the total fare without the consumer affirmatively choosing those optional services or fees. This often is accomplished on a Web site through use of a small box that is pre-checked and must be "unchecked" by a consumer in order to avoid the charge. This can be deceptive depending on the layout of the webpage and instructions accompanying the service and charge. What can be even more problematic is that opt-out provisions are sometimes included on the same webpage as opt-in provisions, in which case it is much less likely that consumers will notice the opt-out nature of certain optional services that carry additional charges. The Department proposes adding a paragraph (c) to section 399.84 to prohibit such opt-out procedures.

Proposed paragraph (c) would provide that if a carrier offers optional services, the consumer must affirmatively opt in to accept and purchase that product or service before the price for that service can be added to the total airfare to be paid. No longer will carriers or ticket agents be allowed to require that a consumer opt out of purchasing such products or services in order to avoid being charged for them. The proposed rule, as part of the current full-price advertising rule, would also apply to carriers and ticket agents that advertise tours which include air transportation. Examples of such opt-out procedures the Department has seen in recent years include fees for travel insurance, rental cars, transfers between airports and hotels, priority boarding, premium seats, and extra legroom. Oftentimes the consumer does not realize that the ancillary services are included in the total price of the ticket due to the deceptive nature of such opt-out provisions. The Department asks interested persons to comment on adding the proposed subsection (c) to the existing price advertising rule. The Department would like to hear from both sellers of air transportation and consumers about the costs and benefits of prohibiting opt-out features.

## 8. Baggage and Other Fees and Related Code-Share Issues

With the increasing industry-wide trend to "unbundle" fares by charging fees for individual services provided in connection with air transportation, the

Department has decided that there is a need to enhance protections for air travelers by establishing rules to ensure adequate notice of such fees for optional services to consumers. When booking air travel, consumers are not always made aware of the extra charges that a carrier may impose on them for additional services. Such charges may include services that traditionally have been included in the ticket price, such as the carriage of one or two checked bags, obtaining seat assignments in advance, in-flight entertainment, and in-flight food and beverage service. In fact, the Airline Tariff Publishing Company (ATPCO), which collects schedule and fare information from airlines for use in computerized reservation systems, has developed a list containing scores of ancillary charges in various categories. Due to what the Department feels is sometimes a lack of clear and adequate disclosure, consumers are not always able to determine the full price of their travel (the ticket price plus the price of additional fees for optional services) prior to purchase.

We also seek comment on the costs and benefits of requiring that two prices be provided in certain airfare advertising—the full fare, including all mandatory charges, as well as that full fare plus the cost of baggage charges that traditionally have been included in the price of the ticket, if these prices differ. We would regard charges for one personal item (*e.g.,* a purse or laptop computer), one carry-on bag, and one or two checked bags as baggage charges that traditionally have been included in the price of a ticket. Should such a requirement for a second price, if adopted, be limited to the full fare plus the cost of baggage charges? Should the Department require carriers to include in the second price all services that traditionally have been included in the price of the ticket such as obtaining seat assignments in advance? Why or why not? In the alternative, the Department is considering requiring sellers of air transportation to display on their Web sites information regarding a full price including optional fees selected by the passenger when a prospective passenger conducts a query for a particular itinerary. In other words, passengers would be able to conduct queries for their specific needs (*e.g.,* airfare and 2 checked bags; air fare, 1 checked bag, and extra legroom). The benefit of this approach is that consumers would be able to more easily compare airfares and charges for their own particular itinerary and options. We invite comment on this approach, including its

feasibility, as well as its costs to airlines and ticket agents.

The Department believes that effective disclosure of the optional nature of services and their costs would prevent carriers from imposing hidden fees on consumers and allow consumers to make better informed decisions when purchasing air travel. In 2008, the Department's Aviation Enforcement Office issued guidance concerning the disclosure of baggage fees to the public. *See, e.g., Notice of the Assistant General Counsel for Aviation Enforcement and Proceedings,* "Guidance on Disclosure of Policies and Charges Associated with Checked Baggage," May 13, 2008, *http://airconsumer.dot.gov/rules/guidance.htm.* We propose to codify this guidance and also cover in the rule notice of charges for services other than checked baggage.

More specifically, the Department is proposing to adopt three provisions in a proposed new 14 CFR 399.85. Proposed section 399.85(a) would require carriers that maintain a Web site accessible to the general public to prominently disclose on the homepage of such Web site any increase in the fee for passenger baggage or any change in the free baggage allowance for checked or carry-on bags (*e.g.,* size, weight, number). This could be done, for example, through direct, prominent notice or through a conspicuous notice of the existence of such fees in a hyperlink that takes the reader directly to an explanation of the carrier's baggage policies and charges. The proposed rule would require this notice to remain on the homepage of the carrier's Web site for at least three months after the change is made. The Department invites interested persons to comment on this proposal, including whether the time period for displaying such changes on the homepage should be greater or less than three months. The Department also asks for comment on the best options for displaying such information to the public if it were to adopt a notice requirement.

Proposed section 399.85(b) would require carriers that issue e-ticket confirmations to passengers to include information regarding their free baggage allowance and/or the applicable fee for a carry-on bag or the first and second checked bag on the e-ticket confirmation. By providing this information to consumers on the e-ticket confirmation—the document that confirms a passenger's travel on the carrier—passengers will be informed well before the flight date and arrival at the airport of the applicable baggage rules and charges. The Department believes that including this information

on the e-ticket confirmation will permit passengers to avoid unexpected baggage charges to the extent possible and also save time at the airport for both passengers and carrier personnel because the passengers will be better informed about the baggage allowance and any charges to be incurred.

Proposed section 399.85(c) would require carriers that have a Web site accessible to the general public to disclose all fees for optional services to consumers through a prominent link on their homepage that leads directly to a listing of those fees. Optional services include but are not limited to the cost of a carry-on bag, checking baggage, advance seat assignments, in-flight food and beverage service, in-flight entertainment, blankets, pillows, or other comfort items, and fees for seat upgrades. The Department feels that having all of the fees for optional services in one place for consumers to review will help ensure that consumers do not encounter such charges unexpectedly and that they can more easily compare these charges among competing carriers. Additionally, disclosure as proposed will result in this important cost information being presented in a clear and concise form and reduce the prospect of delays at the airport and in-flight that can occur when the consumer is unaware of charges for optional services. The Department invites comments regarding the proposal to have full, complete disclosure of all fees for optional services on one Web page, accessible to the consumer through a prominent hyperlink. In particular, we solicit comment on whether we should limit the requirement to disclose fees to "significant" fees for optional services, including comment on the definition of "significant fee" and whether it should be defined as a particular dollar amount. The Department seeks comment on the alternatives to the proposed link to the information on a carrier's homepage, such as disclosure of these optional fees on e-ticket confirmations or elsewhere.

The Department is also considering requiring that carriers make all the information that must be made directly available to consumers via proposed section 399.85 available to global distribution systems (GDS's) in which they participate in an up-to-date fashion and useful format. This would ensure that the information is readily available to both Internet and "brick and mortar" travel agencies and ticket agents so that it can be passed on to the many consumers who use their services to compare air transportation offers and make purchases. We invite comments on this proposal, including the present

ability of carriers to meet this requirement, the potential costs of the requirement, including costs of developing new software or systems to deliver such information to GDS's, if necessary, and the benefits of this requirement.

The proposed section 399.85 would apply to all U.S. and foreign air carriers that have Web sites accessible to the general public in the United States through which tickets are sold, as well as to their agents. The Department invites comment on alternative proposals, including limiting the applicability of the proposed section 399.85 to all flights operated by U.S. carriers, U.S. and foreign carriers that operate any aircraft with sixty (60) or more seats, or U.S. and foreign carriers that operate any aircraft with thirty (30) or more seats. In addition, we invite comment on whether the rule should apply to all ticket agents, as defined in 49 U.S.C. § 40102, which includes not just agents of carriers, but also others who, as a principal, "sells, offers for sale, negotiates for, or holds itself out as selling, providing, or arranging for air transportation." Under proposed section 399.85, the Department would consider the failure of a carrier to give consumers appropriate notice about baggage fees and other optional fees to be an unfair and deceptive practice in violation of 49 U.S.C. 41712.

The Department is also seeking comment on the need for a special rule relating to the disclosure of fees and related restrictions in connection with code-share service. It has come to the Department's attention that many carriers operating flights under a code-share agreement impose different fees and restrictions than those of the carrier under whose identity the service is marketed, notwithstanding the fact that as a condition for approval of international code-share services, the Department has as a matter of policy required that "the carrier selling such transportation (*i.e.*, the carrier shown on the ticket) accept responsibility for the entirety of the code-share journey for all obligations established in the contract of carriage with the passenger; and that the passenger liability of the operating carrier be unaffected." *See, Notice of the Assistant General Counsel for Aviation Enforcement and Proceedings,* "Guidance on Airline Baggage Liability and Responsibilities of Code-Share Partners Involving International Itineraries," *http://airconsumer.dot.gov/rules,* March 26, 2009. For example, they may have different free baggage allowances and different charges for extra pieces and overweight bags, some may not allow unaccompanied minors

while others do (perhaps subject to varying charges and various age restrictions), and some may not provide in-flight medical oxygen while others do (subject to different charges). We believe that, at a minimum, prospective customers for these code-share flights should be made aware of any significant differences between the ancillary services and fees of the carrier under whose identity their service is marketed and those of the carrier operating their flights. Comments are invited on whether such disclosure by ticketing/marketing carriers should be required through reservation agents, Web sites, or e-ticket confirmations or through each of those mechanisms. Further comment is invited on whether there are any ancillary services that should not be allowed to vary among code-share partners, *e.g.,* the free baggage allowance or baggage fees. For example, Department policy provides that for passengers whose ultimate ticketed origin or destination is a U.S. point, the baggage rules that apply at the beginning of the itinerary apply throughout the itinerary, and the ticketing carrier's rules take precedence. *See, e.g., Order 2009–9–20, Dockets OST–2008–0367 and 0370,* "Agreements adopted by the Tariff Coordinating Conference of the International Air Transport Association relating to passenger baggage matters," September 30, 2009. Information on the cost of these proposals is invited.

### 9. Post-Purchase Price Increases

The Department is proposing a new section in 14 CFR part 399 that would prohibit post-purchase price increases in air transportation or air tours by carriers and ticket agents. The seller of air transportation would be prohibited from raising the price after the consumer completes the purchase. Currently, the Department allows post-purchase price increases as long as any term that permits a carrier to increase the price after purchase is included in the conditions of carriage and the consumer receives direct notice of that provision on or with the ticket. *See* 14 CFR 253.7. The Department has found that some sellers of air transportation are abusing this rule by burying provisions purporting to permit them to raise the price in the contract of carriage or conditions of travel and merely providing the consumer a hyperlink to the contract of carriage or conditions of travel. The consumer is unaware of the potential for such increase until well after the purchase is made. Although we have not seen carriers resort to this problematic practice, we have often found this to be the case in the sale of

tour packages that include air transportation, where an air tour operator will increase the price of an air tour before travel, ostensibly in order to pass along fuel surcharges or an increase in the price of a seat. Consumers are not made aware of the potential for a price increase at the time of purchase, and therefore are deceived when the increase is imposed and the seller uses the terms of the contract of carriage to justify an additional collection. Moreover, most airlines and tour operators will advertise and sell tickets or packages at a stated price nearly a year in advance of scheduled travel. We are tentatively of the opinion that it is patently unfair for a carrier or tour operator to advertise and sell air transportation at a particular price long before travel, with the caveat that they reserve the right to change the advertised price at any time before travel, and in any amount. The Department feels it is time to ban the practice of post-purchase price increases.

The Department invites interested parties to comment on this proposal and on several alternatives. As indicated above, the Department's primary proposal is an outright ban on post-purchase price increases. One alternative the Department is considering would be to allow post-purchase price increases, but only as long as the seller of air transportation conspicuously discloses to the consumer the potential for such an increase and the maximum amount of the increase, and the consumer affirmatively agrees to the potential for such an increase prior to purchasing the ticket. Another alternative would be to allow post-purchase price increases, with full and adequate disclosure, that the consumer agrees to in advance of purchasing a ticket, but to prohibit price increases within thirty or sixty days of the first flight in a consumer's itinerary.

### 10. Flight Status Changes

We are proposing to require that certificated air carriers that account for at least 1 percent of domestic scheduled passenger revenues (reporting carriers) promptly notify passengers in the boarding gate area of changes to their domestic scheduled flights resulting from delays or cancellations, promptly update all domestic scheduled flight information under their control at airports regarding changes to the status of particular flights as a result of delays or cancellations and promptly update flight status details available on their Web sites and through their telephone reservation systems. "Domestic scheduled flight" for this purpose means

a flight segment. For example, on a direct flight from Chicago to London with a stop in New York, the Chicago-New York segment would be covered by this requirement. The Department tentatively believes that the cost of requiring smaller carriers to provide this information outweighs the benefits to consumers in general in light of the fact that the operations of the reporting carriers account for nearly 90 percent of all domestic passenger enplanements. We ask for comment on whether the regulation should cover a greater number of carriers and operations, including operations of smaller U.S. carriers and/or international operations of U.S. and foreign carriers.

What would be the cost or benefit of expanding coverage to those additional carriers?

It is important to passengers as well as persons dropping passengers off for outbound flights or meeting passengers on incoming flights to be kept informed on a timely basis of delays and/or cancellations affecting their flights in order to avoid unnecessary waits at, or pointless trips to, an airport. Passengers also need flight status updates as soon as they become available in order to make decisions about alternate travel plans. Carriers recognize the importance of timely and accurate flight information, as evidenced by the fact that many of the largest U.S. carriers promise through their customer service plans to provide passengers all known information about delays and cancellations as soon as they become aware of the issue. Failures by carriers to provide timely or accurate flight status information not only inconvenience passengers and other members of the public but also can result in additional expenses to those persons.

Our proposals here are intended to provide additional measures to ensure that passengers and the general public know about flight delays and cancellations within a reasonable time so that they can, if possible, take steps to protect themselves and avoid unnecessary loss of time and expense. We are therefore proposing that carriers promptly notify passengers holding tickets or reservations on one of their flights as well as other interested parties about changes to a flight's status, *i.e.,* delays and cancellations, which affect the planned operation of the flight by at least 30 minutes. Additional notifications would be required if any such delayed flight was further delayed by 30 minutes or more. By "promptly" we mean that a carrier must provide the required notification regarding the status of a flight as soon as possible but

no later than 30 minutes after the carrier becomes aware or should have become aware of a change in the status of the flight due to a delay or cancellation. This requirement would apply to all the domestic scheduled flight segments that a reporting carrier "markets." For example, for a code-share flight this proposed notification requirement would be the responsibility of the carrier whose code is used, whether or not it is operated under a fee-for-service arrangement.

We note that many covered carriers already voluntarily provide flight status details via the proposed methods proposed in this notice (*i.e.,* announcement in boarding area, Web sites, telephone reservation systems, airport display boards). In addition, most of the largest carriers generally make efforts to notify passengers of changes to the status of their flights by permitting passengers to subscribe to flight status update services via various widely-used media, including computer-generated telephone/voicemail, text messages, and e-mails. This proposal to promptly notify passengers and other interested parties of changes to flights as a result of delays or cancellations would not impose upon carriers a requirement to offer passengers the opportunity to subscribe to such a service but would require carriers to the extent that they use this or other methods of communication to ensure that the flight status changes are promptly updated.

We seek comments on whether it is preferable to require carriers to provide prompt notification of flight status changes and leave it up to the carriers to determine how that notification is provided, or prescribe particular means by which carriers must communicate or must make available flight status updates. We ask for comment on the four proposed means of notification: an announcement in the boarding area, carriers' Web sites, carriers' telephone reservation systems, and airport displays under carriers' control. Commenters should support their opinions with as much detail as possible regarding the practicality, costs, and benefits of any standard they support or oppose. We also seek comment about the cost and benefit of flight status update services. It goes without saying that the quicker that changes to a flight's status can be provided to passengers, the more useful the information is likely to be. In addition to seeking comment on the need, in general, for this proposed notification requirement, we specifically ask for comment on whether the standard we propose—"30 minutes after

the carrier becomes aware or should have become aware of a change in the status of a flight"—is a reasonable notification standard to apply in requiring carriers to pass along updates to passengers and to the public. Does it provide consumers sufficient lead time in most cases to act to protect themselves? If not, why not, and could carriers be expected to meet a more stringent standard? Is the more stringent standard a reasonable standard for carriers to meet and, if not, why not?

In addition, we are proposing that notification be provided regarding any changes that affect the planned operation of a flight by at least 30 minutes. While shorter flight delays occur more frequently, we believe they are less likely to significantly disrupt expectations or travel plans. We ask for comment on whether this 30-minute standard is appropriate. Do consumers in most instances require notice of flight delays that are less than 30 minutes? Would changing the standard of delays to less than 30 minutes impose unreasonable burdens or costs on carriers that outweigh any benefits to the public? According to data from the Department's Bureau of Transportation Statistics (BTS), in calendar year 2009, approximately 10% of departure delays and 11% of arrival delays were over 30 minutes. The majority of scheduled domestic passenger flights depart or arrive 1 to 14 minutes after their scheduled departure and arrival times, respectively.

We note that the requirement to promptly update all domestic scheduled flight information under a carrier's control at airports would cover all communication methods that are under the control of a carrier at an airport. For example, flight information provided via electronic or other display boards at airport counters and departure gates would be covered. We are not proposing at this time that carriers establish new types of flight information outlets but this requirement, if made final, would apply to every type of outlet a carrier elects to use to provide flight information to the public at airports. With respect to flight status information outlets at an airport that are not under a carrier's control, *e.g.,* flight arrival and departure displays that are under the control of an airport authority, a carrier's responsibility is limited to providing the updated flight information to the airport authority within the required 30 minutes.

## 11. Choice-of-Forum Provisions

The Department is proposing to amend 14 CFR part 253, the Part that concerns notice of contract of carriage

terms, by adding a new section to codify the policy of the Department's Aviation Enforcement Office that choice-of-forum provisions are unfair and deceptive when used to limit a passenger's legal forum to a particular inconvenient venue. Choice-of-forum provisions purport to designate the court or jurisdiction where any lawsuit against the carrier concerning the purchased air transportation must be brought *See, e.g., Notice of the Assistant General Counsel for Aviation Enforcement and Proceedings,* "*Choice of Forum' Contract Provisions,*" *http:// airconsumer.dot.gov/rules/ 19960715.htm* (July 15, 1996). It is the Department's view that for air transportation sold in the U.S., it would be an unfair or deceptive practice for the seller to attempt to prevent a passenger from seeking legal redress in any court of competent jurisdiction, including a court within the jurisdiction of the passenger's residence, provided that the carrier does business within that jurisdiction. Consumers should not be forced to litigate in a jurisdiction that could be thousands of miles from their United States residence. The Department believes that such narrow choice-of-forum provisions would operate as a limitation on the right of a consumer to bring legitimate and viable suits. We invite interested persons to comment on this proposal and on the use of such choice-of-forum provisions in contracts of carriage.

*12. Peanut Allergies*

The Department is considering several different measures to provide greater access to air travel for individuals with severe peanut allergies in light of the significant number of children diagnosed with peanut allergies, some of whom do not fly because of health concerns related to peanut service on aircraft. The Air Carrier Access Act (ACAA) prohibits discrimination by U.S. and foreign air carriers against individuals with disabilities. The Department of Transportation defines an individual with a disability in 14 CFR part 382 (Part 382), the regulation implementing the ACAA. An individual with a disability is any individual who has a physical or mental impairment that, on a permanent or temporary basis, substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such an impairment. Generally, a person with an allergy is not an individual with a disability. However, if a person's allergy is sufficiently severe to substantially limit a major life activity, then that person meets the definition of an individual with a disability. Part 382

states that major life activities means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. Airline passengers with severe allergies to peanuts have a qualifying disability as defined in part 382.

Part 382 requires airlines to change or make an exception to an otherwise general policy or practice to make sure that a passenger with a disability can take the trip for which he or she is ticketed unless the change would cause an undue burden on the airline or a fundamental alteration in its services. The Department has in the past told airlines that, based on this requirement, they must make reasonable accommodations for air travelers who are allergic to peanuts. Specifically, in August 1998 the Department's Aviation Enforcement Office sent an industry letter providing guidance on this issue. That letter suggested that, if given advance notice, providing a peanut-free buffer zone in the immediate area of a passenger with a medically-documented severe allergy to peanuts would be a reasonable accommodation for the passenger's disability, and would not constitute an undue burden on the airline.

After the issuance of the guidance letter, the Department was directed by Congress to cease issuing guidance on this subject or face a cutoff of funding for its Aviation Enforcement Office. *See,* for example, section 346 of Public Law 106–69, (October 9, 1999)—"DOT and Related Agencies Appropriations Act, 2000," which stated that none of the funds made available under that Act could be used to require or suggest that airlines provide peanut-free buffer zones or otherwise restrict the distribution of peanuts. This congressional prohibition was to remain in effect "until 90 days after submission to the Congress of a peer-reviewed scientific study that determined that there are severe reactions by passengers to peanuts as a result of contact with very small airborne peanut particles of the kind that passengers might encounter in an aircraft." This specific congressional ban on our involvement in this issue has not appeared recently in any legislation. At this time, we are considering the following alternatives to provide greater access to air travel for individuals with severe peanut allergies: (1) Banning the serving of peanuts and all peanut products by both U.S. and foreign carriers on flights covered by DOT's disability rule; (2) banning the serving of peanuts and all peanut products on all such flights where a passenger with a peanut allergy is on board and has

requested a peanut-free flight in advance; or (3) requiring a peanut-free buffer zone in the immediate area of a passenger with a medically-documented severe allergy to peanuts if passenger has requested a peanut-free flight in advance. We seek comment on these approaches as well as the question of whether it would be preferable to maintain the current practice of not prescribing carrier practices concerning the serving of peanuts. We are particularly interested in hearing views on how peanuts and peanut products brought on board aircraft by passengers should be handled. How likely is it that a passenger with allergies to peanuts will have severe adverse health reactions by being exposed to the airborne transmission of peanut particles in an aircraft cabin (as opposed to ingesting peanuts orally)? Will taking certain specific steps to prepare for a flight (*e.g.,* carrying an epinephrine auto-injector in order to immediately and aggressively treat an anaphylactic reaction) sufficiently protect individuals with severe peanut allergies? Who should be responsible for ensuring an epinephrine auto-injector is available on a flight—the passenger with a severe peanut allergy or the carrier? Is there recent scientific or anecdotal evidence of serious in-flight medical events related to the airborne transmission of peanut particles? Should any food item that contains peanuts be included within the definition of peanut products (*e.g.,* peanut butter crackers, products containing peanut oil)? Is there a way of limiting this definition?

*13. Effective Date*

We propose that any final rule that we adopt take effect 180 days after its publication in the **Federal Register**. We believe this would allow sufficient time for carriers to comply with the various proposed requirements. We invite comments on whether 180 days is the appropriate interval for completing these changes.

**Regulatory Analyses And Notices**

*A. Executive Order 12866 (Regulatory Planning and Review) and DOT Regulatory Policies and Procedures*

This action has been determined to be significant under Executive Order 12866 and the Department of Transportation's Regulatory Policies and Procedures. It has been reviewed by the Office of Management and Budget under that Order. The Regulatory Evaluation finds that the benefits of the proposal appear to exceed its costs, even without considering non-quantifiable benefits. The total present value of passenger

benefits from the proposed requirements over a 10 year period at a 7% discount rate is $87.59 million and the total present value of costs incurred by carriers and other sellers of air transportation over a 10 year period at a 7% discount rate is $25.98 million. The net present value of the rule for 10 years at a 7% discount rate is $61.61 million.

Below, we have included a table outlining the projected costs and benefits of this rulemaking. We invite comment on the quantification of costs and benefits for each provision, as well as the methodology used to develop our cost and benefit estimates. We also seek comment on how unquantified costs and benefits could be measured. More detail on the estimates within this table can be found in the preliminary Regulatory Impact Analysis associated with this proposed rule.

### COMPARISON OF REQUIREMENT-SPECIFIC BENEFITS AND COSTS, 2010–2020
[Discounted at 7%/year to 2010 $ millions]

| | Total |
|---|---|
| **Requirement 1: Expand tarmac delay contingency plan requirements to smaller airports and require that foreign carriers have a tarmac delay contingency plan.** | **Total** |
| Estimated Quantified Benefits ............................................................................................................... | $1.99 |
| Estimated Quantified Costs .................................................................................................................... | $3.24 |
| **Net Benefits** ..................................................................................................................................... | **−$1.25** |
| *Unquantified Benefits:* | |
| • Improved Management of Flight Delays | |
| • Decreased Anxiety with Regard to Flying | |
| • Reduced Stress among Delayed Passengers and Crew | |
| • Improved Overall Carrier Operations | |
| • Improved Customer Good Will Towards Carriers | |
| *Unquantified Costs:* | |
| • Increased Flight Cancellations | |
| • Increased Passenger Anxiety Associated with Potential Flight Cancellations | |
| **Requirement 2: Expand carriers' reporting tarmac delay info to DOT and require reporting by foreign carriers.** | **Total** |
| Estimated Quantified Benefits ............................................................................................................... | not estimated |
| Estimated Quantified Costs .................................................................................................................... | $2.31 |
| **Net Benefits** ..................................................................................................................................... | **not estimated** |
| *Unquantified Benefits:* | |
| • Increased Efficiency of US DOT Oversight and Enforcement Office Operations | |
| • Improved Planning by Passengers | |
| • Improved Management of Flight Delays | |
| • Improved Market Competition | |
| **Requirement 3: Establish of minimum standards for carriers' customer service plans and extend the customer service plan requirements to cover foreign carriers.** | **Total** |
| Estimated Quantified Benefits ............................................................................................................... | $6.25 |
| Estimated Quantified Costs .................................................................................................................... | $8.58 |
| **Net Benefits** ..................................................................................................................................... | **−$2.33** |
| *Unquantified Benefits:* | |
| • Decreased Confusion and Uncertainty Regarding Department's Requirements | |
| • Value of Improved Customer Service Based on Self-Auditing of Adherence to Customer Service Plans for Foreign Carriers | |
| • Improved Customer Good Will Towards Carriers | |
| **Requirement 4: Require incorporation of tarmac delay contingency plans and customer service plans into carrier contracts of carriage.** | **Total** |
| Estimated Quantified Benefits ............................................................................................................... | not estimated |
| Estimated Quantified Costs .................................................................................................................... | not estimated |
| **Net Benefits** ..................................................................................................................................... | **not estimated** |
| *Unquantified Benefits:* | |
| • Decreased Occurrence of Customer Complaints | |
| • Improved Resolution of Customer Complaints | |
| **Requirement 5: Extend requirements for carriers to respond to consumer complaints to cover foreign carriers.** | **Total** |
| Estimated Quantified Benefits ............................................................................................................... | $0.00 |
| Estimated Quantified Costs .................................................................................................................... | $1.82 |
| **Net Benefits** ..................................................................................................................................... | **−$1.82** |
| *Unquantified Benefits:* | |

COMPARISON OF REQUIREMENT-SPECIFIC BENEFITS AND COSTS, 2010–2020—Continued

[Discounted at 7%/year to 2010 $ millions]

| | |
|---|---|
| • Decreased Occurrence of Conduct that Would Produce Complaints<br>• Improved Resolution of Customer Complaints<br>• Decreased Anger Toward Carriers During Resolution of Complaints | |
| **Requirement 6: Changes in denied boarding compensation (involuntary bumping) policy: increase minimum compensation, add inflation adjustment, greater passenger information about policies.** | **Total** |
| Estimated Quantified Benefits ........................................................................................................................<br>Estimated Quantified Costs ............................................................................................................................ | not estimated<br>$0.66 |
| **Net Benefits** ...............................................................................................................................................<br>*Unquantified Benefits:*<br>• Decrease in Confusion Regarding Denied Boarding Compensation Provisions<br>• More Accurate Compensation for those Denied Boarding<br>• Decreased Resentment among Some Passengers Regarding Different Compensation Received | **not estimated** |
| **Requirement 7: Require that carriers include taxes and fees in advertising ("full-fare advertising") and prohibit use of sales provisions that require purchasers to opt out of add-ons such as trip insurance.** | **Total** |
| Estimated Quantified Benefits ........................................................................................................................<br>Estimated Quantified Costs ............................................................................................................................ | $73.50<br>$6.86 |
| **Net Benefits** ...............................................................................................................................................<br>*Unquantified Benefits:*<br>• Travelers Less Likely to Mistakenly Purchase Unwanted Services and Amenities<br>• Improved Market Competition<br>• Improved Customer Good Will Towards Carriers | **$66.64** |
| **Requirement 8: Require carriers to disclose baggage and other optional fees on their Web sites.** | **Total** |
| Estimated Quantified Benefits ........................................................................................................................<br>Estimated Quantified Costs ............................................................................................................................ | not estimated<br>$2.51 |
| **Net Benefits** ...............................................................................................................................................<br>*Unquantified Benefits:*<br>• Decrease in Time at Check-in<br>• Avoidance of Unfair Surprise<br>• Improved Customer Good Will Towards Carriers<br>• Improved Market Competition | **not estimated** |
| **Requirement 9: Ban the practice of post-purchase price increases.** | **Total** |
| Estimated Quantified Benefits ........................................................................................................................<br>Estimated Quantified Costs ............................................................................................................................ | $5.83<br>not estimated |
| **Net Benefits** ...............................................................................................................................................<br>*Unquantified Benefits:*<br>• Improved Customer Good Will Towards Carriers<br>• Avoidance of Unfair Surprise<br>*Unquantified Costs:*<br>• Inability to Increase Prices Based on Unanticipated or Changed Circumstances | **not estimated** |
| **Requirement 10: Require prompt passenger notification of flight status changes (cancellations, delays, etc.) at the boarding gate area, on Web site and on telephone reservation systems.** | **Total** |
| Estimated Quantified Benefits ........................................................................................................................<br>Estimated Quantified Costs ............................................................................................................................ | not estimated<br>not estimated |
| **Net Benefits** ...............................................................................................................................................<br>*Unquantified Benefits:*<br>• Reduced Passenger Anxiety<br>• Greater Comfort and Certainty from Knowing that Information Will Be Available In Timely Manner<br>*Unquantified Costs:*<br>• Expense of Providing Notification | **not estimated** |
| **Requirement 11: Permit consumers to file suit wherever a carrier does business.** | **Total** |
| Estimated Quantified Benefits ........................................................................................................................<br>Estimated Quantified Costs ............................................................................................................................ | not estimated<br>not estimated |
| **Net Benefits** ...............................................................................................................................................<br>*Unquantified Benefits:* | **not estimated** |

COMPARISON OF REQUIREMENT-SPECIFIC BENEFITS AND COSTS, 2010–2020—Continued

[Discounted at 7%/year to 2010 $ millions]

| | Total |
|---|---|
| • Greater compliance with DOT regulations<br>• Improved Customer Good Will Towards Carriers<br>*Unquantified Costs:*<br>• Need to Defend Suit in Location of Consumer's Choice | |
| **Requirements 1–11: TOTAL** ...................................................................................................... | **Total** |
| Estimated Quantified Benefits ................................................................................................... | $87.6 |
| Estimated Quantified Costs ...................................................................................................... | $26.0 |
| **Net Benefits** .......................................................................................................................... | **$61.6** |

*B. Regulatory Flexibility Act*

The Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*) requires an agency to review regulations to assess their impact on small entities unless the agency determines that a rule is not expected to have a significant economic impact on a substantial number of small entities. The regulatory initiatives discussed in this NPRM would have some impact on some small entities, as discussed in the Initial Regulatory Flexibility Analysis.

The Initial Regulatory Flexibility Analysis determined that no more than 12 independently-owned small U.S. carriers operating at least one aircraft with 30 or more passenger seats but none with more than 60 passenger seats would have to comply with the proposed requirements relating to denied boarding compensation and lengthy tarmac delays. These 12 U.S. carriers and an additional 35 small U.S. carriers that only operate aircraft with fewer than 30 seats would potentially have to comply with the requirements pertaining to full fare advertising (requirement to display full fares on Web sites and in print advertising and prohibition on opt-out provisions), disclosure of baggage and other fees, and prohibition on post-purchase price increases. The compliance costs associated with the full fare advertising requirements are estimated at $6,000 or less per carrier. The estimated unit costs for complying with the other requirements are nominal.

The proposed initiatives may have a more substantial impact on small foreign carriers that provide scheduled service on flights to and from the U.S. using only aircraft with 60 or less passenger seats. There is only one small foreign carrier that operates service to and from the U.S. using aircraft with more than 29 but fewer than 61 seats. It would be required to comply with the proposed requirements described above for U.S. carriers of this size-class, as well as requirements relating to tarmac delay contingency plans, customer service plans, and customer problems/complaints (these requirements were

instituted for covered U.S. carriers in a previous proceeding). Each of these sets of requirements may entail compliance costs of $3,000 or more per-carrier, but only the requirement to develop and implement a compliant tarmac delay contingency plan is likely to involve single-year cost in excess of $10,000 per carrier. There are also two small foreign carriers that operate service to and from the U.S. exclusively with aircraft that have fewer than 19 seats; these two carriers would potentially have to comply with the requirements pertaining to full fares advertising (requirement to display full fares on Web sites and in print advertising and prohibition on opt-out provisions), disclosure of baggage and other fees, and prohibition on post-purchase price increases. The per-carrier compliance costs for these two small foreign carriers are expected to be similar to those for U.S. carriers of the same size-class.

It may also be necessary for some small travel agencies and tour operators to revise air travel prices displayed in Web site and print media advertising to comply with the proposed requirements relating to full fare advertising of air fares. Costs for small firms to revise Web sites and update print media advertising are estimated at no more than $3,000 each on a per-firm basis. Finally, a limited number of personnel at some small airports will incur time costs of a few hours on average to interact with carriers that are required to coordinate tarmac contingency plans with airport authorities. We invite comment to facilitate our assessment of the potential impact of these initiatives on small entities.

*C. Executive Order 13132 (Federalism)*

This Notice of Proposed Rulemaking has been analyzed in accordance with the principles and criteria contained in Executive Order 13132 ("Federalism"). This notice does not propose any provision that: (1) Has substantial direct effects on the States, the relationship between the national government and the States, or the distribution of power

and responsibilities among the various levels of government; (2) imposes substantial direct compliance costs on State and local governments; or (3) preempts State law. States are already preempted from regulating in this area by the Airline Deregulation Act, 49 U.S.C. 41713. Therefore, the consultation and funding requirements of Executive Order 13132 do not apply.

*D. Executive Order 13084*

This NPRM has been analyzed in accordance with the principles and criteria contained in Executive Order 13084 ("Consultation and Coordination with Indian Tribal Governments"). Because none of the options on which we are seeking comment would significantly or uniquely affect the communities of the Indian tribal governments or impose substantial direct compliance costs on them, the funding and consultation requirements of Executive Order 13084 do not apply.

*E. Paperwork Reduction Act*

This NPRM proposes three new collections of information that would require approval by the Office of Management and Budget (OMB) under the Paperwork Reduction Act of 1995 (Pub. L. 104–13, 49 U.S.C. 3501 *et seq.*). Under the Paperwork Reduction Act, before an agency submits a proposed collection of information to OMB for approval, it must publish a document in the **Federal Register** providing notice of the proposed collection of information and a 60-day comment period, and must otherwise consult with members of the public and affected agencies concerning the proposed collection.

The first collection of information proposed here is a requirement that foreign air carriers that operate scheduled passenger service to or from the U.S. using any aircraft originally designed to have a passenger capacity of 30 or more seats retain for two years the following information about any ground delay that lasts at least three hours: the length of the delay, the precise cause of the delay, the actions taken to minimize

hardships for passengers, whether the flight ultimately took off (in the case of a departure delay or diversion) or returned to the gate; and an explanation for any tarmac delay that exceeded 3 hours. The Department plans to use the information to investigate instances of long delays on the ground and to identify any trends and patterns that may develop.

The second information collection is a requirement that any foreign air carrier that operates scheduled passenger service to and from the U.S. using any aircraft originally designed to have a passenger capacity of 30 or more seats adopt a customer service plan, audit its adherence to the plan annually, and retain the results of each audit for two years. The Department plans to review the audits to monitor carriers' compliance with their plans and take enforcement action when appropriate.

The third is a requirement that U.S. carriers and foreign carriers that operate any aircraft originally designed to have a passenger capacity of 30 or more seats report monthly tarmac delay data to the Department with respect to their operations at a U.S. airport for any tarmac delay exceeding three hours or more, including diverted flights and cancelled flights. This requirement would apply to reporting carriers under 14 CFR part 234 only with respect to their public charter service and international service. Reporting carriers already submit tarmac delay data to the Department for their domestic scheduled passenger service. The Department plans to use this information to obtain more precise data to compare tarmac delay incidents by carrier, by airport, and by specific time frame, for use in making future policy decisions and developing rulemakings.

For each of these information collections, the title, a description of the respondents, and an estimate of the annual recordkeeping and periodic reporting burden are set forth below:

*1. Requirement to retain for two years information about any ground delay that lasts at least three hours.*

*Respondents:* Foreign air carriers that operate passenger service to and from the U.S. using any aircraft originally designed to have a passenger capacity of 30 or more seats.

*Estimated Annual Burden on Respondents:* 0 to 1 hour per respondent.

*Estimated Total Annual Burden:* 15 hours and 25 minutes for all respondents.

*Frequency:* One information set to submit per three hour plus tarmac delay for each respondent .

*2. Requirement that carrier retain for two years the results of its annual self-audit of its compliance with its Customer Service Plan.*

*Respondents:* Foreign air carriers that operate scheduled passenger service to and from the U.S. using any aircraft originally designed to have a passenger capacity of 30 or more seats.

*Estimated Annual Burden on Respondents:* 15 minutes per year for each respondent.

*Estimated Total Annual Burden:* A maximum of 22 hours for all respondents.

*Frequency:* One information set to retain per year for each respondent.

*3. Requirement that carrier report certain tarmac delay data to the Department on a monthly basis.*

*Respondents:* U.S. carriers that operate passenger service using any aircraft with 30 or more seats, and foreign air carriers that operate passenger service to and from the United States using any aircraft originally designed to have a passenger capacity of 30 or more seats.

*Estimated Annual Burden on Respondents:* 5 to 160 hours per respondent in the first year (average of 40 hours) and no more than 3 hours in subsequent years per respondent.

*Estimated Total Annual Burden:* 5,200 hours in the first year and no more than 390 hours in subsequent years for all respondents.

*Frequency:* One information set to submit per month for each respondent.

The Department invites interested persons to submit comments on any aspect of each of these three information collections, including the following: (1) The necessity and utility of the information collection, (2) the accuracy of the estimate of the burden, (3) ways to enhance the quality, utility, and clarity of the information to be collected, and (4) ways to minimize the burden of collection without reducing the quality of the collected information. Comments submitted in response to this notice will be summarized or included, or both, in the request for OMB approval of these information collections.

*F. Unfunded Mandates Reform Act*

The Department has determined that the requirements of Title II of the Unfunded Mandates Reform Act of 1995 do not apply to this NPRM.

**List of Subjects**

*14 CFR Parts 234, 250, and 259*

Air carriers, Consumer protection, Reporting and recordkeeping requirements.

*14 CFR Part 244*

Air carriers, Consumer protection, and Tarmac delay data.

*14 CFR Part 253*

Air carriers, Consumer protection, and Contract of carriage.

*14 CFR Part 399*

Administrative practice and procedure, Air carriers, Air rates and fares, Air taxis, Consumer protection, Small businesses.

Issued June 2, 2010 in Washington, DC.

**Ray LaHood,**

*Secretary of Transportation.*

For the reasons set forth in the preamble, the Department proposes to amend title 14 CFR Chapter II as follows:

**PART 234—[AMENDED]**

1. The authority citation for 14 CFR part 234 continues to read as follows:

**Authority:** 49 U.S.C. 329 and chapters 401 and 417.

2. Section 234.11 is amended by revising paragraph (d) and adding paragraph (e) to read as follows:

**§ 234.11   Disclosure to consumers.**

\*    \*    \*    \*    \*

(d) For each scheduled domestic flight segment, including domestic segments of a code-share flight operated by another carrier, a reporting carrier shall promptly provide to passengers who are ticketed or hold reservations, and to other interested persons information about a change in the status of a flight, defined for this purpose as cancellation of a flight or a delay of 30 minutes or more in the planned operation of a flight, including additional delays of 30 minutes or more to flights for which notification has already been provided. This information must at a minimum be provided in the boarding gate area, via a carrier's telephone reservation system and on the homepage of a carrier's Web site.

(1) With respect to any carrier that permits passengers to subscribe to flight status notification services, the reporting carrier shall deliver such notification to such passengers, by whatever means is available to the carrier and of the passenger's choice, within 30 minutes after the carrier becomes aware or should have become aware of a change in the status of a flight.

(2) The reporting carrier shall incorporate such notification service commitment into its Customer Service Plan as specified in section 259.5 of this chapter.

(e) Each reporting carrier shall update all flight status displays and other sources of flight information that are under the carrier's control at airports with information on each flight delay of 30 minutes or more or flight cancellation, within 30 minutes after the carrier becomes aware or should have become aware of a change in the status of a flight.

3. A new part 244 is added to read as follows:

## PART 244—REPORTING TARMAC DELAY DATA

Sec.
244.1    Definitions.
244.2    Applicability.
244.3    Reporting of tarmac delay data.

**Authority:** 49 U.S.C. 40101(a)(4), 40101(a)(9), 40113(a), 41702, and 41712.

### § 244.1    Definitions.

For the purposes of this part:
*Arrival time* is the instant when the pilot sets the aircraft parking brake after arriving at the airport gate or passenger unloading area. If the parking brake is not set, record the time for the opening of the passenger door. Also, carriers using a Docking Guidance System (DGS) may record the official "gate-arrival time" when the aircraft is stopped at the appropriate parking mark.

*Cancelled flight* means a flight operation that was not operated, but was listed in an air carrier or a foreign air carrier's computer reservation system within seven calendar days of the scheduled departure.

*Certificated air carrier* means a U.S. air carrier holding a certificate issued under 49 U.S.C. 41102 to conduct passenger service or holding an exemption to conduct passenger operation under 49 U.S.C. 40109.

*Commuter air carrier* means a U.S. commuter air carrier as described in 14 CFR 298.3(b) that is authorized to carry passengers on at least five round trips per week on at least one route between two or more points according to a published flight schedule using small aircraft.

*Covered carrier* means a certificated carrier, a commuter carrier, or a foreign air carrier operating to and from or within the United States, conducting scheduled passenger service or public charter service with at least one aircraft originally designed to have a passenger capacity of 30 or more seats.

*Diverted flight* means a flight which is operated from the scheduled origin point to a point other than the scheduled destination point in the carrier's published schedule.

*Foreign air carrier* means a carrier that is not a citizen of the United States as

defined in 49 U.S.C. 40102(a) that holds a foreign air carrier permit issued under 49 U.S.C. 41302 or an exemption issued under 49 U.S.C. 40109 authorizing direct foreign air transportation.

*Gate departure time* is the instant when the pilot releases the aircraft parking brake after passengers have been boarded and aircraft doors have been closed. In cases where the flight returned to the departure gate before wheels-off time and departed a second time, the reportable gate departure time is the last gate departure time before wheels-off time. In cases of an air return, the reportable gate departure time is the last gate departure time before the gate return. If passengers were boarded without the parking brake being set, the reportable gate departure time is the time that the passenger door was closed. Also, the official "gate-departure time" may be based on aircraft movement for carriers using a Docking Guidance System (DGS). For example, one DGS records gate departure time when the aircraft moves more than 1 meter from the appropriate parking mark within 15 seconds. Fifteen seconds is then subtracted from the recorded time to obtain the appropriate out time.

*Gate return* means that the aircraft leaves the boarding gate only to return to a gate for the purpose of allowing passengers to disembark from the aircraft.

*Tarmac delay* means the holding of an aircraft on the ground either before taking off or after landing with no opportunity for its passengers to deplane.

### § 244.2    Applicability.

(a) This part applies to U.S. certificated air carriers, U.S. commuter air carriers and foreign air carriers that operate passenger service to a U.S. airport with an aircraft originally designed to have a passenger capacity of 30 or more seats. Carriers must report all passenger operations that experience a tarmac time of 3 hours or more at a U.S. airport.

(b) If a U.S. or a foreign air carrier has no 3-hour tarmac times in a given month, it still must submit a monthly report stating there were no 3-hour tarmac times.

(c) U.S. carriers that submit Part 234 Airline Service Quality Performance Report must only submit 3-hour tarmac information for public charter flights and international passengers flights as the domestic scheduled passenger flight information is already being collected in part 234 of this chapter.

### § 244.3    Reporting of tarmac delay data.

(a) Each covered carrier shall file BTS Form 244 "Tarmac Delay Report" with the Office of Airline Information of the Department's Bureau of Transportation and Statistics on a monthly basis, setting forth the information for each of its flights that experienced a tarmac delay of three hours or more, including diverted flights and cancelled flights on which the passengers were boarded and then deplaned before the cancellation. The reports are due within 15 days of the end of each month and shall be made in the form and manner set forth in accounting and reporting directives issued by the Director, Office of Airline Statistics, and shall contain the following information:

(1) Carrier code.
(2) Flight number.
(3) Departure airport (three letter code).
(4) Arrival airport (three letter code).
(5) Date of flight operation (year/month/day).
(6) Gate departure time (actual) in local time.
(7) Gate arrival time (actual) in local time.
(8) Wheels-off time (actual) in local time.
(9) Wheels-on time (actual) in local time.
(10) Aircraft tail number.
(11) Total ground time away from gate for all gate return/fly return at origin airports including cancelled flights.
(12) Longest time away from gate for gate return or canceled flight.
(13) Three letter code of airport where diverted flight.
(14) Wheels-on time at diverted airport.
(15) Total time away from gate at diverted airport.
(16) Longest time away from gate at diverted airport.
(17) Wheels-off time at diverted airport.
(b) The same information required by paragraph (a)(13) through (a)(17) of this section must be provided for each subsequent diverted airport landing.

## PART 250—[AMENDED]

4. The authority citation for 14 CFR part 250 continues to read as follows:

**Authority:** 49 U.S.C. chapters 401, 411, 413 and 417.

5. Section 250.1 is amended by removing the definition of "sum of the values of the remaining flight coupons" and adding a definition of "confirmed reserved space" to read as follows:

### § 250.1    Definitions.

*    *    *    *    *

USCA Case #11-1219    Document #1320345    Filed: 07/22/2011    Page 269 of 384

*Confirmed reserved space* means space on a specific date on a specific flight and class of service of a carrier which has been requested by a passenger, including a passenger with a "zero fare ticket" (e.g., consolidator ticket that does not show a fare amount on the ticket, frequent-flyer award ticket, or ticket obtained using a travel voucher), and which the carrier or its agent has verified, by appropriate notation on the ticket or in any other manner provided therefore by the carrier, as being reserved for the accommodation of the passenger.

\* \* \* \* \*

6. Section 250.2b is amended by revising paragraph (b) and adding paragraph (c) to read as follows:

### §250.2b Carriers to request volunteers for denied boarding.

\* \* \* \* \*

(b) Every carrier shall advise each passenger solicited to volunteer for denied boarding, no later than the time the carrier solicits that passenger to volunteer, whether he or she is in danger of being involuntarily denied boarding (in doing so, the carrier must fully disclose the boarding priority rules that the carrier will apply for that specific flight), and the compensation the carrier is obligated to pay if the passenger is involuntarily denied boarding. If an insufficient number of volunteers come forward, the carrier may deny boarding to other passengers in accordance with its boarding priority rules.

(c) If a carrier offers free or reduced rate air transportation as compensation to volunteers, the carrier must disclose all material restrictions on the use of that transportation before the passenger decides whether to give up his or her confirmed reserved space on that flight in exchange for the free or reduced rate transportation.

7. Section 250.5 is revised to read as follows:

### §250.5 Amount of denied boarding compensation for passengers denied boarding involuntarily.

(a) Subject to the exceptions provided in §250.6, a carrier to whom this part applies as described in §250.2 shall pay compensation to passengers denied boarding involuntarily from an oversold flight at the rate of 200 percent of the fare (including any surcharges and air transportation taxes) to the passenger's next stopover, or if none, to the passenger's final destination, with a maximum of $1,300. However, the compensation shall be one-half the amount described above, with a $650 maximum, if the carrier arranges for

comparable air transportation [see §250.1], or other transportation used by the passenger that, at the time either such arrangement is made, is planned to arrive at the airport of the passenger's next stopover, or if none, the airport of the passenger's final destination, not later than 2 hours after the time the direct or connecting flight from which the passenger was denied boarding is planned to arrive in the case of interstate air transportation, or 4 hours after such time in the case of foreign air transportation.

(b) Carriers may offer free or reduced rate air transportation in lieu of the cash due under paragraph (a) of this section, if:

(1) The value of the transportation benefit offered is equal to or greater than the cash payment otherwise required;

(2) The carrier fully informs the passenger of the amount of cash compensation that would otherwise be due and that the passenger may decline the transportation benefit and receive the cash payment; and

(3) The carrier fully discloses all material restrictions on the use of such free or reduced rate transportation before the passenger decides to give up cash payment in exchange for such transportation.

(c) For the purpose of calculating the denied boarding compensation for a passenger with a "zero fare ticket", the requirements in paragraph (a), (b), and (c) of this section apply. The fare paid by these passengers for purpose of this calculation shall be the lowest cash, check, or credit card payment charged for a comparable class of ticket on the same flight.

(d) The Department of Transportation will review the maximum denied boarding compensation amounts prescribed in this part every two years. The Department will use the Consumer Price Index for All Urban Consumers (CPI–U) as of July of each review year to calculate the revised maximum compensation amounts. The Department will use the following formula:

Current Denied Boarding Compensation multiplied by (a/b) rounded to the nearest $25 where:

a = July CPI–U of year of current adjustment

b = the CPI–U figure in July 2010 when the inflation adjustment provision was added to Part 250.

8. Section 250.9 is amended by revising the section heading and paragraph (c) to read as follows:

### §250.9 Written explanation of denied boarding compensation and boarding priorities, and verbal notification of denied boarding compensation.

\* \* \* \* \*

(c) In addition to furnishing passengers with the carrier's written statement as specified in paragraphs (a) and (b) of this section, if the carrier orally advises involuntarily bumped passengers that they are entitled to receive free or discounted transportation as denied boarding compensation, the carrier must also orally advise the passengers of any restrictions or conditions applicable to the free or discounted transportation and that they are entitled to choose cash or check compensation instead.

### PART 253—[AMENDED]

9. The authority citation for 14 CFR part 253 continues to read as follows:

**Authority:** 49 U.S.C. 40113; 49 U.S.C. Chapters 401, 415 and 417.

10. Section 253.7 is revised to read as follows:

### §253.7 Direct notice of certain terms.

A passenger shall not be bound by any terms restricting refunds of the ticket price or imposing monetary penalties on passengers unless the passenger receives conspicuous written notice of the salient features of those terms on or with the ticket.

11. Section 253.9 is revised to read as follows:

### §253.9 Notice of contract of carriage choice-of-forum provisions.

The Department considers any contract of carriage provision containing a choice-of-forum clause that attempts to preclude a passenger from bringing a consumer-related claim against a carrier in any court of competent jurisdiction, including a court within the jurisdiction of the passenger's residence in the United States, provided that the carrier does business within that jurisdiction, to be an unfair and deceptive practice prohibited by 49 U.S.C. 41712.

### PART 259—[AMENDED]

12. The authority citation for 14 CFR part 259 continues to read as follows:

**Authority:** 49 U.S.C. 40101(a)(4), 40101(a)(9), 40113(a), 41702, and 41712.

13. Section 259.2 is revised to read as follows:

### §259.2 Applicability.

This rule applies to all the flights of a certificated or commuter air carrier if the carrier operates scheduled passenger service or public charter service using any aircraft originally designed to have

a passenger capacity of 30 or more seats, and to all the flights to and from the U.S. of a foreign carrier if the carrier operates scheduled passenger service or public charter service to and from the U.S. using any aircraft originally designed to have a passenger capacity of 30 or more seats, with the exception that § 259.5 and § 259.7 do not apply to charter service.

14. Section 259.3 is revised to read as follows:

### § 259.3.  Definitions.

For the purposes of this part:

*Certificated air carrier* means a U.S. air carrier that holds a certificate issued under 49 U.S.C. 41102 to operate passenger service or an exemption from 49 U.S.C. 41102.

*Commuter air carrier* means a U.S. air carrier as established by 14 CFR 298.3(b) that is authorized to carry passengers on at least five round trips per week on at least one route between two or more points according to a published flight schedule using small aircraft.

*Covered carrier* means a certificated carrier, a commuter carrier, or a foreign air carrier operating to and from or within the United States, conducting scheduled passenger service or public charter service with at least one aircraft originally designed to have a passenger capacity of 30 or more seats.

*Foreign air carrier* means a carrier that is not a citizen of the United States as defined in 49 U.S.C. 40102(a) that holds a foreign air carrier permit issued under 49 U.S.C. 41302 or an exemption under 49 U.S.C. 40109 authorizing direct foreign air transportation.

*Large hub airport* means an airport that accounts for at least 1.00 percent of the total enplanements in the United States.

*Medium hub airport* means an airport accounting for at least 0.25 percent but less than 1.00 percent of the total enplanements in the United States.

*Non-hub airport* means an airport with 10,000 or more annual enplanements but less than 0.05 percent of the country's annual passenger boardings.

*Small hub airport* means an airport accounting for at least 0.05 percent but less than 0.25 percent of the total enplanements in the United States.

*Tarmac delay* means the holding of an aircraft on the ground either before taking off or after landing with no opportunity for its passengers to deplane.

15. Section 259.4 is revised to read as follows:

### § 259.4  Contingency plan for lengthy tarmac delays.

(a) *Adoption of Plan.* Each covered carrier shall adopt a Contingency Plan for Lengthy Tarmac Delays for its scheduled and public charter flights at each large U.S. hub airport, medium hub airport, small hub airport and non-hub airport at which it operates such air service and shall adhere to its plan's terms.

(b) *Contents of Plan.* Each Contingency Plan for Lengthy Tarmac Delays shall include, at a minimum, the following:

(1) For domestic flights, assurance that the covered U.S. air carrier will not permit an aircraft to remain on the tarmac for more than three hours before allowing passengers to deplane unless:

(i) The pilot-in-command determines there is a safety-related or security-related reason (*e.g.* weather, a directive from an appropriate government agency) why the aircraft cannot leave its position on the tarmac to deplane passengers; or

(ii) Air traffic control advises the pilot-in-command that returning to the gate or another disembarkation point elsewhere in order to deplane passengers would significantly disrupt airport operations.

(2) For international flights operated by covered carriers that depart from or arrive at a U.S. airport, assurance that the carrier will not permit an aircraft to remain on the tarmac at a U.S. airport for more than a set number of hours as determined by the carrier and set out in its contingency plan, before allowing passengers to deplane, unless:

(i) The pilot-in-command determines there is a safety-related or security-related reason why the aircraft cannot leave its position on the tarmac to deplane passengers; or

(ii) Air traffic control advises the pilot-in-command that returning to the gate or another disembarkation point elsewhere in order to deplane passengers would significantly disrupt airport operations.

(3) For all flights, assurance that the carrier will provide adequate food and potable water no later than two hours after the aircraft leaves the gate (in the case of a departure) or touches down (in the case of an arrival) if the aircraft remains on the tarmac, unless the pilot-in-command determines that safety or security considerations preclude such service;

(4) For all flights, assurance of operable lavatory facilities, as well as adequate medical attention if needed, while the aircraft remains on the tarmac;

(5) For all flights, assurance that the passengers on the delayed flight will receive notifications regarding the status of the tarmac delay every 30 minutes while the plane is delayed, including the reasons for the tarmac delay;

(6) Assurance of sufficient resources to implement the plan; and

(7) Assurance that the plan has been coordinated with airport authorities at each U.S. large hub airport, medium hub airport, small hub airport and non-hub airport that the carrier serves, as well as its regular U.S. diversion airports;

(8) Assurance that the plan has been coordinated with U.S. Customs and Border Protection (CBP) at each large U.S. hub airport, medium hub airport, small hub airport and non-hub airport that is regularly used for that carrier's international flights, including diversion airports; and

(9) Assurance that the plan has been coordinated with the Transportation Security Administration (TSA) at each large U.S. hub airport, medium hub airport, small hub airport and non-hub airport that the carrier serves, including diversion airports.

(c) *Amendment of plan.* At any time, a carrier may amend its Contingency Plan for Lengthy Tarmac Delays to decrease the time for aircraft to remain on the tarmac for domestic flights covered in paragraph (b)(1) of this section, for aircraft to remain on the tarmac for international flights covered in paragraph (b)(2) of this section, and for the trigger point for food and water covered in paragraph (b)(3) of this section. A carrier may also amend its plan to increase these intervals (up to the limits in this rule), in which case the amended plan shall apply only to those flights that are first offered for sale after the plan's amendment.

(d) *Retention of records.* Each carrier that is required to adopt a Contingency Plan for Lengthy Tarmac Delays shall retain for two years the following information about any tarmac delay that lasts at least three hours:

(1) The length of the delay;

(2) The precise cause of the delay;

(3) The actions taken to minimize hardships for passengers, including the provision of food and water, the maintenance and servicing of lavatories, and medical assistance;

(4) Whether the flight ultimately took off (in the case of a departure delay or diversion) or returned to the gate; and

(5) An explanation for any tarmac delay that exceeded 3 hours (*i.e.*, why the aircraft did not return to the gate by the 3-hour mark).

(e) *Unfair and deceptive practice.* A carrier's failure to comply with the assurances required by this rule and as contained in its Contingency Plan for

Lengthy Tarmac Delays will be considered an unfair and deceptive practice within the meaning of 49 U.S.C. 41712 that is subject to enforcement action by the Department.

16. Section 259.5 is revised to read as follows:

### § 259.5   Customer Service Plan.

(a) *Adoption of Plan.* Each covered carrier shall adopt a Customer Service Plan applicable to its scheduled flights and shall adhere to this plan's terms.

(b) *Contents of Plan.* Each Customer Service Plan shall address the following subjects and comply with the minimum standards set forth:

(1) Offering the lowest fare available on the carrier's Web site, at the ticket counter, or when a customer calls the carrier's reservation center to inquire about a fare or to make a reservation;

(2) Notifying consumers in the boarding gate area, on board aircraft and via a carrier's telephone reservation system and its Web site of known delays, cancellations, and diversions;

(3) Delivering baggage on time, including making every reasonable effort to return mishandled baggage within twenty-four hours and compensating passengers for reasonable expenses that result due to delay in delivery;

(4) Allowing reservations to be held at the quoted fare without payment, or cancelled without penalty, for at least twenty-four hours after the reservation is made;

(5) Where ticket refunds are due, providing prompt refunds for credit card purchases as required by § 374.3 of this chapter and 12 CFR part 226, and for cash and check purchases within 20 days after receiving a complete refund request;

(6) Properly accommodating passengers with disabilities as required by Part 382 of this chapter and for other special-needs passengers as set forth in the carrier's policies and procedures, including during lengthy tarmac delays;

(7) Meeting customers' essential needs during lengthy tarmac delays as required by § 259.4 of this chapter and as provided for in each covered carrier's contingency plan;

(8) Handling "bumped" passengers with fairness and consistency in the case of oversales as required by Part 250 of this chapter and as described in each carrier's policies and procedures for determining boarding priority;

(9) Disclosing cancellation policies, frequent flyer rules, aircraft configuration, and lavatory availability on the selling carrier's Web site, and upon request, from the selling carrier's telephone reservations staff;

(10) Notifying consumers in a timely manner of changes in their travel itineraries;

(11) Ensuring good customer service from code-share partners, including making reasonable efforts to ensure that its code-share partner(s) have comparable customer service plans or provide comparable customer service levels, or have adopted the identified carrier's customer service plan;

(12) Ensuring responsiveness to customer complaints as required by section 259.7 of this chapter; and

(13) Identifying the services it provides to mitigate passenger inconveniences resulting from flight cancellations and misconnections.

(c) *Self-auditing of Plan and retention of records.* Each carrier that is required to adopt a Customer Service Plan shall audit its own adherence to its plan annually. Carriers shall make the results of their audits available for the Department's review upon request for two years following the date any audit is completed.

17. Section 259.6 is revised to read as follows:

### § 259.6   Contract of carriage.

(a) Each U.S. and foreign air carrier that is required to adopt a contingency plan for lengthy tarmac delays shall incorporate this plan into its contract of carriage.

(b) Each U.S. and foreign air carrier that is required to adopt a customer service plan shall incorporate this plan in its contract of carriage.

(c) Each U.S. and foreign air carrier that has a Web site shall post its entire contract of carriage on its Web site in easily accessible form, including all updates to its contract of carriage.

18. Section 259.7 is revised to read as follows:

### § 259.7   Response to consumer problems.

(a) *Designated advocates for passengers' interests.* Each covered carrier shall designate for its scheduled flights an employee who shall be responsible for monitoring the effects of flight delays, flight cancellations, and lengthy tarmac delays on passengers. This employee shall have input into decisions on which flights to cancel and which will be delayed the longest.

(b) *Informing consumers how to complain.* Each covered carrier shall make available the mailing address and e-mail or web address of the designated department in the airline with which to file a complaint about its scheduled service. This information shall be provided on the carrier's Web site (if any), on all e-ticket confirmations and, upon request, at each ticket counter and boarding gate staffed by the carrier or a contractor of the carrier.

(c) *Response to complaints.* Each covered carrier shall acknowledge receipt of each complaint regarding its scheduled service to the complainant within 30 days of receiving it and shall send a substantive response to each complainant within 60 days of receiving the complaint. A complaint is a specific written expression of dissatisfaction concerning a difficulty or problem which the person experienced when using or attempting to use an airline's services.

## PART 399—[AMENDED]

19. The authority citation for 14 CFR part 399 continues to read as follows:

**Authority:** 49 U.S.C. 40101 *et seq.*

20. Section 399.84 is revised to read as follows:

### § 399.84   Price advertising and opt-out provisions.

(a) The Department considers any advertising or solicitation by a direct air carrier, indirect air carrier, an agent of either, or a ticket agent, for passenger air transportation, a tour (*e.g.,* a combination of air transportation and ground accommodations), or a tour component (*e.g.,* a hotel stay) that states a price for such air transportation, tour, or tour component to be an unfair and deceptive practice in violation of 49 U.S.C. 41712, unless the price stated is the entire price to be paid by the customer to the carrier, or agent, for such air transportation, tour, or tour component. Although separate charges included within the total price (*e.g.,* taxes or a fuel surcharge) may be stated in fine print or through links or "pop ups" on Web sites, fares that exclude any required charges may not be displayed in advertising or solicitations.

(b) The Department considers any advertising by the entities listed in paragraph (a) of this section of an each-way airfare that is available only when purchased for round-trip travel to be an unfair and deceptive practice in violation of 49 U.S.C. 41712, unless such airfare is advertised as "each way" and in such a way so that the disclosure of the round trip purchase requirement is clearly and conspicuously noted in the advertisement and is stated prominently and proximately to the each-way fare amount. Each-way fares may not be referred to as "one-way" fares.

(c) When offering a ticket for purchase by a consumer, for passenger air transportation or for an air tour or air tour component, a direct air carrier, indirect air carrier, an agent of either, or

a ticket agent, may not include "opt-out" provisions for additional optional services in connection with air transportation, an air tour, or air tour component that will automatically be added to the purchase if the consumer takes no other action. The consumer must affirmatively "opt in" (*i.e.,* agree) to such a fee for the services before that fee is added to the total price for the air transportation-related purchase. The Department considers the use of "opt-out" provisions to be an unfair and deceptive practice in violation of 49 U.S.C. 41712.

21. A new § 399.85 is added to read as follows:

**§ 399.85  Notice of baggage fees and other fees.**

(a) If a U.S. or foreign air carrier has a Web site accessible for ticket purchases by the general public, the carrier must promptly and prominently disclose any increase in its fee for carry-on or checked baggage and any change in the checked baggage allowance for a passenger on the homepage of the carrier's Web site. Such notice must remain on the homepage for at least three months after the change becomes effective.

(b) On all e-ticket confirmations for air transportation within, to or from the United States, including the summary page at the completion of an online purchase and a post-purchase e-mail confirmation, a U.S. or foreign air carrier must include information regarding the free passenger's baggage allowance and/or the applicable fee for a carry-on bag and the first and second checked bag.

(c) If a U.S. or foreign air carrier has a Web site where it advertises or sells air transportation, on its Web site the carrier must disclose information on fees for optional services that are charged to a passenger purchasing air transportation. Such disclosure must be clear, with a conspicuous link from the air carrier's homepage to the fee disclosure. For purposes of this section, the term "optional services" is defined as any service the airline provides beyond the provision of passenger air transportation. Such fees include, but are not limited to, charges for checked or carry-on baggage, advance seat selection, in-flight beverages, snacks and meals, and seat upgrades.

(d) The Department considers the failure to give the appropriate notice described in paragraphs (a), (b), and (c) of this section to be an unfair and deceptive practice within the meaning of 49 U.S.C. 41712.

22. A new § 399.87 is added to read as follows:

**§ 399.87  Prohibition on post-purchase price increase.**

It is an unfair and deceptive practice within the meaning of 49 U.S.C. 41712 for any seller of scheduled air transportation, or of a tour or tour component that includes scheduled air transportation to increase the price of that air transportation to a consumer, including but not limited to increase in the price of the seat, increase in the price for the carriage of passenger baggage, or increase in an applicable fuel surcharge, after the air transportation has been purchased by the consumer.

[FR Doc. 2010–13572 Filed 6–7–10; 8:45 am]

**BILLING CODE 4910–9X–P**

---

# DEPARTMENT OF COMMERCE

## International Trade Administration

### 19 CFR Part 351

**[Docket No. 100602237–0237–01]**

### Import Administration IA ACCESS Pilot Program

**AGENCY:** Import Administration, International Trade Administration, Department of Commerce.

**ACTION:** Public notice and request for comments.

---

**SUMMARY:** The Department of Commerce (the Department) is creating a pilot program to test an electronic filing system in certain antidumping (AD) and countervailing duty (CVD) proceedings. In addition, the Department is requesting comments from parties on this pilot program.

**DATES:** *Effective Date:* The pilot program will be in effect from July 1, 2010, through September 30, 2010.

*Comments Due Date:* Comments on the Department's conduct of the pilot program for electronic filing should be submitted either electronically or manually no later than 30 days after the publication of this notice in the **Federal Register**.

**ADDRESSES:** Written comments may be submitted by any of the following methods:

• *Federal eRulemaking Portal: http:// www.Regulations.gov.* All comments must be submitted into Docket Number ITA–2010–XXXX. All comments should refer to RIN 0625–AA84.

• *Mail or Hand Delivery/Courier:* Please submit the original and two copies of comments to the Secretary of Commerce, Attn: Evangeline Keenan, Import Administration, APO/Dockets Unit, Room 1870, U.S. Department of

Commerce, Constitution Avenue and 14th Street, NW., Washington, DC 20230.

• *E-mail:* Comments may be submitted electronically via e-mail to *webmaster-support@ita.doc.gov.* Please reference "IA ACCESS Pilot Comments" in the subject line of the e-mail.

**FOR FURTHER INFORMATION CONTACT:** Evangeline Keenan, Acting APO/ Dockets Unit Director, Import Administration, APO/Dockets Unit, Room 1870, U.S. Department of Commerce, Constitution Avenue and 14th Street, NW., Washington, DC 20230; *telephone:* (202) 482–9157.

**SUPPLEMENTARY INFORMATION:**

## Background

The Department is undertaking a review of its regulations in AD and CVD proceedings governing the submission of information to the Department, currently 19 CFR part 351, subpart C, with a view to the adoption of rules and procedures that will implement an electronic filing system, which will be entitled Import Administration's Antidumping and Countervailing Duty Centralized Electronic Service System (IA ACCESS). The Department's current rules on the submission of information in AD and CVD proceedings, at 19 CFR 351.303(c)(1), require that parties submit six paper copies of each submission to the Department. In developing IA ACCESS, the Department seeks to expand the public's access to the Department's AD and CVD proceedings by making all publicly filed documents available on the internet and to facilitate the electronic submission of documents to the Department in AD and CVD proceedings by allowing interested parties to file documents electronically. The Department envisions that such a system will create efficiencies in both the process and costs associated with filing and maintaining documents pertaining to AD and CVD proceedings.

The pilot program will implement IA ACCESS on a small scale to allow the Department to evaluate and gain experience with operating an electronic filing system. Implementation of the full electronic filing system will be accomplished through a later rulemaking that will amend the Department's regulations; the Department also intends to provide more detailed procedures for IA ACCESS in a document separate from the regulations, which the Department intends to publish on its Web site prior to issuing regulations creating IA ACCESS. IA ACCESS will be implemented in three separate phases, or releases, with each phase

Exhibit 11

# Final Regulatory Analysis

# Consumer Rulemaking:
## Enhancing Airline Passenger Protections II

**Contract No.:**
**GS-10F-0269K**

**Order No.:**
**DTOS59-09-F-10089**

**Project No.:**
**1029-000**

Submitted To:

## Office of the Assistant General Counsel
**Aviation Enforcement and Proceedings**
**U.S. Department of Transportation**
**1200 New Jersey Avenue, SE**
**West Wing**
**Washington, DC  20590-0001**

Submitted By:

## Econometrica, Inc.
**4416 East-West Highway**
**Suite 215**
**Bethesda, Maryland  20814**

&

**HDR Decision Economics**
**Silver Spring, Maryland**

## April 8, 2011

ECONOMETRICA, INC.

# Table of Contents

Executive Summary ...................................................................................................... 1

Introduction ................................................................................................................... 3

1.     Discussion of Comments Received on the NPRM ............................................. 4

   1.1. General Comments .......................................................................................... 4
   1.2. Comments Relating to Specific Requirement Areas ...................................... 6

2.     An Overview of the Air Transportation Sector and Current Regulatory Structure 11

   2.1. U.S. and Foreign Air Carriers ....................................................................... 11
   2.2. Airports ......................................................................................................... 13
   2.3. Flights and Passengers .................................................................................. 14
   2.4. Regulatory Authorities .................................................................................. 15
   2.5. Travel Agencies and Tour Operators ............................................................ 16

3.     General Framework for Analysis of Benefits and Costs .................................. 17

   3.1. Type of Air Travel Issues Being Addressed ................................................. 17
   3.2. Availability of Alternatives to Carrier Services or Information ................... 18
   3.3. General Assumptions Used in Estimating Benefits and Costs ..................... 19

4.     Regulatory Evaluation of Specific Requirement Areas ................................... 20

   4.1. Additional Requirements for Tarmac Contingency Plans ............................ 21
   4.2. Tarmac Delay Reporting ............................................................................... 31
   4.3. Minimum Standards for Customer Service Plans (CSPs) ............................ 36
   4.4. Posting of Contracts of Carriage, Customer Service Plans, and Tarmac Contingency Plans on Foreign Carrier Websites ............................................... 41
   4.5. Requiring Foreign Carriers to Respond to Customer Complaints ............... 44
   4.6. Changes in Denied Boarding Compensation (DBC) Policy ......................... 48
   4.7. Required Disclosure of Full Fares in Advertising and Prohibition on Opt-Out Provisions in Ticket Sales ........................................................................... 54
   4.8. Expanded Disclosure of Baggage Fees and Other Optional Fees ................ 61
   4.9. Prohibition on Post-Purchase Fare Increases ............................................... 66
   4.10.    Prompt Passenger Notification of Flight Status Changes ........................ 69
   4.11.    Limitations on Venue Provisions in Contracts of Carriage ..................... 70

5.     Results and Discussion of the Benefit and Cost Analysis ............................... 71

   5.1. Overall Net Benefits of the Rule .................................................................. 71
   5.2. Net Benefits of Specific Sets of Requirements ............................................ 72
   5.3. Cost-per-Passenger Analysis ........................................................................ 76
   5.4. Conclusion .................................................................................................... 77

Appendix 1:  Notes on Estimation of Benefits and Data Sources Used.................................A-1

Appendix 2:  Estimates of Additional Benefits for Requirement Area 7...........................B-1

# List of Tables

Table ES1 - Present Value of Net Benefits for Final Rule, 2012-2021 ........................................ 2
Table 1 - Scheduled Passenger Service on U.S. Carriers, 2009 .................................................. 12
Table 2 - US Carriers by Size Class, 2009.................................................................................... 12
Table 3 - Number of Foreign Carriers ......................................................................................... 13
Table 4 - Passenger Enplanements by Size of Airport, 2009 ...................................................... 14
Table 5 - Scheduled Passenger Service: Departures and Passengers, 2009 ................................ 15
Table 6 - Travel Agencies and Tour Operators, 2007 ................................................................. 16
Table 7 - Estimated Number of Lengthy Tarmac Delays for Foreign Carriers, 2009 ................. 23
Table 8 - Number of Carrier-Airport Pairs with Tarmac Plan Coordination Requirement .......... 24
Table 9 - Benefits Estimates for Requirement Area 1 .................................................................. 26
Table 10 - Unit Costs for Requirement Area 1 ............................................................................. 30
Table 11 - Estimated Compliance Costs for Requirement Area 1 ................................................ 31
Table 12 - Number and Percent of Flights with Tarmac Times of 3 Hours or More ................... 32
Table 13 - Projected Numbers of Reportable 3-Hour Tarmac Delays, 2009................................ 33
Table 14 – Unit Compliance Costs for Requirement Area 2 ........................................................ 35
Table 15 - Estimated Compliance Costs for Requirement Area 2................................................. 36
Table 16 - Benefits Estimates for Requirement Area 3 ................................................................ 38
Table 17 - Unit Costs for Requirement Area 3 ............................................................................. 40
Table 18 - Estimated Compliance Costs for Requirement Area 3................................................. 40
Table 19 - Number of Foreign Carriers Required to Post.............................................................. 42
Table 20 - Unit Costs for Requirement Area 4 ............................................................................. 43
Table 21 - Estimated Compliance Costs for Requirement Area 4................................................. 43
Table 22 - Passenger Service Complaints Received by the Department, 2009 ............................ 44
Table 23 - Number of Consumer Complaints Involving Foreign Carriers, 2009 ........................ 45
Table 24 – Benefits Estimates for Requirement Area 5 ................................................................ 46
Table 25 – Unit Costs for Requirement Area 5 ............................................................................. 47
Table 26 – Estimated Compliance Costs for Requirement Area 5 ................................................ 48
Table 27 – Passengers Denied Boarding on Reporting Carriers, 2009......................................... 48
Table 28 - Unit Costs for Requirement Area 6 ............................................................................. 53
Table 29 - Estimated Compliance Costs for Requirement Area 6................................................. 54
Table 30 - Benefits Estimates for Requirement Area 7 ................................................................ 58
Table 31 - Unit Costs for Requirement Area 7 ............................................................................. 60
Table 32 - Estimated Compliance Costs for Requirement Area 7................................................. 61
Table 33 - Unit Costs for Requirement Area 8 ............................................................................. 64
Table 34 - Estimated Compliance Costs for Requirement Area 8................................................. 65
Table 35 - Benefits Estimates for Requirement Area 9 ................................................................ 67
Table 36 - Unit Costs for Requirement Area 9 ............................................................................. 68
Table 37 - Estimated Compliance Costs for Requirement Area 9................................................. 68
Table 38 - Present Value of Net Benefits for Proposed Requirements, 2012-2021 ..................... 72
Table 39 - Comparison of Requirement Area Benefits and Costs, 2012-2021 ............................ 73

## Executive Summary

The Department of Transportation (DOT) is issuing a Final Rule to provide airline passengers with additional protections in the areas of airline service provision and consumer information. Some of the provisions in this Rule build on regulatory requirements adopted as part of the Final Rule on Enhancing Airline Passenger Protections (EAPP1) that was published in the Federal Register on December 30, 2009. Econometrica and its subcontractor, HDR Decision Economics, were tasked with developing a regulatory evaluation for each of the requirements included in this Final Rule (referred to as "EAPP2"). This regulatory evaluation estimates the economic impact, in terms of benefits and costs, to passengers, U.S. and foreign air carriers, and other entities regulated under this proceeding, as required by Executive Order (EO) 12866.[1]

In this analysis, we discuss and, where possible, provide estimates of the benefits and costs for specific regulatory requirements in 11 areas, including extension of the EAPP1 requirements for tarmac contingency plans, customer services plans, and customer complaint responses to cover foreign carriers; expanded reporting of tarmac delays; changes in denied boarding compensation (DBC) requirements; elimination of the break-out of government taxes and fees from advertised fares for air transportation; and disclosure of baggage and other optional fees.

Most of the new requirements cover carriers offering passenger service to domestic and international destinations. The U.S. air carriers that account for nearly all domestic passenger trips and about 60 percent of international passenger trips from or to U.S. airports are already required to comply with several of these requirements. As many as 130 foreign carriers will also have to comply with the requirements for tarmac contingency plans, customer service plans (CSPs), and customer complaint responses adopted for U.S. carriers in the EAPP1 Final Rule. In addition to U.S. and foreign carriers, the requirements that full fares be displayed in travel advertising and solicitations and that baggage and optional fees be clearly disclosed will also apply to as many as 15,000 travel agents and tour operators.

All quantified benefits and costs estimated for individual requirements were translated into current values for each year in the 10-year period beginning with calendar year 2012.[2] In accordance with Office of Management and Budget (OMB) guidelines, a discount rate of 7 percent is used in the primary analysis and is supplemented with overall estimates using a 3 percent discount rate as well.

---

[1] An analysis of the impact of the new requirements on small carriers, travel agents, and tour operators is provided in the accompanying Regulatory Flexibility Analysis.

[2] In this analysis, the affected parties are assumed to be compliant with the proposed regulations by January 1, 2012, with the exception of the full-fare advertising provision in Requirement Area 7, which is assumed to take effect 60 days later.

*Table ES1 - Present Value of Net Benefits for the Rule, 2012-2021*

|  |  | PV (millions) |
|---|---|---|
| Monetized Benefits | 10 Years, 7% discounting | $45.0 |
|  | 10 Years, 3% discounting | $53.5 |
| Monetized Costs | 10 Years, 7% discounting | $30.7 |
|  | 10 Years, 3% discounting | $33.2 |
| Monetized Net Benefits | 10 Years, 7% discounting | $14.3 |
|  | 10 Years, 3% discounting | $20.3 |

The expected present value (PV) of passenger benefits from the Rule over a 10-year period using a 7 percent discount rate is estimated at $45.0 million. The expected present value of costs incurred by carriers and other sellers of air transportation to comply with the Rule is $30.7 million over 10 years, discounted at 7 percent. The PV of net benefits for a 10-year period at a 7 percent discount rate is thus $14.3 million. Using a 3 percent discount rate, the PV of net benefits for 2012 through 2021 is estimated at $20.3 million.

A comparison of the benefit and cost estimates for each of the 11 sets of new requirements is provided in Section 5.2, along with information on additional benefits and costs for which quantitative estimates could not be developed.

Substantial portions of the estimated benefits, costs, and net benefits from the Rule are attributable to the full-fare advertising provisions of Requirement Area 7. The estimated benefits for these requirements total $29.0 million over the 10-year period from 2012 through 2021 using a discount rate of 7 percent. Benefits estimated for the full-fare advertising provisions represent 64 percent of the total benefits estimated for all 11 sets of new requirements during the period from 2012 through 2021.

The expected costs of complying with the full-fare advertising provisions of Requirement Area 7 are estimated at $6.8 million. All of these costs will be incurred in 2012. Costs estimated for the full-fare advertising requirements represent 22 percent of the total costs estimated for all 11 sets of new requirements during the period from 2012 through 2021.

None of the present values of estimated benefits or estimated costs estimated for any of the other requirements from 2012 through 2021 (discounted at 7 percent) exceed $10 million.

This regulatory analysis indicates that adoption of the new requirements will result in projected benefits to the public that outweigh the estimated costs of the Rule.

# Introduction

The Department of Transportation (DOT) is issuing a Final Rule to provide airline passengers with additional protections in the areas of airline service provision and consumer information. Some of the provisions in this Rule build on regulatory requirements adopted as part of the Final Rule on Enhancing Airline Passenger Protections (EAPP1) that became effective on April 29, 2010.[3]

Econometrica and its subcontractor, HDR Decision Economics, were tasked with developing a regulatory evaluation for each of the requirements included in the Final Rule. This regulatory evaluation estimates the economic impact, in terms of benefits and costs, to passengers, U.S. and foreign air carriers, and other entities regulated under this proceeding, as required by Executive Order (EO) 12866.

The regulatory impact analysis (RIA) is conducted to determine the economic impact, if any, of the Rule and to assess whether, on balance, the Rule is in the public interest. This analysis provides a baseline description of passenger protections, identifies the need for the Rule, and defines the analytic scope and parameters. It discusses the Rule's anticipated effects and presents a summary of the expected benefits and costs.

The May 2010 preliminary RIA presented estimates for the benefits and costs of specific proposals included in the Notice of Proposed Rule Making (NPRM). The final RIA updates these estimates to reflect the provisions incorporated into the Final Rule, which will add new regulatory requirements in the following areas:

| Req. Area | Requirement Description |
|---|---|
| 1 | Expansion of tarmac delay contingency plan requirements and extension of EAPP1 Final Rule requirements to cover foreign carriers |
| 2 | Expanded tarmac delay reporting and application to foreign carriers |
| 3 | Establishment of minimum standards for customer service plans (CSPs) and extension of EAPP1 Final Rule requirements to cover foreign carriers |
| 4 | Extension of requirements to post contracts of carriage, tarmac delay contingency plans and CSPs on websites to cover foreign carriers |
| 5 | Extension of EAPP1 Final Rule requirements for carriers to respond to consumer complaints to cover foreign carriers |
| 6 | Changes in denied boarding compensation (DBC) policy |
| 7 | Full-fare advertising and prohibition on opt-out provisions |
| 8 | Expanded requirements for disclosure of baggage and other optional fees |
| 9 | Prohibition on post-purchase price increases |
| 10 | Prompt passenger notification of flight status changes |
| 11 | Limitations on venue provisions in contracts of carriage. |

This document provides an economic evaluation of the Rule in each of these 11 requirement areas. It also summarizes the comments received in response to the NPRM that relate to the

---

[3] "Final Rule on Enhancing Airline Passenger Protections," DOT-OST-007-0022, December 30, 2009. In this Regulatory Impact Analysis, the Final Rule being evaluated is sometimes referred to as "EAPP2" for clarity.

preliminary RIA and, where possible, indicates how these comments were taken into account in the final RIA.

For each area addressed in the Final Rule, we present the economic rationale for adopting additional requirements. We provide information on current regulatory requirements, Department enforcement policy, and industry practices; specify the nature of the benefits and costs associated with the Rule; and indicate the sources of data used to quantify these costs and benefits, where possible. Benefit and cost estimates are presented for individual requirements, and the aggregate benefits and costs of the requirements are aggregated to determine the present value of net benefits over a 10-year time period. The accompanying Regulatory Flexibility Analysis assesses the extent to which the costs associated with these requirements could potentially affect small carriers, travel agents, and tour operators.

The scope of this analysis is broad, yet it involves estimating very detailed changes that can occur in a wide variety of situations. It was necessary to make many estimates and assumptions in cases where specific data were not available or to make the estimation exercise manageable. The Department solicited comments to improve the analysis to the greatest extent possible. This evaluation summarizes comments submitted to the regulatory docket that were related to the Preliminary Regulatory Analysis and provides a response for each of those comments here.

## 1. Discussion of Comments Received on the NPRM

## 1.1. General Comments

### *Ratio of benefits to costs by provision and unquantifiable benefits*
The Air Transport Association (ATA) and the International Air Transport Association (IATA), among others, noted that benefits were not estimated for some Rule provisions and that the monetized benefits were smaller than the monetized costs for the Rule provisions in some requirement areas. The ATA and IATA argued that the Department should not adopt the proposed requirements in any of the 11 requirement areas in the NPRM for which the monetized benefits in the preliminary RIA did not exceed estimated costs.

Adequate data do not exist to support the development of quantitative estimates for all of the benefits (and costs) that will result from the provisions in each of the 11 requirement areas included in the Final Rule. In the NPRM, the Department solicited information in several areas from knowledgeable parties. To the extent that such information was not available or forthcoming, some benefits and costs could not be quantified in the final evaluation. They are, nonetheless, accurately described as unquantifiable components of the Rule's impact.

Moreover, while we were not able to make quantitative estimates of the benefits for certain Rule provisions, the estimated costs to carriers of complying with these requirements are projected to be extremely small in relation to carrier revenues from passenger service. To confirm that this is the case, in Section 5.3 we present a cost-per-passenger analysis for several Requirement Areas for which quantitative estimates of benefits could not be developed. The cost-per-passenger analysis shows that the cost of complying with these requirements will be extremely low.

*IT costs and fees*

IATA contends that the Regulatory Impact Analysis did not accurately reflect the IT costs associated with meeting all of the requirements included in the NPRM. Among the IT costs that IATA believes were not properly taken into account were the following:

- incremental costs for Web updates that occur more frequently than once a year
- IT costs incurred to update passengers on flight status changes
- submission of monthly data related to tarmac delays
- changes to reservations systems necessary to allow holds without payment for 24 hours
- disclosure of past delays and cancellations
- changes to full-fare advertising requirements for both airlines and ticket agents
- website maintenance and updating to display prominently changes in baggage and other optional fees
- inclusion of baggage allowance and fees on e-tickets
- mandated provision of flight status updates.

Some of these costs were in fact included in the preliminary RIA. Others have been estimated and included in the final evaluation, specifically:

- The incremental costs for Web updates referred to in the IATA comments relate to posting baggage and other optional fee disclosures. As discussed in Section 4.8.2, current DOT enforcement policy already requires carriers to disclose baggage fees and to post an alert on the home page to alert consumers about increases in these fees. There are no additional costs associated with permitting this alert to remain on the home page for 3 months, rather than for some shorter period of time. However, the Final Rule does add other new requirements for carriers and ticket agents concerning the disclosure of baggage and optional fees, particularly with respect to code-share and interline flights. Estimates of these compliance costs are presented in Section 4.8.4 below.

- It is our understanding that most carriers currently have systems in place that are used to update passengers on delayed or cancelled flights—the Rule requirements simply ensure that this information is provided promptly. Consequently, we do not anticipate that there will be significant costs associated with this requirement.

- System set-up and programming costs for submission of tarmac delay reports were included in Section 6.2 of the preliminary RIA. Updated estimates of these costs are presented in Section 4.2.4 of the final RIA.

- Costs associated with changes to reservations systems necessary to allow holds without payment for 24 hours were not included in the preliminary RIA because the Department does have adequate information to estimate these costs. A review of carrier and third-party websites indicated that most reporting U.S. carriers currently allow travelers either to hold a reservation for 24 hours without payment or to cancel ticket purchases within 24 hours without penalty. Both of these options are permissible under the Final Rule requirements.

- The preliminary RIA did not include any costs associated with disclosure of past delays and cancellations because the NPRM did not contain any proposed requirements in this area beyond those already included in the EAPP1 Final Rule.

- Costs associated with changes in the full-fare advertising requirements were included in Section 6.7 of the preliminary RIA. However, IT costs related to display of full-fare advertising on websites were relatively small, because our review of marketing carrier and large online travel agency (OTA) sites indicated that this information was already calculated and, in many cases, displayed on the booking selection pages. For example, the programming required for the four largest OTAs will consist solely of changes to the color, size, and placement of the full-fare price for each option offered.[4] These costs are also included in Section 4.7.4 of the final RIA.

- Section 6.8 of the preliminary RIA included estimates of the costs for website formatting and maintenance for prominent display of changes to baggage and other optional fees. These costs are also included in Section 4.8.4 of the final RIA.

- Section 6.8 of the preliminary RIA also included estimates of the costs for inclusion of baggage allowance and fees on e-tickets. These costs are included in Section 4.8.4 of the final RIA.

- It is our understanding that most carriers currently provide flight status updates. For example, our February 2010 review indicated it was possible to sign up to receive text message updates on the websites of 9 of the 11 reporting carriers that sold tickets directly to the public at that time.

## 1.2. Comments Relating to Specific Requirement Areas

### 1.2.1.  Requirement Area 1: Tarmac Delays and Contingency Plans

*Additional flight cancellations*

Industry analysts Joshua Marks and Daryl Jenkins have argued that the cancellation rate for flights which would otherwise have had lengthy tarmac delays in the absence of the EAPP1 Final Rule has actually been much higher than estimated in the preliminary RIA.[5]

It is important to keep in mind that some flights which previously experienced tarmac delays of more than 3 hours were cancelled even in absence of this regulation. In addition, an analysis we recently conducted for the Department indicates that while the cancellation rate for domestic flights experiencing tarmac delays of 2½ hours or more (the time limit at which a decision to return to the gate must typically be made) has increased since the EAPP1 Rule requirements took effect, the number of cancellations among this cohort of flights has actually decreased relative to

---

[4] At least one of the four largest OTAs displayed full fares including all taxes and fees on the flight selection page for international flights at the time this evaluation was finalized.

[5] See Marks and Jenkins' July 20, 2010, study, "Impact of Three-Hour Tarmac Delay Rules and Fines on Passenger Travel Time and Welfare," and their November 18, 2010, follow-up study, "Summer 2010 Cancellations and the Five-Month Impact of the Three-Hour Tarmac Delay Rule," both of which are available at www.tarmaclimits.com.

the number for the same time period in previous years. Consequently, it is possible that costs that would have been incurred from a higher proportion of flights experiencing tarmac delays of 2½ hours or more being cancelled have been more than offset by the avoided cancellations attributable to the reduced overall numbers of domestic flights that are now experiencing tarmac delays of this length. The impact on cancellations of international flights operated by foreign carriers (for which tarmac delays of 4 hours trigger the contingency plan) is also projected to be minimal.

### Carrier costs for gate returns

IATA states that the preliminary RIA cost estimate for incorporating a time limit for lengthy tarmac delays did not include costs of taxi time back to gate per flight (including passenger, crew, and aircraft), the cost of using ATC (air traffic control) to taxi back to gate, per-flight cost of changing crew or having a spare crew waiting if necessary, and the cost of aircraft station expense (including ground staff and provision of external power unit for aircraft if necessary) per flight. Without including estimates of these costs, IATA contends that the preliminary RIA underestimates the true cost to the carriers of the regulation.

The preliminary RIA included estimates of the fuel costs to planes to taxi back to gate, the cost of providing food and water after 2 hours of delay, and passenger deplaning fees. These costs were relatively small because the projected number of affected flights operated by foreign carriers was estimated to be relatively low, but they were included. The Department does not have access to information on the other cost elements described in the IATA comments. In the absence of adequate information, these costs are listed as unquantifiable costs in the final RIA.

### Costs of cancelled flights

IATA believes that the estimate of $11,600 for the incremental cost of a cancelled flight reported in the preliminary RIA is too low.

While this estimate was presented in the preliminary RIA section summarizing the assumptions used in the benefits and costs analysis, it is actually the cost figure for 1998 cancellations reported in the study used as the source for this estimate.[6] The unit costs estimates used in the preliminary RIA analysis of the tarmac contingency plan requirements included an updated estimate of the cost for a cancellation of $14,818.

The Final Rule requires covered foreign carriers to set a tarmac delay limit of no more than 4 hours.[7] As discussed above, the Department has analyzed data on domestic flights experiencing tarmac delays of 2½ hours or more since the EAPP1 Rule requirements became effective and determined that the number of these flights which are ultimately cancelled has actually decreased. Consequently, no costs associated with additional cancellations are projected to result from this requirement being extended to foreign carriers in the final RIA.

---

[6] Zalman Shavell, "The Effects of Schedule Disruptions on the Economics of Airline Operations," The MITRE Corporation, April 14, 2000.

[7] The tarmac contingency plans posted by U.S. carriers subject to these requirements under the EAPP1 Final Rule typically include a self-selected 4-hour limit on tarmac delays for international flights departing from or arriving at U.S. airports.

***Cost of increased refunds and cancelled passenger trips due to returns to gate during long delays***

The ATA expects that there will be a significant increase in the number of passengers requesting refunds due to "significant delays" and contends that these costs should be included in the RIA.

It is not clear that an increased number of passengers seeking refunds will cause carriers as a whole to incur net costs, because most passengers will seek alternative air transportation after cancelling trips on flights with lengthy delays. In any event, the benefits to passengers who would request refunds to avoid being held on a flight experiencing a lengthy tarmac delay are likely to exceed the administrative costs of providing the refund and rebooking on another flight.

***Costs to airports for contingency plans***

Comments submitted by the Dallas-Fort Worth Airport contended that if tarmac delay contingency plans are required of U.S. airports, the costs airports may incur to implement them should be considered.

The Final Rule requires that covered U.S. and foreign carriers coordinate their tarmac contingency plans with all large hub, medium hub, small hub, and non-hub airports, a significant expansion from the EAPP1 requirement that covered U.S. carriers coordinate their plans with large and medium hubs. The numbers of carriers operating flights to and from each size-class of airport and the numbers of additional carrier contingency plans that authorities at each size-class of airports will need to receive, review, and discuss with carriers are developed and included in the Final RIA. These data are used to estimate costs to carriers for coordinating plans with airport authorities. While we were not able to develop quantitative estimates of the costs to airport authorities associated with this requirement, they are noted as an unquantifiable cost element of the Rule. (See sections 4.1.2 and 4.1.4 below).

## 1.2.2.   Requirement Area 3: Customer Service Plans

***Cost of developing and implementing customer service plans***

The ATA contends that the preliminary RIA significantly underestimated the cost to extend customer service plans to foreign carriers and regional carriers. Using the preliminary estimate of $91,000 per carrier to implement such plans, the ATA calculates that the costs estimated in the preliminary RIA were sufficient for only 36 carriers to implement such plans, but that the preliminary RIA estimates that 86 foreign carriers would need to do so.

The preliminary RIA presented separate CSP compliance cost estimates for large and small carriers. The ATA comment assumes that all foreign carriers will incur the higher costs estimated for large carriers. In addition, U.S. regional carriers were already required to develop and self-audit CSP compliance as part of the EAPP1 Final Rule requirements.

The final RIA incorporates updated estimates of these CSP costs (See Section 4.3.4 below).

### 1.2.3.  Requirement Area 4: Posting Contracts of Carriage, Tarmac Contingency Plans, and Customer Service Plans on Carrier Websites

*Litigation costs*

Many comments expressed the view that litigation costs stemming from proposed requirements to include contingency plans and customer service plans in carriers' contracts of carriage should have been taken into account in the preliminary RIA. The ATA comments referenced estimates submitted in the EAPP1 rule-making, which concluded that each of its members would bear an additional $500,000 in additional annual litigation costs.

The proposed requirements for tarmac delay plans and customer service plans to be included in carrier contracts of carriage have not been included in the Final Rule, so no estimates of costs related to these provisions need be included.

### 1.2.4.  Requirement Area 7: Full-Fare Advertising

*Consumer surplus methodology for benefits estimation*

The ATA comments include several specific criticisms of the estimated benefits from the proposed full-fare advertising requirements that were presented in the preliminary RIA. The principal focus of these comments is that the use of a consumer surplus analysis to estimate the reduction of "dead weight loss" from consumers purchasing tickets without taking into account all of the included taxes and fees is somehow incorrect or inappropriate to use as a benefits estimation methodology.

It is important to note that this analysis was based on peer-reviewed research which showed that providing consumers with more complete information about the final prices of products being purchases did in fact reduced the quantity purchased. This is, in one sense, an unsurprising result. An axiom of mainstream economic theory is that consumers make optimal purchasing choices based on the information available at the time buying decisions are made. It must therefore be the case that providing consumers with more accurate information about the final purchase price earlier in the buying process improves their welfare. In the context of air travel, ticket purchasers on most travel websites will be aware to varying degrees that additional taxes and fees will be included in the final purchase price. However, it is also clear that most consumers will not know the exact amount of these taxes and fees until they are provided with that information by the ticket agent (carrier, travel agency, etc.). A more extended exposition of the case for the existence of this benefit is provided in an appendix to the final RIA.

However, to address the concerns raised about various calculation issues by the ATA and in other comments, we have not included estimates of the increase in consumer surplus from the full-fare advertising requirement in net benefits calculated for the Rule. The final RIA does include, as an unquantifiable benefit of the full-fare advertising requirement, the value to consumers from avoiding purchases at prices higher than they would be willing to pay if they were disclosed initially.

*Search time savings*

The ATA also provided comments about the procedures and data used to calculate the other category of benefits estimated in the preliminary RIA for the full-fare advertising requirement—

those accruing from the time saved by ticket purchasers who compare full-fare prices for the same itinerary across multiple websites. The ATA criticisms focused on several of the intermediate data elements used to compute the number of ticket purchasers who would benefit, as well as the estimate of average time saved by comparing fares from multiple sites.

The ATA comments specifically suggest that the ticket purchases are properly estimated using data from the Bureau of Transportation Statistics (BTS) Origin and Destination (O&D) survey. The final RIA estimates the number of ticket purchases using the O&D survey data. The ATA comments also provide newly available information on the average party size for air trips, which was used in place of the estimate in the preliminary RIA.

ATA also disputed the estimated percentage of passengers who book a trip online (72 percent, according to the PhoCusWright study previously cited) that was used in the preliminary RIA and recommended that estimates be based on the 52 percent share found in a 2008 ATA study, which reportedly included business as well as leisure travel. The final RIA uses the 2008 ATA estimate as the share of air travelers booking online in the base year (2012) of the 10-year time period over which benefits are estimated. However, most observers believe that the share of tickets purchased online will continue to grow during the next 10 years. Accordingly, the estimates in the final RIA are based on the percentage of tickets booked online growing by two percentage points annually from 52 percent in 2012 to 70 percent in 2021.

The ATA comments also question the assumption of an average time saving of 5 minutes for purchasers comparing full fares across multiple websites that was used in the preliminary RIA. In response to this concern, we have re-estimated the amount of time saved to 3 minutes, based on a series of time trials performed at HDR offices. This revised estimate is lower because it measures only the time spent searching on additional websites to find full-fare prices but not the time required to complete the purchasing process (entering names, credit cards, seat preference) on additional websites. The revised estimate is more appropriate because a customer will only go through the purchasing process once, even if they check multiple websites.

### *Impact of full-fare advertising in print and other media on future purchases*
The ATA comments noted that the research on consumer behavior and the analysis of online air ticket purchases presented in the preliminary RIA did not assess the possible impact of the full-fare advertising requirement on the effectiveness of travel advertising, but rather focused solely on the impact on online ticket purchasers.

Both the preliminary and final RIA present monetized estimates only for the benefits that would be realized by online purchasers of air travel. The Department does not have sufficient information available to assess the possible impact of the full-fare advertising requirement on the effectiveness of travel advertising generally.

### *Costs of revising websites and print media advertising*
Finally, IATA contends that costs for revising websites and print media advertising were not included in the preliminary RIA. Estimates of these costs were provided in Section 6.7 of the preliminary RIA and in Section 4.7.4 of the final RIA.

# 2. An Overview of the Air Transportation Sector and Current Regulatory Structure

This section provides an overview of important features of the passenger air travel sector: U.S. and foreign carriers, airports, flights and passengers, regulatory authorities, and travel agencies and tour operators.

## 2.1. U.S. and Foreign Air Carriers

Nearly 300 U.S. and foreign air carriers provide some combination of scheduled and nonscheduled passenger and all-cargo air service to U.S. and international destinations. All U.S. air carriers operating any aircraft of 60 seats or more must have a certificate under 49 USC 41102 (or an exemption issued by DOT from that section) to provide scheduled passenger service. Some carriers operating fleets consisting only of smaller aircraft may also be "certificated carriers." A relatively limited number of carriers operating small aircraft are authorized as "commuter air carriers" under the definition provided in 14 CFR 298.3(b). Foreign air carriers must hold permits issued under 49 USC 41302 (or an exemption issued by DOT from that section) to operate flights that arrive or depart at U.S. airports.

The applicability of some current regulatory requirements varies not only between U.S. and foreign carriers, but also among different categories of U.S. carriers, based on the carrier's share of total industry revenues from scheduled passenger service on domestic routes or the seating capacity of the aircraft the carrier operates.

### *Reporting carriers*

 "Reporting carriers"—those that account for at least 1 percent of domestic scheduled passenger service revenues—must report information to BTS monthly on lengthy tarmac delays, on-time performance (OTP), payment of DBC, and other aspects of carrier performance. In 2012, the first full year in which the Rule will be effective, the roster of reporting carriers is expected to include six mainline carriers (Alaska, American, Delta, Hawaiian, United, and US Airways), three low-cost model major airlines (Frontier, JetBlue, and Southwest), and five regional carriers (American Eagle, Atlantic Southeast, ExpressJet, Mesa, and SkyWest).[8]

---

[8] There were 18 reporting carriers at the end of 2009. Since then, Air Tran has been purchased by Southwest; Continental and United have merged; Comair no longer must report; and Pinnacle has elected to discontinue reporting on a voluntary basis. It is also possible that ExpressJet will discontinue reporting voluntarily if SkyWest (which acquired the carrier in 2010) elects to consolidate reporting by the beginning of 2012.

*Table 1 - Scheduled Passenger Service on U.S. Carriers, 2009*

|  | Number of Carriers | Departures | Passengers | Passengers/ Departure |
|---|---|---|---|---|
| Reporting Carriers | 18 | 7,008,602 | 628,155,438 | 90 |
| Other U.S Carriers | 79 | 2,517,894 | 86,952,529 | 35 |
| Total | 97 | 9,526,496 | 715,107,967 | 75 |
| Reporting % of Total | 18.6% | 73.6% | 87.9% | -- |

Source: BTS T-100 Segment database, 2009

### Aircraft size-based distinctions among U.S. carriers

Many regulatory requirements apply only to carriers that operate at least one aircraft originally designed to hold 30 passengers or more. Carriers that provide passenger service using at least one aircraft originally designed to hold 30 passengers or more, but none that have more than 60 seats, are considered small entities for purposes of assessing impact under the relevant requirements of the Regulatory Flexibility Act. There are also a significant number of carriers that operate only aircraft with fewer than 30 seats. The regulatory requirements for these carriers are less extensive than those for larger carriers. Finally, there are several carriers that do not offer scheduled service but operate public charter flights. The majority of these carriers provide charter service using at least one aircraft with more than 60 seats.

*Table 2 - US Carriers by Size Class, 2009*

| Group | Seat Criterion | Total in 2009 T-100* | Charter-only** | Scheduled Service | Contract Carriers | Other |
|---|---|---|---|---|---|---|
| Large | > 60 | 49 | 16 | 33 | 15 | 18 |
| Small | 30 - 60 | 12 | 0 | 12 | 6 | 6 |
| Very Small | < 30 | 38 | 10 | 28 | 1 | 27 |
| Total | | 99 | 26 | 73 | 22 | 51 |

Note: 17 large carriers and 1 small carrier are reporting carriers.

*Excludes carriers that were no longer operating independently by end of 2010.

**Six charters offered some scheduled service in 2009; all are very small Alaska or sightseeing tour carriers.

The U.S. domestic airline industry continues to undergo significant consolidation. Of the 117 U.S. carriers operating at the beginning of 2009, 20 were no longer providing service 2 years later. Fourteen of the remaining carriers are wholly-owned subsidiaries that do not independently market air transportation services but are treated as separate entities for some reporting and regulatory compliance purposes.

### Mainline and regional airlines

Several U.S. carriers, including 5 of the 14 carriers expected to be reporting carriers by the beginning of 2012, operate flights primarily or exclusively on a contract basis, providing service primarily for the largest mainline network carriers. Most of these carriers do not sell scheduled air transportation services directly to the general public; the flights they operate are listed on the contracting carriers' schedules under code-share agreements. A few small regional carriers (e.g., Cape Air and Great Lakes) operate both contract and independently-marketed flights.

Regional carriers—both contract carriers and those that market flights independently—provide service to a much larger network of communities than do the mainline and low-cost national carriers. The Regional Airlines Association (RAA) estimates that its 68 member carriers provide the only scheduled service available at 263 of the 428 U.S. airports in the 48 contiguous States and at 185 of the 207 airports in Alaska, Hawaii, and Puerto Rico.[9]

Regional carriers are typically subject to the same reporting and regulatory requirements as other airlines in the same size classes. In some instances, however, contract carriers must comply with their mainline partners' commitments and compliance requirements—including relevant provisions in the Final Rule dealing with tarmac delay plans and customer service plans.

### Foreign carriers

In contrast, foreign carriers operating flights to and from the United States are currently subject to a single set of regulatory requirements. Nearly all of them will be subject to the EAPP1 requirements for domestic carriers that are being extended to cover foreign carriers in the EAPP2 Final Rule. There are 130 foreign carriers that operate scheduled or charter service to the United States.[10]

**Table 3 - Number of Foreign Carriers**

| Group | Total in 2009 T-100* | Charter-only* | Scheduled Service | Contract Carriers | Other |
|-------|---------------------|---------------|-------------------|-------------------|-------|
| Alliance | 36 | 0 | 36 | 1 | 35 |
| EU | 47 | 21 | 26 | 2 | 24 |
| Canada | 10 | 2 | 8 | 2 | 6 |
| **Total** | **130** | **29** | **101** | **12** | **89** |

*No charter service carrier operated more than three scheduled service flights in 2009.

## 2.2. Airports

The Federal Aviation Administration (FAA) groups airports into a set of size-based categories based on the number of passengers boarded ("enplanements") annually. There were 565 U.S. airports with at least 2,500 passenger enplanements in 2009. More than two-thirds of domestic and international passengers departed from 29 major metropolitan hubs, and another one-fifth departed from 37 medium hub airports. On the other end of the size spectrum, there were 180 airports with between 2,500 and 10,000 passenger enplanements in 2009. More than half of these (91) were located in Alaska.

---

[9] Regional Airline Association, *2010 Annual Report.*

[10] Four foreign carriers operate passenger service to and from the United States exclusively with aircraft having fewer than 30 seats. These carriers would not have to comply with the requirements that apply only to U.S. and foreign carriers which provide passenger service on at least one aircraft that has 30 or more seats.

*Table 4 - Passenger Enplanements by Size of Airport, 2009*

| Category | Minimum %/# of Passengers | # of Airports | Passengers (millions) | % of Total | Passengers per Airport |
|---|---|---|---|---|---|
| Large Hub | >1% of total | 29 | 491.7 | 69.3% | 17.0 million |
| Medium Hub | >0.25% of total | 37 | 138.0 | 19.4% | 3.7 million |
| Small Hub | >0.05% of total | 69 | 56.7 | 8.0% | 821,000 |
| Non-Hub | >10,000/year | 250 | 22.9 | 3.2% | 91,000 |
| Other Commercial | >2,500/year | 180 | 0.9 | 0.1% | 5,000 |
| **Total** | | **565** | **710.1** | **100.0%** | **1.3 million** |

Source: BTS T-100 Segment database, 2009.

International flights depart from every large and medium hub, most small hubs, and about one-third of non-hub airports. However, only 5 of the 180 airports with between 2,500 and 10,000 passenger departures in 2009 offered scheduled international service.

## 2.3. Flights and Passengers

Airline passengers travel to both domestic and international destinations using both scheduled and nonscheduled (charter) service provided by U.S. and foreign carriers. Carrier-specific data on the annual numbers of domestic and international departures and passengers boarded for each type of flight are available from the BTS T-100 segment database.

Most passenger travel is on scheduled service flights, and seven out of every eight scheduled flights are to destinations within the United States. Virtually all domestic flights are on U.S. carriers. Foreign carriers may transport passengers between two U.S. airports only on segments of flights that originate from or continue on to international destinations. U.S. carriers also account for a significant majority of international departures, although the share of passengers on international flights is divided more evenly between U.S. and foreign carriers because the average number of passengers per departure is larger on flights operated by foreign carriers.

**Table 5 - Scheduled Passenger Service: Departures and Passengers, 2009**

|  | Domestic | International | Combined |
|---|---|---|---|
| **Departures** | | | |
| U.S. Carriers | 8,751,178 | 775,885 | 9,527,063 |
| Foreign Carriers | 2,389 | 483,944 | 486,333 |
| **Total** | **8,753,567** | **1,259,829** | **10,013,396** |
| **Passengers** | | | |
| U.S. Carriers | 631,955,369 | 83,152,598 | 715,107,967 |
| Foreign Carriers | 503,133 | 66,349,930 | 66,853,063 |
| **Total** | **632,458,502** | **149,502,528** | **781,961,030** |
| **Passengers/Departure** | | | |
| U.S. Carriers | 72.2 | 107.2 | 75.1 |
| Foreign Carriers | 210.6 | 137.1 | 137.5 |
| **Total** | **72.3** | **118.7** | **78.1** |

Source: BTS *T-100 Segment database*, 2009

The number of passengers flown typically rises each year, but enplanements fell in 2008 and again in 2009. The FAA Aerospace Forecast for 2010 through 2030 projected increases of 0.4 percent and 0.9 percent, respectively, from 2009 to 2010 in the numbers of passengers flying on domestic and international flights. For 2011 and future years, the Forecast projects that annual passenger enplanements will increase by an average of 2.8 percent annually on domestic routes and 4.2 percent on international routes.[11]

## 2.4. Regulatory Authorities

The OST conducts economic licensing of U.S. carriers; establishes regulatory requirements relating to advertising and provision of scheduled and nonscheduled passenger service; issues guidelines and letters to codify and clarify Department enforcement policy; and enters into consent orders to enforce regulations and impose penalties for noncompliance. All of the requirements evaluated in this regulatory analysis represent modifications of, or clarifications to, existing OST rules and enforcement policy.

During the 3-year period from 2008 through 2010, the OST entered into 75 enforcement orders with U.S. and foreign carriers, travel agencies, and tour operators. More than one-third of these consent orders (26) involved noncompliance with established rules and policy relating to the advertising of air fares.

Regulatory authority for matters involving airports is vested in the FAA. Some of the requirements (especially those relating to tarmac contingency plans) will have a limited impact on airport operations, but the costs that will be incurred by airport authorities could not be quantified.

---

[11] Federal Aviation Administration, *FAA Aerospace Forecast: Fiscal Years 2010-2030.*

Air travel security issues are under the jurisdiction of the Transportation Security Administration (TSA).

Arriving passengers on international flights need to be cleared for entry by Customs and Border Patrol (CBP) personnel. The Rule requires covered carriers to coordinate their tarmac contingency plans with CBP authorities at diversion airports. This will ensure that arriving international passengers can be deplaned and allowed to leave the airport in a timely fashion.

## 2.5. Travel Agencies and Tour Operators

While most regulation of the air transportation sector is concerned with carriers and airports, other sellers of air transportation must comply with OST advertising regulations and guidelines. Travel agencies and tour operators are the two largest industry sectors (in addition to carriers) that sell tickets to passengers for scheduled service flights. These sales sometimes are made on a standalone basis and sometimes as part of a package that may include accommodations, activities, and ground transportation. Carrier, travel agent, and tour operator websites also offer packages that do not include any air transportation.

According to a recent study, about 17 percent of travel agencies have online ticketing capability. The four largest online travel agencies—Expedia, Orbitz, Priceline, and Travelocity—reportedly account for 96 percent of all online sales by travel intermediaries in the leisure travel market segment.[12] However, the travel agent and tour operator sectors consist primarily of small businesses with fewer than 20 employees per firm.

*Table 6 - Travel Agencies and Tour Operators, 2007*

|  | Total Firms | Large OTAs | Online Sales Capability | Offline Sales Only | 20+ Employees | <20 Employees |
|---|---|---|---|---|---|---|
| Travel Agencies | 11,803 | 4 | 2,003 | 9,796 | 626 | 11,177 |
| Tour Operators | 2,687 | 0 | 457 | 2,230 | 267 | 2,420 |

Sources: Bureau of the Census, *County Business Patterns,* 2007; PhoCusWright, *The Role and Value of the Global Distribution Systems in Travel Distribution*, 2009.

The three large Global Distribution System (GDS) companies—Amadeus, Sabre, and Travelport—provide the infrastructure to process both online and offline transactions for most travel agencies and tour operators.  Sabre (Travelocity) and Travelport (Orbitz) also own large OTAs as well. GDS companies reportedly processed more than 376 million air transactions in the United States in 2008, accounting for 64 percent of all airline passenger revenue.[13]

---

[12] PhoCusWright, *The Role and Value of the Global Distribution Systems in Travel Distribution*, November 2009.
[13] Ibid.

# 3. General Framework for Analysis of Benefits and Costs

The Rule includes 11 sets of requirements containing more than 20 provisions that will provide airline passengers with additional protections. While the benefits and costs attributable to each of the 11 requirement areas were evaluated on a standalone basis, there are two dimensions of the evaluation that cut across the specific requirements: (1) the aspect of passenger air travel that will be addressed and (2) the ability of passengers (or prospective passengers) to obtain needed services or information from other sources. The first of these considerations shapes the methodologies used to estimate benefits; the second informs the estimation of both benefits and costs. We also present a listing of the general assumptions used in developing these estimates.

## 3.1. Type of Air Travel Issues Being Addressed

The Rule provisions address three types of passenger air travel issues:

- **_Carrier Service:_** Several of the requirements will standardize or improve aspects of service provision for passengers who have already booked flights (such as Requirement Areas 9 and 10) and, in the case of tarmac delays (Requirement Area 1), have already boarded the aircraft. In many of these areas, some carriers typically provide the level of service required, but others fall short of the requirement to a degree that the service provided is qualitatively different from that which would be reasonable for consumers to expect. Adopting regulations to address these issues will reduce the amount of time consumers lose to delays, move some of the time spent waiting to more comfortable situations, and reduce uncertainty associated with air travel. There are also benefits to consumers at the time of purchase from limiting the frequency and consequences of possible service failures.

- **_Purchaser Information:_** Other requirements will improve the extent and presentation of information available to consumers who are in the process of making air travel purchase decisions. While online search tools provide potential customers with access to much more extensive information about carriers, flight times, and prices than was previously available, it is often difficult to determine the final price of the purchase being contemplated. Adopting additional requirements for the provision of information about flight pricing, fees, and likelihood of delays (Requirement Areas 2, 7, and 8) will reduce consumer search time and improve the chances that purchase decisions are made with sufficient information.

- **_Passenger Equity:_** Two types of possible requirements—those dealing with overbooking (Requirement Area 6) and limitations on venue provisions in contracts of carriage (Requirement Area 11)—primarily address carrier-passenger equity issues, but they may have subtle economic effects as well.[14] Ensuring equitable treatment of involuntarily

---

[14] More specifically, these provisions would ensure that similarly situated passengers would be treated equitably. For example, requiring an increase in the maximum DBC level to account for inflation would compensate future passengers who are involuntarily bumped at the same (real) rate as those who are currently denied the ability to board oversold flights. Prohibiting restrictions on the venue for filing claims would ensure that the costs and

bumped passengers may reduce potential passenger reluctance to purchase consolidator or frequent flyer tickets for trips at busy air travel times. Eliminating restrictions on venue may prompt airlines to be more responsive to the complaints of unsatisfied passengers and avoid increased litigation exposure.

In our development of benefits estimation methodologies, we have therefore grouped the Rule requirements into three categories based on the type of impact and benefits they are expected to have: (1) improving the delivery of services to passengers who have already booked air travel; (2) providing additional or clearer information to consumers who are making travel purchase decisions; and (3) assuring more equitable treatment of similarly-situated passengers. The expected benefits from adopting each of these three categories of requirements were estimated using different approaches:

- *Carrier Service:* In general, the benefits of requirements that will improve carrier delivery of services have been evaluated by assessing the impact on the aggregate amount of time and the quality/comfort of where that time is spent (e.g., in the terminal vs. on the tarmac) during travel for affected passengers. In some instances, the benefit of a requirement will be to increase the certainty of service delivery within expected levels of provision quality and timeliness. Estimating the benefits of these requirements involved making an assessment of the likely ranges of uncertainty premiums that passengers attach to air travel services.

- *Purchaser Information:* A consumer surplus methodology was used to estimate the benefits of requirements that are expected to improve the availability and ease-of-use of pre-purchase air fare information. Evaluating the benefits for each requirement area involved developing an estimate of the number of purchasers who would make use of the additional information and the value to them of having this additional information available. The estimated benefits also depend on the extent to which options are already available to consumers who wish to incorporate them into their purchasing decisions. Valuing the benefits from improved information also required estimating the per-purchaser time savings from reduced search costs.

- *Passenger Equity:* The requirements that address passenger equity issues involve transfers from carriers to passengers. The amounts of these transfers are relatively straightforward to calculate in the case of the possible changes to the DBC policy, but the extent of any transfer resulting from limitations on carrier venue restrictions cannot be quantified.

## 3.2. Availability of Alternatives to Carrier Services or Information

The extent to which consumers have available alternatives to relying on the carrier to provide adequate service or to obtaining adequate information to inform purchase decisions also varies among the areas addressed by Rule provisions:

---

inconvenience associated with filing a consumer-related claim would be similar for consumers in different States, instead of varying with the distance between the carrier's and the passenger's home State.

- ***Post-Purchase Changes in Terms of Service:*** The requirements for tarmac contingency plans for foreign carriers and for all carriers to coordinate these plans with CBP at diversion airports are located at one end of the spectrum of situations with readily available alternatives, with well-publicized instances of passengers being held on the tarmac for prolonged periods of time. The changes in DBC requirements and the prohibition on post-purchase price increases also address situations where the carrier or ticket agent can make unilateral alterations in the terms of service. In these areas, the requirements will limit the range of discretion that could be taken by one party to an airline travel contract (the carrier) in situations where the other party (the passenger) is unable to make welfare loss-mitigating responses to those actions.

- ***Pre-Travel Services or Information Available:*** In contrast, some deficits in the pre-purchase information available to potential purchasers of air travel on carrier websites may be mitigated by use of other online booking services that provide more extensive or more readily accessible information. Similarly, updates on flight status can be obtained from a variety of sources in addition to current carrier notification systems. The economic benefits of additional requirements in these areas depend on the extent of the time costs associated with the increased searching that must be undertaken to obtain the desired information from alternative sources, as well as the extent to which some purchasers of air travel will have access to information that they presently do not know how to obtain. The regulatory evaluation of these provisions includes an assessment of present industry and consumer practices to determine the incremental benefits of more extensive and universal information provision and the extent to which online purchasers of air travel make use of the information that is already available.

## 3.3. General Assumptions Used in Estimating Benefits and Costs

The ability to evaluate and interpret the results of an economic analysis depends to a significant degree on the documentation of the baseline data and assumptions used. The following general assumptions apply throughout the entire analysis of benefits and costs:

- In accordance with Office of Management and Budget (OMB) guidelines, a real discount rate of 7 percent is used in the primary analysis and is supplemented with overall estimates using a 3 percent discount rate as well.

- The requirements take effect on January 1, 2012, with quantifiable benefits and costs calculated over the 10-year period from 2012 through 2021.[15]

- This analysis includes benefits and costs for foreign business and citizens.

---

[15] Most of the Final Rule requirements will become effective 120 days after publication. The full-fare advertising provision of Requirement Area 7 will take effect 60 days later. However, the effective dates for all Rule provisions were aligned to the beginning of the 2012 calendar year in this regulatory evaluation to simplify the presentation and explanation of the benefit and cost estimates.

- The numbers of flights and passengers are assumed to increase annually at the rates projected in the FAA Aerospace Forecast for 2010 through 2030 (See Section 2.3 above).

- The value of travel time (and the cost of air travel delay) is estimated at $28.60 per hour for all airline travelers.[16]

- Costs for domestic carriers to comply with Requirements 1 (tarmac contingency plans), 3 (customer service plans), and 5 (complaint response) were estimated in the regulatory evaluation for the EAPP1 Final Rule.[17] The unit cost estimates in this analysis assume that the per-carrier costs of compliance are equal for domestic and foreign carriers.

- Per-hour costs for applicable categories of carrier, travel agent, and tour operator employees were estimated using Bureau of Labor Statistics (BLS) wage rates, increased by 43 percent to account for the non-wage components (e.g., fringe benefits, employer taxes) of direct labor costs.[18] A mark-up of 100 percent was applied to these direct labor cost estimates to account for supervisory and management planning, communication, training, and oversight time.

A more detailed description and discussion of the baseline data and assumptions used in developing the benefit and cost estimates is provided in Section 4 below and in Appendix 1.


# 4. Regulatory Evaluation of Specific Requirement Areas

This section of the regulatory evaluation provides a specific assessment of the impact, benefits, and costs for each of the 11 specific requirement areas. For each of these, we present the following information:

- ***Current Requirements, Industry Practices, and Need for Additional Regulation.*** This section outlines relevant current regulatory requirements and DOT enforcement policy for each area in which additional passenger protections were developed, presents a summary of current industry practices, and describes the needs addressed by the Rule.

- ***New Area Requirements to Address Identified Needs.*** This section outlines regulatory requirements adopted as part of the Rule and provides information on the entities that will be affected.

- ***Estimated Benefits of Area Requirements.*** This section presents the methodology used to evaluate benefits; estimates for the components that could be evaluated quantitatively; and descriptions of the benefits for which no quantitative estimates could be developed.

---

[16] Economic Values for FAA Investment and Regulatory Decisions, A Guide, Contract No. DFTA 1-02-C00200, GRA Inc., Oct. 3, 2007.
[17] DOT, *Final Regulatory Impact Analysis of Rulemaking on Enhanced Airline Passenger Protections*, December 17, 2009 (hereafter referred to as the "EAPP1 RIA").
[18] BLS, "Employer Costs for Employee Compensation," June 2009.

- *Estimated Costs of Area Requirements.* This section presents the methodology used to evaluate costs; estimates for the components that could be evaluated quantitatively; and descriptions of the costs for which no quantitative estimates could be developed.

In the preliminary RIA, benefit and cost estimates were also developed for four alternative requirement scenarios for comparison with requirements included in the rule text of the NPRM:

- *Requirement Area 1 - Alternative A*: The Department would require a maximum time limit of 4 hours, instead of a carrier-determined limit (expected to be 5 hours), for tarmac delays before requiring the deplaning of passengers on international flights.

- *Requirement Area 1 - Alternative B*: The contingency plan requirements for foreign carriers would apply only to those carriers with at least one flight designed to seat 61 or more passengers.

- *Requirement Area 7 - Alternative C*: The full-fare advertising requirement would apply to carrier websites only.

- *Requirement Area 7 - Alternative D*: The effective date for full-fare advertising for carriers and other advertisers of air travel would be within 30 days of final rule publication.

The preliminary RIA found essentially no differences in net benefits between the base case analyzed for Requirement Area 1 and Alternatives A and B. Alternative A was adopted in the Final Rule. It also determined that net benefits would be lower under Alternatives C and D than under the base case analyzed for Requirement Area 7. The full-fare advertising requirements proposed in the NPRM base case were adopted in the Final Rule.

## 4.1. Additional Requirements for Tarmac Contingency Plans

### 4.1.1. Current Requirements, Industry Practices, and Need for Additional Regulation

The EAPP1 Final Rule requires any certificated or commuter air carrier that offers scheduled passenger service or public charter service using any aircraft with 30 or more seats to develop a contingency plan for long delays on the tarmac for all flights they operate, including those on aircraft containing fewer than 30 seats. For domestic flights, carriers covered by the EAPP1 Final Rule have to ensure that (1) passengers on planes delayed on the tarmac for 2 hours will have access to food, water, clean lavatories, and the assistance of medical personnel if needed and (2) passengers on planes delayed on the tarmac for 3 hours will be permitted to deplane, unless there is a safety or security-related impediment to deplaning passengers or air traffic control (ATC) advises the pilot that permitting passengers to return and deplane would significantly disrupt airport operations. The requirement for a tarmac contingency plan also applies to U.S. carriers operating international flights to and from the United States. However, carriers are currently allowed to set their own time limits in the contingency plans for deplaning international flights. Tarmac contingency plans must be coordinated with the authorities of large-

hub and medium-hub airports (i.e., those that account for at least 1 percent, and between 0.25 and 1 percent, respectively, of total U.S. passenger enplanements).

As noted in Section 4.2.1 below, there were 710 tarmac delays of 3 hours or longer involving scheduled domestic flights operated during the last 12 months (May 2009 through April 2010) before the EAPP1 Final Rule requirements became effective, but only 13 such delays in the first 6 months after the Rule became effective. While current regulations mandate reporting of tarmac delays only at large- and medium-hub airports, it is our understanding that every reporting carrier has provided BTS with tarmac delay information for all of their scheduled domestic flights.[19]

The EAPP1 Final Rule does not require foreign carriers to comply with the EAPP1 Final Rule stipulations relating to carrier handling of lengthy tarmac delays. As Table 5 in Section 2.3 indicates, 44 percent of all passengers on international flights departing from the United States in 2009 flew on foreign carriers. Many of these flights departed from large-hub airports that have a history of problems with lengthy tarmac delays. Consequently, passengers who fly on foreign carriers lack the same minimum guarantee-of-service provision in the event of a lengthy tarmac delay that is currently afforded to travelers to and from the same destinations on covered U.S. carriers.

Recent BTS data on tarmac delays associated with arriving aircraft indicate that these situations almost always arise as a result of landings at diversion airports. This is especially likely to be an issue in the event that an international flight is diverted to an airport that does not have CBP staffing in place at the time of the arrival. Without a CBP presence, it may not be possible to admit (or readmit) to the United States passengers who are arriving on an international flight. These passengers may therefore not be allowed off the airplane and into a diversion airport. The current EAPP1 requirements do not address this potential obstacle to avoiding or reducing the incidence of lengthy tarmac delays associated with inbound international flights.

The EAPP1 Rule also does not require assurance that carriers have coordinated their tarmac contingency plans with the authorities at the small-hub and non-hub airports they serve.

### 4.1.2.  Area 1 Requirements to Address Identified Needs

The Department is extending the coverage of the EAPP1 tarmac contingency plan requirements to include foreign carriers operating scheduled and public charter passenger service flights to and from the United States using at least one aircraft with 30 or more seats. In addition, covered U.S. and foreign carriers will now be required to coordinate their contingency plans with authorities (including terminal operators, where applicable) at all U.S. airports with 10,000 or more passenger enplanements annually that the carrier services, including small-hub and non-hub airports that are not within the scope of the current EAPP1 requirements. Finally, while U.S. carriers are currently required to coordinate their contingency plans and efforts with regularly used airports, the recent Final Rule does not specifically require that carriers must coordinate these contingency plans with CBP officials to enable passengers on diverted incoming

---

[19] As noted above, BTS also receives reports on tarmac delays of less than 3 hours on scheduled domestic flights operated by reporting carriers.

international flights to deplane after extended tarmac delays. The Department has included a requirement in this Rule to ensure that carriers coordinate plans with appropriate CBP personnel at any U.S. airport that the carrier uses as a diversion airport for its international flights.

Because it is difficult to predict the length of a tarmac delay after which individual carrier plans would afford passengers the opportunity to deplane—it could be as much as 6 hours for long cross-Pacific flights but shorter for flights to and from Canada, Mexico, and the Caribbean—the Department decided to set a maximum limit of 4 hours for tarmac contingency plans to afford passengers the opportunity to deplane.[20]

The number of lengthy tarmac delays that would require carrier actions under the proposed requirements can be projected using the distribution of tarmac delay times for reporting U.S. carriers during the most recent 12-month period (May 2009 through April 2010) before the current EAPP1 tarmac delay limits became effective. These projections underscore the sensitivity of the benefit and cost estimates to the time limits specified in foreign carrier tarmac contingency plans. With the maximum time limit before allowing passengers the opportunity to deplane set at 4 hours, the Rule requirement will affect the waiting time experienced by passengers on an average of seven flights annually operated by foreign carriers.[21]

*Table 7 - Estimated Number of Lengthy Tarmac Delays for Foreign Carriers, 2009*

|  | Canadian Carriers* | Other Carriers | Total |
|---|---|---|---|
| 2+ hour delay | 89 | 184 | 273 |
| 3+ hour delay | 28 | 59 | 87 |
| 4+ hour delay | 3 | 7 | 11 |
| 5+ hour delay | 0 | 1 | 1 |

*Canadian carrier tarmac contingency plans are required to have 60/90-minute food/deplaning limits, so these flights are not expected to be delayed 2+ hours without providing passengers with the opportunity to deplane.

Source: Econometrica projections based on BTS tarmac delay reports for reporting carriers.

The total number of carrier-airport pairs for which coordination of tarmac contingency plans would be required was estimated using the BTS T-100 segment data. These tabulations show that the EAPP2 will nearly triple the number of carrier-airport pairs and increase the plan coordination requirements by nearly 200 percent to 5,637 from the 1,938 currently required under the EAPP1 Final Rule.

---

[20] Since the preliminary RIA was prepared, U.S. carriers were required to set time limits for allowing passengers to deplane from international flights experiencing lengthy tarmac delays. A recent review of the tarmac contingency plans posted on the websites of reporting carriers indicates that this limit has typically been set at the 4-hour mark. Delays involving Canadian carrier flights are estimated separately because these carriers are already required to have a tarmac contingency plan in place that affords passengers protections against lengthy onboard delays which are at least equivalent to those guaranteed to passengers on U.S. carriers under the EPP1 and EAPP2 Final Rules (see the Flight Rights Canada policy at http://www.tc.gc.ca/eng/mediaroom/releases-nat-2008-08-h207e-2158.htm#bg2).

[21] The projected numbers of flights projected to experience delays of more than 4+ and 5+ hour delays incorporate a 30-minute time window for returning to the gate before reaching the carrier-specified time limit.

*Table 8 - Number of Carrier-Airport Pairs with Tarmac Plan Coordination Requirement*

| Carrier Size Classification | Airport Category | | | | |
|---|---|---|---|---|---|
| | Large Hub | Medium Hub | Small Hub | Non-Hub | Total |
| Large | 822 | 921 | 1,140 | 1,325 | 4,208 |
| Small | 86 | 109 | 201 | 259 | 655 |
| Foreign | 514 | 119 | 86 | 55 | 774 |
| Total | 1,422 | 1,149 | 1,427 | 1,639 | 5,637 |
| # of Airports | 29 | 37 | 69 | 250 | 385 |
| Carrier Plans/Airport | 49.0 | 31.1 | 20.7 | 6.6 | 14.6 |
| New Plans/Airport* | 17.7 | 3.2 | 20.7 | 6.6 | 9.6 |

*EAPP1 required U.S. carriers to coordinate plans with large and medium hub airports (n=1,938).

### 4.1.3.  Benefits of Area 1 Requirements

Extending the EAPP1 Final Rule's contingency plan requirements for domestic carriers' contingency plans to foreign carriers will provide passengers on foreign carriers' flights departing from or arriving to the United States with the same benefits that passengers on flights of domestic carriers currently receive.

This analysis considers two groups of benefits, divided into those which could be monetized for this analysis and those which could not. The first category includes the insurance value of the guarantee to deplane after an extended tarmac delay. As with insurance, people derive a benefit from the knowledge that the option exists to take advantage of the guarantees provided by this rule, even if they ultimately go unused. Just as consumers are willing to pay for a guaranteed recompense in case of an undesirable event (such as traditional travel insurance for reimbursement for a canceled trip), they are willing to pay some amount to ensure that if ever delayed on the tarmac, they will be given the option to deplane instead of having to remain on the tarmac for an extended period.

No data were found on exactly what this insurance value is. Therefore, we conducted a cost-per-passenger analysis for this component of benefits (See Section 5.3 below).

The second category includes the benefits that arise from a better or more comfortable experience while being delayed on the tarmac. The benefits from this greater comfort are estimated as follows:[22]

---

[22] A similar methodology was used to estimate the benefits of tarmac contingency plans for domestic carriers in the regulatory analysis that accompanied the EAPP1 Final RIA. There are two differences from the approach used in that analysis. The first is that benefits for "meeters and greeters" are not included here, as nearly all arriving international flights with extensive on-tarmac delays are at airports to which the planes have been diverted and therefore are unlikely to keep "meeters and greeters" waiting in the arrival airport. The second is that the analysis no longer includes an attempt to put a dollar value on the greater comfort or security a passenger will feel during any period of delay from knowing that a contingency plan exists. Instead, the cost per passenger analysis is conducted.

- This requirement will shift the portion of total trip time spent in less comfortable conditions for passengers delayed on the tarmac for 2 hours or more. These passengers will now be ensured access to food, water, and adequate lavatory facilities, as well as to medical assistance if needed.

- While studies that specifically address consumer responses to long onboard air travel delays have not been located, estimates from studies of consumer behavior and user experience on other modes of transportation are available to use as proxies. Specifically, analyses on transit systems provide estimates of "premiums" on the value of user time based on the value people place on quicker or easier access to move from one place to another and on improved comfort during travel. This regulatory analysis adopts the premiums on the value of time used in the EAPP1 RIA to evaluate applying a similar requirement to covered U.S. carriers.[23]

- The value of the projected difference in comfort resulting from the proposed requirement is estimated using a percentage of the base value of travel time impacted (i.e. a "premium"), developed from survey-based estimates of the values attached by travelers to different waiting, walking, and transfer conditions. Since no specific estimates of time values for level of service ratings for airline travel are available, values were taken from other modal studies. The most applicable study estimated a time-value premium based on differing levels of service that incorporated factors such as comfort, convenience, and reliability for various categories of public transportation and auto users. In this research, "level of service" ratings were used to determine the value of time spent in different conditions. Based on this study, a premium of 0.34 was used for the greater comfort derived from access to food, water, and clean lavatory facilities, which reflects the difference between different service levels (calculated as the ratio of A-C to D on a scale of A to F; see Appendix for details). The total value of this benefit is calculated as the product of the hours spent by all passengers waiting on the tarmac for more than 2 hours, the premium for greater comfort (assumed to be 0.34), and the DOT-specified value of time for air travelers.[24]

---

[23] For example, studies show that transit riders value sitting more than standing without regard to any change in total travel time required. Travelers also prefer to spend time in transit rather than part of the time waiting for service if total trip length is the same. See William Waters, *The Value of Times Savings for the Economic Valuation of Highway Investments in British Columbia*, BC Ministry of Transportation and Highways, 1992, as discussed in *Transportation Cost and Benefit Analysis – Travel Time Costs*, Victoria Transport Policy Institute, revised August 10, 2007, and Marcus von Wartburg and W.G. Waters II, "*Congestion Externalities and the Value of Travel Time Savings*," in *Towards Estimating the Social and Environmental Costs of Transportation in Canada*, Anming Khang, et al, eds., Center for Transportation Studies, University of British Columbia, August 2004.

[24] This premium is within the range found for the value transit passengers place on being able to sit versus stand (0.20 and 0.87 in two studies that address the quality of travel experience). William Waters presents data that the difference between the value of time sitting versus standing is 0.20 of the prevailing wage rate (William Waters, *The Value of Times Savings for the Economic Valuation of Highway Investments in British Columbia*, BC Ministry of Transportation and Highways, 1992, as discussed in Transportation Cost and Benefit Analysis – Travel Time Costs, Victoria Transport Policy Institute, revised August 10, 2007). An older study (P.B. Goodwin) presents premiums ranging from 0.25 to 0.87 (averaging 0.50) for sitting versus standing in either a public or segregated (demand response only) vehicle (P.B. Goodwin, *Human Effort and the Value of Travel Time*, Journal of Transport Economics and Policy, January 1976).

- No change in overall trip time is assumed for passengers on flights that return to the gate and subsequently depart.[25]

Conceivably, this requirement could result in some flights being cancelled *that would not otherwise have been cancelled* in order to free up needed gates. If this is the case, some passengers would experience a negative impact in the form of a reduction in the benefits received from air travel. However, the Department has analyzed data on flight delays and cancellations in the first 6 months after the EAPP1 Rule limits on lengthy tarmac delays experienced by passengers on domestic flights. The results of this analysis indicate that the number of cancellations of flights that have experienced tarmac delays of 2½ hours or more have not increased since the Rule took effect.

The benefits of the Rule requirements for domestic and foreign carriers to coordinate contingency plans with airport authorities at small hub and non-hub airports and with CBP authorities at diversion airports are difficult to quantify. The regulatory evaluation prepared in support of the EAPP1 Final Rule assumed that the recently adopted regulations would be adequate to ensure complete compliance by domestic carriers. However, the Rule enhancements to the contingency plan requirements may increase the probability that covered domestic carriers completely comply with the EAPP1 requirements. The benefits of these enhancements are therefore estimated to range from 0 to 1 percent of the total benefits previously estimated for domestic carriers' tarmac contingency plans.

The estimates of benefits incorporate two key assumptions:

- The distribution of tarmac delays among foreign carriers' flights to and from U.S. airports is identical to the distribution of reporting domestic carriers' flights.[26]

- There will be no measureable rate of increase in flight cancellations due to the implementation of contingency plans (based up the Department's review of length tarmac delays and cancellations since EAPP1 went into effect, as noted above)

The benefits from increased passenger comfort in Requirement Area 1 are estimated as follows:

*Table 9 - Benefits Estimates for Requirement Area 1*

|  | 2012 | 2012-2021 |
| --- | --- | --- |
| Passengers on Foreign Carrier Flight Segments | 73,216,065 | 887,235,989 |
| Passengers on Foreign Carriers Already in Compliance | 10,856,852 | 131,563,883 |
| Foreign Carrier Flight Segments | 532,607 | 6,454,156 |

---

[25] Carriers are not required to afford deplaning passengers the opportunity to reboard. It is our understanding that, in some cases, no passengers have elected to deplane when delayed planes have returned to the gate. It is possible that passengers on some flights that return to the gate and subsequently depart may experience an increase in waiting time. However, no suitable estimate of the potential increase in waiting time for passengers on these flights could be identified.

[26] Carriers are not currently required to report on-time performance data for international flights to BTS, so it is not possible to calculate the distribution of flights by length of on-tarmac delay for foreign carriers.

| | | |
|---|---|---|
| Flights of Foreign Carriers Already in Compliance | 159,782 | 1,936,247 |
| Passengers who May Benefit | 62,359,213 | 755,672,106 |
| Number of Flights that May Benefit | 396,311 | 5,011,261 |
| Average Passengers per Flight that May Benefit | 166 | 161 |
| **Benefit from Provision of Adequate Food, Drink, and Lavatory Access** | | |
| Value of Time for Passengers (All-Purpose Traveling) | $28.60 | $28.60 |
| Premium for Access to Food, Drink, and Lavatory | 34% | 34% |
| **Incremental Benefit per Hour per Passenger with Access to Food, Drink, and Lavatory** | $9.72 | $9.72 |
| Number of Flights with 2+ hr. Tarmac Delays* | 203 | 2,149 |
| Share of Flights with 2+ hr. Delays that are Arrivals | 10.0% | 10.0% |
| Arriving Flights with 2+ hr. Tarmac Delays* | 20.3 | 214.9 |
| Passengers on Arriving Flights with 2+ hr. Tarmac Delays* | 3,395 | 35,945 |
| Average Hours of Waiting Time after 2+ hr. Taxi-In Tarmac Delay | 0.31 | 0.31 |
| Average Benefit per Passenger from Access to Food, Drink, and Lavatory during Arrivals | $3.01 | $3.01 |
| **Total Benefits from Access to Food, Drink, and Lavatory during Arrivals** | $10,235 | $108,355 |
| Share of Flights with 2+ hr. Delays that are Departures | 90.0% | 90.0% |
| Departing Flights with 2+ hr. Tarmac Delays* | 183 | 1,934 |
| Passengers on Departing Flights with 2+ hr. Tarmac Delays* | 30,559 | 323,509 |
| Average Hours of Waiting Time after 2+ hr. Taxi-Out Tarmac Delay | 0.44 | 0.44 |
| Average Benefit per Passenger from Access to Food, Drink, and Lavatory during Departures | $4.28 | $4.28 |
| **Total Benefits from Access to Food, Drink, and Lavatory during Departures** | $130,747 | $1,384,151 |
| Monetized Benefits from Carrier Coordination with CBP and Additional Airports | $7,984 | $79,844 |
| **Total Benefits during both Arrivals and Departures** | **$148,967** | **$1,572,351** |
| *Total Benefits during both Arrivals and Departures (millions) Discounted* | | *$1.2* |

*excludes flights on foreign carriers that already have compliant plans.

** assumed to be equal to 0.5 percent of the benefits previously estimated for these requirements in the RIA for the EAPP1 Final Rule.

A more detailed description of the procedures used to calculate these benefits is provided in Appendix 1.

Adoption of these requirements may provide several additional categories of potential benefits that could not be quantified in this regulatory evaluation, including the following:

- ***Improved Management of Flight Delays.*** As with domestic carriers, there is a possibility that the existence of contingency plans for long onboard delays could lead to heightened sensitivity to additional delay costs among foreign carrier management. This could lead to improved management of delayed flights, diversion schedules, and other flight management issues, as carriers have additional incentive to avoid long onboard delays.

- ***Decreased Anxiety with Regard to Flying.*** Knowing that contingency plans exist may bring relief during long onboard delays and lower overall flight anxiety for some passengers, making some passengers less uneasy overall about traveling by air. This may lead to a significantly improved travel experience for some passengers (more so than is estimated) and may even lead to an increase in overall demand for air travel.

- ***Reduced Stress among Delayed Passengers and Crew.*** A possible decrease in passenger anxiety, together with improved comfort and convenience brought by contingency plans, may lead to reduced stress among delayed passengers and crew. This may decrease minor conflicts and occasional altercations that arise when people are under stress for extended periods in close quarters.

- ***Improved Overall Carrier Operations.*** Carriers may be able to improve general operations based on analysis of data now required to be stored on substantive delays and carrier responses. This recalls the business management maxim, "What you can measure, you can manage." If carriers measure substantive delays and their responses to them, the result will establish benchmarks for improvements. From these benchmarks, carriers can improve service, leading to more unquantifiable passenger benefits.

- ***Improved Customer Good Will toward Carriers.*** As the level of service provided by carriers improves and complaints decline, overall customer good will toward carriers should improve. Improved good will may lead to a slight increase in demand.

Because there are potentially significant but unquantifiable benefits that may be realized by passengers as a result of these requirements, a cost-per-passenger analysis is presented in Section 5.3 below.

The Department expressly solicited comments regarding the estimation of a premium on the value of time for certainty/security of knowing that if carriers are required to have contingency plans and the premiums for time spent with access to food, water, and clean lavatories after a 2-hour tarmac delay and for the time spent in an airport instead of on the tarmac after waiting an extended period of time.

### 4.1.4.  Cost of Area 1 Requirements

Costs were estimated in the preliminary RIA for scenarios with a 5-hour maximum limit to deplane passengers in foreign carrier contingency plans (base case); a 4-hour maximum limit mandated by the Department (Alternative A); and a variation of the base case scenario in which compliance with this requirement was limited to foreign carriers that operate flights to and from the U.S. using at least one aircraft originally designed with more than 60 seats (Alternative B).[27]

The final RIA cost estimates are based on foreign carrier contingency plans that contain a 4-hour time limit after which passengers must be afforded the opportunity to deplane. In Section 4.1.2, we estimated that these carriers would have needed to apply these plans to respond to 203 tarmac delays of 2 or more hours in 2009. Eight of these delays would have extended past the 4-hour mark.

Foreign carriers (other than Canadian carriers) will incur one-time costs to develop and implement tarmac delay contingency plans and per-flight costs that vary with the length of time that the delayed aircraft remains on the tarmac. Specific compliance cost elements include:

- Staff and management costs to develop, post, and monitor the contingency plan and to collect data on actions triggered by the plan. In the EAPP1 RIA, these costs were aggregated with carrier costs for coordinating contingency plans with large and medium hub airports. In the final RIA, we have disaggregated these costs to be able to estimate the incremental costs that will be incurred as a result of extending the coordination requirement to small hub and non-hub airports. The per-carrier residual fixed cost of developing and posting a tarmac contingency plan is estimated to be approximately $7,500.

- Coordinating tarmac contingency plans with airport authorities (and terminal operators, where applicable) is assumed to take carriers an average of 4 hours per large hub, 3 hours per medium hub, 2 hours per small hub, and 1 hour per non-hub airport from which they operate passenger service.

- Per-person costs to provide adequate food, water, lavatory facilities, and medical attention. The per-person cost to provide adequate food and water was assumed to be $3.71.[28]

- Per-person costs associated with deplaning and reboarding passengers. Per-person costs for passengers on flights required to taxi back to the gate (instead of using buses and mobile stairs) are based on the average taxi time and fuel burn per minute by plane size. Per-person costs were also calculated for passengers deplaned on the tarmac and

---

[27] Only one small foreign carrier currently provides passenger service to and from the United States using at least one aircraft with 30 seats but none that have more than 60 seats. This carrier would not have been required to develop and adhere to a tarmac contingency plan under alternative B.

[28] Carrier costs for servicing toilets are expected to be minimal. This analysis assumes that no increase in onboard medical personnel or equipment will be needed to comply with the Rule.

transferred to the terminal by bus. Airport boarding and deplaning fees were included in the unit costs for both groups of passengers.

Unit costs for foreign carriers to comply with the Rule provisions in Requirement Area 1 as estimated as follows:

*Table 10 - Unit Costs for Requirement Area 1*

|  | Unit Cost |
|---|---|
| Fixed cost per-carrier to develop plan* | $7,500 |
| **Estimated carrier personnel hours per carrier-airport coordination** | |
| large hub | 4 |
| medium hub | 3 |
| small hub | 2 |
| non-hub | 1 |
| Mean wage rate per hour** | $48.77 |
| Full labor cost per hour | $139.48 |
| Per-passenger cost (2+ hour delays) | $3.71 |
| Additional per-passenger cost (4+ hour delays with reboarding) | $2.74 |
| Fuel cost (4+ hour delays with reboarding), per-flight | $176.48 |

*EAPP1 RIA estimate, adjusted to account for airport coordination costs separately.
**Mean wage rate for management occupations, NAICS 481000, BLS Occupational Employment Statistics, May 2009.
***Full cost includes benefits and other direct labor costs (43 percent of mean wage rate) and cost for time associated with supervisor/management review (100 percent of direct labor cost).

Based on these estimates and assumptions, costs incurred by affected carriers to comply with the Rule provisions in Requirement Area 1 are expected to be $1.9 million in 2012 and $3.4 million for the entire 10-year period from 2012 through 2021.

*Table 11 - Estimated Compliance Costs for Requirement Area 1*

| | 2012 | 2012-2021 |
|---|---|---|
| **Development of contingency plan** | | |
| Number of foreign carriers that must develop plans* | 103 | 103 |
| Fixed cost per-carrier to develop plan | $7,500 | $7,500 |
| **Cost of developing contingency plans** | **$772,500** | **$772,500** |
| **Cost of airport-specific plan develop/coordination** | | |
| Large hubs (foreign carriers only) | $286,775 | $286,775 |
| Medium hubs (foreign carriers only) | $49,795 | $49,795 |
| Small hubs (U.S. and foreign carriers) | $398,082 | $398,082 |
| Non hubs (U.S. and foreign carriers) | $228,611 | $228,611 |
| **Cost of airport-specific plan develop/coordination** | **$963,264** | **$963,264** |
| **Variable costs of tarmac contingency plans*** | | |
| Average number of passengers per segment | 175 | 175 |
| Projected tarmac delays of 2+ hours | 202 | 2,442 |
| Passengers affected by tarmac delays of 2+ hours | 35,347 | 428,333 |
| Per-passenger costs, 2+ hour delays | $3.71 | $3.71 |
| Projected tarmac delays of 4+ hours | 8 | 96 |
| Passengers affected by tarmac delays of 4+ hours | 1,385 | 16,780 |
| Additional per-passenger costs, 4+ hour delays with reboarding | $2.74 | $2.74 |
| Per-flight fuel costs, 4+ hour delays with reboarding | $176.48 | $176.48 |
| **Variable costs of tarmac contingency plans** | **$136,323** | **$1,651,975** |
| **Total costs of tarmac contingency plans** | **$1,872,088** | **$3,387,739** |
| Total Compliance Costs (millions) | $1.87 | $3.39 |
| *Discounted Total Compliance Costs (millions)* | | *$2.95* |

*Estimates in this section exclude passengers and flights on Canadian carriers.
Note: Number of flights and passengers incurring tarmac delays increases in subsequent years
by the growth rates for international passengers and flights projected in the 2009 FAA
Aerospace Forecast.

## 4.2. Tarmac Delay Reporting

### 4.2.1.  Current Requirements, Industry Practices, and Need for Additional Regulation

As noted above, reporting carriers are currently required to report flight delay data for regularly
scheduled domestic flights, including information on all tarmac delays of 3 hours of more, to
BTS. Since October 2008, these reports were required to include tarmac delays associated with

flights that returned to the gate and subsequently departed, those that were diverted from their destination airports, and those that were ultimately cancelled.[29]

There were 710 reported tarmac delays of 3 hours or longer involving scheduled domestic flights operated during the last 12 months (May 2009 through April 2010) before the EAPP1 Final Rule requirements became effective. Most of the delays during this period involved departures. Of the 72 delays associated with arriving flights, 65 involved landings at diversion airports.

*Table 12 - Number and Percent of Flights with Tarmac Times of 3 Hours or More*

| Year/Month | Total | Stage of Operation of the 3-Hour Tarmac Time | | | | |
|---|---|---|---|---|---|---|
| | | Prior to Cancellation | Multiple Gate Departure | Taxi-Out | Taxi-In | At Diversion Airport |
| **2009** | | | | | | |
| May | 35 | 7 | 2 | 25 | 1 | 0 |
| Jun | 278 | 40 | 42 | 172 | 1 | 23 |
| Jul | 164 | 21 | 20 | 105 | 0 | 18 |
| Aug | 70 | 7 | 11 | 45 | 0 | 7 |
| Sep | 6 | 0 | 0 | 4 | 0 | 2 |
| Oct | 12 | 0 | 0 | 12 | 0 | 0 |
| Nov | 4 | 0 | 1 | 2 | 0 | 1 |
| Dec | 35 | 5 | 3 | 22 | 0 | 5 |
| **2010** | | | | | | |
| Jan | 22 | 0 | 3 | 14 | 2 | 3 |
| Feb | 60 | 0 | 4 | 54 | 1 | 1 |
| Mar | 20 | 1 | 2 | 14 | 1 | 2 |
| Apr | 4 | 0 | 0 | 1 | 0 | 3 |
| May | 5 | 0 | 0 | 1 | 0 | 4 |
| Jun | 2 | 0 | 0 | 1 | 0 | 1 |
| Jul | 0 | 0 | 0 | 0 | 0 | 0 |
| Aug | 2 | 0 | 0 | 0 | 0 | 2 |
| Sep | 4 | 0 | 2 | 2 | 0 | 0 |
| Oct | 0 | 0 | 0 | 0 | 0 | 0 |
| **May 2009 - Apr 2010** | **710** | **81** | **88** | **470** | **6** | **65** |
| May - Oct 2010 | 13 | 0 | 2 | 4 | 0 | 7 |

Source: BTS, *Monthly Summary of Tarmac Times Jan 2009 - Oct 2010*

There have been only 13 reported delays of 3 hours or more in the first 6 months after the Rule became effective. As Table 12 shows, the number of reported tarmac delays varies substantially on a month-to-month basis but is highest in the summer months because of unexpected severe

---

[29] Final Rule on Revision of Airline Service Quality Performance Reports, Docket No. OST 2007-28522.

weather events. It would therefore be reasonable to expect that the number of delays in the next 6-month period (November 2010 through April 2011) would be lower than for the most recent 6 months (May through October 2010) for which delay reports are available.[30]

At present, however, the Department does not collect information on the number and characteristics of tarmac delays associated with domestic flights operated by non-reporting U.S. carriers and with international flights operated by either U.S. or foreign carriers. Information about these delays will improve the Department's ability to understand the extent and causes of lengthy tarmac delays and provide the basis for assessing whether carriers are complying with current requirements for tarmac contingency plans.

### 4.2.2.   Area 2 Requirements to Address Identified Needs

The Rule requires all covered U.S. carriers and foreign carriers to report specified information to BTS on all tarmac delays of 3 hours or more involving domestic flights or international flights departing from, or arriving at, a U.S. airport.

Information on 3-hour tarmac delays involving domestic flights of reporting carriers is available since October 2008. Reporting carriers accounted for 73 percent of domestic departures and 57 percent of international departures in 2009. If tarmac delays of 3 hours or more were uniformly distributed among reporting carriers, non-reporting U.S. carriers, and foreign carriers, as well as between domestic and international flights, the numbers of reportable delays in 2009 would have been as follows:[31]

*Table 13 - Projected Numbers of Reportable 3-Hour Tarmac Delays, 2009*

|  |  | Total | Domestic | International |
|---|---|---|---|---|
| US Carriers | Reporting | 166 | 26 | 140 |
|  | Non-Reporting | 43 | 10 | 33 |
|  | **Total** | **209** | **36** | **173** |
| Foreign* |  | 59 | 0 | 59 |
| **All Carriers** |  | **268** | **36** | **232** |

*excludes Canadian carriers, which typically will not have reportable tarmac delays.

Source: Estimated from tarmac delay reports for domestic flights operated by reported carriers.

### 4.2.3.   Benefits of Area 2 Requirements

This requirement will provide the Department with more complete information, which could improve its ability to identify, analyze, and respond to issues and enforcement matters relating to carrier adherence to tarmac contingency plans. Passengers may also benefit from BTS making

---

[30] While this analysis was being finalized, a historically unprecedented number of taxi-in delays occurred at JFK Airport during the last few days of 2010 due to a severe blizzard. All of the impacted flights were international arrivals.  At the time this report was prepared, the causes of these delays had not yet been evaluated. The evaluation does not incorporate any projections for future occurrences of similar events.

[31] These projections take into account the subsequent reductions in 3-hour tarmac delays that have taken place as a result of the EAPP1 Rule.

available delay statistics from more carriers of air travel. However, it is not possible to quantify the benefits from these improvements in data coverage and availability.

Since these data will be used for tarmac delay reports published by BTS, it is also possible that benefits may accrue to consumers as they become more aware of the range of incidents of long tarmac delays and adjust their purchasing decisions. Such a scenario will result in improved performance among carriers, especially among international carriers that may set a time limit for tarmac delays before allowing deplaning that is greater than the 3-hour requirement for domestic flights. This analysis does not attempt to estimate such benefits at this point.

There is also a possibility that the publication of incidents of lengthy tarmac delays could generate increased negative passenger attention, in turn leading to heightened sensitivity to additional delay costs among carrier management. This could lead to improved management of delayed flights, diversion schedules, and other flight management issues, as carriers have additional incentive to avoid long tarmac delays.

### 4.2.4.   Cost of Area 2 Requirements

In Section 4.2.2, we estimated that on an annual basis (using data from May 2009 through April 2010 for international flights and from May 2010 through October 2010 for domestic flights), there would have been 10 3-hour tarmac delays involving domestic flights operated by non-reporting U.S. carriers and 263 on international flights operated by U.S. and foreign carriers in 2009 that would have been reportable to BTS under the Rule provisions in Requirement Area 2.

Carriers will incur one-time costs to set up and program tarmac delay data collection systems that produce reports in an electronic format suitable for submission to BTS. In addition, carriers with one or more reportable tarmac delays in a particular month will need to collect data on the affected flights, enter this information into the reporting system, and upload it to a BTS electronic submission application. For this analysis, we have assumed that it will require U.S. reporting carriers (which already have on-time performance reporting systems in place for domestic flights) 2 hours to complete and submit each report.  A per-report estimate of 4 hours was used for other U.S. carriers and foreign carriers.

Unit costs to set up reporting systems and prepare and submit delay reports are estimated as follows:

*Table 14 – Unit Compliance Costs for Requirement Area 2*

| | Direct Labor Hours | Mean Wage Rate* | Full Cost per Hour** | Cost per Firm |
|---|---|---|---|---|
| **Set-up costs to record and transmit tarmac delay data in BTS format** | | | | |
| reporting carriers | | | | |
|    programming for data collection/reporting | 4 | $35.67 | $102.00 | $408 |
|    onsite personnel training | 40 | $24.27 | $69.00 | $2,760 |
| other carriers | | | | |
|    programming for data collection/reporting | 8 | $35.67 | $102.00 | $816 |
|    onsite personnel training | 10 | $24.27 | $69.00 | $690 |
| **Per-report costs for data collection, form completion and review, and forwarding to BTS** | | | | |
| reporting carriers | 2 | $24.27 | $69.00 | $138 |
| other carriers | 4 | $24.27 | $69.00 | $276 |

*Rates for computer programmers and first-line supervisors/managers of office and administrative support workers, NAICS 481000, BLS Occupational Employment Statistics, May 2009.

**Full cost includes benefits and other direct labor costs (43 percent of mean wage rate) and cost for time associated with supervisor/management review (100 percent of direct labor cost).

Based on these estimates and assumptions, costs incurred by affected carriers to comply with Rule provisions in Requirement Area 2 are expected to be approximately $350,000 in 2012 and $910,000 for the 10-year period from 2012 through 2021.

EAPP2 Final Regulatory Analysis                                  1029-000/DTOS59-09-F-10089

*Table 15 - Estimated Compliance Costs for Requirement Area 2*

|  | 2012 | 2012-2021 |
|---|---|---|
| **Number of carriers incurring system set-up/training costs** | | |
| reporting carriers | 18 | 18 |
| other U.S. carriers | 43 | 43 |
| foreign carriers* | 117 | 117 |
| **Cost per carrier** | | |
| reporting carriers | $3,168 | $3,168 |
| foreign carriers* | $1,506 | $1,506 |
| **Total system set-up/training costs** | **$297,984** | **$297,984** |
| **Newly reportable tarmac delays** | | |
| international flights by reporting carriers | 153 | 1,854 |
| other U.S. carriers | 45 | 511 |
| foreign carriers* | 65 | 783 |
| Total reports filed | 263 | 3,149 |
| **Cost per report filed** | | |
| reporting carriers | $138 | |
| other U.S. carriers/foreign carriers* | $276 | |
| **Total cost of filing delay reports** | **$349,458** | **$911,532** |
| Total Compliance Costs (millions) | $0.35 | $0.91 |
| *Discounted Total Compliance Costs (millions)* | | *$0.75* |

*Excludes Canadian carriers, which typically will not have reportable tarmac delays.
Note: Number of flights with reportable tarmac delays increases in subsequent years by the total departure growth rate projected in the 2009 FAA Aerospace Forecast.

## 4.3. Minimum Standards for Customer Service Plans (CSPs)

### 4.3.1. Current Requirements, Industry Practices, and Need for Additional Regulation

Under the EAPP1 Rule, any domestic certificated or commuter air carrier that operates scheduled passenger service with at least one aircraft originally designed with 30 or more seats is required to develop a customer service plan (CSP) that addresses the issues covered by the 12 areas of the Air Transport Association's (ATA) Customer Service Commitment (CSC). These carriers are also required to self-audit their adherence to this CSP. Airlines participating in the ATA CSC have committed to the following:

1. Offering the lowest fare available
2. Notifying customers of known delays, cancellations, and diversions
3. Delivering baggage on time
4. Setting a reasonable baggage liability limit
5. Allowing reservations to be held or canceled

6.  Providing prompt ticket refunds
7.  Properly accommodating passengers with disabilities and other special-needs passengers
8.  Meeting customers' essential needs during lengthy tarmac delays
9.  Handling "bumped" passengers with fairness and consistency
10. Ensuring good customer service from code-share partners
11. Ensuring responsiveness to customer complaints
12. Identifying the services it provides to mitigate passenger inconveniences resulting from cancellations and misconnects.

However, the EAPP1 Final Rule does not establish specific standards for most of these components (although some are already fixed by existing regulatory requirements), nor does the ATA CSC define the meaning of terms used in some of the 12 parts (e.g., "lowest fare," "timely reporting"). The current CSP requirements also do not apply to foreign carriers, which creates a potential disparity in the level of service guaranteed to passengers on international flights operated by U.S. and foreign carriers.

The lack of specified minimum standards for CSPs makes it difficult for both passengers and the Department to evaluate the specific guarantees of service provision that are being made by carriers. In addition, passengers traveling to destinations outside the United States are not currently assured a minimum level of customer service in the areas addressed by the ATA CSC and EAPP1 Final Rule requirements if they choose to fly on a foreign carrier.

### 4.3.2.  Area 3 Requirements to Address Identified Needs

The Rule references or establishes specific standards for each of the 12 required CSP elements. In addition, foreign carriers will be required to establish CSPs that cover passengers on their flights to and from the United States. They will also be required to conduct the annual self-audits of compliance now required of covered U.S. carriers.

The Rule also stipulates that covered U.S. and foreign carriers will have to make the results of the required annual self-audits of compliance available for Department review on request for 2 years following the date on which the audit is completed.

For this analysis, we have assumed that subsidiaries of foreign carriers will not be required to develop independent CSPs. Foreign carriers offering scheduled service that are not subsidiaries of other foreign carriers with flights to and from the United States will need to develop, adhere to, and self-monitor compliance with their CSPs.

### 4.3.3.  Benefits of Area 3 Requirements

The Department believes that the minimum standards specified in the Rule will assist carriers in better preparing their customer service plans and decrease confusion among carrier and consumers as to the CSP requirements.

It is reasonable to assume that adoption of a customer service plan with specific performance standards will improve the level of service provided. As noted in the RIA for the EAPP1 Final

Rule, a review of data from domestic carriers that were self-auditing compliance with customer service plans previous to the EAPP1 Final Rule showed a greater reduction in customer complaints beginning in the 2 years after adoption of self-auditing than for carriers that did not audit in the same timeframe.[32] The historical difference in complaint rates between carriers that self-audited and those that did not is used to estimate the decline in complaints for carriers that will now audit compliance.

*Table 16 - Benefits Estimates for Requirement Area 3*

|  | 2012 | 2012-2021 |
|---|---|---|
| Complaints involving Foreign Carriers Received by DOT, 2009 | 1,566 | 19,335 |
| Ratio of complaints received by carriers to number received by DOT | 61 | 61 |
| Number of Complaints Received by Foreign Carriers | 95,537 | 1,179,453 |
| Percent Reduction of Complaints from by Implementing CSP | 20% | 20% |
| **Reduction in Complaints** | **19,107** | **235,891** |
| **Benefits from Premium on Complaint Free Air Travel** | | |
| Average Price of Airfare (Domestic) | $228 | $228 |
| Average Price of Airfare (International) | $1,781 | $1,781 |
| Percentage of Foreign Carriers Passengers that on Domestic Routes | 0.75% | 0.75% |
| Weighted Average Air Fare | $1,769.31 | $1,769.31 |
| Premium on Foreign Flights for Complaint-Free Travel | 5% | 5% |
| **Average Savings per Complaint Free Flight per Complaining Passenger** | **$88.47** | **$88.47** |
| **Total Benefits from Increase in Complaint-Free Trips** | **$845,171** | **$10,434,093** |
| Total Component Benefits (millions) | $0.85 | $10.43 |
| *Total Component Benefits (millions) Discounted* | | *$7.65* |

Adoption of these requirements may provide several additional categories of potential benefits that could not be quantified in this regulatory evaluation, including the following:

- ***Decreased Confusion and Uncertainty Regarding Department Requirements.*** The specification of standards for the provisions required in carrier customer service plans should lead to a decrease in confusion among carriers and passengers as to what protections are actually provided by the customer service plans. The decrease in

---

[32] For carriers implementing self-audits of adherence to customer service plans, complaints declined in the 2 years following implementation by 39 percent. During the same time period, carriers that did not do self-audits experienced a drop in complaints of only 19 percent. We have assumed that carriers who initiate self-audits of customer service plans in response to the Rule requirements will have a 10 percent decrease in complaints.

confusion may also lead to cost savings for carriers from a reduction in the amount of time required for employees to answer consumer questions regarding the plans.

- ***Value of Improved Customer Service Based on Self-Auditing of Adherence to Customer Service Plans for Foreign Carriers***. Historical data on complaints filed with DOT show that carriers which implement customer service plans and self-audit adherence to the plan have fewer complaints than other carriers. This presumably is based on an improvement in services from carriers to passengers, including better baggage handling, fewer ticketing errors, less discrimination, and fewer other problems for passengers. Carriers are providing service in a better manner to consumers, but the value of this change is difficult to estimate.

- ***Improved Customer Good Will toward Carriers***. Having specific standards to which carriers can refer may result in higher customer satisfaction than would be the case without the standards. This effect could increase customer good will and possibly decrease costs as carriers implement and manage adherence to their customer service plans.

Because there are potentially significant but unquantifiable benefits that may be realized by passengers as a result of these requirements, a cost-per-passenger analysis is presented in Section 5.3 below.

### 4.3.4.  Cost of Area 3 Requirements

Foreign carriers that are not subsidiaries of other foreign carriers will have to develop, implement, and self-audit compliance with CSPs that meet the minimum standards set forth in the Rule. The preliminary RIA included separate compliance cost estimates for large and small foreign carriers. The Department solicited comments as to whether this type of size-based distinction appropriately captures the likely extent of variation in compliance costs among foreign carriers. Having received no comments on this issue, the final RIA assumes that the seven foreign carriers which boarded or deplaned at least 2 million international passengers in the United States in 2009 will need to develop and implement more extensive CSPs than will smaller foreign carriers.

Unit costs to develop, implement, and maintain compliant CSPs are estimated as follows:

*Table 17 - Unit Costs for Requirement Area 3*

|  | 2012 |
|---|---|
| **Develop and implement CSP** |  |
| large foreign carriers* | $35,000 |
| other foreign carriers | $3,850 |
| **Annual cost of CSP support (large carriers)** |  |
| large foreign carriers* | $41,800 |
| other foreign carriers | $4,598 |
| **Annual cost of CSP self-audit (large carriers)** |  |
| large foreign carriers* | $15,000 |
| other foreign carriers | $1,650 |

*More than 2 million passengers annually departing from/arriving in the
United States.

Source: EAPP1 RIA estimates for U.S. carriers.

Based on these estimates and assumptions, costs incurred by affected carriers to comply with
Rule provisions in Requirement Area 3 are expected to be $1.5 million in 2012 and $9.6 million
for the entire 10-year period from 2012 through 2021.

*Table 18 - Estimated Compliance Costs for Requirement Area 3*

|  | 2012 | 2012-2021 |
|---|---|---|
| **Number of foreign carriers by U.S. passenger enplanements, 2009** |  |  |
| large foreign carriers* | 7 | |
| other foreign carriers | 81 | |
| **First-year implementation** |  |  |
| large foreign carriers* | $245,000 | $245,000 |
| other foreign carriers | $311,850 | $311,850 |
| **Annual plan support** |  |  |
| large foreign carriers* | $292,600 | $2,926,000 |
| other foreign carriers | $372,438 | $3,724,380 |
| **Annual self-audits** |  |  |
| large foreign carriers* | $105,000 | $1,050,000 |
| other foreign carriers | $133,650 | $1,336,500 |
| **Total cost of customer service plans** | **$1,460,538** | **$9,593,730** |
| Total Compliance Costs (millions) | $1.46 | $9.59 |
| *Discounted Total Compliance Costs (millions)* |  | *$7.35* |

*More than 2 million passengers annually departing from/arriving in the United States.

It is possible that one or more specific components of the Rule requirements for CSPs will
cause carriers that do not currently meet the specified minimum level of service to incur

additional compliance costs. However, the Department does not have adequate information to be able to determine the numbers of carriers that would need to make substantive changes to comply with each of the various aspects of service provision specified under this requirement, nor is it possible to develop carrier-specific unit cost estimates for any such changes.

## 4.4. Posting of Contracts of Carriage, Customer Service Plans, and Tarmac Contingency Plans on Foreign Carrier Websites

### 4.4.1. Current Requirements, Industry Practices, and Need for Additional Regulation

Under the EAPP1 Final Rule, covered U.S. carriers are required to develop tarmac contingency plans and to post them on their websites. Another section of the EAPP1 Final Rule requires covered U.S. carriers to develop, follow, and self-audit compliance with CSPs. These plans must also be posted on carrier websites.

A February 2010 review of the websites of reporting U.S. carriers that sell air transportation to the general public indicated that all have posted their CSPs on their websites, either on a standalone basis or as part of their contracts of carriage. A subsequent review of these websites in December 2010 confirmed that the tarmac contingency plans required by the EAPP1 are also posted on all reporting U.S. carrier websites.

Of the foreign carriers who have websites accessible to U.S. consumers, all but 30 currently have their contracts of carriage posted. However, only 15 foreign carriers offering service to and from the United States currently have a CSP posted on their website; five of these are in a form that is comparable to the ATA CSC plan. Finally, while all carriers based in member countries of the European Union (EU) must adhere to the EU tarmac delay regulation (261/2004), and most have either a link to or summaries of the regulation on their websites, none have U.S.-specific tarmac delay plans posted on their websites.

### 4.4.2. Area 4 Requirements to Address Identified Needs

The Rule provisions in Requirement Area 4 will require foreign carriers to post contracts of carriage, customer service plans, and tarmac contingency plans on websites targeted to U.S. ticket purchasers.

EAPP2 Final Regulatory Analysis | 1029-000/DTOS59-09-F-10089

*Table 19 - Number of Foreign Carriers Required to Post*

| Document | Total in 2009 T-100* | Exempt* | Non-Exempt | Currently Compliant** | Other |
|---|---|---|---|---|---|
| Contract of Carriage | 130 | 19 | 111 | 81 | 30 |
| CSP | 130 | 40 | 90 | 15 | 75 |
| Tarmac Delay Plan | 130 | 23 | 107 | 0 | 107 |

*Includes wholly-owned subsidiaries (14), other carriers without English-language websites (5), and for CSPs only, other charter carriers (20). In addition, small carriers operating only aircraft with fewer than 30 seats are also exempt from CSP (1) and tarmac delay plan (4) requirements.

**Compliant carriers may need to upload updated or revised plans.

### 4.4.3.  Benefits of Area 4 Requirements

It was not possible to develop quantitative estimates of benefits for this requirement. It is possible that making this information and these service plans more accessible online will lead to some improvement in customer service or in some time-savings to consumers who are seeking this information.

Because there are potentially significant but unquantifiable benefits that may be realized by passengers as a result of these requirements, a cost-per-passenger analysis is presented in Section 5.3 below.

### 4.4.4.  Cost of Area 4 Requirements

Foreign carriers that are not already compliant with the requirements to post contracts of carriage, tarmac contingency plans, and customer service plans on websites marketed to passengers to and from the United States will incur administrative and website programming costs. On a per-carrier basis, these costs were assumed to be equal to those estimated for posting the baggage and optional fee disclosure notices in Section 4.8.4.

Unit costs for foreign carriers to comply with the posting requirements are estimated as follows:

*Table 20 - Unit Costs for Requirement Area 4*

| | Direct Labor Hours | Mean Wage Rate* | Full Cost per Hour** | Cost per Firm |
|---|---|---|---|---|
| **Website programming to post/update documents** | | | | |
| initial programming for new documents | 8 | $35.67 | $102.00 | $816 |
| updated links/website text (annual) | 4 | $35.67 | $102.00 | $408 |

*Rates for computer programmers, NAICS 481000, BLS Occupational Employment Statistics, May 2009.

**Full cost includes benefits and other direct labor costs (43 percent of mean wage rate) and cost for time associated with supervisor/management review (100 percent of direct labor cost).

Based on these estimates and assumptions, costs incurred by affected carriers to comply with Rule provisions in Requirement Area 4 are expected to be $0.2 million in 2012 and $1.3 million for the entire 10-year period from 2012 through 2021.

*Table 21 - Estimated Compliance Costs for Requirement Area 4*

| | 2012 | 2012-21 |
|---|---|---|
| **Posting contracts of carriage** | | |
| Additional foreign carriers required to post | 30 | 30 |
| Unit cost to post (first time) | $816 | $816 |
| Foreign carriers required to update | | 111 |
| Unit cost to post update | | $408 |
| **Total cost of posting contracts of carriage** | **$24,480** | **$432,072** |
| **Posting customer service plans (CSPs)** | | |
| Additional foreign carriers required to post | 75 | 75 |
| Unit cost to post (first time) | $816 | $816 |
| Foreign carriers required to update | | 90 |
| Unit cost to post update | | $408 |
| **Total cost of posting customer service plans** | **$61,200** | **$391,680** |
| **Posting tarmac delay plans** | | |
| Additional foreign carriers required to post | 107 | 107 |
| Unit cost to post (first time) | $816 | $816 |
| Foreign carriers required to update | | 107 |
| Unit cost to post update | | $408 |
| **Total cost to post tarmac delay plans** | **$87,312** | **$480,216** |
| **Total costs for website posting requirements** | **$172,992** | **$1,303,968** |
| Total Compliance Costs (millions) | $0.17 | $1.30 |
| *Discounted Total Compliance Costs (millions)* | | *$0.99* |

## 4.5. Requiring Foreign Carriers to Respond to Customer Complaints

### 4.5.1. Current Requirements, Industry Practices, and Need for Additional Regulation

The EAPP1 Final Rule requires covered U.S. carriers to acknowledge customer complaints in writing and to provide substantive responses to the concerns raised within specified time limits. In 2009 the Department received reports of 7,233 problems concerning service on U.S. carriers and an additional 1,450 complaints related to problems on foreign carriers. The complaint rate per 100,000 passengers on foreign carriers is 50 percent higher than the rate for U.S. carriers.

*Table 22 - Passenger Service Complaints Received by the Department, 2009*

| Complaint Category | Domestic | Foreign | Total |
|---|---|---|---|
| Flight cancellations, delays, etc. | 1,870 | 164 | 2,034 |
| Baggage | 1,281 | 323 | 1,604 |
| Reservations/ticketing/ boarding | 1,085 | 437 | 1,522 |
| Customer service | 974 | 120 | 1,094 |
| Refunds | 460 | 174 | 634 |
| Disability | 465 | 51 | 516 |
| Oversales | 332 | 38 | 370 |
| Fares | 348 | 75 | 423 |
| Discrimination | 107 | 23 | 130 |
| Advertising | 38 | 12 | 50 |
| Animals | 5 | 0 | 5 |
| Other (includes frequent flier) | 268 | 33 | 301 |
| **Total** | **7,233** | **1,450** | **8,683** |
| Passengers Boarded | 631,955,369 | 83,152,598 | 715,107,967 |
| Complaints per 100,000 Passengers | 1.14 | 1.74 | 1.21 |

Source: OST, A*ir Travel Consumer Reports*, Jan-Dec 2009; BTS, *T-100 Segment database, 2009.*

The Department currently lacks the regulatory authority to require that foreign carriers respond to customer complaints within a specified timeframe. As airline passengers become increasingly familiar with the CSPs mandated in the EAPP1 Final Rule for domestic carriers, they are unlikely to be aware that these requirements do not apply to flights operated by foreign carriers when making decisions about booking international travel.

### 4.5.2. Area 5 Requirements to Address Identified Needs

The Rule extends the requirements for covered U.S. carriers in the EAPP1 Final Rule relating to designation of an advocate for customers' interests; acknowledgement of customer complaints in writing; and provision of a substantive response to the concerns raised within specified time limits to provide passengers on foreign carrier flights to and from the United States with the same guarantee of response.

For this analysis, we have assumed that all foreign carriers which are not subsidiaries of other foreign carriers with flights to and from the United States would need to respond to customer complaints in a manner that complies with the Rule requirements. The total number of customer complaints requiring responses is estimated to be 61 times the number of complaints reported directly to the OST, based on a 2001 report by the DOT Inspector General.[33] Improved carrier responsiveness to complaints was estimated to reduce the level of complaints by 20 percent in the EAPP1 RIA.

*Table 23 - Number of Consumer Complaints Involving Foreign Carriers, 2009*

| Variable | Estimate |
|---|---|
| Number of Complaints Received by DOT | 1,450 |
| Ratio of Total to Reported Complaints | 61 |
| Estimated Total Complaints | 88,450 |
| Percent Reduction from CSP Implementation | 20% |
| Expected Number of Complaints with CSP | 70,760 |

Source: OST, Air Travel Consumer Reports, Jan-Dec 2009; EAPP1 RIA.

### 4.5.3.  Benefits of Area 5 Requirements

The benefits of this provision include reduced barriers to filing a complaint which in turn leads to time savings for some travelers, and increasing satisfaction due to more prominently displayed complaint filing information. This analysis considers two components of benefits. The first of these reflects the time consumers save from carriers posting information for filing a complaint on their websites. This benefit is measured and quantified. The second component of benefits consists of the value to consumers who filed complaints of receiving a more specific, targeted response or acknowledgement of the complaint. Since estimates of the dollar value to consumers of improvements in the quality of acknowledgements and responses to complaints could not be located, a cost-per-passenger analysis was conducted. The results are presented in Section 5.3 below.

Quantitative benefits associated with reducing the time required to file a complaint are estimated using the same procedure used to estimate these benefits for the same requirements imposed on domestic carriers in the EAPP1 Final Rule. [34]

---

[33] DOT, "Final Report on Airline Customer Service Commitment," Office of the Inspector General, report AV-2001-020, February 12, 2001." See the Source Notes section of the Appendix for further details.

[34] This includes the time spent locating the appropriate address to send the letter or e-mail but does not include the resolution of complaints.

*Table 24 – Benefits Estimates for Requirement Area 5*

| | 2012 | 2012-2021 |
|---|---|---|
| Number of Complaints (Foreign Carriers) | 1,566 | 19,335 |
| Complaint Multiplier (# of Complaints not filed actually received by Carriers) | 61 | 61 |
| **Number of "Ground Level" Complaints to Foreign Carriers** | **95,537** | **1,179,453** |
| **Benefits from Increase in Consumer Surplus** | | |
| Percent Change in Cost of Complaining | 3.23% | 3.23% |
| Elasticity of Cost of Complaining | 1.07 | 1.07 |
| Percentage Increase in Complaints | 3.47% | 3.47% |
| **Incremental Increase in Number of Complaints** | **3,315** | **40,919** |
| Decrease in the Cost of Complaining | $0.32 | $0.32 |
| **Benefits from Increase in Consumer Surplus** | **$530** | **$6,547** |
| Total Component Benefits (millions) | $0.00 | $0.01 |
| *Total Component Benefits (millions) Discounted* | | *$0.00* |

As with passengers on domestic carriers covered under the EAPP1 Final Rule, passengers on flights of foreign carriers who file complaints may experience greater reassurance and less agitation while awaiting resolution of a complaint. Passengers may feel that their complaints are legitimate when carriers respond to them specifically instead of just noting that a communication has been received. The Department expressly solicited comments regarding estimating the dollar value to customers of receiving a response to their complaint that acknowledges the issues involved, instead of a more generic acknowledgement of the communication, but usable information was not forthcoming.

A cost-per-passenger analysis was conducted in which the net costs of the requirement (total costs, net of the monetized benefits from the more accessible information for filing complaints) was divided by the number of passengers on covered flights by international carriers. The results are presented in Section 5.3 below.

### 4.5.4.  Cost of Area 5 Requirements

Foreign carriers that are not subsidiaries of other foreign carriers will have to comply with the minimum standards for responding to customer complaints included in the Rule provisions in this requirement area. The preliminary RIA included separate compliance cost estimates for large and small foreign carriers. The Department solicited comments as to whether this type of size-based distinction appropriately captures the likely extent of variation in compliance costs among foreign carriers. Having received no comments on this issue, the final RIA assumes that the seven foreign carriers which boarded or deplaned at least 2 million international passengers in the United States in 2009 will need to develop and implement more extensive systems and

procedures to handle customer complaints will smaller foreign carriers. Per-carrier compliance costs are estimated as follows:

*Table 25 – Unit Costs for Requirement Area 5*

|  | 2012 |
|---|---|
| Establish/upgrade complaint handling system and procedures (large foreign carriers*) | $41,371 |
| Establish/upgrade complaint handling system and procedures (other foreign carriers) | $4,261 |
| Per-complaint cost to respond | $1.85 |

*More than 2 million passengers annually departing from/arriving in the United States.

Source: EAPP1 RIA estimates for U.S. carriers.

Based on these estimates and assumptions, costs incurred by affected carriers to comply with Rule provisions in Requirement Area 5 are expected to be $0.8 million in 2012 and $2.4 million for the entire 10-year period from 2012 through 2021.

*Table 26 – Estimated Compliance Costs for Requirement Area 5*

|  | 2012 | 2012-2021 |
|---|---|---|
| **Cost of implementing response systems** |  |  |
| Number of large foreign carriers* | 7 | |
| Number of other foreign carriers | 81 | |
| Cost of implementation, large foreign carriers | $41,371 | |
| Cost of implementation, other foreign carriers | $4,261 | |
| **Cost of responding to complaints** | **$634,738** | **$634,738** |
| Number of complaints | 77,520 | 939,393 |
| Per-complaint response cost | $1.85 | |
| **Cost of responding to individual complaints** | **$143,412** | **$1,737,877** |
| **Total cost of responding to complaints** | **$778,150** | **$2,372,615** |
| Total Compliance Costs (millions) | $0.78 | $2.37 |
| *Discounted Total Compliance Costs (millions)* | | *$1.91* |

*More than 2 million passengers annually departing from/arriving in the United States.

Note: Number of passengers complaining is estimated to increase in subsequent years by the international passenger growth rate projected in the 2009 FAA Aerospace Forecast.

## 4.6. Changes in Denied Boarding Compensation (DBC) Policy

### 4.6.1. Current Requirements, Industry Practices, and Need for Additional Regulation

DOT requires that airlines pay specified amounts of denied boarding compensation (DBC) to passengers on an overbooked flight in cases where the carrier is not able to recruit a sufficient number of passengers to voluntarily surrender their boarding passes in exchange for cash or vouchers. While nearly 90 percent of boarding refusals attributable to carrier oversales in 2009 were resolved by recruiting volunteers, BTS data indicate that nearly 70,000 passengers were involuntarily bumped from oversold flights operated by reporting carriers.[35]

*Table 27 – Passengers Denied Boarding on Reporting Carriers, 2009*

|  | Number | % of Total |
|---|---|---|
| Involuntarily Bumped Passengers | 69,416 | 0.012% |
| Number Receiving DBC | 58,005 | 0.010% |
| Voluntarily Bumped Passengers | 623,673 | 0.106% |
| Total Passengers Boarded | 583,639,896 | |

Source: BTS, *Report of Passengers Denied Confirmed Space*, 2009

---

[35] Under the present requirements, DBC must be paid only to passengers involuntarily bumped from flights on aircraft with 30 or more seats. Additionally, DBC does not have to be paid to passengers bumped from flights on 30-60 seat aircraft to reduce the amount or distribution of weight carried for safety reasons.

Currently, involuntarily bumped travelers are required to be given DBC equal to 100 percent of the fare (200 percent if alternative transportation is not provided within specified time limits) to the next stopover on the flight itinerary, up to the cap specified in the regulation. In 2008, the maximum level of DBC for involuntarily bumped passengers on oversold flights was raised from $200 to $400, when alternative transportation is provided by the carrier within 2 hours for domestic flights and within 4 hours for international flights, and from $400 to $800 otherwise.[36] Based on preliminary analysis of a sample of data from the BTS passenger origins and destinations (O&D) survey, about 7 percent of each-way fares on round-trip tickets and just under one-quarter of one-way fares exceed $400.[37]

The current DBC policy is not clear on the amount of compensation that must be paid to a holder of a zero-fare (e.g., tour consolidator or frequent flyer) ticket who is involuntarily bumped from an oversold flight. In the O&D survey data analyzed, about 4.5 percent of round-trip fares have an each-way value of less than $50, the minimum amount that BTS includes in its statistical estimation of the average fares paid by passengers for air travel.[38] The Department solicited comments on current carrier practices with respect to compensation of these travelers, who may or may not be treated equitably.

Carriers are required to provide a full explanation of the DBC policy in written form, but airline representatives may not always provide complete information about the DBC regulation provisions when orally advising passengers who are involuntarily bumped. BTS Form 251 reports do not include the amounts of DBC paid in the form of vouchers rather than cash or check payments, nor is information available on the extent to which the value of these vouchers typically exceeds the prescribed amount of DBC payable by cash or check. Thus, it is not possible to determine the number or share of passengers who would have been involuntarily bumped but who chose to accept travel vouchers or coupons instead.

The current DBC requirements may not be sufficient to ensure that all passengers bumped from the same flight are treated equitably. Those flying on tickets that exceed the maximum DBC threshold will receive less compensation in relation to the amount of the fare paid; those flying on zero-fare tickets may not be compensated on a basis consistent with those who purchased tickets; and the extent and completeness of the verbal explanations of the compensation options available to potential volunteers for bumping on oversold flights may vary among gate agents.

---

[36] DOT, "Final Rule on Oversales and Denied Boarding Compensation," DOT-OST-2001-9325-1328, April 18, 2008. The original maximum levels for DBC were established in 1978. The 1978 limits of $100 and $200 for DBC are equivalent to $650 and $1,300, respectively, in July 2009, after taking into account increases in the Consumer Price Index over the past 21 years.

[37] The sample analyzed included more than one million records for flights originating in Illinois during the second quarter of 2008; the average fare for a round-trip ticket in this sample was $349. The O&D market file data do not identify the type of fares associated with individual tickets, but analysis of the accompanying coupon file indicates that first-class tickets accounted for about 10 percent of flights in the sample.

[38] Including one-way fares in the analysis does not materially alter the estimate of the proportion of passengers traveling on zero-fare tickets: just over 5 percent of one-way fares in this sample were below $50.

### 4.6.2.  Area 6 Requirements to Address Identified Needs

The Rule makes several changes in the existing requirements relating to denied boarding compensation (DBC):

- The Rule doubles the amount of DBC that must be paid to involuntarily bumped passengers: (1) from 100 percent to 200 percent of the one-way fare when alternative transportation is provided by the carrier within 2 hours for domestic flights and within 4 hours for international flights and (2) from 200 percent to 400 percent of the one-way fare otherwise.

- The Rule also increases the maximum amount of DBC that must be paid to involuntarily bumped passengers: (1) from $400 to $650 when alternative transportation is provided by the carrier within 2 hours for domestic flights and within 4 hours for international flights and (2) from $800 to $1,300 otherwise.

- The Rule stipulates that the Department implement a biannual inflation adjustment to the maximum DBC levels based on changes in the CPI-U, with the amount of the adjustment rounded to the nearest $25. Incorporating this adjustment obviates the need for periodic notice and comment rulemakings while maintaining the real value of the maximum compensation amounts set forth in the existing DBC rule.

- The Rule also clarifies previous DBC rule language by explicitly stating that the definition of "confirmed reserved space" on a flight that includes seats held by zero-fare tickets (e.g., tickets obtained from consolidators, as part of a tour package, or by using frequent flyer miles), thus entitling the holders to DBC if bumped. These passengers will be entitled to compensation at the lowest rate paid by cash, check, or credit card for a comparable class of ticket on the same flight, up to the maximum amount currently specified.[39]

- Carriers will be required to "advise each passenger solicited to volunteer for denied boarding, no later than the time the carrier solicits that passenger to volunteer, (1) whether he or she is in danger of being involuntarily denied boarding (in doing so, the carrier must fully disclose the boarding priority rules that the carrier will apply for that specific flight), and (2) the compensation the carrier is obligated to pay if the passenger is involuntarily denied boarding."

- Another new requirement ensures that involuntarily bumped passengers are informed orally of their ability to receive payment of DBC to which they are entitled either by cash or check, rather than in the form of free or discounted air transportation.

It is difficult to evaluate the impact on the numbers of passengers who will be voluntarily or involuntarily bumped from adoption of these requirements. The increases in the DBC amounts may induce carriers to reduce the number of oversales, which will provide benefits to passengers who are involuntarily bumped, but will reduce the welfare of other passengers who will no longer be able to get seats on fully-booked flights that depart with empty seats.

---

[39] The Final Rule stipulates that a zero-fare ticket does not include free or reduced rate air transportation provided to airline employees and guests.

The impact of the additional notice requirements on volunteers is also difficult to assess, because it depends in large part on how many potential excess volunteers there are for any particular oversold flight. If there are few or no excess volunteers, the expanded explanations may cause more of these passengers to force involuntary bumping to receive more compensation or compensation in a more desirable form (e.g., cash instead of travel vouchers). On the other hand, if there are a sufficiently large number of volunteers in relation to the number of oversold seats, these requirements may simply result in different specific individuals accepting the compensation being offered by the carrier.

It is also possible that some of these requirements may extend the time required to resolve oversales situations and lengthen boarding times.

### 4.6.3.   Benefits of Area 6 Requirements

Several of the changes in the Rule from current DBC policy will increase the amounts paid by carriers to passengers who are bumped involuntarily from oversold flights. However, any benefit to passengers in the form of higher DBC compensation payments (and higher voluntary compensation by the airline to avoid DBC payments) will be offset by an equivalent cost to carriers that is likely to be reflected ultimately in higher airfares. In the end, therefore, these additional payments represent a form of insurance shared by all passengers. The small costs borne by many would offset a significant share of the loss imposed on a few. Assuming that passengers are risk-averse, the rule will afford a small potential increase in aggregate welfare and redistribute the burden of involuntary denial of service more fairly among passengers.

It is also possible that carriers may reduce overbooking rates on some flights in response to the potential increase in DBC compensation costs. While fewer passengers would be involuntarily bumped, it is possible that maintenance of lower average load factors would permit fewer passengers to travel on their preferred flights. At the same time, if increased airfares (resulting from higher DBC payments and voluntary compensation) coincide with a perception of a reduced likelihood of involuntary bumping, airlines might find it possible to add flights without sacrificing profits. The costs and benefits of the potential impact of the rule on ticket prices and overbooking rates cannot be estimated and are not included in this evaluation.

Adoption of the new DBC requirements is expected to provide additional categories of potential benefits that could not be quantified in this regulatory evaluation, including the following:

- *Decrease in Confusion Regarding Denied Boarding Compensation Provisions*. The requirement that carriers must provide information regarding customer DBC rights in the same manner as other compensation is offered (such as a carrier coupon) should decrease confusion among passengers. When passengers are presented information in different formats (such as orally and written), there are ample opportunities for confusion.

- *Decreased Resentment among Some Passengers Regarding Different Compensation Received*. Under current guidelines, some passengers on the same flight and entitled to the same amount of compensation may unwittingly choose different methods of compensation and resent what other passengers received (such as cash).

### 4.6.4.   Cost of Area 6 Requirements

As noted in Section 4.6.3, the DBC provisions of this Rule will cause changes in the level of payments from carriers to passengers and some redistribution of the compensation received for both voluntary and involuntary bumping among passengers themselves. In addition to these monetary transfers, there are also real economic costs associated with implementing changes in the DBC policy and updating the maximum amounts payable on a biannual basis. These costs will be higher in the first year than in subsequent years because the Rule changes to the current DBC policy include new provisions relating to zero-fare tickets and verbal explanations provided to passengers who may be bumped involuntarily from oversold flights.

Changes in the DBC policy will require training and communications with gate agents for carriers in each airport they serve using aircraft with 30 or more seats. The BLS Occupational Employment Statistics estimate that in May 2009, approximately 92,000 people were employed as "Reservation and Transportation Ticket Agents and Travel Clerks," a category that includes reservations staff (both onsite at airports and in call centers), ticket agents, gate or boarding attendants, but not flight-related or baggage handling employees.

In this analysis, we have assumed that one-quarter of these employees are gate agents who will need to receive training and information on changes in the current DBC policy.[40] We have assumed that substantially less time per-employee will be needed to train and communicate with gate attendants and other relevant carrier employees when the threshold amount of DBC is increased biennially in alternating future years.[41]

Unit costs for the steps that will be required to achieve compliance with the Rule provisions in Requirement Area 6 are estimated as follows:

---

[40] Most air carriers with fewer than 2,000 employees report passenger handling personnel under the more general category of "Passenger/General Services & Administration." However, the total number of employees reported in this category by smaller carriers is about 7,400, the majority of whom are not likely to have responsibilities associated with boarding passenger flights.

[41] For this analysis, the Department has assumed that any biannual changes in the maximum DBC limit will be made using the July CPI-U and become effective on January 1 of the following year. These costs may be increased if the adjustments must be made more rapidly, because it reduces the opportunities for carriers to communicate changes to gate agents and other passenger-handling personnel who must be informed.

*Table 28 - Unit Costs for Requirement Area 6*

| | Direct Labor Hours | Mean Wage Rate* | Full Cost per Hour** | Unit Cost |
|---|---|---|---|---|
| **Initial per-carrier programming and per-employee training costs** | | | | |
| programming hours | 20 | $35.67 | $102.00 | $2,040 |
| gate attendants (incl. in ticket agents) | 0.5 | $16.68 | $48.00 | $24 |
| **Bi-annual update per-carrier programming and per-employee training costs** | | | | |
| programming hours | 4 | $35.67 | $102.00 | $408 |
| gate attendants (incl. in ticket agents) | 0.05 | $35.67 | $102.00 | $5 |

*Wages rate for reservation and transportation ticket agents and travel clerks, NAICS 481000, BLS Occupational Employment Statistics, May 2009.

**Full cost includes benefits and other direct labor costs (43 percent of mean wage rate) and cost for time associated with supervisor/management review (100 percent of direct labor cost).

Based on these estimates and assumptions, costs incurred by affected carriers to comply with Rule provisions in Requirement Area 6 in the base case are expected to be approximately $0.6 million in 2012 and $1.0 million for the entire 10-year period from 2012 through 2021.

**Table 29 - Estimated Compliance Costs for Requirement Area 6**

|  | 2012 | DBC Update Years* | 2012-21 |
|---|---|---|---|
| **Programming costs to calculate DBC revisions** | | | |
| Number of marketing U.S. carriers | 24 | 24 | 24 |
| Cost per carrier | $2,040 | $408 | |
| **Cost of programming DBC calculations** | **$48,960** | **$9,792** | **$88,128** |
| **Gate agent training costs** | | | |
| Number of gate agents** | 22,980 | 22,980 | |
| Training costs per employee | $24 | $5 | |
| **Total cost of training gate agents and CSRs** | **$551,520** | **$117,198** | **$1,020,312** |
| Total Compliance Costs (millions) | $0.55 | $0.12 | $1.02 |
| *Discounted Total Compliance Costs (millions)* | | | *$0.97* |

\* "DBC Update Years" are those years in which the maximum amount of DBC will be adjusted, starting 2014 and biennially thereafter.

\*\* Assumes 1/4 of ticket agents must be trained.

# 4.7. Required Disclosure of Full Fares in Advertising and Prohibition on Opt-Out Provisions in Ticket Sales

## 4.7.1. Current Requirements, Industry Practices, and Need for Additional Regulation

Existing regulations require that advertising of air travel prices must include all fees, surcharges, and taxes. However, the Department has a longstanding enforcement policy that permits carriers and other sellers of air transportation to break out from the advertised price any airport or government fees and taxes that are charged on a fixed or per-segment basis.[42]

In February 2010, we conducted a review of the prices advertised on the websites of five mainline carriers, three low-cost carriers, and the four largest online travel agencies (OTAs).[43] Of the eight carrier websites, only Delta's displayed the full-fare prices along with the pre-tax prices at the flight selection stage. All eight carrier websites displayed the additional fees and taxes at the flight booking stage.[44] In contrast, full-fare prices were displayed for each available option at the flight selection stage on all four OTA sites, along with prices that did not include the additional fees and taxes. However, the full-fare prices were shown more prominently on the Expedia and Orbitz flight selection pages than on those for Priceline and Travelocity.

---

[42] The 7.5 percent Federal tax on fares must be included in the price displayed under the current enforcement policy.

[43] For each of these sites, we requested two round-trip fares from Baltimore-Washington International Airport (BWI) to the George W. Bush Houston International Airport (IAH) departing on March 26, 2010, and returning on March 29, 2010. The review included capture of screen displays at the flight selection and booking stages.

[44] The United Airlines flight selection page displayed only the fare for a specific combination of outbound and return flights at a single time, so determining the full-fare price for each combination of available flights required return trips to the flight selection and booking pages.

At present, there are also no specific prohibitions on the ability of carrier, travel agency, and tour operator website purchase engines to include and charge for services in addition to the fare unless the purchaser takes affirmative action to opt-out of paying for these services. The most common charges added on this basis are for travel insurance and preferred seating assignments.[45]

Advertised prices that do not include the full amount of the fare being charged, including all mandatory fees and taxes, complicate consumer comparison of alternative travel itineraries to reach the same destination, which may involve different amounts of these mandatory fees and taxes. For example, booking a flight with a connection will incur additional airport departure and security fees that may partially or even totally offset the price advantage of a flight with one or more connections. Experienced travelers will incur longer search times to confirm that they have found the lowest or most appropriate fare when searching on multiple carrier or OTA sites. Inexperienced travelers may find themselves purchasing tickets at prices that are higher than those for other alternatives they reviewed once the charges for all mandatory fees and taxes are included. They may also unwittingly purchase optional services at prices that exceed what they would be willing to pay for these additions.[46]

In addition, substantial Department resources are required to review carrier, travel agent, and tour operator solicitations that have fees and taxes broken out of the advertised prices to determine if these advertisements comply with current enforcement policy. As noted in Section 2.4, more than one-third of the consent orders entered into by the Department during the 3-year period from 2008 through 2010 involved non-compliance with established rules and policy relating to the advertising of air fares.

### 4.7.2.  Area 7 Requirements to Address Identified Needs

The Department is amending its current enforcement policy on full-fare advertising requirements, which permits carriers and other sellers of air transportation to break out from the advertised price any mandatory airport or government fees that are charged on a fixed or per-segment basis. The Rule specifically prohibits break-out of these charges and fees from advertised fares. This has the effect of reaffirming the stated policy and eliminating the variance from stated policy that limits consumers' access to full fare information when they are in the process of making air travel purchase decisions.[47]

This requirement applies to any advertising or solicitation by "a direct air carrier, indirect air carrier, an agent of either, or a ticket agent, for passenger air transportation, a tour (i.e., a combination of air transportation and ground or cruise accommodations), or a tour component (e.g., a hotel stay) that must be purchased with air transportation that states a price for such air transportation, tour, or tour component." The Rule provision will apply to all carriers, travel

---

[45] Our research on full-fare advertising did not in most cases proceed to the step (after entry of credit card information) at which some booking engines may add charges for optional services on an opt-out basis. However, one large OTA site (Travelocity) added travel insurance at the flight booking stage on an opt-out basis.

[46] While consumers may report that they would not have purchased services such as travel insurance or preferred seating assignment on an opt-in basis, it is likely that many would do so if the prices of these services were lower. For example, it is possible that nearly all passengers would purchase travel insurance if it were offered for $1 or less.

[47] A previous reconsideration of this enforcement policy was conducted in Docket No. OST–2005–23194, which ended with the Notice of Proposed Rulemaking being withdrawn.

agencies, and tour operators and will cover both print and online advertising, as well as online travel booking engines.

In addition, advertising and solicitations that display one-way fares for air transportation that are conditional on purchase of a round-trip ticket will be required to display in a conspicuous manner that they are "each-way fares."

The Rule also prohibits covered entities from requiring customers to purchase additional optional services in connection with air transportation (such as travel insurance or preferred seating assignment) unless a consumer affirmatively chooses to have any such services included in the purchase price.

Because of the long lead times involved in some forms of print media advertising vehicles (e.g., annual visitors' guides, promotional brochures for spring break travel packages), the Department is permitting covered entities to distribute or post advertising materials booked or produced before the rule date that comply with the current enforcement policy standards for a short period of time after the rule is published. The final RIA assumes that all print advertising which is created after the effective date of the Rule will need to comply with the requirement and that all online and print solicitations still in circulation will need to comply with the new requirement within 60 days of the effective date for the Rule.

### 4.7.3. Benefits of Area 7 Requirements

Consumers are likely to benefit in several ways from this provision. The first benefit is the time saved for those consumers beginning a ticket purchase that is later abandoned once the full fare is known. These beneficiaries see a fare advertised (in print, on television, etc.) that does not include all taxes and fees and decide to make the effort to purchase a ticket based on the advertised price, only to find that the full-fare price is "too high" and no longer worth purchasing. While advertising provides information to consumers that can facilitate the purchase of desired goods and services, incomplete pricing information in advertisements generates wasted effort by some consumers who begin to make purchase decisions that are later abandoned once full information is received. However, the value of this benefit could not be quantified because adequate data are not available on the number of these consumers and the average amount of time lost.

Passengers who purchase tickets from websites that did not previously present full fares ***up front*** will benefit by (1) saving time that would previously have been spent searching for the full fare on single or multiple websites to be able to compare full-fare prices or (2) avoiding being attracted by lower, incomplete fares and then not fully taking into account the full fare when it is subsequently revealed, which in turn may lead to less than optimal purchasing decisions. The separation of a price into its components (often called "partitioned pricing") that are presented at different times in the purchasing process has been found in many cases to affect demand. The benefits to the former group of consumers, those who save time reviewing multiple websites, are estimated below. The estimated benefits to those consumers who may make suboptimal purchasing decisions based on the fact that the full-fare is presented only at the end of the purchase is not included in the main analysis. A discussion and estimation of this benefit is

presented in Appendix 2.

Those passengers who visit multiple travel websites to ensure that they can adequately compare prices with all fees and taxes across the universe of websites (some of which may include all taxes and fees but at least some of which do not) are referred to in this evaluation as "Full-Fare Comparison Shoppers."

Under the rule, these Full-Fare Comparison Shoppers will avoid the additional time needed to ensure that they are looking at comparable prices and are making decisions based upon the actual final cost of purchase. Note that this provision will not eliminate the value of comparison shopping across websites for prices. Rather, it will simply eliminate the need to search additional websites for the best fares including all taxes and fees or to spend additional time to be able to locate full-fare information on websites that do not provide full-fare prices up-front.

The typical Full-Fare Comparison Shopper is assumed to be shopping for an average of 1.4 people, which is the average travel party size on commercial airlines.[48] The number of tickets purchased online is therefore divided by 1.4 to arrive at an estimate of the number of persons searching multiple web sites and making purchases. The analysis assumes that these purchasers will save an average of 3 minutes of search and estimation time if all fares displayed on travel websites included all required government taxes and fees up front.[49] This time saving was multiplied by a value of time derived from Department of Transportation data developed for estimating air travelers' value of time and uses a weighted average of the estimated non-work value of time of leisure travelers and the average hourly earnings of business travelers ($24.14 per hour; see Appendix 1 for greater detail).

While independent data are available on the percentage of air passengers who purchase tickets online and for the value of time for air travelers, independent estimates have not yet been found for the percent of online air tickets purchased by consumers who search and examine multiple websites to compare fares and who spend time specifically examining prices including all taxes and fees while shopping for the best price. A conservative estimate of 2 percent of online purchasers searching multiple websites was used for this analysis.

---

[48] Estimate from a 2007 Travel Industry Association study cited in the ATA comments.

[49] Independent data on the potential search time saved were not located. We have therefore re-estimated the amount of time saved to 3 minutes based on a series of user time trials. The revised estimate measures only the portion of time spent searching on additional websites to find full-fare prices as opposed to the time that would be required to complete the entire purchasing process (entering names, credit cards, seat preference, etc.) on more than one site. However, it should be noted that this value could not be estimated for a representative sample of all online ticket purchasers.

*Table 30 - Benefits Estimates for Requirement Area 7*

|  | 2012 | 2012-2021 |
|---|---|---|
| Tickets for Domestic Flights Sold by Reporting Carriers | 260,838,061 | 2,962,820,014 |
| Percent of Passengers on Domestic Flights using Reporting Carriers | 87% | 87% |
| Number of Total Passengers on Domestic Flights | 300,055,656 | 3,408,286,734 |
| Percentage of Domestic Passengers to Total Passengers on U.S. | 88% | 88% |
| Number of Total Tickets for U.S. Carriers | 340,845,677 | 3,871,614,405 |
| Percentage of Passengers using Internet for Airfare Purchase | 52% | 62% |
| Tickets Purchased on Websites | 177,239,752 | 2,396,529,316 |
| Average Travel Trip Party Size | 1.4 | 1.4 |
| **Purchasers of Tickets on Websites** | **126,599,823** | **1,711,806,655** |
| **Full-Fare Comparison Shoppers** | | |
| Assumed Percent of Online Purchasers Who Shop on Multiple Travel Websites without Full Fares Displayed | 2% | 2% |
| Purchasers Benefiting from Up-Front Posting of Full-Fare | 2,531,996 | 34,236,133 |
| Value of Time for Passenger (Personal Non-Traveling) | $24.15 | $24.15 |
| Average Time Saved by Purchasers Due to Up-Front Posting of Full-Fares  (3 minutes = 0.05 hours) | 0.05 | 0.05 |
| Value of Average Time Saved Per Purchaser | $1.21 | $1.21 |
| **Total Value of  Time Saved from Reduction in Search Cost** | **$3,057,386** | **$41,340,131** |
| Total  Benefits (millions) | $3.06 | $41.34 |
| *Total Component Benefits (millions) Discounted* | | *$28.97* |

The full-fare advertising requirement may also improve customer good will toward carriers. With all carriers consistently providing full-fare advertising to consumers, customers may perceive the carriers as treating them more "honestly." Some customers may have more positive experiences purchasing tickets than otherwise, making them slightly more likely to travel by air in the future or to avoid the carriers or websites used previously.

By requiring that a customer take a specific action to opt-out of the purchase of an additional service or amenity, some customers mistakenly make a purchase they did not want or intend. Some customers may misunderstand or simply miss the fact that an opt-out feature is an additional, optional purchase. By prohibiting opt-outs for additional services and amenities, this

provision will increase consumer welfare by decreasing unwanted purchases. While the nature of this effect is well understood, adequate information needed to estimate these benefits has not yet been found.

The Department expressly solicited comments regarding the estimation of several factors in the estimation of benefits for this provision, including the average search time saved for passengers who already search for full fare information; the percentage of passengers who spend time searching websites to find full fare ticket information; the percentage of online ticket purchasers who purchase only from websites that provide full-fare pricing up-front; the percentage of passengers who are fully aware of added fees and taxes when purchasing tickets from travel sites that do not automatically display that data up front; the likely change in demand for those passengers who are not aware of the full amount of taxes and fees until later in the purchase process; and the percentage of travelers who inadvertently purchase additional services and amenities as a result of opt-out features who would otherwise not have made these purchases.

### 4.7.4.  Cost of Area 7 Requirements

Carriers, travel agents, and tour operators that do not currently display fares which include all applicable taxes and fees in their advertising and solicitations will incur costs to comply with this requirement. The extent of these costs will depend in part on the length of time between the date on which the rule is published and the effective date of this requirement. We have assumed for this analysis that sellers of air transportation will need to ensure that any new print advertising developed after the effective date of the Rule will need to comply with the Rule requirement, but they will be able to distribute advertising already in production or distribution until 60 days after the effective date of the Rule. In this scenario, most (90 percent) print advertising materials will not require revisions, either because they do not display prices, display prices that include full fares for any air transportation being sold, or are not expected to remain in circulation for more than 60 days after the effective date of the Rule.[50]

For this analysis, large travel agencies and tour operators are defined as those with 20 or more employees. Our cost estimates assume that these companies will incur larger per-firm costs to revise online and print media advertising and solicitations that do not display full fares for air transportation. Small travel agents and tour operators with fewer than 20 employees are assumed to incur smaller per-firm costs to revise print advertising materials.

The unit costs for revising online and print advertising materials to comply with the Rule provisions in Requirement Area 7 are estimated as follows:

---

[50] For example, advertising for spring break travel packages that does not reflect full fares for air travel could be distributed after an assumed Rule publication date of January 1, 2012, as long as it did not offer tours that could be booked 180 days later.

EAPP2 Final Regulatory Analysis                              1029-000/DTOS59-09-F-10089

*Table 31 - Unit Costs for Requirement Area 7*

| | Direct Labor Hours | Mean Wage Rate* | Full Cost per Hour** | Cost per Firm |
|---|---|---|---|---|
| **Reprogram website flight quotation pages** | | | | |
| Large carriers/ 4 largest OTAs | 80 | $35.91 | $103.00 | $8,240 |
| Small carriers/ large travel agencies/tour operators (20+ employees) | 20 | $35.91 | $103.00 | $2,060 |
| Small travel agencies/tour operators (<20 employees) with online booking capability | 10 | $35.91 | $103.00 | $1,030 |
| **Modify print advertising** | | | | |
| Large carriers/travel agencies/tour operators | 8 | $22.99 | $66.00 | $528 |
| Small carriers/travel agencies/tour operators | 2 | $22.99 | $66.00 | $132 |

*Rates for computer programmers and graphic designers, BLS Occupational Employment Statistics, May 2009.

**Full cost includes benefits and other direct labor costs (43 percent of mean wage rate) and cost for time associated with supervisor/management review (100 percent of direct labor cost).

It should be noted that these estimates do *not* include costs for carrier, travel agency, and tour operator websites to bring price displays on their online flight selection pages and online and print media advertising into compliance with *current* Department guidelines and enforcement policy (See the discussion in Section 4.7.1).

Based on these estimates and assumptions, costs incurred by affected carriers to comply with the Rule provisions in Requirement Area 7 are expected to be $6.8 million in 2012. No additional compliance costs will be incurred in subsequent years, as sellers of air transportation will have the option of displaying full-fare prices in all future advertising and solicitations without first preparing versions of these materials that do not include all relevant government taxes and fees.

*Table 32 - Estimated Compliance Costs for Requirement Area 7*

|  | 2012 only |
|---|---|
| **Reprogramming websites to show full fares** | |
| Number of large U.S. carriers offering tickets for purchase | 18 |
| Number of large foreign carriers offering tickets for purchase | 87 |
| Largest 4 online travel agencies (OTAs) | 4 |
| Unit cost to reprogram websites, large carriers/large OTAs | $8,240 |
| Number of small/very small U.S. carriers | 33 |
| Number of small/very small foreign carriers | 2 |
| Other travel agencies/tour operators (20+ employees) | 893 |
| Unit cost to reprogram websites, small/very small carriers | $2,060 |
| Small travel agencies/tour operators (<20 employees) with online booking capability | 1,567 |
| Unit cost to reprogram websites, small/very small carriers | $1,030 |
| **Total cost of reprogramming websites** | **$4,423,850** |
| **Modification of print advertising to reflect full fares** | |
| Number of large U.S. carriers offering tickets for purchase | 18 |
| Number of large foreign carriers offering tickets for purchase | 87 |
| Largest 4 online travel agencies (OTAs) | 4 |
| Other travel agencies/tour operators (20+ employees) | 893 |
| Unit cost to modify large firm print advertising | $528 |
| Number of affected small/very small U.S. carriers | 33 |
| Number of small/very small foreign carriers | 2 |
| Number of travel agencies/tour operators (<20 employees) | 13,597 |
| Unit cost to modify small firm print advertising | $132 |
| **Total cost of revising print advertising** | **$2,328,480** |
| **Total cost of revising websites and advertising** | **$6,752,330** |
| Total Compliance Costs (millions) | $6.75 |
| *Discounted Total Compliance Costs (millions)* | *$6.75* |

# 4.8. Expanded Disclosure of Baggage Fees and Other Optional Fees

## 4.8.1. Current Requirements, Industry Practices, and Need for Additional Regulation

In recent years, many of the major U.S. carriers have instituted separate charges for checked baggage and other services. While consumer awareness of the existence of checked baggage fees is increasing rapidly, the major carrier and other online booking engines currently do not have an option that allows purchasers to calculate these fees and incorporate them into the prices

displayed in flight search results. This complicates purchaser price comparisons and reduces the likelihood that advertised fares accurately represent the actual cost of air travel.

DOT issued guidance on May 19, 2008, published in the Federal Register at 73 F.R. 28854, which was designed to ensure that prospective air travelers receive timely and effective notice about charges for checked bags. The guidance references the steps needed to meet "implicit requirements" relating to the avoidance of unfair and deceptive practices with respect to disclosure of checked baggage fees. Specifically, DOT advised that:

> …air carriers and foreign air carriers should place a notice regarding the above-described additional baggage charges on the first screen in which the carrier offers a fare quotation of a specific itinerary selected by a consumer… Airline reservations agents should disclose these baggage charges and limitations during telephone or counter sales prior to completing a sale.[51]

The method by which notice must be provided is also specified in the guidance.

Based on a February 2010 review of reporting carrier websites, information on baggage fees and some other optional fees appears to be available to most passengers on major airlines. In addition, information about the many of the fees charged by major U.S. and foreign carriers are readily available on several OTA websites, including Expedia, Travelocity, and Kayak, in formats that facilitate cross-carrier comparisons by consumers.

However, it is possible that a significant number of travelers may visit only the site of the carrier on which they purchased a flight.[52] In many cases, these passengers would not be aware of the amounts of baggage fees and optional fees charged in the absence of notices on these sites, consequently incurring more charges for checked baggage and other optional services than if they had known about the additional costs for these items.

### 4.8.2.   Area 8 Requirements to Address Identified Needs

The Rule requires that each covered U.S. and foreign carrier disclose applicable baggage fees on e-ticket confirmations; post notice of any increases in baggage fees on its home page and maintain any such notice for at least 3 months after the increase; and provide a link from its home page to a page that contains a full disclosure of all baggage and other optional fees for services that passengers may be charged by the airline. These requirements also apply to online travel agencies and other sellers of air transportation.

The regulatory language currently defines covered carriers as those that have ticket-capable websites accessible to the general public. Following this definition, we have assumed that carriers which operate flights only on a contract basis for other carriers will not incur costs to comply with these requirements.

---

[51] Department of Transportation, "Guidance on the Disclosure of Policies and Charges Associated with Checked Baggage," 73 F.R. 28854, May 19, 2008.

[52] This is particularly likely to be true for passengers on low-cost airlines. About 75 percent of JetBlue and Southwest passengers book flights directly on the carrier websites, according to these carriers' most recent annual reports.

### 4.8.3.  Benefits of Area 8 Requirements

Insufficient data were found to adequately estimate the benefits from these requirements. As with the analysis for other portions of this Rule for which robust estimates of benefits have not been found, a cost-per-passenger analysis was conducted. The results are presented in Section 5.3 below.

However, provisions included in Requirement Area 8 may provide potential benefits that could not be quantified in this regulatory evaluation, including the following:

- ***Decrease in Time at Check-in.*** Some consumers are not fully aware of their carrier's baggage fees until they arrive for check-in, even though all the information is available online at the time of purchase. In such cases, some passengers may be delayed at check-in as they attempt to repack so as to reduce their checked-in baggage. Such situations not only increase the amount of time spent checking-in, but also increase time spent waiting for those later in line. Ensuring that baggage fees are prominently displayed will minimize such problems.

- ***Improved Customer Good Will toward Carriers***. With all carriers consistently providing full information regarding baggage fees to consumers in a conspicuous place, customers may perceive that carriers are treating them more "honestly." Some customers may have more positive experiences than otherwise, making them slightly more likely to travel by air in the future.

It should also be noted that if some passengers are not fully aware of baggage fee changes currently and become so due to the requirements in the Rule, some of these passengers may decide to pack differently. These passengers would be more likely to take more into the cabin with them, which may lead to further crowding in the cabin.

### 4.8.4.  Cost of Area 8 Requirements

Because most carriers already post notices on their websites with current fees for baggage and other optional products and services, the compliance costs for the provisions of this requirement that apply to carrier websites are limited to the incremental costs of updating and posting notices when these fees change. While carriers may incur more significant costs to program e-ticket generators to display any baggage fees that may apply, the Department does not have extensive information about the likely magnitude of these costs.

Travel agents and tour operators that provide online booking will also need to locate applicable links to baggage and other fee disclosures on carrier websites. It is reasonable to assume that these links will be compiled into some type of reference sheet or guide that is available to firms in these sectors. Individual firms will incur costs to add these links to their current online booking engines and to update these links periodically.

The following estimates of per-firm costs that will be incurred to achieve compliance with the Rule provisions in Requirement Area 8 were utilized in this analysis:[53]

*Table 33 - Unit Costs for Requirement Area 8*

| | Direct Labor Hours | Mean Wage Rate* | Full Cost per Hour** | Cost per Firm |
|---|---|---|---|---|
| **Website/E-ticket programming** | | | | |
| Modify e-tickets (large marketing carriers/ 4 largest OTAs) | 40 | $35.91 | $103.00 | $4,120 |
| Small carriers/large travel agencies/tour operators (20+ employees) | 20 | $35.91 | $103.00 | $2,060 |
| Small travel agencies/tour operators (<20 employees) with online booking capability | 10 | $35.91 | $103.00 | $1,030 |
| **Post/update links to optional fees (twice per year)** | | | | |
| Large marketing carriers/ 4 largest OTAs | 8 | $35.91 | $103.00 | $824 |
| Small carriers/large travel agencies/tour operators (20+ employees) | 4 | $35.91 | $103.00 | $412 |
| Small travel agencies/tour operators (<20 employees) with online booking capability | 2 | $35.91 | $103.00 | $206 |

*Rates for computer programmers, BLS Occupational Employment Statistics, May 2009.

**Full cost includes benefits and other direct labor costs (43 percent of mean wage rate) and cost for time associated with supervisor/management review (100 percent of direct labor cost).

Based on these estimates and assumptions, costs incurred by affected carriers, travel agents, and tour operators to comply with Rule provisions in Requirement Area 8 are expected to be $4.8 million in 2012 and $9.1 million for the entire 10-year period from 2012 through 2021.

---

[53] The assumed frequencies of posting notices about baggage fees and optional fees on carrier websites (and the accompanying unit cost estimates) were doubled from those used in the preliminary RIA in response to comments received on the NPRM.

**Table 34 - Estimated Compliance Costs for Requirement Area 8**

| | 2012 | 2012-21 |
|---|---|---|
| **Programming/updating e-tickets to display baggage fees/links** | | |
| Large marketing U.S. carriers | 18 | |
| Large marketing foreign carriers | 87 | |
| 4 largest OTAs | 4 | |
| Unit cost, large marketing carriers/largest OTAs | $4,120 | $7,828 |
| Small/very small marketing U.S. carriers | 33 | |
| Small/very small marketing foreign carriers | 2 | |
| Large travel agencies/tour operators (20+ employees) | 893 | |
| Unit cost, small/very small marketing carriers/large travel agencies/tour operators (20+ employees) | $2,060 | $3,914 |
| Small travel agencies/tour operators (<20 employees) with online booking capability | 1,567 | |
| Unit cost, small travel agencies/tour operators (<20 employees) with online booking capability | $1,030 | $1,566 |
| **Total cost of reprogramming e-tickets** | **$3,974,770** | **$7,552,063** |
| **Programming/updating websites to display optional fees/links** | | |
| Large marketing U.S. carriers | 18 | |
| Large marketing foreign carriers | 87 | |
| 4 largest OTAs | 4 | |
| Unit cost, large marketing carriers/largest OTAs | $824 | $1,566 |
| Small/very small marketing U.S. carriers | 33 | |
| Small/very small marketing foreign carriers | 2 | |
| Large travel agencies/tour operators (20+ employees) | 893 | |
| Unit cost, small/very small marketing carriers/large travel agencies/tour operators (20+ employees) | $412 | $783 |
| Small travel agencies/tour operators (<20 employees) with online booking capability | 1,567 | |
| Unit cost, small travel agencies/tour operators (<20 employees) with online booking capability | $206 | $391 |
| **Total cost of optional fee disclosure updates** | **$795,778** | **$1,511,978** |
| **Total cost to post bag/optional fee information** | **$4,770,548** | **$9,064,041** |
| Total Compliance Costs (millions) | $4.77 | $9.06 |
| *Discounted Total Compliance Costs (millions)* | | *$7.88* |

Note: Cost of annual updates/validations for baggage and optional fee links assumed to be 10 percent of base year implementation cost

## 4.9. Prohibition on Post-Purchase Fare Increases

### 4.9.1. Current Requirements, Industry Practices, and Need for Additional Regulation

The Department is aware of several instances in the past few years in which tour operators have imposed post-purchase increases in the prices for air travel or combined travel packages on their customers. Consumers could also possibly find themselves incurring higher costs for air travel than were contracted for at the time of purchase because of increases in baggage fees, notwithstanding the May 19, 2008, DOT guidance on baggage fees, which states that:

> Internet displays and airline agents should also make clear when the added charges or revised policies are to take effect. In no case should more restrictive baggage policies or additional charges be applied retroactively to a consumer who purchased his or her ticket at a time when the charges did not apply, or when a lower charge applied.

A February 2010 review of reporting carrier websites indicated that all reported increases in baggage fees were accompanied by effective dates for the change specified in terms of when tickets were purchased.

It is possible that the current DOT guidance would not have continued to be effective for enforcing the current prohibition on post-purchase price increases. Codifying this policy also reduces the amount of resources and effort required for the Department to determine if entities are complying with its provisions.

### 4.9.2. Area 9 Requirements to Address Identified Needs

The Rule prohibits any "seller of scheduled air transportation, or of a tour or tour component that includes the price of scheduled air transportation" from making any post-purchase increases in the price of that air transportation, except in the case of an increase in a government-imposed tax or fee. The Rule also includes a provision that requires sellers to notify consumers of the potential for any price increases that could take place prior to the time that the services purchased have been paid in full.

The Department does not believe that air carriers, travel agencies, and tour operators currently attempt to impose post-purchase fare increases on prior purchasers of air transportation, but it lacks adequate information to confirm this assessment.

### 4.9.3. Benefits of Area 9 Requirements

Benefits from this provision accrue from the increased certainty of price (level of comfort) when purchasing packages include air travel. The benefit of this provision in addition to the value of the price increase is some level of comfort or certainty to the passenger. The estimated number of potentially impacted travelers was derived using data from two larger tour operator travel associations. For this analysis, a provisional estimate of incremental benefit was made by adding a premium to the value of search time and purchase time of travelers on package tours, as follows:

*Table 35 - Benefits Estimates for Requirement Area 9*

|  | 2012 | 2012-2021 |
|---|---|---|
| Number of Air Tour Package Travelers Who May Benefit from Prohibition of Post-Purchase Increase | 21,135,680 | 240,076,987 |
| Benefits of Certainty |  |  |
| Value of Time for Passenger (Personal Non-Traveling) | $24.15 | $24.15 |
| Premium on Certainty of Purchase | 0.01 | 0.01 |
| Incremental Savings per Passenger per Hour | 0.24 | 0.24 |
| Average Amount of Time Spent Purchasing Airfare | 0.17 | 0.17 |
| Average Savings per Passenger | $0.04 | $0.04 |
| **Monetized Benefits of Certainty** | **$850,711** | **$9,663,099** |
| Total Benefits (millions) | $0.85 | 9.66 |
| *Total Component Benefits (millions) Discounted* |  | *7.15* |

Some consumers will also benefit from increased security that tour package prices will not be increased; a benefit experienced during the entire period from time of travel purchase until the trip is completed. It is similar to an insurance value, the value to the consumer of knowing that even if fees increase, the consumer will not be liable for them. This benefit may also be considered in place of the benefit measured above.

In addition to the benefits for which quantitative estimates could be developed, a prohibition on post-purchase increases may well lead to an improvement in consumer good will toward non-carrier travel organizations such as ticket agents and tour operators.

The Department expressly solicited comments regarding the estimation of the appropriate premium on the value of air ticket purchasers' time from the certainty that there will be no post-purchase price increase, as well as the estimation of the average amount of time to purchase ticket. In addition, the Department requested comments on other methodologies to value the benefit to consumers of knowing that their tour package price is a final price.

### 4.9.4.  Cost of Area 9 Requirements

Most, if not all, domestic and foreign carriers are believed to be currently complying with this requirement. Some tour operators may not be following current Department guidelines that prohibit post-purchase price increases without prior disclosure to, and agreement by, customers at the time of purchase. In any event, it is unlikely that there are significant compliance costs associated with refraining from imposing post-purchase price increases on future purchasers of air transportation and travel packages.

However, tour operators will incur web programming and printed notice development costs to comply with the Final Rule requirement for *pre-purchase* disclosure of the possibility of price increases before the tour has been paid in full. The unit costs used to developing and displaying these disclosures are estimated as follows:

*Table 36 - Unit Costs for Requirement Area 9*

| | Direct Labor Hours | Mean Wage Rate* | Full Cost per Hour** | Cost per Firm |
|---|---|---|---|---|
| **Reprogram website flight confirmation pages** | | | | |
| Large tour operators | 20 | $35.91 | $103.00 | $2,060 |
| Small tour operators | 10 | $35.91 | $103.00 | $1,030 |
| **Develop printed disclosure form** | | | | |
| Large tour operators | 4 | $22.99 | $66.00 | $264 |
| Small tour operators | 2 | $22.99 | $66.00 | $132 |

*Rates for computer programmers and graphic designers, BLS Occupational Employment Statistics, May 2009.

**Full cost includes benefits and other direct labor costs (43 percent of mean wage rate) and cost for time associated with supervisor/management review (100 percent of direct labor cost).

Based on these estimates and assumptions, costs incurred by affected tour operators to comply with Rule provisions in Requirement Area 9 are expected to be $1.1 million in 2012. No additional costs are expected to be incurred during the remainder of the entire 10-year period from 2012 through 2021.

*Table 37 - Estimated Compliance Costs for Requirement Area 9*

| | 2012 only |
|---|---|
| **Reprogramming websites to display disclosure form** | |
| Large tour operators (20+ employees) | 267 |
| Unit cost to reprogram websites, large tour operators | $2,060 |
| Small tour operators (< 20 employees) with online booking | 190 |
| Unit cost to reprogram websites, small tour operator | $1,030 |
| **Total cost of reprogramming** | **$745,720** |
| **Development of printed disclosure statements** | |
| Large tour operators (20+ employees) | 267 |
| Unit cost to develop disclosure statements (large firms) | $264 |
| Small tour operators (< 20 employees) | 2,420 |
| Unit cost to develop disclosure statements (small firms) | $132 |
| **Total cost of revising print advertising** | **$389,928** |
| **Total cost of revising websites and advertising** | **$1,135,648** |
| Total Compliance Costs (millions) | $1.14 |
| *Discounted Total Compliance Costs (millions)* | *$1.14* |

# 4.10. Prompt Passenger Notification of Flight Status Changes

### 4.10.1. Current Requirements, Industry Practices, and Need for Additional Regulation

Passengers learn about changes in flight status (most importantly, delays or cancellations) through gate announcements, electronic displays at airports, checking carrier websites, and, increasingly, automated notifications sent to cell phones or e-mail accounts. At present there are no regulatory requirements relating to the methods of provision, accuracy, or timeliness with which carriers inform passengers about flight status changes.

In particular, carriers are not currently required to offer passengers the option to subscribe to e-mail or text messaging services that provide automatic notification of flight status changes. However, it is possible to sign up to receive these notifications on the websites of all but two reporting carriers that currently sell tickets directly to the public. Flight status updates are also available from a number of third-party providers, including FlightStats.com, 4Info, and Google. A review of some airline passenger forums and other online sources indicates that, in some instances, certain third-party notification services provide more timely updates on flight delays and cancellations than some of the carrier messaging systems.

Because of the increasingly widespread provision of real-time updates, passengers may reasonably expect that all of the channels from which they learn about flight status changes provide prompt updates as new information becomes available. In the absence of regulatory requirements, the speed of updates being posted could vary substantially among carriers or notification channels, and many consumers may not have sufficient information to assess which methods of notification provide relatively more prompt updates.

### 4.10.2. Area 10 Requirements to Address Identified Needs

The Rule requires that reporting carriers provide information on flight status changes to passengers through whatever means they use (electronic messaging services, website flight status tools, departure/arrival boards at airports, and gate attendant announcements) within 30 minutes of when that information either becomes available or should have become available to the carrier.

No information is currently available on the extent to which flight status updates are now disseminated to passengers by various communications channels within 30 minutes of new information becoming available.[54]

### 4.10.3. Benefits of Area 10 Requirements

Conceptually, being assured that carriers will promptly disseminate information about flight status changes may reduce the time and amount of effort that passengers expend to check on possible flight delays and cancellations; allow passengers (and those meeting arriving

---

[54] The Department solicited comments on this issue in the NPRM but did not receive any information that could be used to quantify the impact of the Rule requirements in this area.

passengers) to leave a smaller margin of safety in choosing what time to leave for the airport; and help travelers feel more secure while traveling to the airport, knowing that they will be promptly updated if the status of their flight changes.

The Department currently does not have information on the extent to which reporting carriers currently comply with this requirement. Consequently, it is not possible to develop quantitative estimates of the benefits that passengers will receive from any changes in the promptness with which carriers notify travelers about flight status changes.

### 4.10.4. Cost of Area 10 Requirements

The Department does not have information on the extent to which reporting U.S. carriers currently comply with these requirements. Consequently, it is not possible to develop quantitative estimates of the compliance costs, if any, that will be incurred by the carriers to which these requirements will apply.

## 4.11. Limitations on Venue Provisions in Contracts of Carriage

### 4.11.1. Current Requirements, Industry Practices, and Need for Additional Regulation

There are currently no specific regulatory restrictions on the inclusion of venue provisions in carrier contracts of carriage. However, OST considers the inclusion of restrictive venue provisions in contracts of carriage to be an unfair and deceptive trade practice. The Aviation Enforcement Office has threatened enforcement action against carriers that have previously included restrictions precluding passengers from filing suit in jurisdictions other than those in which the carriers were headquartered.

A February 2010 review of the contracts of carriage for the largest U.S. carriers indicated that only Spirit Airlines included a limitation on the venue for filing claims in its contract of carriage.

The absence of a prohibition on venue restrictions means that passengers traveling on the same flight with the same complaint or claim may face very different costs to pursue the matter, depending on their proximity to the carrier's headquarters. In the case of Spirit Airlines, a passenger residing in Miami who had a claim arising from a round-trip flight to Los Angeles would need only make a short drive for a court appearance, while a passenger residing in southern California with the same type of claim on the same round-trip flight may need to incur substantially higher travel costs associated with pursuing a claim that must be filed in southeastern Florida.

### 4.11.2. Area 11 Requirements to Address Identified Needs

The Rule codifies current Department enforcement policy on permissible restrictions imposed by venue provisions in carrier contracts of carriage. Provisions that eliminate the right of consumers

to bring claims against the carrier in any competent court with jurisdiction are banned and will be treated by the Department as an unfair and deceptive trade practice.

### 4.11.3. Benefits of Area 11 Requirements

Some claimants will benefit from this provision by avoiding costs that they would otherwise have had to incur to travel to other States or to hire out-of-state lawyers. In addition, some lawsuits with merit may not be filed because the financial and time costs of filing in another State and potentially having to travel there for adjudication exceed the expected value of pursuing the claim.

To the extent that legitimate lawsuits act as a deterrent to unlawful corporate behavior, it is possible that prohibiting venue restrictions will increase the effectiveness of this deterrent.

### 4.11.4. Cost of Area 11 Requirements

Air travelers can be expected to be somewhat more likely to pursue claims against carriers in the absence of venue restrictions in carrier contracts of carriage because they will be able to avoid the time and financial costs of out-of-state travel to adjudicate these claims. However, the Department does not possess adequate information to estimate the additional costs that will be incurred by carriers to defend any lawsuits that may be filed. Potential litigation cost savings to consumers and cost increases borne by carriers are included as unquantifiable costs of the Rule in the summary presented in Section 5.2 below.

## 5.  Results and Discussion of the Benefit and Cost Analysis

The goal of a regulatory impact analysis is to estimate the incremental benefits and costs of adopting the Rule. The difference between benefits and costs quantified over the planning horizon lifecycle and discounted to the present represents the primary indicator of regulatory value.[55] A present value (PV) of net benefits greater than zero indicates that measured benefits exceed measured costs and that the regulation is likely to increase the general level of economic welfare accordingly. A PV of net benefits that is less than zero means that measured costs exceed measured benefits. This section summarizes the benefits, costs, and net benefits estimated for the requirements included in the Rule.

## 5.1. Overall Net Benefits of the Rule

All quantified benefits and costs estimated for individual requirements were translated into current values for each year in the 10-year period beginning with calendar year 2012.[56] In

---

[55] This follows the guidance of OMB Circular A-4, which stipulates that this difference—the net present value (NPV)—should be regarded as the principal measure of value produced by a benefit-cost analysis. Further, Executive Order 12866 states that agencies should attempt to maximize the net benefits of their rulemakings, subject to statutory requirements.

[56] The affected parties are assumed to be fully compliant with the Rule by January 1, 2012. The expected effective data for all Rule requirements, with the exception of the full-fare advertising provision of Requirement Area 7, will be 60 days earlier. We have aligned the effective dates in the RIA to simplify the presentation and explanation of the benefit and cost estimates.

accordance with OMB guidelines, a real discount rate of 7 percent is used in the primary analysis and is supplemented with overall estimates using a 3 percent discount rate.

The expected PV of passenger benefits from the requirements included in the Rule is estimated at $45.0 million using a 7 percent discount rate over the 10-year period of analysis. The expected present value of costs incurred by carriers and other sellers of air transportation to comply with these requirements is estimated at $30.7 million, discounted at 7 percent over the same 10-year period. The PV of net benefits for this 10-year period at a 7 percent discount rate is thus $14.3 million. Using a 3 percent discount rate, the PV of net benefits for 2012 through 2021 is estimated at $20.3 million.

*Table 38 - Present Value of Net Benefits for the Rule, 2012-2021*

| | | PV (millions) |
|---|---|---|
| Monetized Benefits | 10 Years, 7% discounting | $45.0 |
| | 10 Years, 3% discounting | $53.5 |
| Monetized Costs | 10 Years, 7% discounting | $30.7 |
| | 10 Years, 3% discounting | $33.2 |
| Monetized Benefits | 10 Years, 7% discounting | $14.3 |
| | 10 Years, 3% discounting | $20.3 |

Table 39 provides estimates of the annualized dollar amounts of these monetized benefits and costs expressed in 2012 dollars at 7 percent and 3 percent discount rates. Annualized benefits of the Rule are estimated at $5.99 million at a 7 percent discount rate and $6.09 million at a 3 percent discount rate over a 10-year period of analysis. Annualized costs of the Rule are estimated at $4.09 million at a 7 percent discount rate and $3.78 million at a 3 percent discount rate over a 10-year period of analysis.

*Table 39 – Accounting Statement: Annualized Value of Rule Benefits and Costs, 2012-2021*

| | | 2012 $millions |
|---|---|---|
| Monetized Benefits | 10 Years, 7% discounting | $5.99 |
| | 10 Years, 3% discounting | $6.09 |
| Monetized Costs | 10 Years, 7% discounting | $4.09 |
| | 10 Years, 3% discounting | $3.78 |
| Monetized Benefits | 10 Years, 7% discounting | $1.90 |
| | 10 Years, 3% discounting | $2.31 |

## 5.2. Net Benefits of Specific Sets of Requirements

A requirement area-by-requirement area summary of benefit and cost estimates, as well as benefits and costs that were identified but could not be quantified, is provided in the table below.

***Table 40 - Comparison of Requirement Area Benefits and Costs, 2012-2021***
(Discounted at 7 percent annually to 2012 $ millions)

| Area 1: Expansion of tarmac contingency plan requirements and extension of EAPP1 requirements to cover foreign carriers | Total |
|---|---|
| Monetized Benefits | $1.2 |
| Monetized Costs | $3.0 |
| **Monetized Net Benefits** | **-$1.8** |
| *Additional unquantifiable benefits and costs that are directly or indirectly related to this rulemaking, which result in benefits that the Department has determined justify the costs:* | |
| Improved Management of Flight Delays | |
| Decreased Anxiety with Regard to Flying | |
| Reduced Stress among Delayed Passengers and Crew | |
| Improved Overall Carrier Operations | |
| Improved Customer Good Will toward Carriers | |
| Additional Gate Return Costs Incurred by Carriers | |
| Time Required for Airport/Terminal Authorities, CBP/TSA to Coordinate Plans | |
| Area 2: Expanded tarmac delay reporting and application to foreign carriers | Total |
| Monetized Benefits* | $0.0 |
| Monetized Costs | $0.8 |
| **Monetized Net Benefits** | **-$0.8** |
| *Additional unquantifiable benefits that are directly or indirectly related to this rulemaking, which result in benefits that the Department has determined justify the costs:* | |
| Increased Efficiency of US DOT Oversight and Enforcement Office Operations | |
| Improved Management of Flight Delays | |
| Area 3: Establishment of minimum standards for customer service plans (CSPs) and extension of EAPP1 Final Rule Areas to cover foreign carriers | Total |
| Monetized Benefits | $7.7 |
| Monetized Costs | $7.4 |
| **Monetized Net Benefits** | **$0.3** |
| *Additional unquantifiable benefits that are directly or indirectly related to this rulemaking, which result in benefits that the Department has determined justify the costs:* | |
| Decreased Confusion and Uncertainty Regarding Department CSP Requirements | |
| Improved Customer Service from Foreign Carrier Self-Auditing of Adherence to CSPs | |
| Improved Customer Good Will toward Carriers | |

*Monetized estimates could not be developed from the information available on the record.

**Table 40 - Comparison of Requirement Area Benefits and Costs, 2012-2021**
(Discounted at 7 percent annually to 2012 $ millions)

| Area 4: Foreign carrier posting of tarmac delay contingency plans, CSPs, and contracts of carriage on websites | Total |
|---|---|
| Monetized Benefits* | $0.0 |
| Monetized Costs | $1.0 |
| **Monetized Net Benefits** | **-$1.0** |
| *Additional unquantifiable benefits that are directly or indirectly related to this rulemaking, which result in benefits that the Department has determined justify the costs:* | |
| Decreased Occurrence of and Improved Resolution of Customer Complaints | |
| **Area 5: Extension of EAPP1 Final Rule Areas for carriers to respond to consumer complaints to cover foreign carriers** | **Total** |
| Monetized Benefits | $0.0 |
| Monetized Costs | $1.9 |
| **Monetized Net Benefits** | **-$1.9** |
| *Additional unquantifiable benefits that are directly or indirectly related to this rulemaking, which result in benefits that the Department has determined justify the costs:* | |
| Decreased Anger toward Carriers During Resolution of Complaints | |
| **Area 6: Changes in denied boarding compensation (DBC) requirements** | **Total** |
| Monetized Benefits* | $0.0 |
| Monetized Costs | $1.0 |
| **Monetized Net Benefits** | **-$1.0** |
| *Additional unquantifiable benefits and costs that are directly or indirectly related to this rulemaking, which result in benefits that the Department has determined justify the costs:* | |
| Decreased Confusion Regarding DBC Provisions | |
| Decreased Resentment among Some Passengers Regarding Different Compensation Received | |
| Programming and Training Costs for Foreign Carriers | |
| **Area 7: Full-fare advertising and prohibition on opt-out provisions** | **Total** |
| Monetized Benefits | $29.0 |
| Monetized Costs | $6.8 |
| **Monetized Net Benefits** | **$22.2** |
| *Additional unquantifiable benefits that are directly or indirectly related to this rulemaking, which result in benefits that the Department has determined justify the costs:* | |
| Travelers Less Likely to Mistakenly Purchase Unwanted Services and Amenities | |
| Improved Customer Good Will toward Carriers | |

*Monetized estimates could not be developed from the information available on the record.

**Table 40 - Comparison of Requirement Area Benefits and Costs, 2012-2021**
(Discounted at 7 percent annually to 2012 $ millions)

| Area 8: Expanded disclosure of baggage and other optional fees | Total |
|---|---|
| Monetized Benefits* | $0.0 |
| Monetized Costs | $7.9 |
| **Monetized Net Benefits** | **-$7.9** |

*Additional unquantifiable benefits that are directly or indirectly related to this rulemaking, which result in benefits that the Department has determined justify the costs:*

| | |
|---|---|
| Decreased Time at Check-in | |
| Improved Customer Good Will toward Carriers | |

| Area 9: Limitations on post-purchase price increases | Total |
|---|---|
| Monetized Benefits | $7.2 |
| Monetized Costs | $1.1 |
| **Monetized Net Benefits** | **$6.1** |

*Additional unquantifiable benefits that are directly or indirectly related to this rulemaking, which result in benefits that the Department has determined justify the costs:*

| | |
|---|---|
| Improved Customer Good Will toward Carriers | |

| Area 10: Prompt passenger notification of flight status changes | Total |
|---|---|
| Monetized Benefits* | $0.0 |
| Monetized Costs* | $0.0 |
| **Monetized Net Benefits** | **$0.0** |

*Additional unquantifiable benefits that are directly or indirectly related to this rulemaking, which result in benefits that the Department has determined justify the costs:*

| | |
|---|---|
| Greater Comfort and Certainty from Knowing that Information Will Be Available In Timely Manner | |

| Area 11: Limitations on venue provisions in contracts of carriage | Total |
|---|---|
| Monetized Benefits* | $0.0 |
| Monetized Costs* | $0.0 |
| **Monetized Net Benefits** | **$0.0** |

*Additional unquantifiable benefits and costs that are directly or indirectly related to this rulemaking, which result in benefits that the Department has determined justify the costs:*

| | |
|---|---|
| Improved Customer Good Will toward Carriers | |
| Reduced Costs for Consumers to File/Adjudicate Claims | |
| Increased Costs for Carriers to Settle/Adjudicate Claims | |

| Requirement Areas 1 -11 Total | Total |
|---|---|
| Monetized Benefits | $45.0 |
| Monetized Costs | $30.7 |
| **Monetized Net Benefits** | **$14.3** |

*Monetized estimates could not be developed from the information available on the record.

Substantial portions of the estimated benefits, costs, and net benefits from the Rule are attributable to the full-fare advertising provision of Requirement Area 7. The expected benefits estimated for this single provision total $29.0 million over the entire 10-year period from 2012 through 2021 using a discount rate of 7 percent. Benefits estimated for the full-fare advertising provision represent 64 percent of the total benefits estimated for the Rule provisions in all 11 requirement areas during the period from 2012 through 2021.

The expected costs of complying with the full-fare advertising provision of Requirement 7 are estimated at $6.8 million. All of these costs will be incurred in 2012. Costs estimated for the full-fare advertising provision represent 22 percent of the total costs estimated for the Rule provisions in all 11 requirement areas during the period from 2011 through 2020.

None of the present values for quantified benefits or costs associated with any of the other 10 requirements from 2012 through 2021 (discounted at 7 percent) are estimated to exceed $10 million.

## 5.3. Cost-per-Passenger Analysis

Because there are potentially significant but unquantifiable benefits that may be realized by passengers as a result of these requirements, a cost-per-passenger analysis was conducted for each Requirement Area in which the benefits either could not be monetized or the monetized benefits were smaller than the estimated costs. The results of these calculations are as follows:

*Requirement Area 1:* A cost-per-passenger analysis was conducted in which we divided the net cost of this component (total costs less estimated benefits of greater comfort due to access to food, water, and clean lavatories) by the number of passengers. The resulting figure represents the minimum level of the insurance value of these requirements that would be necessary for the benefits (including the components for which estimates could be developed) to exceed the estimated costs. Costs of the provisions included in Requirement Area 1 are estimated at $3.2 million over the entire 10-year period from 2012 through 2021. Dividing this total cost (less the measured benefits noted above) by the corresponding affected passenger volume of 887 million over those 10 years results in a threshold value of $0.003, or one-third of one cent. The benefits of the Rule requirements in this area will exceed the costs if air travelers would be willing to pay, on average, at least this amount per trip to be protected by these requirements.

*Requirement Area 3:* To estimate the minimum amount of consumers' willingness to pay for this assurance that would bring the estimated benefits to an amount equal to costs, the total costs for this component of the Rule are divided by the total number of passengers. The resulting figure from this estimate is approximately $0.001, or one-tenth of one cent per passenger.

*Requirement Area 4:* To estimate the minimum amount of the value to consumers for this increased accessibility to customer service plan information (for measured benefits to equal cost), the total costs for this component of the Rule are divided by the total number of passengers. The resulting figure from this estimate is about $0.002, or one-fifth of one cent per passenger.

***Requirement Area 5:*** The net costs of the requirement (total costs, net of the monetized benefits from the more accessible information for filing complaints) were divided by the number of passengers on covered flights by international carriers. The resulting figure of less than one-third of one cent per passenger represents the minimum average value to consumers of this portion of the requirement that would cause total benefits to exceed estimated costs.

***Requirement Area 8:*** To estimate the minimum amount of the value to consumers from greater disclosure of baggage and other optional fees, the total costs for this component of the Rule are divided by the total number of passengers on domestic and foreign carriers. The resulting figure from this estimate is about $^3/_{100}$ of one cent per passenger.

## 5.4. Conclusion

This regulatory analysis indicates that adoption of the new requirements will result in projected benefits to the public that outweigh the estimated costs of the Rule.

# Appendix 1:  Notes on Estimation of Benefits and Data Sources Used

## Requirement Area 1: Tarmac Delay Plans for Foreign Carriers

The formula below illustrates the inputs and calculations used to estimate benefits for this provision.  The abbreviation PAX is used for the word passenger(s).

Overall Assumptions

**(1) Passengers Who May Benefit=**          PAX using Foreign Carriers (Dom & Int'l), Segment
                                             −   #PAX on Foreign Carriers already in Compliance

**(2) Flights That May Benefit=**             No. of Foreign Carrier Flights (Dom & Int'l)
                                             −   #No. of Flights on Foreign Carriers already in Compliance

**(3) Avg. No. of PAX Who May Benefit**
**Per Flight That May Benefit=**             Passengers Who May Benefit *(1)*
                                             ÷  Flights That May Benefit *(2)*


Benefit from Provision of Adequate Food, Drink, and Lavatory

**In-Scope Passengers (Arrivals) =**          Number of Flights w/ Long Tarmac Delays Two+ Hours
                                                 on Foreign Carriers Not already Compliant
                                             X    % of 2+ Hr Delays that are Arrivals
                                             X    Avg. No. of PAX Who May Benefit per Potential
                                                  Flight *(3)*

**In-Scope Passengers (Departures) =**        Number of Flights w/ Long Tarmac Delays Two+ Hours
                                                 on Non-Compliant Carriers
                                             X    % of 2+ Hr Delays that are Departures
                                             X    Avg. No. of PAX Who May Benefit per Potential
                                                  Flight *(3)*


**Incremental Savings per Hour from**
**Food, Drink, Lavatory=**                    Value of Time
                                             X    Premium of Comfort


**Total Savings from Arrivals=**              In-Scope Passengers (Arrivals)
                                             X    Incremental Savings per Hour from Food, Drink,
Lavatory
                                             X    Avg. Wait Time after 2 Hour Tarmac Delay (Arrivals)


**Total Savings from Departures=**            In-Scope Passengers (Departures)
                                             X    Incremental Saving per Hour from Food, Drink,
Lavatory
                                             X    Avg. Wait Time after 2 Hour Tarmac Delay (Depart)


**Calculation of Benefits=**                  Total Savings from Arrivals
                                             +    Total Savings from Departures

Econometrica, Inc.                                                                April 8, 2011

|

## Requirement Area 7: Full-Fare Prices in Advertising

The formula below illustrates the inputs and calculations used to estimate benefits for this provision:

Overall Assumptions

**No. of Round Trip Purchases=**     No. of PAX Who Use U.S. Carriers (Dom & Int'l), Market

X     % of PAX Who Purchase Airfare via Internet

=     No. of PAX who Purchase Airfare via the Internet

Benefits to Passengers who already search for full fare information

**In-Scope Passengers=**     (1) Passengers Who May Benefit

X     % of On-Line Customers Who Research Multiple Websites (one of which does not use full-fare advertising up-front)

÷     Average Number of People in Travel Party

**Calculation of Benefits=**     **In-Scope Passengers**

X     Avg. Extra Time Spent on Internet Searching for Taxes/Fees

X     Value of Time

Benefits to Passengers Who Do Not Currently Compare Full Fares (Elimination of Dead-Weight Loss)

**In-Scope Passengers=**     Passengers Who May Benefit

X     (1- On-Line Customers Who Research on Multiple Websites (one of which uses hidden fees)

X     (1-% of PAX Who Use Website Already Showing Full Fare)

**Decrease in Price=**     Weighted Average Price of Airfare

X     % of Airfare that Make-Up Hidden Fees

**Increase in Market Demand=**     **In-Scope Passengers**

X     Decrease in Price

X     Elasticity of Air Travel Demand

**Calculation of Benefits=**     (In-Scope Passengers

X     Decrease in Price)

+     (Increase in Market Demand

X     ½

X     Decrease in Price)

**EAPP2 Final Regulatory Analysis**                                    **1029-000/DTOS59-09-F-10089**

## Requirement Area 9: Prohibition on Post-Purchase Increase

The formula below illustrates the inputs and calculations used to estimate benefits for this provision:

Overall Assumptions
**In-Scope Passengers=**                    Estimated number of travelers on tour packages

Benefits of Uncertainty
**Calculation of Benefits=**                **In-Scope Passengers**
                                            X    Value of Time
                                            X    Premium for Increased Comfort from Knowing
                                                  Will Be Notified

Econometrica, Inc.                                                              April 8, 2011

## Source Notes

### Multiple Requirement Areas

**Forecast Average Growth of Airline Passenger Traffic per Year**

**Variable Description:** This is the estimated annual growth in airline passenger traffic transported on domestic and international trips from and to airports in the U.S. forecast for the future. These rates are applied in the year 2011 and beyond.

**Source:** U.S. Department of Transportation, Federal Aviation Administration, Aerospace Forecast Fiscal Years 2010–2030.

*Forecast Growth of Airline Passenger Traffic (per Year) on U.S. Airlines*

| Year | All Flights | Domestic Flights | International Flights |
|------|-------------|------------------|----------------------|
| 2010 | 0.5% | 0.4% | 0.9% |
| 2011 and future | 2.8% | 2.6% | 4.2% |

**Passenger Value of Time**

**Variable Description:** This is the monetized value of time for air passengers. This estimate is used to calculate time savings and increased level of comfort.

Estimates of the value of time for air travelers while traveling are those prepared by the Department of Transportation for economic analyses. The value of time for air travelers while not traveling was estimated using earnings estimates used by the Department of Transportation for calculation of the above estimates as follows: a weighted average (by proportion of all travelers) of (1) 100 percent times the average hourly earnings of those traveling by air on business and (2) 50 percent times the average hourly earnings of those traveling by air for personal trips.

**Source:** U.S. Department of Transportation, "Revised Departmental Guidance Valuation of Travel Time in Economic Analysis", 2003.

*Value of Time*

| | Lower 10% Limit | Median | Upper 10% Limit |
|---|-----------------|--------|-----------------|
| Value of Time for Passenger (Personal Non-Traveling) | $21.74 | $24.15 | $26.57 |
| Value of Time for Passenger (Average for All Travelers) | $23.80 | $28.60 | $35.60 |

**Value of Time Premiums for Differing Qualitative Levels of Service**

**Variable Description:** Requiring foreign carriers to set and adhere to limits on lengthy tarmac delays will shift part of the total trip time currently spent in less comfortable conditions (such as the fifth hour on a plane waiting on the tarmac) to time spent in more comfortable conditions (the fifth hour spent in the terminal). The value of the difference in comfort is by applying a value-of-service premium to the base value of travel time saved (see above). Estimates for this comfort premium were developed from economic literature on transportation. Premiums have been derived from survey-based data that reflect travel time values which incorporate the quality waiting, walking, and transfer conditions. Level of service ratings were rider-determined and are used to determine the value of different levels. The values used are shown in the table below.

**Source:** Level of service estimates of value of travel time from Todd Litman, "Valuing Transit Service Quality Improvements," the Victoria Transport Policy Institute, 2007.

*Value of Time Premiums for Differing Qualitative Levels of Service*

| Category | LOS A - C | LOS D | LOS E | LOS F | *Ratio of A-C to D (Proxy for 2-5 Hours Delay)* | *Ratio of A-C to E (Proxy for >5 Hours Delay)* |
|---|---|---|---|---|---|---|
| Adult transit passenger - seated | 35% | 47% | 58% | 70% | 1.34 | 1.68 |
| Adult transit passenger - standing | 50% | 67% | 83% | 100% | 1.34 | 1.68 |

Note: LOS refers to level-of-service and incorporates qualitative factors such as comfort, convenience, and reliability for various modes' waiting, walking, and transfer conditions. LOS A refers to the best conditions and F to the worst. The difference in the value of time between the average for LOS rating A-C and LOS rating D is used to estimate a premium for the greater comfort from access to food, water and clean lavatory facilities. The difference in the value of time between the average for LOS rating A-C and LOS rating E for transit passengers is used to estimate a premium for the greater comfort of waiting in the terminal instead on in the plane on the tarmac.[57]

## Requirement Area 1

**Number of Flights and Passengers with Extended Tarmac Delays**

**Variable Description:** The number of flights and passengers for foreign carriers by amount of tarmac delay time is estimated using the distribution of flights by tarmac delay for domestic "reporting carriers" (those with 1 percent or more of scheduled passenger service) since foreign carriers do file the necessary detailed statistics with the Federal Government. To estimate delays, the ratios of each delay, by length, for reporting domestic carriers were used on the foreign carrier flight population to estimate number of delays at each time interval.

**Source:** Econometrica tabulations of BTS Form 234 data.

---

[57] These premiums are similar to premiums estimated for the value of sitting instead of standing during a transit trip, which have ranged from 20 percent to 50 percent. See Marcus von Wartburg and W.G. Waters II, "Chapter 2: Congestion Externalities and the Value of Travel Time Savings," in *Towards Estimating the Social and Environmental Costs of Transportation in Canada*, Anming Khang, et al eds., Center for Transportation Studies, University of British Columbia, August 2004 and P.B. Goodwin, "Human Effort and the Value of Travel Time," *Journal of Transport Economics and Policy*, January 1976.

### Cost of Posting a Contingency Plan Dealing with Flight Delays on an Airline's Website

**Variable Description:** This is the cost of posting a contingency plan dealing with flight delays on an airline website.

**Source:** Estimate provided by subject matter experts among HDR IT staff compared against figures provided by reporting carriers to modify computer systems to provide additional reporting data to BTS regarding cancellations, diversions, and gate returns, as reported in Regulatory Evaluation on Revision or Airline Service Quality Performance Reports, US Department of Transportation, Docket No OST 2007-28522 for reasonableness.

*Cost of Posting a Contingency Plan Dealing with Flight Delays on an Airline's Website*

| Source | Lower 10% Limit | Median | Upper 10% Limit |
|---|---|---|---|
| Regulatory Evaluation on Revision of Airline Service Quality Performance Reports* | $10,000 | $22,500* | $30,000 |
| Subject Matter Expert | $15,000 | $22,500 | $30,000 |
| In Use | $15,000 | $22,500 | $30,000 |

*Median estimated based upon high and low.

### Cost of an Average Airline Meal

**Variable Description:** This is the average national cost of an airline meal per passenger in the U.S. in 2007.

**Data Sources:** Karen Aho, "The Death of the Airline Meal," MSN Money, Feb. 22, 2008.

*Cost of an Average Airline Meal per Passenger (2009 Dollars)*

| | Lower 10% Limit | Median | Upper 10% Limit |
|---|---|---|---|
| Cost of Average Airline Meal Per Passenger | $2.65 | $3.71 | $4.77 |

### Cost of Deplaning Passengers (per Passenger)

**Variable Description:** This is the cost of deplaning passengers on a per passenger basis. The cost is what an airport would charge airlines to deplane passengers. This is assumed to be $1.37 per passenger (in 2008 dollars). This is the fee that Atlanta International Airport charged airlines to deplane passengers.

**Source:** Paul Meyer, Operations Department, Atlanta International Airport.

## Requirement Areas 3 and 5

**Number of Air Carrier Complaints**

**Variable Description:** This is the annual number of complaints filed with an air carrier. Complaints can relate to flight problems, oversales, customer service, lost baggage, etc. Baseline figures are taken from data compiled by the U.S. Department of Transportation. However, because carriers receive many more complaints than are filed with the U.S. Department of Transportation, a complaint "multiplier" is used to calculate the actual number of "ground-level" complaints received by carriers from passengers.

**Source:** U.S. Department of Transportation, Office of Aviation Enforcement and Proceedings, "Air Travel Consumer Report", January 2008–December 2008; Final Report on Airline Customer Service Commitment," Office of the Inspector General, U.S. Department of Transportation, report AV-2001-020, February 12, 2001, and "Air Travel Consumer Report, U.S. Department of Transportation.

*2008 Filed Complaints*

|  | Lower 10% Limit | Median | Upper 10% Limit |
|---|---|---|---|
| Number of Complaints (Both U.S. and Foreign Carriers) | 10,473 | 9,426 | 11,520 |
| Number of Complaints (Foreign Carriers) | 1,275 | 1,148 | 1,403 |
| Complaint Multiplier (# of Complaints not filed actually received by Carriers)* | 61 | 61 | 61 |

* Multiplier Source: "Final Report on Airline Customer Service Commitment," Office of the Inspector General, U.S. Department of Transportation, report AV-2001-020, February 12, 2001, and "Air Travel Consumer Report, U.S. Department of Transportation.

**Factor to Adjust Number of Annual Complaints to Covered Carriers that Do Not Already Self-Audit Adherence to Customer Service Plans**

**Variable Description:** This the average number of complaints received by covered carriers that are not already self-auditing adherence to customer service plans, which is measured using complaint data reported for domestic carriers as proxy for foreign carriers. The DOT Air Travel Consumer Reports lists complaints received by the Department, but not complaints directly to the carriers. The DOT Inspector General found in 2001 that it received 1,352 complaints for the 10 major airlines, but that those carriers received 82,587 complaints, or 61 times the number of complaints recorded by DOT. To arrive at a total number of complaints for covered carriers, the number of complaints in DOT Air Travel Consumer Reports for covered carriers that are not already self-auditing adherence to customer service plans was multiplied by 61.

**Source:** "Final Report on Airline Customer Service Commitment," Office of the Inspector General, US Department of Transportation, report AV-2001-020, February 12, 2001, and "Air Travel Consumer Report, U.S. Department of Transportation.

**Change in Complaints Due to Self Auditing of Customer Service Plans**

**Variable Description:** This variable measures the decrease in customer complaints that would occur due to self-auditing of adherence to customer plans. For those four carriers that have already implemented self audits (Alaska in 2000, Continental in 2001, Northwest in 1999, Southwest in 1999), the average change in complaints in the 2 years following implementation was calculated to be –39 percent. During those same periods, the change in complaints to carriers that did not self audit was calculated to be –19 percent, a difference of 20 percentage points from self-auditing carriers. Under the conservative assumption that those carriers most likely to benefit from self audits of customer service plans were the first to implement them, remaining carriers that will now implement self audits as a result of the Final Rule are expected to realize an improvement in complaint rates equal to half of difference in comparative complaint rates noted above, i.e., a 10 percent decrease in complaints.

**Source:** Calculations based on data from DOT Air Travel Consumer Report, 1998 through 2007. Information on self auditing of customer service plans from DOT and e-mail communication.

**Summary of Annual Costs for Self-Auditing Service for Reporting and Non-Reporting Carriers**

**Variable Description:** This is the annual cost to reporting carriers of self-auditing additional service (customer complaint) calls stemming from the implementation of the new regulations. The mean annual salary of a customer service representative in 2007, according to the BLS, was $31,040. The Department of Homeland Security 2006 Cost-Benefit Analysis Guidebook[58] recommends using a mark-up of 32.8 percent to wages to take into account benefits received over and above wages.

In addition to the costs of the customer representative, it is assumed that the airlines also hire a contractor to test the quality of the customer service representatives. Northwest contracted with a third party to place "mystery calls" to five reservations centers to test DOT mandates and other compliance issues. The Northwest Airlines customer service plan described that this service is extrapolated to include 100 calls per center per quarter (500 calls per quarter) to test their customer service plan compliance and adjust training/coaching accordingly. Extrapolating further, 2,000 external audit calls need to be made each year. Each of these is assumed to cost $15 per hour and last an average of 30 minutes. The total annual cost of this external audit process is estimated at $15,000 per airline.

Because reporting carriers have much larger operations, on average, than non-reporting carriers, it is assumed that the implementation costs for non-reporting carriers would be proportionally smaller. The average cost for non-reporting carriers to self-audit is at 11 percent of that for reporting carriers, reflecting the portion of passengers on non-reporting carrier flights, or $6,248.

**Data Sources:** Mean starting salary of customer service representative was from the Bureau of Labor Statistic's *May 2007 National Occupational Employment and Wage Estimates*; Benefits

---

[58] Page 15.

multiplier from U.S. Department of Homeland Security, *2006 Cost-Benefit Analysis Guidebook*; Data regarding Northwest external audit costs a subject matter expert.

**Annual Costs to Airlines of Self-Auditing Customer Complaint Calls**

|  | Cost |
|---|---|
| Customer Service Cost | $41,798 |
| Mystery Calling Contract | $15,000 |
| **Total** | **$56,798** |

Source: Bureau of Labor Statistics' May 2007 National Occupational Employment and Wage Estimates; Benefits multiplier from U.S. Department of Homeland Security, 2006 Cost-Benefit Analysis Guidebook; Data regarding Northwest external audit costs from subject matter expert.

## Elasticity of Demand for Complaining

**Variable Description:** This figure (1.0741) estimates the change in number of complaints due to a unit change in the cost of complaining.

**Source:** David Morris, "The Cost of Complaining and the Efficiency of Consumer Complaints Agencies," Journal of Consumer Studies and Home Economics, 1980.

## Cost of Complaining

**Variable Description:** These are the elements that comprise the cost incurred by the passenger to file a complaint. In the absence of information breaking down complaints to carrier by method used to file, one third of complaints are assumed to be submitted online, one third via mail, and one third via phone. Cost components independent of time include: for writing a letter, $0.42 for a stamp and $.10 for paper and envelope; for making a phone call, $0.15 phone charge; for e-mailing a complaint, it was assumed that the incremental cost for those choosing the method would be $0. The value of a consumer's time is assumed at the average hourly wage rate, and the amount of time required to prepare and file a complaint varies from 10 to 30 minutes.

*Value of Time to Prepare and File a Complaint*

| Cost Component | | | Lower 10% Limit (10 Minutes Spent) | Median (20 Minutes Spent) | Upper 10% Limit (30 Minutes Spent) |
|---|---|---|---|---|---|
| Materials Cost | | % of complaints | | | |
| Materials cost of letter writing: | | | | | |
| Stamp | $ 0.42 | | | | |
| paper and envelope | $ 0.10 | | | | |
| | | 33% | $ 0.17 | $ 0.17 | $ 0.17 |
| Equipment cost of calling: | | | | | |
| Phone charge | $ 0.15 | | | | |
| | | 33% | $ 0.05 | $ 0.05 | $ 0.05 |
| Additional equipment/materials cost of going online: | | | | | |
| | $ - | 33% | $ - | $ - | $ - |
| Time Spent (variable from 10 to 30 minutes) | | | | | |
| Value of Time for Air Passengers | $28.60 per hour | | $9.53 | $ 4.77 | $14.30 |
| **Total** | | | **$ 9.76** | **$ 4.99** | **$ 14.52** |

Source: Bureau of Labor Statistics; subject matter experts.


**Cost to Airlines of Providing Information to Travelers on how to File a Complaint on a Website or at Check-In Counter for Reporting Carriers and Non-Reporting Carriers (Also used as proxy for Cost to Airlines of Implementing a Customer Service Plan for Reporting Carriers and Non-Reporting Carriers)**

**Variable Description:** The cost of modifying a website for reporting carriers would be, based on subject matter expert opinion, between $10,000 and $60,000 (with $35,000 the most likely cost and a 90 percent probability of the actual number falling within the $10,000 to $60,000 range).

The cost for reporting carriers to modify counters to provide information to customers on how to file complaints is estimated at $6,347. At OfficeDepot.com, on May 1, 2008, an acrylic engraved wall sign cost $13.99. The national median salary for a building and grounds maintenance employee, according to the BLS, was $9.75 in 2006. Inflating this to 2008 terms (using national Employment Cost Index from the Bureau of Labor Statistics) it becomes $10.26. According to the FAA "Calendar Year 2006 Passenger Activity Commercial Service Airports in U.S.," there were 566 airports in the United States that handled passenger flights. If it is assumed that each airport, on average, requires 20 signs and that it takes a maintenance employee 1 hour to put each sign up, sign costs would be $158,367 and labor costs $114,558 for a grand total of $272,925. In 2007, there were 43 air carriers in the United States with gross revenues of $20 million or higher. Dividing the total costs of $272,925 by 43 carriers, results in a mean airline cost of $6,347.

It is assumed that, since reporting carriers have much larger operations, on average, than non-reporting carriers, the implementation costs for non-reporting carriers would be proportionally

smaller. Websites for some carriers could be updated with a simple link that would require less than a day of an experienced computer programmer's time (at a median hourly wage in 2008 of $33.47 an hour). The average cost for non-reporting carriers is therefore assumed to be lower than for reporting carriers and is estimated at 11 percent of that for reporting carriers, reflecting the portion of passengers on non-reporting carrier flights, or $4,261.

This cost to provide information to customers is also used as a proxy to estimate the costs of implementing a customer service plan for reporting carriers and non-reporting carriers (at the same ratios as above).

**Source:** Estimate for website modification provided by reporting carriers to modify computer systems to provide data for additional reporting requirements per Final Rule on Airline Service Quality Performance Reports used as a proxy. This is also used as a proxy for cost to implement the customer service plan.[59]

## Additional Costs to Provide a Response to all Complaints within 60 Days Which Specifically Address Individual Passenger Complaints

**Variable Description:** This is the incremental cost, to airlines, of providing a response to a passenger complaint within a 60 day period from which the complaint was lodged. These responses need not be resolutions to the problems raised, but rather a targeted acknowledgement of the type/purpose of the complaint. It is assumed that carriers will be able to develop response templates which will streamline this process. This cost was assumed to be equal to the additional labor cost of handling a complaint, estimated at $1.34, when compared to a standard acknowledgement that a communication was received (for example, the difference between sending a letter that the complaint regarding a baggage delay is being examined versus sending a standard response simply thanking the customer for their letter). This number was estimated by finding the hourly wage of "Office and Administrative Support Workers" in the United States (median of $13.08 per hour in 2006 dollars), inflating it to 2008 dollars ($13.60), and adding benefits of 35 percent of wages ($18.10). Assuming that a standard, targeted response to an average complaint can be sent in 6 additional minutes yields a cost of $1.85 per hour.

**Source:** Office and Administrative Support Worker wage data from the Bureau of Labor Statistics, 2006 Occupational Employment Survey; Benefits for national airlines were calculated based on data from Aviation Specialists Group, Inc., *Economic Values for FAA Investment and Regulatory Decisions, A Guide*, Contract No. DFTA 01-02-C00200, p. 4-4. This report was prepared for the Federal Aviations Administration's Office of Aviation Policy and Plans, U.S. Federal Aviation Administration.

---

[59] Reported in Draft Regulatory Evaluation on Revision of Airline Service Quality Performance Reports, U.S. Department of Transportation, Docket No. OST 2007-28522, November 2007.

## Requirement Area 7

**Average Travel Trip Party Size**

**Variable Description:** This figure is the estimated average number of people per group or trip on a commercial airline flight. This variable may also be interpreted as the average number of tickets purchased per trip or transaction. The average trip party size for flight travel is estimated at 1.4.

**Source:** Air Transport Association of America, comments submitted on regards to the Notice of Proposed Rulemaking on Enhancing Airline Passenger Protections II, citing the Travel Industry Association of America (2007).

**Average Price of Airfare**

**Variable Description:** Estimate of average prices for domestic and international flights. A weighted average of the two estimates is calculated to arrive at an all-purpose average price of airfare.

**Source:** American Express Business Travel, "Travel Fares and Rates Approaching Pre-Recession Levels: American Express Business Travel Monitor Reveals Pricing Trends Across North America," December 2010.

*Average Price of Airfares*

|  | Median |
|---|---|
| Average Price of Airfare (Domestic) | $228 |
| Average Price of Airfare (International) | $1,781 |

**Percentage of Passengers Purchasing Airfare Online**

**Variable Description:** Estimate of the proportion of passengers purchasing airfares on websites.

**Source:** Air Transport Association (ATA), comments submitted on regards to the Notice of Proposed Rulemaking on Enhancing Airline Passenger Protections II, citing ATA survey of 2008.

*Proportion of Online Consumers for Flight Travel*

|  | Median |
|---|---|
| Percentage of Passengers Who Purchase Airfare on Carrier Websites | 52% |

**Elasticity of Air Travel Demand**

**Variable Description:** This elasticity estimates the percentage change in demand in relation to a change in price. The elasticity is applied to current demand in response to up-front advertising of hidden fees. Since this is a *revelation in prices* rather than an increase, a low elasticity is used to represent this change.  An elasticity of –0.4 is used in the analysis.

**Source:**  International Air Transport Association, "Air Travel Demand," 2009.

**<u>Requirement Area 9</u>**

**Number of Passengers Purchasing Tour Packages**

**Variable Description:** This figure is the estimated number of people who travel in a tour package with an air component. The estimate was derived by combining estimates of travelers on tour packages by members of two trade associations, NTA (9 million for 2009) and United States Tour Operators Association, USTOA (11 million).

**Source:**  For NTA, telephone conversation with NTA February 4, 2011; for USTOA, Web page accessed on February 4, 2011, http://www.ustoa.com/2009/WhoWeAre.cfm.

# Appendix 2:  Estimates of Additional Benefits for Requirement Area 7

As noted in the discussion regarding benefits to upfront full-fare advertising (section 4.7.3), there are other potential beneficiaries in addition to those noted in the main analysis (the Full-Fare Comparison Shoppers). Some passengers may end up purchasing tickets they otherwise would not have if the first fare they had seen on the online purchase site was a full fare, instead of one that omitted some of the required taxes and fees. Several studies and experiments have demonstrated that partitioned pricing (the separating of a price into its components) can lead to increases in consumer demand.[60] Some have explicitly looked at the impact of the timing that the different pieces of pricing information are revealed in purchasing situation, which reflects the situation to be assessed here – i.e., assessing the impact of presenting consumers with a lower, incomplete price as they begin their transaction and presenting the full price only at the moment of payment. While the reasons behind this effect are not fully understood, it has been theorized that people may "anchor" onto the first price they see, make a decision to purchase based on that price, and then have difficulty letting go of that decision. Industry commenters to the rule strongly disagreed with this theoretical assumption.

One frequently cited study used a field experiment to compare purchases at grocery stores when prices were posted with and without sales tax and found that presenting price tags including taxes on the shelf (i.e., when first encountering the opportunity to select the product for purchase) led to an overall decrease in purchases by 8 percent.[61] Although not a study of how the timing of revealing pricing information impacts purchasing decisions online, the study explicitly compared (at different establishments and for different products) how presenting a price with taxes when the consumer first "reaches" for the product versus revealing taxes at check-out leads to more purchases.

Other studies have examined eBay purchases online in an attempt to assess how consumers incorporate shipping and handling fees in that online medium. Shipping and handling fees on eBay are set by the seller and vary greatly even between identical products, and some research has found that consumers are less sensitive to shipping costs than to bidding prices.[62]

If revealing full-prices later in the purchasing process leads to more purchases than if the full price had not been seen immediately, most economists interpret this effect as purchasers making

---

[60] Deborah Schenck' "Exploiting the Salience Boas in Designing Taxes," (*New York University Law and Economics Working Papers*, Paper 233, 2010) has an informative and extensive review of past work in this area. See also Morwitz, Vicki, Greenleaf, Eric, Shalev, Edith and Johnson, Eric J., The Price Does Not Include Additional Taxes, Fees, and Surcharges: A Review of Research on Partitioned Pricing (February 26, 2009). Available at SSRN: http://ssrn.com/abstract=1350004. Note, though that some studies have found that partitioned pricing can also lead to negative brand recognition and may hurt sales in the future, if the fees are perceived to be excessive and within the seller's ability to control. This differs somewhat from the situation here, since the separate portions of the price are taxes imposed by state, local and federal governments (as opposed to shipping fees, etc.).

[61] Raj Chety, Adam Looney and Kory Kroft, "Salience and Taxation: Theory and Evidence," *American Economic Review*, 2009.

[62] See T. Hossain and J. Morgan, "Plus Shipping and Handling: Revenue (Non) Equivalence in Field Experiments on Ebay," *Advances in Economic Analysis and Policy*, 2006, as noted in David Gamage and Darien Shanske, "On Tax Salience: Market-Salience and Political-Salience." **tax**prof.typepad.com/files/gamage-1.pdf

"sub-optimal" choices—i.e., purchasing air travel at a price higher than they otherwise would have. In such situations, there is what economists would call a "dead-weight loss" which reflects the difference between what consumers would have purchased if they had seen the full-fare from the beginning and what they did purchase. This loss is calculated using average prices, estimates of consumer sensitivity to differences in airfares, and the newly revealed fees and taxes.

The grocery store analysis noted above measured an 8 percent decline in demand when posting prices that included taxes of 7.5 percent. The analysis used here is more conservative and uses a national elasticity for air travel of -0.4 (estimated by the International Air Transport Association) together with an average ticket price of approximately $307 and the value of those fees which are newly required to be included when prices are first posted (estimated at 5 percent).[63] This methodology leads to an estimated 2 percent decline in demand, which is one fourth of the decline noted in the groceries study, while the ratio of the revealed taxes is two thirds (7.5 percent versus 5 percent). The resulting benefit is estimated to be approximately $27 million total over 10 years.

---

[63] Derived from data in the BTS American Travel Survey; see source notes in the Appendix for greater detail.

*Table  - Illustration of Benefits Estimation of Avoided Deadweight Loss*

|  | **2012** | **2012-2021** |
|---|---|---|
| Tickets for Domestic Flights Purchased Online | 177,239,752 | 2,439,667,765 |
| Average Travel Trip Party Size | 1.4 | 1.4 |
| Purchasers of Tickets on Websites | 126,599,823 | 1,742,619,832 |
| Percent of That Are Full-Fare Comparison Shoppers | 2% | 2% |
| Purchasers Who Are Not Full-Fare Comparison Shoppers | 124,067,827 | 1,707,767,435 |
| Percentage of Purchasers Using Websites Already Presenting Full Fare | 90% | 90% |
| Purchasers Who  May Benefit from Up-Front Posting of Full-Fares During Purchasing | 12,406,783 | 170,776,744 |
| Taxes Now Included in Full-Fare as  Percent of Total Price | 5% | 5% |
| Average Price of Airfare (Domestic) | $228 | $228 |
| Average Price of Business Airfare (International) | $1,781 | $1,781 |
| Adjusted (by half) Average Price of Business Airfare (International) | $891 | $891 |
| Percentage of Passengers in U.S. Carrier Flights that are Domestic Flights | 88% | 88% |
| Weight Average Airfare for Passengers of U.S. Domestic Carriers | $307 | $308 |
| Revelation in Price ("Increase in Price") | $15 | $15 |
| National Level Elasticity for Air Travel Demand | (0.40) | (0.40) |
| Percentage Decrease in Demand | -2% | -2% |
| Change in Purchases | 347,390 | 4,781,749 |
| **Discounted Monetized Benefits from Elimination of Dead Weight Loss** | **$2,668,678** | **$27,061,521** |

Econometrica, Inc.                                                              April 8, 2011

Exhibit 12

# AIRLINE ENTRY FOLLOWING U.S. DEREGULATION:
# THE DEFINITIVE LIST OF STARTUP PASSENGER AIRLINES, 1979-2003

by

William A. Jordan[*]©
Professor Emeritus of Economics

Schulich School of Business
York University
Toronto, Canada

18331 Verano Place
San Diego, CA 92128-1240

wjordan@ucsd.edu

Paper for presentation at the 2005 Annual Meeting of the
TRANSPORTATION RESEARCH FORUM
## The George Washington University
### Washington, DC
### March 6-8, 2005

**ABSTRACT**

During the debate leading to airline deregulation, it was widely predicted that a number of new airlines would enter the scheduled passenger airline industry following the elimination of economic regulation of **inter**state operations by the Civil Aeronautics Board (CAB). These airlines would join the eleven trunk, eight local service, two Alaskan and two Hawaiian carriers that were authorized by the CAB to operate scheduled passenger service with jet aircraft at the time the *Airline Deregulation Act of 1978[92 Stat. 1705]* was adopted on October 24, 1978.

Over 25 years have passed since 1978 and it is well known that a great deal of entry has occurred. However, there have been incorrect statements regarding the actual number of such airlines. For example, the *Economist* (July 10, 2004, p. 59) contained the following statement regarding "America's airlines": "Of the 34 newcomers created after deregulation, 32 soon went bust." This paper will show that information is wrong by a factor of almost four; it does so by identifying and listing 129 "startup" airlines that inaugurated interstate scheduled passenger service with jet aircraft. Clearly, it is past time to publish a definitive list of startup airlines that entered the industry following the implementation of deregulation in late 1978, both to promote accurate reporting and to facilitate future research. The purpose of this paper is to provide such a list. Furthermore, it will identify which of those startup airlines emerged from existing airlines that the CAB had prohibited from providing interstate scheduled passenger service with large aircraft prior to 1978 – such as the former supplemental, air cargo, **intra**state and commuter carriers – and which were newly organized after deregulation. Finally, it also identifies those startup scheduled passenger airlines that operated independently of all other carriers and those which were affiliated with larger carriers.

One requirement for a new carrier to obtain an operating certificate under the much-reduced criteria of the *Airline Deregulation Act* has been for it to report traffic, financial and operating data on Form 41 or Form 298 schedules. Each carrier's data were then compiled and published -- initially by the CAB to 1984, and then by the Department of Transportation's Bureau of Transportation Statistics, Office of Airline Information. A few startup airlines may have never actually inaugurated operations, or have been so short-lived that they failed to file any reports before they disappeared. However, the great majority did file for varying periods. The carrier information in this paper is obtained from those filings. This means that not only did the carriers listed actually provide service, but also that consistent traffic and financial data are available to evaluate the performance of each carrier over all or most of its operating life.

1

## AIRLINE ENTRY FOLLOWING U.S. DEREGULATION:
## THE DEFINITIVE LIST OF STARTUP PASSENGER AIRLINES, 1979-2003

**INTRODUCTION**

2003 marked the end of a quarter century of airline deregulation following the adoption of the *Airline Deregulation Act of 1978 [92 Stat. 1705]* on October 24, 1978. The coming and going of many "startup" carriers have been noted by the media and in research reports, but incorrect total numbers of carriers have been noted in many of these sources. One glaring example of misreporting appeared in the *Economist* (July 10, 2004 p. 59), which contained the following statement regarding "America's airlines": "Of the 34 newcomers created after deregulation, 32 soon went bust." This paper will demonstrate that this number understates by a factor of almost four the total number of U.S. startup carriers that inaugurated interstate scheduled passenger service with jet aircraft. It does so simply by listing the 129 startup carriers that entered the industry following October 1978. Hopefully this will promote accurate reporting as well as facilitate research in the future.

**ORIGINAL AIRLINES**

One result of the economic regulation of U.S. airlines by the Civil Aeronautics Board (CAB) between 1938 and 1978 was the severe limitation on the entry of airlines into interstate **trunk, international or territorial** scheduled passenger services. Twenty-three of these "original" airlines received certificates of public convenience and necessity effective August 22, 1938 under the "grandfather" provisions of the *Civil Aeronautics Act of 1938 [52 Stat 973] Sec.401 (e)(1).[1]* From then through 1978 just four other airlines received comparable certificates for long-haul operations, all for international service.[2] No certificates for domestic interstate trunk service were issued after 1938 despite the fact that between 1950 and 1974 the CAB received 79 applications for permission to offer such service from firms outside the domestic scheduled passenger industry, most of which were dismissed without hearing.[3] As shown in Appendix A, by 1978, only eleven of the original trunk/international carriers remained in service, the others having been merged into the surviving certificated carriers.[4] All of these carriers operated only jet/turbojet aircraft by 1978.

Even though the CAB authorized only four new international carriers (and no new domestic trunk carriers) during its 40 years of full regulation, between 1942 and 1950 it did authorize entry by a series of small carriers consisting of 21 **local service** and 9 **Intra-Alaska** airlines, plus one **Intra-Hawaii** airline.[5] In addition, three more Intra-Alaska carriers were certificated in 1959, 1960 and 1976, bringing the total Intra-Alaska carriers to 12.[6] As the names of their categories imply, these carriers were limited to short-haul services between small towns and nearby cities, or within Alaska and Hawaii. Initially, none of these carriers was allowed to provide long-haul, trunk-type interstate service between larger cities. Instead, each carrier was awarded mainly monopoly routes for largely subsidized regional service and was protected by the CAB from entry by new airlines. Two of the Intra-Alaska carriers were authorized to fly to the "Lower 48 States" in 1951,[7] and, over time the local service carriers worked to reduce their various operating restrictions and to be allowed to operate larger aircraft.[8] By the 1978, eight local service, five Alaskan and the two Hawaiian carriers survived; with all but three small Intra-Alaska carriers operating at least some two-engine jet aircraft. Again, the attrition was via mergers, except for four local service carriers whose initial temporary operating certificates were not renewed.[9]

At the time the *Airline Deregulation Act* was adopted, the original certificated scheduled passenger carriers had operated for 40 years within the following regulatory environment with regards to entry: first, they were the only airlines authorized to operate large aircraft in scheduled **inter**state or international passenger service and; second, the entry of new airlines into each category was nonexistent or very limited after the initial period of entry for each category. This was due to the CAB's extremely high standards of "public convenience and necessity" and to its procedural practices which prevented many applications from even being heard.

Because of these CAB policies and because substantial exit did occur through mergers, by the end of 1978 only 26 of the 61 original certificated carriers remained in existence, 23 of which operated jet aircraft -- eleven trunk/international, eight local service, two Alaskan and two Hawaiian. Appendix A lists these 23 carriers and shows that only five of the eleven trunk/international carriers were still operating in 2003. This included United, which was operating under Chapter 11 bankruptcy at the end of 2003. Of the eight local service carriers, only US Airways remained, but it had recently emerged from Chapter 11 bankruptcy and was to reenter Chapter 11

bankruptcy for a second time in 2004.[10]  The four Alaskan/Hawaiian carriers did relatively better.  One airline (Wien) had gone bankrupt in 1984, leaving three still in business, with Hawaiian operating under Chapter 11 bankruptcy in 2003.[11]  In total, only nine (39 percent) of the 23 original certificated carriers operating jet aircraft in 1978 remained after 25 years of deregulation.[12]  Fourteen were no longer in business.

The above analysis shows  that most of the original certificated carriers did not survive under deregulation, but the analysis also shows that their survival wasn't too good under regulation as well.  Twenty-six airlines in 1978 out of the 61 original carriers means that only 43 percent survived after 40 years of regulation (23 jet operators plus the three Intra-Alaska non-jet operators).[13]  What was different between the two periods was not the relative extent of exit, but how it occurred.  Under regulation, so long as a carrier had a CAB operating certificate, exit was via merger.[14]  In contrast, under deregulation, while ten of the original carriers were merged into or acquired by other original carriers through 2003, the other four original carriers (Braniff, Eastern, Pan Am and Wien) terminated service through bankruptcy.[15]  This was a first for the industry.

Between 1979 and 1984 the CAB continued to be responsible for approving mergers prior to its disappearance on December 31, 1984 under the "sunset" provision of the 1978 Act[16]  During these years it approved the Pan Am/National, North Central/Southern, Republic/Hughes Air West and Continental/Texas International mergers.[17]  Obviously, if full economic regulation and mergers had both continued beyond 1984, eventually there would have been very few carriers left in the industry.  This could well have raised the issue of allowing the entry of new trunk-type carriers.  The 1978 Act solved that potential regulatory problem simply by lowering entry barriers to new airlines wishing to inaugurate scheduled passenger service with large jet aircraft.  This brings us to the "startup" airlines of the post-1978 era.

## STARTUP AIRLINES

The *Airline Deregulation Act* reduced the largely prohibitive barrier to entry of "public convenience and necessity" to the much lower and more objective barrier of "fit, willing, and able."  In essence, all an applicant had to do to obtain a certificate to operate large jet aircraft in scheduled passenger service was to demonstrate its financial and operational competence.  In addition, it had to conform to the statutory requirement to submit monthly traffic reports, quarterly financial reports and certain aircraft and personnel data on DOT Forms 41.[18]  This latter requirement is important to this paper because it was possible for a startup carrier to obtain an operating certificate but then either not inaugurate service, or operate so briefly that it didn't file any Form 41 reports with the DOT's Office of Airline Information (OAI) in the Bureau of Transportation Statistics (BTS).  **Thus, to be listed and counted in this paper, a startup carrier had both to obtain a certificate to operate domestic interstate, international or territorial scheduled passenger service with large jet aircraft AND to file traffic and financial data on Forms 41 reports with the OAI to demonstrate it actually provided such service.**

It is important to understand that there were additional CAB-regulated airlines operating in 1978 which were not allowed to provide scheduled passenger service with large aircraft.  After years of contention, the surviving post-World War II nonscheduled airlines had been organized into either the **supplemental** (charter) or scheduled **cargo** categories.  In addition, it happened that the 1938 Act did not provide the CAB with the authority to bar **intra**state carriers from operating scheduled passenger service with large aircraft solely within individual states.[19]  Finally the CAB exempted **air taxi/commuter** carriers from regulation providing they operated small aircraft carrying no more than 30 passengers or a 7,500-pound payload, and did not serve city-pairs where certificated carriers operated.[20]

The first startup carriers to inaugurate and report service did so in 1979.  Not surprisingly, they came mainly from these existing, but restricted airlines – four **intra**state carriers that expanded to start **inter**state service, three supplemental and two cargo carriers that added scheduled passenger service, and two new independent carriers (including Midway which applied for a certificate prior to the enactment of the 1978 Act and whose application was approved by the CAB effective September 9, 1978).[21]  All of these airlines operated large jet aircraft in domestic interstate and/or international service.  They are identified in Appendix B.  Together with the 23 original carriers, these eleven startup carriers yielded a total of 34 airlines operating jet aircraft during all or part of 1979.

Appendix B lists a total of 129 startup carriers that operated between 1979 and 2003. In addition to the existing four former intrastate and six former supplemental/cargo carriers, there were 96 **independent** startup carriers (almost 75 percent of the total) specifically organized at various times to take advantage of the reduced barriers to entry into the mainstream scheduled passenger industry. Finally, 23 **affiliated** airlines also operated during these years. Nineteen of these (excluding Aspen, Continental Micronesia, Presidential and US Air Shuttle) were former commuter carriers that joined the ranks of startup carriers when they introduced regional jet aircraft having 35 to 85 or more seats (such as the ERJ-135/145, CRJ-200/700 and BAe-146). Most of these affiliated carriers transported passengers from smaller communities to hub airports under various contracts with one or more large carriers – mainly original carriers, but including two independent startup carriers (America West and Midwest Airlines). Appendix B shows the entry of commuter carriers into jet operations began in 1983 and 1984, but expanded rapidly starting in 1993 with the introduction of the CRJ and, somewhat later, the ERJ jets.

It is beyond the scope of this paper to describe all of the startup carriers. Rather, its primary purpose is simply to list the 129 such carriers operating during the first 25 years of deregulation, and this is accomplished in Appendix B.[22] In addition to this listing, Appendix B also records the calendar years during which each carrier operated and filed one or more monthly traffic reports with the DOT. This makes it possible to determine how many were short-lived and how many had substantial periods of operation between 1979 and 2003. To facilitate analysis, each carrier's period of operation is specified in one of nine periods – the first includes all the carriers that inaugurated and terminated service within one calendar year, while the longer-lived carriers are assigned to one of the subsequent eight periods, each having a three-year interval.

Appendix B shows that the majority of startup carriers had short lives as interstate/international scheduled passenger airlines. Eighteen carriers operated entirely within one calendar year, while 55 lasted 2-4 years. Thus, out of the 129 startup carriers, 73 (57 percent) operated four years or less, 39 operated from five to ten years, and only 17 operated for more than a decade. Among the 96 independents, 65 (68 percent) terminated service within the first four years, 21 more operated five to ten years, and only ten operated for more than ten years. One reason so many of the 129 startup carriers had short lives is that 44 (over one-third) inaugurated service after 1993. These include the following nine of the 15 independent carriers that provided service in 2003: Air Tran, Allegiant, Frontier-2, JetBlue, North American, Pan Am-3, Sun Country, Sunworld, and USA 3000. In addition, 14 out of 18 affiliated carriers operating at the end of 2003 introduced jet aircraft after 1993. With regards to potential long-lived carriers, since eleven startup carriers inaugurated service in 1979 that is the maximum number that could have operated for the full 25 years. Only one, Southwest, managed to do so. However, four other carriers operated 20 to 22 years by 2003 – America West, Midwest, Air Wisconsin and Horizon.

The large number of original and startup airlines that left the industry between 1979 and 2003 might lead some to think the U.S. airline industry was chaotic and that fewer airlines were in operation at the end of 25 years of deregulation than at the start. Neither situation occurred. While some passengers were doubtless inconvenienced and may have lost the price of a ticket when airlines went out of business unexpectedly, the fact is that large amounts of service were available at all times. In 1978, the system-scheduled capacity of all passenger airlines operating jet aircraft totaled 375 billion available seat-miles (ASM), 337 billion of which (90 percent) were produced by the eleven trunk carriers.[23] In 2000 (the peak year before the adverse impact of 9/11), system scheduled ASM for the industry totaled 966 billion, with 708 billion (73 percent) being produced by the five remaining trunk carriers.[24] This was an increase of 187 percent for the industry and 110 percent for all trunk carriers. Obviously, the reduction in the total number of trunk carriers meant the five surviving trunks grew much more than 110 percent. American, for example, grew 254 percent. However, as a group, the former trunk carriers lost 17 percentage-points in capacity share. This occurred even though system data include international operations where bilateral agreements provide original carriers with some protection from the entry of startup carriers. Appendix B also shows that, in contrast to the 23 original carriers operating jets in 1978, 34 original and startup carriers operated jets in 1979 and 43 operated during 2003. Overall, between 28 and 63 carriers operated jet aircraft in each of the intervening years.[25]

**UNOFFICIAL NAMES**

A number of unofficial names have been used since 1978 to differentiate the original airlines from the startup airlines. For example, "network," "hub-and-spoke," and "legacy" referred to the original trunk/international carriers, as well as the local service and Alaskan/Hawaiian carriers as they grew in size. In contrast, the startup

airlines have been referred to as "upstart" or "low-cost" carriers. "Upstart," of course, has negative connotations and was probably used by those who favored the original carriers. "Low-cost," in contrast, while not pejorative, is not inclusive.  A number of the startup carriers were organized to offer high-quality service that required high operating costs. Carriers such as Legend, McClain, MGM Grand and Ultrair are examples, but they tended to be short-lived. Midwest is another example, but it proved to be long-lived while providing all business-class service for much of its 20-year history. However, the recent reduction in demand for business-class service caused Midwest to inaugurate lower-cost (and lower-price) coach service in August 2003.[26] Finally, virtually all of the affiliated carriers were inherently high-cost operators due to their operating smaller propeller and regional jet aircraft.  This paper has used the word "startup" to refer to the carriers inaugurating interstate/international scheduled passenger service with jet aircraft after 1978 because it is inclusive and is not pejorative. "Original" is also an inclusive, non-judgmental word which focuses on the fact that those carriers were generally among the earliest of the scheduled airlines operating large aircraft. As such, the CAB regulated them.

**CONCLUSIONS**

The main purpose of this paper is to provide an inclusive list of airlines that entered the U.S. interstate/international scheduled passenger industry with large jet aircraft following the adoption of the *Airline Deregulation Act of 1978*. The 129 carriers that entered the industry between 1979 and 2003 are listed in Appendix B.  Based on years of research using the specified sources, it is believed that this list is inclusive and definitive (but see endnotes 11 and 22.)

This paper also demonstrates that entry into the interstate/international scheduled passenger industry with large aircraft was limited under the CAB's economic regulation. Indeed, entry into the dominant trunk category was nonexistent, while only four new carriers were allowed into the international category, two of which were very small and short-lived. Only in the new local service, Intra-Alaska and Intra-Hawaii categories were there significant entry, but those carriers were small and restricted and not until the last decade of regulation were they allowed to provide limited competition to domestic trunk carriers. The entry of the 129 startup carriers between 1979 and 2003 provides evidence of just how restrictive CAB regulation was.

Substantial exit from the industry occurred under both environments. The main difference was that merger was the mode of exit under deregulation while, under deregulation, exit also occurred though, bankruptcies, simple business terminations and transfers to nonscheduled service. Despite the large numbers of carriers that ceased scheduled operations after 1978, during the succeeding 25 years the U.S. traveling public had an ample supply of scheduled passenger service and a larger number of airlines to supply it in a more competitive market structure.

---

[*] The support of the Earhart Foundation and the Social Sciences and Humanities Research Council is gratefully acknowledged. The personnel at the Office of Aviation Information, Bureau of Transportation Statistics, U.S. Department of Transportation were of immense assistance in making available public documents on small and obscure airlines, as well as late-filed reports that were not included in official publications.

[1] These consisted of 19 domestic carriers (16 of which became trunks), three international, and one territorial carrier. U.S. Senate, Civil Aeronautics Board Practices and Procedures, Report of the Subcommittee on Administrative Practices and Procedures of the Committee of the Judiciary (1975), p. 216. Also, Civil Aeronautics Board, Handbook of Airline Statistics, 1962 ed. (October 1962), pp. 1-2, 331 and 481.

[2] These were American Export Airlines (7/12/40), South Pacific Air Lines (8/15/53), Samoan Airlines (4/9/54) and Trans Caribbean Airways (1/14/58). American Export was acquired by American Airlines (6/1/45) and later sold to Pan American (9/9/50); South Pacific operated from 1960 to 1963 before its route was awarded to Pan American 8/6/64; Samoan operated briefly during 1959-60 before its certificate ceased to be effective (6/23/64); and Trans Caribbean operated from 1958 to 1971 when it was merged into American Airlines (3/2/71). Civil Aeronautics Board, Airline Statistics Handbook (1946-1952), (no date), p.11;  Handbook of Airline Statistics,-- 1961 ed. (December 1961) p. I-2; 1962 ed, (October 1962), pp. 481 and 488; 1973 ed. (March 1974), pp. 568-569.

[3] *Supra,* note 1, U.S. Senate, pp. 6-9 and 217-20. This failure to issue operating certificates to new carriers was inconsistent with statements by the sponsors of the Bill, Senators McCarran and Truman, as well by the president

of the Air Transport Association, Colonel Gorrell, that new airlines would be allowed to provide such service (see U.S. Senate, pp. 80-81).

[4] For a analysis of mergers authorized by the CAB, see William A. Jordan, "Problems Stemming from Airline Mergers and Acquisitions," Transportation Journal, (Summer 1988), pp. 9-30.

[5] Supra note 1, Civil Aeronautics Board, pp. 1-2, 482-83 and 515-16; and U.S. Senate, pp. 221-22. Even though the CAB handbooks report that 21 Intra-Alaska carriers were certificated in 1948, the same publications show that no more than nine of these carriers ever reported certificated operations in any one calendar year -- see Civil Aeronautics Board, Handbook of Airline Statistics, 1973 ed. (March 1974), p. 9.

[6] Civil Aeronautics Board, Handbook of Airline Statistics, 1961 ed. (December 1961), pp. I-1 and 2; and Supplement to the Handbook of Airline Statistics (December 1977), p. 1. These three additional carriers did not cause the total Intra-Alaska carriers to exceed the total of nine achieved in 1950. Therefore, it appears that the actual number of Intra-Alaska carriers certificated and operating is 12, not 21 or 24(see note 5). Seven of these12 carriers merged with other airlines between 1956 and 1973. Civil Aeronautics Board, Handbook of Airline Statistics, 1973 ed. (March 1974), pp. 568-69; and Handbook of Airline Statistics 1975 Supplement (November 1975), p. 177.

[7] Alaska Airlines and Pacific Northern Airlines. Civil Aeronautics Board, Handbook of Airline Statistics, 1949-56, (June 1960), pp. 47 & 58. Two very small "other" carriers (Aspen and Wright) also obtained CAB operating certificates in 1967 and 1972 for short-haul service between Denver and Aspen, and between Detroit and Cleveland lakefront airports (pp. 1-2). Also, two small "regional" carriers (Air Midwest and Air New England) were certificated in 1975-76. None of these four carriers operated jet aircraft prior to 1979. Civil Aeronautics Board, Supplement to the Handbook of Airline Statistics (December 1977), p. 1.

[8] Subpart M of Part 302 of the CAB's regulations was adopted on January 15, 1968. It provided for expedited procedures for modifying local service carriers' certificate restrictions. Civil Aeronautics Board, Handbook of Airline Statistics, 1973 ed. (March 1974), p. 524.

[9] Ibid, pp. 568-70; and Supra note 4.

[10] Aviation Week & Space Technology (September 20, 2004), pp. 39-41.

[11] Aviation Week & Space Technology: Wien -- (December 3, 1984), p. 31; Hawaiian – (March 31, 2003), pp.29-30. Brief news articles about a "New Wien" were published in AW&ST, (March 25, 1985), p. 31, (November. 4, 1985), p. 30 and (December 23, 1985), p. 35. That company did not file any traffic or financial reports with the DOT and, therefore, is not included in this paper and is not listed in Appendix B. The Dec. 1985 article reported that "New Wien" had been shut down by DOT order and entered Chapter 11 bankruptcy in early November.

[12] Beginning with January 1981, the CAB changed the certificated carrier categories to "majors, nationals, and regionals (large, medium or small)" with each carrier being assigned to a category depending on the size of its annual total transportation revenues -- majors included carriers with total transportation revenues exceeding one billion dollars, nationals from 100 million to one billion, and regionals various amounts under 100 million dollars. (Civil Aeronautics Board, Air Carrier Traffic Statistics, (December 31, 1981) p. ii. The then surviving trunk/international carriers all became major carriers and many of the other original carriers progressed into that category as they expanded through internal growth and/or merger, and as inflation served to increase revenues in general. This paper, however, continues to use the original CAB categories (trunk/international, local service and Alaskan/Hawaiian) to show the attrition after 1978 among the original carriers in each historical category.

[13] The two "other" and two "regional" carriers are not included in this total nor in the calculation.

[14] Supra note 4.

[15] Braniff – "Paul K. Martin, editor, The Airline Handbook, 1983-84 ed. (Cranston, RI, December 1983), p. 149.; Eastern -- Aviation Week & Space Technology (January 28, 1991), pp. 64-65; Pan American – dotlibrary.dot.gov/ historian/chronology.htm.;  Wien – Aviation Week & Space Technology (December 3, 1984), p. 31.

[16] Sec. 1601 [92 Stat.1744]

[17] Supra. note 4, pp. 10-15.

[18] Sec. 407 [72 Stat.766.]  Commuter carriers had a similar requirement to submit much more limited traffic and Financial reports on DOT Forms 298.

[19] William A. Jordan, Airline Regulation in America:  Effects and Imperfections (Baltimore:  The Johns Hopkins Press, 1970), p. 80.

[20] Supra note 1, 1973 ed., pp. 1-2 for supplemental and cargo carriers; and  pp. 515 and 530 for commuters.  The inability of the CAB to regulate California intrastate carriers is describe in, William A. Jordan, Airline Regulation in America, Effects and Imperfections (Baltimore:  The Johns Hopkins Press, 1970), pp. 15-17. The Airline Deregulation Act also liberalized the exemption restriction on aircraft size for commuter carriers from 30 passengers to 55 passengers, which the CAB soon extended to 60 passengers – Section 416 (b)(4) [92 Stat 1731].  As will be shown, the introduction of 35 to 50-seat regional jet aircraft in 1993 brought commuter carriers into the category of startup carriers operating large aircraft – large according to the definition in effect in 1972-78.

[21] Civil Aeronautics Board, Supplement to the Handbook of Airline Statistics, (November, 1979), p. 2.  This source also lists 13 carriers that received certificates after October 24, 1978.  None reported operations in 1978.

[22] One possible startup carrier is not listed in Appendix B under the affiliated carrier category.  That is Pace Airlines which, during 2003 and on into 2004, operated scheduled passenger service for Air Tran between Atlanta and Los Angeles.  Pace's 737-800 aircraft were able to operate nonstop between these two cities, something Air Tran's 717 aircraft were unable to do on a regular basis.   Air Tran provided the marketing and passenger/ground handling for this service, while Pace simply provided the aircraft and crew.  From Pace's perspective, this limited arrangement appears to be more like a wet lease or public charter than scheduled service by an affiliated carrier.  However, OAI policy required Pace to report this traffic under scheduled service, and also required Air Tran to report the same traffic as part of its totals.  If the reader decides Pace's service was actually scheduled, then the total number of startup carriers should be increased to 130, with the affiliated category being raised to 24.  At the same time, one should exclude Pace's scheduled traffic from industry and startup carrier totals to prevent double counting since this traffic is also included in Air Tran's data.  (Discussion with OAI personnel. July 6, 2004).

[23] Supra note 21, p. 7. Also, Air California, Air Florida, PSA and Southwest, Annual Reports, 1978  (various pages).

[24] U.S. Department of Transportation, Air Carrier Traffic Statistics (December 2001/2000), various pages;  and Air Carrier Industry Scheduled Service Traffic Statistics (Fourth Quarter, December 2000/1999), revised edition, various pages.

[25] William A. Jordan, "Airline Entry, Exit and Market Shares Following Deregulation," Transportation Research Forum, Proceedings – 37th Annual Meeting (October, 1995), p. 225.  Also, Ibid.,  (December 1995-2002).

[26] Aviation Week & Space Technology (June 2, 2003),  p. 15.

APPENDIX  A

ORIGINAL CERTIFICATED CARRIERS OPERATING JET AIRCRAFT IN SCHEDULED PASSENGER SERVICE
U.S. AIRLINE ENTRY AND EXIT, 1979-2003

| Airline | Operating After 1978 | | Years of Operation Between 1979 and 2003 | | | | | | | | | Operating in | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Dates | Years | 1 | 2-4 | 5-7 | 8-10 | 11-13 | 14-16 | 17-19 | 20-22 | 23-25 | 1979 | 2003 |
| **Trunks/International** | | | | | | | | | | | | | |
| American | 1979-2003+ | 25 | | | | | | | | | 1 | X | X |
| Braniff | 1979-1982 | 4 | | 1 | | | | | | | | X | |
| Continental | 1979-2003+ | 25 | | | | | | | | | 1 | X | X |
| Delta | 1979-2003+ | 25 | | | | | | | | | 1 | X | X |
| Eastern | 1979-1991 | 13 | | | | | 1 | | | | | X | |
| National | 1979 | 1 | 1 | | | | | | | | | X | |
| Northwest | 1979-2003+ | 25 | | | | | | | | | 1 | X | X |
| Pan American | 1979-1991 | 13 | | | | | 1 | | | | | X | |
| Trans World | 1979-2001 | 23 | | | | | | | | | 1 | X | |
| United | 1979-2003+ | 25 | | | | | | | | | 1 | X | X |
| Western | 1979-1987 | 9 | | | | 1 | | | | | | X | |
| Total Trunks | 11 | | | | | | | | | | | 11 | 5 |
| **Local Service** | | | | | | | | | | | | | |
| Frontier | 1979-1986 | 8 | | | | 1 | | | | | | X | |
| Ozark | 1979-1986 | 8 | | | | 1 | | | | | | X | |
| Piedmont | 1979-1989 | 11 | | | | | 1 | | | | | X | |
| Hughes Air West | 1979-1980 | 2 | | 1 | | | | | | | | X | |
| Republic | 1979-1986 | 8 | | | | 1 | | | | | | X | |
| Southern | 1979 | 1 | 1 | | | | | | | | | X | |
| Texas International. | 1979-1982 | 4 | | 1 | | | | | | | | X | |
| USAirways/Allegheny | 1979-2003+ | 25 | | | | | | | | | 1 | X | X |
| Total Local Service | 8 | | | | | | | | | | | 8 | 1 |
| **Alaskan/Hawaiian** | | | | | | | | | | | | | |
| Alaska | 1979-2003+ | 25 | | | | | | | | | 1 | X | X |
| Wien | 1979-1984 | 6 | | | 1 | | | | | | | X | |
| Aloha | 1979-2003+ | 25 | | | | | | | | | 1 | X | X |
| Hawaiian | 1979-2003+ | 25 | | | | | | | | | 1 | X | X |
| Total AK/HI | 4 | | | | | | | | | | | 4 | 3 |
| **Total Original** | 23 | | 2 | 3 | 1 | 4 | 3 | | | | 10 | 23 | 9 |

Note:  +Carrier operating beyond 2003.

Sources:  U.S. DOT, Bureau of Transportation Statistics, Office of Airline Information (including previous CAB editions):
Air Carrier Financial Statistics, (various editions, 1979-2003).
Air Carrier Traffic Statistics, (various editions, 1979-2003).

8

APPENDIX B

U.S. AIRLINE ENTRY AND EXIT, 1979-2003
STARTUP CARRIERS OPERATING JET AIRCRAFT IN SCHEDULED PASSENGER SERVICE

| Airline | Operating After 1978 Dates | Years | 1 | 2-4 | 5-7 | 8-10 | 11-13 | 14-16 | 17-19 | 20-22 | 23-25 | 1979 | 2003 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Intrastate** | | | | | | | | | | | | | |
| Air Cal | 1979-1987 | 9 | | | | 1 | | | | | | X | |
| Air Florida | 1979-1984 | 6 | | | 1 | | | | | | | X | |
| PSA | 1979-1988 | 10 | | | | 1 | | | | | | X | |
| Southwest | 1979-2003+ | 25 | | | | | | | | | 1 | X | X |
| Total Intrastate | | 4 | | | 1 | 2 | | | | | 1 | 4 | 1 |
| | | | | | | | | | | | | | |
| **Supplemental/Cargo** | | | | | | | | | | | | | |
| Capitol | 1979-1984 | 6 | | | | 1 | | | | | | X | |
| Evergreen | 1980-1981 | 2 | | 1 | | | | | | | | | |
| Flying Tigers | 1979-1983 | 2 | | 1 | | | | | | | | X | |
| Seaboard World | 1979 | 1 | 1 | | | | | | | | | X | |
| Transamerica | 1979-1985 | 7 | | | 1 | | | | | | | X | |
| World | 79-86/95-96 | 10 | | | | 1 | | | | | | X | |
| Total Supple./Cargo | | 6 | 1 | 2 | 2 | 1 | | | | | | 5 | 0 |
| | | | | | | | | | | | | | |
| **Independent** | | | | | | | | | | | | | |
| Accessair | 1999 | 1 | 1 | | | | | | | | | | |
| Air America/Total | 1985-1989 | 5 | | | 1 | | | | | | | | |
| Air Atlanta | 1984-1987 | 4 | | 1 | | | | | | | | | |
| Air Hawaii | 1985-1986 | 2 | | 1 | | | | | | | | | |
| Air Illinois* | 1982-1984 | 3 | | 1 | | | | | | | | | |
| Air One | 1983-1984 | 2 | | 1 | | | | | | | | | |
| Air South | 1994-1997 | 4 | | 1 | | | | | | | | | |
| Air 21 | 1995-1996 | 2 | | 1 | | | | | | | | | |
| Airpac* | 1984-1985 | 2 | | 1 | | | | | | | | | |
| AirTran | 1994-2003+ | 10 | | | | 1 | | | | | | | X |
| All Star | 1985 | 1 | 1 | | | | | | | | | | |
| Allegiant | 2000-2003+ | 4 | | 1 | | | | | | | | | X |
| Altair* | 1980-1982 | 3 | | 1 | | | | | | | | | |
| America West | 1983-2003+ | 21 | | | | | | | | 1 | | | X |
| American Int'l. * | 1982-1984 | 3 | | 1 | | | | | | | | | |
| Arrow Air | 1982-1986 | 5 | | | 1 | | | | | | | | |
| ATA/Amer. Trans Air | 1986-2003+ | 18 | | | | | | | 1 | | | | X |
| Atlantic Gulf | 1984-1986 | 3 | | 1 | | | | | | | | | |
| Best | 1982-1985 | 4 | | 1 | | | | | | | | | |
| Braniff-2 | 1984-1989 | 6 | | | 1 | | | | | | | | |
| Braniff-3 | 1991-1992 | 2 | | 1 | | | | | | | | | |
| Britt* | 1984-1987 | 4 | | 1 | | | | | | | | | |

APPENDIX  B (Continued)

| Airline | Operating After 1978 Dates | Years | 1 | 2-4 | 5-7 | 8-10 | 11-13 | 14-16 | 17-19 | 20-22 | 23-25 | Operating in 1979 | 2003 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Independent (continued)** | | | | | | | | | | | | | |
| Carnival | 1989-1998 | 10 | | | | 1 | | | | | | | |
| Cascade* | 1984-1985 | 2 | | 1 | | | | | | | | | |
| Casino Express | 1991-2003+ | 13 | | | | | 1 | | | | | | X |
| Challenge Air Trans. | 1985-1986 | 2 | | 1 | | | | | | | | | |
| Challenge Air Int'l. | 1986-1987 | 2 | | 1 | | | | | | | | | |
| Discovery | 1990 | 1 | 1 | | | | | | | | | | |
| Eastwind | 1995-1999 | 5 | | | 1 | | | | | | | | |
| Emerald* | 82-84/1989 | 4 | | 1 | | | | | | | | | |
| Empire* | 1980-1986 | 7 | | | 1 | | | | | | | | |
| Florida Express | 1984-1989 | 6 | | | 1 | | | | | | | | |
| Frontier-2 | 1994-2003+ | 10 | | | | 1 | | | | | | | X |
| Frontier Horizon/Skybus | 1984-1986 | 3 | | 1 | | | | | | | | | |
| Grand | 1994-1995 | 2 | | 1 | | | | | | | | | |
| Great American | 1994-1996 | 3 | | 1 | | | | | | | | | |
| Guy America | 1981-1983 | 3 | | 1 | | | | | | | | | |
| Hawaii Express | 1982-1983 | 2 | | 1 | | | | | | | | | |
| Jet America | 1981-1987 | 7 | | | 1 | | | | | | | | |
| Jet Charter | 1985 | 1 | 1 | | | | | | | | | | |
| JetBlue | 2000-2003+ | 4 | | 1 | | | | | | | | | X |
| JetTrain | 1996 | 1 | 1 | | | | | | | | | | |
| Key | 1992 | 1 | 1 | | | | | | | | | | |
| Kiwi | 1992-1999 | 8 | | | | 1 | | | | | | | |
| Laker | 1996-1997 | 2 | | 1 | | | | | | | | | |
| Legend | 2000 | 1 | 1 | | | | | | | | | | |
| Markair* | 1984-1995 | 12 | | | | | 1 | | | | | | |
| McClain | 1986-1987 | 2 | | 1 | | | | | | | | | |
| MGM Grand | 87-92/94-95 | 8 | | | | 1 | | | | | | | |
| Mid Pacific* | 1985-1987 | 3 | | 1 | | | | | | | | | |
| Midway | 1979-1991 | 13 | | | | | 1 | | | | | X | |
| Midway-2 | 1993-2003 | 11 | | | | | 1 | | | | | | X |
| Midway Express | 1984-1985 | 2 | | 1 | | | | | | | | | |
| Midwest Exp./Airlines | 1984-2003+ | 20 | | | | | | | | 1 | | | X |
| Morris Air | 1993-1994 | 2 | | 1 | | | | | | | | | |
| National-2/Private Jet | 1994-1995 | 2 | | 1 | | | | | | | | | |
| National-3 | 1999-2002 | 4 | | 1 | | | | | | | | | |
| Nations Air | 95-96/98-99 | 4 | | 1 | | | | | | | | | |
| New York Air | 1980-1986 | 7 | | | 1 | | | | | | | | |
| North American | 2000-2003+ | 4 | | 1 | | | | | | | | | X |
| Northeastern | 1982-1985 | 4 | | 1 | | | | | | | | | |

APPENDIX  B (Continued)

| Airline | Operating After 1978 Dates | Years | 1 | 2-4 | 5-7 | 8-10 | 11-13 | 14-16 | 17-19 | 20-22 | 23-25 | 1979 | 2003 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Independent (continued)** | | | | | | | | | | | | | |
| Ozark-2/Great Plains | 2000-2001 | 2 | | 1 | | | | | | | | | |
| Pacific East | 1982-1984 | 3 | | 1 | | | | | | | | | |
| Pacific Express | 1982-1984 | 3 | | 1 | | | | | | | | | |
| Pacific Interstate | 1984-1985 | 2 | | 1 | | | | | | | | | |
| Pan Am-2 | 1997-1998 | 2 | | 1 | | | | | | | | | |
| Pan Am-3 | 2000-2003+ | 4 | | 1 | | | | | | | | | X |
| People Express | 1981-1986 | 6 | | | 1 | | | | | | | | |
| Pilgrim* | 1984-1987 | 4 | | 1 | | | | | | | | | |
| Prestige/Paradise | 1995-1997 | 3 | | 1 | | | | | | | | | |
| Pride Air | 1985 | 1 | 1 | | | | | | | | | | |
| Pro Air | 1997-2000 | 4 | | 1 | | | | | | | | | |
| Reeve* | 1984-2000 | 17 | | | | | | | 1 | | | | |
| Regent Air | 1983-1985 | 3 | | 1 | | | | | | | | | |
| Reno Air | 1992-1999 | 8 | | | | 1 | | | | | | | |
| Royal West | 1986-1987 | 2 | | 1 | | | | | | | | | |
| Royale* | 1984 | 1 | 1 | | | | | | | | | | |
| Samoa | 1985 | 1 | 1 | | | | | | | | | | |
| Skystar | 1986 | 1 | 1 | | | | | | | | | | |
| South Pacific | 1981-1986 | 6 | | | 1 | | | | | | | | |
| Southeast | 1979 | 1 | 1 | | | | | | | | | X | |
| Spirit | 1992-2003+ | 12 | | | | | 1 | | | | | | X |
| Sun Coast | 1987 | 1 | 1 | | | | | | | | | | |
| Sun Country | 1999-2003+ | 5 | | | 1 | | | | | | | | X |
| Sunworld | 1996-2003+ | 8 | | | | 1 | | | | | | | X |
| Tower Air | 1983-2000 | 18 | | | | | | | 1 | | | | |
| Transtar/Muse | 1981-1987 | 7 | | | 1 | | | | | | | | |
| Tristar | 1995-1996 | 2 | | 1 | | | | | | | | | |
| Trump Shuttle | 1989-1992 | 4 | | 1 | | | | | | | | | |
| Ultrair | 1993-1994 | 2 | | 1 | | | | | | | | | |
| US Africa (Int'l.) | 1994-1995 | 2 | | 1 | | | | | | | | | |
| USA 3000 | 2003+ | 1 | 1 | | | | | | | | | | X |
| Valujet | 1993-1998 | 6 | | | 1 | | | | | | | | |
| Vanguard | 1994-2002 | 9 | | | | 1 | | | | | | | |
| Western Pacific | 1995-1998 | 4 | | 1 | | | | | | | | | |
| Worldwide/Leisure | 1994 | 1 | 1 | | | | | | | | | | |
| Total Independent | | 96 | 15 | 50 | 13 | 8 | 5 | 0 | 3 | 2 | 0 | 2 | 15 |

11

APPENDIX B (Continued)

| Airline | Operating After 1978 Dates | Years | 1 | 2-4 | 5-7 | 8-10 | 11-13 | 14-16 | 17-19 | 20-22 | 23-25 | Operating in 1979 | 2003 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Affiliated** | | | | | | | | | | | | | |
| Air Wisconsin* | 1983-2003+ | 21 | | | | | | | | 1 | | | X |
| American Eagle* | 1998-2003+ | 6 | | | 1 | | | | | | | | X |
| Aspen * | 1984-1991 | 8 | | | | 1 | | | | | | | |
| Atlantic Coast* | 1997-2003+ | 7 | | | 1 | | | | | | | | X |
| Atlantic Southeast* | 1996-2003+ | 8 | | | | 1 | | | | | | | X |
| Business Express* | 1989-1996 | 8 | | | | 1 | | | | | | | |
| Chautauqua* | 1998-2003+ | 6 | | | 1 | | | | | | | | X |
| Comair* | 1993-2003+ | 11 | | | | | 1 | | | | | | X |
| Cont. Exp./Express Jet* | 1997-2003+ | 7 | | | 1 | | | | | | | | X |
| Continental Micronesia | 1993-2003+ | 11 | | | | | 1 | | | | | | X |
| Freedom Air | 2002-2003+ | 2 | | 1 | | | | | | | | | X |
| Horizon Air* | 1984-2003+ | 20 | | | | | | | | 1 | | | X |
| Mesa* | 1995-2003+ | 9 | | | | 1 | | | | | | | X |
| Mesaba* | 1997-2003+ | 7 | | | 1 | | | | | | | | X |
| Pinnacle/Express I | 2003+ | 1 | 1 | | | | | | | | | | X |
| Presidential | 1985-1989 | 5 | | 1 | | | | | | | | | |
| PSA-2. | 2003+ | 1 | 1 | | | | | | | | | | X |
| Republic-2 (Holdings) | 2002-2003+ | 2 | | 1 | | | | | | | | | X |
| Skyway/Astral* | 1999-2003+ | 5 | | | 1 | | | | | | | | X |
| Sky West* | 1994-2003+ | 10 | | | | 1 | | | | | | | X |
| Trans States* | 1998-2003+ | 6 | | | 1 | | | | | | | | X |
| USAir Shuttle | 1992-2000 | 9 | | | | 1 | | | | | | | |
| Westair* | 1988-1993 | 6 | | | 1 | | | | | | | | |
| Total Affiliated | | 23 | 2 | 3 | 8 | 6 | 2 | 0 | 0 | 2 | 0 | 0 | 18 |
| | | | | | | | | | | | | | |
| **Total Startup Carriers** | | 129 | 18 | 55 | 24 | 17 | 7 | 0 | 3 | 4 | 1 | 11 | 34 |
| Cumulative Total | | | 18 | 73 | 97 | 114 | 121 | 121 | 124 | 128 | 129 | | |

**Total of Original and Startup Carriers Operating in 1979 and 2003** 34 43

Note:  *Carrier operated propeller aircraft, as well as jet aircraft, during all or part of these years.
        +Carrier operating beyond 2003.

Sources:  U.S. DOT, Bureau of Transportation Statistics, Office of Airline Information (including previous CAB editions):
            Air Carrier Financial Statistics, (various editions, 1979-2003).
            Air Carrier Traffic Statistics, (various editions, 1979-2003).
            Air Carrier Industry Scheduled Service Traffic Statistics, (various editions, 1979-2003)
            Forms 41 and Forms 298 for individual carriers (various reports, 1979-2003).
        Appendix A.